UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

22 CV 10959

(1) Dr. Karolina Maria, Marciniak-Dominguez Goncalves Agra
(2) Mr. Pedro Henrique, Marciniak-Dominguez Goncalves Agra
("Agras")

_____

Write the full name of each plaintiff.

_____CV_____
(Include case number if one has been
assigned)

-against-

(1)  CENTER FOR BRAIN, MINDS AND MACHINES AT MASSACHUSETTS
INSTITUTE OF TECHNOLOGY
(2) MASSACHUSETTS INSTITUTE OF TECHNOLOGY
(3) HARVARD UNIVERSITY AND THE PRESIDENT AND FELLOWS OF
HARVARD COLLEGE
(4) BOSTON CHILDREN'S HOSPITAL
(5) MARINE BIOLOGICAL LABORATORY
(6) UNIVERSITY OF CHICAGO
(7) ROCKEFELLER UNIVERSITY
(8) NATIONAL SCIENCE FOUNDATION (NSF)

Write the full name of each defendant. If you need more
space, please write "see attached" in the space above and
attach an additional sheet of paper with the full list of
names. The names listed above must be identical to those
contained in Section II.

**COMPLAINT**

Do you want a jury trial?
☑ Yes    ☐ No

---

### NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed
with the court should therefore *not* contain: an individual's full social security number or full
birth date; the full name of a person known to be a minor; or a complete financial account
number. A filing may include *only*: the last four digits of a social security number; the year of
an individual's birth; a minor's initials; and the last four digits of a financial account number.
See Federal Rule of Civil Procedure 5.2.

Rev. 1/9/17

## I.   BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

- ☑ **Federal Question**
- ☑ **Diversity of Citizenship**

## A.   If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?

(see attached)

_____

_____

_____

_____

## B.   If you checked Diversity of Citizenship

### 1.   Citizenship of the parties

Of what State is each party a citizen?

The plaintiff , <u>(1) Dr. Karolina Maria, Marciniak-Domingues Goncalves Agra</u> , is a citizen of the State of
(Plaintiff's name)

New York
_____
(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

Poland
_____ .

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

Page 2

If the defendant is an individual:

The defendant, _____, is a citizen of the State of
                    (Defendant's name)

_____

or, if not lawfully admitted for permanent residence in the United States, a citizen or
subject of the foreign state of

_____ .

If the defendant is a corporation:

The defendant, Center for Brain Minds and Machines at MIT , is incorporated under the laws of

the State of  multistate _____

and has its principal place of business in the State of  Massachusetts _____

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in _____ .

If more than one defendant is named in the complaint, attach additional pages providing
information for each additional defendant.

## II. PARTIES

### A. Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional
pages if needed.

(1) Karolina          Maria          Marciniak-Domingues Goncalves Agra

First Name         Middle Initial      Last Name

500 E 63rd Str, Apt 13F

Street Address

New York, New York          NY          10065

County, City          State          Zip Code

9732167339          marciniak.kar@gmail.com

Telephone Number          Email Address (if available)

Page 3

## B.  Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:  Center for Brains Minds and Machines

| First Name | Last Name | |
|---|---|---|
| Kathleen Sullivan (Managing Director) | | |

| Current Job Title (or other identifying information) | | |
|---|---|---|
| McGovern Institute for Brain Research at MIT,43 Vassar St., MIT Bldg. 46, Rm. 46-5169 | | |

| Current Work Address (or other address where defendant may be served) | | |
|---|---|---|
| Middlesex, Cambridge | MA | 02139 |
| County, City | State | Zip Code |

Defendant 2:  MASSACHUSETTS INSTITUTE OF TECHNOLOGY

| First Name | Last Name | |
|---|---|---|
| Office of the General Counsel | | |

| Current Job Title (or other identifying information) | | |
|---|---|---|
| 77 Massachusetts Avenue, 7-206, | | |

| Current Work Address (or other address where defendant may be served) | | |
|---|---|---|
| Middlesex, Cambridge | MA | 02139-4307 |
| County, City | State | Zip Code |

Defendant 3:  HARVARD UNIVERSITY AND THE PRESIDENT AND FELLOWS OF HARVA

| First Name | Last Name | |
|---|---|---|
| HARVARD UNIVERSITY OFFICE OF THE GENERAL COUNSEL | | |

| Current Job Title (or other identifying information) | | |
|---|---|---|
| Richard A. and Susan F. Smith Campus Center, 1350 Massachusetts Avenue, Suite 980 | | |

| Current Work Address (or other address where defendant may be served) | | |
|---|---|---|
| Middlesex, Cambridge | MA | 02138-3834 |
| County, City | State | Zip Code |

Defendant 4:        **BOSTON CHILDREN'S HOSPITAL**

First Name                        Last Name

**Kevin Churchwell CEO**

Current Job Title (or other identifying information)

**300 Longwood Avenue**

Current Work Address (or other address where defendant may be served)

**Suffolk, Boston**              **MA**              **02115**

County, City                      State                Zip Code

## III. STATEMENT OF CLAIM

Place(s) of occurrence: _____

Date(s) of occurrence: _____

## FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

From 2013 until 2023, CBMM Defendants have been sharing common business interests by running the Center for Brains, Minds & Machines (CBMM), a multi-institutional Science and Technology Center enterprise, heavily financed from federal funds through the National Science Foundation. In 2014, CBMM Defendants recruited Plaintiff and in 2016 hired Plaintiff to work in the CBMM as a scientist. In 2017, Plaintiff fell a victim of rape by employee of CBMM Defendants in position of authority for Plaintiff, while Plaintiff was at CBMM work, delegated by CBMM Defendants. Subsequent to the 2017 sexual assault event and to the continuous sexual harassment from the side of two perpetrators (the second being her direct supervisor and CBMM Defendants' Professor), between March 2019 and June 2020, Plaintiff engaged in protected activity by filling sexual assault and sexual harassment complaint ("Plaintiff's complaint") about TWO perpetrators, internally with ALL CBMM Defendants.
This lawsuit centers on CBMM Defendants' retaliatory illegal practices, actions, schemes and cover-up enterprise, towards Plaintiff and the United States, which: (i)   took place in the period between March 2019 and July 2022, (ii)  were initialized by CBMM Defendants against Plaintiff after CBMM Defendants gained actual knowledge about Plaintiff's 2017 sexual assault through Plaintiff's bona fide internal complaint, which she filed with CBMM Defendants in March 2019,(iii) constituted the violation of federal laws.

_____

_____

_____

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

Medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational and employment benefit, a denial of access to next step in academic career, a denial of access to publishing scientific articles, loss of educational and employment benefit including scholarship opportunities, grant opportunities, award opportunities,  loss of income, loss of enjoyment of life, emotional and economic damages associated with inability to flee her abusers, and other economic or non-economic damages, for which Plantiffs ar entitled to just compensation.

**IV. RELIEF**

State briefly what money damages or other relief you want the court to order.

$318,000,000.00

## V.  PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| 12/29/2022 | | |
| --- | --- | --- |
| Dated | | Plaintiff's Signature |
| Karolina | Maria | Marciniak-Domingues Goncalves Agra |
| First Name | Middle Initial | Last Name |
| 500 E 63rd Str, Apt 13 F | | |
| Street Address | | |
| New York, New York | NY | 10065 |
| County, City | State | Zip Code |
| 9733167339 | | marciniak.kar@gmail.com |
| Telephone Number | | Email Address (if available) |

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:
☑ Yes    ☐ No

    If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

(1) DR. KAROLINA MARCINIAK-
DOMINGUES GONCALVES AGRA,         )
                                  )
                                  )
(2) MR. PEDRO MARCINIAK-          )
DOMINGUES GONCALVES AGRA,         )
                                  )
    Plaintiffs,                   )        **JURY TRIAL DEMANDED**
                                  )
                                  )
    v.                            )
                                  )
(1) CENTER FOR BRAINS MINDS AND   )
MACHINES AT MASSACHUSETTS         )
INSTITUTE OF TECHNOLOGY,          )
                                  )
(2) MASSACHUSETTS INSTITUTE OF    )
TECHNOLOGY,                       )
                                  )
(3) HARVARD UNIVERSITY AND THE    )
PRESIDENT AND FELLOWS OF          )
HARVARD COLLEGE,                  )
                                  )
(4) BOSTON CHILDREN'S HOSPITAL,   )
                                  )
(5) MARINE BIOLOGICAL             )
LABORATORY,                       )
                                  )
(6) UNIVERSITY OF CHICAGO,        )
                                  )
(7) ROCKEFELLER UNIVERSITY,       )
                                  )
(8) NATIONAL SCIENCE FOUNDATION
(NSF),

    Defendants.
-------------------------------------------------------------

--------------------Appendix to **Complaint** -----------------------------------

response to **I. BASIS FOR JURISDICTION**

**A. If you checked Federal Question**

**Which of your federal constitutional or federal statutory rights have been violated?**

(i) Unlawful sex discrimination in employment within a covered educational program or activity pursuant to Title IX of the Education Amendments of 1972 20 U.S.C. § 1681, et. seq. ("Title IX") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"):

(ii) Breach of duty of reasonable care under Federal Tort Claims Act (FTCA)

(iii) Conspiracy to Interfere with Civil Rights  (42 U.S.C. § 1985)

(iv) Conspiracy to defraud the United States under 18 U.S. Code § 371,

(iv) Concealment and Cover-up under 18 U.S. Code § 1001,

(v) Tampering with victims, witnesses or informants under 18 U.S. Code §1512,

(vi) Tampering with evidence under 18 U.S. Code §1519,

(vii) Human and sex trafficking under the Victims of Trafficking and Violence Protection Act of 2000 (TVPA),

(ix) Violations of the Racketeer Influenced and Corrupt Organizations Act under 18 U.S.C. § 1962(c)

**A. If you checked Diversity of Citizenship**

**1. Citizenship of the parties**

The Plaintiff (2) Mr. Pedro Henrique, Marciniak-Domingues Goncalves Agra, is a citizen of the State of New York or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of Brazil.

If the defendant is a corporation:

The defendant (2) MASSACHUSETTS INSTITUTE OF TECHNOLOGY is incorporated under the laws of the State of Massachusetts and has its principal place of business in the State of Massachusetts.

The defendant (3) HARVARD UNIVERSITY AND THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE is incorporated under the laws of the State of Massachusetts and has its principal place of business in the State of Massachusetts.

The defendant (4) BOSTON CHILDREN'S HOSPITAL is incorporated under the laws of the State of Massachusetts and has its principal place of business in the State of Massachusetts.

The defendant (5) MARINE BIOLOGICAL LABORATORY is incorporated under the laws of the State of Massachusetts and has its principal place of business in the State of Massachusetts.

The defendant (6) UNIVERSITY OF CHICAGO is incorporated under the laws of the State of Illinois and has its principal place of business in the State of Illinois.

The defendant (7) ROCKEFELLER UNIVERSITY is incorporated under the laws of the State of New York and has its principal place of business in the State of New York.

The defendant (8) NATIONAL SCIENCE FOUNDATION (NSF) is incorporated under the laws of the State of Virginia and has its principal place of business in the State of Virginia.

response to **II. PARTIES**

**A. Plaintiff Information**

(2)

First Name: Pedro Henrique
Last Name: Marciniak-Domingues Goncalves Agra
Street Address: 500 E 63rd Str, Apt 13F
County, City: New York, New York
State: NY
Zip Code: 10065
Telephone Number: 973167339
Email Address (if available): agra13@gmail.com

**A. Defendant Information**

Defendant 5:

First Name:  MARINE BIOLOGICAL LABORATORY
Street Address: Office of Director Nipam Patel, 7 Mbl St
County, City: Barnstable County, Woods Hole
State: MA
Zip Code: 02543
Telephone Number: (508) 289-7300
Email Address: npatel@mbl.edu

Defendant 6:

First Name:  UNIVERSITY OF CHICAGO
Street Address: Office of Legal Counsel, 5801 South Ellis Avenue, Suite 619
County, City: Chicago
State: IL
Zip Code: 60637
Telephone Number: (773) 702-7237

Defendant 7:

First Name:  ROCKEFELLER UNIVERSITY
Street Address: Office of General Counsel, 1230 York Ave
County, City: New York, New York
State: NY
Zip Code: 10065
Telephone Number: (212) 327-8071
Email Address: yeohd@rockefeller.edu

Defendant 8:

First Name:   NATIONAL SCIENCE FOUNDATION
Street Address: Office of General Counsel, 2415 Eisenhower Avenue, Room: W 18200
County, City: Arlington, Alexandria
State: VA
Zip Code: 22314
Telephone Number: (703) 292-8060
Email Address:

## V. PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the
complaint is not being presented for an improper purpose (such as to harass, cause unnecessary
delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or
by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary
support or, if specifically so identified, will likely have evidentiary support after a reasonable
opportunity for further investigation or discovery; and (4) the complaint otherwise complies with
the requirements of Federal Rule of Civil Procedure 11.
I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my
failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Dated: 12/29/2022

Plaintiff's Signature

First Name: Pedro Henrique
Last Name: Marciniak-Domingues Goncalves Agra
Street Address: 500 E 63rd Str, Apt 13F
County, City: New York, New York
State: NY
Zip Code: 10065
Telephone Number: 973167339
Email Address (if available): agra13@gmail.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| (1) DR. KAROLINA MARCINIAK-DOMINGUES GONCALVES AGRA, | ) ) ) |
| (2) MR. PEDRO MARCINIAK- DOMINGUES GONCALVES AGRA, | ) ) ) |
| Plaintiffs, | ) ) ) **JURY TRIAL DEMANDED** |
| v. | ) ) |
| (1) CENTER FOR BRAINS MINDS AND MACHINES AT MASSACHUSETTS INSTITUTE OF TECHNOLOGY, | ) ) ) ) |
| (2) MASSACHUSETTS INSTITUTE OF TECHNOLOGY, | ) ) ) |
| (3) HARVARD UNIVERSITY AND THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE, | ) ) ) ) |
| (4) BOSTON CHILDREN'S HOSPITAL, | ) ) |
| (5) MARINE BIOLOGICAL LABORATORY, | ) ) |
| (6) UNIVERSITY OF CHICAGO, | ) ) |
| (7) ROCKEFELLER UNIVERSITY, | ) ) |
| (8) NATIONAL SCIENCE FOUNDATION (NSF), | ) ) ) ) |
| Defendants. | ) ) |

---------------------------------------------------------

**PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs DR. KAROLINA MARIA MARCINIAK-DOMINGUES GONCALVES AGRA ("Plaintiff") and MR. PEDRO HENRIQUE MARCINIAK-DOMINGUES GONCALVES AGRA (collectively, "Plaintiffs"), complain of Defendants CENTER FOR BRAIN, MINDS AND MACHINES AT MASSACHUSETTS INSTITUTE OF TECHNOLOGY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, HARVARD UNIVERSITY AND THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE, BOSTON

CHILDREN'S HOSPITAL, MARINE BIOLOGICAL LABORATORY, UNIVERSITY OF CHICAGO, ROCKEFELLER UNIVERSITY and NATIONAL SCIENCE FOUNDATION, (collectively, " CBMM Defendants") and in support respectfully allege, upon information and belief, the following:

## I. NATURE OF THE ACTION

1.      This action is brought for:

(i) Unlawful sex discrimination in employment within a covered educational program or activity pursuant to Title IX of the Education Amendments of 1972 20 U.S.C. § 1681, et. seq. ("Title IX") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"),

(ii) Breach of duty of reasonable care under Federal Tort Claims Act (FTCA),
(iii) Conspiracy to Interfere with Civil Rights  (42 U.S.C. § 1985),
(iv) Conspiracy to defraud the United States under 18 U.S. Code § 371,
(iii) Concealment and Cover-up under 18 U.S. Code § 1001,
(iv) Tampering with victims, witnesses or informants under 18 U.S. Code §1512,
(v) Tampering with evidence under 18 U.S. Code §1519,
(vii) Human and sex trafficking under the Victims of Trafficking and Violence Protection Act of 2000 (TVPA),
(viii) Violation of the Racketeer Influenced and Corrupt Organizations Act under 18 U.S.C. §  1962(c).

2.      From 2013 until 2023[1], CBMM Defendants have been sharing common business interests by running the Center for Brains, Minds & Machines (CBMM), a multi-institutional Science and Technology Center enterprise, heavily financed from federal funds through the National Science Foundation.[2]

4.      In 2014, CBMM Defendants recruited and in 2016 hired Plaintiff to work in the CBMM as a scientist.

5.      In 2017, Plaintiff fell a victim of rape by employee of:

(i)      CBMM Defendant (1) CENTER FOR BRAINS MINDS AND MACHINES AT MASSACHUSETTS INSTITUTE OF TECHNOLOGY,
(ii)      CBMM Defendant (2) MASSACHUSETTS INSTITUTE OF TECHNOLOGY,
(iii)      CBMM defendant (3) HARVARD UNIVERSITY AND THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE,
(iv)      CBMM Defendant (4) BOSTON CHILDREN'S HOSPITAL,
(v)      CBMM Defendant (5) MARINE BIOLOGICAL LABORATORY,
(vi)      CBMM Defendant (6) UNIVERSITY OF CHICAGO,

in position of authority for Plaintiff, while Plaintiff was at CBMM work, delegated by:

(i)      CBMM Defendant (1) CENTER FOR BRAINS MINDS AND MACHINES AT MASSACHUSETTS INSTITUTE OF TECHNOLOGY,
(ii)      CBMM Defendant (2) MASSACHUSETTS INSTITUTE OF TECHNOLOGY,
(iii)      CBMM Defendant ROCKEFELLER UNIVERSITY.

---

1    2023 is the estimated end date of the CBMM-NSF corporate agreement
2    The National Science Foundation is an independent agency of the United States government that supports fundamental research and education in all the non-medical fields of science and engineering. Its medical counterpart is the National Institutes of Health.

6.      Subsequent to the 2017 sexual assault event and to the continuous sexual harassment from the side of two perpetrators (the second being her direct supervisor and CBMM Defendants' Professor), between March 2019 and June 2020, Plaintiff engaged in protected activity by filling sexual assault and sexual harassment complaint ("Plaintiff's complaint") about **TWO** perpetrators, internally with **ALL** CBMM Defendants.

7.      At all relevant times, each of CBMM Defendants was either Plaintiff's employer or Plaintiff's joint employer under the U.S. labor and employment laws. [3], thus protected under Title VII.

8.      Plaintiff's salary, while working for CBMM Defendants, was funded from grant title "A Center for Brains, Minds and Machines: the Science and the Technology of Intelligence", ID IN00034259, sponsored by National Science Foundation, with Winrich Freiwald as Principal Investigator.

9.      CBMM Defendants, as recipients of federal funds, and Plaintiff's employer, were obliged to comply with Title IX and Title VII regulations

10.     In the Preamble to the Final Rule, the U.S. Justice Department states that "[r]ecipients should comply with both Title VII and Title IX, to the extent that these laws apply, and nothing in these final regulations precludes a recipient from complying with Title VII." 85 Fed. Reg. 30026, 30451 (May 19, 2020).

11.     This lawsuit centers on CBMM Defendants' retaliatory illegal practices, actions, schemes and cover-up enterprise, towards Plaintiff and the United States, which:

    (i)     took place in the period between March 2019 and July 2022,
    (ii)    were initialized by CBMM Defendants against Plaintiff after CBMM Defendants gained actual knowledge about Plaintiff's 2017 sexual assault through Plaintiff's bona fide internal complaint, which she filed with CBMM Defendants in March 2019,
    (iii)   constituted the violation of Title IX, Title VII, and others federal (and state) laws, including criminal offenses.

12.     In the period between March 2019 and May 2019, CBMM defendants designed, manufactured, executed and actively managed a cover-up enterprise, which:

    (i)     was based on conspiracy,
    (ii)    used discrimination based on sex, concealment, cover-up tactics, witness/evidence/information tampering as tools,
    (iii)   intimidated, humiliated, and caused Plaintiff mental and physical damages
    (iv)    but caused CBMM Defendants to avoid liability for crimes reported in Plaintiff's bona fide internal complaint in March 2019.

13.     CBMM Defendants defrauded Title IX and Title VII grievance procedures towards Plaintiff's complaint through:

    (i) intentionally misusing the primary jurisdiction doctrine,
    (ii) rigging grievance and investigation procedures,

---

3    Plaintiff Marciniak DG Agra was hired in Postdoctoral Associate position in September 2016, and was untimely discharged by CBMM Defendants in November 2021, when she was working for CBMM Defendants in Research Associate position. She also occupied a Teaching Assistant position at 2018 CBMM Summer School

(iii) refusing Plaintiff her right for the appeal process,

(iv) refusing Plaintiff her right for issuing independent determinations after new witnesses and victims of the same perpetrator participated in Plaintiff's internal complaint process

(v) and retaliated against Plaintiffs,

(vi) ultimately untimely discharging Plaintiff in August 2021, effective November 2021.

14.     CBMM Defendants' actions towards Plaintiff were intentionally malicious and aimed to cause her harm. CBMM Defendants took advantage of the victim's vulnerability to engage her with legal and mental health providers purposely hired, and/or otherwise recruited by CBMM Defendants to manipulate Plaintiff during the complaint process and salience her complaint.

15.     In their criminal actions, CBMM Defendants:

(i) intentionally misguided Plaintiff about applicable complaint procedures, (2) "question of jurisdiction" and (3) Plaintiff's rights,

(ii) committed fraud in obtaining the Release of Information form from Plaintiff through the psychologist service,

(iii) by the services of CBMM officials

(iv) to bias the investigation in favor of not finding any probable cause for misconduct,

(iv) systematically obstructed justice by tampering with evidence and witnesses in the ongoing police investigation.

16.     This lawsuit brings to light CBMM Defendants' rape-culture and mafia-like practices. To avoid liability, CBMM Defendants resolved to conspiracy and cover-up practices. Knowing about the severity of sexual harassment crimes and other victims of the same abuser, CBMM Defendants refused to protect Plaintiff and other women from sexual harassment, enabling further sexual harassment to occur. Defendants deliberate indifference in applying their anti-harassment policies, created a hostile working environment which put in danger not only Plaintiff but also other woman in the environment.

17.     The cause of action in relation to sexual harassment and retaliation by CBMM Defendants employee Winrich Freiwald towards Plaintiff until 2020 is, as of today, processed in separate but subordinate to this court venue, i.e., the New York State Division of Human Rights (NYS DHR) [4].

18.     The cause of action in relation to discrimination based on sex, sexual harassment and Plaintiff's 2021 termination under Title VII by CBMM Defendants employee Winrich Freiwald and CBMM Defendant (7) ROCKEFELLER UNIVERSITY is, as of today, processed on a separate but subordinate to this court venue, i.e., EEOC New York office.[5]

19.     The cause of action in relation to discrimination based on sex under Title VII by CBMM Defendants employee and CBMM Defendants (2) MASSACHUSETTS INSTITUTE OF TECHNOLOGY, (3) HARVARD UNIVERSITY AND THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE, (4) BOSTON CHILDREN'S HOSPITAL, towards Plaintiff in the recruitment for the CBMM 2020 Teaching Assistant position, is, as of today, processed on a separate but subordinate to this court venue, i.e., EEOC Boston Office. [6]

---

[4]   Filled on 5/18/2021 by Plaintiff with case no. 10212022. The NYS DHR issued probable cause determination after investigation of the complaint in January 2022.

[5]   Filled on 6/7/2022 by Plaintiff with EEOC charge number 520-2022- 04985.

[6]   EEOC number: 523-2020-01670, 520-2020-04241, 523-2020-01820),  currently under investigation (MCAD 20BEM02531, 20BEM02533, 20BEM02523).

20.     This lawsuit centers on CBMM Defendants' conspiracy and actions around cover-up enterprise in the period between March 2019 and July 2022, and thus are appropriate to be addressed on this venue with Rule 19. Required Joinder of Parties.

21.     Plaintiffs fills this complaint, after:

(i) Plaintiff exhausted all complaint options available to her through CBMM Defendants' internal nondiscriminatory and anti-harassment procedures bona fide informed CBMM Defendants about the events, and

(ii) her protected activity was met with CBMM Defendants' retaliation, which

(ii) turned Plaintiff's life as a victim of the events which she reported in her bona fide internal complaint, and as a scientist, into hell.

(iii) Causing Plaintiff to lose her scientific work which is her passion, her employment and damaged her scientific career.

22.     Defendants' actions caused Plaintiffs to suffer pain and substantially damaged their health. Living under constant fear of further retaliation caused enormous stress in their daily life for more than two years. Plaintiffs have no other choice but to turn to the federal court to seek justice.

23.     Because CBMM Defendants' cover-up enterprise tools and tactics used on Plaintiff have power to intimidate and salience other victims of sexual harassment (and other discriminatory practices) in academia, bringing this lawsuit under federal jurisdiction with jury trial demanded is necessary to assure that similar practices would not be followed in academia or elsewhere.

24.     .Plaintiff and other victims of the sexual harassment from the side of the perpetrators anonymously named in this lawsuit, who, as Plaintiff, found courage to step out from the invisible but real cage of discrimination and abuse in academia, CAN NOT remained to be salienced and threatened with retaliation for exercising their civil rights.

25.     This lawsuit brings one voice of the victim of systemic problem in academia to be heard. This voice is however supported by shouting evidence of CBMM Defendants's illegal practices and shouting evidence of how her and her husband's live was damaged as a consequence of those practices.

26.     Plaintiffs express belief that only THIS litigation can bring justice, and avoid further damage to academia, as only science free from sexual harassment will benefit the humanity.


## II. JURISDICTION AND VENUE


27.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, because Plaintiffs' statutory claims present federal questions over which this Court has jurisdiction. Plaintiffs also assert state-law claims over which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

28.     This Court has original jurisdiction over the case, since the cause of actions required joinder of parties in civil litigation under Federal Rule of Civil Procedure (FRCP) 19.

29.     This Court is the proper venue under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f) because Plaintiffs are domiciled in this District, the CBMM Defendant (7) ROCKEFELLER UNIVERSITY domiciled in and conducts business within this Judicial District, and CBMM Defendant (1) CENTER FOR BRAINS MINDS AND MACHINES AT MASSACHUSETTS INSTITUTE OF TECHNOLOGY and CBMM Defendant (8) NATIONAL SCIENCE FOUNDATION (NSF) conducts business within this Judicial District, and many of the unlawful practices complained of herein occurred in this District, and the events or omissions giving rise to Plaintiffs' claims occurred in this District.

30.     Although the curent lawsuit does not make claims against Defendants in their personal and individual responsibility, Plaintiffs assure the right to file an additional joinder in the course of this litigation if discovery phase results and court decision deem it appropriate. This court has personal jurisdiction over employees of CBMM Defendant (7) ROCKEFELLER UNIVERSITY.     23.     Although the curent lawsuit does not make claims against Defendants in their personal and individual responsibility, Plaintiffs assure the right to file an additional joinder in the course of this litigation if discovery phase results and court decision deem it appropriate. This court has personal jurisdiction over employees of CBMM Defendant (7) ROCKEFELLER UNIVERSITY.

## III. FACTUAL ALLEGATIONS

### A.    Background

31.     On 9/1/2013, National Science Foundation (NSF) cooperative agreement indexed as CCF-1231216 was awarded to MIT to establish the CBMM research and education center dedicated to the study of intelligence, how the brain produces intelligent behavior, and how this scientific discovery may enable the replication of intelligence in machines ("CBMM"). The total awarded amount to date (as of 8/18/2022) is $ 48,079,625.00. The federal funding of CBMM is expected to continue at least until August 31,2023 [7].

32.     CBMM Defendants are: the federal funding agency (National Science Foundation), the awardee (MIT), and sub-awardee institutions (Rockefeller University, Harvard University and the President and Fellows of Harvard College, Boston Children's Hospital, Marine Biological Laboratory, University of Chicago) of the CBMM cooperative agreement.

33.     The CBMM headquarters are located at 77 Massachusetts Ave, Massachusetts Institute of Technology (MIT), Cambridge, MA. CBMM Defendants' employee Tomaso Poggio (MIT), serves in the role of the Director of the CBMM, and CBMM Defendants' employee Kathleen Sullivan (MIT), is the CBMM Center Manager.

34.     Plaintiff is a neuroscientist with background in Psychology (MA, 2008, Adam Mickiewicz University in Poznan, Poland) and Ph.D. in Neuroscience from International Max Planck Research School/ Graduate School of Neural & Behavioral Science in Tuebingen, Germany (2015). [8]

35.     Plaintiff grew up in a low-income family in a small village in the Soviet Union Poland, where she received conservative religious (catholic) upbringing. Plaintiff's father abandoned his first family, i.e., his wife (Plaintiff's mother), Plaintiff, and her younger brother, and immigrated to the USA in

---

7    Information obtained from www.nsf.gov website

8    Plaintiff doctorate work: two first-author publications in high-impact journals (*eLife*, Highest Journal's Impact IF (2011 - 2022): 9.322 and *Proceedings of the Royal Society B: Biological Sciences*, Highest Journal's Impact IF (2011 - 2022): 5.683; source: https://academic-accelerator.com › Impact-of-Journal)

1992. Plaintiff joined her father in his new homeland in 2004 and became the US permanent resident card holder. Although 10 years afterwards she had to voluntary abandoned her green card to complete a doctorate program in Germany, she planned to return to the US for a postdoctoral training in the field to pursue her further academic career, driven by her dream to live and work here as the country providing freedom and opportunities for high-skilled professionals.

36.     During the major international neuroscience conference of Society for Neuroscience which took place in November 2014 in Washington, DC, she was recruited by the CBMM employee, CBMM Principal Investigator and Professor employed by CBMM Defendant (1) CENTER FOR BRAINS MINDS AND MACHINES AT MASSACHUSETTS INSTITUTE OF TECHNOLOGY, and CBMM Defendant (7) ROCKEFELLER UNIVERSITY.

37.     In September 2016, CBMM Defendants appointed Plaintiff in Postdoctorate Associate position to work on the CBMM-founded join collaboration project on one of the CBMM main topic, i.e., Intuitive Physics.

38.     Plaintiff's CBMM research work aimed to find answer to a crucial quest of the brain mechanism underlying the elementary intuitive belief system. The so-called Intuitive Physics is believed to be a core of intelligence as far as intelligence is currently understood in cognitive neuroscience. The scientific questions involving non-human experiments are hard, and the experiments are demanding. Integrity and ethics are indispensable in scientific work.

39.     Plaintiff's 2016-2021 employment exemplified an interdisciplinary postdoctoral work, typical for the CBMM [9] and was contracted as the collaboration between (i) Winrich Freiwald Laboratory of Neural Systems at Rockefeller University, (ii) Nancy Kanwisher laboratory (MIT), and (iii) Josh Tenenbaum laboratory (MIT). [10]

40.     Although primarily based at the Rockefeller University, New York, Plaintiff's CBMM work on Intuitive Physics, was substantially controlled and its development was substantially dependent on other CBMM Defendants (such as above mentioned MIT), who, together with the Rockefeller University, constituted Plaintiff's joint employers. [11]

41.     Specifically, the non-human primate research experiments which Marciniak DG Agra conducted in Freiwald laboratory were (i) theory driven by the work in Tenenbaum laboratory (MIT), and (ii) complimentary and directly comparable with human research experiments on Intuitive Physics and similar methodology used in Kanwisher's laboratory (MIT).

42.     As a result of the collaborative aspect of Plaintiff's work at the CBMM, Plaintiff was registered as CBMM-supported postdoc. [12]

---

9   Please see: https://cbmm.mit.edu/ for further information

10  On 4/20/2016, Freiwald emailed Plaintiff: "*By the way, Karolina, I had A fantastic meeting with Josh Tenenbaum yesterday. There are exciting prospects for you through this collaboration. W*"; on 6/11/2016 Freiwald emailed Plaintiff: "*I had some fantastic conversations with Nancy Kanwisher and Josh Tenenbaum that I am super excited about and would like to share with you when you have time*".

11  The Intuitive Physics as the subject lies beyond the main focus of interest for Freiwald and his laboratory, as Face Perception remains its main focus (see publication list here)

12  On 9/15/2016 Freiwald instructed Lihong Yin, the lab manager (Rockefeller University): "*Karolina is going to visit the CBMM. We should get this CBMM funded (or use our account). Also, can we Karolina registered as a CBMM postdoc?*". On 11/16/2016 Lihong Yin wrote to Marciniak DG Agra, and two other CBMM-supported postdocs: "*Dear All, As CBMM postdocs, you are strongly encouraged to attend post session during the NSF site visit tentatively scheduled next May (please see details below). Change of dates are possible, this is just a heads-up. Thank you, Lihong*". On 10/7/2016 Prof. Kanwisher emailed Kathleen Sullivan, Karolina Marciniak DG Agra cced: "*Karolina is a new postdoc in Freiwald's lab but who may be visiting regularly - can you add her*"

43.     Plaintiff's salary, while working for CBMM Defendants, was funded from grant title "A Center for Brains, Minds and Machines: the Science and the Technology of Intelligence", ID IN00034259, sponsored by National Science Foundation, with Winrich Freiwald as Principal Investigator.

44.     Between 2016 and 2019, Plaintiff had been regularly delegated by CBMM Defendants (1) CENTER FOR BRAINS MINDS AND MACHINES AT MASSACHUSETTS INSTITUTE OF TECHNOLOGY, (2) MASSACHUSETTS INSTITUTE OF TECHNOLOGY, (7) ROCKEFELLER UNIVERSITY, to travel from New York, NY to Cambridge, MA for work. [13] During her visits at MIT, Plaintiff was required to secure board and lodging herself through available private rental hospitality services in the area (hotel or Airbnb). Her visits to the MIT were CBMM funded, and travel refunds were processed according to the NSF guidelines by the CBMM Center Manager at MIT, Kathleen Sullivan.

45.     Plaintiff's work was highly valued by CBMM Defendants, who had been consistently cognizant of the project success and had been supporting the continuation of Plaintiff's scientific work since 2016 until retaliatory events in 2020 and 2021. [14]

46.     For her postdoctoral position at CBMM, CBMM Defendants contracted with Plaintiff CBMM training opportunities and scientific support. [15]

47.     One of the CBMM opportunities is Brains Mind and Machine Summer Course (CBMM Summer School) – the CBMM flagship program aiming to "*create a community of researchers that will train the next generation of scientists and engineers in an emerging new field- the Science and Engineering of Intelligence*". [16]

48.     The CBMM transfers its 3-week long CBMM Summer School program activities to the Marine Biological Laboratory (MBL) campus in the remote location of Woods Hole, MA [17].

49.     In 2017, 2018 and 2019, **ALL** CBMM Defendants delegated Plaintiff, the CBMM-supported postdoc, to participate in the CBMM Summer School for learning, teaching and student project collaboration. [18]

50.     The Directors of the Summer School, who controlled Plaintiff's activities during the CBMM Summer School, are Gabriel Kreiman (Boston Children's Hospital, Harvard University and the President and Fellows of Harvard College); Boris Katz (Massachusetts Institute of Technology); and Tomaso Poggio (Massachusetts Institute of Technology). CBMM Defendants provide also board and lodging for the course participants.

---

to the CBMM mailing list please?". On 10/20/2016 the CBMM administrator sent "*Welcome to CBMM!*" email to Plaintiff Marciniak DG Agra in which Sullivan "*wanted to share some center logistics*".

13  Shortly after the onset of Plaintiff's CBMM work, on 9/15/2016, Freiwald emailed Kanwisher (MIT) and Tenenbaum (MIT), Marciniak DG Agra cced: "*I think it would be great if she could go and visit the two of you and lab members asap*".

14  On 12/11/2017, Freiwald emailed Marciniak DG Agra: "Yes [it is interesting for us], I think you placed a good bet when you chose Intuitive Physics as a subject.w"; on 5/26/2020 Freiwald emailed Marciniak DG Agra: "*I need you to succeed on the Intuitive Physics project*"; Freiwald effectively discontinued Plaintiff's Intuitive Physics projecr shortly afterwards, after subsequent email in which Plaintiff opposed Freiwald's sexual harassment.

15  On 2/19/2016, Freiwald emailed Marciniak DG Agra: "*I think there would be a fantastic fit, and having us work closely with Josh – whom I just sent a message – would be invaluable to make the most out of your work. It will also be good for you to be closely integrated into the CBMM for all the scientific support it offers*";

16  From www.nsf.gov website.

17  MBL is institution affiliated with the University of Chicago ("U of Chicago").

18  See next section for details.

51.    CBMM Defendants did not provide any Title IX nor sexual harassment prevention training for the CBMM-supported postdocs/ CBMM-supported students. [19]

52.    CBMM Defendants did not provide any information on non-discriminatory nor antiharassment policy, nor guided CBMM members on any internal procedures in place to address work misconduct and sexual harassment in the CBMM space. [20]

**B.    CBMM Defendants created hostile environment**

*(i)  CBMM Defendants hired sexual perpetrator and common criminal*

53.    Frederico AC Azevedo ("Azevedo") obtained a PhD degree by fraud and deception. While prematurely submitting his incomplete thesis [21], he intentionally omitted the report of his road crimes (drink and drive), which would appear in his police report, and intentionally manipulated the supervising individuals about the supervision, which would delay the submission. [22]

54.    Azevedo is an impostor at his current position in academia,. He establish himself at CBMM solely due to his socially manipulative skills and not merit [23]. Azevedo secured a successful cover letter for the CBMM Summer School student application process in 2016 from a former CBMM Summer School student and Azevedo's brother[24]. Azevedo followed in his younger brother steps to obtain a visiting student internship with CBMM Defendants.

55.    CBMM Defendants (1) CENTER FOR BRAIN, MINDS AND MACHINES AT MASSACHUSETTS INSTITUTE OF TECHNOLOGY, (2)  MASSACHUSETTS INSTITUTE OF TECHNOLOGY, (3)  HARVARD UNIVERSITY AND THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE and (4) BOSTON CHILDREN'S HOSPITAL installed Azevedo in the CBMM postdoctoral position with Gabriel Kreiman [25] and Bob Desimone [26]as his supervisors.

*(ii)  CBMM Defendans gave power positions to the perpetrator and his enabler*

---

19  The first ever training for the CBMM Summer School participants was introduced in 2019, following Plaintiff's internal complaint in March 2019.

20  The information appeared first on the CBMM website in May 2019, following Plaintiff's complaint to NSF.

21  As result of his doctorate work, Frederico AC Azevedo has only one first-author theoretical review publication in low-impact journal (*Multisensory Research*, Highest Journal's Impact IF (2011 - 2022): 2.339), and the work does not fulfill neither merithorical nor formal requirement.

22  The disciplinatory proceedings in relation to these events are pending with the University of Tuebingen, Germany.

23  Also, no police record was required for him to obtain visa to work as postdoctoral researcher in the USA

24   Azevedo's brother has been remembered by "CBMM Postdoc 1" for poor ethics and outrageous discriminatory behavior, including daily-basis racist and sexist jokes. Azevedo himself also uses heavily racist and nazi language, including during CBMM work.

25  Gabriel Kreiman is CBMM employee and Professor affiliated with CBMM Defendants (1) CENTER FOR BRAIN, MINDS AND MACHINES AT MASSACHUSETTS INSTITUTE OF TECHNOLOGY, (3)  HARVARD UNIVERSITY AND THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE and (4)  BOSTON CHILDREN'S HOSPITAL; Gabriel Kreiman and Frederico Azevedo seem to resonate with respect to cultural proximity and views on sexual harassment.

26  Bob Desimone is a CBMM employee and Professor affiliated with CBMM Defendants (1) CENTER FOR BRAIN, MINDS AND MACHINES AT MASSACHUSETTS INSTITUTE OF TECHNOLOGY, (2) MASSACHUSETTS INSTITUTE OF TECHNOLOGY,

56.     CBMM Defendants installed Azevedo in CBMM Teaching Assistant position at 2017, 2018 and 2019 CBMM Summer School [27] [28]

57.     CBMM Defendants installed also another male postdoc (Xavier Boix) in CBMM postdoctoral role, under Kreiman and Poggio supervision. The individual, senior to Azevedo, served as CBMM senior Teaching Assistant at several  CBMM Summer Schools, including 2017 and 2018, and became friends with Azevedo.

58.     During 2017 CBMM Summer School, the two Teaching Assistants jointly supervised two female students over the 3-week long student projects.

59.     During that time,  Azevedo and Boix used their power position to coerce their subordinate female students into overnight stays in their rooms in the cottage. [29] [30]

60.     CBMM Defendants installed Azevedo to organize social events, which were overly sexual and discriminated female students based on their sex. [31]

61. During CBMM Summer School Azevedo talked about sex overtly in front of other male Teaching Assistants [32].

62.     CBMM Defendants endorsed Azevedo's and Boix's behavior and allowed for their private agenda during the CBMM Summer School.[33]

63.     Feeling above the law, Boix conspired with Azevedo against Plaintiff in summer 2017 in attempt to groom her and coerce into sexual contact.[34]

64.     CBMM Defendants endorsed Azevedo's actions in bringing MIT female students not related to CBMM program to Woods Hole, MA, acting in his role as CBMM Summer School organizer, which put those females at risk of Azevedo's sexual harassmen. [35]

65.     CBMM Defendants endorsed Azevedo's actions in claiming the CBMM Defendant (5) MARINE BIOLOGICAL LABORATORY housing in which he was staying for a *"paper club"* and *"party house"*, with private invitations for female students. [36]

---

27   And intended to install him in 2020.

28   Gabriel Kreiman serves as CBMM Summer School Director

29   One of the female student reported to Plaintiff on 2/9/2020 by email that "a friend [Josephine Cruzat] and I [Vanessa D'Amario] were invited randomly [to the cottage where Azevedo and Boix stayed]".

30   Plaintiff witnessed the women in the morning 8/28/2017 in the line to the cottage bathroom . During that preceding night Plaintiff heared from her door-less bedroom the voices of 4 people laughing and conversing till late in Azevedo's and Boix's rooms downstairs in the cottage.

31   For example, in 2017, Azevedo organized a Boat Fight, in which students competed in teams to swim and sink in cupboard-made "boats", " CBMM Postdoc 1" reported that Azevedo and his befriended Teaching Assistants *"found it amusing to see female students fighting in the water"*.

32   Witness testimony

33   CBMM Defendants hesitated to correct discrimination at CBMM Summer School even after Plaintiff's complain

34   In his email correspondence with Plaintiff, two times Boix referred [Fred] Azevedo to Plaintiff for assistance and intentionally misinformed her on 8/25/2019 referring to *"the cottage house where Fred [Azevedo] and I [Boix] are staying permanently and other people comes and goes"*. Upon her arrival, Boix directly enabled Azevedo to gain close contact to Plaintiffs whereabouts and enabled Azevedo to manipulate the situation and perpetrate his sexual agenda.

35   In 2018, Hannah Pinson was brought to Woods Hole by Azevedo.

36   In 2018, one female student was invited by Azevedo with overly flirtatious behavior to stay with him alone and consume highly alcoholic beverages (testimony of the witness, who participated in Plaintiff's complaint)

66.     CBMM Defendants also endorsed Azevedo and Boix and gave them power over distributing CBMM opportunities at CBMM.

### *(iii) CBMM Defendants were negligent (Title VII) and broke duty of reasonable care (Title IX) in implementing their nondiscriminatory policies*

67.     CBMM Defendants knew about prevalence of sexual harassment in academia and had actual knowledge about sexual harassment events at their campuses prior to Plaintiff's complaint.

68.     In 2002, CBMM Defendant (7) ROCKEFELLER UNIVERSITY undertook disciplinary actions towards its President, Arnold J. Levine[37], after the incident in which he inappropriately involved himself with a female student.

69.     CBMM Defendant (7) ROCKEFELLER UNIVERSITY has been also dealing with allegations of child sexual abuse from 80 accusers, former patients of esteemed Rockefeller University hospital doctor Archibald,  going back to 2004.

70.     The 2016 survey by the US National Postdoctoral Association found that 28% of respondents reported experiencing at least one instance of harassment while they were [postdoctoral] trainees; offenders were predominantly reported as being faculty or staff members. [38]

71.     The 2018 National Academies of Sciences, Engineering, and Medicine study report [39] on the sexual harassment of women in academia found that between 20% and 50% of female students and more than 50% of female faculty and staff (including postdocs) experienced sexually harassing behavior while in academia.

72.     The report described the toll sexual harassment takes on individuals, communities, and institutions, and articulated recommendations for action. In response to the report's findings, the National Academies have urged all of higher education to aim higher by changing the cultures and climates that allow harassment to go unchecked. [40]

73.     Although CBMM Defendants are among initial 28 founding universities, colleges and research institutions to join with National academies on Action Collaborative on Preventing Sexual Harassment in Higher Education initiative created to reduce sexual harassment in higher education [41], CBMM Defendants intentionally refused to act on sexual harassment prevention at home, i.e., in their respective higher education communities.

73.     Despite evidence-based recommendations based on overwhelmingly sound data about prevalence of the sexual harassment in academia, CBMM Defendants did not protect Plaintiff (and other female students and postdocs) from sexually harassing conduct of their faculty and stuff.

---

37   who in result stepped down from the office
38   go.nature.com/2ju83ox
39   The National Science Foundation was among sponsors of the study
40   Here: https://www.nationalacademies.org/our-work/sexual-harassment-in-academia
41   https://orgchart.mit.edu/node/5/letters_to_community/taking-stand-against-sexual-misconduct )

74.     In particular, CBMM Defendants intentionally refused to correct systemic reasons for particular prevalence of sexual harassment at their academic institutions, these include academia's gender imbalance and its hierarchical power structure.

75.     Although research shows that sexual harassment is more likely to occur in male-dominated organizations [42] [43], CBMM Defendants academically remain a male-dominated industry, especially in more senior faculty positions. [44] [45] [46] [47] [48]

76.     CBMM Defendants abide to power differentials perpetuated by academic hierarchical systems, although such structures are shown to generate the prevalence of sexual harassment. Workers in more vulnerable positions or with less power are more likely to be the targets of sexual harassment behavior [49]. Different to romance, sexual harassment serve as an equalizer against women in power, motivated more by control and domination than sexual desire. [50]

77.     Plaintiff is a woman in STEM science. In the field based on excellence, dedication, hard-work and ethics, she ascended in academic career and secured herself a postdoctoral position at CBMM, due to her successful doctorate work and strong academic potential, which has been systematically endorsed by her academic supervisors, including at CBMM.

78.     In summer 2017, as a new CBMM member based in New York, i.e., outside of the CBMM's headquarters at MIT, Cambridge, MA, she was in vulnerable position when she arrived to Woods Hole, MA for the CBMM Summer School. Azevedo (the perpetrator of the sexual assault) and Boix (his enabler), both senior CBMM staff members, at CBMM Summer School in the roles of Teaching Assistants, i.e., faculty members were in authority position over naive in CBMM Plaintiff. [51]

79.     While CBMM Defendants (1) CENTER FOR BRAINS MINDS AND MACHINES AT MASSACHUSETTS INSTITUTE OF TECHNOLOGY, (2) MASSACHUSETTS INSTITUTE OF TECHNOLOGY, (3) HARVARD UNIVERSITY AND THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE, (4) BOSTON CHILDREN'S HOSPITAL, (5) MARINE BIOLOGICAL LABORATORY, (7) ROCKEFELLER UNIVERSITY, were informed about Plaintiff's expected stay at 2017 CBMM Summer School, Plaintiff did not receive any assistance neither from CBMM Defendants' designated employees: CBMM Summer School Directors, employees of CBMM Defendants (1) CENTER FOR BRAINS MINDS AND MACHINES AT MASSACHUSETTS INSTITUTE OF TECHNOLOGY, (2) MASSACHUSETTS INSTITUTE OF TECHNOLOGY,(3) HARVARD UNIVERSITY AND THE

---

42   Hegewisch, A., & O'Farrell, B. (2015). Women in the construction trades. Institute for Women's Policy Research. https://iwpr.org/wp-content/uploads/2020/10/C428-Women-in-Construction-Trades.pdf

43   Medeiros, K. E., & Griffith, J. A. (2019). Double-edged scalpels: The trials and triumphs of women surgeons. Narrative Inquiry in Bioethics, 9(3), 221 – 227.10.1353/nib.2019.0057

44   Bacchi, C. (1993). The brick wall: Why so few women become senior academics. Australian Universities' Review, 36(1), 36 – 41.

45   Diamond, S. J., Thomas, C. R., Desai, S., Holliday, E. B., Jagsi, R., Schmitt, C., & Enestvedt, B. K. (2016). Gender differences in publication productivity, academic rank, and career duration among US academic gastroenterology faculty. Academic Medicine, 91(8), 1158 – 1163. https://doi.org/10.1097/ACM.0000000000001219

46   O'Connor, P. (2020). Why is it so difficult to reduce gender inequality in male-dominated higher educational organizations? A feminist institutional perspective. Interdisciplinary Science Reviews, 45(2), 207 – 228. https://doi.org/10.1080/03080188.2020.1737903

47   Zhuge, Y., Kaufman, J., Simeone, D. M., Chen, H., &  Velazquez, O. C. (2011). Is there still a glass ceiling for women in academic surgery? Annals of Surgery, 253(4), 637 – 643. 10.1097/SLA.0b013e3182111120

48   The statistics on gender inclusiveness at CBMM Defendants institutions are sound, see scarce number of women among CBMM faculty, and Teaching Assistants during 2018 CBMM Summer School.

49   Wilson, F., & Thompson, P. (2001). Sexual harassment as an exercise of power. Gender, Work, & Organization, 8(1), 61 – 83. https://doi.org/10.1111/1468-0432.00122

50   McLaughlin, H., Uggen, C., & Blackstone, A. (2012). Sexual harassment, workplace authority and the paradox of power. American Sociological Review, 77(4), 625 – 647. https://doi.org/10.1177/0003122412451728

51   For Plaintiff, participating in 2017 CBMM Summer School was the first time she met broader CBMM community (including Azevedo), outside of her collaboration network of selected members of Kanwisher's and Tenenbaum's laboratories at MIT.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE, (4) BOSTON CHILDREN'S HOSPITAL, (5) MARINE BIOLOGICAL LABORATORY, (8) NATIONAL SCIENCE FOUNDATION (NSF), Kathleen Sullivan, CMM Managing Director employed by CBMM Defendants (1) CENTER FOR BRAINS MINDS AND MACHINES AT MASSACHUSETTS INSTITUTE OF TECHNOLOGY, (2) MASSACHUSETTS INSTITUTE OF TECHNOLOGY,  nor Carol Hamel, employed by CBMM Defendant (5) MARINE BIOLOGICAL LABORATORY. In fact, none of them replied further to her email nor introduced themselves in person on the venue, although ALL were present on the MBL campus while the events leading to the rape were unfolding.

80.    In result of CBMM Defendants' intentional negligence, CBMM Defendants caused Plaintiff's whereabouts in Woods Hole to depend solely on Azevedo and Boix, who abused the position of power which CBMM Defendants gave to them, to perpetrate their private sexual assault and sexual harassment agenda.

81.    Power imbalance between Plaintiff and her perpetrators, the vulnerability of a new CBMM member who was naive to the CBMM structure and unfamiliar with CBMM administration, the lack of implementation of preventive and complaint procedures, together with the fear of retaliation[52],  did not allow Plaintiff to find any assistance after the rape incident in Woods Hole on 8/30/2017 took place.

82.    Sexual harassment in academia largely goes unreported as a result of the failure to set up systems that protect those that report sexual harassment and challenge academia's hierarchy,  which enables a self-perpetuating cycle of power to flourish. [53]

83.    CBMM Defendants did not implement comprehensive protections in place for those who do report, allowing retaliation to prevail. It was verified that women in higher education who self reported sexual harassment are less likely to be recommended for promotion compared to women with identical qualifications but not reporting [54].

84.    CBMM Defendants did not implement appropriate reporting system, nor did have clear policies and the communication of these policies available for the victims of discrimination and/or harassment at CMM program.

85.    At the time of Plaintiff's internal complaints in 2019, CBMM Defendants did not comply with the minimum standards in New York State Labor Law & 201-G, which requires all employers to adopt a sexual harassment policy that includes (i) a complaint form for employees to report alleged incident[55], (ii)

---

52  Plaintiff feared of loosing her CBMM postdoctoral position, devastating event for her, her family and her career
53  Kirkner, A.C., Lorenz, K., & Mazar, L. (2020). Faculty and staff reporting and disclosure of sexual harassment in higher education. Gender and Education, 1-17. https://doi.org/10.1080/09540253.2020.1763923
54  Hart, C. G. (2019). The penalties of self-reporting sexual harassment. Gender & Society, 33(4), 534 – 559. https://doi.org/10.1177/0891243219842147
55  The Rockefeller University implemented the model complaint form available for employees only recently.

interactive sexual harassment prevention training including addressing questions specific to their industry[56], (iii) published grievance procedures. [57]

86.     In 2018, CBMM Defendant (7) ROCKEFELLER UNIVERSITY appointed Vice President of HR, Virginia Huffman ("Huffman") as the Title IX coordinator. The role of coordinating the school's compliance with federal (and state) nondiscriminatory and anti-harassment laws thus was assigned to Vice President of HR, the most senior-level position in HR team, who reports directly to the business owner. This caused an inherent bias since the HR department's interests are primarily aligned with those of employer. In case of dirty hands, if complaint are likely to hurt profitability by revealing the University's liability, Vice President of HR is prone to bias and/or to be engaged in cover-up scheme.

87.     Plaintiffs alleges that by setting up cover-up scheme enterprise which involves high-rank HR officials and/or Title IX Coordinators at CBMM Defendants' official structures, CBMM Defendants avoided liability in Plaintiff's complaint.

88.     Plaintiffs also alleges that CBMM Defendants rigged the survey and statistics to cover-up sexual harassment occurrences and sexual harassment complaints. In 2018, Women In Science at Rockefeller (WISER), the initiative supporting women in science, volunteered to prepare and administer a climate survey to the Rockefeller community, designed to provide a deeper understanding of the community's experience with sexual harassment and familiarity with existing resources, as well as to identify opportunities for creating a safer environment. CBMM Defendant (7) ROCKEFELLER UNIVERSITY did not agree for the WISER proposal, and hired a third-party consultant, Grant Thornton LLP ("Grant Thornton") to administer a survey. Grant Thornton is Independent Registered Public Accounting Firm, and does not mark any experience as a consultant in sexual harassment. On November 27, 2018, Grant Thornton administered the survey among Rockefeller University community. CBMM Defendant (7) ROCKEFELLER UNIVERSITY did not also allow to include questions suggested earlier by WISER. CBMM Defendant (7) ROCKEFELLER UNIVERSITY used questionnable methodology in analysing their data and results were independently collected and compiled by Grant Thornton. None of the Rockefeller University's community member was able to gain access to the raw data. Although the survey was completed on 12/11/2018, The Rockefeller University community did not see neither raw data nor final report of Grant Thornton, until CBMM Defendant (7) ROCKEFELLER UNIVERSITY sent a summarized version of the report to the community assuring about "ongoing steps" for improvement, on 5/22/2019. [58] In July 2018, a new psychiatrist, Mehta-Naik was introduced to work as on-site psychiatrist at  CBMM Defendant (7) ROCKEFELLER UNIVERSITY.

---

56  Sexual harassment training which Plaintiff received as a part of her onboarding process before starting her appointment in August 2016 was addressed towards supervisors, not employees under supervision, was entitled: 'Preventing Workplace Harassment for Supervisors', and done by the outside company Emtrain. The training was off with academia context. Therefore, the only taining Plaintiff received prior to her 2017 sexual assault and subsequent sexual harassment, was de facto a training for corporate supervisors and did not cover the sexual harassment in academic context, including dealing with abuser with authority or sexual harassment at multi-institutional setup, common in academia; CBMM Defendant (7) ROCKEFELLER UNIVERSITY refused to optimize the content of the training, although contracted Emtrain product allowed for modifications. CBMM Defendant (7) ROCKEFELLER UNIVERSITY paired also with Emtrain.com platform to supply their employees with Preventing Workplace Harassment Training Course. Although the Emtrain platform allows to tune some content and to customize up to 15 micro-lessons cards in the premium version (see https://emtrain.com/products/courses/workplace-harassment-training/ ), CBMM Defendant (7) ROCKEFELLER UNIVERSITY did not customize the standard, business-oriented workplace environment in the course. Such reasonable action would have allowed for presenting content more closely reflecting daily life situations in life of employees working in a scientific environment, under supervision of the University's Heads of laboratory, attending conferences, undertaking training at multiple institutions, and involved in multi-institutional collaborations. Even after CBMM Defendant (7) ROCKEFELLER UNIVERSITY learned about Plaintiff's complaint in 2019, ALL CBMM Defendants failed with respect to introducing adequate prevention trainings (As per testimonies of Teaching Assistants for the 2019 CBMM Summer School, "new" trainings were grotesque and were not taken seriously, including by Azevedo).

57  Vague and confusing description for postdocs;

58  Plaintiff communicated with Huffman about her complaint on 5/21/2019

89.     Plaintiffs allege that CBMM Defendants tampered with data in campus surveys as part of their cover-up enterprise. The results which CBMM Defendants presented to community and evaluators (including NSF) underscored the deepness of existing discrimination and sexual harassment. Questionable methodology, inherent bias and inherent conflict of interest was present in administering the surveys. At CBMM Defendant (7) ROCKEFELLER UNIVERSITY, the employee of third-party administering the survey began to work for CBMM Defendant (7) ROCKEFELLER UNIVERSITY in highly-paid official role while the survey was processed. [59]

90.     According to a large body of social science evidence, the strategies of fast, deeply flawed fixes, for example online surveys and workshops without expertise in the topic, simply don't work." [60] Plaintiffs allege that CBMM Defendants's actions were deliberately negligent and aimed to wipe the problems under the carpet.

91.     Upon information and belief, ALL CBMM Defendants solicit donations from donors nationally and internationally. Plaintiffs allege that CBMM Defendants use federal funds and donations to perpetrate their cover-up enterprise, and use scientific business as umbrella for commit illegal acts.

92.     CBMM Defendants chose not to properly train its faculty professors and other faculty members, including postdocs in position of authority such as in the role of Teaching Assistant at CBMM Summer School.[61]

93.     Based on information and belief, CBMM Defendants created an environment in which sexual harassment by those in power may perpetuate, and then endorsed sexual misconduct perpetuated by its Principal Investigator Winrich Freiwald (see below) and its CBMM-supported postdoc in position of authority, Frederico Azevedo (see below)

94.     According to contemporary research into sexual harassment in academia, it is a common practice to over emphasize so called "star researchers",  and endorse them behaving badly because of inherent money interests of institutions hiring them.

95.     CBMM Defendants were sloppy in applying work ethics and their Personal Relationship Policy and have been behind with respect to commonly accepted social rules, long and widely accepted in the society. Whereas dating [62] between a supervisor and his or her subordinate individual had been widely prohibited in business workplace environment, CBMM Defedants lagged behind.[63]

*(iv) CBMM Defendants endorsed CBMM Summer School rape culture*

---

59   In December 2018, Grant Thornon's Audit Manager, Beth Krumholtz, moved to work at Rockefeller University. After 6 years at Grant Thornon (working as Audit Associate, Audit Senior Associate and then finally as Audit Manager, Beth Krumholtz became an Associated Controller at Rockefelelr University, a high pay position, comparable to CEO, where she, among others, assists in preparing external reports.

60   https://www.pnas.org/doi/10.1073/pnas.2016164117

61   CBMM Defendants initialized trainings among Teaching Assistants in summer 2019, after Plaintiff's complaint. (As per testimonies of Teaching Assistants for the 2019 CBMM Summer School, "new" trainings were grotesque and were not taken seriously, including by Azevedo).

62   Dating as a stage of romantic relationship whereby two people meet socially with the aim of each assessing the other's suitability as a prospective partner in an intimate relationship (from https://en.wikipedia.org/wiki/Dating )

63   The Rockefeller University changed its policy to prohibit dating between the Head of Laboratory and her/his subordinate postdoctoral scientist and/or the University's student only on 5/22/2019, following Plaintiff's complaint.

96.     CBMM Defendants allowed for sexist and misogynist remarks in teaching materials of the CBMM Summer School. The presentation slides of tutorials objectifies female body [64], deriding gender equality [65] and make multiple referrals to sexual interactions between man and woman, making mysogynists jokes [66]

97.     CBMM Defendants endorsed extracurricular fun according to misogynist culture, which effectively marginalizes women. Male-bonding and socialization rituals such as locker-room conversations while drinking alcohol, reinforce structures that reproduce degradation and subordination of women. [67]

98.     In 2017 and 2018, the CBMM Summer School staff welcomed NSF sponsored alcohol. Summer School Directors applied permissive norms towards its use among Summer School participants. In addition, Summer School Director Gabriel Kreiman lack authority over Azevedo's conduct. On 8/28/2017 Plaintiff witnessed Azevedo bringing several beer packages to the Reverse Debate (part of the CBMM program scheduled for 8/28/2017) and distributing it among students. Although Kreiman initially objected, he allowed Azevedo continuing alcohol distribution during the CBMM scientific program.

99.     The CBMM Summer School Directors knew about the incidents of sexual interactions between Teaching Assistants and students happening during the Summer School. One of the incident caused The Summer School Directors (including Kreiman) to call urgent meeting with the group of Teaching Assistants (TAs) on 8/16/2018. During the meeting, Kreiman informed that those sexual interactions between Teaching Assistants and students are not allowed during the Summer School due to power asymmetry existing in those interactions. Kreiman suggested to postpone them once the Summer School officially ends, and to *"look for the* [sexual] *opportunities* [here] *around"*. Plaintiff was one of only three female TAs in a group of twenty. The chairs during the meeting were arranged in the circle, and Plaintiff met Kreiman's gaze when he was indicating people around with his look while saying about *"looking for the* [sexual] *opportunities* [here] *around"*. Kreiman's conduct was sexist and made Plaintiff feel very uncomfortable. During 8/16/2018 meeting, Kreiman did not provide any details on disciplinary actions to be taken for the misconduct, neither referred to sexual harassment policy nor mentioned Title IX and/or Title VII complaint procedures for misconduct. Two other topics of 8/16/2018 meeting were excessive alcohol usage and student bullying. Although Kreiman just warned against and did not inform about the policy nor revealed the details about the events which motivated the meeting, it is known from CBMM member testimonies that the incidents involved visits to the hospital emergency room.

100.    CBMM deliberate negligence encouraged sexual predators to engage in sexually harassing behaviors as it was implicit that they would not be punished. Azevedo was free to act according to his personal agenda and to abuse his power privileges for his sexually predatory agenda. Following the 8/16/2018 meeting, Azevedo approached at least one female CBMM student with sexually charged behavior and attempted to invite her privately to his room for one-to-one (strong) alcohol drinking. When the woman rejected him, he immediately deleted the incriminating for him messages (supporting testimony of the affected woman).

101.    Azevedo is a serial sex offender savvy in pick-up artists techniques, who was notoriously "chasing" women for sex as preys, including during the CBMM Summer School. In order to gain access to Plaintiff's daily whereabouts and her trust, Azevedo "prepared the ground" in advance of Plaintiff's arrival to Woods Hole, by (i) falsely informing Boix (and others) that he knew Plaintiff from Germany (see footnote 23); (ii) arranging with Boix to move in to the cottage during Plaintiff's stay;

---

*(iv) CBMM opportunities are distributed based on privileges and private connections.*

102.    CBMM Defendants allowed the opportunities for CBMM Summer School students to continue work with the CBMM community after the Summer School to be distributed based on alleged quid pro quo sexual harassment. Both women who were invited for overnight stay at Azevedo's and Boix' rooms during 2017 Summer School, obtained a visiting student internship afterwards.[68]

103.    The CBMM Defendants allowed CBMM opportunities to be distributed unequally among CBMM-supported professors and postdocs and the most prestigious one are given to friends based on alleged quid pro quo sexual harassment. CBMM – Google/X summit was held between 1/17/2018 – 1/20/2018 in Palo Alto, CA. A group of CBMM faculty (Prof. Tenenbaum, Prof. Kreiman, Prof. Kanwisher, Prof. Katz, Prof. Poggio) but also CBMM administration (Kathleen Sullivan) and only very few postdocs (but including Azevedo and Boix) was formed secretively as CBMM delegation, which traveled to Paolo Alto for the summit.

104.    The CBMM – Google/X summit opportunity was a privileged information. On 11/16/2017 Azevedo attempted to trade his privileged information to allegedly exchange it for sexual favors and/or Plaintiff's salience, and/or intimidate Plaintiff with his privileged status. He forwarded to her an in-group email thread evidencing NSF-funded $250/night hotel bookings and flight tickets reservations for the entire group (including Azevedo). Azevedo then instructed Plaintiff to contact Kathleen Sullivan and announce to her that Plaintiff had had knowledge from Azevedo that there is still one place left for the trip, if Plaintiff *"wanted to go"*. Plaintiff did not follow Azevedo's instructions. She was shocked and disgusted by the nepotism and favoritism of such actions and felt embarrassed and humiliated solely by the fact of being contacted with such offer.

**C.    Plaintiff fell a victim of rape by CBMM Defendants' employee Azevedo during 2017 CBMM Summer School in Woods Hole, MA, while working for CBMM Defendants.**

*(i) 2017 CBMM Summer School rape*

105.    In March 2017, CBMM Defendants delegated Plaintiff to submit a student application for the 2017 CBMM Summer School program. [69]

106.    On 8/10/2022, Plaintiff received a welcoming email to the 2017 CBMM Summer School from CBMM Defendants' employee, the CBMM school organizer and CBMM senior member, Xavier Boix [70], which implied that Plaintiff's application was admitted.

---

68   One of the female student on 2/9/2020 reported to Plaintiff 'I am actually in MIT for a short period as a visiting student ... I am working actually with Xavier').

69   On 3/8/2017, Freiwald emailed Marciniak DG Agra: "*CBMM, yes!*"," *Yes, I think this would be good for you, Farid is applying, too*", recognizing the CBMM Summer School as "*a fantastic course*"; Plaintiff was in her first

70   Xavier Boix was then a postdoctoral scientist affiliated with CBMM Defendants (1) CENTER FOR BRAINS MINDS AND MACHINES AT MASSACHUSETTS INSTITUTE OF TECHNOLOGY, (2) MASSACHUSETTS INSTITUTE OF TECHNOLOGY, (3) HARVARD UNIVERSITY AND THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE, (4) BOSTON CHILDREN'S HOSPITAL, in Teaching Assistant role controlled by CBMM Defendants (1) CENTER FOR BRAINS MINDS AND MACHINES AT MASSACHUSETTS INSTITUTE OF TECHNOLOGY, (2) MASSACHUSETTS INSTITUTE OF TECHNOLOGY, (3) HARVARD UNIVERSITY AND THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE, (4) BOSTON CHILDREN'S HOSPITAL, (5) MARINE BIOLOGICAL LABORATORY, (8) NATIONAL SCIENCE FOUNDATION

107.    Although subsequent email exchange clarified that the email was unrelated to Plaintiff's application, Boix, in his role of a senior colleague, suggested to Plaintiff to attend part of the CBMM Summer School as a *"listener"* since *"it will be the best way for* [Plaintiff]*, a CBMM researcher based outside of MIT (Cambridge, MA) where a majority of CBMM activities took place, to fully benefit from CBMM integrative science".*

108.    On 8/24/2017, CBMM Defendants enthusiastically encouraged Marciniak DG Agra to attend the remaining of the CBMM Summer School as a *"listener"* to see the lectures, and on 8/26/2017 used the emerging Plaintiff's travel opportunity to Woods Hole, MA, to delegate Plaintiff for a business meeting with MIT collaborators there. [71]

109.    On 8/25/2017, following Xavier Boix's instructions, Plaintiff sent an email to CBMM Summer School Directors (Kreiman, Katz, Poggio), MBL administrator (Carol Hamer) and CBMM administrator (Kathleen Sullivan, MIT) in which she introduced herself and asked for permission *"to attend the program as a 'listener' for 2-3 days (Aug 27-29th)".* [72]

110.    Plaintiff was positively accepted to participate in the CBMM Summer School as a *"listener"* and referred to *" speak with Xavier* [Boix] *about accommodations".* [73]

111.    Upon her scheduled arrival to MBL Woods Hole campus reception on Monday morning, Plaintiff received spoken directions to the program venue, where she then meet Kanwisher, Tenenbaum and Boix during the program, as she expected.

112.    Throughout 8/28/2017- 8/31/2017, Plaintiff attended the program and conducted her scheduled business meetings. Her last meeting (with Tenenbaum's postdocs Tobias Gerstenberg and Kevin Smith) was scheduled and was realized on Thursday, Aug 31st.

113.    In Woods Hole, Plaintiff was welcomed by CBMM Summer School Director Boris Katz. Plaintiff discussed the duration of her stay with Xavier Boix and Boris Katz. Boris Katz turned out to have interest in Freiwald's laboratory research and scheduled for her yet another business meeting with postdoc from his laboratory, Andrei Barbu. Few times during her stay Plaintiff discussed with Katz and Barbu possible collaborations between the laboratories.

114.    For her stay at Woods Hole, MA, CBMM Defendants provided Plaintiff with boarding and housing. Specifically, on 8/25/2017,  Xavier Boix guided Plaintiff about her accommodation as following *"there is space in the cottage house where Fred* [Frederico Azevedo] *and I are staying permanently and other people comes and goes. There is an individual room which nobody will use from Sunday on. The cottage is quite cool and it is just afew minutes walk to the beach".*

115.    Upon approaching Xavier Boix for accommodation arrangements, Plaintiff learned that (i) refereed earlier lodging corresponds to the MBL cottage house located far from the CBMM Summer School program venue, accessible by bike/car/long walking only, (ii) her "individual room" corresponded to a door-less attic space, and only one shared bathroom was available in the cottage house; (iii) no keys to the cottage house were provided to her, and (iii) Plaintiff was asked to organize her whereabouts with the cottage permanent residents (and the only ones at the duration of Plaintiff's stay), each occupying closed-

---

(NSF).

71  On 8/26/2017, Freiwald emailed Kanwisher and Tenenbaum, Marciniak DG Agra cced: *"Karolina has some eye movement data on physics. She will be over in Woods Hole shortly, and I hope you guys can discuss".*

72  A copy of the full email correspondence between Plaintiff, Xavier Boix and the CBMM Summer School organizers is available as evidence.

73  Email from 8/25/2017, in response to Plaintiff's request.

door bedrooms downstairs: Xavier Boix and Frederico Azevedo. Both men were in position of authority over Plaintiff since they had ability to control CBMM Summer School equipment and resources. [74]

116.    Immediately before and during Plaintiff's stay, Xavier Boix (and other employee of CBMM Defendants) were falsely told by Azevedo that Plaintiff is Azevedo's *"old friend from Tuebingen"*, in consequence believing that Azevedo's unusual urge to assist the *"listener"* with her daily whereabouts was the result of a friendship connection. [75]

117.    On 8/30/2017 around 5-6pm, Plaintiff was approached by Azevedo at the common dinner space in CBMM Defendant (5) MARINE BIOLOGICAL LABORATORY campus building SWOPE. Azevedo followed Plaintiff to the dinner table and during the dinner insisted she accepted his offer to use a free room in the same building (SWOPE) to have a rest before scheduled evening program.

118.    Because Plaintiff believed that having some rest at SWOPE would be appropriate in that given context, since (i) the program was expected to continue until 11pm that day (ii) she was still physically weak and *"out of shape"* after physically demanding day and due to her recent and ongoing medical condition [76] (iii) since the cottage was far away, too far away to travel back and forth (iv) believing that Azevedo, as CBMM organizer, had indeed access to a free room to use [77], Plaintiff accepted Azevedo's offer.

119.    Plaintiff fell asleep shortly after Azevedo left the room. Azevedo however intruded into the room later[78]. Despite Plaintiff's repeated verbal and physical defense, Azevedo raped Plaintiff and instructed to remain silent about the event. Confused, hurt, naive in the CBMM environment[79], self-blaming for what happened and in fear of the oppressor in position of authority, Plaintiff did not report the incident immediately.

120.    On 9/1/2017, back in New York, Plaintiff met her Rockefeller University supervisor Winrich Freiwald to discuss the results of collaborative meeting in Woods Hole. Although the meeting was scheduled to take place in his RU office, and Freiwald '*wanted to be able to focus*' (email correspondance), he last-minute moved the meeting out from the office and took Plaintiff for a walk which then turned out to be his relax and entertainment. During *the meeting,* she alluded to Freiwald about the rape which happened 2 days earlier, by reporting about a bad encounter with somebody from another institution. Freiwald smiled as if he found the fact to be funny, thus, part of normal interactions between scientific colleagues, and dismissed the topic. During *the meeting*, Freiwald's behavior exceeded professional limits. He was shortening the personal distance, and several times touched her inappropriately. The event constituted

---

74  Frederico Azevedo was then a postdoctoral scientist affiliated with CBMM Defendants (1) CENTER FOR BRAINS MINDS AND MACHINES AT MASSACHUSETTS INSTITUTE OF TECHNOLOGY, (2) MASSACHUSETTS INSTITUTE OF TECHNOLOGY, (3) HARVARD UNIVERSITY AND THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE, (4) BOSTON CHILDREN'S HOSPITAL, in Teaching Assistant role controlled by CBMM Defendants (1) CENTER FOR BRAINS MINDS AND MACHINES AT MASSACHUSETTS INSTITUTE OF TECHNOLOGY, (2) MASSACHUSETTS INSTITUTE OF TECHNOLOGY, (3) HARVARD UNIVERSITY AND THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE, (4) BOSTON CHILDREN'S HOSPITAL, (5) MARINE BIOLOGICAL LABORATORY, (8) NATIONAL SCIENCE FOUNDATION (NSF).

75  Although Plaintiff and Azevedo completed the same Graduate Programm in Tuebingen, Germany, they never met with each other, nor communicated with each other, either personally or through friends, and they oscillated in different institutions and social circles.

76  Kidney surgery in June 2017 and prolonged flu in July/August while traveling from US to Poland for baptism (Plaintiff has the role of her niece's godmother)

77  The room at SWOPE turned out to be Azevedo's permanent residency; Azevedo and Boix were fooling Plaintiff in the email on 8/25/2017 *"there is space in the cottage house where Fred and I are staying permanently and other people comes and goes"* ,

78  Later, Plaintiff identified to CBMM Defendants the crucial witness who witnessed Azevedo's movements and saw Plaintiff's sleeping before she was sexually assaulted. The witness was never interviewed in the course of subsequent U of Chicago/ MBL investigation.

79  CBMM Defendants refused to give any assistance nor guidance during Plaintiff's stay in Woods Hole in 2017.

sexual harassment incident form Freiwald and was followed by other instances of quid pro quo sexual harassment from freiwald towards Plaintiff.

121.    Plaintiff reported the 2017 rape at Woods Hole on 4/3/2019 (and subsequent sexual harassment from Azevedo) to Falmouth Police having jurisdiction over the case. Since then, several other women came forward to give their testimonies to the detective leading the case, about being the victim of Azevedo's sexual predatory actions. The group includes the victim of Azevedo's 2013 rape, raped after Azevedo intoxicated her with alcohol. In 2017 and 2018, Plaintiff witnessed Azevedo's sexual harassment behavior directed towards other women, including towards the CBMM Defendant (7) ROCKEFELLER UNIVERSITY student.

122.    Feeling above the law, Azevedo ridiculed Plaintiff's complaints to him about the incident, when she confronted him afterwards. At one of such confrontation, Azevedo bragged to Plaintiff that back in his Graduate school, he raped a university student when the woman was unconscious under influence of alcohol, because 'anyway, I will f*ck her' (supporting testimony of the woman emerged during the investigation).

123.    CBMM defendants endorsed Azevedo's sexual assault and sexual harassment towards Plaintiff (and other women). After Plaintiff's internal complaint to CBMM Defendants in March 2019, CBMM Defendant allowed abuser for the Sumemr School 2019, despite ongoing investigation in relation to Plaintiff's complaint. As of today, Azevedo remains employed by CBMM Defendants.


*(ii) While Plaintiff refused further personal contact with Azevedo, he kept intimidating her with his power position in her workplace*


124.    Following the 2017 rape in Woods Hole,Azevedo kept nagging Plaintiff to sustain in contact with him. Subsequent Whatsapp communication contained implied offer of exchange of favors, intimidation and threats.

125.    CBMM Defendants endorsed Azevedo's nagging behavior towards Plaintiff in the email correspondence in her workplace to be nagging in the subsequent conversation with Plaintiff.While Azevedo had been intentionally looking to display power differentials towards Plaintiff in a common CBMM communication, intimidated her and implied he is doing a favor to Plaintiff[80], CBMM Defendants endorsed Azevedo as weekly CBMM research meeting co-organizer and contact point to Plaintiff and her supervisor [81] and delegated Plaintiff for a managerial CBMM task at CBMM Defendant (7) ROCKEFELLER UNIVERSITY location, to work on a remote connection with CBMM research seminar, The task implied (and involved) at least remote contact with Azevedo. [82]

---

80  On 1/30/2018, Plaintiff sent an email inquiry to Kathleen Sullivan about the upcoming CBMM research seminar. Ms. Sullivan responded on 1/31/2018 early morning: *'Hi Karolina, Checking in with the research meeting organizers. Will get back to you as soon as possible. Best wishes, Kathleen'*. Although the individuals in designated roles to organize and support the meeting were Kathleen Sullivan (CBMM administrator), Kris Brewer (technical support) and Dr. Penagos-Vargas (research coordinator), Azevedo stepped in their role and wrote to Plaintiff, ccing the CBMM administrators *'Hi Karolina, I've talked to Kris Brewer about transmitting the CBMM research meeting to Rockfeller and in principle it would be possible. Could you please schedule a time with him to test your connection there? Besides that, will you connect only with your computer or with another a "room system" at Rockfeller? Best regards.Fred. '*. She replied to designated organizers.

81  On 2/15/2018, Sullivan to Freiwald (cced Plaintiff) introducing Azevedo and Penagos-Vargas to Winrich Freiwald as *'two postdocs helping to coordinate the CBMM caucus, research meetings, and seminar talks'*,

*(iii) Azevedo sexually assaulted Plaintiff in March 2018 in New York.*

126.    In March 2018, Azevedo requested from Plaintiff an accommodation at CBMM Defendants (7) ROCKEFELELR UNIVERSITY housing in New York for the neuroscience conference taking place at New York University. Azevedo coerced Plaintiff to agree to enabled him access to the 3-room apartment she shared with another female postdoct from Rockefeller University.

127.    Upon arrival, Plaintiff instructed him to stay in the living room, but Azevedo moved first to Plaintiff's suit to "refresh himself" using Plaintiff's suit bathroom, as the apartment did not have a guest shower. When he finished using Plaintiff's suit bathroom, Azevedo involved Plaintiff to her room for the conversation over "something she wanted to tell him".

128.    Plaintiff informed Azevedo that as a result of Azevedo's rape in Woods Hole, Azevedo contracted Herpes virus to her, which was diagnosed recently during her standard gynecological test. Plaintiff was terrified, since the infection increased chances for women to develop cervical cancer, and asked Azevedo to stop his harassment towards women since it causes harm. Azevedo laughed at her, said "welcome to the population of people with sexually transmitted disease", and violently forced her into sexual intercourse with her without condom.

129.   Plaintiff reported the incident to NYPD, Manhattan Special Victims Squad,  in 2022, after she underwent the initial psychiatric and psychological treatment for Post Traumatic Stress Disorder (PTSD).

*(iv) Azevedo intimidated Plaintiff in May 2018 at MIT, Cambridge, MA*

130.    Azevedo kept displaying his power and influence in CBMM to Plaintiff, following the incident, although Plaintiff refused any personal contact.

131.     In May 2018, Azevedo unnecessary cced Plaintiff on the email he sent to her supervisor, where he appeared as May 2018 CBMM retreat organizer. [83]

132.    Azevedo also attempted to display his facilitation of Plaintiff's and other CBMM members from Freiwald laboratory in the retreat, although none of them neither asked for facilitation nor positively welcomed his action. [84]

133.    On 5/22/2018, Azevedo in his role as CBMM retreat organizer, attempted to involve Plaintiff in participating in a social event at the retreat, while in the group Whatsapp conversation to which he added her. he intentionally used on a several occasion the Neo-Nazi and White Supremacist Terms, calling himself a Fuhrer, a personal title that Hitler claimed for himself.

---

82  On 2/15/2018 Freiwald delegated Plaintiff to manage CBMM research seminar remote connection for his laboratory at Rockefeller University (Freiwald to Plaintiff on 2/15/2018: *"you and I get the email, we will alert people when something interesting is coming up, and then everyone can watch/attend. Does that make sense? W"*; Freiwald to CBMM administrator on 2/15/2018 *"Thanks, Kathleen and Kris – we'll organize this here through Karolina. Thank you! W"*. In 2018 and 2019, Plaintiff felt obliged to work in the interest of Freiwald, thus kept working on CBMM connection according to Freiwald's instructions. The work involved unwelcomed contact with her 2017 sexual assault perpetrator and created a hostile environment for her.

83  Email on 5/14/2018: Azevedo in the role of CBMM retreat organizer invited Freiwald to participate in one of two debates at *"our CBMM retreat* [CBMM annual retreat conference at MIT on 5/25/2018]".

84  Azevedo on 5/14/2018: *"Hi Jean, could you please add Karolina Marciniak (postdoc), Julia Sliwa (postdoc) and Farid Aboharb (PhD student) to the list of attendees of the CBMM retreat? They belong to Freiwald's lab and some of them will do a flash presentation. I am cc'ing this email to them.Thanks! PS: I had to correct some the previous emails. Sorry for the 2nd email."*

134.    Azevedo is known in CBMM community from making homophobic and racist "jokes". In 2018, Azevedo commented on the marriage of a male MIT postdoctoral researcher of the Caucasian race, with a woman of Latin origins as wasting the man's "good genes".

135.    On 5/25/2018, the day of the CBMM retreat at MIT, Cambridge, MA, Plaintiff was approached by Azevedo in MIT building. Azevedo coerced Plaintiff into a private conversation with him at MIT corridor, during which he asked her to break out with her boyfriend and to "hang around with him" over upcoming CBMM Summer School to *"facilitate his sexual encounters"* with CBMM Summer School female students. Plaintiff actively refused Azevedo's action.

136.    In June 2018, Azevedo contacted Plaintiff via Whatsapp with the message *"I hope you are thinking about me and not about your stupid boyfriend"*. Plaintiff immediately blocked Azevedo as a contact on Whatsapp and subsequently deleted Azevedo from all of her social media.

137.    In fear of Azevedo's further harassment, Plaintiff arrived at her Teaching Assistant work at 2018 CBMM Summer School in Woods Hole with her husband (then fiance) for protection. Concerned about Azevedo's behavior, Plaintiff asked her husband to accompany her in Woods Hole for a few days. During their Stay at MBL campus in Woods Hole, both Plaintiffs experienced that Plaintiff was subjected to looks and rumors among male CBMM Teaching Assistants. Throughout her stay there, Plaintiff experienced hostile environment.

138.    By reason of the facts and circumstances stated above, Plaintiff believed that CBMM Defendants endorsed Azevedo's behavior and feared CBMM Defendants retaliation.

139.    Sexual assault survivors struggle with a wide range of emotions that make coming forward difficult: fear of revictimization, fear of retaliation, distortion of allegations by widely spread rumors, and generally not being believed. Studies shown that it is more difficult to report the rape when the rapist is somebody known to the victim or one that the victim has to stay in touch with after the rape. According to statistics, it is four times more likely for a woman to be raped by an acquaintance than by a stranger. The power imbalance between the rapist and his victim is a leading cause of remaining silent afterward, especially when there is no support and the culture does not support the victim in coming forward.

140.    On 3/12/2019, CBMM Defendants delegated Plaintiff to travel to MIT for the upcoming on 3/19/2019 CBMM NSF External Evaluation Meeting, to present a research poster there. [85]

141.    Plaintiff did not encountered Azevedo at MIT in March 2019, but she felt under tremendous stress and fear of potential further harassment from his side in the future. To protect herself and other community members from further sexual harassment, she decided to take internal actions and file the complaint about the events internally with CBMM Defendants.

**D. CBMM Defendants conspire against Plaintiff's complaint after she files CBMM internal complaint in March 2019.**

*(i)Plaintiff filled internal complaint with MIT Title IX & Bias Response Office[86]*

---

85   Freiwald to Plaintiff on 3/12/2019: "Can you make it? I totally did not realize" in response to Kanwisher's request "We are hoping at least one of you can come, and present a poster", Freiwald to Kanwisher 'Karolina can come – I, unfortunately, cannot because of other obligations'; Kanwisher to Freiwald "But if Karolina can come and present a poster that would be great".

86   Now known as the Institute Discrimination and Harassment Response Office (IDHR)

142.    CBMM, as recipient of federal financial assistance from the National Science Foundation, constitutes education programs and activities, as well as employment workplace, where discrimination on the basis of sex is prohibited based on Title IX and Title VII federal laws. [87]

143.    Title IX requires the awardee organization to respond in a prompt and equitable manner by taking immediate action to eliminate the discrimination, prevent its recurrence, and address its effects. [88]

144.    MIT, as the lead awardee institution for the NSF CBMM cooperative agreement, and Plaintiff's joint employer, is designated by NSF to respond to violations of the Title IX and Title VII regulations.[89]

145.    MIT's Policies & Procedures *"sets forth policies and procedures that apply broadly to MIT faculty, other academic staff, research staff, non-academic staff, and, for some policies, to unpaid affiliates and other members of the MIT community,"* and *"…states general standards of conduct."* [90]

146.    Complaints filed under this policy are investigated by MIT's Institute Discrimination & Harassment Response Office (IDHR). The Director of IDHR and MIT's Title IX Coordinator is Sarah Rankin ("Rankin").[91]

147.    In March 2019 Plaintiff filled the complaint with MIT Title IX & Bias Response Office against Azevedo and Boix in relation to 2017 sexual assault and subsequent sexual harassment. [92]

148.    In response to her complaint Plaintiff received an email from Rankin, asking for a phone call.

149.    During the phone call [93]Rankin learned that the complainant (i.e., Plaintiff) had bona fide intentions in filling the complaint [94]. Rankin then inquired about Plaintiff's understanding of Respondents'

---

87    NSF's Title IX regulations at 45 CFR §618; Title VII of the Civil Rights Act of 1964
88    The following NSF regulations apply here:(i) 45 CFR §618.400(a) provides that "…*no person, shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any … education program or activity operated by a recipient that receives Federal financial assistance.*";
89    The following NSF regulations apply here: (ii) 45 CFR §618.135(b) provides that NSF awardee organizations that operate educational programs, "*shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alliging any action that would be prohibited by these Title IX regulations.*"
90    MIT Policies, section 9.1   https://policies.mit.edu/policies-procedures/90-relations-and-responsibilities-within-mit-community
91    Rankin moved to MIT in 2013 from Harvard, where she worked for seven years as director of the Office of Sexual Assault Prevention and Response.
92    Her 3/24/2019 complaint form also included several attachments: a copy of 2017 email correspondence in relation to her participation in the Summer School 2017 (which evidenced Azevedo and Boix conspiration), a detailed description of the 2017 sexual assault and other sexual harassments of from the 2017 sexual assault perpetrator, testimony about Plaintiff's knowledge of other victims of Azevedo, and names of 5 potential witnesses. As preferences for specific outcome, she marked' *Referral to Human Resources for possible investigation of a violation of Institute policy by an employee (faculty and staff)*'*.*
93    The phone call took place on 3/28/2019. Its audio content is documented by cell phone records available as evidence.
94    Plaintiff said to Rankin that she did not "*report this incident anywhere else. This report that I made was the first thing that I did. It costs me already a lot. It was just my thought that that is the place that I should report because CBMM is part of MIT, this person is a member of MIT, I am involved in the work of MIT, I am regularly visiting MIT so I thought, my intuition was that that would be the first place I should report*".

CBMM affiliations [95], to deceive Plaintiff into wrongfully question MIT's jurisdiction over the complaint [96] [97].

150.    Rankin did not act upon Plaintiff's complaint according to the Initial Assessment Complaint and did not *"begin an investigation of the Complaint or attempted informal resolution "*, thus violating MIT Policies and Procedures regarding complaint resolution [98]

151.    The above CBMM Defendant's conduct violated MIT's Institute Discrimination & Harassment Response Office (IDHR) Policies &Procedures [99]and constitutes "deliberate indifference", "hostile environment' and retaliation claims under Title IX, and intentional discrimination based on sex under Title VII.

152.    As a consequence of MIT not acting upon Plaintiff's complaint, Plaintiff suffered substantial distress, mental anguish and feared retaliation and hostile environment.

*(ii) CBMM Defendants created Kafka's bureaucratic nightmare for Plaintiff over her complaint*

153. Rankin contacted Plaintiff by email after 2 weeks, informing her that the inter-institutional discussion regarding her complaint is taking place and asking her to *"talk to my Harvard counter-part* [Jose Martinez] *directly'* to facilitate the process determining Plaintiff's *"formal complaint options".* [100]

154.    Plaintiff agreed to Rankin's request for contacting Harvard, however she again expressed to Rankin her concerns about further harassment from the perpetrator during Plaintiff's upcoming visit at MIT. [101]

---

95  Plaintiff provided all information to the best of her knowledge.

96  Rankin to Plaintiff:' *I ask you all this questions, I am just trying to, as you can imagine it is complicated when there are people that sort of belong to different worlds, trying to figure out you know what is possible. So, in terms of what you were looking for in terms of reaching out and submitting your report. Do you have thoughts on whether ... if it is possible and I don't even know if it is possible if MIT would be the right person or the right entity to conduct an investigation into the allegations or that would be Harvard given his supervisor, we can figure all that out ... is that something that you are looking for that it is going to be some sort of formal investigation into allegations ending in finding whether he violated our sexual harassment or sexual misconduct policy?'*

97  MIT had jurisdiction over the complaint since, (i) MIT, as the institution where CBMM is based, has substantial control over members of CBMM community and their access to the CBMM program activities, and (ii) both Plaintiff, the CBMM-supported postdoc, as per policies '*conducting business with or on behalf of the Institute'* and Azevedo, actively working at MIT in Prof. Desimone laboratory, were MIT community members under MIT's Policies & Procedures definition, which identifies the MIT community as, "*faculty, staff, students, fellows, individuals with visitor appointments, affiliates and any other individual who conducts business with or on behalf of the Institute*" ( link here:

98  MIT Policies, section 9.8 https://policies.mit.edu/policies-procedures/90-relations-and-responsibilities-within-mit-community/98-complaint-resolution#9.8.3

99  MIT Policies, section 9.1 https://policies.mit.edu/policies-procedures/90-relations-and-responsibilities-within-mit-community

100 Rankin to Plaintiff on 4/9/2019 via email: "*Hi Karolina, Thanks for your patience! I spoke to my colleague at Harvard who is trying to sort out what kind of relationship they have with him which will determine whether they can offer any formal complaint options about the incident in 2017. Would you be willing to talk to my Harvard counter-part directly? He had some questions that I wasn't sure about and it would help them to talk with you. If you're willing, I can electronically introduce the two of you. Thanks, Sarah".*

101 Plaintiff to Rankin on 4/15/2019 via email: '*Hi Sarah, Yes, of course I am willing to talk directly to your Harvard counter-part colleague directly. Please, go ahead with putting us in touch. Does he have an access to my report I sent to MIT Title IX? I can also sent another one to Harvard. Just to clarify, I am going to present a poster during CBMM annual evaluation, NSF site visit happening on May 7th within MIT buildings. Am I going to cross my raper and his colleague that helped him there? I wanted to be prepared if that is what is going to happen.'*

155.    Despite Plaintiff's repeated desperate requests for protection, Rankin refused to issue a no-contact order for Plaintiff's upcoming visit at MIT, [102]

156.    The above CBMM Defendant's conduct violated MIT's Institute Discrimination & Harassment Response Office (IDHR) Policies &Procedures regarding supportive measures and issuing a no-contact order [103] and constitutes deliberate indifference, hostile environment and retaliation under Title IX, and discrimination based on sex, negligence and retaliation under Title VII.

157.    During the phone call [104] Harvard Title IX Coordinator Jose Martinez ("Martinez") inquired about Plaintiff's understanding of Respondents' CBMM affiliations [105], to deceive Plaintiff into wrongfully question Harvard (and Boston Children Hospital) jurisdiction over the complain and discourage her from filing the formal complaint [106],

158.    While Plaintiff inquired about no-contact order [107], she learned that issuing the one is conditioned on filing the formal complaint, since in response Martinez asked directly about her intentions to file one and heard from Plaintiff that " *... for sure I want to do a formal complaint because I deeply believe that this person is dangerous for other people and I would really like to avoid other girls being abused by this person. This person is part of the school and*

---

102 Rankin to Martinez on 4/16/2019,  (cced Plaintiff, attached copy of Plaintiff's MIT complaint form): "*Hi Jose, I write to introduce you to Karolina Marciniak, copied here. She would like to discuss the incident described in the attachment. I'll let the two of you find a time to talk. Best, Sarah*"; Rankin to Plaintiff on 4/16/2019: "*I just emailed the two of you. I don't know if you'll see the two men while you're here to present a poster. There are no restrictions on where any of you can be so it's possible (if they are attending the event). You could talk to Harvard about someone talking to him about not contacting you if the two of you are at the same event although that doesn't mean you won't potentially see him (just means he'd be told not to talk to you). Another option is you could apply for a restraining order through the courts and, if you obtained one, he would have to stay a certain distance away from you.*"

103 As per IDHR webpage ( https://idhr.mit.edu/supportive-measures/supportive-measures-actions/mnco ): (i) "*A mutual no contact order (MNCO) is a letter issued by the IDHR Director or designee that implements contact limitations between two community members for a period of time so each community member can focus on their education and/or work. Specifically, a MNCO prohibits both individuals from having any direct or indirect contact with each other, including on or off campus, in person or through another party, by telephone, letter, email, social media or other electronic media, or by any other means. Both individuals are also directed to refrain from any form of harassment, retaliation, or intimidating behavior directed at each other.*" (ii) To request a MNCO, the webpage instructs individuals to complete an incident report form or submit an email directly to IDHR. (iii)  The website states, "*[d]uring the meeting, IDHR staff may ask questions to better understand your concerns, including your perspective on what measures may be appropriate to protect your safety; protect the safety of the MIT community; and deter discriminatory harassment, discrimination, and retaliation*". (iv)  The webpage further states, that "*IDHR can only issue a MNCO between two community members. However, if you are experiencing unwanted contact from an alum or noncommunity member, please contact IDHR for assistance as there are certain circumstances where IDHR can issue a no contact request letter. Depending on the circumstances, IDHR can also work with Residential Education and appropriate campus partners to request that an alum or nonaffiliate be banned from certain residence halls or MIT activities.*"

104 The phone call took place on 4/18/2019. Its audio content is documented by cell phone records and available as evidence.

105 Martinez to Plaintiff: " "*... was he employed by the conference?...do you know his primary appointment? ... do you know if Frederico has another place of employment? ... do you know affiliation with Children's Hospital or another hospital of Frederico? ... I see him as Research Fellow. Did he ever tell you about it? Research Fellow Opthamology?* ) and her affiliations with the Summer School ( Do you know in terms of the Summer School, how were you attending? ... were you a visiting student at MIT or Rockefeller? ... did you registered at the conference? ... would you be able to give me the contact information for that Senior Teaching Assistant [Xavier Boix] that helped you to register for the Summer School? ... were you in touch with the administrators? ... Carol Hamel?* [Plaintiff reading to Martinez ALL recipients of the email she sent on 8/25/2017 with CBMM Summer School participation inquiry]*... would you be able to share this correspondence with me?*".

106 Martinez to Plaintiff: "*... I am trying to understand if it is a joint issue amongst the universities or is there a primary jurisdiction question right? I am trying to understand the structure of it, who is the representative of this Brain Minds and Machines group ... just to let you know about the process, which have different options. You know, somebody can file a formal complaint that is investigate by our office of dispute resolution, ... but primarily they would look at initially if it is our jurisdiction, and that is what I am trying to understand ... the setup here. I can let you know, you can definitely file a formal complaint, that is definitely the option, but I wouldn't like to discourage you if it would say that Harvard does not have jurisdiction ... I am trying to get a little bit of information ahead of time through this channel ...*".

107 Plaintiff to Martinez: " *... I have a visit on 5/7/2019 at MIT and I would like to know what kind of things you can do to make the environment save for me there when I go there*"), Martinez referred her initially back to Rankin *(" ...I think in that sense we can work with Sarah ... "*), to learn from Plaintiff that Rankin referred him ("*Sarah suggested to talk to you about* [reading from Rankin's 4/16/2019 email] *somebody talking to him to not contact you*").

*is in position of power and is using this position of power to abuse students. So, I would like to avoid futher damage to other people, and I feel deeply obliged to do this complaint ... ".*

159.    Martinez then deceived Plaintiff into questioning Harvard's jurisdiction over the complaint, but also suggested the possibility that "*5 institutions*" (including Harvard, MIT, MBL and the Rockefeller University) have joint jurisdiction over the complaint and thus "*Maybe we all have responsibility here, maybe, you know, we all will have to process, MIT will have to process, Rockefeller would have to process".*[108]

160.    Plaintiff expressed to be  *"a little bit lost because it is the second place I am trying to do something, and then it seems that maybe MBL should take the complaint. So, I feel like nobody would like to take the responsibility and I think it is sad."* and correctly argued against referring complaint to MBL, which does not have employment relationship with neither party of the complaint nor has disciplinary power over Respondents [109].

161.    Plaintiff rebuted Martinez's implication to not process the complaint because of its complexity[110].

162.    Plaintiff also pointed out to Martinez the lack of any sexual harassment prevention training in the CBMM. [111]

163.    Martinez summarized the conversation: "*... it is complicated ... and I will work on figuring it out*".

164.    When Plaintiff again inquired about no-contact order [112],  Martinez rebuffed Plaintiff, asking her to"*... let's just continue to check with each other, so that we can decide what will be the thing to do*".

165.    Subsequent to the phone call, Martinez sent to Plaintiff an email where he provided the Harvard policy, which by Initial Assessment applies to Plaintiff's complaint *This Policy applies to sexual or gender-based harassment that is committed by students, faculty, staff, Harvard appointees, or third parties, whenever the misconduct occurs:  1. On Harvard property; or 2. Off Harvard property, if: a) the conduct was in connection with a University or University-recognized program or activity; or b) the conduct may have the effect of creating a hostile environment for a member of the University community.*

---

108 Martinez to Plaintiff: " ... *Got you. I could send you the information abut our office of complaint resolution. I would say that we don't have this evaluation yet if this is part of our program, if that is part of our process because it was outside of the campus. But I would say you can definitely file a formal complaint and there would be a time to figure out if that is part of our process. That is why I am trying to get information about Carol Hamel, you know to help with that information for the formal complaint, but I can give you information abou the formal complaint if you want.*" Plaintiff responded "*Yes, definitely.*" Martinez continued " ... *So, I don't know what is the role of Carol Hammer on this process. I am just trying to understand ....who is sponsoring this event. Because this would be what I consider jurisdiction, right? It might not be a clear cut. It may be that 5 institutions sponsor that event. And all are responsibe for, right? KM.. right ... right. JM: And that is what I am trying to understand where Carol Hamel live. Does she work at MIT? Does she work.. Maybe it is more complicated than that, but maybe it is more simple than that. We would have to look at that. Maybe we all have responsibility here, maybe, you know, we all will have to process, MIT will have to process, Rockefeller would have to process, right? KM.. right ... right. JM: And that is what I am trying to understand where Carol Hammel live. Does she work at MIT? Does she work.. Maybe it is more complicated than that, but maybe it is more simple than that. We would have to look at that.  Maybe we all have responsibility here, maybe, you know, we all will have to process, MIT will have to process, Rockefeller would have to process, right?* "*

109 Plaintiff to Martinez:... *But my argument that it is not the issue directly with the MBL is that this person is part of CBMM and is employed by Harvard and the events that are happening are all the time organized in Boston. So, for me it looks like the Wood Hole was a transfer of the CBMM sponsorship ...*

110 Martinez to Plaintiff "*I don't want  you to feel that we want you to go to the next place, but this is more complicated than other situations we worked with, right?* ", Plaintiff to Martinez " ... *But it does not mean that you should send it away and say that there is no issue ".*

111 Plaintiff to Martinez: *The other think I wanted to tell about MBL is that last year I was attending the Summer School as a Teaching Assistant, and the MBL organized orientation, like a full day orientation for a group, where therew as dedicated training about sexual assault, it was very nice to see it and I was surprised that I did not get nothing like that in 2017*".

112 Plaintiff to Martinez " ...*about no-contact order I will be in touch with you right? You can give me information on that, right?*"

Martinez reported to Plaintiff in the email that he is *"still trying to conduct some research regarding the following in our policy in connection to the Center and it's summer program. We would need to assess the jurisdiction question above".* [113]:

166.     In the email, Martinez did not provide Plaintiff with any information about no-contact order as he promised earlier.

167.     Between 4/18/2019 and 4/23/2019[114]  Plaintiff made two requests for the complaint follow up to Martinez, who reported back to Plaintiff that *"Unfortunately I am still researching and had a call today to discuss Harvard's involvement in the program".*

168.     Not hearing back from Martinez and increasingly fearful about her upcoming visit to MIT[115], Plaintiff emailed Rankin on 5/3/2019 with an attempt to help determining the complaint's jurisdiction: *"I have been in touch with Jose Martinez, your Harvard counterpart but I didn't get the clear answer to the question about the appropriate by law place to submit my report for investigation or designated Title IX coordinator for CBMM. Could you please check with Kathleen Sullivan, CBMM Managing Director and let me know about the relevant procedures that were stated in written assurances section related to Title IX compliance provided by CBMM either at the application stage or at the award stage to the funding agency (NSF)?".* Rankin did not replied to Plaintiff until 5/9/2019.

169.     Plaintiffs allege that CBMM Defendants applied misconceived doctrine of primary jurisdiction to sent Plaintiff's complaint back and forth between MIT, Harvard, the Rockefeller University and MBL/U of Chicago, to salience Plaintiff and cover up Plaintiff's complaint to avoid joined liability.

### *(iii) CBMM Defendants' deliberate negligence caused hostile environment to Plaintiffs (Azevedo intimidated Plaintiff on 5/7/2019)*

170.     Because CBMM Defendants did not issue a no-contact order for Plaintiffs' visit to MIT, Cambridge, MA [116] both Plaintiffs were subjected to extreme stress the days prior to the CBMM conference at MIT at 5/7/2019, in fear of Azevedo's retaliation [117] .[118] [119] [120]

171.     On 5/7/2019 in the morning, upon arrival at MIT at the scheduled time, Plaintiff went to report her presence to the conference poster session organizers as instructed in the email correspondence preceding the event. While she approached the poster stand, she saw Azevedo evoking impression of being a poster session organizer, although his name was NOT on the list of CBMM members participating in the event. [121] The instructions for poster sessions participants asked her to pick up her poster and hang it on designated poster board. While doing so, she noticed Azevedo followed her to her poster board. Although there were multiple poster stands (all poster participants appeared at the same time to prepare the session) Azevedo stopped at the one nearby Plaintiff, and initiated unnecessary assistance towards the individual hanging his poster there, while by gestures, voice and the look being intimidating towards Plaintiff.

---

113 Martinez to Plaintiff on 4/18/2019 via email.
114 The email exchange on 4/22/2019 and the phone call on 4/23/2019
115 The CBMM NSF evaluation conference on 5/7/2019 at CBMM headquarters at the McGovern Institute for Brain Research at MIT, Cambridge, MA.
116 Ref  94,112
117 Pedro assisted her wife from their home in New York to MIT in person.
118 Plaintiffs were informed by Falmouth Police on 4/3/2019 that they were going to interview the suspect about the crimes.
119 Azevedo is known to have criminal record in Germany, as per
120 Plaintiff seek assistance of MIT police, as documented in email correspondence and phone records including call for help immediately after being a victim of  Azevedo's intimidation (see later).
121 A per documented email correspondence.

172.    Following Azevedo's unquestioned intimidation and threats, Plaintiff left the poster session area and called MIT Police, who then assigned MIT policeman to provide a security service for her for the remaining time of the poster presentation event. Same day after the event at MIT concluded, Plaintiff filed an incident report about the events to MIT police and was assisted back home by her husband.

173.    In addition to participating in the NSF site visit poster session, Plaintiff was also delegated to attend lunch with the NSF review team.

174.    Immediately before the lunch, delegated group of CBMM students and postdocs was instructed about the lunch scopes by Lizanne DeStefano, NSF-appointed CBMM evaluator.

175.    Following the instructions, Plaintiff exchanged private conversation with one of the NSF reviewer to share her positive scientific experience as CBMM member, and notified about the lack of information about the CBMM reporting system. [122]

176.    In a follow-up email, Plaintiff was notified by the NSF reviewer: *"Last night I conveyed the Title IX issue to Poggio (without giving away your identity). He said that he would have the information about it and a description of the process of reporting posted on the website of CBMM."*[123]

177.    In the same email, Plaintiff also received suggestion to contact NSF Office of Diversity and Inclusion and was provided with appropriate contact information.[124]

178.    Since then, the CBMM website began to contain the information that the CBMM *"adheres to the policy on harassment set forth [sic]Massachusetts Institute of Technology".* [125]

### *(iv) CBMM Defendants continuously conspired to cover-up and refused further to act upon Plaintiff's complaint*

179.    After Plaintiff's complaint to MIT office in March 2019, *"a number of conversations followed between the various institutions involved in the CBMM Summer Course ".* [126]

180.    However, Rankin's reply to Plaintiff's 5/3/2019 email came after the NSF site visit event at MIT: *" ... Hi Karolina, I am working on connecting with Kathleen Sullivan and will be back in touch when I have more information. I didn't want you to think I was ignoring you!".*[127]

181.    In response, Plaintiff suggested that Rankin *"take my report for formal investigation then".* [128]

---

122 The participants were explicitly instructed by Ms. DeStefano not to complain about their supervisors by name.

123 On 5/7/2019, the NSF reviewer (identity protected here) to Plaintiff.

124 As per documented email correspondence from 5/7/2019: *the folks from NSF suggested that you contact NSF. They will also report this to their Title IX coordinator. The link is this* https://www.nsf.gov/od/odi/awardee_civil_rights/titleix_faqs.jsp *.Most likely NSF will contact me and at that point I will have to send them your identity."*

125 https://cbmm.mit.edu/title-9

126 Response letter from Harvard University Office of The General Counsel from 6/8/2020 to Plaintiff's legal representation at that time, Margaret H. Schmidt from The Victim Rights Law Center, Worcester, MA.

127 Rankin to Plaintiff on 5/9/2019.

128 Plaintiff to Rankin on 5/13/2019 by email.

182.    In the same email, Plaintiff expressed that " *The fact of sending me back and forth, without providing any clear argument apart from using CBMM program – 'being complicated'- to justify the difficulties to deal with situation caused me and my husband extreme stress. We felt confused, misinformed and did not know what to expect".[129]*

183.    In addition, Plaintiff reported about being intimidated by Azevedo during her recent visit at MIT and insisted *"on reporting my case on MIT as this is the institutional core of CBMM, and the place of my work when I come to visit for my project collaborations (Tenenbaum and Kanwisher lab) and to participate in CBMM broader events. Moreover, this is also the place of work for Frederico. The only thing I am requesting is to have a fair formal investigation at MIT that will allow to objectively evaluate my claims and bring truth to light. Looking forward to hear back from you, Karolina".[130]*

184.    However, Rankin Sarah Rankin rebuffed Plaintiff as follows: *"This situation is complicated by the fact that the CBMM program is made up of multiple schools, the incident occurred during a program hosted by another entity at their location, and in August of 2017 when the incident occurred, the respondent was funded by one source and supervised by a different source.[131]*

185.    Rankin explained that *"We are working on untangling all of this to figure out the appropriate entity to conduct an investigation of a complaint should you choose to move forward with the filing of one. I believe I should have a better sense of where the complaint should be filed by tomorrow or Wednesday".[132]*

186.    Plaintiff heard from Martinez as well: *"I just wanted to let you know I am discussing with our Office of General Counsel regarding jurisdiction. The office of dispute resolution would not comment on a complaint that has not been submitted to them. I do have one question for you. You described him as a TA- Can you clarify that he is a TA of the Center for Brains, Minds and Machines or a particular course?".[133]*

187.    Helpless, Plaintiff contacted to the CBMM Director and CBMM Summer School Director, Tomaso Poggio ("Poggio"): *"Dear Tomaso, I am writing to you as to a father, the father of CBMM family, that I have an honor to be part of. I love my project, the inspiration for it and its scientific shape are exclusively owned to the existence of CBMM and tremendous work you have been doing as its director. I am writing to you as the member of our community, feeling comfortable to bring to your eyes the unpleasant events that happened to me. I do care about CBMM research as much as you do thus by my current reporting contribution I would like to help to make the science happen in professional, healthy environment. I am also writing to you because I am highly distressed and lost in the formal complaint process that I initially thought could help me. I have no other choice now rather than to open myself to you to ask for your help."[134]*

188.    In the same email, she revealed the events around the 2017 sexual assault and Azevedo's intimidation on 5/7/2019.[135]

189.    She also summarized her up-to-date interaction with the Title IX coordinators and expressed her concerns that her complaint is not taken into investigation, as *"I am aware that CBMM program and its participants are protected under Title IX compliance procedures. Nevertheless I can not understand why until now I still don't know the responsible person or Title IX coordinator who would take the complaint involving CBMM participant ... I am surprised with the lack of support from Title IX coordinators' side in this matter especially after seeing on the MIT Title IX website (https://titleix.mit.edu/faculty/procedures) what actions could have been taken to avoid any close contact confrontation between me and Mr Azevedo."[136]*

190.    She finalized: *"Finally, as regards to Mr Azevedo, despite the first-impression charming persona, his conduct with fellow female scientists is despicable and puts a shame on the institutions which he represents. I wouldn't like for any other woman to have experience what I have gone through. I strongly believe that impartial formal investigation would take out the damage Mr Azevedo is doing to everyone involved i.e. institutions, me, my husband and other women. At the very least I don't want to meet him in professional capacity ever again. I deeply hope you will be able to support me in this process."[137]*

---

129 Ref 108
130 Ref 108
131 Rankin to Plaintiff on 5/13/2019 by email.
132 Ref. 112
133 Jose Martinez to Plaintoff on 5/13/2019.
134 Plaintiff in confidential email to Tomaso Poggio on 5/14/2019.
135 Ref. 115
136 Ref. 115
137 Ref. 115

191.    Plaintiff never heard back from him. In 2020, she was asked by Kanwisher to reveal this email, which was forwarded to other CBMM Defendants (see later in this complaint)

*(v) CBMM Defendants directed Plaintiff to file the complaint with National Science Foundation Office of Diversity and Inclusion (NSF ODI)*

192.    CBMM, as recipient of federal financial assistance from the Natonal Science Foundation (NSF),  constitutes education programs and activities, as well as employment workplace, where discrimination on the basis of sex is prohibited based on Title IX and Title VII federal laws. [138]

193.    NSF regulations 45 CFR §618.400(a) provides that *"...no person, shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any ... education program or activity operated by a recipient that receives Federal financial assistance.".[139]*

194.    NSF's Office of Diversity and Inclusion office (the NSF ODI office)[140] "*investigates complaints from individuals who feel they have been discriminated against or harassed in connection with their participation in programs or activities funded by NSF grants at institutions that receive NSF grants under the following laws and their implementing regulations: (i) Title VI of the Civil Rights Act of 1964, on the basis of race, color, national origin; (ii) Title IX of the Education Amendments of 1972 on the basis of sex; (iii) Section 504 of the Rehabilitation Act of 1973 on the basis of disability; (iv) Age Discrimination Act of 1975 on the basis of age*". [141]

195.    Plaintiff submitted the NSF complaint on 5/14/2019. In the complaint, Plaintiff alleged that Center for Brain Minds and Machines (CBMM) at 43 Vassar St, Cambridge, MA, discriminated her based on sex. The receipt of her complain form together with complaint supplement materials[142] and consent form was confirmed by Equal Opportunity Compliance Manager for NSF Awardee Programs and Office of Diversity and Inclusion Director – Bob Cosgrove ("Cosgrove"). [143]

*(vi) CBMM Defendants referred Plaintiff's complaint to MBL/U of Chicago for investigation*

196.    CBMM Defendants communicated to Plaintiff that: "***After consulting** with folks at Harvard and the MBL program, **it was determined** that MBL is the most appropriate entity to investigate the matter. I will give your contact information to the Title IX officer at MBL and they will be in touch to review the process with you. Thanks again for your patience as **we sorted this out**".* [144]

---

138 NSF's Title IX regulations at 45 CFR §618; Title VII of the Civil Rights Act of 1964
   139 https://www.law.cornell.edu/cfr/text/45/618.400
140 Currently Office of Equity and Civil Rights (OECR)
141 https://www.nsf.gov/od/oecr/awardee_civil_rights/index.jsp
142 Including Plaintiff's up to date email correspondence with MIT and Harvard Title IX coordinators.
143 On 5/15/2019 at 9:33am Bob Cosgrove Bob Cosgrove emailed the Plaintiff: *"Hi Karolina,  Confirming receipt.  We will evaluate the information you submitted and determine whether we will accept the complaint, dismiss it or refer to another agency. If we have any questions, we will contact you. Regards"*
144 Sarah Rankin to Plaintiff on 5/15/2019 by email, highlights ab intra.

197.    The above communication was conveyed to NSF ODI Director[145], who then interviewed Plaintiff about the complaint over the phone[146]. The NSF ODI Director informed that *"We'll let you know our initial disposition of your complaint soon"*.

198.    As announced (§ 174), Plaintiff was contacted by the MBL and University of Chicago representatives [147], who asked Plaintiff for a phone call *"to discuss your concerns in full"*.

199.    During the phone call[148], Collier and Egan announced to be the individuals investigating and adjudicating the case, should Plaintiff *"want to proceed with formal complaint"*.

200.    Collier and Egan then reviewed with Plaintiff the process of formal complaint, which would start with Plaintiff's submission of *"written information you would like to provide; If there is any documentary evidence, text messages, emails, witnesses that you would like us to review, we would ask for that information as well. Once we gather all information you provide, witnesses you identify, we would then notify him. Well, we would notify him if you decide to move forward with the process to move forward, then we would set up the time to also interview him and ask questions based on what you provided to us. We would also ask him to submit a written response to the allegations. He would have the availability to identify witnesses as well and provide documentary evidence. Once we gather all of that information Ann and I would see of there is any additional follow-up information that we would need. Otherwise we would make a determination based on what we call preponderance evidence standard."*

201.    Plaintiff was concerned about Azevedo tampering the witnesses, thus Collier and Egan reviewed with Plaintiff the investigative steps as follows: *"So our next step would be to review what you send to us and to reach out first to the witnesses and have conversation with them. At the same time after we receive your written statement we will notify him that this process is proceeding and provide him information, same as you receive 1 terms of the policy. So we will let you know the day that we contact him we would also reach out to you this day. I just think it is important for you to know when he is notified"* and then added: *"we would interview the witnesses but we want to receive your written statement first to be sure what kind of questions to ask to the witnesses and then after that point we would notify him"*.

### *(vii) MBL/U of Chicago referred Plaintiff to the Rockefeller University Title IX coordinator*

202.    During the phone call, Collier and Egan advised Plaintiff to speak with the Rockefeller University Title IX coordinator and Human Resources[149]

203.    The strong suggestion to contact Rockefeller University Title IX coordinator and Human Resource appeared again in the phone call conversation, in lieu of finding there *"a support person through this process, somebody that you make aware that you are going though that process so if you have any needs they can assist you. Generally, usually we are working with individuals who are on our campus ... so I just want to recognize that it may be more difficult for you because you haven't met us in person, so somebody that is there for you through this process, you may recommend identify for yourself to go through this process with you"*. Plaintiff agreed to contact the Rockefeller University as suggested.

---

145 Email communication from Plaintiff to Cosgrove on 5/16/2019.

146 The phone call audio record available as evidence.

147 Email correspondance on 5/16/2019 from Bridget Collier ("Collier"), Associate Provost for Equal Opportunity Programs and Title IX
    Coordinator for the University of Chicago (MBL is affiliated with U of Chicago), cced Ann Egan ("Egan"), Director for Human
    Resources, at the Marine Biological Laboratory,

148 The phone call took place on 5/20/2019. Its audio content is documented by cell phone records and available as evidence.

149 Collier to Plaintiff during the 5/20/2019 phone call: "speak with your Title IX coordinator ... That person might be also a relevant
    person to learn more about resources available to you and they would have information on local resources that are available to
    you ... I do think speaking with your Title IX coordinator is a good idea. I am in that role so I can say that our role is to assist
    individuals who may have experienced sexual violence whether it is on the campus or somewhere else. Another idea to consider by
    you is, most universities have Employee Assistance Program. If you contact your HR if you have Employee Assistance Program they
    can provide you information. Generally these programs are at low cost or no cost if you are employee. So that makes another
    resource you can connect with and may have information of what support is available to you".

204.     Immediately following the phone call, Plaintiff " *in need of some support*" contacted Virginia Huffman, the Rockefeller University Title IX Coordinator and Vice President Human Resource ("Huffman"). [150]

### *(viii) Plaintiff relayed the complaint to the Rockefeller University*

205.     Plaintiff met Huffman in person in Huffman's office[151] at Rockefeller University and gave Huffman summary of 2017 sexual assault and subsequent sexual harassment events, as well as up-to-date complaint process. [152]

206.     During the conversation, Plaintiff informed Huffman that MBL/U of Chicago were willing to investigate Plaintiff's complaint, and that they suggested the Rockefeller University to give support.

207.     During the conversation, Huffman asked Plaintiff whether Plaintiff has legal assistance and whether the MBL/U of Chicago process is based on Title IX or Title VII. [153]

### *(ix) The Rockefeller University deceived Plaintiff to believe in lack of involvement/jurisdiction of the Rockefeller University in the issue, and ask Plaintiff to proceed with MBL investigation*

208.     While at the above meeting, Huffman omitted to Plaintiff the following information: the complaint form, the complaint process at the Rockefelelr University, Rockefeller University sexual harassment policy, information about the rights for external complaint. In fact. Huffman made sure Plaintiff is naive to the topic. [154]

209.     The Rockefeller University's harassment prevention policies for employees state: *"This policy This policy applies to applicants, employees, and persons with academic appointments at the University. This policy prohibits discrimination, harassment, and retaliation, whether engaged in by a fellow employee, a supervisor or manager, a person with an academic appointment, or even by someone not directly connected to the University (e.g., an outside vendor, consultant, or customer). Conduct prohibited by these policies is unacceptable in the workplace and in any work-related setting outside the workplace, such as during business trips, business meetings, or business-related social events. "[155]*

210.     Huffman told Plaintiff however that she will assist Plaintiff in MBL/U Chic process, and told Plaintiff to go ahead with the next steps.

---

150 Plaintiff emailed Huffman on On 5/20/2019,

151 The meeting was on 5/21/2019; this and other meetings with Huffman took place at Rockefeller University, New York, NY.

152 Plaintiff made a similar report to her immediate Rockefeller University supervisor, Winrich Freiwald on 7/22/2019

153 Plaintiff did not have any legal assistance nor did she knew the Title IX/Title VII peculiarities at the time.

154 Huffman asked if Plaintiff attend the voluntary workshop on the topic, and Plaintiff informed she did not know about it neither she was aware of the email Huffman referred to

155 Harassment Prevention Policy 2016, Harassment Policies (updated on Oct 2018)

211.    Huffman asked Plaintiff to come to see Huffman in her office the next day, on Wednesday, 5/22/2019.

212.    Following Huffman's assurance about her assistance, Plaintiff contacted MBL/U of Chicago investigators by email and sent written materials.[156]

213.    Next day, Huffman awaited Plaintiff in Huffman's office with handwritten instructions, containing contact details of the individuals Huffman told Plaintiff to contact.[157]

214.    During the meeting, Huffman directly referred Plaintiff to an attorney Rebecca Zipkin ("Zipkin"), for legal representation in Plaintiff's case.[158] [159]

215.    Huffman explained to Plaintiff that the contact between the Rockefeller University and Zipkin had been established in connection to student assistance program. [160]

216.    Huffman reported to Plaintiff that Huffman had already spoken to Zipkin about Plaintiff's complaint [161], asking Zipkin to handle the case as the other student cases, falsely arguing to Zipkin that Plaintiff's postdoctoral affiliation at Rockefeller University was similar to the student one.

217.    Huffman defrauded Plaintiff and made her believe that Huffman was doing a favor to Plaintiff with providing legal assistance and to intentionally cover up Plaintiff's postdoctoral affiliation to increase the likelihood that the associated attorney would assist in Plaintiff's case.

218. Huffman intentionally framed Plaintiff as a student to the attorney to cover up Plaintiff's actual employee status at Rockefeller University which deems the university's liability in Plaintiff's complaint. [162]

219.    Zipkin was an attorney without experience in workplace sexual harassment and knowledge of criminal law other than the one applicable in New York state. Zipkin did not have the competence to legally represent Plaintiff in Massachusetts, the state where the rape event happened and where Plaintiff made a police report in early April 2019. In fact, Zipkin did not have knowledge nor willingness to communicate in Plaintiff name, nor to provide assistance regarding the police investigation.

220.    Zipkin was also not familiar with the structure of academic appointments, and relied on Huffman's expert judgment of Plaintiff's affiliation (Huffman serves not only Title IX coordinator but also the HR Director at Rockefeller University). By introducing Plaintiff position as "*similar to student*", Huffman intentionally omitted the fact of her employment at the Rockefeller University, and as such, the

---

[156] Plaintiff to Collier and Egan on 5/21/2019 : "*Dear Bridget and Ann, Please find attached the detailed description, e-mail scripts and scheme of the Swope room. I am currently working on retrieving my Whatsapp messages and call history I deleted in June 2018, I will send it to you as soon as I am successful with it. I have been in touch with Rockefeller Title IX coordinator who pointed out some local resources to help me. Thank you for mentioning the option to reach out to Rockefeller office to me. I am looking forward to hearing from you about next steps. Best regards, Karolina*". The three attachments to the email were named: "*Swope_room_scheme.jpg*", "*Detailed_Description_5_21_2019.docx*", "*Email_correspondance.docx*".

[157] A copy of handwritten note handed by Huffman to Plaintiff on 5/22/2019: https://drive.google.com/file/d/10bUq4vmDMnq2xJefx0EifiDMD5E4J2QQ/view?usp=share_link

[158] Zipkin was associated with Sanctuary for Families, a non-profit organization working for domestic violence survivors

[159] Huffman gave Plaintiff Zipkin phone number (see the note in ref. 137), and

[160] A pilot, pro-bono initiative to provide resources to students in cases of campus sexual assault at universities across New York City. (https://sanctuaryforfamilies.org/challenging-gender-violence-college-campuses/)

[161] Huffman explained that Zipkin's associate, who "received the call when Huffman called Zipkin last time, may be on the case as well (see the note in ref. 137)

[162] The Rockefeller University has liability for the 2017 sexual assault event under Title VII, since on 8/30/2017 Plaintiff was the Rockefeller University's employee, and she traveled to MBL in Woods Hole, the CBMM Summer School venue, in relation to her employment at Rockefeller University, delegated by Rockefeller University's employer, Winrich Freiwald, who also assigned her work duties for the visit.

Rockefeller University liability under its own (and Title VII and Title IX) policy. Also, to avoid revealing blatant conflict of interest.

221.     Huffman's conduct constitutes deliberate negligence under Title IX and Title VII, and victim tampering. As Vice President Human Resources, Huffman had knowledge of the victim's appointment and affiliations. Huffman was knowledgeable of Title VII and Title IX nuances in Plaintiff and deliberately inquired about Dr. Mraciniak's knowledge of these procedures in the MBL/U of Chicago investigation.

222.     Inter-institutional communication and institutional conspiracy taking place behind Plaintiff back while processing her 3/24/2019 complaint. The Rockefeller University was one of five institutions which Martinez signaled out on 4/18/2019 while discussing with Plaintiff the issue of shared responsibility in her complaint.

223.     The inter-institutional policies require communication if complainant is from outside of institution


### (x) MBL/U Chicago launched the investigation while Huffman's referrals took Plaintiff's legal representation in the process


224.     MBL/u of Chicago confrmed receipt of Plaintiff written material and suggested issuing no contact order [163].

225.     On 5/24/2019, Plaintiff contacted Huffman's referral, Zipkin: *"Dear Rebecca, I am the person that Virginia Huffman from Rockefeller University spoke about. Would you be available to connect and get to know more about my current situation and the areas I would need a hand with?"*.  Zipkin responded within minutes and welcomed Plaintiff as follows *'Hi Karolina, I'm glad you reached out'*.

226.     On 5/28/2019 An in-person meeting between Plaintiff and Zipkin took place on 5/28/2019 in Sanctuary for Families venue in Downtown Manhattan. Plantiff was asked to describe in details sexual assault and sexual harassment events. Uncomfortable since repeated request, other trainees present, announced in last-moment.

227.     Telling her story and describing traumatic for her events over again and again was re-traumatizing for Plaintiff, every time leaving her in tears and vulnerable.

228.     At the end of the 5/28/2019 meeting, Zipkin took personal details of Plaintiff and registered her in the computer system, assuring to Plaintiff to legally represent Plaintiff during her complaint process. Plaintiff recalls Zipking saying: *"You have been fighting so much for yourself until now. You don't have to hold this burden anymore as we will represent you from now"*. As a result of the 5/28/2019 meeting, Plaintiff was relieved and full of hope.

---

[163] On 5/23/2019, Plaintiff heard back from Collier and Egan: *"Thank you, Karolina. We have received your materials and will let you know if we have any questions. In the meantime, I recommend that we move forward with issuing the No Contact Directive to Frederico. I would do this via email, and would notify him that an investigation is proceeding. Please let me know if you have any concerns, and once I hear from you I will proceed"*.

229.    Plaintiff agreed with attorney to discuss subsequent steps of the complaint process. Same day, Plaintiff shared with Zipkin and Morak the complete material in relation to her complaint. [164], and

230.    The Attorneys instructed Plaintiff on 6/3/2019 that the investigators *can go ahead with the no contact order.* Therefore, same day, Plaintiff followed instructions and emailed Collier and Egan:... *Please, move forward with issuing the No Contact Directive and notifying that an investigation is proceeding. Would you be able to let me know exactly when you send the email? (for security reasons).*[165]

231.    On 6/8/2019 Plaintiff heard back from Collier: "*Dear Karolina, We have issued the No Contact Directive and notified Frederico of the investigation. I have attached the letter to you with the details of the No Contact Directive. Our next steps in this process is to interview Frederico and the two witnesses that you have identified*".

(xi) *The Rockefeller University took over the future email correspondence from Azevedo and Plaintiff*

232.    As instructed by Huffman during the last meeting, Plaintiff scheduled a new meeting with Huffman once the investigation launched [166].

233.    The meeting took place on 6/10/2019 meeting. Following Huffman's *security* instructions from the last meeting, Plaintiff listed the perpetrator's email addresses known to Plaintiff, and handed over the handwritten list to Huffman. During the meeting, Huffman called a specific IT person at the Rockefeller University IT department, and told him to implement the redirecting routine "*like usually*", giving him the perpetrator's email addresses Plaintiff provided. Huffman informed Plaintiff that from now, the Rockefeller University will re-rout attempted communication from the perpetrator via Huffman, such that she could review the communication and block it if necessary.

234.    Huffman's actions insinuated security reasons at the moment (to avoid Plaintiff's discomfort from unwanted contact). In fact however they shielded the perpetrator, since any revealed attempt to contact Plaintiff would breach the No-Contact-Order, and could have constitute evidence against the perpetrator in the course of Plaintiff's complaint and/or ongoing police investigation.[167]

235.    Since then, Huffman did not provide any updates whether such contact occurred or not, nor she revealed to Plaintiff the protocol should the contact occurs.

---

164 On 5/28/2019 Plaintiff to Zipkin and Morak: "*Dear Rebecca and Jessica, Thank you once again for your time you spent talking with me today and thank you for your help - you are doing incredible job in Sanctuary and I am so thankful that I did meet you. I am sending the relevant files. Please let me know of any questions you might have. Best regards, Karolina*". The attachment Karolina_5_28_2019.zip, contained 10 files: a copy of the 3/24/2019 MIT complaint, ALL material she sent to Collier and Egan in relation to their investigation, a copy of complete email correspondence with Title IX coordinators, a copy of the email correspondance with detective and NSF reviewer, and a copy of the 5/14/2019 NSF complaint.  On 5/29/2019 Plaintiff heard back from Zipkin: "Hi Karolina, Thank you for sending. We are doing our research and will get back to you by tomorrow with next steps. Best, Rebecca".

165 Instructed by Huffman: On 5/21/2019 Huffman assured Plaintiff that the Rockefeller University would implement security measurements against Azevedo and asked Plaintiff to inform Huffman once the MBL/U of Chicago start their investigation and No-Contact-Order is issued and prepare the list of Azevedo's email addresses. On 6/4/2019, Plaintiff confirmed to Huffman: '*I will let you know the date of issuing No Contact Order as soon I get it*',

166 On 6/10/2019, Plaintiff contacted Huffman to schedule a meeting: '*Would you have time for a short meeting sometime today or tomorrow to give you the update about No Contact Directive?*".

167 The detective was informed about No-contact Order

236.    Later during the same meeting Huffman called in James Rogers ("Rogers"), Director of Security at the Rockefeller University. Once in Huffman's office, Huffman instructed Plaintiff to describe once again to Rogers the events related to the 2017 sexual assault and subsequent sexual harassment.

237.    The experience of having to talk about the 2017 sexual assault once again, and here to the male stranger (in Huffman's presence), was re-traumatizing for Plaintiff and caused her to suffer substantial distress.

238.    Rogers then offered security assistance and assured that the campus security staff would monitor the area for the potential entry of Azevedo on campus. For that, he asked Plaintiff for the perpetrator's picture and visual description. Plaintiff followed the instructions by email. [168]

239.    Rogers never replied nor ever updated Plaintiff on any developments regarding discussed security concerns. Plaintiff was not informed if and what kind of measures were taken. She was not informed for how long she was protected. If any intervention did take place, she was not informed about what protocol was used.

(xii) *Huffman's legal referral withdrew from promised assistance in collecting the crucial evidence in the investigation*

240.    Under Brady v. Maryland and Rule 16 of the Federal Rules of Criminal Procedure, the investigative process "*has a duty to produce all of* [Plaintiff] *communications with perpetrator … in their entirety and forensically-collected format*" and that "[its] *failure to do so violates due process and deprives* [complainant] *of a meaningful opportunity to present evidence and theory of case*".

241.    During the 3/28/2019 phone call, Plaintiff however learned from Rankin that CBMM Defendants would not attempt to recover the "export" of all of the Whatsapp text messages stored on individuals phone, and accept screenshots provided by either party.

242.    Although the screenshots can not be properly authenticated or should be excluded pursuant to the "rule of completeness", they were also allowed in the MBL/U of Chicago investigation into Plaintiff's complaint[169].

243.    Plaintiff committed to deliver the WhatsApp text message evidence, and on 5/21/2019 updated the MBL/U of Chicago to be "*currently working on retrieving my Whatsapp messages and call history I deleted in June 2018*".[170]

244.    An export, which covered the time period of August 30th, 2017 throughout June 2018, would clearly and directly reveal Azevedo's sexual harassment over Plaintiff, his manipulative strategies after the rape to salient the victim, together with the evidence that Plaintiff has been continuously opposing Azevedo's sexual assault and sexual harassment.

---

168 Plaintiff to Rogers on 6/12/2019 by email:"*Dear James, I am sending some information we spoke about at Virginia's office on Monday*"(email including Azevedo's visual description and the link to CBMM website with his picture).
169 Phone call on 5/21/2019
170 Plaintiff deleted Azevedo from her social media in June 2018 as the result of his persistent harassment (see above)

245.    The Whatsapp "export" is generated automatically using an electronic feature that compiles the entirety of a WhatsApp conversation into a printable and sharable electronic format.

246.    Throughout the complaint process, Plaintiff seeked assistance to retrieve the Whatsapp "export", and on 5/28/2019, Plaintiff got assurance that Jessica Morak, who was savvy in the topic, will assist her and connect her with the specialist able to access the Whatsapp retrieve function and produce an "export".

247.    Not receiving the assistance yet, Plaintiff reminded Jessica Morak on 6/10/2019: "*Dear Jessica and Rebecca, I am forwarding the Non-Contact Directive that has been issued on Saturday. Jessica, I was wondering whether you had a chance to check out the possibility of retrieving the Whatsapp messages? Best regards,Karolina* ".

248.    Jessica Morak never replied.

249.    The evidence, if used, could have been crucial for establishing a probable cause in the investigation.

250.    Plaintiffs allege that the withdrawal of Huffman's attorney referral biased the MBL/U of Chic investigation, giving disproportional advantage to Azevedo as the complaint's respondent.


*(xiii) MBL/U Chicago investigators handed over the Complainant's 'written statement' to the Respondent before interviewing Respondent and the witness*


251.    CBMM Defendants did not follow the investigative steps according to the procedure described to Plaintiff during the phone call on 5/20/2019. After receiving written information from Plaintiff, MBL/U of Chicago investigators proceeded with sharing it with Respondens, instead of interviewing witnesses and Respondents first. [171]

252.    Plaintiff did not provide any written statement to be shared with the Respondent. Neither investigative procedures she was introduced to by Collier on 5/20/2019, predicted that the written information Plaintiff had sent to the investigators would be shared with the Respondent during the investigation.

253.    In addition to detailed description of the events, Plaintiff's written material uploaded without knowledge nor permission from Plaintiff, contained also the list and contact information to five witnesses, who could corroborate Plaintiff's testimony.

---

[171] Collier and Egan to Plaintiff by email on 6/24/2019: "*I am writing to update you on the investigation. We expect to conclude interviews this week, and anticipate being able to conclude this process in the next 2-3 weeks. I have created a Box folder where I have uploaded your statement, following this email I will send the invite to the folder. Please let me know if you don't receive the invitation. Once we receive a written statement from Frederico we will upload it for your review. Frederico will also have access to review these materials. If we have further questions once we receive his written statement, we will reach out to you*". Same day, a separate email was sent from Collier and Egan, with "*invitation to collaborate on the folder*" named "*MBL Statements provided by Marciniak and Azevedo*'". Collier and Egan took the document named '*Detailed_Description_5_21_2019*', a 5,096 words document Plaintiff sent to them on 5/21/2019, renamed it to 'Marciniak Statement' and uploaded on 6/24/2019 to the folder, which was created on 6/24/2019. The access to it given both to Complainant and the Respondent.

254.    Only one witness (by reason of the facts and circumstances stated in this lawsuit, it was Boix), who was identified by Respondent to corroborate his narrative, was interviewed by the MBL/U of Chicago investigators.[172]

255.    MBL/U of Chicago interviewed Respondents and the witness after giving access to Plaintiff's written information to the Respondent.[173]

256.    The above conduct gave disproportional advantage to Respondent in the investigation.

*(xiv) Rockefeller University conspired to control separate informational channels about Plaintiff complaint and kept hiding the crucial information away from Plaintiff.*

257.    Plaintiff reported being the victim of rape at 2017 CBMM Summer School, and subsequent sexual harassment from the side of Azevedo as well as the complaint process to her direct supervisor at Rockefeller University, Freiwald, after the Intuitive Physics project follow-up meeting with him on 7/22/2019 early in the morning.

258.    During the meeting, Freiwald was visibly controlled in his reaction to Plaintiff complaint. He withhold himself from offering any support.

259.    Freiwald and Huffman met same day. Their meeting specifically concerned Plaintiff's complaint.

260.    Both Freiwald and Huffman rushed to explain themselves. [174]

261.    Although the meeting between Huffman and Freiwald was not surprising [175], Huffman's and Freiwald's communication with Plaintiff around the meeting was wary and signaled conspiracy to misinform and defraud Plaintiff about ongoing "Title IX processes".[176]

---

172 As per information from Prof. Kanwisher's email to Plaintiff on 1/17/2020   *"Rebecca and I are pushing Title IX hard for any infrrormation about what they found. Meanwhile, I hear that the title IX investigation was conducted by the Univ of Chicago (who owns MBL) and that they interviewed "the two parties plus a witness" ".*

173 Collier and Egan to Plaintiff by email on 6/24/2019: *"We expect to conclude interviews this week"* refers to interviewing both Azevedo and a witness.

174 Huffman to Plaintiff on 7/22/2019 (1): *"Hi Karolina, Hope all is well! I wanted to check in with you and see if you are OK. Jordan has the check ready for your service provider, and it is in my office for pick-up. Did you speak to Winrich? I meet with HOL's every so often about lab issues and he reached out to me. I don't want to be off-guard if you spoke to him about anything. Best, Virginia".* Plaintiff to Huffman on 7/22/2019 at 2:37pm:' *Hi Virginia, Sorry for the last response, I was working in the basement without internet and I just got simultaneously your and Winrich's email annoucing that you two just met.'* Freiwald to Plaintiff on 7/22/2019: *'Dear Karolina, Just FYI, I went to see Ginny this afternoon. The reason was not that you have talked to her, but that I wanted her to give me advice about what to do and not to do in this situation. She did not know the reason for my asking her for the meeting and thus her general email to you. She has kept everything confidential. I thank you for your trust in me.Yours, Winrich'.* Huffman to Plaintiff on 7/22/2019 (2) at 2:55pm: *'Winrich met with me to see how he could be most supportive to you after your conversation with him this morning. If there are things that he can help you with, please let him know. I only listened to things that you shared with him about the matter and we talked about Title IX processes a bit'.*

175 As per Rockefeller University's policies, the Head of laboratories is obliged to report to HR when they receive a discriminatory complaint

176 See Ref. 154.

262.    Following Plaintiff's complaint to Freiwald, Plaintiff encountered his lack of respect and empathy, the fact which exemplified that Freiwald's conduct in general lacked ethics and integrity, is unprofessional and routed with discriminatory animus, which was revealed later through 2020 events.

263.    Plaintiff's complaint she made to Freiwald on 7/22/2019 did not stop Freiwald from sexually harassing her. In fact, the conspiracy to cover up Plaintiff's complaint encouraged Freiwald to feel above the law and continue. In June 2020, when she opposed Freiwald's sexual harassment, Freiwald demoted her, and subsequently, terminated as the result of institutional decision (see later).

264.    The events of 7/22/2019 reveals the role of Huffman, Vice President for HR and Title IX Coordinator as the person masterminding the internal communication channels within the University. Huffman swiftly juggles with her power position within these communication channels to tune her future actions. By controlling the flow of information, Huffman owned the situation.

### (xv) *After procedural errors, MBL/U of Chicago gave expedited outcome of the "investigation" with biased conclusions based on prejudice.*

265.    A month after the investigation launched, MBL/U of Chicago notified Plaintiff by email to adjudicate the process soon.[177]

266.    In his position statement for MBL/U of Chicago *"investigation"*, Azevedo's threatened Plaintiff, by stating: "I advise her to stop, I will not take her actions lightly"

267.    Not receiving any communication, for another 3 weeks, Plaintiff consulted Huffman's legal referral, who suggested to reach out to the MBL/U of Chicago directly. [178]

268.    Collier, *"on leave, however [she was] still working with Ann to finalize our review"*, sent a notice of outcome to Plaintiff by email, which reads that the MBL/U of Chicago *"conclude that the respondent did not violate the MBL's Policy or Code of Conduct"*. [179]

269.    The 8/1/2019 notice of outcome (i) was based on prejudice, since it was reasoned that subsequent to rape sexual activity precluded the first encounter to be non-consensual, (ii) did not include ANY witnesses provided by Plaintiff, who could corroborate Plaintiff's testimony (Plaintiff provided 4 names, plus contact to Azevedo's enabler, Boix, who was named as co-participating in the crime), (iii) followed biased investigative procedures in which Azevedo was given disproportional advantage over Plaintiff.

270.    The outcome did not refer to ANY actions U of Chicago/MBL would do to remove hostile environment for Plaintiff in her CBMM work.

271.    Azevedo was admitted for 2019 CBMM Summer School as a Teaching Assistant.

---

177 Collier and Egan to Plaintiff on 7/11/2019: *"Dear Karolina, I am writing to notify you that the response provided by Frederico Azevedo has been uploaded to the Box folder. We will be sending a notice of outcome to you soon"*.
178 Email correspondence between Plaintiff and Zipkin on 7/29/2019 and 7/30/2019.
179 Email correspondence between 7/30/2019 and 8/2/2019, MBL/U of Chicago notice of outcome dated on 8/1/2019.

(xvi) *MBL/U of Chicago process did not allow appeal for Plaintiff*

272.      Plaintiff consulted the notice of outcome, *"the most unfair and insensitive response I have ever imagine to receive. It seems they did not even interview any witnesses"*, with Huffman's legal referral, who suggested: *"There is usually an appeals process. I am not certain that is the case here. But if you wish to reply to Collier and request the procedure for appeal, we can assist you in preparing an appeal."* [180]

273.      Following Zipkin's instruction, Plaintiff *"inquire[d] about the appeal procedure"* to Collier and Egan[181], to receive the reply that *"The process at the MBL does not provide for an appeal or a review. The determination of outcome is final."*[182] [183]

274.      As per NSF letter from 8/6/2019, *"[Plaintiff's] internally filed complaint with the Office at MIT was referred to the University of Chicago's Office for Equal Opportunity Programs for investigation.  MBL is an affiliate of the University of Chicago and MBL appears to utilize the University of Chicago's Office for Equal Opportunity Programs for internally filed sexual misconduct complaints involving MBL "*.

275.      As per NSF determination letter from 7/1/2022: *"the Office of Equity and Civil Rights[184] found that University of Chicago and MBL utilized the MBL investigative procedures detailed in section 7.0 (Investigation) of the MBL Policy procedures to investigate sexual harassment complaints"*.

276.      The MBL policy which was used to investigate Plaintiff's complaint is: *"When a complaint is received, MBL will investigate the allegation in a fair and expeditious manner.  The investigation will be conducted in such a way as to maintain confidentiality to the extent practicable under the circumstances.  The investigation will include a private interview with the person filing the complaint and with any witnesses.  The person alleged to have committed the harassment will also be interviewed.  When the investigation is complete, MBL will, to the extent appropriate, inform the person filing the complaint and the person alleged to have committed the conduct of the results of the investigation"*.

277.      As per NSF letter from 7/1/2022: *"University of Chicago provides compliance and operational support to MBL, regarding Title IX, and assisted MBL in the investigation of Plaintiff's [Plaintiff] allegations"*. It was not made clear to Plaintiff U why the University of Chicago procedures were not used in the investigation, if it participated in the process.

278.      Plaintiffs allege that CBMM Defendants referred Plaintiff's complaint to the entity with the least jurisdiction control over CBMM (Collier to Plaintiff on 5/20/2019:  *"So if we feel that there was more likely than not that the violation of policy occurred then that standard we would use. If there is a violation of policy we would determine what appropriate sanctions would be. We often ask you or we would ask you what you think the inappropriate sanction would be from this process. So I would say that it is specific to MBL so our authority is only here at MBL. I believe you are both affiliated with MIT and Center for Brain Minds and ...We don't have any authority with that particular program however you are able to share the results of our investigation in terms of the outcome. You wouldn't be able to share any information that would be considered that you learned through this process, we would ask that to be confidential. But you are welcome to share your experiences and you are welcome to share the outcome of the investigation. They may take that information, they may also make a separate determination of what that means for CBMM but we would not be part of that particular analysis".)*

---

180 Email correspondence from 8/2/2019.

181 Email correspondence from 8/5/2019.

182 Email correspondence from 8/8/2019.

183 Although, according to U of Chicago procedures, the investigators should refer Plaintiff to external agencies for appealAlthough U of Chicago refers to external agencies for appeal.

184 Formerly known as the Office of Diversity and Inclusion

279.     Following the outcome, MIT issued a letter for Azevedo to detective from Falmouth Police, which stated that MIT (NOT U of Chicago/MBL) did an investigation on him.


**E  CBMM Defendants conspired to cover up Plaintiff's external complaint**


*(i) Huffman's legal referral withdrew from assisting Plaintiff in filling NSF complaint*


280.     Shortly before U of Chicago/MBL " *investigation*" concluded with its decision, Plaintiff's complaint with NSF filled against CBMM was dismissed, "*since [Plaintiff's] internally filed complaint is ongoing, ODI is unable to accept your complaint and begin an investigation until the University of Chicago's investigative process is concluded.* "[185]

281.     The NSF letter instructed that "[Plaintiff] may *refile your complaint with ODI no later than 60 days after the conclusion of the University of Chicago's investigative process and ODI will again review your complaint for final acceptance or dismissal the complaint.*

282.     Plaintiff discussed resubmitting the NSF complaint with Zipkin, and asked " if you could help me with two things: 1) to advise if it makes any sense in the current situation to negotiate any no contact regulations with this person with MBL or MIT (as the person might be around while I present at conferences, meeting etc) 2) to advise about the possible content of the complaint re-submission to NSF". [186]

283.     The phone call on 8/18/2019 (documented) was set up in a follow-up to the 8/13/2019 email. Zipkin on 8/18/2019 did admit that Plaintiff had clear disadvantage in the MBL/U of Chicago investigation and that the outcome was based on prejudice,

284.     Zipkin was silent about any institutionally internal or external procedures which were available for her to appeal questionable outcome of the MBL/U of Chicago investigation. Zipkin did not inform Plaintiff about her rights to file the complaint with external agencies, such as Office of Diversity and Inclusion (ODI) and EEOC.

285.     Instead, during the phone call on 8/19/2019, Zipkin discouraged Plaintiff from continuing her complaining efforts when she said to her: "*I think it is also important that you take care of yourself, sort of emotional pull that all of this is picking on you and your own well-being and health and really think if you want to keep fighting and defending that. It is also ok to just say I want to have a no contact directive so that he can not come near me and I want to move on because that is what is for me. I want to make sure that you think about that*".

286.     on 8/19/2019 Zipkin initially agreed to review the draft of the NSF complaint for Plaintiff ("If you want to write this up and send to me I can look it over and I can add some arguments to it").

287.     Subsequently however, Zipkin did not act upon her 8/18/2019 promise and did not reply when Plaintiff sent her the draft. Not hearing back from Zipkin, Plaintiff sent another email to Zipkin on 9/30/2019. In this email she again asked for her assistance (in particular, with respect to the institutions which were to be made on the complaint) and informed Zipkin that the required submission deadline was 'tomorrow'. Zipkin replied three days afterward, i.e., after the NSF complaint submission deadline.

---

185 Letter from NSF dated on 8/6/2019.
186 Plaintiff's email to Zipkin on 8/13/2019.

Although Zipkin explained that she was out of the office due to the holiday, neither automatic out-of-office reply was set up during her 'absence', nor the holiday she mentioned was a federal public holiday.

288.    The fact of withdrawal of Huffman's referral compromised the quality of the NSF complaint Plaintiff resubmitted to NSF ODI office on 10/1/2019.

289.    On 5/28/2019, Zipkin assured Plaintiff that Plaintiff had been correctly advocating for herself; therefore, she could finally relax, as Zipkin would take over the advocacy off Plaintiff's shoulders. However, Zipkin and Morak failed to assist Plaintiff during their interactions with Plaintiff from May until November 2019, causing a huge stress to Plaintiff.

### *(ii) Huffman's health care referrals were silencing the victim*

290.    During the meeting on 5/22/2019, Huffman informed Plaintiff that an intake meeting the next day with on-campus psychiatrist[187]: *Nisha Mehta-Naik Thurs 9-10a* was arranged for Plaintiff. Huffman provided to Plaintiff a phone number to OHS secretary (Iris) confirm the appointment.[188]

291.    Apart from the onsite psychiatrist, Dr. Nisha Mehta-Naik ("Mehta-Naik")_, Huffman offered to Plaintiff a mental health service with out of network provider, Maria Solomon ("Solomon"). Huffman instructed Plaintiff that *'we will work in a team to support you, including psychiatrist to assign any medications if needed, and psychotherapist to talk with you about the emotions'*.

292.    Huffman enthusiastically offered that the Rockefeller University covers the cost of Solomon's service.

293.    Plaintiff followed Huffman's instructions. [189]

294.    Plaintiff did not have prior need to use mental health services. Then, as a workplace rape and sexual harassment survivor, Plaintiff believed to find mental health assistance and treatment for the rape trauma syndrome and persistent post-traumatic stress disorder symptoms and to find support in the process of advocating for herself. Both Huffman and the Rockefeller University, a reputable medical research institution, gained Plaintiff's trust in promising quality service of associated health professionals.[190]

295.    Between May and November 2019 (including 5/23,  6/4, 6/18, 7/9, 7/25, 8/27, etc., session schedule is well documented), Plaintiff regularly met on-site psychiatrist at Rockefeller University campus at Office of Health Service.

---

187 Mehta-Naik, a Weill Cornell Medical Center provider, replaced Dr. Daniel Knoepflmacher in July 2018, and was appointed as Rockefeller University on-campus psychiatrist to offer counseling and medical services to employees and students. The appointments are at Rockefelelr OHS, free of charge or copay (The WMCC is in-network RU group health insurance plan provider)

188 Huffman's handwritten note.

189 Phone call logs on 5/22/2019 to the number provided on Huffman's handwritten note; meeting with on-site psychiatrist at instructed date.

190 Following traumatic events related to the 2017 sexual assault and subsequent sexual harassment, the complaint constituting re-traumatizing event on its own, and lack of support, Plaintiff was vulnerable and desperate for help. She welcomed Huffman's willingness to provide psychotherapist, hoping for support. After months of frustration and feeling helpless, she felt grateful to Huffman, believing that Huffman intended to help her with her trauma and struggles. Plaintiff trusted that her institution would help her. She believed that Huffman's service would provide a professional assistance and felt obliged to thank her employer for financially covering Solomon's service (email on 6/4/2019: *"I have a very positive experience from all contacts from you - thank you very much for your help!"*).

296.     Mehta-Naik insisted on continuation[191], although she did not provide to Plaintiff any medical treatment. The on-site psychiatrist was in close interaction with Solomon to assure *efficient team work*. [192].

297.     Although she lacked professional background to assist rape survivors, Solomon regularly welcomed Plaintiff for 'psychotherapy' [193], The first session took place on 5/25/2019, the next one on 5/31/2019, and subsequent weekly or biweekly sittings with Solomon took place until November 2019.[194]

298.     During the sessions, Solomon encouraged Plaintiff to open up about herself, in particular about her current complaint proceedings. Solomon was eager to hear and was making plenty of notes. Open and vulnerable, Plaintiff experienced intense emotional states during the sessions with Solomon. [195]

299.     At the end of the 5/31/2019 session, Solomon communicated to Plaintiff that she had recently been on the phone with Huffman. Solomon praised Huffman for being a lovely person. Solomon confirmed that Huffman would financially cover the sessions and placed the r*elated paperwork* in front of Plaintiff to sign.  The document turned out to be *"authorizing Maria Solomon to release information pertaining to [Plaintiff} evaluation and/or treatment sessions to Virginia Huffman (Rockefeller University)".[196]*

300.     After Plaintiff signed the Release of Information, Solomon folded the form, put it in the envelope together with the invoice, and addressed the envelope to Huffman. Solomon asked to use Plaintiff courtesy to deliver the envelope to the HR department for Huffman at Plaintiff's next earliest convenience.

301.     Following instructions, Plaintiff brought it to the HR department, and announced to Huffman in the email: *"Dear Virginia, I left some paperwork from Maria Solomon for you, she found it convenient to pass it through me – let me know if you get it! Best, Karolina". [197]*

302.     Neither Solomon nor Huffman provided a copy of the document to Plaintiff. Plaintiff owns the document copy only because she asked the HR assistant to make a document copy for her own record while handing it over. The release of information had been not discussed with Plaintiff beforehand (nor afterwards), neither by Huffman, nor Solomon,  nor Mehta-Naik. Neither Huffman nor Solomon were aware that Plaintiff made a copy of the document.

303.      Deception was used in obtaining consent for the written authorization. After one hour meeting with Solomon, Plaintiff was emotionally vulnerable. Solomon and Huffman mislead Plaintiff about confidentiality of the meetings with Solomon. Plaintiff was coerced to consent, since Solomon made implicit that the continuation was conditioned on signing the document.

---

191 She always finished the session by scheduling the next appointment and consistently sent the next meeting invitations through Rockefeller University Outlook email system (Mehta-Naik has Rockefeller University's associated email address: nmehta@rockefeller.edu).

192 The intake meeting with Solomon was arranged through on-site psychiatris for Friday, May 26th.

193 Solomon has a bachelor's degree in Russian Language and Literature. In 1996 she obtained her master's degree in clinical social work from Shirley Ehrenkranz School of Social Work/NY University. Solomon's profile reveals that she also works as a senior social worker at New York-Presbyterian Hospital. However, Solomon is advertised as a Psychotherapist (Maria Solomon LCSW) practicing at 17 East 96th Street NYC 10128 according to her LinkedIn profile (https://www.linkedin.com/in/maria-solomon-39383371/). There, she performed her '*psychotherapeutic sessions'* with Plaintiff. Solomon does not list any relevant training or experience in working with sexual violence survivors, nor report expertise in dealing with trauma issues. Her psychotherapy is listed as 'general'.

194 After Plaintiff realized how difficult and re-traumatizing it is to have to describe those traumatic events over again and again (five times elsewhere, and again separately to Solomon and Mehta-Naik). That is why Plaintiff decided to commit and stay with Huffman's referrals to continue what seemed to her to be a therapy.

195 Revealing traumatic events made Plaintiff cry, and the sittings with Solomon, especially the first ones on 5/24/2019 and 5/31/2019, were filled with long moments in tears, leaving Plaintiff in a bad shape, due to unprofessionally closed sessions.

196 https://drive.google.com/file/d/1XLR3J122yEl5lrYoC9i0t3sYf6yIz01F/view?usp=share_link

197 Email correspondence from 6/4/2019

304.     Release of Information was to control and manipulate Plaintiff's actions. The move was part of extortion scheme – to obtain business advantage. Solomon- out of network provider, no electronic payment, thus no HIPPA rules- the way to

305.     Solomon work did not constitute any form of qualified therapeutic intervention. In her work with Plaintiff, Solomon did not use any social worker/counseling / therapeutical techniques apart from *listening*. The sittings with Solomon were not aimed at processing and reducing trauma and PTSD symptoms, strengthening self esteem and improve quality of Plaintiff's social interactions, as provided by competent and effective crisis intervention services. [198]

306.     Huffman's mental health referral services were unprofessional and unethical. Although visibly traumatized and in need for a treatment, neither Solomon nor Mehta-Naik provided adequate service nor referred Plaintiff further to another specialist.

307.     Plaintiff was discouraged from seeking additional mental health services. In July 2019, Plaintiff expressed to Mehta-Naik the interest in Victim Intervention Program at Weil Cornell and wished to enroll in the group psychotherapy based on shared experience of other survivor of sexual harassment. [199] Mehta-Naik actively discouraged Plaintiff from proceeding, and argued that since Plaintiff is already in a regular therapy with Solomon, she should not spend too much time on extra mental health services but should better focus on her Intuitive Physics project. Because she did not want to compromise her work by any means, Plaintiff complied. [200]

308.     In summary, Huffman's health care referrals did not constitute an adequate response to employee injury at work - the 2017 rape and subsequent sexual harassment.

309.     Huffman's conduct was malicious and constituted intentional negligence, causing Plaintiffs substantial personal damage.

310. Solomon did not act in the role of Plaintiff's advocate throughout her complaint process. Huffman's mental health service referrals clearly misaligned with reasonably expected assistance.

311.     On 10/26/2019, Plaintiff communicated to Solomon that Plaintiff was in touch with another victim of the same perpetrator (Azevedo) and that the victim was willing to testify in the criminal and institutional investigations. Solomon doubted whether the fact had any legal value and tamed Plaintiff initial belief that this information would move the case forward. Solomon advised Plaintiff against moving forward with the new evidence to avoid harm to the perpetrator. She rebuked Plaintiff, angrily asking if Plaintiff was aware that her actions could cause disciplinary actions and negatively affect perpetrator's work and his future career if she continues. When Plaintiff, taken by surprise by Solomon's stance said 'I thought we are fighting for justice here', Solomon responded: *"No, you are fighting for justice"*. [201]

---

198 Plaintiff interacted with Solomon as a rape survivor but also as an expert in psychological methods (Plaintiff obtained MSc degree in clinical psychology). The estimate of poor quality of Solomon's service is based on not only on Plaintiff's academic knowledge. On a regular basis (in person and over the video chat meetings, starting in May 2019) Plaintiff discussed Solomon's performance with another psychologist, Plaintiff's long-term colleague with following credentials: MS degree in clinical psychology and an BSc degree in social work, accredited psychotherapist, trained in Transactional Analysis in UK, with over 15 years of experience as social worker and UKCP registered Transactional Analysis psychotherapist in the UK, working with clients experiencing various difficulties, including trauma from rape. She evaluated that the interactions between Plaintiff and Solomon had been not constituting any form of qualified therapeutic intervention.

199 Plaintiff sought rapport with other victims of sexual violence for therapeutic purposes

200 Both Mehta-Naik and Solomon noticed that Plaintiff was passionate about science.

201 Plaintiff believed her complaint deserved an impartial and fair investigation, and she thought she would be supported and encouraged to exercise her civic rights. Filing the complaint helped Plaintiff not only in restoring her self-agency, brutally destroyed by the rape

312.     Solomon's work is evaluated negatively by other patients: "***This woman sucks as a therapist.*** *She is very cold, distant and extremely invalidating. Most of us seeking help are in desperate need of feeling heard, validated and trusted. My experience with her has made me feel anything but. I feel like she actually made me feel worse. I hated my sessions with this woman She is on a high horse.* **What Maria wants Maria gets**. *She has an ego that gets the better of her. She also doesn't really put in any work. She just sits and listens and invalidates. She really does suck. It's a shame that this woman is allowed to practice. She does more damage than good. And calls herself a professional.*" [202]

313.     The pattern of Solomon's sessions with Plaintiff is easy to pinpoint: Solomon was only sitting, listening and making notes. Solomon was also asking questions, but not about health but about updates in the complaint process, who Plaintiff currently discusses the next step and whether she follows attorney's advises. Solomon always discussed with Plaintiff her next moves. Solomon did not refrain from asking Plaintiff all of these questions even during the last concluding session with Plaintiff. [203]

314.     Plaintiff was coerced into continuing to meet Huffman's mental health referrals. Solomon and Mehta-Naik hesitated to terminate the sessions with Plaintiff. [204]

315.     Solomon instructed Plaintiff to discuss with others in the team before taking any actions. Solomon carefully tracked with whom Plaintiff discussed her next steps and monitored the content of the discussions.

316.     Solomon and Mehta-Naik in fact normalized to Plaintiff the status-quo of the rape culture and advised against complaining to avoid difficulties and struggles. They advised Plaintiff to see the fact of filing the complaint as sufficient success for "somebody in your situation".

317.     Through the *"therapy"*, Plaintiff learned that her *defeat* in the complaint process, i.e., negative outcome from the MBL/U of Chicago investigation, was likely expected. The cure Solomon and Mehta-Naik prepared for Plaintiff was to accept that unavoidable defeat.

318.     When Plaintiff reported to Solomon to consider refilling the NSF complaint, she was advised to think twice if it is worth continuing with her other complaint. In fact, her actions concerning filing out the NSF complaint were highly scrutinized. [205]

319.     While Plaintiff's healing process required support and work on regaining confidence and agency, Solomon's conduct as "*cold*" and controlling "*therapist*" was far from an autonomy-supportive therapy that improves the client's wellness and enables the satisfaction of their basic needs as they pursue what matters most to them.[206]

320.     The pattern of interactions Plaintiff had with Solomon's and Mehta-Naik's indicated that the mental health services from Huffman's referrals acted with inherent conflict of interest to the sole benefit and interest of Plaintiff, and as such the lacked legally and ethically imposed fiduciary principle of

---

and subsequent abuse. Through her complaint she aimed to improve the CBMM community, her scientific environment, which she believed suffered from managerial misconduct, which allowed these criminal actions to happen in the first place. Plaintiff was disappointed by Solomon's lack of support.

202 The review of one of the recipients of Solomon's service from 7/4/2020 (https://www.yelp.com/biz/solomon-maria-new-york )

203 The last session with Solomon from 11/16/2019 is documented with audio recording available as evidence.

204 Documented by the last phone call with and e-mail correspondance with Mehta-Naik; ref. 182 for the evidence of Solomon's coercion. The sessions were conducted with unprofessional protocol and no therapeutic contact defining ending goals of the sessions was ever formulated.

205 Huffman encouraged Plaintiff to continue seeing Solomon and declared Huffman would continue to cover associated costs.

206 Ryan, R. M., & Deci, E. L. (2017). Self-determination theory: Basic psychological needs in motivation, development, and wellness. The Guilford Press. https://doi.org/10.1521/978.14625/28806

counseling.  Mental health professionals conducting such misbehavior should not be allowed to practice therapy again.

321.    Based on the presence of the element of trust in a therapeutic interaction. [207] , and victim's vulnerable emotional state, mental health services influenced Plaintiff's decisions about next step in the complaint process.

322.    As the services did not benefit Plaintiff neither in terms of psychotherapy nor advocacy, they were to inquire about what are her next moves in the complaint process, to steer Plaintiff into not complaining any further.

323.    As such, they were part of cover-up scheme. Huffman ordered the services to silence the complainant and thus keep the complaint low-profile.

324.    A female Rockefeller University student, in the waiting room of Solomon's office, after one of her sessions with Solomon in 2019. Potentially, involved in Huffman's scheme. The fact that other Rockefeller University students and postdocs could have been undertaking similar treatment (in fact.) is deeply distressing.

325.    The conduct of mental health services providers from Huffman's referrals caused to physical and mental harm to Plaintiffs. As a victim, Plaintiff did not receive any validation for their pain. As a consequence of Defendants' actions, the recovery momentum from early 2019 was damaged, delaying further therapeutic process, causing yet another trauma, this time every-day trauma of living in fear of a new harassment and/or retaliation, and extreme daily-basis stress.

326.    Huffman - HR Director and Title IX coordinator at Rockefeller University - who held the strings. Huffman's referrals were masterminded to include only carefully selected providers, based on the availability of privileged information about the course of the service to Huffman and/or easiness of obtaining it. Moreover, Huffman used deception in obtaining the Release of Information form to secure access to privileged information concerning the complaining employee.

327.    Huffman, as a person and institutional official, and recipient of privileged info from Solomon, was aware of both physical and emotional pain and the signs of a huge stress Plaintiff was experiencing through the May-Nov 2019 interactions.

328.    Huffman did not use that privileged information from Solomon to assist Plaintiff in her struggles as a victim of sexual assault in the workplace and to help Plaintiff to regain her health. Huffman let Plaintiff to suffer even more, because then in emotionally vulnerable state, Plaintiff could be steered, in the interest of desired compliance with Rockefeller University's interests as an institution, and she does not externally complain about Rockefeller University's institutional misconduct.

329.    Huffman misused the privileged information she gained about Plaintiff. Huffman's behavior as  the one representing Defendants, was intentionally malicious and holds them responsible under federal and state laws.

330.    By staying the mental health providers referred by Huffman, Plaintiff missed the opportunity to promptly start a professional sexual violence trauma therapy with a specialized mental health provider (with Ph.D. in clinical psychology) whose time and availability for new patients was otherwise highly limited.

---

207 This characteristic of the therapeutic relationship is the cause why the mental health service is an ethically and legally regulated area of service (The *Mental Healthcare* Act 2017, The American Psychological Association).

*(iii) Rockefeller University refused to assist with issuing new No Contact Order*

331.    Plaintiff discussed with Huffman the outcome of MBL/U of Chicago investigation and next steps.[208]

332.    During the discussion, Plaintiff expressed her concerns over the status of No-Contact Order issued by MBL/U of Chicago in lieu of Plaintiff's participation in future CBMM events, including the upcoming one. [209]

333.    Huffman refused to act in her administrative role.

334.    Subsequent discussion with referred attorney[210] led Plaintiff to contact Collier and Egan in that matter. [211]

335.    The response assuring the No-Contact Order issued on 6/8/2019 remains in place arrived 10 days after her inquiry, too late for Plaintiff to register and participate in the conference.

336.    The lack of expedited actions from the side of Huffman and delayed communication with MBL/U of Chicago investigators, caused her losing "*an important opportunity for the CBMM Community to come together, present current research and discuss ongoing and/or potential collaborations*"[212]

337.    Plaintiff was planning to participate, as there were new developments in her ongoing work that she had been performing with MIT collaborators. She hoped to discuss it with Freiwald, Prof. Tenenbaum, and Prof. Kanwisher in a group. Because Plaintiff and Freiwald were based in New York, whereas the MIT collaborators were based in Boston, CBMM meetings proved to have a convenient format in organizing such working group meetings (see August 2018 meeting in Woods Hole). By not participating, Plaintiff lost training and developmental opportunities and got isolated from the CBMM community.

*(iv) Rockefeller University covered-up breach of existing No Contact Order by Azevedo*

338.    Earlier in 2019, Plaintiff was delegated to organizing the remote connections of CBMM research seminars for Freiwald's laboratory.

339.    CBMM delegated perpetrator as one of two postdocs *' helping to coordinate the CBMM caucus, research meetings, and seminar talks*' [213]

---

208 In-person meeting on 8/14/2019.
209 CBMM annual retreat conference on 8/30/2019 in Woods Hole, MA.
210 Here phone call on 8/18/2019
211 Plaintiff to Collier and Egan on 8/19/2019: " *Could you please update me on the status of No Contact Order? I would like to keep it in place for any future conferences or events*",
212 From the CBMM organizers invitation email to CBMM Retreat conference.
213 Kathleen Sullivan to Winrich Freiwald on 2/15/2018

340.     Neither Freiwald nor Huffman discussed with Plaintiff her ongoing CBMM duties and their potential adjustment in lieu of her complaint, although both Huffman and Freiwald knew the 2017 sexual assault perpetrator's identity.

341.     In September 2019 Freiwald delegated Plaintiff to attend the research seminar.[214]

342.     On the day of the seminar, 9/24/2019, when she remotely connected, unexpectedly and shockingly she encountered on the screen the full view of Azevedo himself as the research seminar host, standing in front of the camera. Mr. Brewer, the CBMM administrator who usually had been checking the remote connection with Plaintiff, was not there.

343.     Immediately after Plaintiff connected, Azevedo sought interaction with Plaintiff (saying *'Can people from New York hear me?'*)[215]. Although he appeared in the role of research seminar organizer operating the projection system, he did not share the presenters slides once Plaintiff connected, but kept the front camera view such that view of himself in the foreground, instead of the view of the presentation slides, appeared on Plaintiff's screen. Therefore, intentional action to be viewed by Plaintiff. Intimidating for Plaintiff.

344.     Noticing the issue, Kathleen Sullivan, who was in the audience, fixed the issue.[216]

345.     The incident caused Plaintiff a huge stress as she perceived the event as Azvedo's provocation (it was the first research seminar after the outcome of the MBL/U of Chicago investigation), As a result of the provocation during the event, Plaintiff faced enormous stress. She was confronted by her perpetrator at work once again, and his behavior violated established No-Contact-Directive. Moreover, she could not exit the situation. She felt obliged to stay connected since Freiwald asked her to attend the seminar and summarize it to him afterwards.

346.     Plaintiff reported the incident to attorney.[217] who concluded that the incident falls in the gray zone of the current No-Contact order and referred to Ms, Huffman for assisting with reformulating the No-Contact order to cover CBMM specific context.[218]

347.     Zipkin referred Plaintiff to Huffman for further assistance.

---

214 On 9/24/2019 Freiwald to Plaintiff: *"Great, Karolina! I cannot watch, but would appreciate a brief summary on their method (how do they study bypassing connections) and findings, if that is ok. Reason is we want to study them, too. Thanks! W".*

215 Plaintiff was THE ONLY person from New York at the moment

216 Ms. Sullivan to remote participants on 9/24/2019: *'Hi All, Can everyone connected hear us? Best Kathleen'*, Plaintiff replied: *"I can hear you but the only camera view we have is pointing towards audience. Would be good to connect the screen too."*; Kathleen Sullivan: *"Ok thought her was sharing his slides with you. Can you see Ko's presentation/slides?"* ; Plaintiff: *"Great!!! Thank you Kathleen!".*

217 Plaintiff Zipkin in an email on 9/30/2019: *"...Another issue I wanted to discuss with you ... is the event that happened last Tuesday, which is related to No Contact order. I am organizing webex stream of the CBMM seminars for our lab here in New York where lab members can individually connect from their computer to participate in the seminar physically happening at MIT. Till now to organize it and to connect I stayed in touch with CBMM administrator and CBMM IT person but on Tuesday when I connected, surprisingly, I saw the abuser who was checking the stream from their site and apparently was hosting the seminar, (i.e. later introducing the speaker). I did not connect with the camera and microphone that time but he knew I was there and was asking if 'the people from New York' can hear him'. This situation caused me a huge stress especially that I had to stay and listen to the talk because of my job responsibilities. I would like to hear from you if 1) this can be consider already as the violation of No Contact Order; 2) if we can reinforce No Contact Order rules in this context to prevent the further contact in case he might be a regular host of this event, happening more or less every week from now (I might in this case ask eg. IT person to be always there checking the connection, instead of Mr Azevedo, in case we can support this argument by No Contact order). Looking forward to hear from you, Best regards, Karolina".*

218 Here: Phone call on 10/3/2019.

348.    Because Huffman repeatedly was referring to fix the no-contact order issue with event organizers, In her conversation with Zipkin on 10/3/2019, Plaintiff also expressed willingness to report sexual assault to Azevedo's supervisor. However, Zipkin advised Plaintiff not to do it, warning against defamation litigation. Zipkin advised Plaintiff worng, since Plaintiff had right to report sexual assault *and sexual harassment incidents to the perpetrator's supervisor.*

349.    Plaintiff reported the incident to Huffman on 10/25/2019, and asked her again to intervene and assist Plaintiff in a new No Contact Order to cover the relevant events. Huffman did not take any action and belittled the incident.

## F. Defendants conspire against Plaintiff when new developments and wtnesses in the case emerge

### (i) *Rockefeller University gained actual knowledge about new witnesses (Azevedo's other victims)*

350.    In October 2019, Plaintiff learned about nother victim of the same perpetrator and the woman was willing to corroborate the fact to the police and support the NSF institutional complaint.

351.    The woman, who has been in contact with Azevedo until mid 2017, corroborated Azevedo's pattern of sexually predatory behavior and testified about Azevedo's sexual harassment towards her. Importantly, the woman also knew about Azevedo's previous rape, the one Plaintiff reported in the investigation, and could potentially provide more information which would allow to contact the woman who was the victim.

352.    Now, with these new corroborations, the testimony of Plaintiff gained substantial support. Plaintiff believed that the corroborations of the new witness would constitute a breakthrough in her complaint process and with the new evidence, the investigative process might gain momentum.

353.    Plaintiff reported the fact to attorneys and asked for help with handling this new evidence in her complaint process.[219]

354.    Neither Zipkin nor Morak never replied to Plaintiff anymore, even after Plaintiff sent an email on 11/21/2019, to conclude her interactions with Zipkin and Morak and withdraw their representation.

355.    Plaintiff reported the new evidence to Solomon.[220]

356.    Plaintiff reported the new evidence to and Huffman.[221]

357.    During the meeting with Huffman,  Plaintiff communicated to Huffman her belief about the importance of the new evidence for the ongoing police investigation and the NSF complaint.[222]

---

219 Email on 10/23/2019
220 On 10/26/2019, see the paragraph 285 above.
221 Email on 10/25/2019 "*Dear Virginia, I have some good news about my issue and I would like to discuss with you how to proceed. Would you have time to meet? Please let me know. Best regards, Karolina".* , in-person meeting same day
222 Plaintiff filed the complaint with NSF on 10/1/2019.

358.    Huffman offered legal assistance. As Plaintiff reported she hadn't heard back yet from Zipkin, Huffman asked Plaintiff during the meeting: 'So, you are asking for the lawyer?' and announced that she would 'talk to the General Council' and follow up with Plaintiff.

359.    Huffman offered to assist with relaying this info to the detective, through onsite former-police officer currently working in Rockefeller University security department, Michael Murphy ("Murphy").

360.    Huffman explained to Plaintiff that Murphy is a former police officer and would be knowledgeable about police proceedings, and called Murphy in the meeting to Huffman's office.

361.    Huffman asked Plaintiff to explain to Murphy how she filed the police report and what exactly she conveyed to the detective. In particular, Huffman asked Plaintiff whether she described the 2017 sexual assault event to the detective as rape or she named it differently. Plaintiff explained to Huffman and Murphy that she described the 2017 event as rape to the detective when she filed the police report on 4/3/2019.

362.    Having to talk about the details of her experience once again, this time to the male stranger, and using the word ' rape' which was horrifying for Plaintiff (at that time, she also avoided using sexual harassment and sexual assault terms at all, resolving to use 'Title IX issue' to classify what happened to her), was traumatizing and extremely stressful. Making her use the word 'rape' triggered painful memories and associated emotions.

363.    As Plaintiff gave the summary of the events, Murphy asked Plaintiff about the name and the contact details of the detective. Plaintiff took it out the Falmouth Police detective's visit card from her wallet[223] and

364.    Murphy took a picture of the detective visit card with his smartphone and informed Plaintiff that he would call the detective in order to get information about the current status of the case and how to proceed with the new witness.

365.    Murphy reached out by email to Plaintiff one week later: '*Hi I have two calls into the detective, I haven't heard back yet. I will follow up again.*' [224]

366.    Plaintiff responded the same day: "*Hi Michael, Thank you for your effort. Have you already tried to leave a message (you can refer to my name)? I had a success in the past with detective getting back to me after leaving the voice message. Otherwise I think it would be good to contact Falmouth Police center and his supervisor to inquire if he still works there. Best, Karolina*". [225]

367.    Murphy has never contacted Plaintiff again since then.


(ii) *Rockefeller University refused to reopen the investigation into Plaintiff's complaint*

---

223 Since 4/3/2019, when she filed the police report, Plaintiff carried handy in her smartphone wallet.
224 Email from Murphy to Plaintiff on 10/31/2019
225 Email from Plaintiff to Murphy on 10/31/2019

368.    Another meeting between Huffman and Plaintiff was arranged as the follow up. [226]

369.    During the meeting, Huffman referred Plaintiff to the specific attorney and explained Plaintiff that *"since somebody knows her directly, she might be … available".*[227]

370.    Huffman prepared handwritten note with contact details of the attorney. [228]

371.    Huffman instructed Plaintiff further:  *"And if you could just let her know … if you call her let her know that you are from Rockefeller and you got her name from … HR (…) So, this is called Safe Horizons. So, it is a firm that also, similarly like Sanctuary for Families, have attorneys, and somebody at my office that knows her, I think they are friends, and she said "Oh, she should call her" and … ummm… and sure she would get some … attention. If you don't, call me back".* [229]

372.    Huffman explained that *"Um.. I can't … I asked our lawyers about legal aid and that is not something that we could do, other than what I can do is give you hardship funds as a postdoc, if you are engaged in some legal action. So, if you hire attorney to pursue this I can give you certain amount, we usually do up to 5,000 (…) A donor gave money for postdocs (…)".* [230]

373.    When Plaintiff asked how would this work, Huffman explained that *"you will have to get it preapproved … You need to tell me that you have been engaged with a firm and … I would pretty much have flexibility up to 5,000, but what beyond that money I will have to make sure. Because this is the money that the donors gave to help postdocs with extenuating circumstances, so I will be putting it through … it is not like University, it is a donor-based donation …  I need to write a report for a donor".*[231]

374.    Huffman instructed Plaintiff to contact the attorney:  *"I would try this person [from the note] and see if she can help."* [232]

375.    Huffman also asked Plaintiff: *"Where you are at this process right now?".*  Plaintiff responded that she was waiting to meet Huffman and that *"let's see".* [233]

376.    Huffman asked further: *"Did you hear from NIH* [she actually meant NSF[234]] *people?"*[235]

377.    While Plaintiff responded that she did not, Huffman advised: *"I asked the attorney, I just said, and she said basically, (…) it is like kind of your choice if you want attorney contact NIH or you could contact NIH and say that there is some additional information that people are willing to corroborate the story".* [236]

378.    At the end of the 11/15/2019 meeting, Plaintiff thanked Huffman. *"Ok, just call me"* [237], responded Huffman.

---

226 Plaintiff to Huffman by email on 11/1/2019: *"Hi Virginia, I was wondering if you got any updates after our meeting last Friday? Best, Karolina".  On* 11/6/2019, Plaintiff was contacted by email by Huffman's assistant who then assisted in scheduling the meeting for 11/15/2019.

227 Huffman: *"So, somebody who works for me knew of another organization. Because she came out of working for such kind of organization, and has a friend that is a lawyer for this place, it is called Safe Horizons. (…) I can write down the name. Because it could be another option. And since somebody knows her directly, she might be, you know, available? Because she is director of the program.'* Audio record: https://drive.google.com/file/d/1Exf1LVann7P9K5b23hAz18i-dcXewI05/view?usp=share_link

228 Handwritten note: https://drive.google.com/file/d/1tunl5rCq7A4Pyj-9jcvI8ZKinSD7iHOn/view?usp=share_link

229 Audio record: https://drive.google.com/file/d/1Exf1LVann7P9K5b23hAz18i-dcXewI05/view?usp=share_link

230 op. cit

231 op. cit

232 op. cit

233 op. cit

234 Huffman meant NSF, National Science Foundation; Huffman confused NSF with NIH, National Institute of Health, the other major governmental funding agency in science

235 op. cit

236 op. cit

237 op. cit

379.     It is a reasonable conclusion that the attorney referred by Huffman does not have relevant credentials for facilitating Plaintiff's complaint process. [238]

380.     It is a reasonable conclusion that the hardship fund which Huffman proposed as a second option, was very limited and unlikely to pay for the attorney consultation in Plaintiff's case. [239]

381.     In face of new evidence, Huffman did not act in her administrative role and did not reopen the investigation into Plaintiff's complaint.

*(iii) After gaining actual knowledge about new witnesses, other CBMM Defendants also refused to reopen the investigation into Plaintiff's complaint*

382.     In early January 2020, Kanwisher[240], learned about Plaintiff's complaint and reached out to Plaintiff: *"I just talked to Katharina and I am so very very sorry to hear what you have been through ... and further devastated that apparently no one has been of any help"*. [241]

383.     In her communication to Plaintiff, Kanwisher asked Plaintiff's permission to discuss the situation with her colleague female MIT Professor, Rebecca Saxe, and the CBMM evaluator, Lizanne DeStefano.

384.     In addition, Kanwisher asked Plaintiff to forward to her the email Plaintiff sent to CBMM Director, Tomaso Poggi ("Poggio") o in May 2019. With permissions from Plaintiff, Kanwisher subsequently shared the email content with Rebecca Saxe and Lizanne DiStefano.

385.     In her subsequent email communication to Plaintiff, Kanwisher reported that the CBMM evaluator was *"shocked"* that Poggio never replied, and that *"meanwhile as far as I can tell, Azevedo was a TA last summer and is scheduled to be a TA this summer, which is beyond belief"*. [242]

386.     Kanwisher reported to Plaintiff that Kanwisher's *"goals are to debar hium from teh CBMM summer school (and hopefully from CBMM altogether), to insist on a more serious sexual harassment training this summer that all faculty attend (to underline its seriousness), and if I can determine that Tommy read your email and did nothing, to have him removed as head of CBMM. I may not succeed at the third thing, but I will try, starting with trying to find out if he read your email"*. [243]

---

238 The individual in question, Christine Perumal is a Director at Safe Horizon Domestic Violence Law Project. Her areas of expertise are family issues, like seeking a divorce or separation dispute. There is no available information indicating that Ms. Perumal was knowledgeable about sexual harassment and sexual assault criminal litigation. In addition, Ms. Perumal's practice is in New York. Her credentials included no information about the license to practice in Massachusetts. Ms. Permual did not list any expertise nor experience in dealing with sexual harassment, neither sexual assault, nor discrimination complaint processes neither in academia nor in the workplace in general.

239 Given the standard legal fee within the range of $200- $300 per hour, $5K would approximately cover only two 8-hour days of the attorney work, insufficient to provide legal consulation/representation based on the full review of the complaint materials.

240 Nancy Kanwisher ("Kanwisher") is CBMM and MIT Professor and Plaintiff's collaborator on the Intuitive Physics project.

241 Nancy Kanwisher to Plaintiff by email on 1/6/2020.

242 Kanwisher to Plaintiff by email on 1/16/2020

243 op. cit

387.    Subsequently, Kanwisher reported to Plaintiff about what she had learned about MBL/U of Chicago investigation (*"one witness interviewed"*), and that Bob Desimone ("Desimone"), MIT Professor and Azevedo's supervisor[244], learned about the complaint and *"was about to talk to Azevedo"*. [245]

388.    With Plaintiff's permissions, Kanwisher subsequently share the content of Plaintiff's email to Poggio with Desimone: *"I think it will help Bob understand how serious this is, and it will immunize him against what are sure to be excuses Axevedo will try to make"*.[246]

389.    Next, Kanwisher updated Plaintiff about her *"goals moving forward: i) address the situation in any fashion that would be helpful to you - please tell me what would be most helpful, or think abotu it and we can diiscuss on the phone. ii) either cancel the summer school for this summer or make major changes including debaring Azevedo and perhaps others from TAing or attending iii) address the broader toxic culture of the summer school as run by men only, and men who range from insensitive or oblivious to criminal"*. [247]

390.    In addition, Kanwisher signaled to Plaintiff that she encountered resistance in moving forward with her goals, and *"to move forward I realize I will have to share info with others"*, in particular with Josh Tenenbaum, the MIT Professor and Plaintiff's other collaborator, since *"Tenenbaum – he will be taken more seriously than I will by Tommy and Gabriel"*. [248]

391.    In a subsequent phone call, Kanwisher learned from Plaintiff that Plaintiff wish is the thorough and impartial investigation into her complaint. Kanwisher also learned that there are other victims of sexual assault and sexual harassment from Azevedo who are willing to corroborate Plaintiff's testimony in the complaint process. Kanwisher reported that CBMM Defendants kept refusing to reopen the investigation against Azevedo, considering the MBL/U of Chicago outcome as the final one in their determination.

392.    Next, Kanwisher reported by email that *"Given the challenges of launching a second official investigation, I am hoping that Lizanne* [DeStefano] *will at least do an informal investigation in the service of deciding whether there is a broader problem with the climate for women in CBMM and which TAs should be allowed back this summer and hwat policies we need to change"*, and asked Plaintiff: ***"do you think the other woman with knowledge of Azevedo's behavior might be willing to talk to Lizanne, on the condition of keeping her identity confidential from the rest of us?*** *(And, did I understand you correctly, that she is willing to speak to the NSF people?). Corroboration from others would help us enormously in getting Tommy et al to understand why these TAs cannot come back to the summer school and why serious fixes are required. It is just too easy for them to dismiss the testimony of one person, particularly in light of the unfortunate Title IX conclusion"*.[249]

393.    Plaintiff  reported to *"I have asked the student and she is definitely willing to have a conversation with Lizanne"*[250], and subsequently Kanwisher connected Plaintiff with Lizanne DeStefano: *"Thanks very much Karolina. I am ccing Lizanne here. Lizanne, I think it would be very useful if you could talk to the person Karolina mentions. Thank you! Nancy"*. Plaintiff then connected the witness with Lizanne DeStefano.

394.    Subsequently, Plaintiff reported to Lizanne DeStefano and Nancy Kanwisher: *"I would like to let you know that there are* **two other victims of FA, who would be glad to speak, in the prerequisite of anonymity, about their experience. One of them has the same experience like mine**. *I would be more than happy if Lizanne could talk to them. As I menoned to Nancy before, I am also in touch with a person who was participant in summer school as Teaching Assistant in 2019. She would be happy to share her concerns derived from that experience as well"*.[251]

---

244 Frederico Azevedo worked in Desimone's laboratory at MIT
245 Kanwisher to Plaintiff by email on 1/17/2020
246 op. cit
247 Kanwisher to Plaintiff by email on 1/18/2020
248 op. cit; reference to Tomasso Poggio and Gabriel Kreiman
249 Kanwisher to Plaintiff by email on 1/19/2020
250 Plaintiff to Kanwisher by email on 1/23/2020
251 Plaintiff to Lizanne DeStefano and Nancy Kanwisher by email on 2/5/2020

395.    Kanwisher replied: "*Thank you Karolina! Lizanne is taking to people and this will be helpful. So far it seems like it will be hard to do a new investigation of your specific experience, but at the very least I hope to fix the problems for the future.* **hopefully I will have more for you in a few weeks**. *Nancy*".[252]

396.    Plaintiff then asked Lizanne DeStefano for "*more details about the prerequisite of anonymity for the individuals participating in the current process of contacting you?*",[253] and learned from DeStefano: "*I will not reveal the names of students that have spoken with me. I will report findings to leadership. I make every effort to do this in a way that will prevent individuals from being identified ---but I do caution respondents that there may be some risk associated with disclosure*". When Plaintiff inquired: "*Thank you so much for clarifying. Could you please let me know if testimonies from individuals that are not part of the program would be of any relevance for the current process? This information is crucial as it will help to weight the decision to participate against the risk that has been just mentioned*", DeStefano replied: "*At this moment, we are looking for ways to improve the climate of the Summer School. If the people you are referring to are part of CBMM—their input would be relevant. If not, and they have not participated in the summer school –probably not*".

397.    Plaintiff did not hear back from Nancy Kanwisher nor Lizanne DeStefano whatsoever since then.

398.    A new policy for handling harassment and discrimination complaints against faculty and staff went into into effect on Feb. 3, 2020.

399.    MIT revised complaint resolution policy and procedures for complaints against faculty and staff relies on professional, neutral investigators to conduct fact finding, which provides enhanced processes for consistent and fair handling of these types of complaints.

400.    By reason of the facts and circumstances stated above, Plaintiffs allege that CBMM Defendants deprived Plaintiff the right for fair and impartial investigation into her complaint under the new protocols.

## G. Defendants terminate Plaintiff's employment

### (i) CBMM Retaliated Plaintiff in the recruitment for the CBMM Summer School Teaching Assistant position

401.    In 2018 and 2019, Plaintiff was selected for a Teaching Position for the CBMM Summer School.

402.    In January 2020, Plaintiff was offered a Teaching Assistant position for 2020 CBMM Summer School. Plaintiff accepted the offer. [254]

403.    In the email correspondence, Plaintiff notified about No Contact Order against Azevedo. [255]

---

252 Kanwisher to Plaintiff by email on 2/5/2020
253 Plaintiff to Lizanne DeStefano by email on 2/6/2020
254 Email from  the 2020 Summer School senior Teaching Assistant Andrei Barbu
255 op. cit

404.    In February 2020, she received communication that The Directors decided not to select her in the recruitment for the position.[256]

405.    In a follow-up communication, the CBMM Summer School Director confirm refusing the position to Plaintiff and revealed knowledge about Plaintiff's complaint.[257]

406.    Plaintiff forwarded the correspondence to Nancy Kanwisher, and signalled *"this selection issue to be related to the conversation about CBMM culture we have been currently having thus wanted to give you updates"*.[258]

407.    Plaintiff never heard back neither from DeStefano nor from Kanwisher.

408.    Plaintiff was not offered the position in subsequent year, 2021, although during the 2020 recruitment for the position CBMM Defendants were informed that Plaintiff was interested in the 2021 position.

409.    Because of the events, Plaintiff was assisted by CBMM postdoctoral colleagues, who connected her with attorneys in Massachusetts, who then referred Plaintiff to Victim Rights Law Center.

410.    Victim Rights Law Center provides free legal services for sexual assault victims with civil legal issues in Massachusetts, excluding any assistance in filling civil lawsuits against the schools.

411.    Between March and May 2020, the attorneys from there legally represented Plaintiff in reviewing Plaintiff's 2017 sexual assault and subsequent sexual harassment, and Plaintiff's complaint, discussed with Plaintiff her civil rights, and agreed to assist Plaintiff with attempt to reinstall her in the CBMM position. For that, the attorneys[259] represented Plaintiff in the communication with Harvard, MIT [260] and NSF [261], concerning jurisdiction over the 2017 sexual assault and subsequent sexual harassment and the current status of Plaintiff's complaint.

412.    As the result of above with respect to denied Teaching Assistance position, Plaintiff learned about her rights to fill the complaints with NSF ODI office and EEOC, which she subsequently did, on 5/4/2020 (the NSF ODI office) and 08/10/2020 (EEOC Boston area).

413.    After unsuccessful mediation in September 2020 (all but one CBMM Defendants refused mediation), Plaintiff's EEOC complaints were referred to MCAD for investigation, which is ongoing as per the date of submission of this lawsuit.


*(ii) Freiwald's sexual harassment "enterprise"*

---

256 Email from Andrei Barbu on 2/4/2020
257 Email from Gabriel Kreiman on 2/11/2020
258 Email on 2/5/2020,
259 Margaret H. Schmidt, Aileen Konanez
260 Letter from Margaret H. Schmidt to Harvard University Office of the General Counsel on 5/15/20020, response from Heather Quay, University Attorney, Harvard University Office of the General Counsel to Schmidt on 6/8/2020. The response denied any wrongdoing from Harvard University, and defrauded to Plaintiff the involvement of Harvard University and Boston Children Hospital in Plaintiff's complaint jurisdiction.
261 Emails with Robert Cosgrove on 5/4/2020, 5/20/2020, 6/3/2020; phone call on 6/5/2020

414.    In June 2020, the lab climate survey in a format suggested by the Rockefeller University community and authorized by Freiwald, was performed anonymously among Freiwald laboratory members. [262]

415.    When asked *"Have you experienced or witnessed a hostile work environment in the lab? (bullying, gender harassment, sexual harassment)"*, majority of the respondents chose the answers indicating the presence of hostile environment in the lab.

416.    As further revealed in the lab survey results, majority of Freiwald laboratory members are unhappy in the laboratory, experienced "communication issues", do not feel comfortable with sharing personal concerns (housing, financial, family, physical or mental health) with Freiwald as their supervisor and are lacking Freiwald's supervisory contribution.[263]

417.    The evidence of systemic discrimination based on sex in Freiwald laboratory includes gender stereotyping and sexism in distributing laboratory tasks. Women are more often than men to be delegated by Freiwald to do tedious, demanding, "dirty" jobs, i.e., the ones that have to be done but nobody likes to do, often requiring over-hour and weekend work, such as animal training.[264], assistance during laboratory surgical procedures and administrative work.[265]

418.    Women in Freiwald laboratory (including Plaintiff) are more often than men selected for solely social and decorative functions while Freiwald advertises his laboratory on a forum .[266]

419.    Freiwald selected Plaintiff over other male CBMM postdocs in his laboratory and assigned her the role of his CBMM secretary, which effectively substitutes his tasks as the CBMM Principal Investigator.

420.    The evidence of systemic discrimination based on sex in Freiwald laboratory also includes sexual jokes and sexual content distributed in Freiwald laboratory by males, with Freiwald permission, on the regular basis between 2017 and 2021[267]. Freiwald allowed the content to be widespread inside the laboratory, but censored the external presentation, including the one for the NSF evaluation[268]

421.    Freiwald, as the Head of Laboratory and laboratory manager, refused to created a structured scientific environment and structured scientific exchange opportunities for his employees. Scientific projects in Freiwald's laboratory are logistically complex and require supervisory coordination and supervisory decision-making. In his supervisory role, Freiwald does not attend the project progress reports presented at the laboratory meetings. As a result, in such circumstances, the progress of an individual's project depends on Freiwald's supervisory input and decisions delivered by him during one-to-one meetings.

---

262 Freiwald lab survey questions and results: https://drive.google.com/file/d/1O9kLfk-jEQTmdn4L_swd80-JVLXGkfSZ/view?usp=share_link

263 op. cit.

264 All last thirteen chair and fixation trainings in Freiwald laboratory (as per December 2021) were performed by women (excluding female laboratory employee working with animals permanently). Three out of thirteen were performed by Plaintiff.

265 Corroborated by testimony of others

266 For example (1) Freiwald's email request to accompany him and to "spend some time" with him during the River Campus open event directed only to women on 5/8/2019; (2) similar, women-only email request from 2/20/2018 for a meeting with Trustees

267 Upon Plaintiff's information; graphical screenshots of the content, including the videos of sex presented during the laboratory meeting, and the picture of "squished balls" sent around the laboratory members on 11/18/2021 available for discovery and jury trial

268 Freiwald to Farid Aboharb (cced Plaintiff) on 4/25/2019 providing information to Aboharb for the NSF Site Visit at MIT on 5/7/2019: *"On the right hand side then some of the animations (no sex) for future experiments"*.

422.    Freiwald invites women from Freiwald laboratory more often than men for one-to-one meetings outside the office, which include meetings over meal in the restaurants, and meetings in residential location.

423.    By reason of the facts and circumstances stated above, Freiwald created a culture in which he conditioned his support as the supervisor and conferred an employment benefit and job assignments solely based on Plaintiff's gender or sex.

424.    Freiwald coercion and his *quid pro quo* sexual harassment is fueled on power imbalance and hierarchical male-dominated academic structure and based on traditional reference letter system mechanism to coerce loyalty and salience in the victims.

425.    Even when confronted with the results of the lab survey, Freiwald, in his addressing speech towards the lab members in August 2020, announced that he does not want to change the culture.

426.    Freiwald expects women to conform to sexism and punishes women who do not.

### *(iii) Freiwald sexually harassed Plaintiff*

427.    Evidenced in email correspondence, text messages, and witness testimonies is Freiwald's engagement in a specific form of unlawful gender discrimination towards her– sexual harassment  , in the form of quid pro sexual harassment and hostile environment, since 2017 until Plaintiff opposed it in 2020. [269]

428.    Two of sexual harassment events from the side of Freiwald towards Plaintiff continued into February 2020, which included Freiwald's sexual jokes and innuendoes as well as Freiwald's sexually charged body language insinuating the request for sexual favors.

429.    An email correspondence between Plaintiff and Freiwald emerged in May 2020 in lieu of lab reopening after the first wave of pandemic.

430.    With lab reopening, Plaitiff assured Freiwald about her readiness to restart her laboratory duties after the compulsory brake due to the lockdown.

431.    In lieu of general insecurities of pandemic, Plaintiff asked Freiwald if her CBMM salary will be continued as before, and explain that her concerns come because her fear of retaliation as earlier this year CBMM refused her Teaching Assistant position. Therefore, she was hoping to hear from Freiwald a long-term career advice.

432.    Freiwald confirmed his continuous support for Plaintiff's work *"I need you to succeed on the Intuitive Physics project"* [270] and asked *"do not worry about the fellowship, CBMM financially. That will be fine even if push came to shove"* [271].

---

269 The events of (with requests for social meeting outside of work and unwanted advances are detailed in the NYS DHR complaint
270 Freiwald to Plaintiff, email on 5/26/2020
271 Freiwald to Plaintiff, email on 5/28/2020

433.   Plaintiff calmed down *"to hear your reassurance concerning financial situation"*, and reported to Freiwald about being *"wholly excited about"* her Intuitive Physics project, and her committment to finalize it, despite *"The difficulties of Title IX complaint have been pretty strenuous and financially, mentally and physically exhausting, making even my husband name the last year as the worst of his life"*. [272]

434.   Freiwald then made suggestion to meet in person. It concerned Plaintiff, because recent personal meetings with Freiwald clearly broke the limits of professionalism, and now such request for in-person meeting would be in addition an ill-advised request, as the regulations of limited personal contact were still in place.

435.   Fearing further sexual harassment from Freiwald would occur as the next in-person meeting was in planning, Plaintiff alluded to one of Freiwald's sexual harassment behavior, and signaled that she opposed it:   *"I am not a person that gives up easily. I always tend to look for ways to turn a negative experience into the positive one and I also learned a lot from trauma. That is also why I set up clear borders for my work environment, involving no restaurant professional meeting and not working with intrusive men like Michael"*. [273]

436.   Following 6 days after Plaintiff's last email, Freiwald responded shortly requesting a Zoom meeting with Plaintiff for the following day. [274]

437.   During the Zoom conversation with Plaintiff in early June 2020, Freiwald effectively breaching the contract with Plaintiff and terminated her employment on the Intuitive Physics project: *"So, I have been thinking a lot about you and the worries that you have and the project. So, my conclusion, and I can tell you a bit more why I think that, is … it would be the best for you to move to a different place and different environment. So let me … This is probably not what you expected, but I have been thinking about it quite a bit"*. [275]

### *(iv)  Freiwald and Rockefeller University retaliated against Plaintiff after she opposed Freiwald's sexual harassment*

438.   Together, in the period between June 2020 and effective termination of her employment, Freiwald demoted Plaintiff in her work on the Intuitive Physics project[276], and demoted Plaintiff from the general tasks in his laboratory[277].

439.   In the follow-up email correspondence with Freiwald, Plaintiff attempted to clarify her termination which she perceived to be a *"misunderstanding"*. Consistent with a hostile tone of the earlier phone call, here in the email Freiwald again expressed hostility and retaliatory animus, threatening Plaintiff that if she stays *"it will be the end of her career"* [278]

---

272 Plaintiff to Freiwald, email on 5/29/2020
273 Plaintiff to Freiwald, email on 5/29/2020
274 Freiwald to Plaintiff on 6/3/2020,
275 Freiwald to Plaintiff, Zoom meeting on 6/4/2020. The meeting is documented with audio record.
276 i.e., pursuing the Intuitive Physics project with the second methodology, as contracted in the Intuitive Physics project proposal from 2016; Freiwald to Plaintiff on 6/4/2020, and on 6/12/2020
277 Between June 2020 and January 2021, Plaintiff was stripped off the Cornell protocol management (email correspondence
278 Freiwald to Plaintiff, email on 6/12/2020

440.     Freiwald instructed Plaintiff to *"wrap things up here"* and look for another opportunity [279], implying that her employment is due to finish in only two months, until her next scheduled reappointment date.

441.     Had she terminated her experimental work then, as Freiwald instructed, all the work on the Intuitive Physics project which Plaintiff performed since 2016 would have been wasted, as the results, although scientifically significant, deemed insufficient with that current sample size for a scientific publication.  The perspective of scientific publication emerged due to project's high quality and promising initial results.

442.     In order to protect the scientific merit of the Intuitive Physics project, Plaintiff desperately contacted the lab manager, who then mediated with Freiwald and the Rockefeller University HR Department the extension of Plaintiff's appointment at the Rockefeller University.[280]

443.     Although Plaintiff initiated the contact with the lab manager much in advance of her reappointment transition date [281], Defendant issued the reappointment confirmation for Plaintiff 11 days after the transition day

444.     The Rockefeller University last-minute reappointed Plaintiff for a shorter period [282], constituting negative employment actions.

445.     Because of Defendants' retaliatory animus and their resulting negative employment actions, Plaintiffs suffered enormous stress nut only about her work but utmost about her and her family basic needs, due to the induction of a huge prolonged uncertainty about their basics whereabouts [283].

446.     Between December 2020 and January 2021, Plaintiff presented wrapped up conclusions from her up-to-date work[284], which Freiwald evaluated well as scientifically valid and *publishable* in a scientific journal. [285]

447.     Apart from 1-2 scientific papers on the Intuitive Physics project, an additional writing task was assigned to Plaintiff in February 2021, with a deadline in summer 2021. Plaintiff was delegated to write a review article for special issue of Cognitive Neuropsychology dedicated to the Intuitive Physics topic. [286] [287]

---

279 Freiwald to Plaintiff on 6/4/2020 and 6/12/2020; then on 12/22/2020

280 Phone call between Plaintiff and the lab manager on 7/22/2020 (audio record), and follow-up email corerspondance between Plaintiff and the lab manager between 7/22/2020 and 9/11/2020

281 i.e., 6 weeks before Sept 1,2020

282 i.e., 6 months. The standard reappointing process would have been prepared in advance, and the reappointment would have been made for one year, as contracted in the five-year Postdoctoral Associate period and Research Scholar visa sponsorship documentation with the Rockefeller University

283 Both Plaintiffs' US visas had been dependent on The Rockefeller University's appointment contract with Plaintiff, life place transitioning and traveling was impeded due to ongoing pandemic

284 Plaintiff worked day and night, overworking to fulfill work duties which she overseen based on scientific and laboratory feasible criteria.

285 Email correspondence between Plaintiff and Freiwald on 12/22/2021, on 1/7/2021

286 Email correspondence between Freiwald, Plaintiff and the journal editor: on 2/2/2021, between 2/5/2021 and 2/17/2021; on 2/21/2021: Freiwald to the special issue editor on 2/5/2021 about *"a postdoc in the lab working on Intuitive Physics"* to write *"an opinion or perspective paper to place the recent NHP findings in a broader context"*.

287 This publication with Plaintiff's sole authorship contribution entitled "F=ma. Is macaque brain Newtonian?" was positively evaluated during peer-review and is currently in minor editorial review before being accepted for publication.

448.    In lieu of her new assignments, Freiwald and the Rockefeller University extended her work at Rockefeller University, and appointed Plaintiff in a three year Research Associate contract on an H1-B visa, effective in September 2021.

449.    Although Plaintiff proved work capability and consistently showed extreme devotion to her work, which presented itself in an exceptionally high standard among the work of other postdocts and students in Freiwald laboratory (which is confirmed by Freiwald's willingness to publish the results of her work[288]), she continued to be demoted from further pursuing the Intuitive Physics project in extend contracted and agreed upon with CBMM Defendants prior to the retaliatory events in June 2020.

450.    The tasks of which she was demoted of as the result of retaliation, constituted substantial part of her contracted work in Freiwald laboratory. Following retaliatory events, they were subsequently distributed among other (male) postdocs in Freiwald laboratory.

451.    Freiwald substantially limited laboratory resources to Plaintiff, following retaliatory events, including personal resources. In 2020 and 2021 Freiwald modified the work duties of a visiting student, arranged before retaliatory events to work under Plaintiff's supervision and contribute to her Intuitive Physics project [289], such that the student instead assisted another postdoctoral male individual.[290]

452.    None of other postdoctoral nor graduate student currently or formerly working in Freiwald laboratory suffered employment negative actions comparable to Plaintiff's treatment.

453.    As the result of demotion, Plaintiff was deprived of the relevant work experience and the relevant training which she planned and highly desired to gain while she had been contracted as the CBMM-supported postdoc.

454.    This included CBMM-specific scientific opportunities and collaborations, from which she was effectively isolated in 2020.

455.    By reason of the facts and circumstances stated above Plaintiffs allege that CBMM Defendants used Postdoctoral researcher "*with the goal of establishing themselves as independent investigators, with expertise in a certain area of scientific study*"[291] as easy target for their sexual harassment enterprise, and human and sex trafficking.


(v) The *NSF ODI office gained actual knowledge about Freiwald's and Rockefeller University's retaliation and conspired against Plaintiff to avoid external complain against the Rockefeller University*


456.    The NSF ODI office contacted Plaintiff on June 3 2020 informing about "follow up questions regarding [Plaintiff's earlier] submission of the documents about Teaching Assistant position discrimination", and requested a phone call. The phone call between NSF ODI Equal Opportunity Compliance Manager for NSF Awardee Programs and Plaintiff was initially scheduled for June 4 at 4 pm, but was subsequently postponed for June 5, as in the meantime Freiwald requested a Zoom call with Plaintiff for the very same date.

---

288 All scientific articles authored with Freiwald as the Head of Laboratory are published in high-impact journals.
289 Email correspondance between Freiwald, Plaintiff and Sam Coolsaet in October 2019
290 Lucas Tian
291 As per CBMM Defendants' position statement.

457.     During the phone call[292], Plaintiff in tears revealed to NSF ODI Equal Opportunity Compliance Manager for NSF Awardee Programs about Freiwald's negative employment actions towards her from the previous day. Plaintiff also alluded to the events at CBMM MIT earlier in 2020, including her communication with MIT Professors, Nancy Kanwisher and Rebecca Saxe.

458.     In response, NSF ODI Equal Opportunity Compliance Manager for NSF Awardee Programs asked Plaintiff to submit by email all documentation which might have been relevant in the matter. Plaintiff complied and provided email correspondence and information supporting the argument that CBMM Defendants up-to-date 2020 discrimination and retaliation had been due to her earlier sexual assault and sexual harassment complaints. [293]

459.     In September 2020, the NSF ODI office received Plaintiff's complaint against the Rockefeller University, and informed that *"We are still investigating your first complaint and hope to make a determination on your CBMM retaliation complaint soon."[294]*

460.     Soon after the NSF ODI office confirmed with Plaintiff her status as the CBMM employee [295] [296], Plaintiff heard from the NSF ODI office that: *" **ODI is referring your retaliation complaint against Rockefeller U to the US Equal Employment Opportunity Commission, New York District Office,** which confirmed receipt of your complaint. I expect that they will contact you soon. Please refer to the attached letter for additional information. We are still investigating your MIT and University of Chicago/MBL complaint and we are still evaluating your retaliation complaint against MIT".[297]*

461.     The attached NSF Complaint Disposition Letter read that *"We have reviewed your complaint and have made the determination that we will refer your complaint to the Federal agency that may have primary authority and jurisdiction to investigate your complaint"* and that *"ODI has forwarded your complaint and all supporting documentation you submitted to ODI to the EEOC area office that covers New York City. The address and contact information for the EEOC New York District Office is below"* (the EEOC New York address included)[298]

462.     Plaintiff replied to *"Confirming receipt of your email and the letter. Looking forward to hearing from EEOC then. Please let me know if there is anything needed from me with regards to my previous complaints".[299]*

463.     However, Plaintiff was not contacted by the EEOC New York office, nor any new case/ case inquiry was posted by EEOC on her EEOC portal.

464.     Instead, in October 2020, Plaintiff received a call from the woman, who, calling from the Washington landline phone NOT associated with any EEOC office [300], introduced herself as an EEO Investigator, and performed with Plaintiff a 46 minute [301] conversation concerning her "allegations", to discredit her testimony and "dismiss" Plaintiff's alleged EEOC complaint at the end of the call. [302]

---

292 The mobile phone audio record available
293 Plaintiff to Cosgrove by email (included attachment) on 6/9/2020
294 Cosgrove to Plaintiff on 9/2/2020
295 Cosgrove to Plaintiff on 9/8/2020: *"At Rockefeller University, was your job title Postdoctoral Fellow or Postdoctoral Associate? Did you receive a salary or a stipend?"*; Plaintiff's response *"I am Postdoctoral Associate"* from 9/8/2020;
296 Plaintiff's salary at the Rockefeller University was funded from grant title "A Center for Brains, Minds and Machines: the Science and the Technology of Intelligence", ID IN00034259, sponsored by National Science Foundation, with Winrich Freiwald as Principal Investigator (documented)
297 Cosgrove to Plaintiff on 9/10/2022
298 op. cit
299 Plaintiff to Cosgrove on 9/11/2020
300 The phone number is registered to a private person working as EEO (not EEOC) Investigator who lives in District of Columbia, Washington DC.
301 The EEOC New York schedule a 15-minutes long intake calls
302 Plaintiff's mobile phone audio record available

465.     During the phone call, the woman, who Plaintiff was talking with, was continuously rude and invalidating towards Plaintiff, and several times she reacted towards the information Plaintiff provided with stereotypes and myths about victims of sexual violence.  Her behavior was (I) motivated by prejudice on the basis of Plaintiff's sex, therefore constitutes a hate crime, and (ii) dismissed facts and documentation of CBMM Defendants retaliation, both unlikely for the individual who would be in the role of a federal investigator during an intake EEOC call.

466.     By reason of the facts and circumstances stated above, Plaintiffs allege that CBMM Defendants (i) defrauded the NSF ODI policies and procedures in handling Plaintiff's complaint by not correctly forwarding Plaintiff's complaint to EEOC New York office; (ii) broke the federal and state laws prohibiting federal officials to impede complainants civil rights, and (iii) deceived Plaintiff into believing her complaint was dismissed by EEOC New York.

467.     As a proximal consequence of CBMM Defendants' actions, Plaintiff felt intimidated and helpless about contacting the external agencies with her complaint.

### *(vi) Plaintiff filled New York State Division of Human Rights complaint*

468.     Upon belief in science and academia and lack of information about her civil rights, Plaintiff was naive in her communication with CBMM Defendants Title IX Coordinators and Human Resource Department, and did not consider that the individuals she was in touch with could have had unclean hands.

469.     In result, Plaintiff was transparent with her CBMM employers, including about her communication with the NSF ODI office, and believed that she is supported in her wish to improve the scientific environment as a victim of the sexual assault and sexual harassment.

470.     However, after CBMM Defendants contradictory to expected reaction towards her complaint as new victims of the same perpetrator emerged, who were willing to corroborate Plaintiff's testimony, Plaintiff lost hope that she has been correctly assisted in her complaint process by CBMM Defendants.

471.     In December 2019, Plaintiff fell a victim of persistent staring behavior from the Rockefeller University professor, who has been known in the Rockefeller University female community from similar incidents.

472.     One female postdoc have *"heard of similar instances from other women. I don't know if anyone's complained but we definitely talked about making sure no young female student interviews him for Natural Selections [the Rockefeller University community magazine]. And he's made me uncomfortable on a couple of laundry days when he and his partner were also putting their laundry in. He would still stare a shade too long."*[303]

473.     Plaintiff and other women were referred to complain to Virginia Huffman, who arranged the meeting with them in her office. During the meeting and subsequent process, Huffman (I) did not file the complaint form as federal and state laws required,(ii) threatened complainants with the necessity of breaking confidentiality rules should they proceed, and (iii) concluded the "investigation" with biased

---

303 As per email communication

justifycation of professor's behavior by his medical condition. Huffman could not reveal more because of *"confidentiality rules".* [304]

474.    Upon Plaintiff's information and belief, at least two other women complaint about Freiwald's discriminatory behavior and laboratory hostile environment to Huffman, including in spring 2021, and did not receive Huffman's assistance.

475.    In April 2021 some of the Freiwald lab members expressed concerns over continuous hostile environment on a forum and wanted the lab climate survey to be redone[305] , since *"it is important to understand whether things have improved in our lab since the last survey"*[306]

476.    During her interaction with Huffman's mental health referrals, Plaintiff informed being uncomfortable with Freiwald's persistent requests for one-to-one socializing, and communicated experiencing fear of him and hostile workplace environment.

477.    Upon Plaintiff's information and belief, at least one other women from Freiwald laboratory was referred by Huffman to the Rockefeller University on-site psychiatrist after she complained to Huffman about Freiwald, and on-site psychiatrist had to clearly admit that Freiwald behavior was discriminatory and inappropriate, but the women's complaint was subsequently dismissed by Huffman.

478.    By reason of the facts and circumstances stated above, Plaintiff believed that Rockefeller University endorsed Freiwald's sexual harassment behavior and acted on covering up the complaints.

479.    In result, Plaintiff hesitated to further communicate with Huffman and feared further retaliation from her CBMM employer.

480.    In May 2021 Plaintiff filed NYS DHR complaint against Winrich Freiwald and the Rockefeller University, alleging discrimination based on sex (sexual harassment) and retaliation. In filling her complaint Plaintiff hoped for positive resolution, i.e., "letter of apology" and compensation for her lost employment, but Respondents consistently denied any wrongdoing in their position statement.

481.    In January 2022, the NYS DHR issued probable cause determination after investigation of Plaintiff's complaint.

482.    As of today, Winrich Freiwald is still working at the Rockefeller University.


*(vii) Rockefeller University CBMM issued Plaintiff's employment hard termination*


483.    In August 2021, Freiwald informed Plaintiff that *"The University and I"* decided to interrupt her current employment at the Rockefeller University, effective November 30, 2021.[307]

---

[304] Independent of which medical condition underlined the persistent
    and creepy staring behavior of the professor, he must have got cured, since from women's complaint actions, whenever Plaintiff crossed him afterwards, his sight was not creepy anymore.
[305] Performing a survey on a regular basis was an unanimous agreement among the group in 2020 lab survey
[306] Email on 4/21/2021 posted on Neural Systems Trainees group (identity protected)

[307] Freiwald to Plaintiff on 8/12/2021

484.    The termination was sudden and untimely as it fell only 3 months after starting of Plaintiff's Research Assosiate 3 year contract, and abruptly interrupted Plaintiff's ongoing work contracted with Freiwald earlier in 2021.

485.    Plaintiff silently opposed to Freiwald's email notice.

486.    In November 2021, Plaintiff was contacted by the Rockefeller University HR Department, who informed that Plaintiff's "last day of employment at the University will be November 30, 2021" and gave her the "exit" instructions. [308]

487.    Plaintiff complied with signing "RU Software License Compliance Policy" and "Postdoctoral Alumni Database Questionnaire", however refused to have an "exit interview",  informing Michael Wiener by email that it would be "inappropriate" and "hurting" for her, given that the reason of her sudden termination is retaliation due to her sexual harassment complaint.  Michael Wiener did not respond to this email.

488.    The subsequent day The Rockefeller University HR Department returned to Plaintiff a copy of her and her husband's visa petition (see also below). [309]

489.     In late November 2021, Plaintiff was contacted by Freiwald lab manager, who instructed her about returning lab items and deactivating services by the end of her employment. [310]

490.    Plaintiff complied with all Lab Manager requirements.[311]


*(viii) Rockefeller University obstructed ongoing jurisdiction proceedings and tampered with evidence*


491.    In July 2021 the Rockefeller University General Counsel sent to Plaintiff a Memorandum with a Legal Hold Notice  *" to notify and/or remind you of your document preservation obligations in light of the administrative complaint you filed against The Rockefeller University (the "University") and Dr. Winrich Freiwald".* [312]

492.    In the Legal Hold Notice, Plaintiff was instructed *"to preserve the documents and records … including … e-mails … electronic files …correspondance …and/or any other data compilation from which information can be obtained, relating in any way to your complaint".* [313]

493.    In addition, Plaintiff was instructed *"You must not destroy, delete, alter, or conceal any documents which could be potentially relevant to the subject matter of this dispute".*[314]

494.    Plaintiff was asked to *"review and sign the acknowledgmenet below, and return one copy of the signed notice to me".* [315]

---

308 Email from Michael Wiener to Plaintiff (cced Benjamin Lasalata, Anthony Sacchetti, Chad Ethier) on 11/17/2021
309 Email from Benjamin Lasalata to Plaintiff on 11/18/2021
310 Email from Lihong Yin to Plaintiff (cced Winrich Freiwald) on 11/24/2021
311 Email from Plaintiff to Lihong Yin on 11/29/2021
312 July 3,2021
313 op. cit
314 op. cit
315 op. cit

495.    Plaintiff signed and return the Legal hold notice.[316]

496.    The Rockefeller University general Counsel conformed the receipt, and inquired about Plaintiff's counsel contact info[317]. Plaintiff replied informing that she is per se Complainant in the matter, and provided the contact information to her and her husband.[318]

497.    The "exit" instructions she received in November 2021 from the Rockefeller University HR Department read that *"As a result of your departure from the University, your Information Technology (IT) RUNet account (which includes your access to email, VPN, Central File Storage (CFS), Windows Domain and other services that require your RUNet username and password for authentication) will be locked and closed 5 business days after date of departure ...* **Upon account closure, all of your email and files will be deleted.** *This includes files in the CFS home directory for this account, as well as any files in any UNIX home directories"*.

498.    The "exit" instruction also notified that *"you may have your RUNet account access extended for a period of 90 days"*, and requests are made to IT by the laboratory designate.

499.    Plaintiff then contacted the Freiwald Lab Manager, and requested extension to protect the electronical evidence specified in the Legal Notice.

500.    In her 11/24/2021 email, the lab manager confirmed submission of a *"request to IT for a 90-day extension of your RUnet Account."*[319]

501.    On November 29, the Rockefeller University IT department confirmed that "The RUNet Account for Karolina Marciniak (kmarciniak) has been extended for 90 days."[320]

502.    At the beginning of December 2021, Plaintiff received an email from Freiwald, who "doubted" the RUNet account extension for her.[321]

503.    In subsequent days, Plaintiff received an email from Freiwald Laboratory manager, who informed Plaintiff that *"we have suspended your access [to Plaintiff's RUNet account]. With respect to your email account, we are posting an auto-reply that will be sent to anyone who emails your RU email address"*.[322]

504.    Plaintiff replied to the lab manager with a copy of the Legal Notice, explaining that she *"requested continuous access to my RU account because I am obliged to preserve the documents and records outlined in the Legal Hold Notice which I signed on 8/25/2021 (I attach the copy of the document to this e-mail). "*.

505.    Plaintiff also provided a new email address and notified that *"In case my access continues to be suspended and auto-reply service activated, I prefer THIS email address to be included in the auto-reply message."*[323]

506.    The RUNet account remained blocked for Plaintiff. Plaintiff was never contacted back by the Lab Manager, nor she received ANY email forwarded from the RU account to the new email address she provided.

---

316 signed on 8/26/2021.
317 Email on 8/26/2021
318 Email on 11/16/2021
319 i.e., Electronic Rockefeller University email account kmarciniak@rockefeller.edu ; which Plaintiff requested
320 Email from IT Help Desk to Lihong Yin (cced Plaintiff) on 11/29/2021
321 Email from Freiwald to Plaintiff on 12/7/2021
322 Email from Lihong Yin on 12/15/2021
323 Plaintiff to Lihong Yin on 12/16/2021

*(ix)  Rockefeller University treated Plaintiffs with deliberate malice in housing*

507.    Retaliation in housing. Plaintiffs have been living in RU housing since Sept 2016, and was joined by her husband on September 2018.[324]

508.    Planning to expand their family with a child, Plaintiffs leased a two-bedroom apartment starting from October 2018.

509.    In spring 2020 due to Covid-19 pandemic and resulting lockdown in the New York City, Plaintiff Pedro Agra lost his contract in fashion.[325]

510.    Due to economic difficulties[326], Plaintiff reached out to Rockefeller University financial office, explaining her hardship circumstances, and *"desperately asking for help"* with rent relief[327]

510.    With no reply, Plaintiff subsequently inquired about financial relief due to the pandemic to Rockefeller University President as the question during his Town hall Zoom meeting with RU postdocs on 5/5/2021. Plaintiff did not receive any response during the Town hall meeting nor as a follow-up email afterwards.

511.    On 5/6/2020, Subsequently, Plaintiff reached out to Associate VP Physical Facilities & Housing, identified as a contact person on the housing lease, explaining her housing and financial circumstances, and asked for assistance. [328]

512.    Plaintiffs expressed their willingness to move to a smaller, one bedroom apartment, and were referred to housing administration, who realized the transfer.[329]

513.    As Plaintiff inquired further about financial help with the rent arrears accumulated from the beginning of Covid-19 pandemic lockdown, she was referred to the Rockefeller University HR Department, and was further referred to Jordan Sese, Virginia Huffman's assistant. [330]

514.    After detailing their financial hardship and submitting "several documents for review to the committee", Plaintiff was *"approved a scholarship in the amount of $5,000 with tax implications applied"*[331]

515.    Unfortunately, the amount was neither substantial nor adequate to cover the rent arrears.[332]

516.    The Rockefeller University administration neither offer additional help nor was understanding of further pandemic hardship, and in spring 2021 asked Plaintiff to "remit full payment to

---

[324] When Plaintiffs registered their Domestic Partnership; Plaintiffs married on 12/18/2018.
[325] Fashion industry was one of the first branches in economy which got affected by pandemic and lockdowns
[326] Mr. Agra's salary constituted substantial part of Plaintiffs' household income
[327] Email to Mr. Glaster, Manager of Accounts Receivable on 4/30/2020
[328] Email to Alex Kogan on 5/6/2021
[329] Plaintiffs were willing to cut the rent cost going forwards as soon as possible and agreed to move to the first available apartment; the moving transfer was realized on 6/21/2020
[330] Email on 6/23/2020, 6/29/2020
[331] Email from Sese on 8/10/2020
[332] From the gross $5,000 fund, Plaintiff received on 8/31/2020 only $2,860.22 as a take-home amount additional to her salary; Plaintiffs' monthly rent for 2 bedroom apartment was $3,284.00; for 1 bedroom apartment it was $2,334.

clear the outstanding balance".[333], and did not consider Plaintiff's request for abatement due to landlord repairs and construction in their apartment.

517.    Plaintiff committed to repay in steps, and contacted the Rockefeller University HR department again.[334], who after requesting *"additional information [including detailed income documentation] for the committee"* [335], which Plaintiff provided[336], informed that *"the scholarship committee have made a onetime exception and have approved a $10,000 scholarship"* [337], which as subject to taxation again, was neither substantial nor adequate to cover the rent arrears.[338]

518.    As a consequence of the Rockefeller University's intentional malice, Plaintiffs had been subjected to continuous stress.

519.    Throughout the pandemic, Plaintiffs had been continuously attempting to regulate the Rockefeller University housing rent arrears in full.

520.    In September 2021 Plaintiffs confirmed their eligibility for the New York State Emergency Rental Assistance Program (ERAP), and Plaintiff reached out to the Rockefeller University to request filling out the "landlord" portion of her ERAP application.[339]Not receiving any reply, Plaintiff sent a follow up email, which was left without reply as well.[340]

521.    In a subsequent direct correspondence with one of the email recipient, Plaintiff confirmed that the Rockefeller University housing administration received Plaintiff's *"email regarding the financial payment program"* [341]. Yet, Plaintiff's request to relay it to the responsible individual[342] was never returned.

522.    In early 2022 Plaintiff was notified to be *"provisionally approved for ERAP assistance"*, and that the program *"has contacted your Landlord … to cooperate with ERAP by providing necessary documents and information"*[343]

523.    In late 2022, Plaintiff was notified that *"your Landlord/Property Owner has not submitted documents or information necessary to fully evaluate your application."*[344]

*(x) Rockefeller University treated Plaintiffs with disadvantage in considering access to the campus facilities*

---

333 Email on 3/3/2021 from Ms. Brown, and additional email from Mr. Kogan
     334 Email on 3/4/2021, 3/25/2021, 4/7/2021
335 Email on 4/16/2021
336 Email on 6/2/2021
337 Email on 7/2/2021
     338 From a gross amount of $10,000, Plaintiff received only a take-home amount of $5,803.56 additional to her salary
339 Plaintiff emailed Mr Kogan (ccing Ms. Brown and Mr. Glaster) on 9/2/2021
340 Plaintiff emailed Mr Kogan (ccing Ms. Brown and Mr. Glaster) on 9/14/2021
341 Sharisse Brown to Plaintiff on 9/23/2021
342 Plaintiff to Sharisse Brown on 9/23/2021
343 Email on 1/28/2022
344 Email on 10/14/2022

524.    The Rockefeller University campus has outdoor tennis court located in the campus outskirt on top of the parking lot[345], which is made available through a booking system[346] to be used by the University's employees and their families and friends.[347]

525.    Plaintiffs, who like tennis, used the facility, and stopped when the campus activities were restricted due to Covid-19 pandemic.

526.    In 2021 spring, the Rockefeller University campus was operating in an eased phase, and both Plaintiffs were vaccinated as recommended by the Rockefeller University administration. In addition, Plaintiff was tested for Covid-19 virus weekly, with consistent negative results.

527.    Although the access to the Rockefeller University campus was still restricted for the visitors, exceptions were allowed.

528.    On two separate occasions in 2021, Plaintiffs were noticed by Virginia Huffman (one time she secretly observed Plaintiff from the parking lot stairs), and subsequently scolded by the security department for inappropriate usage.

529.    Plaintiffs then learned that Plaintiff Pedro Agra was not allowed on the campus. Plaintiff's subsequent email request she made to the Rockefeller University for exception (which RU alleged in their regulations), in which she rebuffed the security concerns and argued for the need of minimum physical activities while working long hours under stress, was rejected.

530.    Plaintiffs did not use the tennis court since.

531.    In early 2022 Plaintiff made another request if she and her husband can use the University's tennis court. The request was again rejected.[348]


*(xi) Rockefeller University abruptly cut Plaintiffs US legal immigration status and "offered" her one-way return ticket to Poland*


532.    In 2021 the Rockefeller University filled the H-1B petition  (and associated H-4 petition for her husband), following the University's decision to install Plaintiff in a new Research Associate position (see above).

533.    A three year H-1B employment petition, filled by the Rockefeller University, effective September 1, 2021 until August 31, 2024,  was approved by Department of Homeland Security, USCIS in June 2021.

534.    Plaintiff's untimely termination in August 2021, due to CBMM Defendants' retaliation, constituted: (1) A willful violation resulting in displacement of a US worker employed by the employer in the period beginning 90 days before and ending 90 days after the filing of an H-1B petition in conjunction

---

345 The Rockefeller University reconstructed the court from the open air facility into the covered one in late 2022.
346 Two hours per week were allowed
347 Plaintiff Pedro Agra, as inhabitant of the Rockefeller University housing, had access to the Rockefeller University campus
348 Email from LaSalata on 4/6/2022

with: (i) A willful violation of the provisions pertaining to wages/working condition, strike/lockout, notification, labor condition application specificity, displacement, or recruitment; or (ii) A willful misrepresentation of a material fact on the labor condition application, pursuant to (2) 8 USC 1182(n)(2)(c) (iii) and 20 CFR 655.810(b)(3) of U.S. Department of Labor, and is subject to Civil Monetary Penalty up to $59,028.[349]

535.    In January 2022 Plaintiff received a letter from the Rockefeller University HR department, informing that *"your employment with the Rockefeller University ("the University") has ended and as a result **the University intends to withdraw the H1B petition"**.*[350]

536.    The letter suggested that Plaintiff agree that *"the University purchase a ticket for your transportation to Poland"*, as if the University was fulfilling its obligation pursuant to employee-employer two-sided agreement for earlier termination of the H-1B employment .[351]

537.    In March 2022, Plaintiff responded to the Rockefeller University communication not accepting the ticket, but reminding that *" Rockefeller University (the University") did not follow bona fide termination process".* [352]

538.    Plaintiff heard back from the Rockefeller University that *"your employment has ended and the University has withdrawn your H-1B Visa".*[353]

539.    The Rockefeller University finished the communication by insisting again with offering the return ticket to Poland: *"If you would like the University to purchase transportation for your return to Poland, please let us know in writing."*[354]

540.    Reading that The Rockefeller University already withdrawn Plaintiff's H-1B visa petition (in contrary to earlier communication stating the "intention" to withdrawn) caused Plaintiff substantial stress over her current immigration status.

541.    In a subsequent email, Plaintiff requested a copy of the *"University's withdrawal letter to the USCIS Service Center that issued the H-1B approval notice, for my further US visa arrangements"*[355]

542.    Plaintiff was aware that prompt arrangements for a new visa are due following only a short grace period after the Rockefeller University withdrawn the H-1B petition.

543.    The Rockefeller University delayed their response, and Plaintiff had to follow-up in another email, stating that *"I hope the University can understand the importance of your prompt response regarding the H-1B withdrawal for my and my family's visa status."*[356]

544.    The Rockefeller University replied with a copy of *"a confirmation from USCIS of the revocation of your H1B petition"*, stating that *"The transmission of this document in no way constitutes any legal advice or opinion concerning  your*

---

349  https://www.dol.gov/agencies/whd/immigration/h1b
350 LaSalata on 1/17/2022
351 The Rockefeller University cited Section 214(c)(5) of the Immigration and Nationality Act
352 Email on 3/7/2022 from Plaintiff to LaSalata
353 Lasalata to Plaintiff on 3/29/2022
354 Op. cit.
355 Plaintiff to LaSalata on 3/29/2022
356 Plaintiff to LaSalata on 4/4/2022

*status in the US."*, later in the email underlying that *"you are not an authorized user"* of the Rockefeller University facilities.[357]

545.     The USCIS withdrawal confirmation dated 2/24/2022, which clearly indicates that the Rockefeller University filled a written withdrawal of the petition without notifying Plaintiff.

546.     The above mentioned Defendant's conduct was intentionally malicious and intended to put Plaintiff under substantial pressure and to dislocate her from the country, by forcing her to accept the return ticket to Poland from the Defendant.

547.     As result of Defendant's conduct, Plaintiffs suffered substantial distress over their whereabouts over extended period of time and included stressfull expedited application process for a new visa. [358]

### *(xii) The NSF ODI office closed Plaintiff's complaints arguing CBMM Defendants met compliance*

548.     The NSF Office of Diversity and Inclusion (ODI) [359] have duty of care to federal laws: *"As a US Government agency, our mission is to serve the bests interests of the United States by ensuing that NSF funded programs are free of unlawful discrimination, harassment and retaliation through a neutral process of investigation and fact-finding which seeks to determine whether the NSF awardee institution has violated Title IX or other laws with respect to your allegations."*[360]

549.     The NSF ODI's employers are federal officials and fiduciary to the federal law.

550.     CBMM, as recipient of federal financial assistance from the Natonal Science Foundation, constitutes education programs and activities, as well as employment workplace, where discrimination on the basis of sex is prohibited based on Title IX and Title VII federal laws. [361]

551.     The NSF requires the awardee organization to respond in a prompt and equitable manner by taking immediate action to eliminate the discrimination, prevent its recurrence, and address its effects. [362]

552.     The NSF- CBMM corporate agreement contains written assurances section related to Title IX compliance, which contains relevant complaint procedures.

553.     MIT, as the lead awardee institution for the NSF CBMM cooperative agreement, and Plaintiff's joint employer, is designated by NSF to respond to violations of the Title IX and Title VII regulations.[363]

---

357 Lasalata to Plaintiff on 4/6/2022
358 Plaintiffs center of living is in the US and they did not wish to leave the US.
359 Now Office of Equity and Civil Rights (OECR)
360 https://www.nsf.gov/od/oecr/complaints.jsp
361 NSF's Title IX regulations at 45 CFR §618; Title VII of the Civil Rights Act of 1964
362 The following NSF regulations apply here:(i) 45 CFR §618.400(a) provides that *"…no person, shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any … education program or activity operated by a recipient that receives Federal financial assistance."*;
363 The following NSF regulations apply here: (ii) 45 CFR §618.135(b) provides that NSF awardee organizations that operate educational programs, *"shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alliging any action that would be prohibited by these Title IX regulations."*

554.    Plaintiff correctly identified the MIT office to file the complaint about the 2017 sexual assault and subsequent sexual harassment from two individuals.

555.    MIT had substantial degree of control over the harasser (and his enabler) and the environment in which the harassment occurs.[364][365]

556.    Although the sexual assault occurred on other than MIT campus (the MBL campus), it did occur in the context of an educational program or activity operated (and sponsored) by the MIT, i.e., the CBMM Summer School.

557.    Plaintiff correctly demanded the MIT office to take corrective actions, since *"Where the school knows or reasonably should know of an incident of sexual misconduct, the school must take steps to understand what occurred and to respond appropriately.[366] In particular, when sexual misconduct is so severe, persistent, or pervasive as to deny or limit a student's ability to participate in or benefit from the school's programs or activities, a hostile environment exists and the school must respond."[367]*

558.    The NSF-designated CBMM reviewer got knowledge about the complaint on 5/6/2019, and *"conveyed the Title IX issue to Poggio* [the CBMM Director at MIT], who *"said that he would have the information about it and a description of the process of reporting posted on the website of CBMM. "[368]*

559.    Since then, the CBMM website currently states that the CBMM *"adheres to the policy on harassment set forth [sic] Massachusetts Institute of Technology"* [369]

560.    The NSF-designated CBMM reviewer contacted the NSF Office of Diversity and Inclusion Office about Plaintiff's complaint, and NSF ODI office recommended Plaintiff to contact the office directly, providing Plaintiff with the appropriate contact information.[370]

561.    Plaintiff made a direct contact with NSF ODI on 5/14/2019, and provided the office with extensive description and documentation of the 2017 sexual assault and subsequent sexual harassment events, together with the events around her complaint and her concerns: *"I originally contacted MIT because it is the core CBMM institution. I am working in close collaboration with two MIT labs (Tenenbaum, Kanwisher) thus I visit this institution both for my research and to participate in CBMM events. Most importantly, Mr Azevedo works on a daily basis at MIT which creates possibility of potential contact whenever I visit MIT. I have to say that I noticed the striking differences around managing the Title IX claims by MIT and Harvard. MIT's procedures seem to take defined amount of time (around 3 months) whereas while speaking with Harvard coordinator I was informed that only the first review process might take 6 months. All of that is leaving me concerned that not taking the claim by MIT could have served the interests of institution that uses CBMM program as umbrella term to present my case as more complicated and unbearable for standard procedures, hence referring me back and forwards".* As she further describe the recent intimidation by Azevedo at Mit on 5/7/2019, she asked NSF ODI *"I hope you will help me with this matter. What I am asking of you is to act on my behalf in making sure I will never have to meet Mr Azevedo at MIT institute again when I work there. He is a sexual predator who grooms women and uses his position of power to abuse and intimidate his victims, as above the example of May 7th ".* Following the NSF ODI instructions, Plaintiff submitted a set of forms constituting an *"NSF complaint against CBMM ".[371]*

---

364 Davis, 526 U.S. at 644
365 Both Azevedo and Boix had been working at MIT, and performed faculty function in CBMM Summer School.
366 Guidance at (VII), Office for Civil Rights, Revised Sexual Harassment Guidance (66 Fed. Reg. 5512, Jan. 19, 2001), available at https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf; see also Office for Civil Rights, Dear Colleague Letter on Sexual Harassment (Jan. 25, 2006), available at https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html.
367 Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 631 (1999); 34 C.F.R. § 106.31(a); 2001 Guidance at (V)(A)(1).
368 On 5/7/2019, the NSF reviewer (identity protected here) to Plaintiff.
369 https://cbmm.mit.edu/title-9
370 As per documented email correspondence from 5/7/2019, op. cit
371 Plaintiff to Cosgrove on 5/14/2019

562.    This knowledge and fact evidence which Plaintiff systematically shared with NSF came during the period of the NSF site visit, in which NSF had been annually evaluating the CBMM to issue *"the official report"* and decide on *"continued funding for all of us from NSF"* .[372]

563.    As per NSF ODI email to Plaintiff *"If violations are found, ODI will engage the awardee institutions in a resolution process to correct those violations that brings the institutions into compliance with these Federal civil rights laws. "*[373]

564.    Although the NSF ODI informed Plaintiff that *" ODI does not serve as an advocate or representative of either the complainant or awardee"*[374], the NSF ODI sided with the interest of the CBMM awardee institutions to avoid liability, discriminated Plaintiff and conspired against her complaint by intentionally (i) silently supporting and/or (ii) actively participating in the ongoing proceedings into Plaintiff's complaint at NSF-CBMM awardee insitutions, i.e., multi-institutional discussion among CBMM awardees over *"which institution would be appropriate to perform the investigation"*.[375]

565.    Between March and May 2019, while her complaint was taken but not acted upon by CBMM Defendants, Plaintiff correctly inquired about the statuary grievance policy of the NSF CBMM agreement[376], however it was hidden to her throughout the entire complaint process[377]

566.    Plaintiffs allege that between 5/7/2019, when NSF ODI got to know about Plaintiff's complaint and 5/15/2019, when Plaintiff's heard back from MIT Title IX coordinator, the NSF ODI office was complacent and/or actively managed the complaint cover-up scheme among CBMM awardee institutions, which was explained to Plaintiff as the *"resolution of the jurisdictional question"*.[378]

567.    NSF ODI did not forward Plaintiff's complaint to EEOC as conditions of her employment deemed appropriate.[379]

568.    Once Plaintiff informed the NSF ODI that *"MIT is rejecting to investigate my case"* and forwarded the email from the MIT Title IX Coordinator from 5/15/2019[380], the NSF ODI performed a phone call with Plaintiff on 5/17/2019[381],  collected her Title IX Coordinators email correspondance[382], but then put Plaintiff on hold, informing her that *"We'll let you know our initial disposition of your complaint soon."*[383]

569.    In August 2019, Shortly before the U of Chicago/MBL concluded their *"investigation"*, the NSF ODI office dismissed Plaintiff's complaint against CBMM, arguing in the letter to Plaintiff that *"ODI*

---

[372] As per email from Tomaso Poggio on 5/8/2019
[373] Cosgrove to Plaintiff on 5/14/2019
[374] Cosgrove to Plaintiff on 5/14/2019
[375] As per Plaintiff's documented communication with MIT, Harvard and Rockefeller University officials.
[376] Plaintiff to MIT Title IX coordinator on 5/3/2019: *"Could you please check with Kathleen Sullivan, CBMM Managing Director and let me know about the relevant procedures that were stated in written assurances section related to Title IX compliance provided by CBMM either at the application stage or the award stage to the funding agency (NSF)?"*
[377] Sarah Rankin in response to Plaintiff on 5/9/2019: *"I am working on connecting with Kathleen Sullivan and will be back in touch when I have more information"*; on 5/15/2019: *" After consulting with..., it was determined ..."*
[378] As per Plaintiff's documented communication with MIT, Harvard and Rockefeller University officials.
[379] The following NSF complaint procedures apply: *"While faculty and staff of NSF awardee institutions (including postdocs) can file discrimination/harassment/retaliation complaints with NSF with respect to conditions of employment, those complaints are usually referred to the United States Equal Employment Opportunity Commission (EEOC) in accordance with the EEOC regulations at 29 C.F.R. §§ 1691.5 and the United States Department of Justice regulations at 28 C.F.R. § 42.605 which require that ODI forward to the EEOC any individual complaints of employment discrimination. "*
[380] Plaintiff to Cosgrove on 5/16/2019
[381] The phone audio record available
[382] 5/17/2019
[383] Cosgrove to Plaintiff on 5/17/2019

*does not accept complaints for investigation and resolution that are currently under investigation in other forums, including those complaints that are filed with NSF awardee institutions' internal discrimination, harassment and retaliation complaint processes"*[384]

570.     The NSF ODI did not provide Plaintiff with any allegedly relevant NSF regulations to justify its dismissal decision.

571.     After not agreeing with blatantly biased outcome of the U of Chicago/MBL *"investigation"*, Plaintiff was communicating with the Rockefeller University Title IX coordinator.

572.     During this communication, Plaintiff expressed to the Rockefeller University Title IX coordinator Plaintiff's intention to resubmit her complaint to the NSF ODI in a required by the NSF ODI office time-frame, i.e., maximum 60 days after the U of Chicago/MBL *"investigative"* outcome.

573.     As result of communicating to the Rockefeller University Title IX coordinator Plaintiff's intention to resubmit her complaint to the NSF ODI, Plaintiff experienced interference from the Rockefeller University Title IX coordinator's legal and mental health referrals in preparing the NSF ODI re-submission (see earlier).

574.     In consequence, Plaintiff submitted the NSF ODI complaint without any assistance and in last moment, i.e., on the last day of the valid submission period. The complaint she submitted to the NSF ODI office on 10/1/2019 was again about "CBMM at MIT" .

575.     The NSF ODI office confirmed the receipt of the complain and informed Plaintiff that *"We will review and let you know soon if we accept or dismiss the complaint. If we have any questions about your complaint we will contact you."* [385]

576.     In November 2019, Plaintiff contacted the NSF ODI office with a new information about a female witness, who had been knowledgeable about Azevedo's behavior and his assaults as his ex-girlfriend and his victim. Plaintiff relayed to the NSF ODI office that *"She is willing to be contacted/ interviewed and to provide further contact details to other victims she is aware of. Please let me know how to proceed in order to enable her participation in a way that would protect her rights as the witness."*[386]

577.     Plaintiff heard back from the NSF ODI: *"Thanks Karolina. We're looking to let you know of our initial determination by the end of the month."*[387]

578.     The NSF ODI office contacted Plaintiff again in December 2019 *"to update you that we are now looking to make our determination by Christmas or the end of the month. Apologies for the delay."*[388]

579.     At the beginning of January 2020, the NSF ODI office asked Plaintiff if she is *"filling your complaint against the University of Chicago as well"*, since her allegations indicate she might want to [389].

580.     Plaintiff shortly confirmed[390], and then provided an *"additional appendix information to the material related to my complaint I have provided so far: I have heard from the 2018 Brains, Minds, and Machines Summer Course student who experienced a behavior from Frederico Azevedo that was overly flirtatious, together with uncomfortable request to be alone in a sexual*

---

384 Cosgrove to Plaintiff on 8/6/2019
385 Cosgrove to Plaintiff on 10/2/2019
386 Paintiff to Cosgrove on 11/5/2019
387 Cosgrove to Plaintiff on 11/5/2019
388 Cosgrove to Plaintiff on 12/3/2019
389 Cosgrove to Plaintiff on 1/6/2020
390 Plaintiff to Cosgrove on 1/6/2020

*way. She is **willing to be contacted to provide detailed information**. Please let me know at the right moment how to proceed further in order to enable her participation in a complaint and potential investigation."*[391]

581.    The NSF ODI office replied that *"you should hear from us by the end of the month"*, and informed that *"At this time, if we are to accept the complaint, our investigation would be limited to a review U Chicago's investigation of your complaint and MIT's handling of your complaint. We will not re-investigate any incidents of harassment or assault to determine whether the accused individual commited acts or not. Our investigation would determine if the investigation by U Chicago was done in a fair and equitable manner under our Title IX regulations. That said, we may still want to talk to the other individual or others who had interactions with the accused."*[392]

582.    At the same time, Plaintiff was communicating with the MIT professor, who was reporting to Plaintiff on ongoing proceedings at CBMM related to her complaint, under the CBMM evaluator DeStefano guidance (see above). During a phone call conversation, the MIT professor, who was in touch with DeStefano, inquired about Plaintiff's contact with the NSF ODI office, and asked her for details of *"the NSF person who you are speaking with"*[393]

583.    The NSF ODI office contacted Plaintiff in February 2020 that *"we are looking to get evaluation letters to you by the end of this week"*[394]

584.    Plaintiff replied *"Thank you for updating me. Could you please inform me if the evaluation letters concern solely the question if my complaint gets accepted into the investigation and if I could help with any additional material needed for this decision? I wouldn't like to lose this opportunity for my voice to be heard thus I am sending the detailed material related to the U Chic investigation and handling my complaint by MIT, containing some privacy sensitive files, like recorded phone calls (with Univ Chicago conversation from May 20th). There are also currently 3 individuals willing to corroborate the accused person's behavior. I referred to these individuals in my testimonies. As this email system does not allow zip files as attachment[395], I am going to send a separate email from my Gmail account in a second. Please let me know if there is anything else that I can submit that might be relevant to the current process."*[396]

585.    The NSF ODI office replied that *"We are going to accept your complaints for investigation. The letters should go out today at the earliest, but hopefully no later than Friday."*, and formulated the allegations: *" However, with complaint such as your complaint against U Chicago, when you allege that a Title IX complaint investigation was not done in a "prompt and equitable" (i.e., the instituton did not interview witnesses you idenfy or did not include pertinent facts or testimony in their findings or conclusion) , we look at how they investigated the complaints. We do not re-investigate the complaint to determine if the respondent was responsible for committing sexual misconduct.* **If we find that they did not follow their procedures, we would then have to determine how the institution comes into compliance with Title IX with respect to the investigation and how that corrective action is decided upon is on a case-by-case basis.** *It could include some form of investigation by the institution, but I can't guarantee a this time that will occur with your complaint. MIT is going to be investigated somewhat differently as that deals with a jurisdictional issue (they are the prime awardee for the CBBM funding, but referred the non-MIT employee to his institution for investigation) and the no-contact order issue."*[397]

586.    Plaintiff replied *"I do understand that the investigation in case of my complaint against U Chic relates to the investigation itself. I would like to send now an additional statement towards points from the [U of Chicago/MBL] Outcome Notice that I would like to appeal ( more specifically, reference towards messages that mixed all sexual encounters together without distinguishing the [first] one clearly identified by me as rape ). Please excuse me my additional questions, after my earlier experience with MBL/U Chic process, I would like to be sure that I could provide all the necessary information before a crucial decision is made."*[398]

587.    On 2/21/2020, the NSF ODI office informed Plaintiff that the "complaint against U Chicago and MBL has been accepted for investigation", and included the acceptance letter at attachment.[399]

391 Plaintiff to Cosgrove on 1/16/2020
392 Cosgrove to Plaintiff on 1/16/2020
393 Phone call on ….. mobile phone audio record available
394 Cosgrove to Plaintiff on 2/19/2020
395 Plaintiff's RUNet account
396 Plaintiff to Cosgrove on 2/19/2020
397 Cosgrove to Plaintiff on 2/19/2020
398 Plaintiff to Cosgrove on 2/21/2020
399 Cosgrove to Plaintiff on 2/21/2020

588.    On 2/24/2020, the NSF ODI office sent to Plaintiff the acceptance letter of the "complaint against the Massachusetts Institute of Technology (MIT)".[400]

589.    In summary. The NSF ODI office kept Plaintiff's complaint under "initial determination", from 5//7/2019 until 2/21/2020 (U of Chicago/MBL) and  2/24/2020 (CBMM at MIT).This period consisted of documented multi-institutional discussions over Plaintiff's complaint, including the CBMM internal "investigation in January 2020".

590.    Although Plaintiff submitted her complaint against "CBMM" and "CBMM at MIT", and described clearly the "back and forth" process between the CBMM institutions, including Harvard and her communication with the Harvard Title IX Coordinator, the NSF ODI office intentionally decided NOT TO include Harvard nor Boston Children Hospital in the NSF ODI investigation into Plaintiff's NSF ODI complaint.

591.    The NSF ODI office also DID NOT include the Rockefeller University, although the institution was CBMM subawardee and knew about Plaintiff's complaint. The RU did not act upon it, co-failed to conduct prompt and equitable investigation, referring the complaint to another institution, and created hostile environment for Plaintiff, its employee.

592.    The NSF ODI office divided the complaint artificially into the one against MIT and the other against MBL/U of Chicago, omitting the involvement of Harvard and the Rockefelelr University (but all 5 institutions have liability, as per communication with Harvard Title IX coordinator).

593.    In March 2020, Plaintiff was referred to Victims Intervention Center and seek their assistance, in lieu of being rejected the Teaching Assistant position at 2020 CBMM Summer School. The attorneys from there represented Plaintiff in communication with the NSF ODI office and Harvard Medical School (see above).

594.    Plaintiff was reporting retaliation in 2020, and contacted the NSF, submitting ALL information. (and complaint on 5/4/2020). The attorneys spoke to Cosgrove about *"how Plaintif's recent complaint works with the original NSF complaint [Plaintiff] filled"*.[401]

595.    Plaintiff provided NSF with package with materials related to her CBMM Teaching Assistant retaliation, including documentation about the offer, the revocation of the offer, CBMM staffs' reasons for withdrawing the offer, documentation about serving in the Summer School position in the previous years".[402]

596.    The NSF ODI contacted Plaintiff with follow-up questions on 6/3/2020, and the phone call happened on 6/5/2020, during which Plaintiff reported to the NSF ODI office about Freiwald's negative employment actions towards her the previous day.

597.    As requested by the NSF ODI, she sent the Jan and Feb 2020 email corerspondance with kanwisher and saxe (Plaintiff to Cosgrove on 6/9/2020).

598.    Plaintiff filled out complaint against RU, Cosgrove confirmed on 9/2/2020.

---

400 Cosgrove to Plaintiff on 2/24/2020
401 Email communication in May 2020 with Schmidt and Konanez
402 Plaintiff to Cosgrove on 5/20/2020, Cosgrove confirmed receipt on 5/20/2022

599.    On 9/10/2020, the NSF ODI referred "is referring your retaliation complaint against Rockefeller U to the US Equal Employment Opportunity Commission, New York District Office, which confirmed receipt of your complaint.  I expect that they will contact you soon.  Please refer to the attached letter for additional information. We are still investigating your MIT and University of Chicago/MBL complaint and we are still evaluating your retaliation complaint against MIT."

600.    However, Plaintiff was not contacted by the EEOC New York office, nor any new case/ case inquiry was posted by EEOC on her EEOC portal.

601.    Instead, in October 2020, Plaintiff received a call from the woman, who, calling from the Washington landline phone NOT associated with any EEOC office 1, introduced herself as an EEO Investigator, and performed with Plaintiff a 46 minute 2 conversation concerning her "allegations", to discredit her testimony and "dismiss" Plaintiff's alleged EEOC complaint at the end of the call. 3

602.    During the phone call, the woman, who Plaintiff was talking with, was continuously rude and invalidating towards Plaintiff, and several times she reacted towards the information Plaintiff provided with stereotypes and myths about victims of sexual violence.  Her behavior was (I) motivated by prejudice on the basis of Plaintiff's sex, therefore constitutes a hate crime, and (ii) dismissed facts and documentation of CBMM Defendants retaliation, both unlikely for the individual who would be in the role of a federal investigator during an intake EEOC call.

603.    By reason of the facts and circumstances stated above, Plaintiffs allege that CBMM Defendants (i) defrauded the NSF ODI policies and procedures in handling Plaintiff's complaint by not correctly forwarding Plaintiff's complaint to EEOC New York office; (ii) broke the federal and state laws prohibiting federal officials to impede complainants civil rights, and (iii) deceived Plaintiff into believing her complaint was dismissed by EEOC New York.

604.    As a proximal consequence of CBMM Defendants' actions, Plaintiff felt intimidated and helpless about contacting the external agencies with her complaint.

605.    On 10/27/2020 the NSF ODI office communicated to Plaintiff to forward her "retaliation complaint against MIT/MBL" to EEOC Boston Office. The letter came after Plaintiff already contacted the EEOC Boston by herself, and filled the charge of discrimination based on sex on 8/10/2020 against ALL involved institutions in refusing her Teaching Assistant position at the beginning of 2020.

606.    In December 2020, Plaintiff contacted NSF ODI office "to ask if there are any updates with respect to the investigation of my MIT and University of Chicago/MBL complaints?" and relayed to NSF ODI the information that " the police investigation of the 2017 sexual assault collected the statements from other victims of the same perpetrator and is forwarding the report further".[403]

607.    The NSF ODI office replied to Plaintiff in January 2021: *"Hi Karolina, Sorry for the delay in responding to you and Happy New Year to you. We are still **investigating the complaints** you referenced below.  If you do have any further info to provide please send it on. Thanks,"*[404]

608.    In April 2021, the NSF ODI office contacted Plaintiff *"with an update that your complaint will be investigated by Mr. William (Scott) Carr of ODI, who is copied here.  Mr. Carr will be in contact with you in the near future if any further information is needed from you for the investigation. Please contact Scott going forward during the investigation. Thanks for your patience".*[405]

---

403 Plaintiff to Cosgrove on 12/21/2020
404 Cosgrove to Plaintiff on  1/15/2021
405 Cosgrove to Plaintiff (cced: Rhonda J Davis , Javier Inclan, William Scott Carr) on 4/29/2021

609.    Wiliam Scott Carr, the *new* investigator of Plaintiff's complaint, reached out directly to Plaintiff in his NSF ODI Management & Program Analyst role to inform her that *" As per Mr. Cosgrove's 29 April 2021 email, I have been assigned to review the complaint you filed with our office. **Over the next several days, I will be reviewing the documentation provided to our office, in order to determine if ODI will accept the complaint or if it will be referred to another agency that may have jurisdictional authority to investigate.** Based on my initial review of the files, I understand this has been quite a lengthy process for you and I will do all that can to avoid any additional, unnecessary delays. Throughout this process, please feel free to contact me if you have any questions or concerns"*.[406]

610.    Plaintiff replied to Wiliam Scott Carr and asked to *"please do not hesitate to contact me with questions or concerns or the request for clarification you may have throughout your review. Sincerely, Karolina Marciniak".*[407]

611.    In July 2021, Carr contacted to ask about additional information[408], which Plaintiff extensively provided. In response, she heard that Wiliam Scott Carr *"will review this information and will be in touch if* [he has] *any further questions"*[409]

612.    In January 2022, Plaintiff inquired to NSF ODI *"about the current status of [her] complaint"*, and relayed that *"the sexual harassment and retaliation complaint against the Rockefeller University and Winrich Freiwald, which I filled in 2021 with NYS DHR and EEOC (double filling), following the NSF ODI 9/10/2020 decision to forward the corresponding NSF complaint against the Rockefeller University to EEOC (Case Number NSF-ODI-APC-20-0098), was granted a plausible cause determination after the NYS DHR investigation and the case will proceed further (please see the NYS DHR determination letter which I attached to this email)."*[410]

613.    Plaintiff heard back from Wiliam Scott Carr, now affiliated in the role of Awardee Compliance in NSF ODI: *"Thank you for this additional information. I will place this in your file. Our office is still looking into your cases against MIT and MBL/U of Chicago, but we hope to have a determination very soon."*[411]

614.    In March 2020, Wiliam Scott Carr contacted Plaintiff with *"a document for our determination and final disposition of this [i.e.,Case Number NSF-OECR-ACB-20-0002 against MIT] complaint."*[412]

615.    The NSF determination letter read that *"The National Science Foundation (NSF or the Foundation), Office of Equity and Civil Rights (OECR)*[413], *has completed its investigation of the complaint you (the Complainant) filed with our office on October 1, 2019, which was accepted for investigation on February 24, 2020. In that complaint, you alleged that the **Massachusetts Institute of Technology (MIT or the Respondent) violated Title IX of the Education Amendments of 1972 (Title IX), 20 USC §1681 et seq., effectuated by NSF regulation at 45 CFR §618**, when the Respondent failed to conduct a prompt and equitable investigation of a complaint you filed with MIT alleging sexual misconduct (sexual assault) by a teaching assistant (the accused party) while attending the NSF-funded, Brains, Minds & Machines (BMM) 2017-Summer Course (the 2017 Summer Course) held at the Marine Biological Laboratory (MBL) in Woods Hole, Massachusetts. Specifically, you allege that after filing a complaint with the MIT Title IX & Bias Response Office2 in March 2019, the Respondent determined it lacked jurisdiction to accept the complaint and referred the issue to another institution within the BMM collaboration. You also allege that the Respondent failed to impose interim measures in May 2019 to prevent contact between you and the accused party during an event hosted at MIT. After a thorough review of all gathered information, **OECR has concluded that the preponderance of evidence does not establish a violation of Title IX with respect to your allegations against the Respondent.**"*[414]

---

406 Wiliam Scott Carr to Plaintiff (cced Robert Cosgrove) on 4/30/2021;

407 Plaintiff to Wiliam Scott Carr (cced Robert Cosgrove) on 4/30/2021

408 Email on 7/19/2021 from William Scott Carr: "*Plaintiff, I wanted to reach out to you regarding the status of your case. The complaint is still open and being investigated. I fully appreciate your desire to bring this matter to a logical, fair and equitable conclusion. Be assured that your complaint is very important to our office and we share this desire. To that end, I have a couple follow-up questions that I hope you can clarify for me*".

409 William Scott Carr to Plaintiff on 7/26/2021

410 Plaintiff to Wiliam Scott Carr (cced: Robert Cosgrove)  on 1/24/2022

411 Wiliam Scott Carr to Plaintiff (cc: Robert Cosgrove) on 1/24/2022

412 Wiliam Scott Carr to Plaintiff (cced Javier Inclan) on 3/17/2022

413 Formerly Office of Diversity & Inclusion (ODI)

414 op. cit.

616.    The NSF determination letter further stated that the investigation included interview with MIT, who, according to the NSF ODI investigation, "correctly" determined lack of jurisdiction towards Plaintiff's complain.

617.    Had the NSF ODI office investigation into Plaintiff's complaint was impartial, it would have concluded that, according to MIT Policies and Procedures, which were at place, BOTH Plaintiff 's 2019 complaint Complainant (i.e., Plaintiff) and Respondents (Frederico Azevedo and Xavier Boix) were falling into "MIT community" category[415] and Respondents conduct created hostile environment at MIT (see above), thus MIT was obliged to investigate Plaintiff's complaint according to its grievance procedure policy.

618.    The NSF determination letter further stated that based on interviewing the MIT official, non issuing a no-contact order by MIT resulted from "miscommunications between the MIT Title IX coordinator and The Harvard Title IX coordinator", and between the MIT Title IX coordinator and Plaintiff.

619.    Had the NSF ODI office investigation into Plaintiff's complaint was impartial, it would have noticed that, according to detailed correspondence between Plaintiff and both Title IX coordinators and audio records of the phone calls between Plaintiff and Title IX coordinators, there was NO misunderstanding but intentional negligence, infliction of emotional stress, and intention to defraud and cover up from the side of the MIT and Harvard Title IX coordinators with respect to issuing the No-Contact order for the 5/7/2019 event at MIT. In particular, both retaliated with not issuing the no-contact order after Plaintiff signed her intention to proceed with institutional formal investigation into her complaint.

620.    By reason of the facts and circumstances stated above, the NSF ODI office could have not concluded that MIT "in its role as the primary awardee for CBMM, … acted properly in its stewardship role as the primary awardee in the CBMM collaboration by assisting the Complainant, considering acceptance of the complaint, and subsequently facilitating the process resulting in the complaint being accepted by the joint MBL/U of Chicago investigation team".[416]

621.    Instead, the MIT (and other CBMM Defendants) acted in its stewardship role to avoid liability, and assisted Plaintiff's abuser, to frame Plaintiff into rigged "investigation" by carefully chosen "investigation team" (ref to letter), to then since it issued a document to the police that MIT did an investigation on him, and thus defrauding the legal procedings into suggesting that by the MIT authority and its grievance policies, Azevedo was innocent. As per Detective correspondence from 7/10/2020:"[Azevedo]  also provided with **the MIT investigative report done on him** a.

622.    In July 2022, the NSF ODI office contacted Plaintiff with a determination letter *" regarding the National Science Foundation, Office of Diversity and Inclusion's final determination in complaint NSF-ODI-APC-20-0001 "* [417]

623.    The determination letter read that *"After a thorough review of all gathered information, OECR has concluded that the preponderance of evidence does not establish a violation of Title IX with respect to your allegations against the Respondents".* [418]

---

415 Both MIT and Harvard Title IX coordinators had knowledge of Complainant's and Respondents' work affiliations with MIT as the CBMM main awardee institution.
416 op. cit.
417 Wiliam Scott Carr to Plaintiff (cced Sarah P Wiliams) on 7/1/2022
418 Respondents in the complaint were University of Chicago and Marine Biological Laboratory, which the letter identifies as an affiliate institution of University of Chicago

624.    In the letter to Plaintiff, the NSF ODI reported to receive "copies of records and communications in the Respondents' possession pertaining to the Complainant's 2019 complaint", however in its investigative section does not refer to any single date when Azevedo and Boix were interviewed.

625.    In the letter to Plaintiff, the NSF ODI reported to receive "documents detailing the role of the Respondents in sponsoring the Summer Course" and stated that the investigation revealed that

626.    "In its investigation, OECR reviewed and considered information provided by the Complainant and the Respondents… including Respondets' position statement regarding the Complainant's allegation; statement of non-discrimination; Title IX and Misconduct policies; policies and procedures for the intake, processing, investigation and resolution of sexual misconduct complaints; . The NSF ODI did not comment that the policies were vague and specifying little details about the investigative procedures.

627.    The NSF ODI office deliberately did not consider a crucial evidence Plaintiff provided, i.e., that Respondents did not follow their procedures, which they described very clearly to Plaintiff during the phone call in May 2019, and which they effectively DID not follow.

628.    The NSF ODI office did no consider Complainants' actual allegation that the interviews were biased, as investigators provided Complainants written documentation to the espondent BEFORE interviewing him and Xavier Boix. "evident that they made interviews after Box folder was shared with accused.

629.    The NSF ODI office wrongly followed Respondents statement which claimed that they allegedly interviewed "all but one witnesses the Complainant provided". They interiew one individual from 5 individuals Plaintiff listed as potential witnesses, and it happened that the individual who was interviewed was Xavier Boix, the co-accused, who corroborated Azevedo's position, to avoid disciplinary actions".

630.    In its determination, The NSF ODI did not considered Complainant's (i.e., Plaintiff's) documentation, provided extensive evidence of Complainant factual arguments and factual knowledge.

631.    For example, Plaintiff insisted on interviewing a "crucial witness", who had direct knowledge of the proximal facts and saw Plaintiff sleeping before she was assaulted, and was in contact with Azeedo.

632.    The fact that this witness allegedly "did not respond to the Respondent's request to meet despite multiple attempts" was not binding, since under Title VII, employees can be requested to participate in the investigative process.

633.    If the investigation was fair, it would have deemed necessary to interview other witnesses Plaintiff identified.

634.    The NSF investigation was not fact-based nor was fair in concluding that not interviewing other witnesses which Plaintiff identified, (which ALL were part of the CBMM SummerSchool program, witnessed Plaintiff and Azevedo's interactions during the Summer School, and included potential other victims of the perpetrator), and arguing that interviewing Xavier Boix (who Plaintiff in her complaint clearly identify as perpetrator's enabler) as a witness, which put the testimonies of two perpetrators against Plaintiff, was "equitable". The Complainant (i.e., Plaintiff) had a clear disadvantage during the U of Chicago/MBL "investigation".

## IV. CLAIMS FOR RELIEF

**FIRST CAUSE OF ACTION**

**Violation of Title IX and Title VII**

**Heightened Risk**

**20 U.S.C. §§ 1681,  42 U.S. Code § 2000e–2, et seq.,**

**(by Plaintiff against all CBMM Defendants)**

638.    Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

639.    Plaintiff allege violations of Title IX and/or Title VII against CBMM Defendants due to the heightened risk of sex-based discrimination on CBMM Defendants' campuses.

640.    CBMM Defendants operate programs in receipt of federal funds and are thus covered by Title IX's prohibition on sex-based discrimination.

641.    At all relevant times, CBMM Defentants operations were within the jurisdiction of any department or agency of the United States

642.    At all relevant times, CBMM Defendants were Plaintiff's employer, joint employer or agent exerting control over Plaintiff's employer compliance with Title IX and/or Title VII and state, and local laws prohibiting discrimination based on sex.

643.    CBMM Defendants had actual knowledge about sexual harassment on their campuses but refused to act with reasonable care towards preventing it, creating heighten risk working environment for Plaintiff, with disproportional prevalence of sexual harassment.[419]

644.    Pursuant to Defendants' official policy, practice, and/or custom of deliberate indifference, Defendants cultivated a culture of silence by failing to report complaints of sex-based discrimination, failing to initiate and/or conduct adequate investigations and grievance procedures under Title IX and Title VII, and failing to ensure that victimized postdocs had equal access to educational and employment opportunities and benefits or grievance procedures.

645.    The ongoing sexual and physical assaults, harassment, abuse, and stalking Plaintiff experienced, and the subsequent Title IX and/or Title VII failures by CBMM Defendants, were so severe, pervasive, and objectively offensive that Plaintiff was denied equal access to CBMM's educational and employment opportunities and benefits, as she worked twice as hard and experienced physical and mental strain to keep her work on the highest level despite working in the hostile environment.

---

419 Only military workplace has the comparably high to STEM science statistics with relation to sexual harassment prevalence.

646.     As a direct, natural, and proximate result of CBMM Defendants' violation of Title IX and/or Title VII and creation and perpetuation of an environment with heightened risk, Plaintiffs have suffered actual damages including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational and employment benefit, a denial of access to next step in academic career, a denial of access to publishing scientific articles, loss of educational and employment benefit including scholarship opportunities, grant opportunities, award opportunities,  loss of income, loss of enjoyment of life, emotional and economic damages associated with inability to flee her abusers, and other economic or non-economic damages, for which she is entitled to just compensation.

647.     It is respectfully demanded to apply §42.9 Fraudulent Concealment Exception to Statute of Limitations.


**SECOND CAUSE OF ACTION**

**Violation of Title IX and Title VII**

**Negligence (Title VII)**

**Breach of duty of reasonable care (Title IX)**

**20 U.S.C. §§ 1681,  42 U.S. Code § 2000e–2, et seq.,**

**(by Plaintiff against all CBMM Defendants)**


648.     Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

649.     Plaintiff allege violations of Title IX and/or Title VII against CBMM Defendants due to CBMM Defendants' negligence under Title VII and breach of duty of reasonable care under Title IX against Plaintiff.

650.     CBMM Defendants operate programs in receipt of federal funds and are thus covered by Title IX's duty of reasonable care towards Plaintiff

651.     At all relevant times, CBMM Defendants were Plaintiff's employer, joint employer or agent exerting control over Plaintiff's employer compliance with Title IX and/or Title VII and state, and local laws prohibiting discrimination based on sex, and under Title VII was obliged to act once CBMM defendant knew or should have known that harassment may have occurred.

652.     Following her March 2019 internal complaint to CBMM Defendants, CBMM Defendants owed Plaintiff a duty of care/reasonable care which was breached during complaint process: (i) by: failing to provide Plaintiff with a fair hearing because the individuals investigating and adjudicating her case had been indoctrinated with bias against the complainant reporting sexual assault; (ii) procedural deficiencies throughout the process cumulatively amounted to breach of duty.

653.     Specifically, in their procedures, CBMM Defendants (i) failed to rely on and seek to follow their own policies, (ii) denied to let witness testimonies and documentation favorable to Plaintiff's stance, (iii) refused appeal procedures.

654.     Had one or some CBMM Defendants dismissed Plaintiff's allegations of sexual assault and sexual harassment under Title IX, CBMM Defendants had clear obligation to act under Title VII. CBMM Defendants deprived Plaintiff of an opportunity to address her complaint separately for Title VII purposed.

655.     The Final Rule ("Final Rule") under Title IX of the Education Amendments of 1972[420], section 106.6(f) states that "nothing in this part may be read in derogation of any individual's rights under Title VII … or any regulations promulgated thereunder,"

656.     In the Preamble to the Final Rule, the U.S. Justice Department states that "[r]ecipients should comply with both Title VII and Title IX, to the extent that these laws apply, and nothing in these final regulations precludes a recipient from complying with Title VII." 85 Fed. Reg. 30026, 30451 (May 19, 2020).

657.     CBMM Defendants obligation to begin an inquiry was triggered once Plaintiff's CBMM employers 'knew or should have known" that harassment may have occurred. Plaintiff correctly notified about sexual harassment from BOTH perpetrators, including her notice to employer representative who supervised or managed Plaintiff.

658.     Under Title VII, covered employers MUST investigate claims of sexual harassment by or against employees. This duty exists irrespective of the gender(s) of the parties to the alleged harassment. Title VII also requires a negligence standard if a co-worker harasses another co-worker, and the Faragher-Ellerth affirmative defense requires an employer to exercise reasonable care with respect to supervisor-on-employee harassment. [421]

659.     As a direct, natural, and proximate result of CBMM Defendants' violation of Title IX and/or Title VII and negligence and breach of duty of reasonable care, Plaintiffs have suffered actual damages including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational and employment benefit, a denial of access to next step in academic career, a denial of access to publishing scientific articles, loss of educational and employment benefit including scholarship opportunities, grant opportunities, award opportunities,  loss of income, loss of enjoyment of life, emotional and economic damages associated with inability to flee her abusers, and other economic or non-economic damages, for which she is entitled to just compensation.

660.     It is respectfully demanded to apply §42.9 Fraudulent Concealment Exception to Statute of Limitations.


**THIRD CAUSE OF ACTION**

**Violation of Title IX and Title VII**

---

420 which took effect on August 14, 2020

421 A supervisor is any individual that has the authority to recommend business decisions affecting the employee or has the power to direct the employee's daily activities.(New York State and New York City)

**Hostile environment**

**20 U.S.C. §§ 1681,  42 U.S. Code § 2000e–2, et seq.,**

**(by Plaintiff against all CBMM Defendants)**

661.    Plaintiff adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

662.    Plaintiff allege violations of Title IX and Title VII against CBMM Defendants due to CBMM Defendants' cultivation and perpetuation of a sexually hostile environment against Plaintiff.

663.    Defendants operate programs in receipt of federal funds and are thus covered by Title IX's prohibition on sex discrimination.

664.    At all relevant times, Defendants were Plaintiff's employer, joint employer or agent exerting control over Plaintiff's employer compliance with Title IX and/or Title VII and state, and local laws prohibiting discrimination based on sex.

665.    The abuse factually alleged in this Complaint, perpetuated by CBMM Defendants and/or CBMM Defendants' employee or affiliate, created an abusive and sexually hostile educational and workplace environment for Plaintiff in CBMM, including the Laboratory of Neural Systems at Rockefeller University, that impeded and effectively denied Plaintiff's equal access to educational and employment opportunities and benefits.

666.    CBMM Defendants created and/or subjected Plaintiff to a hostile educational environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 (a) ("Title IX") and Title VII of the Civil Rights Act of 1964 ("Title VII").

667.    The ongoing sexual and physical assaults, harassment, abuse, and stalking Plaintiff experienced, and the subsequent Title IX and/or Title VII failures by CBMM Defendants, were so severe, pervasive, and objectively offensive that Plaintiff was denied equal access to CBMM's educational and employment opportunities and benefits, as she worked twice as hard and experienced physical and mental strain to keep her work on the highest level.

668.    Plaintiff was subjected to a hostile educational environment created by Defendants' lack of policies and procedures and failure to properly investigate, prevent, and/or address the sexual and physical assaults and harassment perpetrated on Plaintiff.

669.    CBMM Defendants are liable for the abusive and hostile educational environment in CBMM environment, including at Laboratory of Neural Systems at Rockefeller University, CBMM Summer School and CBMM events, and CBMM Defendants' campuses, because CBMM Defendants had actual knowledge of Plaintiff's abusers' acts of sex-based discrimination against Plaintiff and other female CBMM community members, but allowed them to continue to have unfettered access to female students and postdocs, including Plaintiffs.

670.    CBMM Defendants are also liable for CBMM Defendants' failure to remedy the hostile educational environment experienced by Plaintiff by failing to offer Plaintiffs appropriate interim measures

and accommodations that could have provided Plaintiff with equal access to educational and employment opportunities and benefits.

671.     Defendants are also liable for their failure to remedy the hostile educational environment by failing to initiate and/or conduct proper investigations and/or re-initiate proper investigation into Plaintiff's complaint in lieu of new evidence

672.     As a direct, natural, and proximate result of CBMM Defendants' violation of Title IX and/or Title VII by creating and perpetuating a sexually hostile environment, Plaintiffs have suffered actual damages including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational and employment benefit, a denial of access to next step in academic career, a denial of access to publishing scientific articles, loss of educational and employment benefit including scholarship opportunities, grant opportunities, award opportunities,  loss of income, loss of enjoyment of life, emotional and economic damages associated with inability to flee her abusers, and other economic or non-economic damages, for which she is entitled to just compensation.

673.     It is respectfully demanded to apply §42.9 Fraudulent Concealment Exception to Statute of Limitations.

**FOURTH CAUSE OF ACTION**

**Violation of Title IX and Title VII**

**Erroneous Outcome**

**20 U.S.C. §§ 1681,  42 U.S. Code § 2000e–2, et seq.,**

**(by Plaintiff against CBMM Defendants)**

674.     Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

675.     Plaintiff allege violations of Title IX and/or Title VII against Defendants due to the erroneous outcomes of investigations of sex-based discrimination.

676.     Defendants operate programs in receipt of federal funds and are thus covered by Title IX's prohibition on sex discrimination.

677.     At all relevant times, Defendants were Plaintiff's employer, joint employer or agent exerting control over Plaintiff's employer compliance with Title IX and/or Title VII and state, and local laws prohibiting discrimination based on sex.

678.     CBMM Defendants did not fairly investigated Plaintiff March 2019 complaint and her other complaints which followed (i) by: failing to provide Plaintiff with a fair hearing because the individuals investigating and adjudicating her case had been indoctrinated with bias against the complainant reporting

sexual assault; (ii) procedural deficiencies throughout the process cumulatively amounted to biased thus erroneous outcome.

679.     Specifically, in their procedures, CBMM Defendants (i) failed to rely on and seek to follow their own policies, (ii) denied to let witness testimonies and documentation favorable to Plaintiff's stance, (iii) refused appeal procedures.

680.     CBMM Defendants could not argue that a crucial witness in the investigation of Plaintiff's complaint about 2017 sexual assault and subsequent sexual harassment avoided participating in the Title IX investigation process. An employee-party's option not to cooperate is contrary to established Title VII procedure. Under Title VII, which focuses on the employer-employee relationship, an employer can compel an employee to participate in an investigation of a gender discrimination or harassment complaint under Title VII.

681.     The Final Rule ("Final Rule") under Title IX of the Education Amendments of 1972[422], section 106.6(f) states that "nothing in this part may be read in derogation of any individual's rights under Title VII … or any regulations promulgated thereunder,"

682.     In the Preamble to the Final Rule, the U.S. Justice Department states that "[r]ecipients should comply with both Title VII and Title IX, to the extent that these laws apply, and nothing in these final regulations precludes a recipient from complying with Title VII." 85 Fed. Reg. 30026, 30451 (May 19, 2020).

683.     Section 106.45(b)(5) of the Final Rule also states that a recipient may not restrict a party or witness' ability to discuss the allegations under investigation. CBMM Defendants substantially restricted Plaintiff's ability to discuss the allegations under investigation.

684.     In their investigative proceedings into Plaintiff's complaint from March 2019, CBMM Defendants: (i)  referred Plaintiff complaint for the investigation to the CBMM awardee institutions of the least jurisdiction over the involved parties and with the most unregulated an/or vaguely defined investigation procedure, (ii) gave disproportional advantage to the Respondent (perpetrator) in processing and investigating Plaintiff's complaint (iii) issued erroneous outcome based on bias and prejudice, (iv) allowed no appeal for Plaintiff to the erroneous outcome (iv) deprived Plaintiff of opportunity to re-investigate Plaintiff's complaint on other (more fair) venue,  after new witness emerged and were willing to corroborate Plaintiff's testimony,

685.     CBMM Defendants gave erroneous outcome in investigating Plaintiff's NSF complaints.

686.     The ongoing sexual and physical assaults, harassment, abuse, and stalking Plaintiff experienced, and the subsequent Title IX and/or Title VII failures by CBMM Defendants, were so severe, pervasive, and objectively offensive that Plaintiff was denied equal access to CBMM's educational and employment opportunities and benefits, as she worked twice as hard and experienced physical and mental strain to keep her work on the highest level despite working in the hostile environment.

687.     As a direct, natural, and proximate result of CBMM Defendants' violation of Title IX and/or Title VII and creation and perpetuation of an environment with heightened risk, Plaintiffs have suffered actual damages including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational and employment benefit, a denial of access to

---

422 which took effect on August 14, 2020

next step in academic career, a denial of access to publishing scientific articles, loss of educational and employment benefit including scholarship opportunities, grant opportunities, award opportunities,  loss of income, loss of enjoyment of life, emotional and economic damages associated with inability to flee her abusers, and other economic or non-economic damages, for which she is entitled to just compensation.

688.     It is respectfully demanded to apply §42.9 Fraudulent Concealment Exception to Statute of Limitations.

**FIFTH CAUSE OF ACTION**

**Violation of Title IX and Title VII**

**Deliberate Indifference to Sex Discrimination**

**20 U.S.C. §§ 1681,  42 U.S. Code § 2000e–2, et seq.,**

**The Final Rule "Final Rule" under Title IX of the Education Amendments of 1972 (took effect on August 14, 2020),**

**(by Plaintiff against all CBMM Defendants)**

689.     Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

690.     Plaintiff allege violations of Title IX and Title VII against Defendants due to CBMM Defendants' deliberate indifference to sex-based discrimination.

691.     Defendants operate programs in receipt of federal funds and are thus covered by Title IX's prohibition on sex discrimination.

692.     As female scientist seeking equal access to educational programs and activities and equal employment opportunity at CBMM, Plaintiff was member of a protected class covered by Title IX and Title VII;

693.     At all relevant times, Defendants were Plaintiff's employer, joint employer or agent exerting control over Plaintiff's employer compliance with Title IX and Title VII (and others) federal, state, and local laws prohibiting discrimination based on sex.

694.     Each of CBMM Defendants not only knew or should have known about the sex-based discrimination towards Plaintiff, but each of CBMM Defendants at some relevant point of Plaintiff's complaint process gained actual knowledge of the sex-based discrimination.

695.     ALL CBMM defendants repeatedly failed to protect Plaintiffs consistent with their own policies and federal law guidance, by reacting to the actual knowledge in a deliberately indifferent manner.

696.     Plaintiff was repeatedly subject to sex-based discrimination by CBMM Defendants as articulated in Plaintiff's factual allegations.

697.     Plaintiff was repeatedly subject to sex-based discrimination in the form of sexual assaults, sexual harassment,  and stalking by employees of CBMM Defendants as articulated in Plaintiffs' allegations.

698.     At all relevant times, CBMM Defendants exercised substantial control over Plaintiff's abusers who, at all relevant times, were (or remain currently) enrolled at CBMM and/or were (or remain currently) employed by CBMM Defendants and/or were (or remain currently) affiliated with CBMM Defendants.

699.     Despite the sexual misconduct of their employers was severe and pervasive, CBMM Defendants acted with deliberate indifference to the acts of sex-based discrimination by failing to take any action to prevent them, deter the fellows and/or employees responsible, and/or protect Plaintiffs from sexual misconduct. CBMM Defendants also acted with deliberate indifference to acts of sexual misconduct by failing to take immediate, effective remedial steps to resolve Plaintiff's allegations of sex-based discrimination.

700.     CBMM Defendants' response to the harassment or lack thereof was clearly unreasonable in light of the known circumstances.

701.     CBMM Defendants' repeated failure to promptly and appropriately respond to the sexual misconduct Plaintiff experienced resulted in Plaintiff, on the basis of their sex, being excluded from participation in, being denied the benefits of, and being subjected to discrimination in CBMM's educational programs and activities in violation of Title IX and/or Title VII.

702.     CBMM Defendants acted intentionally and with deliberate indifference to the repeated denial of Plaintiff's access to educational opportunities or benefits. CBMM Defendants' violation of their duty to Plaintiff arises from their systemic failure to properly enforce Title IX and/or Title VII. Pursuant to CBMM Defendants' official policy, practice, and/or custom of deliberate indifference, they cultivated a culture of silence by failing to report complaints of sex-based discrimination, initiate and/or conduct adequate investigations and grievance procedures under Title IX and/or Title VII, and ensure victimized CBMM members had equal access to educational opportunities and benefits or grievance procedures.

703.     The ongoing sexual and physical assaults, harassment, abuse, and stalking Plaintiff experienced, and the subsequent Title IX and/or Title VII failures by CBMM Defendants, were so severe, pervasive, and objectively offensive that Plaintiff was denied equal access to CBMM's educational opportunities and benefits, as she worked twice as hard and experienced physical and mental strain to keep her work on the highest level.

704.     As a direct, natural, and proximate result of CBMM Defendants' violation of Title IX and/or Title VII due to their deliberate indifference to sex-based discrimination, Plaintiffs have suffered actual damages including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational and employment benefit, a denial of access to next step in academic career, a denial of access to publishing scientific articles, loss of educational and employment benefit including scholarship opportunities, grant opportunities, award opportunities,  loss of income, loss of enjoyment of life, emotional and economic damages associated with inability to flee her abusers, and other economic or non-economic damages, for which she is entitled to just compensation.

705.     It is respectfully demanded to apply §42.9 Fraudulent Concealment Exception to Statute of Limitations.

**SIXTH CAUSE OF ACTION**

**Violation of Title IX and Title VII**

**Retaliation by Title VII**

**Retaliation by Withholding Protection Otherwise Conferred by Title IX**

**20 U.S.C. §§ 1681,  42 U.S. Code § 2000e–2, et seq.,**

**(by Plaintiff against all CBMM Defendants)**

706.     Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

707.     Plaintiff allege violations of Title IX and/or Title VII against Defendants due to retaliation.

708.     Defendants operate programs in receipt of federal funds and are thus covered by Title IX's prohibition on sex-based discrimination.

709.     At all relevant times, Defendants were Plaintiff's employer, joint employer or agent exerting control over Plaintiff's employer compliance with Title IX and/or Title VII and state, and local laws prohibiting discrimination based on sex.

710.     CBMM Defendants discriminated against Plaintiff on the basis of sex by taking disciplinary action against her as a result of her complaint, counter to her right to an equitable grievance process under Title IX[423] and Title VII[424].

711.     Title IX and/or Title VII and its interpretive regulations prohibit retaliation against any person who complains about what they reasonably believe to be a Title IX and/or Title VII violation, advocates on behalf of Title IX and/or Title VII rights and enforcement, or cooperates in any investigation of a Title IX and/or Title VII violation.

712.     Plaintiff engaged in protected activity by reporting incidents of sex-based discrimination perpetrated on them by CBMM postdocs and faculty to Defendants' designated staff. Plaintiff's actions were protected by the anti-retaliation provision of Title IX and/or Title VII.

713.     Plaintiff made the reports to CBMM Defendants Responsible Employees who, Pursuant to the Equal Opportunity Policy,  were responsible for ensuring that the institution as a whole complied with its Title IX and Title VII obligations.

714. CBMM Defendants did not stop perpetrators from retaliating and threatening Plaintiff. In July 2019, Azevedo stated in his position statement during the U of Chicago/MBL "investigation", that he *"advice her to stop* [complaining]*"* and if she continues, he '*will not take it lightly*'. The second sexual

---

423 34 C.F.R. § 106.8.
424 42 U.S.C. § 2000e-3(a)

perpetrator, Freiwald, threatened her in the email in July 2020, saying that if she insists to stay, *"it will be the end of* [her] *carreer"*.

715.    CBMM Defendants engaged in materially adverse actions against Plaintiffs when Defendants' staff failed to report Plaintiff's disclosures of sexual misconduct and when CBMM Defendants' Title IX Offices failed to properly investigate Plaintiff's claims of sex discrimination, failed to initiate or modify appropriate interim measures to ensure her safety and ongoing equal access to educational and eployment opportunities and benefits, and failed to implement appropriate sanctions and responsive measures to remedy the sexually hostile environment and prevent its recurrence.

716.    There was a causal connection between Plaintiff's decisions to exercise their rights under Title IX and/or Title VII by reporting sex-based discrimination and Defendants' decisions to engage in adverse actions against them. The lack of issuance of a no-contact order to Plaintiff before 5/7/2019 CBMM event at MIT, was clearly done in retaliation for Plaintiff's desire to proceed with formal investigation.

717.    After her complaint process, initiated on 3/24/2019, and lasting until her participation in the internal CBMM audit in January 2020, her educational and employment opportunities in the CBMM suddenly vanished, despite her excellent work performance and a her extraordinary commitment.

718.    Defendants' employee in NSF Office of Diversity and Inclusion, would have set the tone from the top on the importance of Title IX and Title VII, and would have been responsible for ensuring that all NSF-CBMM employees complied with their Title IX obligations.

719    CBMM Defendants' retaliation constitutes a per se violation of Title IX and Title VII and left Plaintiff vulnerable to further sex discrimination such that Plaintiffs were denied equal access to CBMM's educational and employment opportunities and benefits, as she worked twice as hard and experienced physical and mental strain to keep her work on the highest level despite working in the hostile environment.

720.    As a direct and proximate result of CBMM Defendants' Title IX and Title VII retaliation, Plaintiff has sustained injuries and damages, including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational and employment benefit, a denial of access to next step in academic career, a denial of access to publishing scientific articles, loss of educational and employment benefit including scholarship opportunities, grant opportunities, award opportunities,  loss of income, loss of enjoyment of life, emotional and economic damages associated with inability to flee her abusers, and other economic or non-economic damages, for which she is entitled to just compensation.

721.    It is respectfully demanded to apply §42.9 Fraudulent Concealment Exception to Statute of Limitations.

**SEVENTH CAUSE OF ACTION**

**Negligence**

**Breach of duty of reasonable care**

**Federal Tort Claims Act (FTCA)**

**(By Plaintiff against National Science Foundation)**

722.    Plaintiff adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

723.    Plaintiff alleges negligence by National Science Foundation ODI office.

708.    Defendants operate programs in receipt of federal funds and are thus covered by Title IX's prohibition on sex-based discrimination.

724.    At all relevant times, the National Science Foundation Defendant owed Plaintiff a duty of reasonable care to ensure their safety and freedom from sex-based assault, harassment, and abuse while Plaintiff was postdocs at CBMM by, among other things, conducting investigations into their claims of sex-based assault, sexual misconduct, and misconduct in enforcing the Title IX Policy.

725.    Since 5/7/2019, CBMM Defendant NSF had actual knowledge that Plaintiff had been subject to sexual misconduct and the remaining CBMM Defendants took no reasonable protective measures to protect Plaintiffs nor took action to prevent its recurrence or remedy its effects.

726.    Since 5/7/2019, CBMM Defendant NSF had actual knowledge that Plaintiff had been subject to discrimination based on sex in her complain process, but CBMM Defendants NSF took no reasonable protective measures to protect Plaintiffs in their right to give her due due process nor took action to prevent its recurrence or remedy its effects.

727.    Plaintiff filed multiple complaint with National Science Foundation ODI

728.    In assisting Marciniak DG Agra, National Science Foundation ODI employee were acting within the scope of their duties.

729.    The employees of National Science Foundation ODI office were acting negligently. Did not intervene in May 2019.

730.    The employees of National Science Foundation ODI office were acting wrongfully. Did not refer to EEOC, although Defendants were joint employer.

731.    The Defendants' failure to properly discipline the perpetrators identified the cmplaint from ...Complaint constitutes a breach of the duty of care. The Defendants' failure to follow their own policies in reviewing, investigating, and resolving complaints of sexual assault and harassment pursuant to Title IX constitutes a breach of its duty of care to Plaintiff.

732.    Defendant' failure to respond to substantiated reports of sexual misconduct against high-ranking employees, failure to ensure CBMM implemented its Title IX Policy and Code of Conduct, and failure to ensure CBMM treated all students and postdocs equally constituted a breach of the duty of care.

733.    As a direct and proximate result of National Science Foundation ODI negligence, Plaintiffs have suffered medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational and employment benefit, a denial of access to next step in academic career, a denial of access to publishing scientific articles, loss of educational and employment benefit including scholarship

opportunities, grant opportunities, award opportunities,  loss of income, loss of enjoyment of life, emotional and economic damages associated with inability to flee her abusers, and other economic or non-economic damages, for which she is entitled to just compensation.

734.    It is respectfully demanded to apply §42.9 Fraudulent Concealment Exception to Statute of Limitations.

**EIGHT CAUSE OF ACTION**

**Conspiracy to Interfere with Civil Rights**

 **42 U.S.C. 1985 (1-3) (1976 ed., Supp. II).**

**(by Plaintiffs against CBMM Defendants entities and any Individual Defendants who Court may identify in the process of this litigation)**

**(Damages under § 1985(3))**

735.    Plaintiff adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

736.    Plaintiff alleges Conspiracy to Intervere with Civil Rights by all CBMM Defendants

737.     From 2013, CBMM Defendants have been sharing common business interests by running the Center for Brains, Minds & Machines (CBMM), a multi-institutional Science and Technology Center enterprise, heavily financed from federal funds through the National Science Foundation. CBMM Defendants operate programs in receipt of federal funds and are thus covered by Title IX's prohibition on sex-based discrimination.

738.    At all relevant times, Defendants were Plaintiff's employer, joint employer or agent exerting control over Plaintiff's employer compliance with Title IX and/or Title VII and state, and local laws prohibiting discrimination based on sex.  At all relevant times, CBMM Defentants operations were within the jurisdiction of any department or agency of the United States

739. At all relevant times, Plaintiff was protected under Title IX and Title VII laws and had constitutionally protected interest in continued employment.

740.    Plaintiff allege that between March 2019 and July 2022, CBMM Defendant conspired to prevent federal officers (including police officers) who were investigating Plaintiff's complaint from performing duties. CBMM defendants interrupted, hindered and impeded federal officers in their official duties. Following the U of Chicago/MBL investigation outcome in August 2019, CBMM defendants issued for accused "the MIT investigative report done on Azevedo", which Azevedo provided to the Falmouth Police detective investigating the 2017 sexual assault and subsequent sexual harassment from the side of Azevedo. In their action, CBMM Defendants intended to impede Falmouth Police in prosecuting the case,

by falsely claiming that the investigation was done by MIT, to use the authority of major Massachusetts school with well developed grievance procedures in arguing that Azevedo was innocent.

741.    Plaintiff allege that between March 2019 and July 2022, CBMM Defendants conspired to obstruct justice, intimidating party and witness. CBMM Defendants impeded, hindered, obstructed, and defeated, in any manner, the due course of justice in Massachusetts, New York, Illinous, and Virginia States, with intent to deny Plaintiff the equal protection of the laws, to injure her or her property for lawfully enforcing or attempting to enforce her right to the equal protection of the laws.

742.    Plaintiff allege that between March 2019 ad July 2022, CBMM Defendants deprived Plaintiff of her rights and privileges, including constitutionally protected interest in continued employment.

743.    Plaintiff allege that her employment was terminated in furtherance of CBMM respondents' conspiracy to retaliate against her for cooperating in the federal and state investigation related to Plaintiff's complaint and testifying to the police officers, state and federal officials, and/or then before the grand jury and to deter her and others (including other victims her husband) from testifying in the criminal proceedings, in violation of Section 1985(2).

744.    CBMM Respondents intended this termination as retaliation against Plaintiff for her cooperation with federal agents and her testimonies to the police department, as well as her testimony to the federal agency (EEOC) and state employment agency, the New York State Division of Human Rights Ibid. In addition, CBMM Defendants intended through Plaintiff's termination to intimidate Plaintiff, her husband and other CBMM Defendants employees from cooperating with federal agents or testifying in any criminal matters involving CBMM Defendants.

745.    Plaintiffs were injured in their person or property and deprived of a federal right or privilege as a result of an act in furtherance of a conspiracy prohibited under any part of Section 1985, including clause one of Section 1985(2). Nominal, compensatory, and punitive damages are available to Plaintiffs under § 1985.

746.    Plaintiffs allege sufficient injury to sustain an action under those provisions. Plaintiffs were injured in their persons and property, and suffered loss and damage of a type which is compensated in a common law tort action.

747.    Plaintiffs' loss involved mental anguish, bodily injury and loss of their tangible monetary property.

748.    Plaintiff suffered also damages resulting from termination of employment, such as lost earnings, lost of future earning, scholarships and awards.

749.    As a direct and proximate result of CBMM Defendants' conspiracy to deprive Plaintiffs of their Constitutional Rights, Plaintiffs have suffered and will continue to suffer medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational and employment benefit, a denial of access to next step in academic career, a denial of access to publishing scientific articles, loss of educational and employment benefit including scholarship opportunities, grant opportunities, award opportunities,  loss of income, loss of enjoyment of life, emotional and economic damages associated with inability to flee her abusers, and other economic or non-economic damages, for which they are entitled to just compensation.

750.     Plaintiffs are entitled to monetary compensation for past violations of constitutional rights from the Individual Defendants in their personal capacities, once Individual Defendants are identified in the course of this litigation.

**NINTH CAUSE OF ACTION**

**Conspiracy to defraud the United States**

**Damages under 18 U.S. Code § 371,**

**(by Plaintiff against CBMM Defendants and any Individual Defendants who Court may identify in the process of this litigation)**

750.     Plaintiff adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

751.     Plaintiff allege that CBMM Defendants cheated the Government out of money, interfered and obstruct legitimate Government activity, and made wrongful use of a government instrumentality.

752.     From 2013, CBMM Defendants have been sharing common business interests by running the Center for Brains, Minds & Machines (CBMM), a multi-institutional Science and Technology Center enterprise, heavily financed from federal funds through the National Science Foundation.

753.     CBMM Defendants operate programs in receipt of federal funds and are thus covered by Title IX's prohibition on sex-based discrimination.

754.     At all relevant times, Defendants were Plaintiff's employer, joint employer or agent exerting control over Plaintiff's employer compliance with Title IX and/or Title VII and state, and local laws prohibiting discrimination based on sex.

755.     At all relevant times, CBMM Defentants operations were within the jurisdiction of any department or agency of the United States. CBMM Defendants engaged in scheme or artifice to defraud, with the objective to defraud the NSF to obtain continuous federal grant money by means of false and fraudulent representations and promises which CBMM Defendants knew to be false.

756.     Plaintiff allege that CBMM Defendants perpetuated a conspiracy to defraud federal money from the NSF, by covering up Plaintiff's complaint to falsely present Title IX (and Title VII) compliance in their annual report.

757.  By reason of the facts and circumstances stated in this complaint, Plaintiffs allege that CBMM Defendants conspired to to cheat the U.S. government of money by interfering with or obstructing lawful government functions through deceit, craft or tickery, and by means that are dishonest.

758.     The general conspiracy statue, 18 U.S.Code § 371,creates an offense "[i]f two or more persons conspire either to commit any offense agaist the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose".

759.     Although CBMM Defendants may claim that obtaining the NSF money agreed upon in NSF-CBMM corporate agreement was not illegal, neither the conspiracy's goal nor the means used to achieve it need to be independently illegal, according to U.S. courts.

760.     Sexual harassment and hostile environment decrease productivity. Therefore, CBMM Defendants conduct damaged science and impaired the development of scientific finding for the benefit of humanity (Rockefeller motto)

761.     As a direct and proximate result of CBMM Defendants' conspiracy to defraud the United States, Plaintiff allege sufficient injury to sustain an action under those provisions, since allegations of civil conspiracy are permitted to connect the actions of separate CBMM Defendants with an otherwise actionable tort.[425] Plaintiffs were injured in their persons and property, and suffered loss and damage of a type which is compensated in a common law tort action.

762.     In this scheme, Plaintiff lost her scientific career. She was retaliated, and cut from conventional reference-letter support system, and was deprived from further development of her research and her scientific carreer.

763.     As a direct and proximate result of CBMM Defendants' conspiracy to defraud the United States, Plaintiffs have suffered and will continue to suffer medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational and employment benefit, a denial of access to next step in academic career, a denial of access to publishing scientific articles, loss of educational and employment benefit including scholarship opportunities, grant opportunities, award opportunities,  loss of income, loss of enjoyment of life, emotional and economic damages associated with inability to flee her abusers, and other economic or non-economic damages, for which they are entitled to just compensation.


**TENTH CAUSE OF ACTION**

**Concealment and Cover-up**

**Damages under 18 U.S. Code § 1001  (amendment on October 11, 1996)**

**(by Plaintiff against CBMM Defendants and any Individual Defendants who Court may identify in the process of this litigation)**

764.     Plaintiff adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

765.     Plaintiff allege that CBMM Defendants (i) knowingly and willfully falsified, concealed and covered up by tricks, scheme and device material facts concerning Plaintiff's complaint, (ii) made false, fictitious and fraudulent statements and representations with respect to CBMM Defendants internal policies in relation to Plaintiff's complaint, and (iii) made and used false writing and documents in relation Plaintiff's complaint, knowing the same to contain false, fictitious or fraudulent statement or entry.

---

425 Alexander & Alexander of N.Y. v Fritzen, 68 NY2d 968, 969 [1986]

766.    From 2013, CBMM Defendants have been sharing common business interests by running the Center for Brains, Minds & Machines (CBMM), a multi-institutional Science and Technology Center enterprise, heavily financed from federal funds through the National Science Foundation.

767.    At all relevant times, CBMM Defentants operations were within the jurisdiction of federal or state department or agency of the United States.

768.    CBMM Defendants operate programs in receipt of federal funds and are thus covered by Title IX's prohibition on sex-based discrimination.

769.    At all relevant times, Defendants were Plaintiff's employer, joint employer or agent exerting control over Plaintiff's employer compliance with Title IX and/or Title VII and state, and local laws prohibiting discrimination based on sex.

770.    Between March 2019 and July 2022, CBMM Defendants committed a crime to knowingly make false statement to a governmental agency, the NSF over Plaintiff's complaint jurisdiction and investigation under federal laws (Title IX and Title VII). CBMM Defendants intentionally made fale and fraudulent statement to NSF ODI office in the course of the NSF ODI review and investigation over Plaintiff's complaints she submitted to the NSF ODI office between May 2019 and September 2020.

771.    Following the U of Chicago/MBL investigation outcome, CBMM defendants issued for accused "the MIT investigative report done of Azevedo", which Azevedo provided to the Falmouth Police detective investigating the 2017 sexual assault and subsequent sexual harassment from the side of Azevedo. In their action, CBMM Defendants intended to impede Falmouth Police in prosecuting the case, by falsely claiming that the investigation was done by MIT, to use the authority of major Massachusetts school with well developed grievance procedures in arguing that Azevedo was innocent.

772.    CBMM Defendants deceptive practices created the *perversion*, from which the government is protected under Section 1001[426]

773.    CBMM Defendants actions were directed against Plaintiff and against her civil rights for equitable and fair investigation into her complaint, and inflicted pain and suffering on her.

774.    The actions of separate Defendants are connected with an otherwise actionable tort.

775.    As a direct and proximate result of CBMM Defendants' concealment and cover-up, Plaintiff allege sufficient injury to sustain an action under those provisions, since allegations of civil conspiracy are permitted to connect the actions of separate CBMM Defendants with an otherwise actionable tort.[427]

776.    Plaintiffs were injured in their persons and property, and suffered loss and damage of a type which is compensated in a common law tort action.

777.    As a direct and proximate result of CBMM Defendants' conspiracy to defraud the United States, Plaintiff have suffered and will continue to suffer medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety,

---

426 Bryson v. United States, 396 U.S. 64 (1969).
427 Alexander & Alexander of N.Y. v Fritzen, 68 NY2d 968, 969 [1986]

emotional and physical pain and suffering, a denial of access to educational and employment benefit, a denial of access to next step in academic career, a denial of access to publishing scientific articles, loss of educational and employment benefit including scholarship opportunities, grant opportunities, award opportunities,  loss of income, loss of enjoyment of life, emotional and economic damages associated with inability to flee her abusers, and other economic or non-economic damages, for which she is entitled to just compensation.


## ELEVENTH CAUSE OF ACTION

**Tampering with victims, witnesses or informants**

 **under 18 U.S. Code §1512,**

**(by Plaintiffs against CBMM Defendants and any Individual Defendants who Court may identify in the process of this litigation)**


764.     Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

765.     Plaintiffs allege that CBMM Defendants intentionally (i) used threat of physical force to influence, delay or prevent the testimony of Plaintiff as a witness (and other witnesses) in the official proceeding in relation to Plaintiff's complaint she submitted internally to CBMM Defendants and to Falmouth police department.; (ii) knowingly used intimidation, threatenedand corruptly persuaded Plaintiff (and other victims), or attempted to do so, and engaged in misleading conduct towards Plaintiff, with intent to influence, delay or prevent Plaintiff's testimony in the official proceeding in relation to Plaintiff's complaint, to induce Plaintiff to withhold a record and document from an official proceedings, and to evade legal process summoning Plaintiff to appear as a witness.

766.     Plaintiffs also allege that CBMM Defendants (i) corruptly obstructed, influenced or impeded the official proceeding in relation to Plaintiff's complain, (ii) hindered, delayed or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense.

767.     Plaintiffs also allege that CBMM defendants intentionally harassed Plaintiff (and other witnesses) and thereby hindered, delayed, prevented or dissuaded Plaintiff from (I) attending or testifying in an official proceeding (ii) reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense, (iii) arresting or seeking the arrest of the perpetrator in connection with a Federal offense, (iv) causing a criminal prosecution to be sought or instituted, or assisting in such prosecution or proceeding;

768.     At all relevant times, CBMM Defentants operations were within the jurisdiction of federal or state department or agency of the United States.

769.     From 2013, CBMM Defendants have been sharing common business interests by running the Center for Brains, Minds & Machines (CBMM), a multi-institutional Science and Technology Center enterprise, heavily financed from federal funds through the National Science Foundation.

770.    CBMM Defendants operate programs in receipt of federal funds and are thus covered by Title IX's prohibition on sex-based discrimination.

771.    At all relevant times, Defendants were Plaintiff's employer, joint employer or agent exerting control over Plaintiff's employer compliance with Title IX and/or Title VII and state, and local laws prohibiting discrimination based on sex.

772.    CBMM Defendants conduct intended to illegitimately affect the presentation of evidence in Federal proceedings or the communication of information to Federal law enforcement officers, to impede Plaintiff's testimony, affect her credibility, and thus cover-up her complaint to avoid liability.

773.    Plaintiff allege that her employment was terminated in furtherance of CBMM respondents' conspiracy to retaliate against her for cooperating in the federal and state investigation related to Plaintiff's complaint and testifying to the police officers, state and federal officials, and/or then before the grand jury and to deter her and others (including other victims her husband) from testifying in the criminal proceedings, to cover-up Plaintiff's complaint and avoid liability.

774.    As a direct and proximate result of CBMM Defendants' tampering with victims, witnesses or informants, Plaintiffs allege sufficient injury to sustain an action under those provisions, since Plaintiffs' allegations are permitted to connect the actions of separate CBMM Defendants with an otherwise actionable tort.[428] Plaintiffs were injured in their persons and property, and suffered loss and damage of a type which is compensated in a common law tort action.

775.    As a direct and proximate result of CBMM Defendants' tampering with victims, witnesses or informants,, Plaintiffs have suffered and will continue to suffer medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational and employment benefit, a denial of access to next step in academic career, a denial of access to publishing scientific articles, loss of educational and employment benefit including scholarship opportunities, grant opportunities, award opportunities,  loss of income, loss of enjoyment of life, emotional and economic damages associated with inability to flee her abusers, and other economic or non-economic damages, for which they are entitled to just compensation.

**TWELFTH CAUSE OF ACTION**

**Tampering with evidence**

 **under 18 U.S. Code §1519,**

**(by Plaintiffs against CBMM Defendants and any Individual Defendants who Court may identify in the process of this litigation)**

776.    Plaintiff adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

---

428 Alexander & Alexander of N.Y. v Fritzen, 68 NY2d 968, 969 [1986]

777.     Plaintiff allege that throughout Plaintiff's complaint process, CBMM Defendants knowingly altered, destroyed, mutilated, concealed, covered up, falsified, or made a false entry in record, document, or tangible object, with the intent to impede, obstruct, or influence the investigation or proper administration of Plaintiff's complaint within the jurisdiction of federal and state agencies of the United States, or in relation to contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

778.     At all relevant times, CBMM Defentants operations were within the jurisdiction of federal or state department or agency of the United States.

779.     From 2013, CBMM Defendants have been sharing common business interests by running the Center for Brains, Minds & Machines (CBMM), a multi-institutional Science and Technology Center enterprise, heavily financed from federal funds through the National Science Foundation.

780.     CBMM Defendants operate programs in receipt of federal funds and are thus covered by Title IX's prohibition on sex-based discrimination.

781.     At all relevant times, Defendants were Plaintiff's employer, joint employer or agent exerting control over Plaintiff's employer compliance with Title IX and/or Title VII and state, and local laws prohibiting discrimination based on sex.

782. At all relevant times, CBMM Defendants was in possession of Plaintiff's RUNet account, including her rockefeller email account. From June 2019, CBMM Defendants tampered with Plaintiff's email account to conceal to her any communication from the perpetrator. Following Plaintiff's termination in November 2021, CBMM Defendants impeded Plaintiff's access to her email account containing the communication with Freiwald, impeding her obligation to keep electronic evidence for NYS DHR (and other) litigation against CBMM Defendants.

783.     Plaintiff allege that her employment was terminated in furtherance of CBMM respondents' conspiracy in tampering with evidence, and to retaliate against her for cooperating in the federal and state investigation related to Plaintiff's complaint and testifying to the police officers, state and federal officials, and/or before the grand jury and to deter her and others (including other victims her husband) from testifying and/or providing material evidence in the criminal proceedings, to cover-up Plaintiff's complaint and avoid liability.

784.     As a direct and proximate result of CBMM Defendants' tampering with evidence, Plaintiffs allege sufficient injury to sustain an action under those provisions, since Plaintiffs' allegations are permitted to connect the actions of separate CBMM Defendants with an otherwise actionable tort.[429] Plaintiffs were injured in their persons and property, and suffered loss and damage of a type which is compensated in a common law tort action.

785.     As a direct and proximate result of CBMM Defendants' tampering with evidence, Plaintiffs have suffered and will continue to suffer medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational and employment benefit, a denial of access to next step in academic career, a denial of access to publishing scientific articles, loss of educational and employment benefit including scholarship opportunities, grant opportunities, award opportunities, loss of income, loss of enjoyment of life, emotional and economic damages associated with inability to flee her abusers, and other economic or non-economic damages, for which they are entitled to just compensation.

---

429 Alexander & Alexander of N.Y. v Fritzen, 68 NY2d 968, 969 [1986]

**THIRTEEN CAUSE OF ACTION**

**Human and sex trafficking**

**under the Victims of Trafficking and Violence Protection Act of 2000 (TVPA)**

**(Plaintiff against CBMM Defendants and any Individual Defendants who Court may identify in the process of this litigation)**

786.    Plaintiff adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

787.    Plaintiff allege to be a victim of human and sex trafficking by CBMM Defendants.

788.    At all relevant times, CBMM Defentants operations were within the jurisdiction of federal or state department or agency of the United States.

789.    From 2013, CBMM Defendants have been sharing common business interests by running the Center for Brains, Minds & Machines (CBMM), a multi-institutional Science and Technology Center enterprise, heavily financed from federal funds through the National Science Foundation.

790.    CBMM Defendants operate programs in receipt of federal funds and are thus covered by Title IX's prohibition on sex-based discrimination.

791.    At all relevant times, Defendants were Plaintiff's employer, joint employer or agent exerting control over Plaintiff's employer compliance with Title IX and/or Title VII and state, and local laws prohibiting discrimination based on sex.

792.    CBMM Defendants recruited Plaintiff in 2014, during the major neuroscience conference in Washington, D.C., to work for CBMM Defendants as a scientist.

793.    Between 2014 and 2016, CBMM Defendants lured Plaintiff with the promise of cutting-edge technology and high-level scientific opportunities, to coerce her into accepting to move her center of living from Germany to the United States, to work for CBMM Defendants.

794.    CBMM Defendants contracted with Plaintiff postdoctoral work, which in the non-human primate neuroscience field, may take [430]up to 10 years.

795.    Plaintiff allege that while Plaintiff had been working for CBMM Defendants, CBMM Defendants: (I) forced her into labor, (ii) trafficked with respect to peonage, slavery and involuntary servitude, and (iii) sex trafficked Plaintiff by force, fraud and coercion.

796.    CBMM Defendants perpetuated culture of sexual coercion, and quid pro quo sexual harassment, and retaliated against Plaintiff when she opposed it.

---

430 and indeed takes, see male postdoctoral employees in Freiwald laboratory

797.    CBMM defendants demanded from Plaintiff to work extremely hard and under tremendous stress, and her work for CBMM involved working in heightened risk laboratory settings with infectious specimens and wild animals, and demanded non-stop over-hours with no days off.

798.    For her work at CBMM, CBMM Defendants provided her with J-1 and then H-1B visa petitions, which in retaliation they abruptly withheld, offering for her a one-way return ticket to Poland.

799.    Although CBMM Defendants could have issued a H-1B petition early in her employment, enabling her to enter the permanent residency process, which then would increase Plaintiff's constitutional rights in the United States, CBMM Defendants preferred to issue a J-1 visa, and hold Plaintiff fully dependent on her employer.[431]

800.    CBMM endorsed Plaintiff's two sexual perpetrators, who perpetuated coerce, quiod pro quo sexual harassment, and even sexual assault towards her, making it an implicit condition for her scientific work at CBMM.

801.    As soon as Plaintiff complained to CBMM Defendants internally about sexual assault and sexual harassment, she was retaliated, heavily punished, and her complaint was covered-up.

802.    As a direct and proximate result of being a victim of CBMM Defendants' human and sex trafficking, Plaintiffs allege sufficient injury to sustain an action under those provisions.

803.    Plaintiff has suffered and will continue to suffer medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational and employment benefit, a denial of access to next step in academic career, a denial of access to publishing scientific articles, loss of educational and employment benefit including scholarship opportunities, grant opportunities, award opportunities,  loss of income, loss of enjoyment of life, emotional and economic damages associated with inability to flee her abusers, and other economic or non-economic damages, for which she is entitled to just compensation.

## FOURTEEN CAUSE OF ACTION

## Violations of the Racketeer Influenced and Corrupt Organizations Act

## 18 U.S.C. § 1962(c)

## (Plaintiff against CBMM Defendants and any Individual Defendants who Court may identify in the process of this litigation)

804.    Plaintiffs incorporate by reference the previously plead paragraphs as if fully plead herein.

805.    Platif allege that CBMM Defendants (i) employed, or have been associated with or engaged in conspiracy and cover-up enterprise or the activities which affected interstate or foreign

---

431 While on J-1, Research Scholar can not work anywhere else without permission from sponsoring institution

commerce, and (ii) conducted or participated, directly or indirectly, in the conduct of this enterprise's affairs through a pattern of racketeering activity.

806.    This cause of action is against all CBMM Defendants who at all relevant times were deemed a "person" within the meaning of 18 U.S.C. §1961(3), because they were "capable of holding a legal or beneficial interest in property."

807.    The activities of CBMM Defendants, created the enterprise that has been used as a tool to carry out the scheme and pattern of racketeering activity. The enterprise has beenascertainable engaged in and conducts activities that affect interstate commerce. All CBMM Defendants are associated with the enterprise as they do business collectively throughout the NSF-CBMM corporate agreement.

808.    All CBMM Defendants, are a group of "persons" associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in the foregoing paragraphs of this Complaint. These Defendants form this association in fact for the common and continuing purpose described herein and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity.

809.    Each of CBMM Defendants participated in the operation of or management of the enterprise. The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity. There may be other members of the enterprise who are unknown at this time, but which will be uncovered during discovery.

810.    All CBMM Defendants, agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs, cover-up Plaintiff's complaint, and defraud the United States federal funds.

811.    Specifically, CBMM Defendants conspired and defrauded Plaintiffs by representing and contracting with Plaintiffs to provide an educational and/or work environment in line with federal regulatory guidelines, including one free from harassment and in compliance with the Constitution and federal law, but intentionally and uniformly refusing to do so by knowingly, recklessly, or culpably engaging in the scheme to deter and cover up sexual misconduct complaints filled by Plaintiff, causing physical harm, mental anguish, humiliation, embarrassment, as well as financial loss and destruction of property to Plaintiffs.

812.    Upon information and belief, pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts of wire and mail fraud, including but not limited to interstate phone calls wire communication to conspire and cover up Plaintiff's sexual assault and sexual harassment complaint to keep annual solicitation of federal funds and other donations from national and international sources, and utilizing the funds to implement a sexual misconduct reporting scheme designed to keep complaints within the control of CBMM Defendants and avoid liability resulting from reported complaint, including Plaintiff's complaint.

813.    Upon information and belief, NSF ODI office, CBMM Director, and Title IX Coordinators knowingly made false certifications in the annual NSF report in compliance with NSF mandates regarding sexual misconduct education in order to protect certain CBMM members, i.e., male sexual perpetrators and their enablers, to continue soliciting NSF funds that they otherwise wouldn't be able to maintain. These false certifications had the effect of harming Plaintiffs and other CBMM members, not just those experiencing sexual violence or harassment from CBMM sexual perpetrators.

814.    CBMM Defendants' routine and systematic use of federal funds and other donations to implement a scheme has been designed to protect CBMM sexual perpetrator and cover up the complaints, and constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961.

815.    The racketeering activity, through the use of the interstate mails and wires, was made possible by CBMM Defendants' regular and repeated use of the services of the enterprise. Defendants had the specific intent to engage in the substantive Racketeer Influenced and Corrupt Organizations Act ("RICO") violations alleged herein.

816.    Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

817.    The acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and result, participants, victims and method of commission.

818.    Further, the acts of racketeering by Defendants have been continuous in that they (i) financed handpicked
companies to perform an "audit" of CBMM Defendants program; (ii) financed handpicked
companies to perform inefficient and superficial sexual harassment training (ii) financed individuals to salience the victims. Using a company handpicked and paid for by federal funds and solicited donations allowed the Defendants to systematically refuse to acknowledge student complaints of sexual assault or otherwise implement a Title IX complaint system of reporting.

819.    There was repeated and continuing conduct during the past years for all named Defendants, and there is a continued threat of repetition of such conduct.

820.    As a direct and proximate result of being a victim of CBMM Defendants' human and sex trafficking, Plaintiffs allege sufficient injury to sustain an action under those provisions.

821.    As a direct and proximate result of CBMM Defendants' racketeering activity, Plaintiffs have suffered and will continue to suffer medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational and employment benefit, a denial of access to next step in academic career, a denial of access to publishing scientific articles, loss of educational and employment benefit including scholarship opportunities, grant opportunities, award opportunities,  loss of income, loss of enjoyment of life, emotional and economic damages associated with inability to flee her abusers, and other economic or non-economic damages, for which they are entitled to just compensation.

**FIFTEEN CAUSE OF ACTION**

**Intentional infliction of emotional distress (IIED)**

**New York State Law**

**(by Plaintiffs against CBMM Defendants)**

822.    Plaintiffs incorporate by reference the previously plead paragraphs as if fully plead herein.

823.    Plaintiff allege that following Plaintiff's internal bona fide complaint in March 2019, CBMM Defendants acted towards her and her husband with intention to inflict emotional distress.

824.    At all relevant times, CBMM Defentants operations were within the jurisdiction of federal or state department or agency of the United States.

825.    From 2013, CBMM Defendants have been sharing common business interests by running the Center for Brains, Minds & Machines (CBMM), a multi-institutional Science and Technology Center enterprise, heavily financed from federal funds through the National Science Foundation.

826.    CBMM Defendants operate programs in receipt of federal funds and are thus covered by Title IX's prohibition on sex-based discrimination.

827.    At all relevant times, Defendants were Plaintiff's employer, joint employer or agent exerting control over Plaintiff's employer compliance with Title IX and/or Title VII and state, and local laws prohibiting discrimination based on sex.

828.    By reason of the facts and circumstances stated above, CBMM Defendants conduct in relation to her sexual assault and sexual harassment complaint she filled with CBMM Defendants, was (i) extreme and outrageous, beyond the bounds of acceptable conduct in a civilized society, and (ii) intended to cause severe emotional distress on Plaintiffs.

829.    The conduct was motivated by creation of a hostile work (and life) environment by racial and sexual harassment, and constitute a prima facie case of intentional infliction of emotional distress. [432]

830.    There is a causal connection between CBMM conduct and the injury Plaintiffs suffered

831.    As a direct and proximate result of CBMM Defendants' racketeering activity, Plaintiffs have suffered and will continue to suffer medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational and employment benefit, a denial of access to next step in academic career, a denial of access to publishing scientific articles, loss of educational and employment benefit including scholarship opportunities, grant opportunities, award opportunities,  loss of income, loss of enjoyment of life, emotional and economic damages associated with inability to flee her abusers, and other economic or non-economic damages, for which they are entitled to just compensation.


**SIXTEEN CAUSE OF ACTION**

**Loss of consortium**

**New York State Law**

**(by Plaintiff Pedro Henrique Marciniak-Domingues Agra against CBMM Defendants)**

---

432 Howard Univ. v. Best, 484 A.2d at 986,

832.     Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

833.     Plaintiffs are 38 years old and have been married since December 18, 2018.

834.     Plaintiffs have a loving, close and dependent relationship.

835.     The nature of their close relationship gives rise to a loss of consortium claim by Pedro Agra, who, but for CBMM Defendants negative conduct towards Plaintiff, resulting in his wife's physical and mental damage, would have continued to rely on her guidance, companionship, assistance and support throughout their daily lives.

836.     Pedro Henrique Marciniak-Domingues Agra's loss of consortium with his wife Karolina Marciniak Agra was directly and proximately caused by CBMM Defendants.

837.     Pedro Henrique Marciniak-Domingues Agra suffered loss of consortium damages to be individually determined by the jury at trial, and include: the loss of the value and enjoyment of his life, the loss of his wife's household services, the loss of his wife's earlings and earning capacity, aggravated circumstances surrounding CBMM Dfefendants retaliation, the loss of love, companionship, comfort, care, assistance, protection, affection, society, guidance, training, and moral support from his wife.

## PRAYER FOR RELIEF

838.     Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

839.     Plaintiffs request damages for CBMM Defendants' wrongful conduct in an amount of $318,000,000.00 plus the amount to be determined at trial. The amount requested is for compensatory damages for:

i. The fear, pain, and suffering of Plaintiff Karolina Marciniak Agra after being subjected to CBMM Defendants wrongful conduct, and associated fear, pain, and suffering of Plaintiff  Pedro Henrique Marciniak-Domingues Agra.

ii. The loss of the value and enjoyment of her and his life;

iii. The loss of the value and enjoyment of her scientific work;

iv. The loss of her and his earnings and earning capacity.

v. The loss of her academic career

vi. Medical expenses

vii. Aggravating circumstances surrounding the retaliation and her wrongful termination;

viii. Punitive damages in an amount to be determined at trial

ix. Costs.

x. Such other relief as this Court or a jury may find appropriate

Dated: December 29, 2022

Dr. Karolina Marciniak Domingues Goncalves Agra [Printed]     [Signature]
(Plaintiff)

500 E 63RD STR APT 13F
NEW YORK, NY, 10065

Pedro Henrique Domingues Goncalves Agra [Printed]     [Signature]
(Plaintiff)

500 E 63RD STR, APT 13F
NEW YORK, NY, 10065     **VERIFICATION**

Dr. Karolina Marciniak Domingues Goncalves Agra, being duly sworn, deposes and says:
I am the plaintiff in the above-entitled action. I have read the foregoing complaint
and know the contents thereof. The same are true to my knowledge, except as to matters
therein stated to be alleged on information and belief and as to those matters I believe
them to be true.

Dr. Karolina Marciniak Domingues Goncalves Agra

[Printed]     [Signature]

Mr. Pedro Henrique Domingues Goncalves Agra, being duly sworn, deposes and says:
I am the plaintiff in the above-entitled action. I have read the foregoing complaint
and know the contents thereof. The same are true to my knowledge, except as to matters
therein stated to be alleged on information and belief and as to those matters I believe

them to be true.

Mr. Pedro Henrique Domingues Goncalves Agra

[Printed] AMBER MORALES

Sworn to before me this: 12-29-22
Notary Public

AMBER T. MORALES
Notary Public, State of New York
Reg. No. 01MO6365062
Qualified in New York County
Commission Expires 09/25/2025

[Signature]