# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| (1) DR. KAROLINA MARCINIAK-DOMINGUES GONCALVES AGRA, | ) ) ) | |
| (2) MR. PEDRO HENRIQUE MARCINIAK-DOMINGUES GONCALVES AGRA, | ) ) ) | **Index No.: 1:22-cv-10959-ALC** |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| (1) MASSACHUSETTS INSTITUTE OF TECHNOLOGY, | ) ) ) | **JURY TRIAL DEMANDED** |
| (2) PRESIDENT AND FELLOWS OF HARVARD COLLEGE, | ) ) ) | |
| (3) BOSTON CHILDREN'S HOSPITAL, | ) ) | |
| (4) MARINE BIOLOGICAL LABORATORY, | ) ) | |
| (5) UNIVERSITY OF CHICAGO, | ) ) | |
| (6) ROCKEFELLER UNIVERSITY, | ) ) | |
| (7) NATIONAL SCIENCE FOUNDATION (NSF)- CENTER FOR BRAINS MINDS AND MACHINES (CBMM) COOPERATIVE AGREEMENT, | ) ) ) ) ) | |
| Defendants. | ) ) ) ) ) | |

--------------------------------------------------------

# PLAINTIFFS' FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

*Pro Se* Plaintiffs DR. KAROLINA MARIA MARCINIAK-DOMINGUES GONCALVES AGRA ("Marciniak") and MR. PEDRO HENRIQUE MARCINIAK-DOMINGUES GONCALVES AGRA ("Agra") complain of Defendants MASSACHUSETTS INSTITUTE OF TECHNOLOGY ("MIT"), PRESIDENT AND FELLOWS OF HARVARD COLLEGE ("Harvard"), BOSTON CHILDREN'S HOSPITAL ("BCH") , MARINE BIOLOGICAL LABORATORY ("MBL"), UNIVERSITY OF CHICAGO

("U of Chic"), ROCKEFELLER UNIVERSITY ("RU") and NATIONAL SCIENCE FOUNDATION-CENTER FOR BRAINS MINDS AND MACHINES COOPERATIVE AGREEMENT ("NSF-CBMM COOPERATIVE AGREEMENT") and in support respectfully allege, upon information and belief, the following:

## I. STATEMENT OF JURISDICTION, VENUE AND NATURE OF SUIT

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, because our statutory claims present federal questions over which this Court has jurisdiction. Plaintiffs also assert state-law claims over which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2. This Court has original jurisdiction over the case, since the cause of actions required joinder of parties in civil litigation under Federal Rule of Civil Procedure (FRCP) 19.

3. This Court is the proper venue under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f) because Plaintiffs are domiciled in this District, Marciniak's former primary employer (RU) is domiciled in and conducts business within this Judicial District, all causes of action emerged as proximal cause of RU conducting CBMM business operations with other Defendants, including within this Judicial District, and many of the unlawful practices complained of herein occurred in this District, and the events or omissions giving rise to Plaintiffs' claims occurred in this District.

4. Although the current lawsuit does not identify individual Defendants in their personal and individual responsibility, Plaintiffs assure their right to file an additional joinder in the course of this litigation if discovery phase results and court decision deem it appropriate. This court has personal jurisdiction over employees of RU.

5. Plaintiffs seek civil remedy and to recover monetary actual, compensatory and punitive damages pursuant to 18 U.S.C. § 1595 and Victims of Trafficking and Violence Protection Act of 2000 ("TVPA"), injunctive relief, front pay, back pay, and compensatory and punitive damages pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), injunctive relief, monetary damages and all appropriate remedies pursuant to Title IX of the Education Amendments of 1972 20 U.S.C. § 1681, et. seq. ("Title IX"), civil remedy and to recover monetary damages pursuant to the Civil Rights Act of 1871, 42 U.S.C. 1985(2) and (3), damages and the cost of the suit pursuant to Racketeer Influenced and Corrupt organization Act ("RICO"), as well as and remedies from state claims of negligent hiring, training, supervision and retention, intentional infliction of emotional distress, and loss of consortium, and other remedies and punitive damages which the Court my find appropriate and just.

## II. PARTIES TO THIS ACTION

6. Marciniak is a neuroscientist with background in Psychology (MA, 2008, Adam Mickiewicz University in Poznan, Poland) and Ph.D in Neuroscience (2015, International Max Planck Research School, Graduate School of Neural & Behavioral Science in Tuebingen, Germany). As part of her doctorate research program, she acquired extensive experience in neuroscience, particularly as applied to magnetic functional imaging of the social attention and single cell electrophysiology of cerebellar motor adaptation in non-human primates, two current areas of major scientific and medical interest in autism-related research. As a result of her doctorate work, Marciniak had co-authored four original papers which have been published in leading scientific journals [1]. Although realized in hostile work environment, her postdoctoral work between

---

[1]   Including two first-author publications in high-impact journals (*eLife*, Highest Journal's Impact IF (2011 - 2022): 9.322 and *Proceedings of the Royal Society B: Biological Sciences*, Highest Journal's Impact IF (2011 - 2022): 5.683; source: https://academic-

2016 and 2021 resulted also in original scientific paper on brain mechanisms of the first accessible model of intelligence, a causal physical reasoning in non-human primates. The results of her research have important implications for understanding human cognition and development of new machine learning algorithms.

7. Agra arrived to New York for his latest contract in fashion, the industry where Agra has been working for 20 years. Marciniak and Agra, who are of the same age, met in New York in 2018, got engaged on Marciniak's birthday on July 27, 2018, and married on Dec 18, 2018. Since engaged, they have been living together in the Rockefeller University housing. Between 2016 and 2021, Rockefeller University had been a primary employer of Marciniak postdoctoral appointment, which is a junior-level academic position. Designed as mentored training, "postdocs" work on specific research project, under supervision of tenure-track academics, who in exchange for postdocs' expertise and scientific innovation, enable them to develop a specific set of academic skills desired to launch independent research in a particular academic field.

8. Defendants share common business by operating Center for Brains, Minds and Machines enterprise (CBMM), a multi-institutional research and education center *dedicated to the study of intelligence, how the brain produces intelligent behavior, and how this scientific discovery may enable the replication of intelligence in machines.* CBMM at MIT was established in 2013 under cooperative agreement instrument of NSF. NSF is an independent agency of the United States government that supports fundamental research and education in all non-medical fields of science and engineering [2]. As of 8/18/2022, NSF awarded over 48 million tax-payers dollars to CBMM. MIT is the main awardee, whereas Harvard, BCH, MBL, U of Chicago and RU are selected sub-awardee institutions of the NSF-CBMM cooperative agreement.

9. The cause of action giving rise to this complaint took place between 2014 and 2022, when Marciniak recruited and subsequently worked for and trained at the Center as a junior researcher or "postdoc", under three CBMM Principal Investigators: Winrich Freiwald (RU), Josh Tenenbaum (MIT) and Nancy Kanwisher (MIT). Rockefeller University was her employer from September 2016 to November 2021. MIT was her joint employer from September 2016 to November 2021. MIT was her joint employer because MIT had control over her employment and work progress, shared her work, and had been overseeing her work. MIT is also main awardee institution of CBMM, and *CBMM adheres to the policy on harassment set forth [sic] Massachusetts Institute of Technology.*

10. Harvard and BCH, together with MIT, were employing institutions of Marciniak's sexual assault and sexual harassment perpetrator, against whom in March 2019 she filed with MIT a sexual assault and sexual harassment complaint in relation to a rape in August 2017 at CBMM Summer School, an annual CBMM training program, and in relation to his subsequent sexual harassment. MBL is an administrative part of U of Chicago, and is the host of the CBMM Summer School program at its location in Woods Hole, MA. The CBMM Summer School program is financed from NSF-CBMM grant through MIT and Harvard. CBMM Summer School Directors are employed by MIT, Harvard and BCH. Following Marciniak's complaint to MIT, U of Chicago and MBL were designated to conduct joint investigation into her complaint against the perpetrator.

11. MIT, Harvard and BCH were Marciniak's joint employers during Teaching Assistant position which she held in August 2018 at CBMM Summer School, which she was subsequently accepted for the CBMM Summer School in 2019, and which she was refused for the Summer School program in 2020. They were Marciniak's joint employers because they had control over her hiring, they trained her for the job, and overseen her work. Teaching Assistant was also the sexual assault perpetrator's position which he held at CBMM Summer School in 2017, when the even took place as Marciniak visited in a role of listening

accelerator.com › Impact-of-Journal)
2   Its medical counterpart is the National Institutes of Health.

student delegated by Rockefeller University and MIT. At all relevant times, RU, MIT, Harvard, BCH, MBL and U of Chicago institutions were educational institutions receiving federal financial assistance.

## III. PREVIOUS ADMINISTRATIVE REMEDIES

12. Marciniak exhausted all internal institutional complain process in relation to sexual assault in 2017 and subsequent sexual harassment. Between March 2019 and January 2020, all Defendants informally processed and selected ones investigated her complaint. In May and Sept 2019, Marciniak filed the complaint about institutional processing of her complaint with NSF Office of Diversity and Inclusion. The complaint was accepted for investigation in February 2020, and closed in March and July 2022 with determination of no alleged discrimination. On 8/10/2020, Marciniak filed retaliation complaint with EEOC Boston against MIT, Harvard and BCH in relation to the events from February 2020, when she was refused the Teaching Assistant position by CBMM Summer School Directors. On 4/5/2023, Marciniak received Notice of Right to Sue to pursue claim in another forum (Exhibit 1).

13. In May 2020, Marciniak opposed sexual harassment from Freiwald, her supervisor at RU, and on 6/4/2020 was demoted in her main project. In May 2021, she filed a sexual harassment and retaliation complaint with New York State Division of Human Rights (NYSDHR) against Winrich Freiwald and Rockefeller University. In August 2021, Marciniak was hard-terminated in her employment, effective November 2021. In January 2022, NYSDHR issued probable cause determination after the investigation. On 6/7/2022 Marciniak filed sex discrimination and retaliation complaint with EEOC NY against Rockefeller University, and on 3/21/2023 she receive Right to Sue Letter in relation to her complaint (Exhibit 2). On 4/3/2023, Marciniak requested dismissal for administrative convenience in relation to her complaint NYSDHR.

14. Plaintiffs assure their remaining defenses of failure of administrative remedies, limits of statue of limitations and right to sue, because to raise the issue, Plaintiffs followed the rule of a good faith and were taking certain procedural steps at certain times by consistently seeking to follow the orderly progress of litigation.

## IV.   STATEMENT OF CLAIMS

## 1. FIRST CAUSE OF ACTION:

## LABOR EXPLOITATION, LABOR TRAFFICKING, SEX TRAFFICKING

**Involuntary servitude 18 U.S.C. § 1584  (against MIT, Harvard, BCH, U of Chic, MBL, RU),
Forced labor U.S.C.  § 1589  (MIT, Harvard, BCH, U of Chic, MBL, RU),
Trafficking with respect to involuntary servitude, or forced labor 18 U.S.C. § 1590
(against MIT, Harvard, BCH, U of Chic, MBL, RU),
Sex Trafficking by Force, Fraud, or Coercion 18 U.S.C. § 1591
(against MIT, Harvard, BCH, U of Chic, MBL, RU).**

### 1.1. Recruitment:

15. In November 2014, Freiwald, the trafficker, scouted Marciniak's application while recruiting for postdoctoral openings in his laboratory at RU. During the subsequent neuroscience conference, he invited her for the interview to the restaurant, where he lured her into position with promises of big opportunities

for breakthrough research in the area of her interests, and picturing the cutting-edge technological advancement of his laboratory.

16. In December 2014 Freiwald interviewed also Marciniak's boyfriend of 8 years with similar to her background, with whom she moved from Poland to Germany to do PhDs together. Freiwald offer the position only to her, evoking impression of applying high selection criteria based on scientific achievements. Freiwald promised her career advancements by projecting her high chances for postdoctoral fellowship award given him as a host, therefore opening for her the doors for long-term but eventually highly successful postdoctoral training.

17. From December 2014 to August 2015, Marciniak wrote a research proposal, which was enthusiastically accepted by Freiwald. He also enthusiastically scheduled for her a lab visit, which took place days after her PhD graduation in September 2015. However, during the visit wrap-up meeting at RU, Freiwald told her that he assigned her proposed research to another postdoc in his lab, and asked her to develop a new research proposal on another topic. Freiwald's action was discouraging to Marciniak. Because in addition she was not allowed to see the lab facilities while visiting RU, she felt insecure about Freiwald's promises. In September 2015, she had to give up her US green card due to her PhD commitments in Germany. In result of all above, she refused to commit joining the lab. She did not sign the paperwork, which Freiwald sent to her 4 days before her visit at RU commenced.

18. Between October and December 2015, Freiwald nagged her with questions *how was [she] doing*, offering himself to plan her next steps. Marciniak politely replied but did not make any further arrangements with him regarding the job. In February 2016, to her surprise, Freiwald sent emails timed to her vulnerabilities (she was going through her relationship break-up), where he revealed stalking on her private issues and using his position of power and emotional manipulation, decided on her next steps. In a quick maneuver, he effectively assigned her upfront for a CBMM research collaboration, promising *us work[ing] closely with Josh [Josh Tenenbaum]* as *invaluable to make the most out of [her] work* and *good for [her] to me closely integrated into the CBMM for all the scientific support it offers*. Marciniak was shocked, because this option was not discussed between them before, but she had to agree because Freiwald conveyed that Tenenbaum was already informed, and withdrawing would damage her reputation.

19. Since November 2014, she discussed with Freiwald her potential employment only as the result of receiving the award from the European funding sources, which would allow her working independently. In March 2016, Marciniak planned another lab visit *to discuss and finalize the [research] proposal*, on which she conditioned further employment arrangements. Because she encountered travel difficulties, the visit was canceled last moment. On 3/21/2016, shortly after she emailed Freiwald about cancellation and her uncertainty *on how to proceed*, Freiwald arranged a private skype call, in which he offered RU's support in the visa matter. Marciniak understood the visa was in relation to her prospective lab visit at RU, as she still wanted to evaluate the lab facilities before committing to the job.

20. To her surprise, immediately after the call, Freiwald sent a "New Postdoc" email to the Director of Immigration and Academic Appointments group in Human Resources, Maria Lazzaro ("Lazzaro"), who initiated postdoctoral appointments at the request of Head of Laboratory at RU. Freiwald cced his lab manager and Marciniak on the email, and in the email thread, Freiwald effectively commenced the process of her employment at RU. Initially, Lazzaro attempted to speak with Marciniak personally, however Freiwald stepped in and spoke for Marciniak describing her visa situation as *complicated*, to effectively maneuvered with Lazzaro into electing a J-1 Visa sponsorship for her employment at RU in September 2016. Marciniak was confused, shocked and naive in the issues, and not prepared to discuss her employment conditions, but given Freiwald's threatening view about her visa situation, she saliently agreed, believing that any employment is already a huge 'favor' RU was doing in her "complicated" situation.

Marciniak realized with time that her situation was actually to her advantage, since due to her permanent resident green card holder status, an H-1B classification with better working conditions was appropriate[3].

21. Although Marciniak did not want to commit before seing the lab, finalizing the research project and sending application for the fellowship, at the end of the above email communication with RU officer, she was under the RU officer's pressure, and agreed to go through the paperwork with Freiwald's lab manager and to RU's minimum postdoc salary.

## 1.2. Freiwald's promises did not meet reality:

22. The final research proposal from 2016/early 2017 which Marciniak prepared and submitted to the external award-based fellowship agencies in Europe under Freiwald's and MIT collaborators' supervision, was based on Freiwald's assertion of readiness of required technology (non-human fMRI and large-scale electrophysiology) and resources (non-human primates *ready with localized face patches*) in his laboratory. Freiwald was lying. When Marciniak arrived, the new fMRI protocol had to be developed from scratch, and the large-scale electrophysiology method was still in the very early developmental stage. Progressing with the project also required animal resource groundwork. Freiwald asked her to do it all as the condition of her work.

23. Freiwald withdrawn himself from providing any guidelines or support instantaneously once Marciniak arrived in the lab, such that it was on her to *figure it out* and to *move fast with technical implementation*. In the first months, he would terrorize with unrealistic expectations and intimidation. In spring 2017, Marciniak was awarded a 2-year fellowship to realize proposed research in Freiwad' laboratory, effective Sept 2017. Marciniak worked through the obstacles and objectively, the project moved forward towards first results in summer 2017, and subsequent ones in summer 2018. With enthusiasm from the MIT collaborators, in late 2018 it moved to the preparation for the next phase.

24. In February 2019, under temporal stagnation from CBMM input to the project, Freiwald took over the control of te project's course and under the guise of engagement in yet another collaboration (*to scan with Leuven*) and promise of additional publication, he asked Marciniak for additional work, diverting the project to her disadvantage by shifting its main and the most relevant for her phase forward in time. By this time, it was clear that Freiwald had power to decide Marciniak's near and far future[4]. As her fellowship was due to expire on August 2019, the fear of sudden termination was threatening, since her visa was dependent on her employment. Her projected success was conditioned on contenting Freiwald, and the project termination at this stage would leave her with incomplete scientific outcome, effectively disrupting her career and moved her to the failed group of postdocs[5]. Marciniak's work was on demand, often day and night, to meet urgency of delivering quick results for Freiwald.

25. Fearing to be perceived as less committed to the project, therefore a bad scientist, Marciniak did not take any holidays or day offs. The threat of being perceived as not committed was not only from Freiwald, but also from MIT collaborators. During the meeting with Marciniak and Freiwald in May 2019, Tenenbaum laughed with a joy of deserved punishment while reporting that Kanwisher thew out from her lab the CBMM-supported PhD student from the same (Intuitive Physics) collaborative project for being not enough committed. i.e., *developing artistic interests*.

---

3   Rockefeller elected J-1 visa because it was cheaper, but in the context, it was abuse of the legal and administrative process
4   One-year postdoctoral appointments at RU were initialized by Head of Laboratory "based on satisfactory performance"
5   not mentioning the threat of not receiving the reference letter from Freiwald

26. Since 2019, after her fellowship finished, Freiwald took the complete control over Marciniak's working conditions by strengthening her financial dependence on him. In February 2020, Marciniak intended to submit the RU's Spring 2019 Internal Postdoctoral Fellowship application based on new results, but Freiwald told her to submit the old *template*, and made to her work requests preventing her from working on the application. Expecting her application would not be competitive enough to get the fellowship, she left the meeting in tears. As she did not get the fellowship, she inquired for feedback from RU's fellowship administration. Freiwald interrupted and stopped her.

27. Under Freiwald's financial dependence, effectively under NSF-CBMM grant awarded to RU, Marciniak feared retaliation once she filed complaint with NSF in relation to institutional processing of her sexual harassment complaint, and her participation in the internal CBMM audit on the matter in early 2020. In May 2020, Marciniak got Freiwald's financial reassurance about her salary, however he did not specified any details nor conditions of his support.

28. Later in the May 2020 email exchange, Marciniak set up boundaries about professional meetings in the restaurant, alluding to one of Freiwald's behavior related to his sexual harassment. In response, Freiwald fired her, asking to *wrap up things here* and look for another position. The action resulted from Freiwald's discontentment with her opposition to his quid pro quo sexual harassment, and Marciniak was punished by being cut-off from the project's main phase, and CBMM collaboration. When she tried to clarify *misunderstanding*, Freiwald threatened her with the end of her career.

29. Then, the pandemic was still going on, and travel restrictions limited Marciniak's and Agra's mobility in finding another opportunities. Between June and August 2020, Freiwald put a sadistic time pressure on Marciniak to *wrap up things here*. Fearing further intimidation, she didn't dare to ask for reappointment and in attempt to *save* her project, she worked day and night. Plaintiffs were in constant fear about their visa and their whereabouts. In July 2020, Marciniak contacted Freiwald lab manager to advocate for any reappointment for her which would enable her to finish her ongoing experiment to fulfill minimum publishing requirements. Freiwald waited until last-moment with the reappointment, leaving Plaintiffs in fear of their visa and their whereabouts. Freiwald gave 6 months, and put yet another time pressure. Marciniak worked day and night, and in late 2020 presented the results to Freiwald, who then delegated her for further analysis and writing papers, in spring 2021 extending her reappointment. In August 2021, Freiwald and RU hard-terminated Marciniak's employment effective in November 2021, in retaliation to her complaint against RU and Freiwald from May 2021.

## 1.3. RU and CBMM held to postdoctoral involuntary servitude and force labor and exploited their work and services:

30. RU, MIT, Harvard, BCH, U of Chicago and MBL held to involuntary servitude of postdocs by setting up, upholding and promoting academic system based on letter of reference and collaboration score, which makes postdocs more vulnerable to the condition of indentured servitude. The system exploits postdoctoral work, giving disproportional financial advantage to the academic institutions, the sole financial beneficiary of inventions, and to Head of Laboratory, the sole decision-maker on copyrightable scientific publications.

31. To reinforce this system, Defendants use the scheme based on *brainwashing* (i) the academia and funding agencies in believing on instant progress in the field, and (ii) postdoctoral candidates, promising a mentored opportunity to advance their education and chances for permanent academic posts in a few years' time. While RU attracts postdoctoral researcher *with the goal of establishing themselves as independent investigators, with expertise in a certain area of scientific study,* RU operates the system of one-year appointments controlled by Head of Laboratory, enforcing the culture of pleasing the boss, and

enabling power abuse situation to easily emerge and pass unnoticed. Freiwald, the trafficker, abused this system by quid pro quo sexual harassment towards Marciniak (see later).

32. Marciniak and other RU's postdocs, with substantial contribution of foreign individuals, are vulnerable to receiving inhumane treatment at work and living in inhumane conditions. RU provides nearby housing, which for foreigners remains the only available option for renting apartment in New York. Because RU charges standard New York prices for their studios, one- and two-bedroom apartments with two-year waiting queue for a studio apartment, RU's minimum postdoctoral salary is enough only for shared accommodation in a Scholars Residence/Faculty House building complex connected by exclusive bridge with RU's campus. The proximity of living and working is abused by the superiors to demand working extra hours, night shifts and weekends, and work as essential personnel beyond individual's project research was demanded during the pandemic. The building complex is located at FDR's exit to the hospital area, with high noise level 24hour/day. The building is permeable to neighbor's noise and no rules of conduct are established. Neglected condition of building's water system and its amenities cause rusty running water and the building maintenance only sporadically executes repair, such Plaintiffs have been living without basic kitchen amenities for 2 years. Any request for abatement was seen as troublemaker behavior. In spring 2021, RU unnecessary prolonged restrictions on using outdoor tennis court, and did not allow my request for exemption based on the health conditions.

33. Compliance is reinforced among postdocs in CBMM program, and raising complaints *about your supervisor* was actively inhibited by the instructions of DeStefano on how to talk to NSF evaluators during the CBMM annual evaluation event on 5/8/2019, and Poggio's instructions that positive evaluation is decisive for *continued NSF funding for all of us.*

34. RU is insensitive, oblivious and ignorant to the lives of their postdocs. In Spring 2020, Plaintiffs were in a hardship situation due to the fact that Agra lost his contract in fashion. Plaintiffs were desperately asking for rent relief from RU housing. After 5-month long inquiries across RU's financial office, President's office, and RU's Physical Facilities & Housing office, and HR, Plaintiffs were given *a [one-time] scholarship* of insignificant amount, and in spring 2021, RU's housing demanded to immediately *remit full payment to clear the outstanding balance*, leaving Plaintiffs in imminent fear of eviction. Starting in September 2021, RU did not support Plaintiffs' application for COVID Rent Relief Program [6].RU submitted the required landlord documents only after Plaintiffs filled this lawsuit.

## 1.4. RU and CBMM benefited from my work and services obtained under the condition of labor exploitation and sex trafficking:

35. Freiwald utilized CBMM to enticed Marciniak to the position by esoteric promises that with collaboration we can *go deep,* and throughout her employment blackmailed her to coerce into personal meetings of a sexual nature as a sole condition of receiving work benefits. Freiwald continued his quid pro quo sexual harassment towards Marciniak also after she reported to him to be a victim of the sexual assault and sexual harassment in the CBMM program. Once she gently complained to him about his behavior, he fired her, causing her financial and reputation harm.

36. On a regular basis starting in October 2016, Freiwald delegated Marciniak to travel to MIT to work in CBMM collaboration. In August 2017, he delegated her to the CBMM Summer School to discuss with Tenenbaum and Kanwisher her *eye data*, and to extended her collaborative projects load with Boris Katz laboratory. In 2018, he delegated her for a Teaching Assistant position [7], during which Marciniak also prepared a research meeting with MIT collaborators. On 8/23/2018, Kanwisher, a world-leader in the

---

6   The New York State Emergency Rental Assistance Program (ERAP)
7   CBMM paid her one fifth of the promised honorarium

method, was "*excited about Karolina's promising new data with responses to physical events!*, and CBMM benefited further from her work, in 2019 using her research in CBMM progress report and delegating Marciniak twice to present the research during NSF CBMM annual evaluation. All of that service was obtained without any payment, since Marciniak was financed by the fellowship from the German funding agency.

37. Between 2016 and 2020, Freiwald exploited Marciniak's services for CBMM, using her as his unpaid CBMM secretary. In early 2018, he assigned her to organize remote conenction for CBMM meetings at RU, although it was him who was expected to participate. He delegated Marciniak to CBMM annual evaluations events in 2019 also in substitution of him. Marciniak never received any payment for her extra work, although Freiwald, The CBMM Principal Investigator, received a regular salary from his CBMM position.

38. Freiwald exploited Marciniak's work till the limits. Although having funds available to compensate the downgrade of the fMRI machine, he did not hire technicians, technical experts, nor *scanned in collaboration with Leuven* but demanded from Marciniak to work extra hours in the position of 3 technicians on technical equipment and animal resources, i.e., beyond her interest, contrary to their contract, and to the disadvantage of her research and career progress.

39. The successful completion of the postdoctoral project is measured as the quality and number of published scientific articles. The authorship policy in Freiwald's laboratory follows RU's intellectual property policy, which states that the experimental work in the form of data and results belongs to the Head of Laboratory, who agrees on publishable content and makes article submission decisions. It was Freiwald's decision whether one can successfully finish the project in his laboratory with a scientific publication.

40. In the aftermath of her termination, all her work she had done for Freiwald, remained, had been used and will be continued to be used for the sole benefits of Freiwald and CBMM. Marciniak was not paid for the work on the article she has just published, in which CBMM and Rockefeller are fairly acknowledged, as it was developed substantially after her termination. Marciniak was deprived of the part of the postdoctoral training, which she was fairly expected to gain, and (i) did not develop research and expertise which she was promised, (ii) was deprived the opportunity to publish her research, (ii) did not get any recommendation letter. Freiwald and CBMM exploited her work and services, and then, when she complained, he effectively destroyed her and ended her career.

## 2. SECOND CAUSE OF ACTION:

## UNLAWFUL SEX DISCRIMINATION–DISPARATE TREATMENT

**Title IX (against RU, MIT, Harvard. BCH, U of Chicago, MBL),**
**Title VII, NYSHRL, NYCHRL (against RU).**

### 2.1. Discrimination based on sex in Freiwald's laboratory at RU:

41. As of 9/12/2021, there are only five female scientists and 16 male scientists working in Freiwald's laboratory. Within the period of Marciniak's employment at RU, Freiwald's decisions on distributing laboratory resources and delegating laboratory tasks among postdocs and PhD students were discriminatory for women. Women were more often than men asked for tedious, demanding, "dirty" jobs, i.e., the ones that have to be done but nobody likes to do, which required working overtime and on weekends, such as animal training, surgical procedures and administrative tasks, whereas men are free to do research. On a regular basis during her employment, Freiwald put on her administrative work with

managing the protocols, and selected her over other male CBMM postdocs in his laboratory to organize and manage remote connection of the CBMM weekly research seminars for his laboratory members, and to go to MIT with scientific poster presentation for CBMM annual evaluations, which did not give any benefits to advance her work nor career.

42. Men more than women are given privileges in choosing preferred research project in Freiwald's lab. In Spring 2017, given shortcomings of the fMRI method that time, and *the time to technical implementation*, a male CBMM postdoc withdrawn himself from his non-human primate project. Although Marciniak was in the very same challenging situation, Freiwald offered another, more convenient project to the male postdoc, and ordered her to take over his work, which included implementation of the new fMRI protocol and extra animal work, constituting non-stop grueling laboratory work responsibilities with extra hours and weekends, and by performing them, Marciniak did not gain any benefits for the progress of her career.

43. Men in Freiwald's laboratory were also given more career-advancement opportunities. In early 2015, Marciniak prepared a research project, which Freiwald enthusiastically accepted. However in Aug 2015. when the opportunity to apply for postdoctoral fellowship emerged, he blocked Marciniak's, but endorsed the application of the male postdoc from his laboratory. Similarly, in 2020, he refused to support Marciniak's application for the internal RU postdoctoral fellowship, but endorsed the one of CBMM male postdoc similarly situated to her.

44. Freiwald also discriminated Marciniak because of her sex with respect to distributing teaching opportunities. In 2019, it was the male CBMM postdoc who was given the teaching opportunity at Hunter College for the following academic year. Marciniak was promised to teach next year, but it never happened.

45. Freiwald discriminated Marciniak based on sex with respect to assigning supportive personnel. In October 2019, he assigned a student to work with her on her research project. But when the student arrived in late 2020, he assigned him to another CBMM male postdoc.

46. On a regular basis between 2017 and 2021, men in Freiwald laboratory distributed through email and presented during the laboratory meetings sexual jokes and sexual content, including the videos of sex and the picture of *squished balls.* Freiwald allowed the content to be widespread within the laboratory, but censored the external presentation, including the one for the NSF evaluation in 2019.

47. Freiwald, the supervisor and decision maker of each and every scientific project in the laboratory, refused to create a structured scientific exchange culture in his laboratory. Freiwald rarely attended the laboratory meetings such that his decision-making input was not available for the individual laboratory member in the group settings. In result, the work progress of individual laboratory member was conditioned on the one-to-one meetings with him. Freiwald had been inviting women members more often than men for one-to-one meetings outside the office space, such as to the restaurant or residential location.

48. Marciniak and other women in Freiwald laboratory were more often than men selected for solely social and decorative functions in RU community. In February 2018, Freiwald asked Marciniak and two other female laboratory junior researchers to accompany him at the social event in the evening the next day in the office of another RU's Head of Laboratory, where Freiwald was invited as a guest. None of the women was familiar nor involved in the research topic of the event, unlike other male postdoc from his laboratory, who however Freiwald did not invite. Marciniak and the other women were asked for evening outfits, and their role during the event turned out to be Freiwald's plus ones, i.e., to solely accompany Freiwald. He asked them to sit with him together during PowerPoint presentation and walk with him together during the other's lab tour. This role made was uncomfortable for Marciniak and it was socially

embarrassing for her when the external guests approached with thematic questions expecting that her presence was indicative of her involvement in the research concerning the topic of the event. Marciniak had to explain that her sole connection to the event was that she was from Freiwald's lab, which made it clear she was there as a decorative object. Freiwald made a similar request to *spend some time* with him only to women from his laboratory in May 2019.

49. Faced with the results of the lab climate survey in summer 2020 which pictured hostile environment, Freiwald refused to implement changes, conveying that the way he manages the laboratory is *his philosophy.*

## 2.2. Discrimination based on sex in CBMM program:

50. Me and other women participating in the CBMM Summer School were subjected to different treatment because of their sex. CBMM Summer School teaching material in 2018 contained sexist and misogynist remarks. The presentation slides of tutorials objectified female body, derided gender equality and made multiple referrals to sexual interactions between man and woman in the form of misogynists jokes.

51. During CBMM Summer School in 2018, only 3 out of 20 Teaching Assistants (TAs) were women. During the meeting with the Directors on 8/16/2018, Kreiman discussed the *sex with students topic*, suggesting to postpone the interactions once the Summer School officially ends, and to *look for the [sexual] opportunities [here] around.* The chairs during the meeting were arranged in the circle, and Marciniak met Kreiman's gaze when he was indicating people around with his look while saying about *looking for the [sexual] opportunities [here] around*, encouraging male TAs to approach female TAs for sex. His behavior made Marciniak very uncomfortable.

52. Across years, CBMM endorsed extracurricular fun during CBMM events according to misogynist culture, which effectively marginalized women. Male-bonding and socialization rituals, locker-room conversations (including porn), drinking alcohol, created spaces that reproduced degradation and subordination of women.

53. CBMM opportunities had been distributed unequally among CBMM faculty and postdocs, based on sex and favoritism. In late 2017, CBMM Directors and selected faculty[8], together with very few (but all male) postdocs associated with them, formed secretively a CBMM delegation, which in January 2018 traveled to Paolo Alto for the summit with one of the CBMM industry partner, Google. This privileged networking opportunity was limited to the chosen ones, and the recruitment for the trip had not been announced broader in the community.

54. In early 2020, CBMM performed an internal audit whether there is a sexual discrimination problem in the CBMM community. Marciniak's sexual assault and sexual harassment complaint from March 2019, the subsequent institutional response with procedural errors, and the testimonies of other victims of the same perpetrators were conveyed to the CBMM external evaluator, DeStefano. The audit discriminated against Marciniak, by running the process under uncontrolled confidentiality rules, and allowed rumors about Marciniak to be spread by the perpetrator among the CBMM faculty. The CBMM Directors subsequently denied Marciniak a Teaching Assistant position for the 2020 CBMM Summer School.

55. In June 2020, Freiwald cut off Marciniak's CBMM opportunities, which were contracted for her postdoctoral work. Freiwald assigned the resources to another male CBMM postdoc from his laboratory.

---

8   Poggio, Kreiman, Katz Tenenbaum, Kanwisher

## 3. THIRD CAUSE OF ACTION:

## QUID PRO QUO SEXUAL HARASSMENT from Freiwald

**Title VII, NYSHRL, NYCHRL (against RU),**
**Title IX (against MIT).**

## HOSTILE WORK ENVIRONMENT

**Title VII (against RU)**

56. During the recruitment for the position and during her employment, Marciniak's interactions with Freiwald were based on power disparity. Freiwald abused these power dynamics to maneuver the interactions such that Marciniak could receive his supervisory input and progress decisions only when agreeing to one-to-one meetings. On numerous occasions, Freiwald hid or delayed relevant information until an in-person meeting and conditioned revealing it to her on her willingness to meet with him in person (or on skype, before September 2016). Freiwald routinely unexpectedly turned planned office meetings into social encounters, which he tended to move to non-professional settings. Freiwald conducted those encounters not in gender-neural and merit-focused way, but sexualized atmosphere by paying attention to Marciniak as a woman, making sexually suggestive comments, and subjected her to his inappropriate behavior and sexual advances.

57. On 9/1/2017, Marciniak had a meeting with Freiwald concluding her business trip to CBMM Summer School in Woods Hole. Scheduled in the office, Freiwald moved it last moment outside the University. Although he purposely chose the time *to be able to focus*, he arrived in the office not to realize the meeting itself, but to ask Marciniak to accompany him for a walk to the Upper East Side post office [9] Freiwald did not inform her about this change beforehand and did not provide alternatives to realize the meeting otherwise. Instead, he appeared already wearing his backpack, and ready to go, expecting no disagreement. During the 40-minutes walk, Freiwald was insistently shortening the physical distance, was touching Marciniak's lower back in a sexual way and was persistently looking at her legs and buttocks while letting her pas in front of him. Marciniak did not welcome Freiwald's advances and they made her extremely uncomfortable. Freiwald displayed towards her a one-sided gender-focused attention, which in this situation evoked a social perception of coercion and dominance, and which made her feel, colloquially, like an escort.   In result, Marciniak was subjected to the derogatory public social perception in the neighborhood where she lived and worked.

58. On 9/24/2018, Marciniak had a meeting with Friwald regarding planning of the upcoming medical procedures,  following earlier meeting with Tenenbaum, Kanwisher and Freiwald in Woods Hole. Although Freiwald was available for office meetings with other male postdocs and PhD students, he asked Marciniak for *lunch in the Abby*, an elegant campus restaurant for dining with colleagues in a serene, sophisticated setting. Freiwald awaited her in a sofa lounge near the restaurant entrance to enter the restaurant together with her, and chose a small table for two, where conversing people sit face to face at a very close distance, although a bigger table, more suitable for discussion over computer screen was available. To present figures Marciniak prepared for the meeting, she held her laptop in the air until Freiwald quickly, with embarrassment, asked her to put it back in the bag, decreasing meeting productivity, and effectively turning it into a social encounter. During the meeting, Freiwald was inquiring about her intimate life and asked whether she liked older men while touching her hand with smirking face. The event embarrassed Marciniak in front of her colleagues and the Rockefeller

---

9    it is hard to believe that walking on Upper East Side Manhattan streets promotes focus

University community, since it was noticeable that a female postdoctoral researcher dining with her male supervisor at the restaurant table for two was an unusual event and subject to rumors.

59. On 5/14/2019, Freiwald moved the meeting with Tenenbaum scheduled on RU campus to *a good restaurant* downtown Manhattan. Marciniak agreed afraid that the refusal would be perceived as her lack of commitment to the project, and asked for the location. Freiwald kept the conversation about meeting place in a personal channel with Tenenbaum, until he suddenly wrote to her that *we should get going. I'll come and pick you up*. Terrified by the perspective of the office embarrassment[10] and commuting with Freiwald downtown, Marciniak ran away and replied that *[she was]already on the way[11]*. On the way back from the meeting[12], Freiwald repeatedly attempted to shorten the physical distance with her and was visually scanning her body, looking at her legs and her buttock. In the subway, he purposely maneuvered into touching her back and hand. His advancement were unwelcome and made her feel uncomfortable. At the end of the trip, she found an excuse to part with him at the corner to avoid embarrassment of entering the RU campus together.

60. In late 2019, while casually discussing her results with a female senior PhD student in the lab, Marcniak was met with her suggestion to invite Freiwald for lunch to facilitate the progress of her work. Marciniak refused her suggestion. To avoid any socially suggestive situations, she was then systematically choosing the earliest morning hours for office meetings with Freiwald.

61. On 2/13/2020, Freiwald unexpectedly asked Marciniak to meet late afternoon next day, on Valentine's day *to discuss next steps forward in [her] project.* During the meeting, Freiwald praised the new results of her research with excitement talking about the potential of the project. Freiwald's body language during the meeting became open and seating in his chair he turned into relaxed lounge position. At some point at the end of the meeting, he spread his legs open and exposed through his clothes his visible erection. Because the meeting was about project progress, his saliently smirking face and sexually charged body language insinuated to Marciniak his request for sexual favors. Marciniak left the room quickly.

62. On 2/27/2020, a follow-up office meeting between Marciniak and Freiwald was scheduled in late afternoon. While discussing the video set for the next experiments, Freiwald picked up the one about monkey eating banana, and made a sexually suggestive joke about a banana. He underlined the world banana with his language prosody and added a secretive smile, communicating that the world *banana* had for him at that moment a double meaning with a sexual connotation through its phallic shape. His behavior made her very uncomfortable, and Marciniak did not say anything.

63. Due to pandemic, no other personal meetings were scheduled until on 5/28/2020, Freiwald suggested *we continue in person* the email discussion. Because the request was personal, as the regulations of limited personal contact were still in place, Marciniak feared further unwanted innuendoes from Freiwald. Marciniak took the advantage of the fact that the email exchange was about her working conditions, and in her next email on 5/29/2020, Marciniak communicated the necessity to set up boundaries in her situation, such as no professional meetings in a restaurant, alluding to Freiwald's behavior.

64. Freiwald replied on 6/3/2020, requesting a Zoom meeting for the following day, in which he fired Marciniak, by discontinuing her project and asking her to *wrap up things here*. When in a follow-up

---

10  Freiwald never was coming to that office
11  Later, she felt embarrassed in front of her shocked colleagues reporting in a suggestive tone that Freiwald was looking for her in the office anyway
12  They travelled together

email Marciniak tried to clarify what she perceived to be a *misunderstanding,* he threatened her with the end of her career. Following this email exchange, Marciniak feared to talk to him directly and in July and August 2020, was communicating through his lab manager, until direct communication reporting her results to Freiwald in December 2020.

65. Because the discontent with Freiwald's management had been growing in the lab, in summer 2020, with Freiwald's consent, a lab climate survey based on RU's template was executed internally among Freiwald's lab members. The results revealed that majority of lab members were not happy in the lab, declared to experience hostile environment, and did not feel comfortable to talk to Freiwald as a supervisor about their problems. In addition, they reported to lack his guidance, supervision and felt that the rules for distribution of opportunities in the lab were unfair. Following the results, the lab members discussed and prepared for Freiwald a guided summary of what could be changed to improve the lab culture. In August 2020, the results and the guidance were discussed with Freiwald. To the disappointment of the lab members, Freiwald refused changes, arguing that the way he runs the lab is his personal *philosophy*, expressing disappointment and lack of trust towards everybody who would question it. In spring 2021, Freiwald refused to redo the survey. Around that time, Marciniak learned from another female PhD student in the lab that Freiwald threatened her with termination after she complained to him about lack of his support because of her sex and national origin. Freiwald complained about her to HR, and she was referred to the onsite psychiatrist, who diagnosed Freiwald's behavior as volatile.

66. Given the lack of support from Huffman towards my earlier complaints, and believing the RU HR had been endorsing Freiwald's actions, Marciniak was afraid to complain about him to HR again. In May 2021, Marciniak filed a complaint with New York State Division of Human Rights[13] against Rockefeller University and Winrich Freiwald, alleging sexual harassment and retaliation[14].

# 4. FOURTH CAUSE OF ACTION:

# DISCRIMINATION BASED ON SEX-HOSTILE ENVIRONMENT from Azevedo

## Title IX (against RU, MIT, Harvard, BCH, MBL, U of Chic)

### 4.1. The rape in 2017 CBMM Summer School:

67. In March 2017, Marciniak submitted a student application for the 2017 CBMM Summer School program in Woods Hole, MA, and subsequently was placed on the waiting list. On 8/10/2022, Marciniak received a welcoming email from a senior Teaching Assistant (TA) Xavier Boix [Boix]. Believing she was accepted, Marciniak replied. Boix's response clarified that the welcoming email was unrelated to her application, however he suggested Marciniak attended the Summer School as a *listener s*tudent. After further encouragement from Freiwald, Marciniak followed Boix's instructions and on 8/25/2015 reached out to CBMM Summer School Directors, and the School administration for permission to attend the program for 3 days. Marciniak was given positive response and was instructed to *speak with Xavier* [Boix] *about accommodations.* Freiwald was delighted Marciniak would go and scheduled for her a business meetings with MIT collaborators there.

68. Attending the program was the very first opportunity for Marciniak to meet the entire CBMM community. Marciniak was a first-year postdoc, based outside of CBMM headquarters in Cambridge, MA,

---

13  double filled with EEOC
14  A probable cause determination after the investigation was issued in January 2022

and until then, she had been working only with MIT collaborators within her project working group (Boix was not part of her working group). Marciniak was positively welcomed by the MIT collaborators and one of the CBMM Summer School Director, Boris Katz, also interested in collaborations.

69. Naive to the Summer School environment, Marciniak believed Boix that she was given an individual room in a guest house. Upon arrival, Marciniak learned that the house was an off-campus cottage[15] as co-ed living space with *staying permanently* Boix and Azevedo, two Teaching Assistants under the CBMM Summer School Director, Gabriel Kreiman's supervision. Her room was a door-less attic space, and only one shared bathroom was available. Marciniak did not have her own key to the house, and was required to organize her whereabouts with Azevedo.  Both men appeared in position of authority to her. Marciniak learned later that Azevedo falsely was talking about her as his *old friend from Tuebingen*, to justify his nagging assistance towards her, staying in the cottage despite having accommodation on the campus. Azevedo invited Marciniak to the cottage night party on the first day of her stay, which Marciniak refused.

70. On her last day, in the evening, Marciniak was approached by Azevedo during the dinner, and he followed her to her table. During the meal, he insisted Marciniak accepted his offer to use a free room there in the campus building to have a rest before scheduled evening program. Because the program was expected to continue until 11pm that day, and Marciniak was tired after physically demanding day and in the condition of medical recovery, because the cottage was too far away to travel back and forth during available break, and because it sounded plausible to her that Azevedo, a CBMM organizer, could have made such proposal in good faith, Marciniak accepted Azevedo's offer. Azevedo showed her the room, and she fell asleep shortly after Azevedo left the room. Marciniak woke up realizing that he intruded in the room, and was climbing on top of her in the bed. Azevedo overpowered her despite her repeated verbal and physical opposition to Azevedo's sexual advances, and he violently raped her, instructing her afterwards to remain silent about the event, and controlling her whereabouts until the end of her stay in Woods Hole. Confused, hurt, naive in the CBMM environment and available resources, self-blaming for what happened and in fear of the oppressor in position of authority, Marciniak did not report the incident immediately. Marciniak did not have anybody available who she could confine in about what happened, and feared losing the job if she called the police. Marciniak reported the incident to the Falmouth Police having jurisdiction over the case in April 2019.

71. On the return trip to New York, Marciniak emailed Freiwald requesting a meeting under excuse of follow-up, planning to tell him about what happened. On 9/1/2017, the day of the meeting, Freiwald last-minute moved it from the office to a walk to the post office. Marciniak did not feel comfortable to use the world rape on the street to describe her experience, but she managed to move the discussion topic towards it by telling him she had a bad encounter with somebody with another affiliation. Because Freiwald did not express any concerns about the fact, and kept dwelling on positives of the Woods Hole and Martha's Vineyard, Marciniak did not continue on the topic anymore fearing to be ridiculed for her complaint and believing that the rape event would be normalized in the CBMM environment as a consensual encounter.

## 4.2. Subsequent sexual harassment and hostile environment:

72. Following the rape, Azevedo intimidated her. He instructed Marciniak *not to talk*, and nagged her into subsequent contact, under the guise of a *friendship*. When Marciniak confronted him about the rape event, he ridiculed her wording of the non-consensual encounter, telling her the consent does not matter, recalling the event from his graduate school, when he initialized the sexual encounter with a sleeping under the influence of the alcohol junior student, because *anyway, I would f\*ck her*. In subsequent weeks, Azevedo insisted on her to enable the accommodation for him and his friends while visiting New York, as a CBMM collegiate

---

15  accessible by bike, car or long walking

behavior. During the visit in November 2017, Azevedo attempted to coerce me into grooming my female friend to have sexual encounter with him. When I denied and it did not happened, he became aggressive towards me.

73. In November 2017, Azevedo forwarded to Marciniak an insider CBMM correspondence about the opportunity of a CBMM trip to Paulo Alto which he was involved in, and suggested her to contact the CBMM manager to enroll herself by Azevedo's reference. Marciniak did not. From January to May 2018, Azevedo had been consistently interrupting in a CBMM threat about organizing research meetings and CBMM retreat, to step in as the organizer and maneuver Marciniak in the contact. Following the sexual assault in August 2017, he kept spreading rumors about her among CBMM community, falsely telling he was an individual who had enabled a CBMM participation for her.

### 4.3. Sexual assault in March 2018 in New York:

74. In February 2019, Azevedo demanded from Marciniak another CBMM collegiate behavior by enabling him the accommodation for the March neuroscience conference in New York, threatening about cutting off her CBMM opportunities if Marciniak hadn't agreed. Under pressure, in mid-March Marciniak enabled him access to the 2-room apartment in RU housing, which she shared with another female postdoc from Rockefeller University. Upon his arrival, Marciniak instructed him to stay in the living room, but Azevedo insisted to first *refresh himself* using her suit bathroom, as the apartment did not have a guest shower. On his way out, Azevedo involved her in the conversation over *something [Marciniak] wanted to tell him*. Marciniak planned, and then told him that as a result of his rape on her in Woods Hole, Azevedo contracted to her a HSV infection, which Marciniak discovered at her recent standard gynecological test. Marciniak was terrified, since the infection increased chances for women to develop cervical cancer, and asked Azevedo to stop sexually harassing women since it caused them harm. Azevedo laughed at her saying *welcome to the population of people with sexually transmitted disease*, and then violently forced her into sexual intercourse with him without condom, while Marciniak verbally and non-verbally was saying no. Devastated, confused, helpless and ashamed, in fear of Azevedo[16], she did not manage to throw him out of her apartment immediately afterwards, and only while the conference was over and Azevedo left, Marciniak opposed to his subsequent request for another personal contact in New York, and cut off the contact with him. Marciniak reported the incident to NYPD, Manhattan Special Victims Squad, in 2022, after the initial psychiatric and psychological treatment for Post Traumatic Stress Disorder.

### 4.4. Intimidation in May 2018 at CBMM event at MIT:

75. In May 2018, Azevedo displayed himself as the CBMM retreat organizer in the email correspondance to Freiwald and attempted to facilitate the participation in the event for Marciniak and other CBMM members from Freiwald lab, although none of them neither asked for facilitation nor positively welcomed his action. On 5/22/2018, Azevedo in his role as CBMM retreat organizer, attempted to involve Marciniak in a social event at the CBMM retreat, thus added her to his self-made Whatsapp group of the event "organizers". There, he multiple times intentionally used the Neo-Nazi and White Supremacist terms, calling himself a Fuhrer, i.e., a personal title that Hitler claimed for himself[17] Azevedo had been otherwise known in CBMM community from making homophobic and racist *jokes*. In 2018, Azevedo commented on the marriage of a male MIT postdoctoral researcher of the Caucasian race, with a woman of Latin origins as wasting the man's *good genes*.

76. On 5/25/2018, the day of the CBMM retreat, Azevedo cornered her at MIT corridor, forcing into private conversation. In fear, Marciniak told him Marciniak din't want to have anything to do with him, and

---

16  On several occasions Azevedo behaved aggressively towards her when she did not follow his requests
17  Marciniak is of Polish nationality

to deter him further, Marciniak told him she had a boyfriend whom she loved very much and wanted to marry, i.e., Agra. Azevedo asked her to break out with her boyfriend and to *hang with him* during upcoming CBMM Summer School to facilitate his sexual encounters with CBMM Summer School female students. Marciniak ran away. During the event, Marciniak heard he commented on her Polish origins, saying in the group that all cleaning ladies in Germany are from Poland. In June 2018, Azevedo contacted her on Whatsapp with the message *I hope you are thinking about me and not about your stupid boyfriend*. Marciniak blocked Azevedo as a contact on Whatsapp and subsequently deleted Azevedo's contact from all of her media.

## 4.5. Work under constant fear of harassment:

77. In summer 2018, fearing continuous harassment from Azevedo, Marciniak asked Agra to accompany her to the CBMM Summer School in Woods Hole, where Marciniak was working as a Teaching Assistant. Since Plaintiffs' arrival, they had been subjected to persistent gazing and rumors behind their back among male CBMM members befriended with Azevedo. The atmosphere of the program was not inclusive for Marciniak, and the School seemed rather to remind a men's summer club rather than a flagship program of world-renowned institutions. During the School, Marciniak witnessed that Azevedo brought informally to the School a foreign visiting student at MIT, and that he notoriously was chasing the program's female students. With the knowledge of the CBMM Summer School organization, Marciniak then realized that he had been notoriously abusing the privileges arising from his position for his private agenda as a serial sexual perpetrator.

78. In March 2019, Freiwald, Kanwisher and Tenenbaum delegated her to travel to MIT for a scientific poster presentation during CBMM NSF External Evaluation meeting. Marciniak arrived there under tremendous stress and fear of potential further harassment from Azevedo. Marciniak did not eventually encounter him there, but after Marciniak was notified about the need for her presence at the subsequent event in May 2019, Marciniak searched the MIT website for available complaint options. To protect herself and other CBMM members, at the end of March 2019 she filed a sexual harassment complaint with MIT, and subsequently, in early April 2019, reported the 2017 sexual assault and subsequent sexual harassment from Azevedo to the Falmouth Police.

## 4.6. Intimidation in May 2019 at CBMM event at MIT:

79. Despite her desperate and repeated requests for protection, neither MIT nor Harvard issued a no-contact order for her upcoming visit at MIT. Because during her report to the police Marciniak heard he would be interviewed, Plaintiffs feared Azevedo's retaliation. On 5/7/2019, Plaintiffs arrived at MIT at the scheduled time and Marciniak went to report herself to the conference poster session organizers as instructed earlier in the email. When Marciniak approached the poster stand, she saw Azevedo evoking impression of being in a role of poster session organizer, although his name was not on the list of CBMM members participating in the event. While Marciniak pick up her poster and headed to hang it on designated poster board, she noticed Azevedo followed her. Azevedo stopped at the poster board next to her, and initiated unnecessary assistance towards the individual hanging his poster there, while his gestures, voice and the look expressed intimidation towards Marciniak. She finished her task with shaking hands and ran away. Fearing Azevedo would approach her later, Marciniak called MIT Police, who then assigned MIT policeman to provide a security service for her during the poster session, and after the event at MIT concluded, Marciniak filed an incident report with MIT police.

## 4.7. Threats during the investigation in summer 2019:

80. On 7/11/2019, Azevedo's position statement was uploaded in the cloud folder shared between the parties. In the statement, Azevedo threatened: *I advise her to stop [her complaint action], I will not take*

*her actions lightly*. Marciniak was afraid for her life. Throughout summer 2019, while the investigation was going on, Marciniak could not walk calmly from the RU campus to the scanning facilities, without fear of potential retaliatory attack from Azevedo. Marciniak went to the self-defense course and had been carrying pepper spray in her pocket.

81. Following the lack of probable cause investigative outcome after faulty procedure, neither Freiwald nor Huffman discussed with Marciniak her ongoing CBMM duties and assisted with issuing a new contact order. In result, Marciniak could neither participate in the CBMM Summer School that year, nor in the CBMM retreat, losing training, research and networking opportunities, and got isolated from the CBMM community.

## 4.8. Breach of no-contact-order in September 2019, intimidation:

82. In September 2019, Freiwald delegated her to remotely attend that given day's CBMM weekly research seminar, and provide a summary report for him. The moment Marciniak connected remotely, unexpectedly and shockingly, she encountered on the screen the full view of Azevedo himself as the research seminar host, standing in front of the camera. The CBMM technical support who had been usually checking the remote connection with her, was not there. Azevedo immediately sought interaction asking *Can people from New York hear me*, specifically referring to her. Then, he kept the view of himself in the foreground camera, instead of switching the system to the presentation slides, such that only him appeared on Marciniak's computer screen, instead of the presentation. Since this was the first CBMM research seminar after the investigative outcome, Marciniak took his actions as further intimidation, and experienced enormous stress, especially that Marciniak had to stay connected and attentive to give the summary to Freiwald afterwards. At some point during the seminar, the CBMM administrator noticed and fixed the issue. Subsequently, Marciniak reported the event to RU (Huffman) and asked her to intervene and assist in issuing a new no-contact order to cover relevant CBMM events, but Huffman belittled the incident and refused to take any action.

## 4.9. Hostile work environment after CBMM internal audit in early 2020:

83. In January 2020, Kanwisher got to know about Marciniak's complaint from one of her lab members, and emailed her to discuss it in detail. Throughout the early January email exchange and phone call, Marciniak summarized to Kanwisher the events of her complaint, shared with Kanwisher her email to Poggio from May 2019, described the complaint process and its investigative procedural errors, and revealed that other victims of Azevedo came forward in the meantime and were willing to corroborate her complaint.

84. Initially, Kanwisher shared and discussed the information with her female colleague, CBMM evaluator DeStefano, and MIT Title IX coordinator. Subsequently, the group also shared all with Tenenbaum, Azevedo's MIT supervisor, and CBMM Directors. Putting her trust into Kanwisher's assertion of her willingness to bring the matter to impartial investigation, Marciniak gave her permission to share the letter to Poggio from May 2019. To her shocking surprise, the discussion of her complaint uncontrollably spilled over the CBMM management and the audit turned into a smear campaign against her. As reporting back, Kanwisher signaled that Azevedo's supervisor *was about to talk to him*, to then announcing that CBMM Directors *dismissed [Marciniak's] testimony. Kanwisher* then told her that Marciniak's wish for impartial formal investigation into her complaint was *impossible*, and the audit at its best would turn into informal investigation *whether there is broader discrimination based on sex issue at CBMM*. For that, Marciniak was asked to connect DeStefano with other victims of Azevedo, which Marciniak then did.

85. In early February 2020, the CBMM Directors refused to Marciniak the Teaching Assistant position for the 2020 Summer School, and Marciniak tried to talk about it with Kanwisher, but she never replied to Marciniak's message. In addition, contrary to Kanwisher's promise to update Marciniak on the result on the audit, Marciniak never heard back neither from Kanwisher nor DeStefano. Later in June 2020, Marciniak tried to signal the CBMM retaliation to Freiwald. He assured her that Marciniak should not worry about CBMM fellowship financially, but then, after Marciniak talked about the professional boarders in her workspace, he fired her.

86. The 2017 sexual assault and subsequent sexual harassment from Azevedo, her CBMM workplace colleague, and the events around her sexual assault and sexual harassment complaint against him, caused intolerable alteration of her working conditions until the end of Marciniak's employment in November 2021. Marciniak was cut off from CBMM resources, CBMM opportunities, CBMM networking, CBMM training, and CBMM scientific opportunities.

# 5. FIFTH CAUSE OF ACTION:

# DELIBERATE INDIFFERENCE

**Title IX (against RU, MIT, Harvard, BCH, MBL, U of Chic)**

# BREACH OF DUTY OF REASONABLE CARE

**Title VII (against RU, MIT)**

**5.1. Informal processing of the MIT complaint from March 2019:**

87. In March 2019, Marciniak filled an incident report with MIT Title IX & Bias Response Office[18] against Azevedo, with Boix as involved person, in relation to 2017 sexual assault and subsequent sexual harassment from Azevedo. The Director Sarah Rankin followed-up shortly and the phone call was scheduled for 3/28/2019. Marciniak told Rankin that Marciniak wanted to proceed with formal complaint due to her concerns about other women in CBMM environment, and needed no-contact order for her visits at MIT, including upcoming one on 5/7/2019. Rankin was *not sure at all whether MIT would be a right person/entity to conduct investigation into allegations*, and told her that she will talk with other institutions such that Marciniak could have *options*.

88. Rankin followed-up after 2 weeks and asked Marciniak to *talk to my Harvard counter-part directly* to *determine whether they can offer any formal complaint options.* Marciniak agreed, believing she was facilitating her complaint process, which Rankin described to her as *complicated*. When Marciniak told her that Marciniak relied on MIT to not cross her rapist and his enabling colleague during her upcoming visit at MIT, Rankin replied that *there are no restrictions*, and *it is possible [that Marciniak would cross them] if they [were] attending the event*, directing her to *talk to Harvard about someone talking to him*, or to *apply for a restraining order through the courts*.

89. During the phone call on 4/18/2019, Harvard Title IX Coordinator Jose Martinez ("Martinez") *[was] trying to understand if it is a joint issue among the universities or is there a primary jurisdiction question*, suggesting that *the representative of this Brain Minds and Machines group* may be MBL, and was *trying to get a little bit of information ahead of time through this channel* for Marciniak not to be

---

18 Now the Institute Discrimination and Harassment Response Office (IDHR)

disappointed had she filed a formal complaint, but then *it would say that Harvard does not have jurisdiction.* Marciniak expressed to be *a little bit lost because it is the second place [she] was trying to do something, and then it seems that maybe MBL should take the complaint,* and Marciniak felt *like nobody would like to take the responsibility.* Marciniak argued against referring complaint to MBL because only other schools had disciplinary authority over harasser, and *it looks like the Wood Hole was a transfer of the CBMM sponsorship.* Martinez suggested then that *5 institutions* have joint jurisdiction over the complaint and thus *maybe we all have responsibility here, maybe, you know, we all will have to process, MIT will have to process, Rockefeller would have to process.* Martinez *[didn't] want [her] to feel that we want you to go to the next place, but this is more complicated than other situations we worked with, right?",* which Marciniak commented that *it does not mean that you should send it away and say that there is no issue.* At the end, Martinez concluded that *it is complicated* and *[he] will work on figuring it out.*

90. About her *visit on 5/7/2019 at MIT,* Marciniak wanted *to know what kind of things [Martinez could] do to make the environment save for [her] there when [Marciniak would go] there"* and Martinez [thought] *in that sense we can work with Sarah,* but since *Sarah suggested to talk to [Martinez] about [it]*, Martinez conditioned issuing the no-contact order upon Marciniak's further intention about the formal complaint, and suggested *to check with each other, so that we can decide what will be the thing to do,* but did not provide any further no-contact information in follow-up email, apart from citing Harvard policy applying to sexual harassment off Harvard property about *the conduct was in connection with a University or University-recognized program or activity; or the conduct may have the effect of creating a hostile environment for a member of the University community* – "the jurisdiction question we would need to assess".

91. Marciniak followed up with Martinez, but he *unfortunately [was] still researching and had a call [that day] to discuss Harvard's involvement in the program.* Not hearing back from Martinez and increasingly fearful about her upcoming visit to MIT, Marciniak emailed Rankin, reporting on getting no assistance from Harvard and in attempt to help determining the complaint's jurisdiction asked Rankin to *check with Kathleen Sullivan, CBMM Managing Director about the relevant procedures that were stated in written assurances section related to Title IX compliance provided by CBMM either at the application stage or the award stage to the funding agency (NSF)..* Rankin did not reply until 5/9/2019.

92. On 5/13/2019, Marciniak reported to Rankin that *the fact of sending [her] back and forth, without providing any clear argument apart from using CBMM program – 'being complicated'- to justify the difficulties to deal with situation caused [Plaintiffs] extreme stress. [Plantiffs] felt confused, misinformed and did not know what to expect [during the visit],* describing Azevedo's intimidating acts at MIT during her visit, and begged Rankin to *take [her] report for formal investigation* as *the only thing [Marciniak was] requesting [was] to have a fair formal investigation at MIT that will allow to objectively evaluate [her] claims.* Rankin replied that *we are working on untangling all of this [program hosted by another entity at their location, Azevedo' source of funding and his supervision] to figure out the appropriate entity to conduct an investigation of a complaint should you choose to move forward with the filing of one.* Same day, Martinez emailed he was still *discussing with our Office of General Counsel regarding jurisdiction.*

93. Helpless, on 5/14/2019, Marciniak emailed CBMM Director Tomaso Poggio ("Poggio"), *writing to [him] as to a father, the father of CBMM family (...) because [Marciniak was] highly distressed and lost in the formal complaint process that [she] initially thought could help [her],* thus, *to ask for [his] help,* and described the events around the complaint and the complaint process. Poggio never replied to her email.

94. On 5/7/2019, while at MIT presenting her research at the annual CBMM evaluation, Marciniak reported on apparent shortcomings of the CBMM complaint process to the NSF-delegated CBMM

reviewer[19], who then *conveyed the Title IX issue to Poggio*, and to the NSF Office of Diversity and Inclusion Office (ODI). Subsequently, the NSF ODI instructed her to submit the NSF complaint, collected material documentation, and conducted a phone interview with her on 5/17/2019, to then deliberate on the *initial disposition of [her] complaint* until 8/6/2019, when they emailed her about dismissing her complaint because of the ongoing status of the U of Chicago/MBL investigation.

95. On 5/15/2019, Marciniak got an email from Rankin telling that *after consulting with folks at Harvard and the MBL program, it was determined that MBL is the most appropriate entity to investigate the matter. [Rankin then] [would] give [her] contact information to the Title IX officer at MBL and they [would] be in touch to review the process with [her].* Next day, Bridget Collier ("Collier"), Associate Provost for Equal Opportunity Programs and Title IX Coordinator for the University of Chicago (MBL is affiliated with U of Chicago), and Ann Egan ("Egan"), Director for Human Resources, at MBL, reached out to scheduled a phone call.

96. During the phone call on 5/20/2019, Collier and Egan outlined the complaint process, in which Marciniak would submit a *written information with documentary evidence and list of witnesses*, should Marciniak decided to proceed. They also referred her to speak to the RU's Title IX coordinator and HR Director about *resources available to [her]*, and as a *support person through this process*. Desperate for help, immediately after the call Marciniak contacted Virginia Huffman ("Huffman"), and Huffman scheduled a meeting with her for the following day.

97. During the 5/21/2019 meeting, Marciniak described to Huffman the 2017 sexual assault and subsequent sexual harassment from the CBMM colleague, Azevedo, as well as the up-to-date complaint process, including the referral to RU which Marciniak got from U of Chicago/MBL, and their investigative outlook [20]. Huffman told her to go ahead with it, assuring that RU will assist her in the process. Huffman scheduled a followed-up meeting for the next day, when she awaited Marciniak with a handwritten note containing contact details to the attorneys (Rebecca Zipkin "Zipkin" and Jessica Morak "Morak"), and RU's mental health provider, whom Huffman had made familiarized with Marciniak's *case*, and whose services towards her Huffman told will be covered by RU. Specifically, Huffman told her that she had prepared a mental health *team* for Marciniak with an on-site psychiatrist (Mehta- Naik) and off-site psychotherapist, Maria Solomon ("Solomon"), to whom Huffman told her to talk about her *emotions,* and whose services were to be covered directly by Huffman.

98. Marciniak submitted her written information with the list of witnesses to Collier and Egan the same day. On 5/28/2019 during in-person meeting, Zipkin and Morak took over her legal representation in the complaint. They said that Marciniak had been advocating for herself so hard and didn't have to do it anymore. During the meeting, Morak elected to take over technicalities regarding retrieving Whatsapp messages to be used as evidence in the investigation [21]. On 6/3/2019, Zipkin and Morak instructed that the investigators can go ahead with notifying the perpetrator and issuing no contact order. On 6/10/2019, Marciniak had another follow-up meeting with Huffman, when Huffman received from Marciniak the list of perpetrator's email addresses and his visuals, and implemented redirecting routine at RU's IT and security system, such that Huffman would receive Azevedo's emails coming to RU first. Between 6/8/2019 until 8/11/2019, Marciniak had been only updated about investigative steps happening beyond her control and contradictory to the timeline and investigative steps promised by Collier and Egan on 5/20/2019. Zipkin however did not worry about the steps and asked her to wait for the outcome.

---

19  it was an evaluation event
20  I made a similar report to Freiwald on 7/22/2019
21  Morak withdrew herself unexpectedly from this promise in the course of the investigation

99. The outcome notice from 8/11/2019 was *the most unfair* Marciniak could ever imagine and despite the fact that the investigation procedure gave her disproportional disadvantage, no appeal process was allowed.

100. On 8/13/2019 and 8/19/2019, Marciniak discussed the outcome and her wish to resubmit the NSF complaint with Zipkin. Zipkin admitted that the process was unfair, however advised her to consider *emotional pull that all of this [was] picking on [her] and [her] own well-being and health and really think if [Marciniak] want[ed] to keep fighting and defending that. Zipkin want[ed] to make sure that [Marciniak thought] about* that it *is also ok to just say [Marciniak] want to have a no contact directive so that he can not come near me and [Marciniak] want to move on because that is what is for [her]".* In September, Marciniak asked Zipkin for assistance with NSF complaint. Although she initially agreed, once Marciniak sent her a draft, she withdrawn herself and did not replied before the NSF submission deadline. In result, Marciniak submitted her draft to NSF on 10/1/2019 completely naive in the legal issues.

101. In August 2019, Marciniak also discussed the outcome and next steps with Huffman. Huffman assured about her continuous support with covering costs of Solomon's services. In August and September Marciniak asked for her assistance with a no-contact order, but Huffman was belittling the issue and advising her to discuss it on the go with events organizers and Freiwald, because *Winrich is nice.*

**5.2. New evidence was not admitted in the complaint process:**

102. In October 2019, Marciniak was contacted by the woman who had been another victim of Azevedo's sexually predatory behavior, knew about his yet another victims, and was willing to corroborate Marciniak's institutional complaint and ongoing criminal investigation in Falmouth. On 10/23/2019, Marciniak reached out with this information to Zipkin and Morak and asked *how to proceed.* They never replied. Then, on 10/25/2019, Marciniak reported on this new development to Huffman. During that meeting, Marciniak told her that Marciniak believed a new investigation into her complaint would be appropriate and asked for Huffman's assistance with next steps. Marciniak also reported to Huffman that Azevedo broke the no-contact order on 9/24/2019, when Marciniak remotely participated in the CBMM research seminar.

103. Huffman told her she would talk to RU General Council. During the same meeting, Huffman called in the RU's security officer, Michael Murphy ("Murphy"), who, allegedly, former police officer, could be of help. In the office, Mr. Murphy asked about details of Marciniak's police report to Falmouth Police from April 2019[22] and took a picture of the leading detective's visit card which Marciniak showed to him. Murphy followed up by email on 10/31/2019, reporting he *[hadn't] heard back yet [from the detective],* but *[would] follow up again. Marciniak* never heard back from him.

104. A follow-up meeting between Huffman and Marciniak was scheduled for 11/15/2019. Huffman reported she talked to General Council, and has prepared another off-site legal referral for Marciniak. The person was Christine Perumal, *director of the program* from *similar* to Sanctuary for Families organization, called Safe Horizon. Since Huffman's referral was based on informal association of Ms. Perumal with *somebody* from Huffman's *office, somebody who kn[ew] her,* Ms. Perumal *[would] be available for [her].* Huffman told her that the person from Huffman's office who knew Ms. Perumal advised that Marciniak should contact Ms. Perumal and *for sure [Marciniak] would get some ... attention,* and assistance in representing her in contact with NSF to *say that there is some additional information and people are willing to corroborate the story.* Huffman also informed that in case Marciniak wanted to get *engaged in some legal action,* the only thing RU can offer is a hardship funds for postdoc. The money would be from *a donor, usually up to $5,000,* while Huffman would report to *a donor* on the action.

---

22  re-traumatizing me while I had to use the world rape, and to talk details in front of a man

105. On 11/5/2019, Marciniak emailed NSF ODI office with information about the new witness *willing to be contacted/ interviewed and to provide further contact details to other victims she is aware of,* and asked *how to proceed in order to enable her participation in a way that would protect her rights as the witness.* The office replied *[they were] looking to let [her] know of [their] initial determination by the end of the month,* to then postpone it *by Christmas or the end of the month,* to then in January 2020 delay it further. On 1/16/2019, Marciniak provided an *additional appendix information to the material related to my complaint,* including that the *2018 CBMM Summer School student came forward as the victim of Azevedo's overly flirtatious behavior and uncomfortable request to be alone in a sexual way,* and *[was] willing to be contacted.* The NSF ODI replied that *if [they were] to accept the complaint,* the investigation would be solely on institutional compliance under *our Title IX regulations,* but *[they] may still want to talk to the other individual or others who had interactions with the accused.*

106. In early January 2020, Kanwisher learned about Marciniak's complaint from her lab member and on 1/6/2020 emailed Marciniak to be *very very sorry to hear what [Marciniak] have been through ... and further devastated that apparently no one has been of any help.* Kanwisher asked Marciniak's permission to discuss the situation with her female CBMM colleague, and for the copy of her 5/14/2019 letter to Poggio. With her other permission, Kanwisher then shared it also with Lizanne DeStefano, CBMM external evaluator ("DeStefano"). On 1/16/2020, Kanwisher reported that DiStefano was *"shocked"* that Poggio never replied, and that *meanwhile as far as [she] can tell, Azevedo was a TA last summer and [was] scheduled to be a TA th[at] summer, which [was] beyond belief.* Kanwisher wrote that *[her] goals are to debar hium from teh CBMM summer school (and hopefully from CBMM altogether), to insist on a more serious sexual harassment training th[at] summer that all faculty attend (to underline its seriousness), and if [she] can determine that Tommy read [my] email and did nothing, to have him removed as head of CBMM.*

107. On 1/17/2020, Kanwisher reported she had learned from MIT officials that only *one witness [was] interviewed* during MBL/U of Chicago investigation[23], and that Azevedo's MIT supervisor *was about to talk to Azevedo.* Kanwisher asked for Marciniak's further permissions to share her letter to Poggio, since Kanwisher *[thought] it will help Bob understand how serious this is, and it [would] immunize him against what are sure to be excuses Axevedo will try to make.* On 1/18/2020, Kanwisher followed-up about her goals, including *either cancel the summer school for this summer or make major changes* and to *address the broader toxic culture of the summer school as run by men only, and men who range from insensitive or oblivious to criminal* asking my permission to share information with Tenenbaum, since *"[Tenenbaum] will be taken more seriously than [Kanwisher would] by Tommy [Poggio] and Gabriel [Kreiman]".*

108. Throughout the email exchange and phone call, Marciniak expressed that her only wish was thorough and impartial investigation into her complaint, given the procedural errors of the previous one and that since the investigative outcome, other victims of the same perpetrator were willing to corroborate her complaint. At the end, Kanwisher reported that CBMM management was refusing to reopen the investigation against Azevedo, considering the MBL/U of Chicago outcome as the final one in their determination, but Kanwisher asked her who *the NSF person who you are speaking with* was. On 1/19/2020, Kanwisher asked her to connect DeStefano with other victims, since it *would help us enormously in getting Tommy et al to understand why these TAs cannot come back to the summer school and why serious fixes are required.* Marciniak did connect the women with DeStefano, and while discussing the anonymity of participation of another individual, i.e. the victim of Azevedo's 2013 rape, DeStefano told Marciniak that *there may be some risk associated with disclosure,* and anyway *[the victim's] input would probably not be relevant in the current process.*

---

23  Later determined it was Xavier Boix

109. Following the interviews with the victims, neither Kanwisher nor DeStefano even contacted her again. Marciniak heard only from CBMM colleague and 2020 Summer School Teaching Assistant[24] that in the subsequent Summer School program in 2020, some accommodation and social event rules were introduced.

110. Later in February 2020, Marciniak sent supplementary documentation and evidence of the procedural errors in U of Chic/MBL investigation, and information about *currently 3 individuals willing to corroborate the accused person's behavior.* On 2/21/2020 and 2/24/2020, the NSF ODI office emailed her that her NSF complaint *has been accepted for investigation.* Throughout 2020, Marciniak had been notifying NSF and subsequently filed NSF complaints about being rejected by CBMM Summer School Directors for 2020 Summer School Teaching Assistant position, and demoted and fired by Freiwald after her sexual harassment complaint to him. In January 2021, Marciniak notified NSF ODI office about probable cause determination after investigation from New York State Division of Human Rights regarding her sexual harassment and retaliation complaint against Freiwald and Rockefeller University. The NSF ODI office replied they would issue a notice of outcome regarding her first NSF complaint soon, which they did, and subsequently in March and July 2022, the NSF ODI office determined that the institutions did not violated NSF Title IX procedures in processing the March 2019 complaint Marciniak submitted to MIT.

# 6. SIXTH CAUSE OF ACTION:

# ERRONEOUS OUTCOME

**Title IX (against RU, MBL, U of Chicago, MIT, Harvard, BCH)**

**6.1. Biased referral to U of Chic/ MBL for investigation:**

111. On 5/15/2019, Sarah Rankin informed Marciniak that after multiinstitutional discussions *it was decided* that MBL is the most appropriate entity to investigate her MIT complaint from March 2019, and subsequently Marciniak was contacted by U of Chicago Title IX coordinator (Collier) and MBL HR Director (Egan), who then took role of the complaint investigators.

112. Upon information and belief, U of Chicago and MBL revealed afterwards that in their investigative steps they followed MBL policy[25]. The MBL policy does not specify the investigative procedures, apart from stating that the investigation will be *fair and expedited.*

113. Throughout her complaint process starting in March 2019, Marciniak indicated she wished for impartial investigation into her complaint, and elected MIT as her preferred option to investigate the complaint, since in their policies, MIT[26] had implemented investigative procedures, which assigned independent investigator to conduct interviews and review the evidence, and gave for each party equal opportunity to inspect, review and respond to the evidence prior to conclusion of the investigation.

114. The referral of her complaint for investigation to U of Chicago/MBL team under RU's supervision inherently put her in disadvantage as a party in the process, since U of Chicago/MBL was the entity among involved institutions with the least jurisdiction over the Respondents [27], and only MBL and

---

24  Marciniak was rejected the position
25  Although MBL is an affiliate of the University of Chicago and MBL appears to utilize the University of Chicago's Office for Equal Opportunity Programs for internally filed sexual misconduct complaints involving MBL
26  and Harvard too
27  Had the investigators concluded there was more likely than not that the violation of policy occurred, their available sanctions and authority were specific to MBL only.

RU were the involved institutions whose policies lacked published investigative procedures. Unregulated an/or vaguely defined policies made their processes in relation to my complaint more vulnerable to to bias from individuals conducting the process (Collier, Egan, and Huffman), who lacked impartiality in the process due to the conflict of interest emerging from their other official roles (HR Director, Vice-President).

**6.2. Procedural errors in U of Chic/MBL investigation:**

115. On 5/20/2019, upon her detailed inquiry and her overt concern about Azevedo manipulating witnesses, Collier and Egan gave her their investigative outlook, according to which, they would first review her written material, interview the witnesses *and then after that point we would notify him*. Upon discussing the process with Huffman and Huffman's agreement the process may go ahead, on 5/21/2019, Marciniak provided to Collier and Egan the *Detailed_Information* document, which contained the list and contact details to 5 witnesses who could corroborate the events in her testimony, and named Boix, the perpetrator's enabler, as the involved person [28].

116. Contrary to what was agreed upon earlier, on 5/23/2019 the investigators reported that their next step would be to issue a no-contact order and to *notify Respondent about the investigation*. Marciniak discussed the step with Zipkin and Morak, who then on 6/3/2019 announced that the investigators can *go ahead*, and that step was announced to happened on 6/8/2019. Then, the investigators told that *[their] next step in this process is to interview Frederico and the two witnesses you have identified,* making her believe that the individuals who knew Marciniak was sleeping in the room before the assault, and were familiar with Azevedo's moves that evening, were being interviewed.

117. To her terrifying surprise, on 6/24/2019 Collier and Egan proceeded with the step which they did not inform her about on 5/20/2019, namely they wrote with *update* that they *uploaded [her] statement[29]* in a cloud folder shared between the parties, and that *Frederico [Azevedo] [would] have access to these document*. They announced they *[would] wait for Frederico's written statement* and then *[would] let [her] know if they have questions*, expecting *to conclude the interviews this week, and anticipate being able to conclude this process in the next 2-3 weeks*. On 7/11/2019, they notified that Azevedo's statement was uploaded and *[they] [would] be sending notice of outcome soon*".

118. Surprised that Marciniak was not given chance to respond to Azevedo's statement[30], Marciniak inquired to Zipkin and Morak whether Marciniak should respond. Zipkin reviewed the cloud shared documents with *position statements*, and advised her to ask investigators about the date of expected conclusion, which Marciniak did on 7/30/2019. Marciniak got reply from Collier, who was *on leave but still working with Ann to finalize [their] review and expected to send the letter within a week*. On 8/1/2019, Marciniak received the notice that *based on a preponderance of the evidence, the investigators found insufficient evidence to support the Complainant's allegation*, and on 8/8/2019 they informed that *the process does not allow appeal[31]*.

119. Based on above, procedural deficiencies gave disproportional advantage to Azevedo in the process and cumulative procedural irregularities through the process affected the outcome of the U of Chicago/MBL investigation. Specifically:

---

28   In his email exchange with me before the assault, Boix lied to me that Azevedo was living in the house permanently, and during my stay there, facilitated Azevedo's perpetrator plan towards me.
29   Referring to my *Detailed_Description* document containing list of the witnesses, which investigators renamed to *Marciniak_Statement*
30   e.g., rebutting his false information he was my old friend from Tuebingen
31   Although U of Chicago process requires providing for the complainant referral to the external agencies for appeal.

- the investigators failed to rely on and seek to follow their own policies, and procedural steps which investigators outlined to Marciniak on 5/20/2019, and the actual steps put Marciniak in disadvantage;
- Azevedo was given her *Detailed_Description* material and had 18 days to prepare his statement around it, e.g., to produce a consensual relationship story. Although this version could have been rebutted easily, Marciniak was not given any chance to respond;
- Witness testimonies favorable to Marciniak's stance were denied, and out of 6 names which Marciniak provided, the investigators interviewed the involved party, i.e., Boix as Marciniak's witness. Boix was interviewed after my written material was made available to the opposite party, and it was reasonable to assume that Boix, Azevedo's colleague and his *partner in crime*, would corroborate Azevedo's position to save his own job and reputation;
- Although the screenshots can not be properly authenticated, Respondent's screenshots of Whatsapp messages were allowed, whereas Marciniak was deprived the opportunity to submit the Whatsapp messages, which she looked to retrieve as the Whatsapp export in its entirely and forensically-collected format through Morak [Huffman's legal referral]'s assistance. The withdrawal of Morak's assistance biased the MBL/U of Chic investigation, giving disproportional advantage to Azevedo;

120. In addition, the investigators were the Title IX Coordinator and the HR Director, the officers reporting to the entity's owner or director. The lack of proper administrative care over Marciniak's stay at MBL when the assault happened, among others, contributed to the assault itself. Therefore, Collier and Egan had a conflict of interest as the investigators. Indoctrinated with bias against the complainant reporting sexual assault, the investigators actions were biased against Marciniak as a party in the process, the fact which in result affected the outcome of the investigation.

121. The 8/1/2019 notice of outcome was based on prejudice, since it was reasoned that Marciniak's subsequent to the rape contact with Azevedo precluded that alleged sexual assault, the very first encounter between her and Azevedo, was non-consensual. The outcome did not refer to any actions U of Chicago/MBL would do to remove hostile environment for Marciniak in her CBMM work. However, Azevedo was admitted for 2019 CBMM Summer School as a Teaching Assistant.

122. After the investigation concluded, Marciniak was not given the appeal option. Moreover, on 5/20/2019, Marciniak was told Marciniak was not able to *share any information that would be considered that you learned through this process*, only her *experiences* and *the results of our investigation in terms of the outcome*. The investigators did not intervened when Azevedo in his position statement threatened her by advising her to stop, saying he would *not take her actions lightly*, terrifying her and preventing her from considering any other complaining options or resources. In addition, longer than expected investigative process and delayed outcome prevented her from participation in the 2019 CBMM Summer School as a Teaching Assistant.

## 6.3. Refusal of the appeal process despite reasonable grounds:

123. In August 2019, Marciniak discussed the bias in the investigative outcome ad procedural irregularities in the process with Huffman, and her legal referrals. In October 2019, Marciniak also reported to them about new developments, i.e., a new witness not available earlier during the investigative process, who came forward as Azevedo's other victim, and was willing to corroborate her complaint. In January 2020, Marciniak provided the above information, and referred Azevedo's other victims[32] to DeStefano, who then led CBMM internal audit on the matter. By direct communication with Huffman in October and

---

32  including CBMM Summer School student

November 2019, and indirect communication with CBMM management in January 2020[33], Marciniak conveyed her wish to reopen the investigation into her complaint as appropriate in that situation.

124. Given her reasonable appeal, RU and CBMM refused to reopen the investigation into her complaint, although RU as well as MIT and Harvard had implemented appeal procedures in their policies. To endorse the U of Chicago/MBL investigative biased outcome further, MIT issued a letter for Azevedo to Falmouth Police detective investigating the sexual assault, which stated that MIT (NOT U of Chicago/MBL) did an investigation on him, finding him not guilty.

125. In February 2020, the NSF ODI office accepted Marciniak's NSF complaint about institutional irregularities in processing her complaint. However, the NSF ODI office issued the outcome notice in this matter only in 2022 (March 2022 and July 2022), which did not give me chance to seek civil remedy with respect to this issue earlier.

# 7. SEVENTH CAUSE OF ACTION:

## NEGLIGENT HIRING, TRAINING, SUPERVISION AND RETENTION

### State law claims (against RU, MIT, Harvard, BCH)

### 7.1. Towards Azvedo (and Boix):

126. In Spring 2017, Harvard, BCH and MIT hired a sexual perpetrator and common criminal, Frederico AC Azevedo ("Azevedo"). While enrolled in a PhD program in Germany before, Azevedo had two police records in relation to illegal drug use[34]. There, in 2013, Azevedo committed rape on a female student from the junior program of his graduate school, At the end, he obtained a PhD degree by defrauding and deceiving the Graduate School administration and the PhD thesis supervisors into submitting incomplete PhD thesis to avoid uncovering a new police record entry about him, which if uncovered, would terminate his PhD pursuit. By relying on informal hiring policy based on favoritism, Harvard, BCH and MIT did not perform a routine background screening which would have uncovered above facts.

127. Had the background check been not available, there were foreseeable signs that Azevedo was unfit for the position. Gabriel Kreiman and Robert Desimone, Azevedo's prospective postdoctoral supervisors, recruited him through CBMM Summer School program. In CBMM, Azevedo involved himself as a student through the earlier participation of his brother, whose common racist and sexist jokes evoked multiple complains from fellow students and subsequent refusal of reference letter from CBMM faculty and prevented him from seeking desired position at MIT. As CBMM summer school student, Azevedo initialized locker-room conversations about sex and porn, engaging other students and Teaching Assistants, and was *bragging about* his discriminatory way to treat women.

128. In summer 2017, Harvard, BCH and MIT, through CBMM Summer School Directors, installed Azevedo as Teaching Assistant ("TA") and Xavier Boix as a senior TA at 2017 CBMM Summer School, the positions of authority towards students and listener students. In 2017, the recruitment for the position was informal, and lacked a screening process of the applicants. It was announced then that b*eing a TA in the summer school is fairly relaxed. We will play tennis, go swimming at the beach, bike riding, etc. Housing and food will be covered.*

---

33  through communication with Kanwisher and DeStefano
34  driving under influence of the alcohol

129. During the 2017 School, Azevedo did not give any tutorial. He however co-supervised with Boix two female students, the women who Boix and Azevedo *regularly invited* for overnight stay to the off-campus cottage, which CBMM Summer School Directors rented as per Boix's request. Besides, Azevedo's responsibilities were to organize student social events [35] and doing shopping for evening snacks and alcohol with CBMM money and under CBMM Director's acceptance. Summer School Directors lacked supervisory authority over Azevedo's conduct. On 8/28/2017, Azevedo brought several beer packages to the lecture hall venue and distributed it among students, proposing alcohol also to Marciniak. Although Kreiman initially objected, he allowed Azevedo to continue alcohol distribution during the CBMM School's scientific program.

130. Even before Marciniak arrived to Woods Hole on 8/28/2017, there were red flags for CBMM Directors indicating that Boix and Azevedo were abusing their privileged position towards her by screening through her earlier student application and setting up her accommodation arrangements. Azevedo, a serial sex offender savvy in *pick-up artists* techniques, who was notoriously *chasing* women preys for sex, *prepared the ground* in advance of Marciniak's arrival in Woods Hole, by falsely informing Boix (and others) that he *knew* Marciniak from Germany, and moved in to the cottage during her stay, conspiring with Boix to assist in her whereabouts and to keep her under impression that he lived there permanently, in attempt to coerce here into sexual contact there. When Marciniak reached out with her inquiry to the School administration, CBMM Directors guided her to *talk to Xavier about accommodation* under MBL and CBMM administrator consent.

131. Because Azevedo's behavior was not properly supervised, he sexually assaulted Marciniak in 2017 expecting he would not be punished. Therefore, Azevedo was free to act according to his personal agenda and to abuse his power privileges for his sexually predatory agenda. Although on 8/16/2018 Kreiman reminded during the meeting with the Summer School Teaching Assistants that *sex with students* was not allowed, Kreiman did not specified whether there are any repercussions. Son after the event, Azevedo approached (at least) one female CBMM student with sexually charged behavior and attempted to invite her privately to his room for one-to-one (strong) alcohol drinking. When the woman rejected him, he immediately deleted the incriminating for him messages.

132. Since Marciniak reported Azevedo's 2017 sexual assault and his subsequent sexual harassment to Falmouth Police on 4/3/2019, several of Azevedo's victims came forward to the Falmouth Police with their supportive testimonies, including about his rape act from 2013 in Germany.

133. Following Marciniak's complaint to MIT in March 2019, Azevedo was still allowed in a Teaching Assistant position at CBMM Summer School. The sexual harassment prevention training for Teaching Assistance was introduced only then, before 2019 CBMM Summer School. Azevedo participated, and overtly laughed at the content. As of today, Azevedo remains employed by MIT and actively participates in CBMM program.

## 7.2. Towards Freiwald:

134. Rockefeller University hired Freiwald despite there was information available that Freiwald had been routinely mixing personal and work relationships, and looked for partners among females in subordinate to him position at work. During Marciniak's employment, it was a common knowledge that Freiwald chose his dates among RU employers in his workspace. Among huge amount of student applications Freiwald received on a regular basis as RU Professor, Freiwald picked up the ones of his like. It was common that Freiwald unexpectedly approached female students from various RU programs rotating

---

35  One of them was about students fighting in the water to the amusement of Azevedo and his friends

in RU labs with the position offer after only seeing them and never having a conversation with them, and subsequently invited them off-campus for the interview.

135. In 2019, several students at RU complained about Freiwald's supervision to their program manager, who then elected to not recommend Freiwald as a supervisor anymore. Across Marciniak's employment, several complaints about hostile environment in Freiwald laboratory were directed to RU HR department. Yet, Freiwald's behavior never improved.

136. The results of 2020 lab climate survey executed among Freiwald's lab members revealed that majority of lab members were not happy in the lab, declared to experience hostile environment, and did not feel comfortable to talk to Freiwald as a supervisor about their problems. More disturbingly however, Freiwald rejected to introduce improvements, and justified his *personal philosophy* of leading the lab.

137. Freiwald was not properly trained and supervised in sexual harassment prevention nor in handling sexual harassment complaints. On 9/1/2017, Freiwald did not properly react when Marciniak reported negative encounter with somebody from another institution, alluding to her sexual assault. When Marciniak told him directly about the events and her complaint in July 2019, Freiwald did not provide support, even after discussing the issue with Huffman same day. RU failed to train Freiwald not to retaliate for the complaints. On 6/4/2020, while delivering his decision to fire Marciniak after she gently complained to him about his behavior, Freiwald's actions were egregious and lacked any human decency.

138. Although RU knew about Freiwald's behavior, RU endorsed Marciniak's hard-termination in 2021. Following a probable cause determination after investigation into my New York State Division of Human Rights complaint about Freiwald's sexual harassment and Freiwald's retaliation, RU has been continuously keeping Freiwald as RU professor.

# 8. EIGHT CAUSE OF ACTION:

# HEIGHTENED RISK

**Title IX (against RU, MIT, Harvard, BCH, MBL, U of Chicago)**

**8.1. Defendants knew about prevalence of sexual harassment in academia:**

139. The 2018 National Academies of Sciences, Engineering, and Medicine ("NAS") study report on the sexual harassment of women in academia found that between 20% and 50% of female students and more than 50% of female faculty and staff (including postdocs) experienced sexually harassing behavior while in academia. The 2016 survey by the US National Postdoctoral Association found that 28% of respondents reported experiencing at least one instance of harassment while they were [postdoctoral] trainees; offenders were predominantly reported as being faculty or staff members. Statistics shows that only military workplace has the comparably high to science, technology, engineering, and mathematics disciplines with relation to sexual harassment prevalence. The NAS report described the toll sexual harassment takes on individuals, communities, and institutions, and articulated recommendations for action. In response to the report's findings, the NASS have urged all of higher education to aim higher by changing the cultures and climates that allow harassment to go unchecked.

140. Although Defendants are among initial 28 founding universities, colleges and research institutions to join with NAS on Action Collaborative on Preventing Sexual Harassment in Higher

Education initiative created to reduce sexual harassment in higher education, Defendants did not act on sexual harassment prevention at home, i.e., in their respective higher education communities.

141. Defendants did not to correct systemic reasons for particular prevalence of sexual harassment at their academic institutions, these include academia's gender imbalance and its hierarchical power structure. Academic hierarchical structures generate the prevalence of sexual harassment, and workers in more vulnerable positions or with less power are more likely to be the targets of sexual harassment behavior. Defendants' academical structures had been male-dominated, especially in more senior faculty positions, and male-dominated hierarchies are more likely to enable sexual harassment of women. Different to romance, sexual harassment would serve as an equalizer against women in power, motivated more by control and domination than sexual desire. Conferences and fieldwork constitute heightened risk for sexual harassment of women, and data from 2014 surveys in those workplace settings find widespread incidents of inappropriate conduct across several disciplines.

## 8.2. Defendants policies caused increased prevalence of sexual harassment on their campuses:

142. In 2002, RU undertook disciplinary actions towards its President, Arnold J. Levine, after the incident in which he inappropriately involved himself with a female student. RU has been also dealing with allegations of child sexual abuse from 80 accusers, former patients of esteemed Rockefeller University hospital doctor Archibald, going back to 2004.

143. RU operates bar on its campus, called Faculty Club, which offers free happy hour alcohol 3 times per week for RU community. RU policy had been systematically enhancing adult-only atmosphere in the Faculty Club, by refusing suggestions from postdoctoral communityto limit alcohol-serving hours and make the Faculty Club more child-friendly. In the bar, RU endorses locker-room talks and socializing style which tended to discriminate women.

144. Defendants were sloppy in applying work ethics and their Personal Relationship Policy which then fell behind with respect to commonly accepted social rules in the workplace. Whereas dating between a supervisor and his or her subordinate individual had been widely prohibited in business workplace environment, RU adjusted its policy to prohibit dating between the Head of Laboratory and her/his subordinate postdoctoral scientist and/or the University's student only on 5/22/2019.

145. On 4/26/2018, RU appointed Vice President of HR, Virginia Huffman ("Huffman") as the Title IX coordinator. The role of coordinating the school's compliance with federal (and state) nondiscriminatory and anti-harassment laws thus was assigned to the most senior-level position in HR team, who reports directly to the business owner. This caused an inherent bias since the HR department's interests are primarily aligned with those of employer. If complaint is likely to hurt the University's profitability by revealing its liability, Vice President of HR is prone to bias and/or to be engaged a scheme to cover up the complaint.

146. In 2018, Women In Science at Rockefeller (WISER) initiative noticed ineffectiveness of RU's policies in preventing sexual harassment at RU and demanded from RU's officials the permission to administered a climate survey to the Rockefeller community. WISER was not allowed to do it neither contribute the survey questions. To administered a survey, RU hired a third-party consultant, Grant Thornton LLP, without the expertise in the topic[36]. In December 2018, shortly after administering the survey, Grant Thornon's Audit Manager with 6-year work experience in the company, Beth Krumholtz, moved to work at Rockefeller University as Associated Controller. RU reported on the survey's results half

---

36   According to a large body of social science evidence, the strategies of fast, deeply flawed fixes, for example online surveys and workshops without expertise in the topic, simply don't work.

a year afterwards, in May 2019, but provided to the community only summarized version of the report, vaguely assuring about *ongoing steps* for improvement, which RU never subsequently reported on.

147. At the time of Marciniak's complaint interaction with Huffman in May 2019, RU nondiscriminatory policy was in noncompliance with the minimum standards in New York State Labor Law & 201-G, and lacked complaint form and published investigative procedures. RU did not adjust their policies to comply with the law following my complaint. In December 2019, Marciniak fell a victim of persistent staring behavior at RU housing from the RU professor, who had been known among female RU community from similar incidents.  Marciniak and other women were referred with their complain to Huffman, and subsequently met with Huffman in person in her office and asked for RU's action. During the meeting and the subsequent process, Huffman (i) did not file (nor proposed to file) the complaint form as federal and state laws required, (ii) threatened them with the necessity of revealing their names to the professor should they decided to proceed, and (iii) in January 2021 concluded her *investigation* with biased justification of the professor's behavior by professor's medical condition [37]. Huffman did not reveal more because of *confidentiality rules*, and closed the action without any world of apology.

### 8.3. Defendants official custom of deliberate indifference increased Marciniak's vulnerability towards her 2017 sexual assault and subsequent sexual harassment:

148. Because in 2019 Huffman processed Marciniak's complaint against Azevedo in an informal way, while discussing it with Freiwald in July 2019 the complaint status reflected institutional success in implementing that informal strategy and showed lack of institutional intention for pursuing potential disciplinary actions towards Azevedo on the level of his employment. In result of above, Marciniak was more vulnerable to Freiwald's subsequent sexual harassment. By learning how easy it was to dismiss the complaint, Freiwald remained secure that he could stay under the radar of law with his quid pro quo sexual harassment towards Marciniak, assured he would never face any repercussions for his behavior.

149. RU did not have implemented appropriate sexual harassment prevention training at the time of Marciniak's employment. The only nondiscrimination training Marciniak received was online, in August 2016. It was *Preventing Workplace Harassment for Supervisors* (not for employees under supervision, such as postdocs), administered by a third-party company (Emtrain). The content was off with respect to academic work context, and did not cover the sexual harassment topic, including how to deal with abuser in position of authority, especially in multi-institutional setup, common in academia, such as collaborations and conferences [38]. Since 2019, RU was obliged by law to administer the sexual harassment prevention training on the annual basis, yet, the training material never exemplified any daily life situations of a postdoctoral work.

150. In addition, RU policy separated employees and students, and lacked any description which procedures apply to postdocs.

151. RU nondiscriminatory policies and the sexual harassment prevention training had been ineffective, and did not properly train RU faculty. Freiwald,  a person with authority to remedy sexual assault, did not respond to Marciniak's testimony from 9/1/2017 of having *bad encounter* with somebody from another affiliation, and continued inappropriate behavior towards her, making her more vulnerable to his 2020 sexual harassment actions and his subsequent retaliation.

---

37 He must had got cured, since whenever I crossed him afterwards the complaint actions, his sight was not creepy anymore

38 The Emtrain platform allowed RU to tune some content and to customize up to 15 micro-lessons cards

152. In 2017, when sexual assault from Azevedo occurred, and during his continuous sexual harassment towards Marciniak, CBMM program was in non compliance with Title IX requirements. CBMM lacked information for CBMM members about nondiscriminatory policies and Title IX implementations in the program. CBMM did not provide any sexual harassment prevention training for CBMM-supported postdocs and students [39]. CBMM did not guide its members on any internal procedures in place to address work misconduct and sexual harassment in the CBMM workplace. Because conduct rules were not available, and because Marciniak lacked information on sexual harassment grievance procedures, Marciniak was more vulnerable to Azevedo's sexual assault and his subsequent sexual harassment.

153. In 2017, CBMM Summer School lacked proper management and administration, and endorsed individual Teaching Assistant ("TA")s' abuse of power. Whereas in August 2017, the CBMM Summer School Directors and CBMM Summer School administration were informed about Marciniak's expected stay at CBMM Summer School in Woods Hole, and they were knowledgeable that she was naive in the CBMM community, Marciniak did not receive any otherwise reasonably expected assistance from CBMM designated employees, i.e., CBMM Summer School Directors, CBMM Managing Director nor Carol Hamel, MBL administrator. None of them (apart from CBMM Summer School Director Boris Katz) replied to her email nor introduced themselves (apart from Katz) in person on the venue, although all individuals were present on the MBL campus while the events leading to the rape from Azevedo were unfolding. Marciniak did not have any CBMM support available after the rape, which made her more vulnerable to subsequent abusive actions from the perpetrator.

154. During the Summer School in 2017 (and at least in 2018 as well), CBMM Directors allowed off-campus cottage rentals with co-ed living space exclusively for selected TAs, where room for guests (like Marciniak) was not overseen by the course directors. In the cottage where Marciniak stayed, TAs favored by the CBMM Summer School Directors were regularly organizing parties and socials outside of CBMM Summer School scheduled activities, under approval of CBMM Summer School Directors. There, selected CBMM Summer School students were invited and stayed overnight in TAs rooms. The parties and socials in the cottage used CBMM-sponsored alcohol. In August 2017, before the assault, Summer School Directors witnessed the perpetrator offering alcohol to students and guests (including Marciniak), but did not exercise their authority power to correct his behavior, in result reinforcing permissive norms towards the perpetrator's behavior. Because CBMM Summer School Directors, management and administration did not exerted control over the school environment and over the behavior of its faculty, Marciniak was more vulnerable to sexual assault from Azevedo.

155. Following her complaint to MIT in March 2019, MIT (and other Defendants) had actual knowledge of the events and of the risk of further hostile environment for other members of CBMM community. Despite the fact that CBMM *adheres to the policy on harassment set forth [sic] Massachusetts Institute of Technology*, neither MIT nor other Defendants with jurisdiction over the complaint appied available to Marciniak grievance procedure to stop sexual harassment, subsequently making her more vulnerable to perpetrator's intimidating actions in May 2019, creating hostile CBMM workplace for her.

156. Upon information and belief, there had been multiple prior allegations to NSF ODI office from CBMM participants about difficulties in their sexual harassment complaint process submitted to MIT. Upon information and belief, MIT Title IX coordinator (and others officials) would make deliberate indifference towards sexual harassment complaints in CBMM program their official policy, and process the complaints in informal way based on their belief that MIT was not obliged to report incidents processed in informal way under Clergy Act requirements and report them to NSF during the CBMM annual evaluation.

---

39  The training for TAs introduced after CBMM learned about my complaint was grotesque and was not taken seriously

157. The CBMM Summer School Directors knew about the incidents of sexual interactions between Teaching Assistants and students happening during the Summer School. In 2018, one of the incident caused The Summer School Directors to call urgent meeting with the group of Teaching Assistants (TAs)[40]. During the meeting, Kreiman informed that those sexual interactions between Teaching Assistants and students are not allowed. Kreiman suggested to postpone them once the Summer School officially ends, and to *look for the [sexual] opportunities [here] around,* referring o the group of TAs. Kreiman did not provide any details on disciplinary actions to be taken for the misconduct, neither referred to sexual harassment policy nor mentioned Title IX and/or Title VII complaint procedures for misconduct.

158. While directing CBMM, in particular CBMM Summer School program, Poggio and Kreiman served as a pivotal figures in creating the rule of conduct in the workplace. The distribution of opportunities and an internal disciplinary system that was *in-house when it should have been open house,* fostered an environment in which postdocs working with them were given disproportional advantages, and were shielded from the institutional disciplinary system. This mafia-like environment made Marciniak more vulnerable to sexual assault and sexual harassment from the side of the perpetrator and his enabler, who abused their power position under belief of being shielded under Poggio and Kreiman supervision.

159. Pursuant to Defendants' official custom of deliberate indifference, Defendants cultivated a culture of silence by failing to report complaints of sex-based discrimination, failing to initiate and/or conduct adequate investigations and grievance procedures, and failing to ensure that victimized postdocs had equal access to educational and employment opportunities and benefits or grievance procedures.

160. The ongoing sexual and physical assaults, harassment, abuse, and stalking Marciniak experienced, and the subsequent investigative failures by CBMM Defendants, were so severe, pervasive, and objectively offensive that Marciniak was denied equal access to CBMM's educational and employment opportunities and benefits.

# 9. NINTH CAUSE OF ACTION:

# RETALIATION

**Title IX (against MIT, Harvard, BCH, MBL, U of Chic),**

**Title VII (against RU, MIT, Harvard, BCH),**

**New York Labor Law § 215 (against RU).**

**9.1. Retaliation in the recruitment for Teaching Assistant position in February 2020:**

161. CBMM Summer School is a flagship CBMM program, an intense three-week course held in Woods Hole, MA, which contains lectures by CBMM faculty, and student projects. Teaching Assistants (TAs) are selected among advanced CBMM PhD students or among CBMM postdocs, to conduct students workshops and supervise student projects.

162. In December 2018, Freiwald contacted Gabriel Kreiman to refer Marciniak for Teaching Assistant position in 2018 CBMM Summer School and PhD student in Freiwald lab as listener, and Kreiman replied that *in principel,[he] would like to bring [only] [Freiwald's] postdoc as TA.* In January

---

40  Two other topics during the meeting were excessive alcohol usage and student bullying by TA.

2018, Marciniak was contacted by two senior Teaching Assistants to confirm her interest in being TA, and was *added to the roster [of TAs for 2018 CBMM Summer School]*. In March 2018, Marciniak received an email with instructions for *2018 CBMM Summer School faculty*, and was registered as Research Facilitator. To request authorization from my visa sponsor (RU), a letter was issued a letter with position name, its duration period, position salary (*a modest honorarium of $1000* plus travel expenses), and *invitation* for the position from *Dr. Boriz Katz*. From July to August 2018, while working in the position, Marciniak was instructed on the job by senior TAs from MIT and Harvard/BCH, and supervised by CBMM Summer School Directors.

163. In her work as Teaching Assistant in 2018, Marciniak fulfilled the duties of the position by (i) being physically present and available at the program during the 3-week period required (ii) preparing the student project proposals, providing her authorship scientific material to the students and presenting the proposals together with other TAs, (iii) co-supervisoring of a few student projects, helping overloaded TAs as required, and (iv) co-tutoring a programming workshop for students, all of this despite it was her first time in a TA position.

164. Her performance in 2018 was evaluated positively and Marciniak was subsequently invited for the position in 2019. Then, Marciniak was included in the final accepted list of TAs by the recruiting team even before her reply to the invitation. Marciniak conditioned her final decision to participate as TA in 2019 Summer School on the complaint process and in May 2019 informed the investigators that she would be willing to participate in the School once the investigation was concluded. Because the investigation was effectively concluded only on 8/1/2019, it took another week to hear from the investigators there was no appeal, and yet another to clarify the no-contact order issue, Marciniak did not have the final opportunity to participate in the 2019 CBMM Summer School as a Teaching Assistant.

165. On 1/30/2020, Marciniak was contacted by a senior TA, Barbu, who inquired about her interest in the TA 2020 position. On 2/2/2020, Marciniak gave a positive response with the information about her availability for the full period of the Summer School, and her intention to supervise student projects and give tutorial. She also informed Barbu that she conditioned her participation on whether Azevedo would be TA, due to the no-contact order. Barbu gave a positive reply on 2/3/2020, and *put [her] on the list and notify[ied] [her] concerns*.

166. On 2/4/2020, Marciniak heard back from Barbu, who told her that *the directors had a look at the list* and did not select her for the position. Marciniak forwarded this email to Kanwisher, signaling retaliation, but Kanwisher never replied. Marciniak reached out again to Barbu on 2/7/2020 and told him that Marciniak "*consider[ed] other than TA participation in the Summer School*", and inquired if Azevedo was invited as TA, because she wanted to *adjust [her] actions to meet the constraints [of attached no-contact order]*. On 2/11/2020, Marciniak received email from CBMM Summer School Director, Kreiman (cced Katz), informing that *[they] won't be able to recruit [her] as a TA this year*, and made her understand that she won't be welcomed at CBMM Summer School anymore, but Kreiman *[hoped] to see [her] around in some of the CBMM meetings as well as other scientific meetings*.

167. Other CBMM members with similar to Marciniak expertise and qualifications required to perform the Teaching Assistant job, were accepted for the same position in 2020. Marciniak was not offered the position in the subsequent, 2021 year.

168. Marciniak was retaliated during the recruitment for the position because of her protected activity. In March 2019, she filled a complaint with MIT about sexual assault at 2017 CBMM Summer School and subsequent sexual harassment from Azevedo, while he worked as TA, and Marciniak visited the program as listen-in student. Since then, her complaint had been informally routed between all relevant institutions involved in the CBMM program, including discussing it with CBMM management. The complaint was directed for U of Chic/MBL joint investigation, which concluded in August 2019. From early January until early February 2020, Marciniak participated in an internal CBMM audit led by DeStefano[41] about her complaint and broader issue of sexual harassment in the CBMM program. Marciniak contributed with her complaint material, including a copy of the May 2019 letter she sent to Poggio. She also provided details about procedural errors in joint U of Chicago/MBL investigation, and informed about, and then connected DeStefano with other victims of the same perpetrator, including in the CBMM Summer School program and prior he commenced working there.

169. There was a causal connection between her protected activity by reporting sex-based discrimination, and CBMM Summer School Directors decision to refuse her Teaching Assistant position in 2020. Upon information and belief, Andrei Barbu contacted her about the position in January 2020 without knowledge of her protected activity. After her positive answer, he put her on the list, which he then handed over to the CBMM Summer School Directors. The directors, who had developed retaliatory animus towards Marciniak and her complaint actions, made a final decision on TA selection. By refusing the position to her, they signaled that her actions had not been welcomed, and intended to isolate her from the CBMM Summer School community. Upon information and belief, they acted upon belief that my undisturbed work with CBMM as Teaching Assistant could have led to other sexual harassment complaints at CBMM Summer School program, causing them to face liability.

170. On 5/4/2020, I filed a complaint with NSF ODI about being rejected for TA position by CBMM, and on 8/10/2020 I filed the similar complaint against MIT, Harvard and BCH with EEOC Boston area.

**9.2. Retaliation after opposing Freiwald's sexual harassment In June 2020:**

171. In May 2020, Marciniak and Freiwald conducted email conversations. After Freiwald announced instructions for *lab reopening* following COVID lockdown, Marciniak reached out to confirm her readiness to restart her laboratory research halted due to pandemic. She also asked Freiwald if her salary would be still supported by CBMM, given her *ongoing Title IX complaint* and explained that her concerns emerged because "*[she] already experienced retaliation from some people from CBMM,* referring to retaliation in TA recruitment earlier that year. On 5/26/2020, Freiwald confirmed his continuous support for her work as he *need[ed] [her] to succeed on the Intuitive Physics project* and then on 5/28/2020 told her *do not worry about the fellowship, CBMM financially. That will be fine even if push came to shove.*

172. On 5/29/2020, Marciniak thanked Freiwald for his reassurance and reiterated her full commitment to finalize her Intuitive Physics project. In the same email, she continued to discuss the Title IX matter and her determination to see it through, noting that *the difficulties of Title IX complaint have been pretty strenuous and financially, mentally and physically exhausting, making even my husband name the last year as the worst of his life.* Because Freiwald wrote he wanted to talk more in person, and because during those one-to-one meetings, including earlier in 2020,  he behaved inappropriately towards Marciniak, she took the opportunity that the discussion was about her working conditions, and in that 5/29/2020 email she also discussed how her work situation necessitated boundaries, like no professional meetings in restaurants. That part of the email implicated Freiwald, because it alluded to his inappropriate behavior.

---

41  she was referred by Kanwisher

173. Freiwald did not reply right away. On 6/3/2020, he wrote shortly to request a Zoom meeting for the next day, where he fired Marciniak, by terminating her work on the project and asking her to *wrap-up things here*. There was a causal relation between her protected activity by reporting sex-based discrimination to Freiwald, my supervisor, designated to receive the report, and his decision to demote her and effectively terminating her employment. Freiwald retaliated against her because she opposed his quid pro quo sexual harassment.

174. RUs engaged in materially adverse actions against her when Freiwald, RU's employee in supervising posotion, failed to report her complaint about his sexual harassment as required by RU policy, therefore depriving her the opportunity to have her claims of sex discrimination properly investigated. RU also failed to initiate appropriate interim measures to ensure her safety and ongoing equal access to educational and employment opportunities and benefits, and failed to implement appropriate sanctions and responsive measures to remedy the sexual hostile environment and prevent its occurrence.

175. After the 6/4/2020 Zoom meeting, Marciniak followed up with Freiwald by email in attempt to resolve what she perceived to be the *misunderstanding* about her sudden unexpected termination. Freiwald replied on 6/12/2020, and insisted there was no misunderstanding, reiterating his 6/4/2020 decision to terminate her project where it stands, instructing her again to *wrap things up here* and look for another opportunity. Freiwald implied that the timeline for her to finish was the expiration of her ongoing one-year appointment at RU, effective 8/31/2017. Freiwald concluded his email by threatening her that if she stay[s], *that [would] be the end of [her] career*.

176. Freiwald's message left her without doubts that his decision was to effectively breached the postdoctoral training contract which Freiwald and her made in 2016. Freiwald's decision demoted her in her work on the Intuitive Physics project by cutting her off from the realization of project's electophysiological phase, its main part, which involved developing the expertise which Marciniak was promised to gain during her postdoctoral training, under the agreement with Freiwald and CBMM collaborators upheld by Freiwald until his drastic change of course in that issue only on 6/4/2020. Freiwald knew Marciniak needed this expertise for her career to go forward. As the result of demotion, Marciniak was deprived of the relevant work experience and the relevant training which she planned and highly desired to gain while she had been contracted as the CBMM-supported postdoc. This included CBMM-specific scientific opportunities and collaborations, from which Marciniak was effectively isolated in 2020.

177. Freiwald's decision to terminate her project was irrational, since to *wrap things up here* did not have any scientific ground neither could have been justified by the emerging results. In addition, it occurred unexpectedly in the project's timeline.  On 6/4/2020 and afterwards, Freiwald asked her to use her remaining time in the laboratory to conduct only minimal work necessary to finalize solely up-to-date project's conclusions, terminating also her ongoing fMRI work in collaboration with Tenenbaum. In result, Marciniak was fully deprived of educational and research opportunities resulting from the CBMM collaboration. The time-course and nature of Freiwald's action revealed typical for strong emotional decisions volatility.

178. Plaintiffs were devastated by Freiwald's decision. Marciniak could have not expected to find other opportunities within two months period. She would also leave Freiwald's lab without publication, limiting her range of opportunities to find another postdoctoral opportunity. In commitment to her scientific project, she then carried on the laboratory work which she had been doing non-stop since lab reopening in late May.  Working day and night, Marciniak attempted to *save* its scientific merit by obtaining scientifically valid dataset. Because Freiwald's expectations to finish in two months were by default unrealistic, on 7/22/2020 Marciniak desperately contacted the lab manager for assistance. Between 7/22/2020 and 9/11/2020, the woman mediated with Freiwald and the RU HR Department *any* extension of

Marciniak's RU appointment, which would allow her to complete her ongoing experiments. Under Freiwald's last-minute decision, Marciniak was reappointed for 6 months.

179. Between June 2020 and January 2021, Freiwald also demoted her in general laboratory tasks and Marciniak was stripped off the Cornell protocol management. In addition, when the student who was supposed to work with her arrived in the lab, Freiwald reassigned the student to work with other, similarly situated CBMM male postdoc in the lab. Consequently, Freiwald also reassigned the laboratory resources planned for launching the second phase of my project to him.

180. None of other postdoctoral nor graduate student currently or formerly working in Freiwald laboratory suffered employment negative actions comparable to Freiwald's treatment towards Marciniak as described above.

### 9.3. Retaliation in 2021 after filling the New York State Division of Human Rights complaint:

181. In December 2020, Marciniak reached out to Freiwald with her results, which Freiwald evaluated as scientifically valid and found the results *publishable* for a scientific article. In January 2021, Freiwald ordered her to prepare analysis and write 1-2 scientific papers based on the results. In February 2021, Freiwald assigned to her an additional writing task, with a deadline in summer 2021. Marciniak was delegated to write a review article for a special issue of Cognitive Neuropsychology dedicated to the Intuitive Physics topic. [42] For the work on the assignments, Freiwald and RU appointed her in a three year Research Associate contract on an H1-B visa, effective in September 2021.

182. In May 2021, Marciniak filed NYS DHR complaint against Winrich Freiwald and the Rockefeller University about his sexual harassment and 2020 retaliation events. In filling her complaint, Marciniak hoped for positive resolution, i.e., *letter of apology* and compensation of her lost employment, but the complaint's Respondents consistently denied any wrongdoing in their position statement. In January 2022, the NYS DHR issued probable cause determination after investigation of Marciniak's complaint.

183. On 8/12/2021, half a month before her reappointment to a new Research Associate position, Freiwald emailed her and told her that *The University and I* decided to terminate her employment at the RU, effective November 30, 2021. Shocked and speechless, Marciniak silently opposed to Freiwald's email notice. The termination was sudden and untimely as it fell only 3 months after starting of the new Research Assosiate 3 year contract, and abruptly interrupted her ongoing work contracted with Freiwald earlier in 2021. Marciniak submitted the review paper in September 2021, and by default it was impossible for her to conclude the remaining work on other publications and write two papers until November 30.

184. On 11/17/2021, Marciniak received an email from Michael Wiener (and others cced) from RU HR Department, which informed that her *last day of employment at the University will be November 30, 2021* and gave me the *exit* instructions. Subsequently, on 11/24/2021, Marciniak also received exit instructions from Freiwald's lab manager. In early 2022, RU withdrew their H-1B petition for Plaintiff's stay, and offered to Marciniak a one-way *ticket to Poland*.

## 10. TENTH CAUSE OF ACTION:

## CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS

### the Civil Rights Act of 1871, 42 U.S.C. 1985(2) and (3)

---

42  This publication is currently in press.

(against RU, MIT, Harvard, BCH, U of Chic, MBL)

**10.1. Conspiracy to conceal the commission of the crime:**

185. Employed by MIT, Harvard and BCH, Azevedo was a serial sex offender. In 2017, during the CBMM Summer School program, while in power position (savvy in CBMM Teaching Assistant) over Marciniak (naive listening student, CBMM Summer School first-timer), Azevedo committed a rape crime on her. He subsequently manipulated her into keeping salient about the events, and committed another crime on her in New York, in March 2018.

186. In March 2019 Marciniak submitted the Harassment, Discrimination, Bias, and Hate Incident Reporting Form to MIT Title IX and Bias Response Office. Marciniak's report described the rape at CBMM Summer School 2017 and subsequent sexual harassment from Azevedo (accused), and identified enabling person, Boix (as involved person). The report also identified several witnesses who could corroborate Marciniak's testimony. In the report form, Marciniak requested *Referral to Human Resources for possible investigation of a violation of Institute policy by an employee (faculty and staff)*.

187. Subsequently, Marciniak was contacted by Sarah Rankin ("Rankin"), Title IX Coordinator and Director of the Title IX and Bias Response Office at MIT. Upon information and belief, Rankin was familiar with *Fred* [Azevedo], as MIT office had already received complaints about him. After talking to Marciniak, Rankin initialized talking with other institutions such that Marciniak could have *options*.

188. Between March and May 2019, Marciniak's report was informally processed and routed between Title IX coordinators of the institutions involved in the Summer School program, i.e., Rankin (MIT), Martinez (Harvard/BCH), and Collier (U of Chic[43]) , and their General Councils and HR Directors Egan (MBL), and the CBMM Management ("Sullivan"). Upon information and belief, RU's Title IX Coordinator and HR Vice President Virginia Huffman (Rockefeller University, "Huffman") was also contacted about Marciniak's complaint in this process, because Title IX procedures require to contact Title IX coordinator from the complainant's institution if complainant is from the outside institution. RU as institution was also mentioned by Harvard Title IX coordinator, Jose Martinez ("Martinez") while he discussed with Marciniak possible joint jurisdiction over the complaint in April 2019.

189. In this period, the multi-institutional overt and/or cover agreement(s) (*meeting of the minds*) was(were) achieved about the complaint prospects. Upon information and belief, the complaint was evaluated as serious, and to avoid *bad publicity*, it was decided to refuse Marciniak the option of the formal investigation at MIT and Harvard, both of which which would had to be based on impartial procedures.

190. In this period, Marciniak repeatedly expressed her wish for impartial investigation, and argued that Rankin and/or Martinez should take her complaint into formal investigation[44]. Both institutions' policies had developed investigative procedures with independent investigators and equal rights for both parties to access, review and respond to evidence before the final investigative report, as well as available appeal procedures. As the result of applying misrepresentations, both Rankin and Martinez diverted Marciniak's complaint away from their formal processes. Although Marciniak inquired to Rankin about the passage from the NSF-CBMM agreement instructing as per Title IX requirements on the complaint process in the CBMM program, Rankin did not provide it to her.

---

43  MBL is an affiliate of the University of Chicago and MBL appears to utilize the University of Chicago's Office for Equal Opportunity Programs for internally filed sexual misconduct complaints involving MBL

44  As per NSF-CBMM agreement, CBMM *adheres to the policy on harassment set forth [sic]Massachusetts Institute of Technology.*

191. In conversing with Marciniak, Rankin and Martinez were consistently conveying to her that other institution, effectively MBL, would be more appropriate for the investigation, but they avoided explaining to her the reasoning behind not accepting her complaint at the first place. To enable multi-institutional *meeting of the minds*, Rankin and Martinez were both delaying the process under the guise of it being *complicated*. In result, both deprived Marciniak of her right to no-contact order during her visit at MIT in early May 2019.

192. In mid-May 2019, in consequence of the multi-institutional conversations, *it was decided* that MBL was the appropriate entity to conduct the investigation, and Marciniak was subsequently contacted by Bridget Collier ("Collier"), Associate Provost for Equal Opportunity Programs and Title IX Coordinator for the University of Chicago and Ann Egan ("Egan"), Director for Human Resources at MBL - the investigators. On 5/20/2019, while outlining to Marciniak their investigative outlook, Collier and Egan referred Marciniak back to Huffman for *resources available to [her]*, and as a *support person through this process*.

193. After investigators maneuvered the process to Marciniak's disadvantage (MBL policy, which was applied, does not have established investigative procedures), the investigation concluded without probable cause determination, while Marciniak was meanwhile *supported* by Huffman and Huffman's legal and mental referrals, and no appeal process was available to Marciniak afterwards.

## 10.2. Conspiracy to salience the victim:

194. In May 2019, *in need of support*, Marciniak contacted Huffman after the investigators' referral. Having trust in academic institutions, Marciniak accepted Huffman's referrals as professionally helpful for her. Between May and November 2019, Huffman conducted multiple meetings with Marciniak, and she got to know her and her complaint perspective in details. On 5/21/2019, as Marciniak reported to her the 2017 sexual assault and subsequent sexual harassment from Azevedo, Huffman diverted the jurisdiction over the complaint away from RU, although RU nondiscriminatory policy applied to the events of the complaint.

195. On 5/22/2019, while giving her the legal referral, Huffman told her that Huffman had spoken with Zipkin and had explained to Zipkin that Zipkin should assist her as RU's student[45]. While interacting with Marciniak afterwards, Huffman's legal referral never discussed with Marciniak RU's jurisdiction over the complaint, nor subsequent to the outcome of the U of Chicago/MBL informed her about her rights to file external complaint. Zipkin told Marciniak she would assist her in the investigative process to relieve Marciniak after Marciniak had been *advocating* for herself for so long, but then Zipkin approved discriminating for Marciniak investigative steps, and did not step in to correct procedural irregularities.

196. After investigative outcome, Zipkin impeded Marciniak's intent to proceed with re-submission of the NSF complaint, by advising her to consider to stop there given the *emotional strain* this process had on her, and last moment withdrew herself from assisting with NSF complaint draft. Zipkin disappeared when Marciniak contacted her in October 2019 asking for assistance in proceeding with new evidence in the case. Although Zipkin's assistant, Morak, promised assistance with retrieving Whatsapp messsages to be included as evidence during the investigation, she withdrew herself unexpectedly while the investigation was launched.

197. Huffman also referred Marciniak for mental health service, and covered the services of the off-site psychotherapist, Maria Solomon ("Solomon"). On 5/31/2019, at the end of Marciniak's second *session* with the referred psychotherapist, Solomon told Marciniak she had talked with Huffman on the phone, described Huffman as a lovely person, and confirmed that Huffman would cover the costs of Solomon's

---

45   although while the sexual assault happened, Marciniak was RU's employee

services towards Marciniak, while placing in front of her the document to sign as the necessary paperwork. The form was *authorizing Maria Solomon to release information pertaining to [Marciniak's] evaluation and/or treatment sessions to Virginia Huffman (Rockefeller University),* and Solomon folded the signed paper and together with her current bill placed in the envelope, which she asked Marciniak to hand over to Huffman.

198. Between May and October 2019, Solomon was talking with Marciniak about how Marciniak was thinking about her situation, about the complaint process and instructed her further to talk to Zipkin before taking any actions. After the investigative outcome, both Solomon and on-site psychiatrist advised Marciniak to accept it. After Marciniak reported to Solomon that Marciniak consider refilling the NSF complaint, she advised her to think twice. On 10/26/2019, Marciniak told her that she was contacted by another victim of the same perpetrator who was willing to testify in the criminal and institutional investigations. Solomon doubted whether the fact had any legal value and tamed Marciniak's initial belief that this information would move the case forward. Solomon advised her against moving forward with the new evidence to avoid harm to the perpetrator. She rebuked Marciniak, angrily asking if Marciniak was aware that her actions could cause disciplinary actions and negatively affect perpetrator's work and his future career if Marciniak continued. Taken by surprise by Solomon's stance Marciniak said that [she] *thought we are fighting for justice here,* Solomon responded: *No, you are fighting for justice.*

199. In result of the above, Marciniak was deprived equal access to her civil rights: Title IX and Title VII, and

**10. 3. Conspiracy to impede the criminal investigation:**

200. As per information and belief, Azevedo was interviewed by the Falmouth Police after the U of Chic/MBL investigation. From early January until early February 2020, Marciniak participated in an internal CBMM audit led by DeStefano[46] about her complaint and broader issue of sexual harassment in the CBMM program. Marciniak contributed with her complaint material, including a copy of the May 2019 letter she sent to Poggio. She also provided details about procedural errors in joint U of Chicago/MBL investigation, and informed about, and then connected DeStefano with other victims of the same perpetrator, including the one in the CBMM Summer School program and the one in 2013, prior he commenced working there.

201. Although Marciniak participated hoping that the investigation into her complaint would be reopen given the new evidence, Marciniak learned it was *impossible.* As per information and belief, MIT issued the document for Azevedo, which he provided to the Falmouth Police that MIT (not U of Chic/MBL) did investigation on him, and found him not guilty. As per information and belief, the Falmouth Police collected testimonies of 4 other than Marciniak victims of Azevedo corroborating his sex predatory pattern. As per information and belief, MBL refused to hand over their investigative documentation on the case to Falmouth Police without court order.

# 11. ELEVENTH CAUSE OF ACTION:

# RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT ("RICO")

**18 U.S.C. §§ 1961-1968 (against RU, MIT, Harvard, BCH, U of Chic, MBL, NSF-CBMM cooperative agreement)**

---

46   she was referred by Kanwisher

202. The Center for Brains, Minds and Machines (CBMM) is a multi-institutional NSF Science and Technology Center (STC) dedicated to the study of the science and engineering of intelligence. CBMM was established in 2013 under NSF cooperative agreement award instrument. The total awarded amount to the MIT-based CBMM program (as of 8/18/2022) is $ 48,079,625.00. The federal funding of CBMM is expected to continue at least until August 31,2023. Since 2013, CBMM had established partnerships with academic and industrial institutions, including Google, Microsoft,  Siemens, under the umbrella of overlapping interests in advancing artificial intelligence and machine algorithms. Bridging science and technology through (human) collaboration, CBMM is a show-off for MIT (and Harvard, BCH, U of Chic, MBL, RU) to attract private sector money. Defendants, the CBMM awardee and sub-awardee recipients, are private academic institutions, whose main, if not sole, benefit from CBMM participation, is to gain visibility on national and international arena to attract the industrial partnership's money, and thus ensure continuous flow of their endorsements and tuition.

203. As per NSF Science and Technology Center agreements, CBMM annually reports on its research progress, goals, activities etc. For the NSF annual evaluation, CBMM and its employee provide written reports. In addition, NSF STC Site Visit, invitation only meeting held annually around May, is held at MIT. This conference-like format with poster presentations and lectures, gives the external NSF-designated reviewers the chance to evaluate the CBMM progress, to then decide on continuous funding. NSF-CBMM cooperative agreement is based on the idea of mutual benefits. This contract provides for incentive-based compensation, where CBMM employees can gain continuous CBMM salary and additional grants, just from the fact of continuous NSF funding of the CBMM program, in addition to the benefit of, by visibility, attracting industrial partners. Losing continuous NSF funding implies loss of interest, such as salary, grants and endowments.

204. Because CBMM is a federally-funded program, CBMM awardee and sub-awardee institutions are required to comply with federal laws, including Title IX. NSF Office of Equity and Civil Rights[47], has developed NSF Awardee Civil Rights Compliance Program, to investigate complaints of unlawful discrimination, harassment and retaliation in NSF-funded programs services and activities.

205. To maximize this incentive-based compensation, and prevent loss of interest resulting from finding non-compliance with Title IX regulations, it was imperative for the CBMM Director Tomaso Poggio ("Poggio") and others, to protect the sexual perpetrators accused of sexual misconduct in the program, and to downplay any reports of sexual misconduct which might jeopardize the ability to positively "pass" the annual NSF evaluation. The NSF-CBMM cooperative agreement is a formal enterprise under which an informal, mafia-like structure have been created to carry out the racketeering activity. Between 2019 and 2022, Defendants engaged in pattern of racketeering activity by covering up Marciniak's sexual harassment complaints in the CBMM program. Defendants directly or indirectly benefited from pattern of racketeering activity. By engaging in the pattern of racketeering activity, CBMM Defendants avoided liability in Marciniak's complaint, and secured continuous NSF funding to CBMM. To sustain the NSF-CBMM cooperative agreement, Defendants' routinely and systematically use of national and international funds.

206. CBMM Director, CBMM Summer School Directors, and Defendants' Title IX Coordinators/HR Directors knowingly defrauded Marciniak, the victim of sexual assault in the program, harbored sex trafficking in the program and obstructed the course of justice in relation to the crime which occurred in the program. Defendants had the specific intent to engage in the substantive Racketeer Influenced and Corrupt Organizations Act ("RICO") violations alleged herein, in order to appear in compliance with Title IX requirements of the federally funded program. The racketeering activity, through

---

47  Formerly Office of Diversity and Inclusion

the use of the interstate mails and wires, was made possible by Defendants' regular and repeated use of the services of the enterprise. Between March 2019 and May 2019, each and every Defendant's Title IX Coordinator/HR Director had actual knowledge about Marciniak's complaint in relation to 2017 sexual assault and subsequent sexual harassment, and orchestrated conspiracy to conceal the commission of the crime by comparing their policies and moving Marciniak's complaint to be processed under the least structured policy. Then, between May and August 2019, the selected institutions rigged the investigative steps to give disproportional advantage to the side of the perpetrator in the complaint. The process did not allow appeal. After Marciniak reported on additional evidence and procedural errors reasonably expecting that the appeal would be allowed, Defendants further blocked her complaint from being reopened.

207. On 5/7/2019, while at MIT presenting research at the annual CBMM evaluation, Marciniak reported on apparent shortcomings of the CBMM complaint process to the NSF-delegated CBMM reviewer, who then conveyed the Title IX issue to Poggio, and to the NSF Office of Diversity and Inclusion Office (ODI). Marciniak contacted the office with her complaint, and it was the NSF ODI officer, Robert Cosgrove[48] ("Cosgrove"), who replied and instructed her to submit the NSF complaint about her complaint process in CBMM, collected material documentation, and conducted a phone interview with her on 5/17/2019, to then deliberate on the *initial disposition of [her] complaint* until 8/6/2019, when he emailed her about dismissing her complaint because of the ongoing status of the U of Chicago/MBL investigation. Marciniak resubmitted her NSF complaint in October 2019.Since May 2019, Marciniak had been systematically reporting to Cosgrove about her complaint process, and provided him with detailed material documentation, as well as updated him on new developments. After *deliberation*, in February 2020, Cosgrove accepted her complaint for investigation, and Scott Carr took it over in 2021, to then issue together with Cosgrove a notice of outcome in March and July 2022, without probable cause determination. The investigation was not thorough, involved only selected Defendants (e.g., omitted Harvard and BCH), and did not take into account Marciniak's evidence.

208. Cosgrove was also involved in covering up Marciniak's another complaint. On 6/4/2020, Cosgrove learned from Marciniak about Freiwald's retaliation, and on 9/2/2020 received her complaint against Freiwald and Rockefeller. On 9/10/2020, Cosgrove emailed Marciniak that ODI was referring her complaint to EEOC New York office, and told her she would be contacted by them. Marciniak expected that her EEOC inquiry forwarded to EEOC will appear on her EEOC online portal, or she would be called by EEOC New York to schedule an intake call[49] On 10/20/2020, Marciniak received a call from the Washington landline phone number registered to a private person working as EEO (not EEOC) Investigator[50] living in District of Columbia, Washington DC. A woman introduced herself as an EEO Investigator, and performed with Marciniak a 46 minute conversation concerning Marciniak's *allegations*, to discredit Marciniak's testimony, i.e., *dismiss* Plaintiff's alleged EEOC complaint at the end of the call. During the phone call, the woman, who Marciniak was talking with, was continuously rude and invalidating towards Marciniak, and several times reacted towards the information which Marciniak provided with stereotypes and myths about victims of sexual violence. Her behavior was (i) motivated by prejudice on the basis of Marciniak's sex and (ii) dismissed blatant temporal proximity between Marciniak's protected activity and Freiwald's negative employment action in May- June 2020 events, both unlikely for the individual who would be in the role of a federal investigator during an intake EEOC call.

209. By the reason of the facts and circumstances stated above, Plaintiffs allege that NSF-CBMM cooperative agreement (I) defrauded the NSF ODI policies and procedures in handling Marciniak's complaint (ii) broke the federal and state laws prohibiting federal officials to impede complainants civil rights, and (iii) deceived Marciniak into believing her complaint was dismissed by EEOC New York. These

---

48  Robert Cosgrove and Scott Carr are two NSF officers from the Awardee Compliance Branch of the OECR office.
49  The EEOC New York schedule a 15-minutes long intake calls
50  the number was NOT associated with any EEOC office

acts constitute substantive RICO violations. As a proximal consequence of the RICO violations, Marciniak felt intimidated and helpless about contacting the external agencies further with her complaint.

# 12. TWELFTH CAUSE OF ACTION:

# INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**State Law Claims (against RU)**

210. Marciniak was employed by RU from September 2016 until November 2021. In her internal bona fide complaint in March 2019 to MIT, and the subsequent one in May 2019 to Huffman, Marciniak trusted her employer in reasonably expecting that she would receive help after the 2017 sexual assault and subsequent sexual harassment from a CBMM colleague. In May 2019, She arrived to Huffman vulnerable. Marciniak had not receive neither psychiatric nor psychotherapeutic treatment for trauma in relation to her sexual assaults and sexual harassment, but in April the opportunity for starting a specialized professional help emerged, as the spot had been free at some professional recommended to her. In that situation, given the cost of $300, 00 per session, Marciniak welcomed Huffman's offer to pay for the psychotherapist with open heart and was grateful to her employer.

211. To her drastic disadvantage, the psychotherapist whom Huffman referred Marciniak to, and whom Marciniak had been seing from May until November 2019, lacked training and experience in the area, as well as lacked empathy and sensitivity. But of utmost, Solomon lacked ethics, thus agreed to work with Huffman on Marciniak, to observe Marciniak's actions and talk with her about how Marciniak was seing her situation, and to subsequently relay that information to Huffman. As a person who knew Marciniak so well, Huffman was well situated to help, but instead, Huffman kept Marciniak in unprofessional hand of the psychologist and the attorney, to make Marciniak more exhausted from the complaint actions, and to influence her to give up. Because of being "treated" by Huffman, Marciniak's could have never recovered from the sexual assault and sexual harassment, and Huffman's Title IX "coordination" turned into coordinating of network of protection of the institutional interests.

212. This claim is against RU, because Rockefeller University had known Plaintiffs well – Marciniak as a sexual assault victim and Marciniak and Agra as a couple holding hands on the street and a couple in a hardship condition, when Marciniak in detail pictured their situation during the pandemic after Agra lost his work contract and they were looking for rent relief. Rockefeller University conduct in relation to Marciniak's employment termination was extreme and outrageous, beyond the bounds of acceptable conduct in a civilized society. Whereas RU could have kept an excellent scientist and benefit from Marciniak's success, the University chose to demote her in 2020, cutting off the very scientific opportunities for which Marciniak moved her center of live from Germany to US. Finally, when she attempted to protect her employment rights and filed a NYSDHR complain in May 2021, RU fired her effectie in November 2021, and subsequently in February 2022 withdrew Plaintiffs' visa petition, shaking the ground beneath their feet.

213. Beyond the limits of any human decency, RU planned their actions to put Plaintiffs against the wall, and concealed the withdrawal, to then uncover for them the limited grace period which remained to them to apply for the new one. RU's actions were purposeful and aimed precisely to inflict them emotional distress, such that in desperation they would accept the proposal which RU prepared for Marciniak- a one way ticket to Poland. By sending Plaintiffs away, RU hoped to send away also their *problem*, i.e., the NYSDHR complaint, which Marciniak filed in relation to Freiwald's and the RU's actions in 2020, and which was granted probable cause determination in January 2022.

214. RU's action did inflicted emotional distress on Plaintiffs. The enormous amount of stress Plaintiffs experiences over extended period of time caused them Post Traumatic Stress Disorder, which has been requiring medical and psychological treatment. It is ironic that Rockefeller University's logo reads "science for the benefits of humanity". In their recent termination and visa withdrawal actions, RU seemed to experiment the limits of human durability. Subjected to RU's experiment, Plaintiffs were like the rats given electric shocks. Exhausted, and in pain, with time developing helplessness, since they learned they never knew when and where the next one would come, with the only certainty that it was beyond their control and that the shock was huge. The RU experimentators turned out to be a sadist, and/or applied the procedure so many times that the RU experimentator learned that the conditions they subjected Plaintiffs to would be unbearable to sustain for anyone.

215. The conduct was motivated by creation of a hostile work and life environment and strong retaliatory animus towards Marciniak's complaint, and constitute a prima facie case of intentional infliction of emotional distress. Plaintiffs have suffered and will continue to suffer mental and physical distress and medical costs associated with mental and physical health treatment.

## 14. FOURTEENTH CAUSE OF ACTION:

## LOSS OF CONSORTIUM

### State Law Claims (Agra against RU, MIT, Harvard, BCH, MBL, U of Chic)

216. Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein. Plaintiffs are 38 years old and have been married since December 18, 2018.

217. Plaintiffs have a loving, close and dependent relationship. The nature of their close relationship gives rise to a loss of consortium claim by Agra, who, but for Defendants negative conduct towards Marciniak, resulting in his wife's physical and mental illness, would have continued to rely on her guidance, companionship, assistance and support throughout their daily lives.

218. Agra's loss of consortium with his wife Karolina Marciniak Agra was directly and proximately caused by Defendants. Agra suffered loss of consortium damages to be individually determined by the jury at trial, and include: the loss of the value and enjoyment of his life, the loss of his wife's household services, the loss of his wife's earnings and earning capacity, aggravated circumstances surrounding Defendants retaliation, the loss of love, companionship, comfort, care, assistance, protection, affection, society, guidance, training, and moral support from his wife.

# PRAYER FOR RELIEF

219.    Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

220.    Plaintiffs request damages for Defendants' wrongful conduct in an amount of $318,000,000.00 (three hundred eighteen million dollars) plus the amount to be determined at trial. The amount requested is for compensatory damages for:

i. The fear, pain, and suffering of Marciniak after being subjected to Defendants wrongful conduct, and associated fear, pain, and suffering of Agra.

ii. The loss of the value and enjoyment of her and his life;

iii. The loss of the value and enjoyment of her scientific work;

iv. The loss of her and his earnings and earning capacity.

v. The loss of her academic career

vi. Medical expenses

vii. Aggravating circumstances surrounding the retaliation and her wrongful termination;

viii. Punitive damages in an amount to be determined at trial

ix. Costs.

x. Such other relief as this Court or a jury may find appropriate

Dated: April 10, 2023

Dr. Karolina Marciniak Domingues Goncalves Agra [Printed]          [Signature]
(Plaintiff)

Pedro Henrique Marciniak Domingues Goncalves Agra [Printed]          [Signature]
(Plaintiff)

# EXHIBIT 1

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Boston Area Office**
15 New Dudbury St, Room 475
Boston, MA 02203
(617) 865-3670
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 04/05/2023

**To:** Ms. Karolina Marciniak
500 E 63rd Str Apt 13 F
NEW YORK, NY 10065

Charge No: 520-2020-04241

EEOC Representative and email:   AMON KINSEY
Supervisory Investigator
amon.kinsey@eeoc.gov

### DISMISSAL OF CHARGE

The EEOC is closing this charge because: Charging Party is pursuing claims in another forum.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By:Timothy Riera
04/05/2023

Timothy Riera
Acting District Director

**Cc:**
Kathleen D Sullivan
CENTER FOR BRAIN MINDS AND MACHINES, MIT
77 Massachuestts Avenue, Room 46-2005
Cambridge, MA 02139


Allison K Romantz
MIT OFFICE OF GENERAL COUNSEL
77 Massachusetts Avenue 7-206
Cambridge, MA 02139


Please retain this notice for your records.

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Boston Area Office**
15 New Dudbury St, Room 475
Boston, MA 02203
(617) 865-3670
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 04/05/2023

**To:** Ms. Karolina Marciniak
500 E 63rd Str Apt 13 F
NEW YORK, NY 10065

Charge No: 523-2020-01670

EEOC Representative and email:    AMON KINSEY
Supervisory Investigator
amon.kinsey@eeoc.gov

### DISMISSAL OF CHARGE

The EEOC is closing this charge because: Charging Party is pursuing claims in another forum.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By:Timothy Riera
04/05/2023

Timothy Riera
Acting District Director

**Cc:**
Marilyn Schriever
marilyn_schriever@harvard.edu

Robert P Joy
MORGAN BROWN & JOY
200 State Street, 11th Floor
Boston, MA 02109


Marilyn G Schriever
Harvard University Office of the General Counsel
1350 Massachusetts Ave. Suite 980
Cambridge, MA 02138


Karen Deely
MORGAN BROWN & JOY
200 State Street, 11th Floor
Boston, MA 02109


Please retain this notice for your records.

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Boston Area Office**
15 New Dudbury St, Room 475
Boston, MA 02203
(617) 865-3670
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
### (This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 04/05/2023

**To:** Ms. Karolina Marciniak
500 E 63rd Str Apt 13 F
NEW YORK, NY 10065

Charge No: 523-2020-01820

EEOC Representative and email:      AMON KINSEY
Supervisory Investigator
amon.kinsey@eeoc.gov

---

### DISMISSAL OF CHARGE

The EEOC is closing this charge because: Charting Party is pursuing claims in another forum.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By:Timothy Riera
04/05/2023

Timothy Riera
Acting District Director

**Cc:**
James Horgan
300 Longwood Avenue
Boston, MA 02115


Ellen Rothstein
BOSTON CHILDREN'S HOSPITAL
300 Longwood Avenue
Boston, MA 02115


Please retain this notice for your records.

# EXHIBIT 2

EEOC Form 161-B (01/2022)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | Karolina Marciniak<br>500 E 63rd Street, APT 13F<br>NEW YORK, NY 10065 | From: | New York District Office<br>33 Whitehall St, 5th Floor<br>New York, NY 10004 |
|---|---|---|---|

| EEOC Charge No.<br>**520-2022-04985** | EEOC Representative<br>**GLENDORA YOUNG,**<br>**EEOC Investigator** | Telephone No.<br>**9295065290** |
|---|---|---|

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

More than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge.

*Equal Pay Act (EPA): You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.***

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Digitally Signed By:Timothy Riera
03/21/2023

Enclosures(s)

**Timothy Riera**
**Acting District Director**

cc:   **Noa Baddish**
      **Proskauer Rose LLP**
      **Eleven Times Square**
      **New York, NY 10036**
      **Elise Bloom**
      **Proskauer Rose LLP**
      **Eleven Times Square**
      **New York, NY 10036**