# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

KAROLINA MARCINIAK- DOMINGUES            )
GONCALVES AGRA,                          )
                                         )
    Plaintiff,                           )          **Index No.: 1:22-cv-10959-ALC**
                                         )
    v.                                   )
                                         )
ROCKEFELLER UNIVERSITY,                  )
MASSACHUSETTS INSTITUTE OF               )          **SECOND AMENDED**
TECHNOLOGY and PRESIDENT AND             )          **COMPLAINT**
FELLOWS OF HARVARD COLLEGE,              )
                                         )          **JURY TRIAL DEMANDED**
                                         )
    Defendants.                          )

-----------------------------------------------------------

    Plaintiff Dr. KAROLINA MARIA MARCINIAK-DOMINGUES GONCALVES AGRA ("Plaintiff") complain of Defendants ROCKEFELLER UNIVERSITY ("RU"), MASSACHUSETTS INSTITUTE OF TECHNOLOGY ("MIT") and PRESIDENT AND FELLOWS OF HARVARD COLLEGE ("Harvard") and in support respectfully allege, upon information and belief, the following:

## I. NATURE OF THE ACTION

    1.  This action is brought pursuant to18 U.S.C. § 1595 and Victims of Trafficking and Violence Protection Act of 2000 ("TVPA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII"), Title IX of the Education Amendments of 1972 20 U.S.C. § 1681, *et. seq*. ("Title IX"), Civil Rights Act of 1871, 42 U.S.C. 1985(2), Racketeer Influenced and Corrupt organization Act ("RICO"), state claims including the New York State Executive Law ("NYSHRL") § 296, et seq., the New York City Admin. Code § 8-101, *et seq*. ("NYCHRL"), and a common law claim for intentional infliction of emotional distress.

    2.  Plaintiff brings this action against Defendants for economic, non-economic, compensatory and punitive damages, pre-judgment interest and costs and reasonable attorneys' fees, and any such remedies the Court deems just and proper.

## II. JURISDICTION AND VENUE

3.   This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343, because Plaintiff's statutory claims present federal questions, and pursuant to 28 U.S.C. § 1332(a), because the matter in controversy as to Plaintiff exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States, citizens of a State and citizens or subjects of a foreign state, or citizens of different States and citizens or subjects of a foreign state are additional parties.

4.   The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and city law pursuant to 28 U.S.C. § 1367(a). Plaintiff asserts supplemental State law claims pursuant to the New York State Constitution, New York Executive Law § 296, *et seq*. and New York City Admin. Code § 8-101, *et seq*.

5.   This Court has personal jurisdiction over Rockefeller University because its principal place of business is located in this state at York Avenue, New York, New York.

6.   Exercising personal jurisdiction over remaining Defendants by this Court is consistent with the Constitution and laws of the United States pursuant to New York's long-arm statute, N.Y. C.P.L.R. § 302(a)(1) – (4), because at all relevant times they have engaged in substantial business activities in the State of New York.

7.   The Court has general jurisdiction over Harvard and MIT given the specific circumstances of this case and the interplay of these academic institutions that share research and access funding.

8.   The dynamic between these NSF federally funded universities (Harvard, MIT, and RU) is unique due to their cooperative agreement with the CBMM program to collaborate with each other and share both research and talent.

9.   As listed in this complaint below, Defendants MIT and Harvard transacted, solicited, and conducted business in New York through the employees, agents, and/or representatives, and derived substantial revenue from such business in New York. Their contacts with New York were purposeful and had a strong nexus to the claims asserted in this case, beginning in 2014 and continuing through 2021. Harvard and MIT derived substantial revenue from interstate commerce by transacting business within New York.

10. The collaboration involved shared research objectives and goals that directly benefitted all, there were significant exchanges of scientific goods, data, or personnel between the two institutions and the institutions relied on each other for critical aspects of Plaintiff's research or project. The nexus of the collaboration lies in New York due to the primary decision-making and oversight activities related to Plaintiff's work being conducted within the state.

11. Harvard and MIT's transactions in New York, as defined by CPLR § 302(a), included utilizing RU as a primary location for the corrupt activities described in this complaint. These activities involved a pattern of racketeering aimed at silencing Plaintiff's sexual harassment complaint and retaliating against her.

Due to the funding's connection to these allegations, Defendants Harvard and MIT have sufficient minimum contacts with New York to justify the exercise of jurisdiction.

12. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this judicial district, and application and enforcement of Defendants' equal employment opportunity ("EEO") policies, affecting the hiring, promotion, work assignments, discipline and termination of its employees, may be found in this District.

13. All conditions precedent to jurisdiction have occurred or been complied with including, and in particular: (i) within the time prescribed by law, Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR") and EEOC under "dual filing" on or about May 18, 2021 alleging violations of federal law including, but not limited to, Title VII of the Civil Rights Act of 1964; (ii) within the time prescribed by law, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on or about June 7, 2022. A Dismissal and Notice of Right to Sue issued by the EEOC on March 21, 2023.

## III. JURY DEMAND

14. Pursuant to Fed. R. Civ. P. 38(b), Plaintiff respectfully demands a trial by jury on all issues and claims set forth in this Second Amended Complaint ("Complaint").

## IV. PARTIES

15. Plaintiff Dr. Karolina Marciniak-Domingues Goncalves Agra is, and at all times mentioned in this Complaint was, a resident and domiciliary of the New York City.

16. Upon information and belief, Defendant RU is, and at all times mentioned in this Complaint was, incorporated under the laws of the State of New York and is authorized to operate in the State of New York and qualified to do business in New York State.

17. Upon information and belief, Defendants MIT and Harvard are, and at all times mentioned in this Complaint were, incorporated under the laws of the State of Massachusetts, and are authorized to operate in the State of New York and qualified to do business in New York State.

18. Plaintiff is a neuroscientist with background in Psychology (MA, 2008, Adam Mickiewicz University in Poznan, Poland) and PhD in Neuroscience (2015, International Max Planck Research School, Graduate School of Neural & Behavioral Science in Tuebingen, Germany). As part of her doctorate research program, she acquired extensive experience in neuroscience, particularly as applied to magnetic functional imaging of the social attention and single cell electrophysiology of cerebellar motor adaptation in non-human primates, two current areas of major scientific and medical interest in autism-related research. As a result of her doctorate work, Marciniak had authored or co-authored five original research articles, which have been published in leading scientific journals.

19. Defendants share common business by operating Center for Brains, Minds and Machines enterprise ("CBMM"), a multi-institutional research and education center, dedicated to the study of intelligence, how the brain produces intelligent behavior and how this scientific discovery may enable the replication of intelligence in machines.

20. CBMM was established at MIT in 2013 under a cooperative agreement through funding via National Science Foundation ("NSF"). MIT is the main awardee[1], whereas President and Fellows of Harvard College ("Harvard"), and Rockefeller University ("RU") are sub-awardee institutions of the NSF-CBMM agreement.

21. Under that agreement, Winrich Freiwald, the RU's Professor and former MIT postdoctoral researcher, became one of the CBMM's Principal Investigators, and has been receiving and managing the CBMM research funding (i.e., research grant) for neuroscience research performed under the CBMM scope and in connection with CBMM scientific goals at his Laboratory of Neural Systems at Rockefeller University. Freiwald, The CBMM Principal Investigator, received a regular salary from his CBMM position.

22. CBMM's collaboration has led to increased funding for RU by pooling resources and sharing research costs. The partnership also made RU more attractive to funding agencies, leading to increased grant opportunities. CBMM's expertise in Systems Neuroscience, the area of research in Freiwald's laboratory in collaboration with CBMM, helped RU secure funding for the research projects and research centers that otherwise might have been outside its scope. Because of Freiwald's CBMM research, in 2021 RU established Price Family Center for the Social Brain, and Freiwald was appointed as its Co-Director.

23. Plaintiff's claims arose between in or about 2014 to 2022 when she was scouted and coerced into employment as a postdoctoral researcher at RU, working under the supervision of Winrich Freiwald of RU, Josh Tenenbaum of MIT, and Nancy Kanwisher of MIT.

24. Between in or about 2016 to 2021, the significant exchanges of resources, such as personnel, data, or equipment, was conducted between the three institutions, RU, MIT and Harvard for the advancement of Plaintiff's research project on Intuitive Physics in monkeys. Freiwald executed a primary oversight and management of Plaintiff's work and the majority of the data analysis and research were conducted in New York.

25. As part of her training and education, she was also participating in the annual program called CBMM Summer School in Woods Hole, MA, and the CBMM Retreat held at MIT, the events which were jointly overseen by MIT and Harvard.

---

1    The CBMM headquarters are located at 77 Massachusetts Ave, Massachusetts Institute of Technology (MIT), Cambridge, MA. CBMM Defendants' employee Tomaso Poggio (MIT), serves in the role of the Director of the CBMM, and CBMM Defendants' employee Kathleen Sullivan (MIT), is the CBMM Center Manager.

26. Defendants both directly (RU) and indirectly and jointly (MIT, Harvard) employed Plaintiff as defined by federal law including, but not limited to, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., the NYSHRL.

# V. STATEMENT OF FACTS

### *(1) Defendants' employees and agents lured and coerced Plaintiff to work for them.*

27. Throughout his academic career, Freiwald, whom RU appointed as Assistant Professor and the Head of Laboratory of Neural Circuits at RU in 2009 and whose predatory and exploitative mindset this lawsuit brings to light, has demonstrated a pattern of seeking personal relationships with individuals in positions of junior authority. Prior to receiving position at RU, Freiwald had a long-term romantic and professional partnership with Doris Tsao, which began while Freiwald was a postdoctoral fellow at MIT and Tsao was a PhD student at Harvard in early 2000 and ended on a bad note around 2008 because of Freiwald's misconduct. During his time at RU, Freiwald engaged in romantic relationships with a veterinarian doctor, whom he worked with at RU.

28. In or about November 2014, Freiwald reviewed Plaintiff's application while recruiting for postdoctoral openings in his laboratory at RU. Plaintiff was invited for an interview, which was scheduled to take place during a neuroscience conference in Washington D.C.

29. Once Plaintiff met Freiwald there, he spontaneously relocated the job interview from the Convention Center to the upscale restaurant in the city. He immediately offered her the postdoctoral position at his laboratory at RU in New York and promised she would be free to pursue the research of her proposal, assuring her that the laboratory was equipped in neuroscience technology relevant to Plaintiff's interests. During the interview, Freiwald inquired about Plaintiff's Polish upbringing and highlighted his German nationality. He gained Plaintiff's trust and control by talking about his laboratory's purported technological advancements and repeated several times that his laboratory was financially well-equipped to cover all the costs of her salary and the project. This was presented to Plaintiff as an opportunity for long-term but ultimately highly successful postdoctoral training, which would be unwise to decline. At the end of the interview, Plaintiff reached for her wallet to pay her bill, but Freiwald insisted on covering it himself.

30. In or about December 2014, Freiwald conducted a Skype interview with Plaintiff's then-fiancé but offered a position solely to Plaintiff. Although her fiancé possessed a similar background and had relocated from Poland to Germany for their joint PhD studies, Freiwald declined to extend him an offer, citing a lack of experience with non-human primates. This decision contradicts Freiwald's previous hiring of other male postdoctoral candidates who also lacked such expertise.

31. Under pressure, in or about December 2014, Plaintiff communicated her acceptance of Freiwald's offer and expressed her intention to relocate to New York with her fiancé, who planned to seek employment opportunities elsewhere.

32. In or about September 2015, Freiwald invited Plaintiff alone to travel from Germany to New York to view the facilities of his laboratory at RU and discuss the project proposal, arranging for her to stay at the campus guest house.

33. To accommodate Plaintiff's arrival, it was Freiwald's female laboratory manager, Lihong Yin ("Yin") who communicated with Plaintiff about the accommodation, itinerary and planned every detail of her visit. Yet, on Sunday, September 27, 2015, the day of her arrival but preceding her visit's formal start, Freiwald sent a personal "Welcome to New York" email to Plaintiff, in which he provided his cell phone number, flirtatiously requesting personal contact "for whatever reason, anytime, ok?". Plaintiff did not act upon Freiwald's innuendoes.

34. During Plaintiff's stay at RU, Freiwald insisted on picking her up from the guest house, but Yin ultimately did so.

35. At the conclusion of Plaintiff visit to RU, Freiwald disclosed to her that the research Plaintiff proposed was already being pursued in the laboratory and requested that she prepare another proposal. Given this unexpected development and the uncertainty regarding the laboratory's research facilities, Plaintiff decided to withdraw her commitment to the position.

36. Consequently, she did not complete the necessary paperwork to initiate her hiring process, which Yin had sent prior to Plaintiff's visit at RU, on or about September 24, 2015.

37. Despite this events, Plaintiff continued to receive persistent emails from Freiwald, who remained insistent on hiring her.

38. In November 2015, Freiwald initialized an email exchange with Plaintiff with "How are you doing? I hope all is well with you? Just wondering." Plaintiff replied after 3 days that she was OK, and in transitory situation following her PhD completion back in Germany. Freiwald immediately replied, offering "help in planning [her] next steps". Plaintiff did not reply.

39. In December 2015, Freiwald initialized a "Happy New Year" email exchange with Plaintiff, in which he inquired with whom Plaintiff was spending her holiday. Plaintiff politely replied to Happy New Year wishes but did not continue the personal exchange.

40. On February 6, 2016, Freiwald emailed Plaintiff again saying that he "[has] been worrying for some time now that [she] might not be doing well" and encouraged her to talk to him. Plaintiff did not reply.

41. On or about February 14, 2016, on Valentine's Day, Freiwald emailed to her "just a brief note to let [her] know that [he] mostly wanted [her] not to be afraid of anything", and insisted that she opens up to him saying that he is a good listener and understanding.

6

42. Because Freiwald assured that he "just want[ed] to make sure [she was] doing alright", Plaintiff replied 3 days later and said she was OK but had been dealing with some personal matters that had left her somewhat confused. In his response, on February 19, Freiwald "ha[d] to admit that [he] feared [she was] going through some personal matters".

43. In the same email Freiwald told her that it would be the best for her to work together with Freiwald and Josh Tenenbaum ("Tenenbaum"), Professor at MIT. Freiwald said "there would be a fanastic fit", and that he already contacted Tenenbaum about "having us [Plaintiff and Freiwald] work closely with [him]".

44. Freiwald told Plaintiff that this purported CBMM collaboration would be "invaluable to make the most out of [Plaintiff's] work and that it would be good for her to be "closely integrated into the CBMM for all the scientific support it offers".

45. At the time, Plaintiff was emotionally vulnerable due to the recent termination of her engagement. Freiwald's intrusion into her personal life, without her consent, left her feeling pressured and unable to decline the CBMM offer, especially since Freiwald had already contacted the professor at MIT about it.

46. In or about March 2016, Plaintiff planned another visit to RU to clarify the project proposal and verify laboratory facilities before committing to the position. However, a last-minute cancellation occurred due to her lack of valid visa.

47. On or about March 21, 2016, shortly after Plaintiff emailed Freiwald about the cancellation and her uncertainty on how to proceed, Freiwald arranged a Skype call, in which he offered RU's support in securing the visa. Plaintiff understood the visa was in relation to her prospective laboratory visit to RU, as she still wanted to evaluate the laboratory facilities before committing to the job.

48. To her surprise, immediately after the call, Freiwald sent a "New Postdoc" email to the Director of Immigration and Academic Appointments group in Human Resources, Maria Lazzaro ("Lazzaro"), who initiates postdoctoral appointments at the request of the Head of Laboratory at RU, copying Yin. The email effectively commenced the process of Plaintiff's employment at RU. Initially, Lazzaro attempted to speak with Plaintiff personally about its details, however, Freiwald stepped in and spoke for her, describing her visa situation as complicated, to have Lazzaro elect a less-favorable for Plaintiff J-1 Visa sponsorship for her postdoctoral employment at RU. Under pressure, Plaintiff agreed.

49. After accepting the position and RU's sponsorship for the J-1 visa, Plaintiff learned that an H-1B visa was more appropriate for her immigration situation.

50. On or about April 20, 2016, Freiwald further enticed Plaintiff with the CBMM collaboration by saying that he had "a fantastic" meeting with Tenenbaum, and that "there are exciting prospects for [Plaintiff] through this collaboration".

51. In or about July 2016, Freiwald, Tenenbaum and Kanwisher supervised Plaintiff's research proposal, and agreed that Plaintiff's research should focus on "electrophysiology to inform our understanding of Intuitive Physcs". On July 23, 2016, Freiwald sent Plaintiff's proposal to Kanwisher and Tenenbaum.

52. On or about August 1, 2016, Tenenbaum and Kanwisher provided their positive feedback on Plaintiff's proposal, describing it as "cool" and "dynamite".

53. In or about February 2017, under Freiwald', Kanwisher's and Tenenbaum's supervision, Plaintiff submitted the postdoctoral research proposal for her work. In result, she was given prestigious 2-year Feodor-Lynen fellowship from the German Humboldt foundation, which paid 50% of her salary between September 1, 2017 to August 30, 2019. In collaboration, RU agreed to cover the remaining part of the salary to complete the project.

54. On or about September 1, 2016, Plaintiff realized Freiwald gravely misrepresented to her the state, maturity and capabilities of the laboratory facilities. When Plaintiff arrived to commence her employment, the new fMRI protocol had to be developed from scratch, and the large-scale electrophysiology method was still in the very early developmental stage.

**(2)** ***Defendants shared personnel, data and resources and jointly exerted substantial control over Plaintiff's work and her workplace***

55. On or about September 15, 2016, Freiwald contacted Kanwsher and Tenenbaum to delegate Plaintiff to travel to MIT to establish collaborations. Plaintiff's scheduled visit at MIT took place between October 6 and 7, 2017. Tenenbaum and Kanwisher hosted Plaintiff, attended her PowerPoint presentation, and directed Plaintiff to discuss further with MIT's postdocs and students working on the topic.

56. Following Plaintiff's visit, between October 2016 to July 2017, a follow-up email correspondence through MIT and RU's email accounts was conducted between Plaintiff and Freiwald, Tenenbaum, Kanwisher, and other MIT employees, Kevin A. Smith, Tobias Gerstenberg, Sarah Schwettman, and Ilker Yiildirim, who supervised, guided and advised on Plaintiff's work in Freiwald's laboratory at RU.

57. On or about October 20, 2016, Kathleen Sullivan, the CBMM Center Director at MIT ("Sullivan"), contacted Plaintiff to welcome her in CBMM as a "CBMM-supported postdoc", and provided her with the center's "logistics". Among others, Plaintiff was required to complete the Responsible Conduct of Research course, which she subsequently did in New York, While contacting her with logistics, Sullivan did not provide Plaintiff with any anti-harassment information or sexual prevention training.

58. Between late 2016 and 2020, Plaintiff was recipient of the CBMM communication to her Rockefeller University email account, including weekly CBMM announcements by the CBMM

management, including Kathleen Sullivan of MIT ("Sullivan") and Kris Brewer ("Brewer") of MIT, directed to CBMM postdocs and students, informing about CBMM events and opportunities.

59. In or about early 2017, Tenenbaum traveled to RU to give a guest lecture, and requested Freiwald to meet Plaintiff and Freiwald together to discuss and supervise in person the next steps in Plaintiff's work.

60. In or about March 2017, Plaintiff was delegated by Freiwald to send an application for the CBMM Summer School in Woods Hole, Massachusetts that coming summer. CBMM Summer School is a flagship CBMM program, an intense three-week course held at Marine Biological Laboratory campus ("MBL")[2] in Woods Hole, MA, which contains lectures by MIT's, Harvard's and RU's faculty, and the faculty, which also included Teaching Assistants, assists students on preparing student projects. Tuition for the course, as well as room and board on the MBL campus, is funded by NSF through a sub-award from MIT through Harvard to MBL.

61. In or about March 2017, Freiwald supervised Plaintiff's participation in non-human primate medical procedure in a role of a "Master of Procedure". As in this role, the individual was supposed to give instructions to surgeons and assistants, including to Freiwald, he encouraged her to "be that slave driver once in your life".

62. On or about August 11, 2017, Xavier Boix ("Boix") of MIT's and Harvard in a role of senior Teaching Assistant at the CBMM Summer School program, suggested, encouraged and instructed Plaintiff on inquiring to the program Directors, Tomasso Poggio ("Poggio") of MIT, Boris Katz("Katz") of MIT and Gabriel Kreiman ("Kreiman") of Harvard about participating in the program as a "listener", to attend lectures, observe course activities, and interact with course staff and participants.

63. After obtaining Freiwald's approval, on or about August 25, 2017, she followed Boix's instruction, and emailed Kreiman, Katz and Poggio, copying Sullivan of MIT, and  requesting approval to attend part of the remaining course in a listener role. Same day, she received a positive response by Director Boris Katz, who referred her to Xavier Boix to speak about her accommodation arrangements.

64. On or about August 26, 2017, Freiwald delegated Plaintiff to discuss in person with Tenenbaum and Kanwisher Plaintiff's new eye-movement data acquired at RU in Freiwald's laboratory.

65. Between August 28 and August 31, 2017 Plaintiff attended the CBMM Summer School program, and conducted several meetings with Kanwisher and Tenenbaum at MBL in Woods Hole to discuss her work progress.

66. On or about August 31, 2017, she was directed by Tenenbaum to discuss the nest steps in her project paradigm with Kevin Smith and Tobi Gerstenberg, two (2) MIT employees in postdoctoral position under Tenenbaum's supervision, whom Tenenbaum directed to directly assist Plaintiff. Subsequent to this meeting, Tenenbaum, Kanwisher and Freiwald supervised an email exchange concerning further development, i.e.,

---

2   MBL is part of the University of Chicago

planning and implementing Smith's and Gerstenberg's new psychophysical paradigm in Plaintiff's work with monkeys at RU.

67. In or about September 2017, Kris Brewer, the Director of Technology for the CBMM, and the MIT employee, traveled from MIT, Cambridge, MA to Rockefeller University, New York, NY with a CBMM-sponsored technical equipment to record the interview with Marciniak and perform a photo-shooting session with her in Freiwald's laboratory. The results of Brewer's work at Rockefeller University, New York, were posted in promotional materials of the CBMM.

68. In late August 2017, during her stay at MBL, Woods Hole, MA in late August 2017, Plaintiff was directed by Katz to discuss possible collaborations with Andrei Barbu, the Research Associate in Katz' laboratory and MIT employee. to explore potential collaborations with Andrei Barbu, a Research Associate at Katz's laboratory and MIT employee. A new project outline emerged during the meeting, and subsequently in New York Plaintiff performed for this project new experimental analysis, communicating the results with Barbu and Freiwald.

69. In or around November 7, 2017, Boris Katz and Andrew Barbu traveled from Cambridge, MA to New York, for a scheduled meeting at RU with Freiwald, Plaintiff and other laboratory members, where further discussions on collaborative research took place.

70. In November 2017, Plaintiff received a data transfer with a video material from Nancy Kanwisher and Leila Lisik, MIT's employee, which Plaintiff subsequently implemented as experimental stimuli in her research in Freiwald's laboratory.

71. On or about December 6, 2017, Kreiman posted an announcement about recruitment opening for the CBMM summer course the following summer, and Freiwald shared this information with Plaintiff, offering to facilitate participation. Plaintiff replied expressing an interest in a Teaching Assistant position[3]. Following this, Freiwald emailed Kreiman in inquiring about the possibility of two CBMM members, Farid Aboharb, a student, and Plaintiff, a postdoctoral researcher, to participate in the course as listener and Teaching Assistant respectively.

72. On December 7, 2018, Kreiman responded with interest in "taking your [Freiwald's] postdoc as a TA", and subsequently Plaintiff sent to Kreiman her credentials for the position.

73. On December 11, 2017, Freiwald shared with Plaintiff part of his internal correspondence with Tennenbaum regarding his scientific collaboration with DeepMind and Google and the potentials of Intuitive Physics, Plaintiff's research topic. Freiwald wrote to her: 'I think you placed a good bet when you chose Intuitive Physics as a subject'.

---

3    Teaching Assistants (TAs) are selected among advanced CBMM PhD students or among CBMM postdocs, to conduct students workshops and supervise student projects for the duration of the course.

74. In February 2018, Freiwald, Kanwisher and Tenenbaum delegated Plaintiff to travel to MIT for the CBMM-NSF annual report, where she "represented" Freiwald's laboratory, and presented a scientific poster on her research she performed under supervision of Tenenbaum, Freiwald, and Kanwisher at RU.

75. On February 15, 2018, Freiwald delegated Marciniak to administer a webinar connection with the weekly CBMM research seminars taking place at MIT, Cambridge, MA, to the benefit of Freiwald's laboratory members not directly participating in CBMM program. It was Plaintiff's responsibility to set up the connection at RU, and coordinate with MIT employees including Kathleen Sullivan and Kris Brewer. Marciniak has been fulfilling this duty at Rockefeller University until 2019, including in September 2019, when she was intimidated by Azevedo.

76. On March 7, 2018, Plaintiff learned that she was accepted as Teaching Assistant for the CBMM Summer School that summer, and informed Freiwald and Yin.

77. On March 23, 2018, Cheri Gherst, Education Administrator at MBL requested a letter of authorization from the RU, Office of Immigration and Academic Appointments, Plaintiff's visa sponsor, inviting Plantiff, on behalf of the CBMM Summer School Director Boris Katz, to serve as a Teaching Assistant August 9-30,2018 in the CBMM Summer School at MBL, Woods Hole, MA. It was explained that "this activity would greatly enrich Karolina Marciniak's J-1 visa program and will also benefit the research of those participating in the course", and that she will be reimbursed expenses associated with the visit to MBL, and receive "a modest honorarium of $1000[4]".

78. On March 26, 2018, Benjamin LaSalata in capacity as Alternate Responsible Officer of Exchange Visitor Program P-1-02194, under the sponsorship of The Rockefeller University, made authorization for her participation in the position, and determined that it is directly related to the objectives of Plaintiff's exchange visitor program, is incidental to her primary program activities, and will not delay the completion date of Plaintiff's program.

79. On May 25-26, 2018, Plaintiff and two of her colleagues from Freiwald's laboratory, Julia Sliwa and Farid Aboharb, attended the annual CBMM Retreat conference held at MIT, where Plaintiff gave a presentation to the CBMM crowd about her postdoctoral research on Intuitive Physics in monkeys, which she was performing under supervision of Freiwald, Tenenbaum and Kanwisher at RU.

80. Same day, on May 25, 2018, at MIT, she discussed her project progress with Tenenbaum in more details, and in result Tenenbaum arranged an introductory meeting for her with new MIT employees and CBMM engineers, Jeremy Schwatrz and Seth Alter, to work in collaboration with Tenenbaum and his personnel on intuitive physics animation, which they planned she would deploy in her ongoing experiments at RU.

---

4    Following Plaintiff's successful participation in the position, in September 2018, she received only $200.

81. In May 2018, Freiwald attended the NSF Site Visit (CBMM annual evaluation), where he presented the CBMM-related research in his laboratory, including the presentation of Plaintiff's research, entitled the Intuitive Physics as the research project Plaintiff is working in his laboratory in collaboration with Tenenbaum and Kanwisher.

82. On July 12, 2018, Barbu and Boix, as senior Teaching Assistants, provided instructions to other Teaching Assistants, including Plaintiff. A meeting was scheduled for July 16 in the CBMM reading room at MIT to discuss tutorials and project organization for the year. Due to scheduled experiments, Plaintiff contacted Barbu to inform him of her inability to attend. Barbu offered to send her an email summary of the meeting.

83. Between July 16 and August 11, Plaintiff discussed her Teaching Assistant tasks with Andrei Barbu. Barbu provided Plaintiff with instructions, guidelines, and examples of student projects that she would be supervising. They also discussed potential projects that Plaintiff could lead.

84. Between August 10 and 30, Xavier Boix and Andrei Barbu regularly sent announcements and updates.

85. On August 6, 2018, Andrei Barbu assigned Plaintiff as a co-tutor with Francisco Flores (an MIT/Harvard employee) for a programming tutorial. Between August 6 and 11, while co-teaching the tutorial, Plaintiff received guidance and materials from Francisco Flores, who, together with Andrei Barbu, supervised her performance.

86. On August 16, 2018, Kreiman (of Harvard) and Katz (of MIT) performed a mandatory meeting for all Teaching Assistants. During the meeting, Kreiman instructed on how to tutor, and instructed on the personal relationship rules with students, by not allowing "sex with students" until the Summer School is over, and that TA should look for opportunities somewhere else, moving his gaze around the group, including Plaintiff, who was only one of three women in the group, out of 22 individuals, and felt extremely uncomfortable about Kreiman's behavior.

87. On August 22, 2018 at MBL in Woods Hole, MA, Plaintiff gave a computer presentation to Freiwald, Kanwisher and Tenenbaum updating about her new fMRI data, which were met with enthusiasm, and discussing next steps. During the meeting, Tenenbaum committed to direct and supervised his laboratory personnel of MIT and the CBMM engineers of MIT to work for Plaintiff's project by "creating animated and physical interactions simulations for monkey experiment on intuitive physics".

88. On September 6, 2018, at MIT, Cambridge, Plaintiff met with a group of MIT employees, who were delegated by Tenenbaum to work on Plaintiff's project: Jeremy Schwartz ("Schwartz"), Seth Alter ("Alter"), Martha Kryven ("Kryven") and Kevin Smith ("Smith"), clarifying the current state of technology developed at MIT called ThreeDWorld, setting up goals for its development and time frame for Plaintiff's project.

89. On October 30, 2018, in New York, Plaintiff conducted a Skype meeting with Schwartz, Alter, Kryven and Smith, discussing the specific functionality required to develop the 3D environment and Smith's involvement to integrate his algorithms in it.

90. Between September 6 and December 7, 2018, Schwartz and Alter worked at MIT to implement Plaintiff's project's requirements into ThreeDWorld technology.

91. In or about December 2018, Plaintiff communicated with Kevin Smith about his timeline to deliver the final product to be used in Plaintiff's research at RU.

92. Due to Plaintiff's positive performance as a Teaching Assistant at the CBMM Summer School in 2018, Barbu contacted Plaintiff in February 2019, and offered her a position in the current year.

93. On March 14, 2019, at RU, Plaintiff discussed her project's new developments with Ilker Yildirim, a collaborator from Tenenbaum's laboratory at MIT who was visiting RU.

94. In or about March 2019, Freiwald delegated Plaintiff to attend the NSF Site Visit at MIT and present a poster.

95. During a visit to MIT in March 2014, Plaintiff met with Tenenbaum and Kanwisher to discuss the next steps in her project. Subsequently, Tenenbaum assigned Marta Kryven as Plaintiff's primary collaborator for creating intuitive physics animations.

96. Between March 2019 and February 28, 2020, Plaintiff participated in multiple Skype calls and email exchanges with Kryven to collaborate on the Stimuli project. Tenenbaum also involved his laboratory manager, Sholei, in the collaboration.

97. In or about April 2019, Plaintiff, a member of the CBMM Module 3 research group supervised by Freiwald, Tenenbaum, and Kanwisher, submitted her Intuitive Physics project report for the annual CBMM-NSF evaluation.

98. On or April 23, 2019, Freiwald assigned Plaintiff to present a scientific poster at annual CBMM-NSF evaluation visit scheduled for May 7, 2019, at MIT. Despite Farid Aboharb's interest in attending, Freiwald declined his request, stating that "there has been no request for your presence yet" and that Aboharb would not scientifically benefit from the visit.

99. During a May 2019 meeting with Marciniak and Freiwald in New York, Tenenbaum gleefully reported that Kanwisher had dismissed a CBMM-supported PhD student from the same collaborative project (Intuitive Physics) for perceived insufficient commitment, specifically due to the student's developing artistic interests.

100.     Fearing a similar negative perception and potential career consequences, Marciniak felt under pressure and worked around the clock, refraining from taking any holidays or days off until the end of her employment.

101.    During the meeting, Plaintiff discussed with Tenenbaum her upcoming computational training in relation to electrophysiological part of her project and requested suggestions for potential mentors. Tenenbaum offered to provide the training himself.

102.    In or about July 2019, Freiwald was approached by Susan Epstein, a Hunter College Professor and CBMM colleague, about recruiting either Plaintiff or Ben Deen, a male CBMM postdoc with similar to Plaintiff qualifications, for a guest lecturer position in the Brains, Minds, and Machines course at Hunter College and CUNY. The course and its founder, Susan Epstein, were supported by NSF-CBMM funding. It was initially agreed that Deen would be recruited for the 2019/2020 academic year, and Plaintiff would take the position in the 2020/2021 and the 2021/2022 academic years[5].

103.    Between July and September 2019, Tenenbaum hired three summer students at MIT's summer student program, to assist with creating animations for Plaintiff's Intuitive Physics research project, under Plaintiff's and Kryven's supervision.

104.    In late 2019, when Kanwisher visited RU, Plaintiff requested Freiwald's assistance in obtaining a reference letter for her upcoming postdoctoral fellowship application. Freiwald agreed to facilitate the process and contacted Kanwisher on Plaintiff's behalf.

105.    In or about January 2020, Kryven sent Plaintiff the completed product of their collaborative work on Intuitive Physics monkey videos. This was the result of efforts by Tenenbaum, Kryven, Schwartz, Alter, and three MIT summer school students on Plaintiff's project. Plaintiff subsequently shared and discussed this material with Freiwald, exploring its potential use in Plaintiff's future experiments at his laboratory at RU.

106.     On or about March 30, 2020, Plaintiff, a member of the CBMM Module 3 research group supervised by Freiwald, Tenenbaum, and Kanwisher, submitted her Intuitive Physics project report for the annual CBMM-NSF evaluation. The report highlighted that 'a set of a few cortical areas localized in temporal, parietal, premotor and prefrontal regions emerged as candidate nodes performing intuitive physics computations (…). The identified NHP's brain areas will be targeted for subsequent electrophysiology experiments allowing in depth exploration of these regions for the possibility of hosting neural physics engine'.

107.    Between September 1, 2019, and November 30, 2021, Plaintiff's salary, while employed at RU, was funded by the grant titled "A Center for Brains, Minds and Machines: the Science and the Technology of Intelligence" (ID IN00034259), sponsored by the National Science Foundation, with Winrich Freiwald as Principal Investigator.

---

5    However, following Plaintiff's opposition to Freiwald's sexual harassment in 2020, he unilaterally assigned the position in the 2020/2021 and the 2021/2022 to Deen. This suggests that Freiwald's decision was motivated by retaliation rather than merit.

***(3) While coerced to work for Defendants, and attending professional meetings held on and off-campus in connection with CBMM, a federally-funded program.***

***Marciniak was sexually harassed by her superiors, Freiwald and Azevedo.***

108.    As part of his "philosophy" of leading the scientific laboratory, Freiwald demonstrated a clear disregard for creating a respectful and professional workplace environment and at all relevant times to this complaint perpetuated a culture that normalized and condoned sexual harassment. Dissemination of sexually explicit content via email and during lab meetings, including sexually suggestive videos and images, such as those depicting monkeys engaging in sexual acts was regular between 2017 and 2021. While Freiwald instructed male student to censor such content for external presentations, including an NSF evaluation in April 2019, he allowed it to circulate freely within the laboratory.

109.    Delegated by Freiwald, between August 28 and August 31, 2017 Plaintiff attended a CBMM Summer School, where she was assigned to share off-campus accommodation with Frederico Azevedo ("Azevedo") and Boix, both of whom she had not met previously. Both men were Teaching Assistants.

110.    Despite the professional circumstances, Azevedo fostered a party atmosphere in the cottage, and invited Plaintiff to a late-night gathering, which she declined. The next morning, she discovered two (2) female students had stayed over in the cottage. Plaintiff later learned of Azevedo's attempts to arrange a threesome with these students. Additionally, Plaintiff discovered that Azevedo was spreading false rumors about Plaintiff, claiming they were old friends from Tübingen, Germany.

111.    On August 30, Azevedo offered her a room for rest during a prolonged program. As she slept, she was awakened by Azevedo and another individual, Premachandran, Azevedo violated her personal boundaries by sexually assaulting her despite her resistance and the lack of consent to the sex. Azevedo later dismissed his illegal actions, mocked Plaintiff's emotions and coerced her silence. Soon after this rape, he cornered Plaintiff insisting on her secrecy. This left Plaintiff feeling helpless and ashamed. This experience shattered Plaintiff's sense of safety and trust.

112.    On September 1, 2017, Plaintiff scheduled a meeting with Freiwald concluding her business trip to Woods Hole, MA, with intention to complain about Azevedo's sexual assault on her two days earlier. The meeting, initially scheduled to take place in the office, was moved unilaterally last minute outside the university by Freiwald, who arrived at the office with his backpack in hand, and expecting Marciniak to agree without question. During a 40-minute walk, Freiwald persistently invaded Plaintiff's personal space,

touching her lower back inappropriately and leering at her with a suggestive and lascivious staring at her legs and buttocks while letting her pas in front of him.

113.    This behavior made Plaintiff extremely uncomfortable and subjected her to derogatory public social perception in the neighborhood where she lived and worked.

114.    During the conversation, Plaintiff attempted to seek help from Freiwald, informing him of a "bad encounter with somebody from another institution". Freiwald, however, dismissed the seriousness of her complaint and changed the topic, suggesting that Plaintiff should trivialize the situation and accept it as a daily-life reality of CBMM Summer Course.

115.    Between in or about September 1, 2017 to September 7, 2017, Plaintiff confronted Azevedo about the injuries he had caused her, which he dismissed. Azevedo harassed Plaintiff through daily calls and text messages, checking on her interactions and conversations. He ordered and intimidated Plaintiff to stay silent about the sexual assault incident and pretended to be her new friend, advising her to enjoy this situation.

116.    At some point in September 2017, Plaintiff confronted Azevedo about him assaulting her, clearly stating that she remembered saying no to any sexual relations. Azevedo ridiculed her wording of the non-consensual encounter, telling her that consent did not matter. He shared a disturbing event from his graduate school further instilling fear and intimidation in Plaintiff.

117.    In or about November 2017 to January 2018, Azevedo coerced Plaintiff into participating in "three-some" sexual encounters with other women. In or about November, Azevedo insisted that Plaintiff provide accommodation for him and his female friend during their visit to New York. Subsequently, he misused Plaintiff's pictures to create a profile on Tinder, which he used to seek further "threesome" sexual encounters. In January, he attempted to coerce Plaintiff into another threesome sexual encounter. When Plaintiff refused, he immediately became aggressive towards her.

118.    On November 16, 2017, Azevedo forwarded to Plaintiff an internal CBMM email conversation from Sullivan to Azevedo concerning planning the trip of a small group of CBMM representatives to Paolo Alto, CA for a collaborative meeting with Google/X. Sullivan was informing about extending the hotel booking and instructions on how to have the trip funded through NSF. The selected CBMM staff who were scheduled for the tip included Sullivan, Azevedo, Barbu, Boix, Kanwisher, Katz, Kreiman, Poggio, as well as others: James DiCarlo, Qianli Liao, Thomas Oconnel, Haim Sompolinsky,Kasper Vinken, Matthew Wilson, Kenneth Blum.  Notably, the trip was kept confidential and not announced through any of the established CBMM email lists.

119.    Azevedo suggested that Plaintiff contact Sullivan to inquire about joining a trip, mentioning Azevedo's referral. While the opportunity for networking and collaboration was clear,

Plaintiff declined due to her belief that Azevedo was conditioning the opportunity on her willingness to engage in sexual favors.

120.     In or about February 2018, Freiwald sent an email to Plaintiff and two (2) other female junior researchers in the laboratory, inviting them to accompany him to a social event the following evening. The event was to be held in the office of another Head of Laboratory at Defendant RU, where Freiwald was a guest. None of the women were familiar with or involved in the research topic of the event. The women were asked to dress in evening outfits and their role during the event was to solely accompany Freiwald. He asked them to sit with him during a PowerPoint presentation and walk with him during a laboratory tour. This role was uncomfortable for Plaintiff, and it was socially embarrassing when external guests approached with thematic questions, expecting that her presence indicated her involvement in the research concerning the topic of the event, but she was unable to provide informed responses. Plaintiff had to explain that her sole connection to the event was that she was from Freiwald's laboratory. It was clear that she was there as his arm candy.

121.     In or about February 2018, Azevedo was delegated by his supervisors, Kreiman of Harvard, and Desimone of MIT, to travel to New York for a neuroscience conference held at NYU, and pressured Plaintiff for accommodation.

122.     On or about March 15, 2018, succumbing to pressure, Plaintiff allowed Azevedo to stay on the living room sofa in her shared two-room apartment at RU. Upon his arrival, Plaintiff directed him to the living room, yet Azevedo insisted on using Plaintiff's private bathroom because there was no guest shower. Exiting the bathroom, he initiated a conversation, shutting the door, during which Plaintiff disclosed her contraction of an HSV infection because of Azevedo's assault on her in Woods Hole. Expressing her fear of the infection's impact on cervical cancer risk for women, Plaintiff pleaded with Azevedo to halt his sexual harassment, stressing the harm to women. Shockingly, Azevedo callously responded with laughter and the remark, "welcome to the population of people with STDs." Subsequently, he forcefully pushed Plaintiff onto the bed, engaging in non-consensual intercourse without a condom despite her repeated protests and attempts to escape[6].

123.     After the incident, Plaintiff grappled with feelings of devastation, confusion, helplessness and shame. Fearing Azevedo's influence, she attempted to quickly dismiss the traumatic experience. Enduring feelings of self-blame and regret for allowing his access to her apartment, Plaintiff resolved to prevent any future intrusions into her personal space. Despite subsequent requests, she vehemently refused any further personal contact with Azevedo in New York.

---

6   Plaintiff reported the rape the incident to NYPD, Manhattan Special Victims Squad, in 2022, after receiving the initial psychiatric and psychological treatment for Post Traumatic Stress Disorder.

124.      In or about May 2018, during the CBMM retreat conference at MIT, Azevedo approached Plaintiff in a corridor and initiated a private conversation with her. Plaintiff expressed her disinterest and informed him of her romantic relationship and intention to marry her current boyfriend. Azevedo suggested that she end her relationship and accompany him during the upcoming CBMM Summer School, where she was recruited as a Teaching Assistant, to facilitate his interactions with female CBMM summer school students.

125.      On or about May 22, 2018, Azevedo, in his role as CBMM retreat organizer, attempted to involve Plaintiff in a social event at the CBMM retreat at MIT. He added her to his self-made WhatsApp group of event "organizers". In this group, he repeatedly used Neo-Nazi and White Supremacist terms, referring to himself as a Fuhrer. When Plaintiff refused his advances, he made derogatory comments about her Polish background in front of the conference participants.

126.      In or about June 2018, Azevedo sent a message to Plaintiff stating, "I hope you are thinking about me and not about your stupid boyfriend". In response, Plaintiff blocked him as a contact on WhatsApp and subsequently removed Azevedo's contact from all of her social media.

127.      In or about July-August 2018, during the CBMM Summer School in Woods Hole, Plaintiff, concerned about potential harassment from Azevedo, requested her then fiancé, now husband, Pedro Agra, accompany her while she was set to work as a Teaching Assistant for three (3) weeks. Upon their arrival, they faced persistent scrutiny and gossip among male CBMM members affiliated with Azevedo. The program's environment lacked inclusivity for women, with lectures filled with sexist jokes and a culture endorsing private gatherings and alcohol. Plaintiff observed Azevedo informally bringing a visiting student from MIT to the School and actively pursuing female students in a sexual manner. The atmosphere seemed more akin to a men's club than a prestigious program from esteemed institutions. During a meeting between Teaching Assistants and course Directors, including Gabriel Kreiman, the School Director and Azevedo's supervisor, there was condemnation of sexual encounters between Teaching Assistants and female students during the program, but an encouragement to seek such encounters "elsewhere."

128.      On September 24, 2018, Plaintiff had a meeting with Freiwald regarding the planning of forthcoming medical procedures. While Freiwald was available for office meetings with male postdocs and PhD students, he invited Marciniak to a lunch meeting at the Abby, an upscale campus restaurant for colleague gatherings in a refined ambiance instead of just meeting his in office. Freiwald awaited Plaintiff in a sofa lounge near the restaurant entrance and chose a small table for two (2), despite the availability of a larger, more suitable table for productive discussions. In an attempt to present figures prepared for the meeting, Plaintiff held her laptop until Freiwald abruptly requested it be put away,

diminishing the meeting's focus and transforming it into a social encounter. Throughout the meeting, Freiwald inquired about Plaintiff's personal life instead of work, asking if she preferred older men while making physical gestures, leading to embarrassment for Plaintiff among her colleagues and the RU community.

129.     In February 2019, Plaintiff was given a Teaching Assistant at CBMM Summer School again. However, as she subsequently noticed Azevedo among the list of faculty, she immediately feared Azevedo's further harassment and the hostile environment, and decided to withdraw herself.

130.     In March 2019, Freiwald proposed using lab funds for additional fMRI experiments at a collaborating laboratory in Belgium while Marciniak focused on the second phase at Freiwald's New York lab. Under the guise of pursuing another collaboration (to scan with Leuven), Freiwald promised additional publications, enticing Marciniak to agree to this arrangement[7].

131.     On or about May 14, 2019, an incident occurred in New York Freiwald arranged a lunch meeting with Plaintiff and Tenenbaum in a restaurant downtown Manhattan, New York. Fearing that refusal might be perceived as a lack of commitment to the project, Plaintiff agreed. However, Freiwald kept the conversation about the meeting place in a personal channel with Tenenbaum until he suddenly wrote to Plaintiff that they should get going. Terrified by the prospect of commuting with Freiwald downtown and recalling Freiwald's previous inappropriate behavior when moving office meetings outside the office space to the Abbey, Plaintiff left early and replied that she was already on her way. Freiwald still embarassed her and came to look for her in her postdoctoral office.

132.     After the meeting, Freiwald insisted on accompanying Plaintiff back. While alone on the subway, Freiwald repeatedly attempted to reduce the physical distance between them, visually scanning her body and staring inappropriately at her legs and buttocks. Despite Marciniak's attempts to maintain a respectful distance, Freiwald persisted, making her feel uncomfortable. As they exited the train, Freiwald let her pass first by slapping her buttocks. His advances were unwelcome and caused Plaintiff significant discomfort. At the end of the trip, she sought a pretext to separate from him at the corner to avoid embarrassment of entering the RU campus together.

133.     On or about May 15, 2019, following Freiwald's behavior on May 14, Plaintiff shared her experiences with her female colleagues in Freiwald's laboratory. One colleague revealed that Freiwald had recently requested only the women from his laboratory to spend time with him during an RU event.

---

7     However, following Plaintiff's opposition to Freiwald's sexual harassment in 2020, Freiwald withdrew the promise.

134.    On July 22, 2019, Plaintiff confined in Freiwald about Azevedo's sexual assault and sexual harassment, and her complaints, hoping for support from him. Freiwald seemed to not to know how to behave. Freiwald never followed-up with her on that matter nor offered help in facilitating no-contact order.

135.    In September 2019, Plaintiff's two-year Humboldt postdoctoral fellowship has ended and Plaintiff was appointed as Postdoctoral Associate at RU on a one-year appointment. Under this condition, she felt pressured and became aware that she was financially dependent on Freiwald.

136.    In or about October 2019, during a casual discussion with a female senior PhD student in the lab, Plaintiff was suggested to invite Freiwald to lunch to facilitate her research progress, conveying to Plaintiff that it is how the things in the lab are. Because Marciniak was escaping Freiwald's sexual harassment, she declined this suggestion and to avoid any potential social implications, she subsequently scheduled eary morning office meetings with Freiwald.

137.    In October 2019, Freiwald coordinated with Plaintiff to hire a student, Sam Coolsaet, from collaborating non-human primate fMRI laboratory in Belgium, to join Marciniak's project between 2020 and 2021. In an email exchange with Coolsaet, to which Marciniak was copied, Freiwald anticipated that the project would shift towards electrophysiology by the time Coolsaet joined. This suggests that Freiwald envisioned Marciniak progressing to the next stage of her research within a year.

138.    In or around January 2020, Plaintiff had been conducting regular meetings with Freiwald exclusively in his office.

139.    On January 20, 2020, Freiwald requested to meet Plaintiff to discuss the results of her work and the next step forward to proceed to the project's second part, electrophysiology.  She had obtained results that were of interest and of satisfaction to Freiwald, therefore she sought his permission to submit an internal fellowship application based on them. However, Freiwald prohibited her from spending time on this, instructed her to submit the old application and provided other directives. Feeling that not reporting on project progress would compromise the quality of the application and her chances for the award, Plaintiff left the meeting in tears. She was financially dependent on Freiwald, and her whereabouts were closely tied to the visa sponsored by RU. It appeared that by not allowing her to submit the successful application, Freiwald was increasing this dependence. and withdraw support for a good-quality proposal for the fellowship in January 2020. Later, Plaintiff learned that Freiwald instead supported extensively the application of a male postdoc in Freiwald's laboratory- Ben Deen.

140.    On February 13, 2020, Freiwald spontaneously requested a meeting with Plaintiff in person in his office during the late afternoon next day, on Valentine's day, under the guise to discuss

next steps forward in her project. During this meeting, Freiwald praised Plaintiff's project, discussing its potential with excitement and highlighted the next steps in upcoming planned transition to the project's electrophysiological phase and computational training. At some point, the meeting took a disturbing turn as Freiwald, with a smirking face, said it depends on her how she wanted to proceed. Freiwald's body language became suggestive, as he reclined in his chair and displayed a visible erection through his clothing. Freiwald kept smirking face and stayed in silence awaiting Plaintiff's reaction. She immediately felt embarrassed and quickly concluded the conversation and proceeded to leave the room.

141.    Freiwald then stood up from his chair and moved to open a door for her. As she was going out, she felt that Freiwald squeezed and slapped her buttocks. Later, Plaintiff expressed disbelief and lodged a complaint to her husband about the situation.

142.    On February 27, 2020, a subsequent office meeting was scheduled between Plaintiff and Freiwald in late afternoon. During a discussion about upcoming experiments, Freiwald made a sexually suggestive joke about a video featuring a monkey eating a banana. He emphasized the word "banana" with a suggestive smile, conveying a sexual connotation. Plaintiff felt uncomfortable but redirected the conversation back to scientific matters.

143.    In March and April 2020, due to the Covid restrictions, Plaintiff's communications with Freiwald was held by email exchange, which came to relieve for Plaintiff, given growing discomfort due to Freiwald clearly sexually harassing her and propositioning her for sex.

144.    On or about May 27, 2020, Plaintiff addressed to Freiwald concerns regarding Plaintiff's funding for a postdoctoral position and project support given her Title IX complaint against CBMM, Early on May 28th, Freiwald wrote to Plaintiff, among other things, "Do not worry about the fellowship, CBMM financially. That will be fine even if push came to shove" and suggested continuing the conversation about Plaintiff's future career in person. Concerned about potential inappropriate behavior from Freiwald as experienced previously, Plaintiff looked for the way to decline this request, which was again sexually suggestive, given Freiwald's prior behavior during the prior personal meeting, and given current limitations on personal contact.

145.    In a subsequent email to Freiwald, on May 29, 2020, Plaintiff expressed the necessity for her to establish clear professional boundaries. She specifically requested to not have future professional meetings in restaurants, alluding to Freiwald's prior inappropriate behavior as he persistently sought to move their meetings to unprofessional settings such as restaurants.

146.     Plaintiff anticipated that Freiwald would respond promptly and sympathetically to her polite request. However, Freiwald, faced with Plaintiff's direct opposition to his sexual advances, could not control his rage.

### (4) Rockefeller, MIT and Harvard SILENCED Plaintiff's multiple internal complaints

147.     On or about March 12, 2019, Plaintiff was directed by her supervisors: Freiwald, Tenenbaum and Kanwisher, to travel to MIT for a CBMM National Science Foundation ("NSF") evaluation, where she was to present a research poster. She arrived under significant stress and fear of potential further harassment from Azevedo. Although she did not encounter him there, she learned that she would be assigned to another NSF CBMM evaluation meeting in or about May 2019. Fearing a potential encounter with Azevedo and concerned for other women in the environment, she explored the MIT website for available complaint options.

148.     In or about March 2019, Plaintiff filed an incident report with Defendant MIT's Title IX & Bias Response Office, now known as the Institute Discrimination and Harassment Response Office ("IDHR") against Azevedo and Boix in relation to a 2017 sexual assault and subsequent sexual harassment from Azevedo, The Director, Sarah Rankin ("Rankin") replied to Plaintiff's complaint and a phone call was scheduled for on or about March 28, 2019.

149.     Plaintiff expressed her desire to proceed with a formal complaint due to her concerns about other women in the CBMM environment and requested a no-contact order for her visits to MIT, including an upcoming one on May 7, 2019. Despite MIT had jurisdiction over complaint and was the appropriate entity to conduct an investigation into the allegations, as (i) the institution leading CBMM where CBMM is based,  (ii) had substantial control over members of CBMM community and their access to the CBMM program activities, and (iii) both Plaintiff, the CBMM-supported postdoc, as per policies 'conducting business with or on behalf of the Institute' and Azevedo, actively working at MIT in Robert Desimone's laboratory, were MIT community members under MIT's Policies & Procedures definition, which identifies the MIT community as, "faculty, staff, students, fellows, individuals with visitor appointments, affiliates and any other individual who conducts business with or on behalf of the Institute" (MIT Policies, section 9.1, 9.8.), Rankin told Plaintiff she had to discuss with other institutions.

150.     In or about early April 2019, Rankin directed Plaintiff to speak directly with Rankin's counterpart at Harvard to determine whether they could offer any formal complaint options. Plaintiff agreed to, believing it was facilitating her complaint process, which Rankin had described as

"complicated". Despite expressing her reliance on MIT to prevent any encounters with Azevedo during her upcoming visit, Rankin refused to issue a no-contact order and replied to Plaintiff that there were no restrictions placed on him at that time and that it was possible she might encounter him if they were attending the upcoming CBMM event on May 7, 2019.

151.    Around the same time period, Plaintiff filed a police report with the Falmouth Police Department, which has jurisdiction in Woods Hole, Massachusetts alleging the circumstances of Azevedo's sexual assault of her in 2017 and his subsequent sexual harassment.

152.    On or about April 18, 2019, during a telephone call with Harvard Title IX Coordinator, Jose Martinez ("Martinez"), Plaintiff heard that Harvard would also unlikely accept Plaintiff's complaint, despite having jurisdiction over the CBMM program and the two individuals, Azevedo and Boix, who Plaintiff explained were conspiring to enable Azevedo's acts. Despite subsequent email and phone call follow up on the matter and Plaintiff's concerns, he refused to issue a no-contact order for the CBMM event at MIT on May 7, 2019.

153.    In or around May 4, 2019, as Plaintiff received no response from Martinez and grew more anxious about her impending visit to MIT, she reached out to Rankin via email. In her message, Plaintiff expressed her lack of assistance from Harvard and sought guidance regarding the jurisdiction of her complaint. Plaintiff asked Rankin to inquire with Kathleen Sullivan, CBMM Managing Director, about "the procedures outlined in the written assurances related to Title IX compliance provided by CBMM either during the application process or upon receiving funding from the agency, NSF", which later she learned was designating MIT as the institution responsible for implementing the grievance process at the program.

154.    On or about May 7, 2019, during a conference at MIT, Plaintiff experienced harassment and intimidation from Azevedo while she was hanging her poster. Despite her repeated pleas for protection, neither MIT nor Harvard issued a no-contact order for her upcoming visit to MIT. Given that she had heard Azevedo would be interviewed due to her filing the police report, she feared retaliation from him. Upon arriving at MIT at the scheduled time, Plaintiff reported to the conference poster session organizers as instructed in an earlier email. As she approached the poster stand, she noticed Azevedo giving the impression of being a poster session organizer, even though his name was not on the list of CBMM members participating in the event. As she picked up her poster and headed to hang it on the designated poster board, she noticed Azevedo following her.

155.    Azevedo stopped at the poster board next to hers and began offering unnecessary assistance to the individual hanging their poster there, all the while attempting to intimidate Plaintiff through his physical gestures, voice and looks. She quickly left the area. Fearing that Azevedo would

approach her later, Plaintiff called the MIT Police, who then assigned a police officer to provide security for her during the poster session. Once the event at MIT concluded, she filed an incident report with the MIT police. Plaintiff reported her struggle with the institutional complaint process and the lack of information about the complaint process in the CBMM material to one of the NSF reviewers at the event, who subsequently directed her to the NSF Office of Diversity and Inclusion ("ODI") with her complaint.

156.    Later during the day, on May 7, 2019, Plaintiff spoke to the NSF evaluator about the complaint and he later reported back to her that he *conveyed the Title IX issue to Poggio*

157.    Early on May 14, 2019, in the morning, Plaintiff sent an email to CBMM Director, Tomaso Poggio, detailing Azevedo's sexual assault and subsequent sexual harassment on her and seeking Poggio's assistance due to her distress and confusion with the formal complaint process. Poggio did not respond to this email.

158.    Between March and May 2019, Defendants held several multi-institutional discussions through their Title IX coordinators Rankin, Martinez and Hoffman, as well as CBMM Directors, including Kathleen Sullivan. As Plaintiff later learned for her colleague, who spoke with Sullivan, Plaintiff's identity was uncovered during those discussions, and that Plaintiff's complaint was "worrying" for Defendants' reputation.

159.    Later, on May 14, 2019, Plaintiff received an email from Rankin stating that after consulting with individuals at Harvard and the MBL program, it was determined that MBL was the most appropriate entity to investigate the matter. The next day, Bridget Collier ("Collier"), the Title IX coordinator from the University of Chicago and Ann Egan ("Egan"), the HR Director from MBL, reached out to schedule a telephone call.

160.    In or about May 20, 2019, during a phone call with Collier and Egan, they outlined the complaint process, according to which, should Plaintiff decide to proceed, they would first review Plaintiff's written information with documentary evidence and a list of witnesses, then interview the witnesses and then after that point, they would notify Azevedo about the investigation and interview him. They also said they would ask Plaintiff for additional clarification if needed.

161.    During the phone call, Plaintiff also discussed with them Plaintiff's participation in that year's CBMM Summer School as Teaching Assistant. She explained she withdrew by not following the checking-in instructions yet but said she would be willing to participate if the investigation was concluded by that time. This was noted by Collier and Egan, who assured that they would be done by the time the Summer School launches.

162.     They also referred her to speak to the RU's Title IX Coordinator and Human Resources ("HR") Director about available resources and support during this process. Desperate for help, Plaintiff immediately contacted Virginia Huffman ("Huffman") from RU via email, and Huffman scheduled a meeting with her for the following day.

163.     On or about May 21, 2019 and 22, 2019, during meeting with Huffman, Plaintiff described the 2017 sexual assault and subsequent sexual harassment from Azevedo, as well as the ongoing complaint process, including the referral to RU and the University of Chicago and the lack of investigation into her complaints thus far. Huffman advised Plaintiff to proceed with the investigation by University of Chicago, assuring that RU would assist her in the process.

164.     Because Huffman did not provide Plaintiff with the RU's policy from which it would be clear that RU had jurisdiction over Plaintiff's complaint due to Plaintiff's status as RU's employee and RU's connections with the CBMM program, Plaintiff believed Huffman that Plaintiff's complaint fell under Title IX policy of the University of Chicago, of which MBL is an affiliate.

165.     Huffman scheduled a follow-up meeting for the next day, during which she provided Plaintiff with contact details for attorneys, Rebecca Zipkin and Jessica Morak and RU's mental health providers, whom Huffman familiarized with Plaintiff's case, and instructed to treat as a case of Plaintiff being a "student", similarly to earlier cases delegated to Zipkin by Huffman. Huffman assured Plaintiff that the services of these providers would be covered by RU.

166.     After the meeting with Huffman on or about May 21, 2019, Plaintiff submitted her written information with the list of witnesses to Collier and Egan.

167.     On or about May 28, 2019, Plaintiff had an in-person meeting with attorneys Rebecca Zipkin ("Zipkin") and Jessica Morak ("Morak") at the Sanctuary for Families location in New York. They took over her legal representation in the complaint against Azevedo and assured her that she no longer needed to advocate for herself. During the meeting, Morak agreed to handle the technicalities of retrieving WhatsApp messages to be used as evidence in the investigation.

168.     Contrary to what was agreed upon earlier, on May 23, 2019, the investigators reported to Plaintiff that their next step would be to issue a no-contact order and to notify Respondent about the investigation. Marciniak was concerned that contacting him about investigation before interviewing witnessed, as agreed, would be biased. She discussed the step with Zipkin and Morak, In or about June 3, 2019, Zipkin and Morak instructed via email that the investigators could proceed with notifying the perpetrator and issuing a no-contact order.

169.     Following Huffman's instructions, Plaintiff was meeting Solomon and Mehta-Naik on a regular basis between May and November 2019.  However, what only interested Solom and Mehta-

Naik was the next steps in the U of Chicago investigation and were instructing Plaintiff to discuss her next steps in the complaint process with Zipkin. They also told Plaintiff that it is OK if the investigation won't find the perpetrator guilty, because the complaint process is difficult, and she should be satisfied and perceive her up-to-date complaint efforts as sufficiently assertive.

170.    On May 31, 2019, at the conclusion of Plaintiff's second appointment with RU's referred psychotherapist, Maria Solomon, at her location at 17E 96th St, New York, Plaintiff was asked to sign a document that Solomon described as paperwork for RU's HR to process payment for her services. Solomon folded the signed document and placed it in an envelope addressed to Huffman, requesting that Plaintiff deliver it to the RU's HR department. Plaintiff obtained a copy of the document, and neither Huffman nor Solomon were aware of her possession of it. Plaintiff later discovered that she had signed a Release of Information authorizing the disclosure of her treatment sessions to "Virginia Huffman, RU." Plaintiff never before or afterwards discussed this matter with Huffman. The consent to Release information about Dr. Marciniak's mental treatment to her employer was obtained by deception. Her vulnerable emotional state as a rape victim was used for manipulation.

171.    In or about June 10, 2019, Plaintiff had a follow-up meeting with Huffman. Huffman received a list of Azevedo's email addresses and his visuals from Plaintiff and implemented a redirecting routine at RU's IT and security system, such that Huffman would receive Azevedo's emails sent to RU first. While this was presented as a safety measure, Huffman never informed Marciniak whether Azevedo had made any contact or what actions would be taken if he did.

172.    On June 10, 2019, Plaintiff followed up with Morak regarding retrieving the WhatsApp messages for the investigation. Morak never replied.

173.    On June 24, 2019, to Plaintiff's terrifying surprise, Collier and Egan emailed Plaintiff to inform her they proceeded with the step which they had described to Plaintiff during the telecall on or about May 20, 2019. A virtual Box folder was created by the investigators and Plaintiff's written information, which she had sent on or about May 21, 2019 was renamed and uploaded as "Marciniak Statement". They announced that Azevedo had access to this information, and that they would wait for his written statement and would let her know if they have any questions. They also said they expected to conclude "the interviews" within a week and in the next 2-3 weeks conclude the process.

174.    Plaintiff was concerned about Azevedo would have an unfair advantage having access to this information, which included witness names and contacts provided by Plaintiff, before preparing his statement.  However, she still believed that the investigators followed their assertion that they would interviewed the witnesses beforehand, and she believed she would be contacted for rebuttal in case investigators find conflicting statements. On

26

175.     She then awaited anticipated resolution, which she was happy was to be concluded before the CBMM Summer School enabling her to participate in a clean from Azevedo's harassment environment.

176.     On July 11, 2019, Collier and Egan notified that Azevedo's statement was uploaded and [they] [would] be sending notice of outcome soon.   To Plaintiff's shock, in his statement, Azevedo threatened: *I advise her to stop [her complaint action], I will not take her actions lightly*. Marciniak was afraid for her life.

177.     On July 22, Plaintiff confined to Freiwald about sexual harassment from Azevedo and ongoing complaint process. Freiwald seemed not to know how to react and told Plaintiff that he "wanted to kill him". After the meeting, Freiwald, who did not inform Plaintiff about his plans, rushed to meet Huffman one to one to discuss Plaintiff's complaint behind the close doors.

178.     Given the ongoing investigation, with was taking longer than expected, Plaintiff did not attend the CBMM Summer Course in Woods Hole, starting on August 8, 2019, as a Teaching Assistant.

179.     On or about August 11, 2019, the outcome of the investigation was announced, which stated a lack of probable cause that Azevedo broke the MBL policies. Plaintiff was not allowed to appeal this outcome.

180.     Although (i) MBL is an affiliate of the University of Chicago and (ii) MBL utilizes the University of Chicago's Title IX Office for Equal Opportunity Programs for internally filed sexual misconduct complaints involving MBL and (iii) Bridget Collier of University of Chicago was leading the investigation, it was determined in the subsequent NSF investigation by Scott Carr for Robert Cosgrove from the Office of Equity and Civil Rights that Collier and Egan used MBL investigative procedures to process Plaintiff's complaint, instead of the ones defined by the University of Chicago's policy. The MBL policy does not specify the investigative procedures, apart from stating that the investigation will be fair and expedited. The University of Chicago's Title IX policy in contrary is comprehensive, and states that each party is given the opportunity to provide a written optional response to the final investigative report, and the matter is then is referred to the independent Title IX Hearing Panel.

181.     In August 2019, Plaintiff discussed the outcome of the investigation with Huffman. Huffman calmly noted Plaintiff's report that there was no appeal available but told her to keep discussing with Huffman and Zipkin her next steps and offered to continue paying for Solomon's services.

182.     During the meeting with Huffman in August 2019, Plaintiff told Huffman about the upcoming annual CBMM Retreat held on August 30, 2019 in Woods Hole, MA and expressed her wish

to participate, but was concerned that the previous no-contact order was not valid anymore. She asked Huffman to facilitate with other institutions to issue a new contact order for the future CBMM meetings, but Huffman declined.

183.    At some point, Plaintiff discussed with Solomon the prevailing academic culture at her workplace, highlighting the expectation that women participate in one-on-one meetings in restaurants and face harassment at conferences. Solomon took note of Plaintiff's specific mention of Freiwald's behavior.

184.    On August 19, 2019, Plaintiff discussed the outcome of the MBL's investigation with Zipkin and told her she considered re-filing the NSF complaint in light of procedural deficiencies of the MBL investigation. Zipkin offered to review it for her but advised her against "keeping fighting and defending that", because of the "emotional pull that all of this is picking on you and [because] of your well-being".

185.    In or about September, Plaintiff sent the NSF complaint draft to Zipkin, but Zipkin did not reply, even after Plaintiff's follow-up e-mail.

186.    On September 24, 2019, in New York, Freiwald delegated Plaintiff by email to remotely attend that day's CBMM weekly research seminar and provide a summary report for him. When Plaintiff connected remotely, she unexpectedly encountered Azevedo on the screen, who appeared to be the research seminar host.

187.    After Plaintiff filed the NSF complaint, Zipkin reconnected with her on October 3, 2019. During their phone call, Plaintiff informed Zipkin of a recent incident involving Azevedo during a remote CBMM seminar. Plaintiff believed Azevedo had violated a no-contact order, but Zipkin disagreed, asserting that the order did not apply in this situation.

188.    Plaintiff expressed her desire to discuss the issue with Gabriel Kreiman, Azevedo's supervisor at Harvard. However, Zipkin advised against this, claiming that such actions could be considered defamatory.

189.    At the same period, in October 2019, Plaintiff was contacted by Azevedo's former girlfriend, who had ended their relationship in or about August 2017 due to his abuse. She was willing to corroborate Plaintiff's institutional complaints and the ongoing criminal investigation in Fallmouth against Azevedo.

190.    Plaintiff relayed this information to Zipkin on October 23, 2019 by email, and in person to Huffman on October 25, 2019, and November 15, 2019 at RU, asking for their assistance with the next steps in reopening the investigation, and help to relay this information to the NSF. Marciniak also

reported to Huffman that Azevedo broke the no-contact order on September 24,2019, when Marciniak remotely participated in the CBMM research seminar. No action was taken.

191.    On October 25, 2019, Huffman told Plaintiff she would talk to RU General Council. During the same meeting, Huffman called in the RU's security officer, Michael Murphy ("Murphy"), who, allegedly, former police officer, could be of help. In the office, Mr. Murphy asked about details of Marciniak's police report to Falmouth Police from April 20191 and took a picture of the leading detective's visit card which Marciniak showed to him. Murphy followed up by email on October 31, 2019, reporting he [hadn't] heard back yet [from the detective], but [would] follow up again. Plaintiff never heard back from him.

192.    On October 26, 2019, during a scheduled session, Plaintiff informed Solomon of a new development in her case. Solomon cast doubt on the legal significance of this information, rebuking Plaintiff and angrily questioning whether she understood the potential consequences of proceeding with the matter, potentially leading to disciplinary actions for Azevedo, affecting his work and career. This made Plaintiff guilty about her complaint. She felt intimidating and discouraged from pursuing the matter. But of most importance, she felt confused. Plaintiff responded by asking, "I thought we were fighting for justice here." Solomon replied, "No, you are fighting for justice", making her question whether she should contact the Fallmouth Police detective about it. In result, she did not.

193.    On or about November 5, 2019, Plaintiff emailed NSF ODI office with information about the new witness willing to be contacted/ interviewed and that she can also provide contact details to other victims she is aware of, and asked how to proceed in order to enable her participation in a way that would protect her rights as the witness. They conveyed that they will issue an "initial determination" soon, signaling that at some point in this process they will interview Plaintiff's new witnesses.

194.    On or about November 15, 2019, Huffman informed Plaintiff that, after consulting with the General Counsel, RU was unable to provide any assistance regarding her complaint.

195.    Feeling unsupported, Marciniak informed Solomon during their next appointment of her desire to terminate their sessions. Solomon objected, suggesting that the decision be made in consultation with Huffman. Despite Plaintiff's insistence, as during the usual sessions, Solomon continued to inquire about her NSF complaint and future plans regarding her complaint process,

196.    Meeting similar resistance, Plaintiff also terminated her sessions with RU's on-site psychiatrist around November 2019.

197.    On December 11, 2019, Plaintiff complained to the Rockefeller Housing administration of a recent incident in the housing building, in which one of the RU Professor at the RU had inappropriately and persistently stared at Plaintiff, following his similar behavior on a few occasions similar to that one earlier.

The administrator forwarded Plaintiff's complaint to Virginia Huffman, who scheduled a meeting regarding Plaintiff's complaint.

198.    On or about December 20, 2019, Plaintiff was joined to meet Huffman by two other women, a PhD student and postdoctoral researcher, who was also made similarly uncomfortable by the same individual "on a couple of laundry days when he and his partner were also putting their laundry in, as he would still stare a shade too long". She reported that she have heard of similar instances from other women, and that "we definitely talked about making sure no young female student interviews him for Natural Selections [the RU's community newspaper]",

199.    Huffman did not file any complaint form nor made any formal record of Plaintiff's complaint.

200.    On or about January 13, 2020, Plaintiff and other women met with Huffman for a follow-up meeting. Huffman informed them that the Professor had a medical condition, suggesting that his persistent staring behavior was unintentional despite multiple reports from women indicating that his behavior was specifically targeted towards women. Huffman abruptly ended further discussion, citing medical confidentiality issues.

201.    The absence of any recurrence of the Professor's behavior towards Plaintiff or other women after her complaint to Huffman directly contradicts Huffman's argument. This suggests that the Professor was capable of modifying his behavior, indicating that his previous actions were intentional and not unintentional as Huffman claimed.

202.    Plaintiff and other women were shocked by the blatant bias displayed during the complaint process, and felt lack of support.

203.    Despite multiple suggestions from Plaintiff and other women, Huffman failed to address the need for improvements in the common spaces at the RU campus, including the campus housing.

204.    In early 2020, Plaintiff was contacted by a former CBMM Summer School student who admitted to being subjected to Azevedo's sexually suggestive behavior. The student described how towards the end of the CBMM Summer School in 2018, Azevedo had attempted to lure her alone to his room for a private meeting, offering her a caipirinha drink. The woman showed Azevedo's flirtatious message to her colleague students, before refusing Azevedo's flirtatious proposal. Azevedo immediately deleted the message, but the woman said she had witnesses and was willing to corroborate Plaintiff's complaint against Azevedo.

205.    At the same time, in early January 2020, Plaintiff was contacted by a female former CBMM Summer School student, who admitted to be the victim of Azevedo's overly flirtatious behavior and uncomfortable request to be alone with her in his room in a sexual way, luring her with

caipirinha drink, during the CBMM Summer School in 2018. She showed Azevedo's flirtatious text message to her colleagues before texting Azevedo back with refusal. Azevedo immediately deleted the message. She was willing to corroborate Plaintiff's complaint and had witnesses who saw the message.

206.    On or about January 16, 2019, Plaintiff emailed the NSF Office to relay the new evidence of a new victim of Azevedo, this time from the CBMM program itself, and informed that the woman was willing to testify during the investigation. The NSF office informed that they are working on initial determination into her complaint of the institutional response and will let her know.

207.    On or about January 16, 2020, Kanwisher informed Plaintiff that Azevedo was scheduled to be a Teaching Assistant at the CBMM Summer School that year. Kanwisher expressed her intention to "debar him" from the CBMM Summer School, and "hopefully from CBMM altogether" as a consequence of the investigation into the CBMM culture led by DeStefano.

208.    Kanwisher also intended to draw consequences for Poggio for lack of his response.

209.    On or about January 17, 2020, Kanwisher informed Plaintiff that the initial investigation into Plaintiff's complaint by MBL involved interviewing only one witness Xavier Boix, a co-perpetrator who corroborated Azevedo's version of events. None of Plaintiff's five witnesses were interviewed.

210.    Kanwisher then Plaintiff's permission to share Plaintiff's May 14, 2019 complaint to Poggio with Robert Desimone, MIT Professor, Azevedo's supervisor, as Azevedo has been working in Desimone's laboratory at MIT. Kanwisher informed Plaintiff that Desimone was "shocked" upon hearing about the allegations and planned to speak with Azevedo. With Plaintiff's consent,

211.    On January 17, 2020, Plaintiff provided Kanwisher and DeStefano with a detailed account of the events surrounding her sexual harassment complaint, including the flawed investigation process that favored Azevedo. Plaintiff highlighted how Azevedo and Xavier Boix conspired to groom her, manipulate her housing arrangements, and ultimately carry out the sexual assault.

212.    On January 18, 2020, Kanwisher sought Plaintiff's permissions to proceed with DeStefano's investigation, which Kanwisher described, would be involving DeStefano speaking with all the parties involved, and DeStefano presenting results and recommended fixes, including which TA should not be allowed, to the CBMM Summer School Directors. To convince the CBMM Summer School Directors to initiate DeStefano's investigation, Kanwisher sought to involve Tenenbaum, who "will be taken more seriously than [Kanwisher would] by Tommy [Poggio] and Gabriel [Kreiman]". Accordingly, Plaintiff gave her permissions to share the details of Plaintiff's complaint against Azevedo with Tenenbaum, who then conveyed it to the CBMM Summer School Directors.

213.     Later, on or about January 18, 2020, Kanwisher and Plaintiff talked on the phone, and Plaintiff revealed about other victims of Azevedo who had come forward in the meantime and were willing to corroborate her complaint.

214.     On or about January 19, 2020, Kanwisher requested that Plaintiff connects DeStefano with Azevedo's other victims, which Plaintiff did.

215.     Later, Plaintiff learned that the CBMM Summer School student, whom Plaintiff referred, was interviewed by DeStefano. Although Plaintiff also informed DeStefano that another woman, who was sexually assaulted by Azevedo also came forward and was willing to testify, DeStefano told Plaintiff that at that stage, her testimony will not be relevant.

216.     Since Plaintiff had gained contact with Azevedo's other victims, and informed the institutions about the new developments, she hoped that the new investigation will be launched.

217.     She did not contact the Fallmouth Police about new development.

218.     In or about July 2020, Plaintiff learned that Azevedo provided to the Falmouth Police detective leading the case "the MIT investigative report done on him", in support of his denial to Plaintiff's allegations.

219.     Only in July 2020, Plaintiff forwarded detective's request to have anyone with knowledge of Azevedo's actions and/or inappropriate dealings with him contact him as soon as possible to the 4 women who by then came forward to Plaintiff that they were sexually assaulted and/or harassed by Azevedo. They all testified to the Falmouth Police.

220.     On or about August 31, 2021, Plaintiff was informed that the Fallmouth Police contacted Ann Egan.

221.     In or about February 2022, due to the ever increasing documents provided, the case was resubmitted to be heard in front of the Clerk magistrate in Falmouth District Court against Mr. Azevedo. The case is under investigation.

222.     In or about November 2022, Plaintiff reported Azevedo's sexual assault from March 15, 2018 in New York to the NYPD.

223.     In or about January 2023, Plaintiff learned that Ann Egan refused to provide the MBL's findings to the Fallmouth Police and said they would do only with the court order.

## (5) RETALIATION

224.     Following the interviews with Azevedo's other victims in or about January 2020, neither Kanwisher nor DeStefano even contacted Plaintiff again.

225.    On January 30, 2020, Plaintiff was contacted by Andrei Barbu, who, offered Plaintiff a Teaching Assistant position for the upcoming CBMM Summer School. She replied on February 2 that she was interested, if Azevedo was not attending, and Barbu confirmed that he "added her to the roster adding her constraint", and that the CBMM Director would decide on final selection.

226.    On January 31, 2020, during the internal conversation about TA recruitment between Gabriel Kreiman and Andrei Barbu, cc'd Boris Katz, Andrzej Banburski, Kreiman relied he was "sympathetic to having more women TAs", however instructed Barbu that "Regardless, as mentioned in the previous email, please do NOT make any commitment to any TAs yet. [Kreiman] want[ed] to make sure that Boris [Katz], Tommy [Poggio], and [Kreiman] can go through the whole list and make adjustments if necessary", and instructed Andrei Barbu to mark the comments about TAs and their constraints] in the shared spreadsheet? Thanks,"

227.    Early on February 3, 2020 Andrei Barbu and Andrzej Banburski send "a list of everyone who expressed interest along with any key constraints they have mentioned" to Gabriel Kreiman and Boris Katz.

228.    One hour later, Kreiman returned the list where "[he] added a column with [his] proposed list of 14 out of 18", and asked Boris Katz for acceptance. Plaintiff was one of 4, whom Kreiman removed, and the only woman who was not selected by Kreiman.

229.    On February 4, Barbu contacted Plaintiff that she was refused the position.

230.    On Feb 4, 2020, Barbu asked Kreiman to include to the list a male TA candidate. Kreiman replied he was inclined to keep woman candidate of similar qualification instead of him, "to keep the number of women up", and later instructed: "I am ok with all of this ([female TA candidate] + [male TA candidate]), let us try not to drop any women TAs at this stage", alluding to refusing the position to Plaintiff the day earlier.

231.    On February 5, 2020, Kreiman unexpectedly selected the late application from male postdoc Kohitij Kar for the Teaching Assistant position, asserting that his interest alone should qualify him for the role.

232.    On February 5, 2020, Plaintiff forwarded the TA recruitment and the Director's decision not to recruit her to Kanwisher, signaling that it is causally related to Plaintiff's participation in DeStefano's investigation. Kanwisher never replied.

233.    On February 5, 2020, Plaintiff replied to Barbu, to clarify that her restriction with respect to Azevedo was because of the no-contact order, which she attached, and sought other opportunities to be involved in the summer school, if Azevedo was not going there.

234.    On February 11, she was contacted by Gabriel Kreiman himself, who said that Azevedo was not selected, and that the fact that she was not selected was not related to her complaint, but her scientific profile. He ended the email by "hoping to see her in other scientific events", implying she is not welcomed at the Summer School anymore.

235.    Plaintiff was deeply affected by not having this opportunity anymore, and she feared further retaliation, especially that her salary was funded by the CBMM grant at RU.

236.    On May 4, 2020, Plaintiff filed a complaint with NSF ODI about being rejected for the Teaching Assistant position by the CBMM Summer School Directors, and on August 10, 2020, she filed the complaint about the events to the EEOC in Boston.

237.    On May 13, 2020, Lindsey Cole, Program Director, and Academic Committees and Initiatives at RU contacted Plaintiff that her Kavli NSI-sponsored postdoctoral fellowship application was not selected. Plaintiff shared this information with Freiwald and Yin, and requested a feedback on her application to Cole, but Freiwald stopped her, and instructed to "keep on trying".

238.    In late May 2020, RU announced the return policy after the initial phase of Covid, and Freiwald contacted his laboratory members, including Plaintiff, about the details. She used this opportunity to clarify her uncertainty about financial situation for her project going forward, and emailed Freiwald about it on May 27, 2020. She was relieved when Freiwald assured her in his reply on May 28, 20 that she should not worry financially. She became however very uncomfortable when she red later in the email that Freiwald suggested to continue the discussion about her future in person, fearing that Freiwald would move the meeting again to the unprofessional settings, like the restaurant, and would again use the meeting to sexually harass her. Given that his behavior escalated recently, and the transitioning phase of her project, Freiwald was alluding that he expected her to comply with his requests for sexual favors in order for her project to continue to the electrophysiology.

239.    On May 29, 2020 Plaintiff emailed Freiwald thanking for his assurance. She then explained her need to set up professional boundaries, and refused going to the restaurants with Freiwald anymore, alluding to his misbehavior towards her.

240.    Approximately a week later, on June 4, 2020, Freiwald responded to Plaintiff's email by scheduling a Zoom meeting for the following day. During this meeting, Freiwald unexpectedly announced that he decided that it would be better for Plaintiff to change the environment and to look for another place to work. Freiwald told Plaintiff to wrap up things here, suggesting he was canceling the Intuitive Physics's project planned second phase, electrophysiology.

241.    Because this came as a shock for Plaintiff, she was in disbelief as Freiwald's abrupt termination lacked a genuine evaluation of scientific merits.

242.    On or around June 4, 2020, Plaintiff reported Freiwald's unexpected decision to terminate her project to Robert Cosgrove, an NSF ODI office officer. Plaintiff informed Cosgrove of the connection between this decision and her sexual harassment complaint and provided relevant documentation upon Cosgrove's request.

243.    Despite Plaintiff's repeated requests to communicate via her Gmail account, Cosgrove and subsequently Scott Carr from the NSF ODI office continued to send correspondence to her RU account.

244.    On June 9, 2020, Plaintiff sent a follow-up email in an attempt to clarify what she perceived to be a misunderstanding. Freiwald replied that "there is no misunderstanding" and threatened to end her career if she stayed any longer.

245.    In July 2020, Plaintiff explained Freiwald's unexpected turn of events for her to Freiwald's Laboratory manager, Yin, and asked that she mediate with Freiwald on Plaintiff's behalf. Nothing however seemed to convince Freiwald to change his decision.

246.    On July 30, 2020, Freiwald emailed Plaintiff to inform her that her upcoming appointment would be extended for only six months, instead of the usual one-year term, and that she should focus on completing a limited number of fMRI experiments to conclude her research.

247.    Freiwald's action offered Plaintiff a shortened contract with demoted conditions, limiting her role to finalizing ongoing experiments and halting progress towards the second phase, electrophysiology, which was part of the original agreement between Plaintiff and Defendants for her postdoctoral work at RU.

248.    This demotion resulted for Plaintiff in decreased responsibilities, reduced learning opportunities, and a lower status. In addition, limiting the Plaintiff's ability to work on the second phase of the project, electrophysiology, hindered her career development and advancement.

249.    Freiwald's email from July 30, 2020 was an adverse employment action, because it negatively affected Plaintiff's job security and opportunities for advancement, and increased her risk of unemployment, given the aggravated circumstances of the ongoing Covid pandemic.

250.    Plaintiff did not receive any communication from Tenenbaum or Kanwisher afterwards, feeling further excluded from CBMM.

251.    In June, three representatives from the Freiwald laboratory administered an anonymous "Lab Climate Survey" among Freiwald's laboratory members. The survey, in a form of a google forms, was created in September 2019 by Leslie Vosshall, the Professor at RU, and was recommended "to identify issues in the lab that the lab head can work with members to address to improve lab culture".

252.        . This action was agreed upon among laboratory members and Freiwald, following growing internal concerns among Freiwald's laboratory members about Freiwald's misbehavior and his laboratory's hostile culture.

253.        On August 5, 2020, Freiwald addressed the results of the "Lab Climate Survey" to a completed group of laboratory members, including Plaintiff. Despite the survey revealing widespread dissatisfaction and a hostile work environment, Freiwald refused to acknowledge the need for cultural change, citing his "philosophy." He harshly criticized those who expressed unhappiness, advising them to reconsider their scientific pursuits or leave the lab. Freiwald further threatened to sever relationships with anyone who voiced dissent.

254.        On September 10, 2020, Robert Cosgrove from the NSF ODI office informed Plaintiff that her complaint against RU and Freiwald was forwarded to the EEOC New York office, and that she will be contacted by the investigator from there to conduct an interview.

255.        On October 20, 2020, Plaintiff received a call from the Washington landline phone number registered to a private person working as EEO (not EEOC) Investigator[8] living in District of Columbia, Washington DC. A woman introduced herself as an EEO Investigator and performed with Plaintiff a 46 minute conversation[9] concerning Plaintiff's allegations, to discredit Plaintiff's testimony, i.e., dismiss Plaintiff's alleged EEOC complaint at the end of the call. During the phone call, the woman, who Plaintiff was talking with, was continuously rude and invalidating towards Plaintiff, and several times reacted towards the information which Plaintiff provided with stereotypes and myths about victims of sexual violence.  Her behavior was (i) motivated by prejudice on the basis of Plaintiff's sex and (ii) dismissed blatant temporal proximity between Plaintiff's protected activity and Freiwald's subsequent negative employment actions, both unlikely for the individual who would be in the role of a federal investigator during an intake EEOC call.

256.        In late 2020, Freiwald reneged on his previous agreement with Plaintiff to allow her to serve as a guest lecturer in a CBMM course at Hunter College. Despite their earlier agreement from July 2019, Freiwald instead assigned the position to a male postdoc, Ben Deen.

257.        Despite previous assurances, Freiwald retracted his proposal for a collaboration with a laboratory in Belgium. In late 2020, Sam Coolsaet, the student who had been contracted to work with Plaintiff on the Intuitive Physics project, was reassigned to a male postdoc, Lucas Tian.

258.        Consequently, in late 2020, Freiwald diverted the electrophysiological resources originally promised to Plaintiff and assigned them to Lucas Tian.

---

8    The number was not associated with any EEOC office.
9    Plaintiff later learned that the EEOC New York schedules only a 15-minutes long intake calls.

259.     In late 2020, Freiwald substantially diminished her responsibilities in the laboratory regarding managing the fMRI protocol, assigning them instead to Yin.

260.     In or about December 2020, Freiwald positively assessed Marciniak's new fMRI results, recognizing their potential for scientific publications, despite maintaining his earlier decision to prevent her from completing the electrophysiological part of her project.

261.     In or about February 2021, Freiwald assigned Plaintiff an additional task: writing a review paper on the Intuitive Physics review paper. This task was prioritized due to its June 2020 submission deadline. It was reasonable to assume that this new assignment would override the previous employment timeline, as it would be impossible to complete all papers by November 2021.

262.     In light of the additional writing task assigned in February 2020, Freiwald and Rockefeller University sponsored an H-1B visa petition for Plaintiff (and her husband) for three years, effective September 1, 2021, and lasting until August 31, 2024. Freiwald retained Plaintiff in this demoted postdoctoral position due to the perceived ease of obtaining scientific papers as a result of Plaintiff's work, and the benefits of her fMRI expertise without the need to hire the additional personnel.

263.     On two separate occasions in Spring 2021, Plaintiff and her husband were observed playing tennis on the campus tennis court by Virginia Huffman. Following these sightings, the security department contacted Plaintiff to inform her that her husband was not permitted on campus.

264.     Plaintiff responded by requesting an exception to allow her husband to play with her on the outdoor tennis court, citing her need for physical activity to balance her long working hours and the couple's COVID-19 vaccination status. Additionally, Plaintiff mentioned her weekly self-testing using RU's equipment and her consistently negative results.

265.     Despite these justifications, the RU administration denied Plaintiff's request. On April 6, 2022, Plaintiff submitted another request to the HR Department, Mr. LaSalata, which was also rejected.

266.     In early 2021, Plaintiff learned about the experience of the female PhD student in the Freiwald's laboratory, who complained about the lack of support from Freiwald, and whom Freiwald referred to the HR Department labeling her as "threatening" him. The student reported to Plaintiff that Freiwald subsequently was threatening to finish her employment if she was to complain again.

267.     On or about May 18, 2021, Plaintiff filed a sexual harassment and retaliation complaint against Freiwald and RU with the New York State Division of Human Right as a dual filed with the EEOC, about Freiwald's sexual harassment and his 2020 retaliatory actions after Plaintiff opposed it.

268.     On July 3, 2021, RU's Vice President and General Counsel sent to Plaintiff the Legal Hold Notice Memorandum, to notify and/or remind [Plaintiff] of her document preservation obligations in light of the administrative complaint before the New York State Division of Human Rights she filed against RU Freiwald.

269.     In summer 2021, despite Freiwald's laboratory members' repeated requests and the clear need for updated data, Freiwald adamantly refused to conduct a revised

270.     On July 9, 2021, RU and Freiwald, represented by attorneys Elise Bloom and Noa M. Baddish, submitted to the Division their position statement, in which they denied the allegations.

271.     On August 3, 2021, Freiwald inquired about the progress of Plaintiff's fMRI data analysis for the Intuitive Physics experimental paper. Plaintiff gave to Freiwald an overview of her recent submission of the Intuitive Physics review paper and reminded that the timeline for the experimental paper shifted because she was working on submitting the review paper first. She also mentioned that she has been involved in the complaint process "about the sexual assault, harassment and retaliation events that happened during [her] work at Rockefeller University", and she "ha[s] been dealing with legal requirements to prepare and submit the documentation", including "the submission deadline which is due in a couple of days", referring to the NYSDHR complaint she requirement for the Complainant to submit a rebuttal to Respondents' position.

272.     In reply, on August 12, 2021, just two (2) weeks before her reappointment to a new Research Associate position, Freiwald sent Plaintiff an email informing her that both he and RU made the collective decision to terminate her employment at Ru effective November 30, 2021. Taken aback and at a loss for words, Plaintiff quietly resisted Freiwald's email notice. The termination came abruptly and at an inopportune time, as it occurred only three (3) months after the start of her new three-year Research Associate contract. It also abruptly interrupted her ongoing work that had been contracted with Freiwald earlier in 2021. Plaintiff submitted the review paper in or about September 2021. It was impossible for her to conclude the remaining work on other publications and write two (2) papers by November 30.

273.     On September 2, 2021, Plaintiff contacted RU's Vice-President Alex Kogan, copying Sharisse Brown from the housing administration and Michael Glaster from RU's financial department, to request that RU files out the landlord portion of her New York State Emergency Rental Assistance Program (ERAP). On September 23, 2021, Ms. Brown confirmed the receipt of Plaintiff's message, but RU did not fulfill Plaintiff's request.

274.     On or about November 17, 2021, Plaintiff received an email from Michael Wiener (with others cc'd) from RU's HR Department. The email informed her that her last day of employment at the University would be November 30, 2021 and provided her with exit instructions, which, among others, informed that Plaintiff's RUNet account, which included her access to email, and data server, will be closed 5 days after her departure.

275.     To comply with the Notice of Hold, which obligated Plaintiff to preserve evidence in pending NYSDHR investigation, she followed the instructions to have her RUNet access extended, and contacted Freiwald's Lab Manager, who on or about November 24, 2021, made an extension request to IT

on her behalf and sent to Plaintiff additional exit instructions from Freiwald's laboratory manager, which she followed. On November 29, the RU IT department granted Plaintiff the 90-days extension.

276.    On December 7, 2021, Freiwald emailed Plaintiff to doubt that the extension was needed, and on December 15, 2021 Freiwald's lab manager, Lihong Yin ("Yin") informed Plaintiff that "[they] suspended [Plaintiff's] access [to Plaintiff's RUNet account], and are posting an auto-reply that will be sent to anyone who emails [Plaintiff]". Plaintiff replied to Yin with a copy of her legal notice, explaining she requested the extension, because she was obliged to preserve data, and not having her account deleted. Plaintiff never heard back from Yin, and her account access was kept suspended.

277.    In early January 6, Plaintiff sent three applications for a postdoctoral position, but because she did not have a positive letter of recommendation from Freiwald, she was rejected.

278.    On January 17, 2022, Plaintiff received a letter from the RU's HR department, informing that the University intends to withdraw her H1B petition, and offered her a one-way ticket to Poland.

279.    On January 18, 2022, the NYSDHR issued a probable cause determination towards Plaintiff's sexual harassment and retaliation complaint against Freiwald and RU, and the issue was recommended for a public hearing.

280.    On January 24, 2022, Plaintiff emailed the compliance officers William Scott Carr and Robert Cosgrove from the NSF ODI the NYSDHR Determination Letter, and Mr. Carr replied that he will "place this in [Plaintiff's] file", and that very soon they will issue determination in Plaintiff's cases against MIT and MBL/U of Chicago. On March 2022, Mr. Carr informed Plaintiff that the NSF ODI did not found probable cause determination against MIT (NSF-OECR-ACB-20-0002). Plaintiff's evidence was not admitted in the investigation. None of the other victims of Azevedo were interviewed. The NSF ODI office issued similar determination towards the MBL/U of Chicago (Case No. NSF-ODI-APC-20-0001), on July 1, 2022. Although the National Science Foundation policy plead that the perpetrators of sexual harassment and retaliation will have the NSF funding limited, no such restrictions were done on Freiwald.

281.    On January 28, 2022, Plaintiff was notified that Plaintiff's ERAP application was provisionally approved, and that the program contacted RU to cooperate with ERAP by providing necessary documents and information. On October 14, 2022, Plaintiff was notified that RU has not yet submitted documents or information necessary to fully evaluate Plaintiff's application. RU submitted the required landlord documents only after Plaintiffs filled this lawsuit.

282.    On February 24, 2022, RU filed a written withdrawal of Plaintiff's H1B petition with USCIS but did not notify Plaintiff.

283.    Only after Plaintiff's inquiry on March 29, 2022, did LaSalata present her with the visa withdrawal receipt, abruptly confronting her with the imminent loss of her and her husband's visa status. In

the same email, LaSalata repeated RU's earlier offer and wrote that "If [Plaintiff] would like the University to purchase transportation for [her] return to Poland, please let us know in writing."

284.    As result of Defendant's conduct, Plaintiffs suffered substantial distress over her and her husband whereabouts, and fearing being deported.

285.    In April 2023, Plaintiff's Intuitive Physics review paper was published. She subsequently contacted Freiwald's Lab Manager, Yin, and the CBMM Director, Kathleen Sullivan, requesting that the institutions cover the $3,000 open-access fee. Given the institutions' affiliation with Plaintiff's work and the acknowledgment of NSF-CBMM grant contributions in the paper, Plaintiff believed they should support the open-access publication.

286.    Despite the open-access policy being favored in federally-funded programs, Sullivan confirmed that Freiwald, Kanwisher, and Tenenbaum had not complied with Plaintiff's request.

287.    Following Plaintiff's termination, her contributions to Freiwald's and CBMM were used without compensation or acknowledgment. Marciniak was denied the opportunity to complete her postdoctoral training in electrophysiology, publish her research, or obtain a recommendation letter. Freiwald and Defendants exploited her work and services, ultimately destroying her physical and mental health and her career after she voiced her concerns.

288.    Because RU reinforces the policy, according to which the Head of Laboratory at RU has ownership of experimental data and result,  the Head of Laboratory makes decisions regarding publishable content and article submissions. Ultimately, Freiwald's decision determined whether a postdoctoral researcher could successfully complete a project and achieve a scientific publication.

289.    By rejecting her the opportunity of her experimental data to be published, Freiwald effectively retaliated against Plaintiff by ruining her research and academic career.

290.    Plaintiff has suffered and will continue to suffer medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational and employment benefit, a denial of access to next step in academic career, a denial of access to publishing scientific articles, loss of educational and employment benefit including scholarship opportunities, grant opportunities, award opportunities,  loss of income, loss of enjoyment of life, emotional and economic damages associated with inability to flee her abusers, and other economic or non-economic damages, for which she is entitled to just compensation.

291.    Economic damages: As a consequence of Defendants' conduct, Plaintiff has suffered and will suffer harm, including lost past and future income and employment benefits, damage to her career, and lost wages, overtime, unpaid expenses, and penalties, as well as interest on unpaid wages at the legal rate from and after each payday on which those wages should have been paid, in a sum to be proven at trial.

292.      Non-economic damages: As a consequence of Defendants' conduct, Plaintiff has suffered and will suffer psychological and emotional distress, humiliation, and mental and physical pain and anguish, in a sum to be proven at trial.

293.      Punitive damages: The conduct of Defendants was outrageous and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's protected civil rights, entitling Plaintiff to an award of punitive damages under federal law. In addition, Defendants' conduct constitutes malicious, willful, wanton and/or reckless indifference to Plaintiff protected rights, entitling Plaintiff to punitive damages against Defendants under State Law.

294.      Attorneys' fees: Plaintiff has incurred and continues to incur legal expenses and attorneys' fees.

# FIRST CAUSE OF ACTION

## Violation of the TVPA under 18 U.S.C. § 1591, *et seq.*, for sex and human trafficking – Against All Defendants.

295.      The allegations set forth in the foregoing paragraphs are re-alleged and incorporated herein by reference.

296.      The statute of limitations for violations of the sex trafficking statute is 10 years1.Plaintiff was affected within the 10 years prior to filing suit.

297.      Azevedo and Freiwald engaged with Plaintiff in commercial sex act under Section 1591(e)(3), because the instances of sexual assault and sexual harassment from them towards Plaintiff alleged in this complaint, involved either actual sexual contact (Azevedo), or intent to obtain this contact (Freiwald).

298.      In violation of 18 U.S.C. § 1591, Azevedo and Freiwald knowingly, in or affecting interstate or foreign commerce, recruited, enticed, or solicited Plaintiff knowing that means of fraud, or coercion, or a combination thereof would be used to cause Plaintiff to engage in any sex act on account of which anything of value would be given to or received by any person.

299.      Freiwald's actions knowingly affected interstate or foreign commerce, because in his capacity as RU's employee and agent, and the CBMM Principal Investigator Freiwald's work affected RU's interstate and foreign commerce. In result of his manipulative and deceptive actions to recruit Plaintiff, Freiwald caused Plaintiff to allocate from Germany to New York for doing business with Defendants. Freiwald engaged in electronic communications to arrange above-mentioned trafficking.

300.      Freiwald recruited, enticed, or solicited Plaintiff by means of fraudulent misrepresentations about his lab facilities, and of coercion into signing a postdoctoral appointment with Defendants.  she did

not want to commit before seeing the laboratory, finalizing the research project and sending application for the fellowship.

301.     Freiwald, a cognitive neuroscience Professor, had psychological knowledge to carefully observe Marciniak and sensed her vulnerabilities, and was intentionally driving Plaintiff to be a victim of his sexual harassment. Freiwald exploited Marciniak's vulnerabilities and make false promises to gain trust and control. He quickly became to manipulate her in the direction that she perceived he selected her based on her achievements, whereas it was to satisfy his sexual needs in a quid pro quo manner, which humiliated Marciniak.

302.     Plaintiff did not sense Freiwald's manipulation, until she already allocated to New York. Once Plaintiff was trafficked to New York, Freiwald coerced her into private one-to-one meetings, where he sexually harassed her, persistently propositioning her for sex in exchange for the progress in her project and under threat of serious harm of being terminated and deported. Marciniak's interactions with Freiwald were based on power disparity. Freiwald abused these power dynamics to maneuver the interactions such that Marciniak could receive his supervisory input and progress decisions only when agreeing to one-to-one meetings. In or about September 2015, he sent her a flirtatious message propositioning sexual encounter while she was visiting RU. Between November 2014 and March 2016 Freiwald used psychological manipulation and coercion to control Marciniak and make Marciniak work for Defendants, making her dependent of their money, instilling fear of deportation. In Sept 2017, he normalized Plaintiff's "bad encounter [with Azevedo] in Woods Hole", suggesting her that sexually submitting is a daily bread for women in CBMM. In Sept/Oct 2018, while he communicated to Freiwald's laboratory that she was engaged with Agra, he lured her into private meeting in the restaurant, where he suggestively inquired about her private life and asking whether he liked older men, propositioning her for sex in exchange for a progress in her project. In May 2019, he lured her into a private encounter under the guise of meeting with MIT Professor in New York, where he sexually harassed her. In or about February 2020, he exposed his visible erection to Plaintiff, and made sexually suggestive joke about monkey eating banana, making Plaintiff understand that he demanded sexual favors for the progress in her research. In May 2020, despite the pandemic restrictions, he asked Plaintiff for a personal meeting under the guise to discuss her research.

303.     Freiwald knew that the promise to advance her research and career advancement would entice Plaintiff into private meetings with Freiwald, and knew that once Plaintiff was there, Freiwald was in position to force the sexual activity he desired.

304.     There was a connection between commercial value and sex act. When Plaintiff opposed Freiwald's sexual harassment in May 2020, he subsequently, in June 2020 informed her that she was not allowed to continued her project to the second phase, shortened her contract with RU on July 30, 2020, and kept her demoted in her job responsibilities. In August 2020, he opposed to introduce any changes to the

laboratory environment.  Once she launched the external complaint in May 2021, and told Freiwald to be determined to proceed on August 5, 2021, Defendants fired her, effective November 2021. Freiwald lacked empathy and remorse. He viewed Marciniak as commodity rather than individual and showed little remorse for their actions. Disregard for Marciniak's human rights.

305.    Azevedo also knew he would use fraud, physical force or coercion on Plaintiff for a sexual encounter. In summer 2017, in his role as Plaintiff's supervisor, Azevedo lured Marciniak to the separate room a MBL campus under the guise of offering her a place for nap in an unoccupied room, to which Azevedo, as the program organizer, had an access, where he raped her. Being fit and participating in a continuous program was the activity contracted in Plaintiff's job, and Plaintiff felt compelled to do it. In March 2018, Azevedo coerced Marciniak into providing him a housing at her RU housing, because he was delegated by Defendant MIT and Harvard for a neuroscience conference at NYU, where he sexually assaulted her again. In both situations, Azevedo demanded the CBMM comradeship from Marciniak, to not talk, and controlled her afterwards. Following the shocking rape, Azevedo kept drawing her back, and nagged her into subsequent contact, which he layered with ~~under~~ the guise of a CBMM comradeship *friendship.* In contrary, Marciniak wanted to drown that shame,

306.    Azevedo and Freiwald were aware that (i) securing and keeping work visa for Plaintiff, and development of her career path by working for Defendants were of significant commercial value for Plaintiff; (ii) meeting to discuss her research was indispensable to produce significant results and publish an article which had significant commercial value for Plaintiff. Azevedo and Freiwald used Plaintiff's representation of this value, or their influence on Plaintiff's work, to recruit and entice Plaintiff to private locations, where they would perform sex acts or propositioned her for sex in exchange for this value.

307.    18 U.S.C. § 1595 provides in pertinent part that an individual who is a victim of sex trafficking under 18 U.S.C. § 1591 may bring a civil action against "any person whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter."

308.    First, as set forth above, Freiwald and Azevedo engaged in acts in violation of 18 U.S.C. § 1591.

309.     Defendants knowingly held to involuntary servitude of postdocs by setting up, upholding and promoting academic system based on letter of reference and collaboration score, which makes postdocs more vulnerable to the condition of indentured servitude.  The system exploits postdoctoral work, giving disproportional financial advantage to the academic institutions, the sole financial beneficiary of inventions, and to Head of Laboratory, the sole decision-maker on copyrightable scientific publications.

310.    Freiwald fostered a climate of fear at RU, using the threat of withdrawing Marciniak's appointment as a powerful tool of control.

311.     The institutions protected their male faculty's wishes and did not want to restrict them. To claim that they knew about the connection between benefits and in a venture that violated the TVPA. The comment of Kreiman from CBMM Summer School 2018.

312.     Defendants RU, MIT and Harvard knowingly participated in Freiwald's and Azevedo's venture in violation of 18 U.S.C. § 1591 by knowingly benefiting from, facilitating, and receiving value for, the ventures in which Freiwald and Azevedo travelled in interstate commerce, and used the means of foreign and interstate commerce, to recruit or entice female young scientists into forced or coerced sexual encounters on the promise of continuous CBMM benefits, with knowing, or in reckless disregard of the facts that Freiwald and Azevedo would defraud, force and/or coerce and/or proposition Plaintiff for sexual encounters from Plaintiff seeking to continue doing business with Defendants.

313.     Hoffman, Rankin and other employees of each Defendant, acting in the scope of their employment as Freiwald and Azevedo had directed, coordinated form ventures that coerced, transported and harbored Plaintiff, either with knowledge or in reckless disregard of the fact that Tacchini would use threats of force, means of force, and coercion to force plaintiff into commercial sex acts.

314.     Hoffman, Rankin and other employees of each Defendant, knew from observation of Azevedo and Freiwald that (I) Freiwald was taking his subordinate females for private one-to-one meetings; (I) Freiwald had history of pursuing junior to him women from the same environment for sexual and romantic encounters; (iii) Azevedo was socializing with selected female students in Woods Hole.

315.     Defendants did not simply fail to adequately detect signs of Azevedo's and Freiwald's sex trafficking; they did detect multiple signs of their coercive sex-trafficking venture and continued to participating in the venture. They knew that the venture was on-going, which was why they resolved to covering-up Plaintiff's complaint and intimidated the victim.

316.     Despite the actual knowledge provided by Plaintiff, Defendants continued to pay for and/or facilitated their foreign and interstate commerce and their interstate and foreign trips, knowing or in reckless disregard of the facts that they would encounter aspiring female scientists seeking to do business with Defendants, and they would seek to coerce, defraud and/or force and/or proposition sexual activity in the guise of legitimate scientific work.

317.     Defendants' employees, executive or agents, including Boix, aided Azevedo's sexual exploitation of Plaintiff in Woods Hole, with the intent of exploitation and financial benefit. This affirmative conduct was done in reckless disregard of the facts that Azevedo would use force and coercion against female students such as Plaintiff into the aforesaid commercial sex act.

318.     Freiwald's and Azevedo's status in Defendant's corporations gave them a power to influence Defendants' employees and executives, to perpetrate misconduct reported in this lawsuit.

319.    Among the concrete steps that Defendants took to aid and participate in Freiwald's and Azevedo's sex-trafficking venture was to silence Plaintiff's complaints and Freiwald's and Azevedo's continuous employment.

320.    Among the concrete steps that Defendants took to aid and participate in Freiwald's and Azevedo's sex-trafficking venture was Defendants' failed policy around sexual harassment. This failure was not just passive facilitation but a deliberate omission by Defendants, which allowed Azevedo and Freiwald to continue their sex-trafficking venture through abusing students, including Plaintiff, which would have otherwise been prevented.

321.    The reason that Defendants ignored numerous red flags about Freiwald and Azevedo was to receive financial benefits from their continuous services and their sex-trafficking ventures.

322.    Each Defendant benefitted financially from their participation in Freiwald's and Azevedo's venture because it ensured that Freiwald continued to scout and manage students, ensuring that CBMM and Defendants continued to make money, Hoffman, Poggio and Kreiman continued to receive their paychecks, bonuses and other incentives, and Defendants continued to make money in collaboration with each other.

323.    Freiwald and Azevedo provided specific benefits to Defendants because of Defendants' facilitation of their sex trafficking venture was the scientific advancements and publications brought to CBMM by students and postdocs, including Plaintiff. CBMM continuously benefitted from Plaintiff's work, and the CBMM advertising material featuring Plaintiff's image. In the organization with favoritism policy, where Freiwald and Azevedo had power resulting from their long-term employment, position and alliance with CBMM management, and where Defendant's employee could get easily fired, Freiwald's and Azevedo's sex trafficking assistants and enablers were receiving benefits of continuous employment for being salient about their sex trafficking venture.

324.    Freiwald and Azevedo secured the complicity of Defendants in their sex trafficking venture as a condition of their continued and ongoing employment.

325.    Defendants participated in the following overt acts that evidenced their participation in a sex trafficking scheme: recruiting or enticing victims, including using force, fraud, or coercion to persuade someone to engage in commercial sex; transporting victims; harboring victims; exploiting victims; benefiting from the exploitation of victims; conspiring with others to engage in sex trafficking; facilitating in assisting the transportation, housing or other logistical aspects of sex trafficking Plaintiff; conspiring to plan or agree to participate in this sex trafficking scheme; and obstructing justice by attempting to cover up or prevent the investigation or prosecution of sex trafficking.

326.    As a proximate result of the foregoing, Plaintiff has sustained loss of wages, bonuses, benefits, promotional opportunities and other prerequisites of employment.

327.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation.

## SECOND CAUSE OF ACTION

## UNLAWFUL SEX DISCRIMINATION-INTENTIONAL DISCRIMINATION

### Title IX (against RU, MIT, Harvard)

328.    The allegations set forth in the foregoing paragraphs are re-alleged and incorporated herein by reference.

329.    Under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

330.    Plaintiff brings Title IX claim against Defendants, because facts alleged in the Complaint establish a prima facie case, i.e., Plaintiff was a woman, who was highly qualified for the position Plaintiff applied for, and was eligible for, an educational program operated by recipients of federal financial assistance that was accepting applicants; despite Plaintiff's eligibility, she was rejected, and that the recipient selected applicants of Plaintiff's qualifications of the other sex.

331.    Plaintiff has valid Title IX claims against Harvard, MIT and RU, because she brought these claims in federal court on December 29, 2022 (Dkt. 1) after filing a charge with the EEOC within 300 days of the discriminatory acts. 42 U.S.C. § 2000e-5(e)(1).

332.    As of September 12, 2021, there were only five female scientists and 16 male scientists working in Freiwald's laboratory.

333.    Following Plaintiff's opposing Freiwald's sexual harassment in May 2020 and the publication of lab results in August 2020, Freiwald ceased hiring female scientists for his laboratory. As of early 2024, there were no female postdocs working under Freiwald. RU's support for Freiwald's decision to exclude women from his laboratory has been noted, particularly given the exclusively male composition of his group meetings. This has led to concerns among female researchers at RU.

334.    Between 2016 and 2021, laboratory tasks among postdocs and PhD students were discriminatory for women. Plaintiff is a woman coerced by Freiwald to work in his laboratory, whom he, similarly to other women, delegated more often for tedious, demanding, "dirty" jobs, i.e., the ones that have to be done but nobody likes to do, which required working overtime and on weekends, such as animal

training, surgical procedures and administrative tasks, whereas men were free to do research analysis , prepare written materials and spend time on developing their career  In addition, Men  more  than  women were given privileges in choosing preferred research project in Freiwald's lab. On a regular basis during her employment, Freiwald put on her administrative work with managing the protocols, and selected her over other male CBMM postdocs in his laboratory to organize and manage remote connection of the CBMM weekly research seminars for his laboratory members, and to go to MIT with scientific poster presentation for CBMM annual evaluations, which did not give any benefits to advance her work nor career.

335.    Freiwald, the supervisor and decision maker of each and every scientific project in the laboratory, refused to create a structured scientific exchange culture in his laboratory. Freiwald rarely attended the laboratory meetings such that his decision-making input was not available for the individual laboratory member in the group settings. In result, the work progress of individual laboratory member was conditioned on the one-to-one meetings with him. Freiwald had been inviting women members more often than men for one-to-one meetings outside the office space, such as to the restaurant or residential location.

336.    Men in Freiwald's laboratory were also given more career-advancement opportunities. In early 2015, Marciniak prepared a research project, which Freiwald enthusiastically accepted. However in Aug 2015, when the opportunity to apply for postdoctoral fellowship emerged, he blocked Marciniak's, but endorsed the application of the male postdoc from his laboratory. Similarly, in 2020, he refused to support Marciniak's application for the internal RU postdoctoral fellowship but endorsed the one of CBMM male postdoc similarly situated to her.

337.    In Spring 2017, given shortcomings of the fMRI method that time, and the time to technical implementation, a male CBMM postdoc, Ben Deen, withdrew himself from the non-human primate project. Although Plaintiff was in the very same challenging situation, Freiwald offered another, more convenient project to Deen, and ordered Plaintiff to take over his work, which included implementation of the new fMRI protocol and extra animal work, constituting non-stop grueling laboratory work responsibilities with extra hours and weekends, and by performing them, Plaintiff did not gain any benefits for the progress of her career. Throughout 2017-2021, Freiwald supported Deen in his chosen research and career path, such that he could advance in academia, while conditioning Plaintiff's progress on submitting to Freiwald's sexual harassment.

338.    Between 2014 and 2020, Freiwald sexually harassed Marciniak during professional meetings intended to discuss her project. This constituted sex-based discrimination. Freiwald's behavior was overtly sexual, leaving no doubt that he was propositioning her.

339.    MIT's and Harvard's employees and professors, and CBMM Summer School Directors perpetuated the program environment, which discriminated women. During CBMM Summer School in 2018, only 3 out of 20 Teaching Assistants (TAs) were women. During the meeting with the Directors on

8/16/2018, Kreiman discussed the sex with students topic, suggesting to postpone the interactions once the Summer School officially ends, and to look for the [sexual] opportunities [here] around. The chairs during the meeting were arranged in the circle, and Marciniak met Kreiman's gaze when he was indicating people around with his look while saying about looking for the [sexual] opportunities [here] around, encouraging male TAs to approach female TAs for sex. His behavior made Marciniak very uncomfortable.

340.    Across years, CBMM endorsed extracurricular fun during CBMM events according to misogynist culture, which effectively marginalized women. Male-bonding and socialization ritual.

341.    In fact, former school participants report that Azevedo was initializing and leading these conversations when he attended the program as a student himself, previously to 2017, when he for the first time attended in a Teaching Assistant position.

342.    Freiwald's discriminatory motive came to light on and subsequent to May 28, 2020, when Plaintiff opposed Freiwald's sexual harassment towards her by alluding to one of his behavior, i.e., conducting professional meetings in the restaurants where Freiwald sexually harassed Plaintiff. Freiwald replied only after a week, requesting a Zoom meeting, during which he told her that although not what she expected to hear, he decided that it would be betetr for her to move to a different environment, effectively communicating to her to discontinue her project, despite Freiwald's continuous earlier support, documented as far as during the May 2020 email conversation between Plaintiff and Freiwald. Freiwald's sudden change of tone in the course of this exchange followed precisely and was because of Plaintiff's action to "set up the professional boarders" in her refusal to go for the professional meetings with him to the restaurants.

343.    Following May 28, 2020, when Plaintiff opposed Freiwald's ongoing sexual harassment complained towards her, Freiwald retaliated against her by (I) halting her project's planned progress on June 4, 2020; (ii) extending her contract only for half a year, instead of a standard one-year RU appointment on July 30, 2020, to signal her to leave the lab as soon as possible; (iii) kept her demoted despite of positively evaluating her results in December 2020; (iv) ultimately terminating her employment effective November 2021 upon Plaintiff filed external complaint against RU and Freiwald and signaled to Freiwald to continue with her Title IX complaint in August 2021. Freiwald and RU did not engaged in any adverse employment action in this period towards none of similarly situated male post-docs: Ben Deen (Freiwald supported his research and positively referenced for Assistant Professor position), Minggui Chen (continuously employed at RU).

344.    On August 4, 2020, Freiwald refused to implement changes to hostile workplace environment, informing Plaintiff and others that such culture is his preferred choice, his "philosophy".

345.    Between June 2020 and November 2021, her untimely termination, Plaintiff was working in demoted position, as Freiwald and RU refused to continued planned phase 2 of her project,

electrophysiology, while supporting similarly situated to Marciniak male postdoc also associated with CBMM, Lucas Tian, in advancing to using this method, and continuing Tian's employment at RU.

346.     In June 2020, Freiwald cut off Marciniak's CBMM opportunities, which were contracted for her postdoctoral work. Freiwald assigned the resources to Tian, another male CBMM postdoc from his laboratory.

347.     CBMM opportunities were distributed unequally among CBMM faculty and postdocs based on sex and favoritism

348.     CBMM opportunities had been distributed unequally among CBMM faculty and postdocs, based on sex and favoritism. Favoritism culture and assignment of the positions not based on merits. In late 2017, CBMM Directors and selected faculty[10], together with very few (but all male) postdocs associated with them, formed secretively a CBMM delegation, which in January 2018 traveled to Paolo Alto for the summit with one of the CBMM industry partner, Google. This privileged networking opportunity was limited to the chosen ones, and the recruitment for the trip had not been announced broader in the community. Between December 2019 and early February 2020, Plaintiff participated in the protected activity by submitting her complaint, the evidence of the procedural errors in the previous investigation, and connected the investigator, Lizanne DeStefano, with another victims of Azevedo's misconduct. In January 2020, CBMM Directors, MIT and Harvard employees, opposed to introducing changes. On February 4, the CBMM Directors discriminated against Marciniak because of her participation in that latest protected activity.

349.     Freiwald and Defendant RU, MIT and Harvard discriminated Plaintiff in conditions and privileges of her employment because of her sex with respect to distributing teaching and supervising positions and opportunities.

350.     In July 2019, it was agreed that from the following year, the 2020 Plaintiff will obtain the position as a guest lecturer at the Brains, Minds and Machines course organized and sponsored by Defendants at Hunter College. Following Plaintiff's engagement in protected activity in early 2020, and resulting from it retaliation, the position in late 2020 and 2021 was assigned to Deen, and not Plaintiff.

351.     Freiwald and RU discriminated Marciniak based on sex with respect to assigning supportive personnel. In October 2019, he assigned a student to work with her on her research project. But when the student arrived in late 2020, he assigned him to another CBMM male postdoc.

352.     As a proximate result of the foregoing, Plaintiff has sustained loss of wages, bonuses, benefits, promotional opportunities and other prerequisites of employment.

---

10  Poggio, Kreiman, Katz Tenenbaum and Kanwisher.

353.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation.

## THIRD CAUSE OF ACTION

### *QUID PRO QUO* SEXUAL HARASSMENT from Freiwald

#### Title VII, NYSHRL, NYCHRL, Title IX (against RU),

### HOSTILE WORK ENVIRONMENT

#### Title VII (against RU)

354.     The allegations set forth in the foregoing paragraphs are realleged and incorporated herein.

355.     Defendant RU is liable as an employer for Freiwald's quid pro quo sexual harassment under Title VII, because (1) Plaintiff was subject to unwelcome sexual conduct or unwelcome sexual advance from Freiwald, and (2) her reaction to that conduct was used as basis for adverse employment action. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e.

356.     In his actions between 2014 and 2020 prior to May 28, 2020, Freiwald was persistently bothering Marciniak, constantly violating her boundaries. He was obsessive and predatory, insisted on hiring her and aggressively attempted to pursue her sexually. In November 2014, Freiwald moved the job interview to the upscale restaurant outside of the professional environment, where he made misleading claims about his laboratory's technological advancements and was quick to offer the position exclusively to her and not her boyfriend. In September 2015, while she was visiting the RU campus, he was flirtatious in requesting a personal contact. Despite her withdrawal from the hiring process, Freiwald kept sending her personal messages, including on Valentine's Day in February 2016, which insisted that Plaintiff confine in him with her personal matters, and lessen her protective boundaries towards him. Ultimately, on February 19, 2016, he imposed a prospective postdoctoral project on her at CBMM by announcing he already contacted the MIT Professor about her. In March 2016, he coerced her into agreeing to a J-1 visa postdoctoral appointment at RU, effectively causing her to move to New York in September 2016. Once Plaintiff was based in New York, he persistently was luring her for meetings in the restaurants under the guise of professional meetings. During those meetings, he was shortening the distance and touching her inappropriately, and commenting on her

body parts including on September 1, 2017, May 2018, September 2018, asked her in suggestive way whether she likes older man, referring to himself, in September 2018. In summer 2019, Plaintiff informed him about sexual assault from Azevedo, hoping it will discouraged him. But given the negative outcome.

357.    Freiwald commentary about an individual's body. Freiwald's sexual harassment conduct also included:

(i) unwelcomed sexual advances or requests for sexual favor, such as going out;

(ii) sexual jokes or innuendoes (banana joke, February 2020);

(iii) commentary about an individual's body to Plaintiff;

(iv) inappropriate touching and obscene visible signs of sexual arousal during a meeting with Plaintiff;

(v) inappropriate sex stereotyping as follows: (1) expecting females to be more sensitive, more emotional, not aggressive, and submissive – treating Dr. Marciniak with retaliatory animus when she complained; (2) Asking only women to perform duties that are stereotypically assigned to that gender, i.e., taking care of animals, administrative, secretary jobs, representative, decorative assignments, participating in social events, smiling and be nice; (vi) display or circulation in the workplace of sexually suggestive objects or pictures: (lab meeting presentation), knowing about it, and prohibiting only for external lectures and presentations; (vii) Hostile acts from the side of Prof. Freiwald starting on 6/4/2020. (viii) Prof. Freiwald's conduct created a hostile environment for Dr. Marciniak. Freiwald produced a situation of discriminatory and sexual nature, which resulted in adverse settings for Plaintiff. The hostile environment created by Freiwald caused her to be under constant stress and fear.

358.    As a proximate result of the foregoing, Plaintiff has sustained loss of wages, bonuses, benefits, promotional opportunities and other prerequisites of employment.

359.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation.

## FOURTH CAUSE OF ACTION

## DISCRIMINATION BASED ON SEX-HOSTILE ENVIRONMENT

### Title IX (against MIT, Harvard and Rockefeller)

360.    The allegations set forth in the foregoing paragraphs are realleged and incorporated herein.

361.    MIT's and Havard's conduct in mishandling Plaintiff's complaint was (i) objectively severe or pervasive, that is, it created an environment that a reasonable person would find hostile and abusive; (ii) plaintiff subjectively perceived it as hostile or abusive; and (iii) created such environment because of Plaintiff's sex.

362.    First, MIT and Harvard fostered a toxic, misogynistic culture and academic environment at the CBMM Summer School program that favored men and degrading participating women, which was overseen by MIT and Harvard's staff, where MIT's and Harvard's Azevedo ceased the opportunity to sexually assault Plaintiff.

363.    They had red flags about Azevedo, who participated in the program before and was initializing locker-room conversations. They had red flags in 2017, when Plaintiff arrived. Kreiman was not able to control Azevedo, who was distributing alcohol. Second, in 2018, Kreiman forbade sex with students, and then the student from that school reported, that later on Azevedo was sending flirtatious messages. Therefore, at least in early 2020, when they heard from the student, they knew about him. They had sufficient authority to address Plaintiff's alleged discrimination and to institute corrective measures but failed to adequately respond. They kept him hired and promoted him to the Research Associate position.

364.    Plaintiff lodged complaints of her sexual harassment to every available channel in line with defendants' policies and requested a no-contact order, which Rankin of MIT and Martinez of Harvard scoffed at and denied.

365.    They did not launched formal investigation, which would involve an independent investigator, but forwarded the investigation to MBL, who lacked any authority to remedy the misconduct, to discipline Azevedo. Therefore, they broke their own policies.

366.    MIT and Harvard, through its CBMM summer program, fostered a toxic, misogynistic academic environment that favored men and mishandled Plaintiff's March 2019 sexual assault complaint.

367.    In 2020, after ignoring new witnesses and procedural deficiencies of the initial investigation, DeStefano, an official who has authority to address the alleged discrimination and to institute corrective measures on the university's behalf, had actual knowledge of discrimination.

368.    Despite conveying towards her that they intend to address the complaint, MIT, Harvard and RU and its associated entities conspired to bury Marciniak's allegations of assault, sexual harassment, disparate treatment, and retaliation, ultimately leading to her termination and retaliating against her.

369.    As a result, Plaintiff was unable to participate in the CBMM Summer School or retreat, missing out on valuable training, research, and networking opportunities. This isolation further marginalized Plaintiff within the CBMM community.

370.    RU engaged in its own conduct involved in its own actions, to not act and burry her complaint. RU's conduct contributed to and compounded her sexual harassment prior to and after Azevedo sexually assaulted her, including through Freiwald, who mishandled Plaintiff's early complaint about Azevedo in September 2017.

371.    In addition, RU has a policy of mishandling complaints, including Plaintiff's other complaint from December 2020.

372.    Although RU did not employ Azevedo, they directly refused to contact other institutions to facilitate a new no-contact order.

373.    Because they failed to adequately respond, they created hostile environment which was sufficiently severe or pervasive to alter the conditions of Plaintiff's educational environment. First, in May 2019 at MIT. Then, virtual meeting in September 2019. Then, January 2020, the retaliation.

374.    In early February 2020, the CBMM Directors refused to Marciniak the Teaching Assistant position for the 2020 Summer School, and Marciniak tried to talk about it with Kanwisher, but she never replied to Marciniak's message. In addition, contrary to Kanwisher's promise to update Marciniak on the result on the audit, Marciniak never heard back neither from Kanwisher nor DeStefano. Later in June 2020, Marciniak tried to signal the CBMM retaliation to Freiwald. He assured her that Marciniak should not worry about CBMM fellowship financially, but then, after Marciniak talked about the professional boarders in her workspace, he fired her.

375.    The 2017 sexual assault and subsequent sexual harassment from Azevedo, her CBMM workplace colleague, and the events around her sexual assault and sexual harassment complaint against him, caused intolerable alteration of her working conditions until the end of Marciniak's employment in November 2021. Marciniak was cut off from CBMM resources, CBMM opportunities, CBMM networking, CBMM training, and CBMM scientific opportunities.

376.    As a proximate result of the foregoing, Plaintiff has sustained loss of wages, bonuses, benefits, promotional opportunities and other prerequisites of employment.

377.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation.

## FIFTH CAUSE OF ACTION

## DELIBERATE INDIFFERENCE

### Title IX (against RU, MIT and Harvard)

378.    The allegations set forth in the aforementioned paragraphs are realleged and incorporated herein.

379.    Harvard has secondary liability for the actions of Kreiman, Boix and Azevedo. The institution's decision to not fire Azevedo after knowing about students and not to re-open Plaintiff's complaint, was a deliberate indifference. Given her reasonable appeal, RU and CBMM refused to reopen the investigation into her complaint. Defendants failed to follow their own policies and procedures despite receiving Plaintiff's multiple complaint. Further, they did not issue a no-contact Order.

380.    When the new development emerged (MBL's procedural errors and Azevedo's other victim's), they did not reopen the investigation.

381.    As a proximate result of the foregoing, Plaintiff has sustained loss of wages, bonuses, benefits, promotional opportunities and other prerequisites of employment.

382.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation.

## SIXTH CAUSE OF ACTION

## HEIGHTENED RISK

### Title IX (against RU, MIT, Harvard)

383.    The allegations set forth in the aforementioned paragraphs are realleged and incorporated herein.

384.    Only military workplace exhibits a comparable high level of sexual harassment prevalence to the academic environment in STEM.

385.    Conferences and fieldwork settings are known to pose heightened risks of sexual harassment for women. Data from 2014 surveys in these environments reveal widespread incidents of inappropriate conduct across various academic disciplines.

386.    Harvard, MIT and RU and their officials responsible to implement federal Title IX and Title VII policies, knew well about the high rates of sexual harassment in academia, from the National Academies of Sciences, Engineering, and Medicine ("NAS"). In 2018, the NAS study report found that between 20% and 50% of female students and more than 50% of female faculty and staff (including

postdocs) experienced sexually harassing behavior while in academia. Harvard and MIT had been in fact among initial 28 founding universities, colleges and research institutions to join with NAS on Action Collaborative on Preventing Sexual Harassment in Higher Education initiative created to reduce sexual harassment in higher education. Yet, as this lawsuit describes, Defendants did not follow their assurances that they would fight with the problem at home.

387.    At all relevant times to the complaint, Harvard, MIT and RU failed to address the systemic factors contributing to the prevalence of sexual harassment at their academic institutions, such as gender imbalance and hierarchical power structures, and fostered the male-dominated leadership an a climate where women in vulnerable positions, including Plaintiff, were targeted.

388.    RU appointed Virginia Huffman, Vice President of HR, as Title IX coordinator on April 26, 2018. This placed the responsibility for ensuring compliance with nondiscrimination and anti-harassment laws in the hands of the most senior HR position, potentially creating a conflict of interest. Given HR's alignment with the employer's interests, there's a risk of bias or attempts to cover up complaints that could harm the university's reputation or profitability

389.    Rockefeller University, despite facing allegations of sexual misconduct involving faculty members[11], failed to implement a clear policy prohibiting personal relationships between professors and their subordinate students and postdocs, therefore failed to protect vulnerable females, including Plaintiff. The RU only announced the change in the policy after Plaintiff filed her complaint to Huffman in May 2019.

390.    In her role as … Huffman persistently denied to ensure safety of ...that RU engages in the conference culture, which ...specificity of the collaborative context, conferences etc.

391.    In addition, RU policy separated employees and students, and lacked any description which procedures apply to postdocs.

392.    Defendants' policies caused increased prevalence of sexual harassment on their campuses.

393.    In 2018, WISER, a women's advocacy group at Rockefeller University, recognized the ineffectiveness of RU's existing sexual harassment prevention policies and sought Huffman's permissions to to prepare the proper question for the survey to be administered as a climate survey to the RU community, but Huffman denied their requests.

394.    RU operates a campus bar, the Faculty Club, offering free alcohol three times a week. Despite suggestions from the postdoctoral community, RU has consistently fostered an adult-only atmosphere by resisting changes to alcohol-serving hours or child-friendly policies. The Faculty Club's environment often involves locker-room-style conversations and socialization, which discriminate against

---

11  These known include Dr. Reginald Archibald's sexual abuse of child patients and former President Arnold J. Levine's inappropriate involvement with a female student in 2002.

women. At some point in 2017 or 2018, Plaintiff had experience of being compared to a monkey after mentioning her work with monkeys.

395.    RU used online material, According to a large body of social science evidence, the strategies of fast, deeply flawed fixes, for example online surveys and workshops without expertise in the topic, simply don't work.

396.    At the time of Marciniak's complaint interaction with Huffman in May 2019, RU nondiscriminatory policy was in noncompliance with the minimum standards in New York State Labor Law & 201-G, and lacked complaint form and published investigative procedures. RU did not adjust their policies to comply with the law following my complaint. In December 2019, Marciniak fell a victim of persistent staring behavior at RU housing from the RU professor, who had been known among female RU community from similar incidents.  Marciniak and other women were referred with their complain to Huffman, and subsequently met with Huffman in person in her office and asked for RU's action. During the meeting and the subsequent process, Huffman (i) did not file (nor proposed to file) the complaint form as federal and state laws required, (ii) threatened them with the necessity of revealing their names to the professor should they decided to proceed, and (iii) in January 2021 concluded her *investigation* with biased justification of the professor's behavior by professor's medical condition. Huffman did not reveal more because of *confidentiality rules*, and closed the action without any world of apology.

397.    Freiwald's sexual harassment of Marciniak was emboldened by the informal handling of her previous complaint against Azevedo. Huffman's failure to take formal action in 2019 led Freiwald to believe that his own misconduct would go unpunished, creating a culture of impunity within the institution. This perceived lack of consequences emboldened Freiwald to continue his predatory behavior towards Marciniak.

398.    RU lacked appropriate sexual harassment prevention training during Marciniak's employment. The only anti-discrimination training provided was an online course in or about August 2016 intended for supervisors, not employees. This training did not cover sexual harassment. The training she received was irrelevant to the academic workplace and failed to address sexual harassment, particularly within the hierarchical structure of academia. Despite legal obligations to conduct annual sexual harassment prevention training since 2019, RU's training materials did not reflect the realities of daily life for postdoctoral researcher, although the Emtrain platform allowed RU to tune the content and to customize up to 15 micro-lessons cards.

399.    In 2017, when Marciniak was sexually assaulted by Azevedo, CBMM was in violation of Title IX requirements. The program Directors and administration, lacked clear information about nondiscrimination policies and Title IX procedures for its members. CBMM failed to provide sexual harassment prevention training for its postdocs and students, and lacked internal procedures for addressing

workplace misconduct. This lack of guidance and support made Marciniak more vulnerable to sexual harassment and hindered her ability to report and address the assault.

400.    Defendants had some knowledge of a heightened risk of sexual assault by Azevedo, as there were multiple flags of his misbehavior. Azevedo was known among TAs, from initializing and leading locker-room conversations in the prior year when he was attending.

401.    Poggio and Kreiman, key figures in the CBMM Summer School program, played a significant role in establishing workplace conduct rules. However, the program's internal disciplinary system, which should have been open to all, fostered an environment where postdocs working with them were given preferential treatment. This "mafia-like" atmosphere made Marciniak more vulnerable to sexual harassment and assault, as the perpetrators felt protected under Poggio and Kreiman's supervision.

402.    On September 1, 2017, Freiwald ignored Plaintiff's report of a bad encounter with someone from another affiliation. This inaction contributed to a culture that allowed Freiwald to continue his inappropriate behavior towards Marciniak, making her more vulnerable to his subsequent sexual harassment and retaliation.

403.    Upon information and belief, in or about 2018, the CBMM Summer School Directors knew about the incidents of sexual interactions between Teaching Assistants and students happening during the Summer School. In 2018, one of the incident caused The Summer School Directors to call urgent meeting with the group of Teaching Assistants (TAs)[12]. During the meeting, Kreiman informed that those sexual interactions between Teaching Assistants and students are not allowed. Kreiman suggested to postpone them once the Summer School officially ends, and to *look for the [sexual] opportunities [here] around,* referring to the group of TAs. Kreiman did not provide any details on disciplinary actions to be taken for the misconduct, neither referred to sexual harassment policy nor mentioned Title IX and/or Title VII complaint procedures for misconduct.

404.    Upon information and belief, Defendants had knowledge of heightened risk that Freiwald would abuse power disparity. Kanwisher knowledgeable about Freiwald partnership with Tsao, and that it ended up on a bad note.

405.    Defendants observed Freiwald surrounded by his directly subordinated females. Freiwald's pursuit of Marciniak, a subordinate postdoc, was motivated by a desire for control and domination, not genuine attraction. His actions demonstrate a disregard for professional boundaries and a culture that allowed for such abusive behavior.

406.    Defendants official custom of deliberate indifference increased Marciniak's vulnerability towards her 2017 sexual assault and subsequent sexual harassment: Harvard's response in light of new

---

12  Two other topics during the meeting were excessive alcohol usage and student bullying by TA.

evidence to the complaint-another victim of Azevedo, in early 2020. They did not reopen the investigation, and retaliated against Marciniak.

407.    In or about the summer of 2017, Harvard and MIT, through CBMM Summer School Directors, installed Azevedo as Teaching Assistant ("TA") and Xavier Boix as a senior TA at 2017 CBMM Summer School, the positions of authority towards students and listener students. In 2017, the recruitment for the position was informal, and lacked a screening process of the applicants. It was announced then that being a TA in the summer school is fairly relaxed. We will play tennis, go swimming at the beach, bike riding, etc. Housing and food will be covered.

408.    Because in 2019 Huffman processed Marciniak's complaint against Azevedo in an informal way, while discussing it with Freiwald in July 2019 the complaint status reflected institutional success in implementing that informal strategy and showed lack of institutional intention for pursuing potential disciplinary actions towards Azevedo on the level of his employment. In result of above, Marciniak was more vulnerable to Freiwald's subsequent sexual harassment. By learning how easy it was to dismiss the complaint, Freiwald remained secure that he could stay under the radar of law with his quid pro quo sexual harassment towards Marciniak, assured he would never face any repercussions for his behavior.

409.    Defendants acted with deliberate indifference in reaction to sexual harassment complaint, and it deprived her of access to educational opportunities and benefits. After Marciniak filed a sexual harassment complaint with MIT in March 2019, MIT and other relevant parties became aware of the incident and the potential for a hostile work environment. Despite having harassment policies in place, MIT failed to take appropriate action to address the situation and issue a no-contact order. This lack of response made Marciniak more vulnerable to further harassment by the perpetrator and contributed to a hostile work environment for other CBMM members.

410.    official policy, and process the complaints in informal way based on their belief that MIT was not obliged to report incidents processed in informal way (I) to avoid bad data for statistics, under Clery Act, which obliged colleges and universities to report the crime

411.    Defendants fostered a culture of silence regarding sexual discrimination, neglecting to report complaints, conduct proper investigations, or ensure equal access to grievance procedures. This deliberate indifference violated the rights of victims and created a hostile environment.

412.    The ongoing sexual and physical assaults, harassment, abuse, and stalking Marciniak experienced, and the subsequent investigative failures by CBMM Defendants, were so severe, pervasive, and objectively offensive that Marciniak was denied equal access to CBMM's educational and employment opportunities and benefits.

413.    As a proximate result of the foregoing, Plaintiff has sustained loss of wages, bonuses, benefits, promotional opportunities and other prerequisites of employment.

414.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation.

## SEVENTH CAUSE OF ACTION

## RETALIATION

### Title IX (against MIT, Harvard)
### Title VII (against RU)

415.    The allegations set forth in the aforementioned paragraphs are realleged and incorporated herein.

416.    Plaintiff engaged in multiple protected activity with Harvard: (i) between April and May 2019 she reported an provided documentation to the Harvard's official, Title IX – Martinez a sexual assault perpetrated by Harvard's employees – Azevedo ad Boix under supervision of Harvard's Professor, Kreiman at Harvard's recognized and sponsored program, the annual CBMM Summer School, held at MBL campus in Woods Hole, MA (ii) between early January and early February of 2020, Plaintiff participated in the investigation into the CBMM Summer School culture launched by the CBMM external evaluator, Lizanne DeStefano, where Plaintiff, in addition to detailed description of the events, reported to DeStefano her previous complaint efforts to Harvard and that Harvard refused to issue a no-contact order for her upcoming visit to Harvard's recognized event, the procedural deficiencies of MBL's investigation of Azevedo, provided evidential documentation, and connected DeStefano with other victims of Azevedo's sexual harassment at that program, who were interviewed, and corroborated Plaintiff's complaint.

417.    The CBMM Summer School Director and Harvard Professor, Kreiman, was knowledgeable about Plaintiff's protected activity, because on or around January 18, 2020, Tenenbaum talked to Poggio and Kreiman about Plaintiff's complaint, which was investigated by DeStefano.

418.    Between late January and early February 2020, the annual recruitment for a Teaching Assistant position at that program was held and on February 4, Harvard, through its agent in the CBMM Program, the Program Director, Kreiman, rejected the position to Plaintiff, who was applying, while accepting similarly qualified male candidates.

419.    Plaintiff engaged in multiple protected activity with MIT: (i) between March and May 2019 she reported an provided documentation to the MIT's official, Title IX – Rankin a sexual assault

perpetrated by MIT's employees – Azevedo ad Boix under supervision of MIT's Professors, Desimone and Poggio at MIT's recognized and sponsored program, the annual CBMM Summer School, held at MBL campus in Woods Hole, MA (ii) between early January and early February of 2020, Plaintiff participated in the investigation into the CBMM Summer School culture launched by the CBMM external evaluator, Lizanne DeStefano, where Plaintiff, in addition to detailed description of the events, reported to DeStefano her previous complaint efforts to MIT and that MIT refused to issue a no-contact order for her upcoming visit to MIT's recognized event, the procedural deficiencies of MBL's investigation of Azevedo, provided evidential documentation, and connected DeStefano with other victims of Azevedo's sexual harassment at that program, who were interviewed, and corroborated Plaintiff's complaint.

420.    The CBMM Summer School Directors and MIT Professors, Katz and Poggio, were knowledgeable about Plaintiff's protected activity, because on or around January 18, 2020, Tenenbaum talked to Poggio and Kreiman about Plaintiff's complaint, which was investigated by DeStefano.

421.    Between late January and early February 2020, the annual recruitment for a Teaching Assistant position at that program was held and on February 4, MIT, through its agents in the CBMM Program, the Program Directors, Poggio and Katz, rejected the position to Plaintiff, who was applying, while accepting similarly qualified male candidates.

422.    Other CBMM members with similar to Marciniak expertise and qualifications required to perform the Teaching Assistant job, were accepted for the same position in 2020. Marciniak was not offered the position in the subsequent, 2021 year.

423.    There was a causal connection between her protected activity by reporting sex-based discrimination, and the CBMM Summer School Directors decision to refuse her Teaching Assistant position in 2020. The directors, who had developed retaliatory animus towards Marciniak and her complaint actions, made a final decision on TA selection. By refusing the position to her, they signaled that her actions had not been welcomed, and intended to isolate her from the CBMM Summer School community. Upon information and belief, they acted upon belief that my undisturbed work with CBMM as Teaching Assistant could have led to other sexual harassment complaints at CBMM Summer School program, causing them to face liability.

424.    On or about May 4,2020, Plaintiff filed a complaint with NSF ODI about being rejected for TA position by CBMM, and on August 10, 202, she filed the similar complaint against MIT, Harvard and BCH with EEOC Boston area.

425.      Plaintiff understood that she was ultimately demoted by Freiwald to these less attractive job arrangements solely because she was being punished for opposing sexual harassment from him on 5/29/2020.

426.      Plaintiff engaged in protected activity on or about May 29, 2020, when she complained to Freiwald about his sexual harassment, by refusing to go to the restaurant with him for the professional meetings, which Freiwald notoriously moving to unprofessional settings, such as restaurants, where he sexually harassed her.

427.      Following this, Freiwald conducted a Zoom meeting with her on June 4, 2020, where he said she should look for another place to work, and on July 30, 2020, he conducted a first adverse employment action towards Plaintiff by shortening the extension of her appointment with RU to 6 months, instead of issuing her an annual appointment and asking her to complete only remaining fMRI experiments.

428.      There was a causal relation between her protected activity by reporting sex-based discrimination to Freiwald, my supervisor, designated to receive the report, and his decision to demote her and effectively terminating her employment. Freiwald retaliated against her because she opposed his quid pro quo sexual harassment.

429.      Freiwald's abrupt termination was based on ulterior motives rather than a genuine evaluation of scientific merit. Freiwald's decision was not scientifically justified, as the project had sufficient funding and Marciniak's work was promising.

430.      RUs engaged in materially adverse actions against her when Freiwald, RU's employee in supervising position failed to report her complaint about his sexual harassment as required by RU policy, therefore depriving her the opportunity to have her claims of sex discrimination properly investigated. RU also failed to initiate appropriate interim measures to ensure her safety and ongoing equal access to educational and employment opportunities and benefits and failed to implement appropriate sanctions and responsive measures to remedy the sexual hostile environment and prevent its occurrence.

431.       Freiwald's decision to cut Marciniak off from the electrophysiological phase of the Intuitive Physics project effectively breached their 2016 postdoctoral training contract. This demotion hindered Marciniak's career advancement by depriving her of crucial experience and training. Freiwald was aware of Marciniak's career goals and the importance of this phase for her future. By isolating her from relevant opportunities and collaborations, Freiwald undermined the purpose of her postdoctoral position at CBMM.

432.      Freiwald's decision to terminate Plaintiff's project was arbitrary and lacked scientific justification. This abrupt change highlights Freiwald's emotional volatility and strongly suggests a potential personal vendetta against Plaintiff.

433.      Other retaliatory actions by Freiwald: cancelling the assistance of the student, whom he assigned to similarly situated male CBMM postdoc in Freiwald's lab, Tian.

434.     Freiwald supported and promoted other similarly situated male postdocs.

435.     On May 18, 2021, Marciniak filed NYS DHR complaint against Winrich Freiwald and the Rockefeller University reporting Freiwald sexually harassed her and retaliated against her by demoting her in the position.

436.     During the conversation between Freiwald and Marciniak, she told him she engaged in protected activity.

437.     On August 12, 2021, Plaintiff was informed that Freiwald and RU decided to terminate Plaintiff effective on November 30, 2021.

438.     The termination was sudden and untimely as it fell only 3 months after the starting of the new Research Associate's 3-year contract and abruptly interrupted her ongoing work contracted with Freiwald earlier in 2021.

439.      In January 2022, the NYS DHR issued probable cause determination after investigation of Marciniak's complaint.

440.     Defendant RU continued to retaliate against her and intimidated her.

441.      In early 2022, RU withdrew their H-1B petition for Plaintiff's stay and offered to Marciniak a one-way *ticket to Poland*.

442.     As a proximate result of the foregoing, Plaintiff has sustained loss of wages, bonuses, benefits, promotional opportunities and other prerequisites of employment.

443.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation.

## EIGHTH CAUSE OF ACTION:

## CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS

### the Civil Rights Act of 1871, 42 U.S.C. 1985(2) and (3)
### (against RU, MIT, Harvard)

444.     The allegations set forth in the aforementioned paragraphs are realleged and incorporated herein.

445.     Defendants violated a number of Plaintiff's civil rights, including: (I) Plaintiff's right to equal protection under the law, guaranteed by the 14th Amendment of the U.S. Constitution, prohibiting discrimination on the basis of sex, such as sexual harassment, which therefore is unlawful; (ii) Plaintiff's right to a workplace free from discrimination under Title VII of the Civil Rights Act of 1964, prohibiting discrimination on the basis of sex, including sexual harassment, in the workplace; (iii) Plaintiff's right to

participate in federally funded program or activity free from discrimination under Title IX, prohibiting discrimination on the basis of sex, including sexual harassment (iv) Plaintiff's right to freedom from retaliation for launching sexual harassment complaints.

446.    Plaintiff, an employee and trainee, complained of sexual harassment and was subsequently punished and retaliated against by Defendants, her employers, who therefore violated her right to freedom from retaliation.

447.    Between March 2019 and May 2019, Defendants established a conspiracy to silence Plaintiff's complaint through the actions of their Title IX Coordinators.

448.    who had access and knowledge of the individual's policies applicable to Plaintiff's case. During multiple multi-institutional intentionally and maliciously disfavored and rejected the most reasonable avenue to process Plaintiff's complaint- to apply formal and impartial investigation, and collaborate with the Fallmouth Police.

449.    By silencing Plaintiff's complaint, Defendants engaged in a pattern of behavior that violated these and other civil rights. This created a hostile work environment for other employees and deterred other victims from coming forward.

450.    MIT had implemented investigative procedures, which assigned independent investigator to conduct interviews and review the evidence, and gave for each party equal opportunity to inspect, review and respond to the evidence prior to conclusion of the investigation. Plaintiff had right to fair and impartial grievance procedure, which she did not receive.

451.    As a proximate result of the foregoing, Plaintiff has sustained loss of wages, bonuses, benefits, promotional opportunities and other prerequisites of employment.

452.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation.

## NINTH CAUSE OF ACTION:

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT ("RICO")

### 18 U.S.C. §§ 1961-1968 (against RU, MIT and Harvard)

453.    The allegations set forth in the aforementioned paragraphs are realleged and incorporated herein.

454.     Under 18 U.S.C. § 1962(c), it unlawful "for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity".

455.     Defendants essentially formulated a scheme to bury Plaintiff's complaint of rape and sexual harassment by top performing researchers who's research was of high value to Defendants because it in part ensured the continuous flow of federal funding via the NSF. CBMM must report its findings and any Title IX violations to the NSF, which could jeopardize prestige and future funding.

456.     To maximize this incentive-based compensation and prevent loss of interest resulting from finding non-compliance with the Title IX regulations, it was imperative for the CBMM Director Tomaso Poggio ("Poggio") and others, to protect sexual perpetrators, Freiwald and Azevedo, accused of sexual misconduct in the program and to downplay any report of sexual misconduct which might jeopardize the ability to positively "pass" the annual NSF evaluation. The NSF-CBMM cooperative agreement is a formal enterprise created to carry out the racketeering activity harming Marciniak. Between 2019 and 2022, Defendants engaged in a pattern of racketeering activity by covering up Marciniak's sexual harassment complaints in the CBMM program.

457.     By engaging in the pattern of racketeering activity, CBMM Defendants avoided liability in Marciniak's complaint even by violating the psychotherapist-patient confidentiality to pressure her not to proceed pursuing justice against her rapist and harasser to maintain continuous NSF funding to CBMM. Defendants had the specific intent and incentive to engage in the substantive RICO violations alleged herein in order to appear in compliance with Title IX requirements of the federally funded program to maintain receipt of funds and to avoid bad publicity.

458.     The involvement of the enterprise spanned upward even to the purported investigators of these civil rights' violations.

459.     Pattern of conduct to over years effect the covering up scheme to shield the accused perpetrators from Marciniak's complaints, as required by the statute.

460.     the depths of Defendants' deception when alleging they conspired to deceive her into believing her complaint was dismissed by the EEOC New York office relating to her September 2020 complaint against Freiwald and RU.

461.     Marciniak's complaints are horizontally or vertically related as these institutions all had the same incentive to maintain a reputable public image to receive funding and protect their top performers achieved by strongarming an individual postdoc researcher gaining entry into the country on a visa fostered by RU. The inequal power dynamic is obvious between the parties – Azevedo as a CBMM organizer and TA and Freiwald as a tenured professor gifted by RU his own lab complete with his own procedures. With these positions of power of Marciniak, they were firmly in positions to exercise their wills against

Marciniak. Her complaints are all related as Defendants' continued to improperly address the inappropriate sexual conduct and unchecked discriminatory animus of its male educators.

462.    Marciniak was targeted by these perpetrators for sexual gratification and then by Defendants during the attempted cover up scheme for the related reason of making these complaints go away without truly addressing the toxic culture that has been permitted to run amok in these particular institutions for several years. This was a narrowed scheme against Marciniak to conceal these unsightly and illegal accusations of sexual misconduct in what historically have been renowned, highly professional environments – a reputation slipping away as of late.

463.    Continuity of Defendants' criminal activity is demonstrated in Marciniak's Complaint as the institutions involved were aware of the complained of misconduct for multiple years from 2019 to 2022, constituting a substantial period of time and have yet to address it – both Freiwald and Azevedo remain employed with RU and MIT, respectively. As multiple women have been sexually assaulted by Azevedo while he held his position at MIT and he continues to research for Defendants, earning a salary from the federally-funded NSF-CBMM collaboration composed of tax-payers' dollars, he will continue these indeed predicate acts without any intervention from Defendants. Perhaps now with the instant litigation, he will suffer the appropriate consequences to his insidious illegal behavior towards women.

464.    Plaintiff suffered injury to her business, which is constituted by (i) Plaintiff's research, a product of her intellectual labor and expertise, which represents a valuable asset that she has invested time and effort in developing; (ii) Hours of work, i.e. the time and energy that Plaintiff dedicated to her research, constituted a significant investment of her resources., and this effort is a form of business activity; (iii) Plaintiff's professional reputation, a valuable asset that she has built over time through her work and achievements, which is a form of intangible property.

465.    Plaintiff's work was being exploited or harmed by the Defendants' RICO activities.

466.    Plaintiff's business, after being terminated by Freiwald for refusing his sexual advances, sustained a negative financial impact and the emotional distress she endured since being transported by RU to the United States absolutely constitutes an actionable injury to her person adversely affecting her bodily health.

467.    Plaintiff's injury was proximately caused by her conduct as both a whistleblower and non-participant (both acts non-distinguishable from the perspective of RICO).

468.    Plaintiff's injury to her business and property flowed from defendants' commission of a pattern of racketeering activity in connection with the conduct of an enterprise. Huffman, the enterprise participant, in her position in the RU corporation, engaged in an overall scheme which consisted of the commission of the predicate acts and the cover-up of those activities, which caused plaintiff to lose her job.

469.    Plaintiff sustained a loss of scientific earning potential. Plaintiff lost access to collaboration with access to specialized facilities and equipment that would otherwise be not available, and lost the ability to exchange data and research material among colleagues. She also lost out on the opportunity to the development of joint intellectual property that could be commercialized or licensed.

470.    RICO predicate offenses (1) sex trafficking. Each defendant engaged in recruiting, enticing Plaintiff for the position, harboring and transporting and covering-up the enterprise;

471.    RICO predicate offenses (2): Defendants engaged in various instances of Tampering with a witness, victim, or an informant under 18 US Code § 1512(b) and 18 US Code § 1512(c): (I) Morak "corruptly" concealed a record or attempted to do so, with the intent to impair the object's integrity or availability for use in an official proceeding 18 US Code § 1512(c)(1); (2) Freiwald, and RU attempted to destroy, or conceal a record, Plaintiff's RUNet email account, with intend to impair the record's availability for the NYSDHR complaint.  18 US Code § 1512(c)(1); (3) Defendants used dishonest or unethical methods, deception (using false information or misleading statements to manipulate Plaintiff's decision) and coercion (using intimidation to force Plaintiff to withhold from proceeding and informing NSF and police about other victims),  to deliberate attempt to (I) influence, delay, or prevent the testimony (any person) of Victim 1 (Azevedo's girlfriend) in an official proceeding (NSF complaint, police record, Episodes in 2019, there was a real delay of the testimonies, until later 2020), under 18 US Code § 1512(b)(1) (4) Defendants otherwise obstructed, influenced, or impeded (any) official proceeding, or attempted to do so, under 18 US Code § 1512(c)(2), which included sending her back to Poland twice in early 2022, after Defendants knew that the NYSDHR issued probable cause determination, to hinder, delay and prevent or dissuade Plaintiff from attending and testifying in the NYSDHR proceedings.

472. Through Huffman and her co-conspirators, Zipkin, Morak, Mehta-Naik, and Solomon actions, Defendants intentionally harassed her, therefore hindered, delayed, and dissuaded Plaintiff from reporting Azevedo to a law reinforcement officer in New York, in connection with Azevedo's rape on Plaintiff from March 15, 2018, 18 US Code § 1512(c)(2).

473. Huffman also attempted to corruptly persuade Plaintiff by paying services for her, which she believed was psychotherapy, but which in fact was to extract information about her next steps and what she thinks about the complaint, to then effectively persuade her to not complaint.

474.    Plaintiff's internal sexual harassment complaint to RU, MIT, Harvard, the complaint to NSF about MIT, Harvard in 2019, and about RU in September 2020, for retaliation, are related because Defendants had a common incentive to improperly address the inappropriate sexual misconduct which was motivated by discriminatory animus. Defendants had common interest to silence sexual misconduct in the CBMM program, and skew Title IX procedures to Plaintiff's disadvantage such as they would avoid liability towards their misconduct.

475.    Defendants attempted to cover up racketeering by terminating Plaintiff with knowledge of it. Plaintiff's supervisor sexually harassed Plaintiff and caused her to be fired in an effort to cover up a racketeering scheme she had discovered and opposed to be involved in as a victim, When plaintiff refused to collaborate in covering up RICO.

476.    Defendants' retaliatory acts towards Plaintiff, including her termination, were over acts done in furtherance of a conspiracy to operate CBMM through a pattern of racketeering activity as defined by the RICO statue.

477.    The only was Defendants could continue their illegal scheme was to rid CBMM of those people who would not "go along" with sexual harassment, including Plaintiff.

478.    Plaintiff was bot the victim and the target of the racketeering activity.

479. As a proximate result of the foregoing, Plaintiff has sustained loss of wages, bonuses, benefits, promotional opportunities and other prerequisites of employment.

480. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation.

# TENTH CAUSE OF ACTION:

# INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### State Law Claims (against RU)

481.    The allegations set forth in the aforementioned paragraphs are realleged and incorporated herein.

482.    RU's conduct to withdraw Marciniak's visa, effectively forcing her to leave the country, was a deliberate act of retaliation designed to silence her and prevent her from pursuing legal action. This action caused Marciniak significant emotional distress and had severe consequences for her well-being.

483.    This RU's unexpected action lead Plaintiff to feelings of uncertainty, anxiety, and fear about her and her family's future in the United States. Plaintiff experienced emotional turmoil, such as sadness, anger, and frustration, as she grappled with the loss of her job, income, and stability. Additionally, the abrupt termination of their visa may disrupt their personal life, impacting their relationships, housing arrangements, and overall well-being.

# **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests judgment against the Defendants and respectfully requests that this Court:

(a) Declare Defendants' conduct a violation of Plaintiff's rights;
(b) request damages for Defendants' wrongful conduct in an amount to be determined at trial. The amount requested is for compensatory damages for:

i.        The fear, pain, and suffering of Marciniak after being subjected to Defendants wrongful conduct;

ii. The loss of the value and enjoyment of her life;

iii. The loss of the value and enjoyment of her scientific work;

iv. The loss of her and his earnings and earning capacity;

v. The loss of her academic career;

vi. Medical expenses;

vii. Aggravating circumstances surrounding the retaliation and her wrongful termination;

viii. Punitive damages in an amount to be determined at trial;

ix. Costs and

x. Such other relief as this Court or a jury may find appropriate.


Dated: October 21, 2024                    Respectfully submitted,

                                           SHEGERIAN & ASSOCIATES

                                           By: */s/ Olivia M. Clancy*
                                           _____
                                           Olivia M. Clancy
                                           90 Broad Street, Ste. 804
                                           New York, New York 10004
                                           Tel. 212-257-8883
                                           oclancy@shegerianlaw.com
                                           *Counsel for Plaintiff*