# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KAROLINA MARIA MARCINIAK-DOMINGUES GONCALVES AGRA,<br><br>                   Plaintiff,<br><br>- against -<br><br><br>ROCKEFELLER UNIVERSITY, FREDERICO AZEVEDO and WINRICH FREIWALD,<br>                  Defendants. | Civil Case No.: 1:22-cv-10959-ALC<br><br><br>**THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Dr. KAROLINA MARIA MARCINIAK-DOMINGUES GONCALVES AGRA ("Plaintiff") complain of Defendants ROCKEFELLER UNIVERSITY ("RU"), FREDERICO AZEVEDO ("Azevedo") and WINRICH FREIWALD ("Freiwald"), and in support respectfully states and alleges, upon information and belief, the following:

## PRELIMINARY STATEMENT

Defendants RU, Azevedo and Freiwald intentionally discriminated against Plaintiff based on her gender, fostered a hostile work environment, sexually harassed her and subjected her to retaliation ultimately resulting in termination, abruptly ceasing her research, reputational damage and economic damages. Despite numerous complaints, Defendants allowed this discrimination, harassment and retaliation to persist, inflicting upon Plaintiff severe emotional distress. Furthermore, Defendants retaliated against Plaintiff after she lodged complaints opposing the discrimination, sexual harassment by both Defendants Freiwald and Azevedo, ad rape by Azevedo. The retaliation culminated in the unlawful termination of Plaintiff's employment on or about November 30, 2021 despite her stellar performance as a postdoctorate researcher working in Freiwald's laboratory researching Intuitive Physics. Additionally, Plaintiff asserts claims against Azevedo and Freiwald pursuant to the New York City Gender-Motivated Violence Act,

1

based on allegations of sexual assault and sexual harassment she endured. These claims are brought within the applicable statutory look-back period permitted under the Act.

## NATURE OF THE ACTION

1.  This action is brought pursuant to the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. § 2000e *et seq*. ("Title VII"), the New York State Executive Law ("NYSHRL") § 296, *et seq*., the New York City Admin. Code § 8-101, et seq. ("NYCHRL"), and the N.Y.C. Admin. Code §§ 10-1101, et seq.) ("VGMVPL")

2.  Plaintiff brings this action against Defendants for economic, non-economic, compensatory and punitive damages, pre-judgment interest and costs and reasonable attorneys' fees, and any such remedies the Court deems just and proper.

## JURISDICTION AND VENUE

3.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, because Plaintiff's statutory claims present federal questions. Plaintiffs also assert supplemental state and city law claims pursuant to the New York State Constitution, New York Executive Law § 296, et seq., New York City Admin. Code § 8-101, et seq., and N.Y.C. Admin. Code §§ 10-1101, et seq.) ("VGMVPL") over which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

4.  This Court has personal jurisdiction over Defendants RU and Freiwald, who are New York domiciliary. This Court also has personal jurisdiction over Defendant Azevedo pursuant to New York's long-arm statute, CPLR § 302(a)(2), because he committed tortious acts within the state. A substantial part of the events giving rise to Plaintiff's claims occurred in New York, including the sexual harassment, hostile work environment, and retaliation Plaintiff endured while working at RU.

5.  Venue is properly laid in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District, and application and enforcement of Defendants' equal employment opportunity ("EEO") policies, affecting the hiring, promotion, work assignments, discipline and termination of its employees, may be found in this District.

6. All conditions precedent to jurisdiction have occurred or been complied with including, and in particular:

a. Within 300 days of Defendants Rockefeller and Freiwald's adverse employment action, which took place on July 30, 2020 in response to her opposition to Freiwald's sexual harassment, Plaintiff filed a complaint against Defendants RU and Freiwald with the New York State Division of Human Rights ("NYSDHR"), Case No. 10212022, Federal Charge No. 16GC101854, on or about May 18, 2021 alleging violations of federal law including, but not limited to, Title VII of the Civil Rights Act of 1964. A probable cause determination upon investigation was issued on January 18, 2022 [EXHIBIT A]. Dismissal for administrative convenience because Plaintiff intended to pursue federal remedies in court, in which forum all the issues concerning the question of discrimination charged can be resolved, and Notice of Right to Sue was issued by the NYSDHR on April 7, 2023.

b. Within 300 days of Defendants Rockefeller and Freiwald's termination of Plaintiff's employment, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on or about June 7, 2022. A Dismissal and Notice of Right to Sue was issued by the EEOC on March 21, 2023.

## JURY DEMAND

7. Pursuant to Fed. R. Civ. P. 38(b), Plaintiff respectfully demands a trial by jury on all issues and claims set forth in this Complaint.

## PARTIES

8. Plaintiff Dr. Karolina Marciniak-Domingues Goncalves Agra is, since August 30, 2016, a resident of the State of New York[1].

9. Plaintiff had been continuously employed by Defendant RU from in or about September 2016 until the date of her termination on or about November 30, 2021. Defendant RU is incorporated under the laws of the State of New York. Defendant RU employed Plaintiff as defined by federal law including, but not limited to, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.

---

1 Plaintiff is a neuroscientist with background in Psychology (MA, 2008, Adam Mickiewicz University in Poznan, Poland) and PhD in Neuroscience (2015, International Max Planck Research School, Graduate School of Neural & Behavioral Science in Tuebingen, Germany). She has extensive training in neuroscience, particularly as applied to magnetic functional imaging and single cell electrophysiology of social attention and motor adaptation in non-human primates. Plaintiff had authored or co-authored several original research articles, which have been published in leading scientific journals. https://orcid.org/0000-0003-2389-269X

10. At all relevant times to this Complaint, Defendant RU shared a common business with Massachusetts Institute of Technology ("MIT") and President and Fellow of Harvard College ("Harvard") under federally funded program, the National Science Foundation's Center for Brain, Minds and Machines ("CBMM"), sharing resources and personnel, including Plaintiff.

11. Defendant Freiwald is a resident of the State of New York, a Professor at RU, and the Principal Investigator on the NSF-CBMM grant awarded to RU. During all times material to this matter, Freiwald served as the Plaintiff's supervisor and held the authority to make decisions regarding her hiring, termination, and employment conditions.

12. Defendant Azevedo is a resident of the State of Massachusetts and ("MIT")'s employee associated with CBMM since 2014.

## STATEMENT OF FACTS

13. In 2009, Defendant RU appointed Defendant Freiwald as Assistant Professor and Head of Laboratory of Neural Circuits at RU. Freiwald secured this appointment by leveraging his academic career through the exploitation of his prior relationship with Doris Tsao, who had been occupying a position of subordinate authority to him.

14. Upon information and belief, between 2009 and 2016, Freiwald engaged in at least one personal relationship with an RU's employee, who provided services under his direction.

15. In or about November 2014, Freiwald reviewed Plaintiff's application while recruiting for postdoctoral openings in his laboratory at RU and invited Plaintiff for an interview scheduled to occur during a neuroscience conference in Washington D.C.

16. Upon meeting Plaintiff at the neuroscience conference, Freiwald abruptly relocated the scheduled job interview from the Convention Center to an upscale restaurant in the city. He immediately offered her the postdoctoral position at his laboratory at RU, promising her autonomy to pursue her research proposal and assuring her that the laboratory possessed the necessary neuroscience technology and financial

stability to cover her salary. At the conclusion of the interview, when Plaintiff attempted to pay her bill, Freiwald insisted on covering the expense.

17. In September 2015, at Freiwald's invitation, Plaintiff traveled to New York to tour his laboratory facilities at RU and discuss her research proposal. Freiwald arranged for her accommodation at the campus guest house and paid for transportation. On or about September 24, 2015, he initialized Plaintiff's hiring process by sending the necessary paperwork.

18. Upon Plaintiff's arrival at RU on Sunday, September 27, 2015 but prior to the scheduled commencement of Plaintiff's visit, Freiwald sent her a personal email, where he provided his cell phone number and made a request for personal contact "for whatever reason, anytime, ok?". He also insisted on personally collecting her from the guest house. Plaintiff did not act upon Freiwald's request.

19. At the conclusion of Plaintiff visit to RU, Freiwald disclosed to her that the research Plaintiff proposed was already being pursued in the laboratory by another postdoc and requested that she prepare another proposal. Given this unexpected development and the uncertainty regarding the laboratory's research facilities, which Plaintiff could not tour, she withdrew from the hiring process.

20. In November 2015, Freiwald sent her an email insisting on "planning [her] next steps". Plaintiff did not reply.

21. In December 2015, Freiwald initiated a "Happy New Year" email exchange with Plaintiff, inquiring about her holiday plans. Plaintiff responded politely with New Year's greetings but did not engage in further personal conversation.

22. On February 6, 2016, Freiwald emailed Plaintiff again, expressing concern that she "might not be doing well" and urging her to confide in him. Plaintiff did not reply.

23. On February 14, 2016, Valentine's Day, Freiwald sent another email, assuring Plaintiff that she had "nothing to be afraid of" and insisting she open up to him, claiming to be a "good listener and understanding."

24. On February 17, 2016, Plaintiff replied stating she was "OK" but dealing with personal matters.

5

25. On February 19, 2016, Freiwald wrote he had "feared" she was experiencing personal difficulties, and informed Plaintiff that he had already contacted Professor Josh Tenenbaum of MIT ("Tenenbaum") about Freiwald and Plaintiff "working closely" together. Freiwald represented this purported collaboration with the Center for Brains, Minds, and Machines ("CBMM") as "invaluable" for Plaintiff's work and beneficial for her "closely integrated" scientific support.

26. In or about March 2016, Plaintiff scheduled a follow-up visit to RU to clarify the project proposal and confirm laboratory resources before committing to the postdoctoral position. Regrettably, the visit was canceled due to an unanticipated visa procedural issue.

27. On or about March 21, 2016, following Plaintiff's communication with Freiwald regarding the visit cancellation, Freiwald called Plaintiff and offered RU's assistance in securing the necessary visa, which Plaintiff understood to be for the purpose of her prospective laboratory visit. She remained intent on evaluating the facilities prior to accepting the postdoctoral position.

28. Immediately following the call, Freiwald, without Plaintiff's prior knowledge or explicit consent, initiated the postdoctoral appointment process by sending a "New Postdoc" email to Maria Lazzaro ("Lazzaro"), Director of Immigration and Academic Appointments at RU's Human Resources. This email, which copied Freiwald's Lab Manager, Lihong Yin, formally began Plaintiff's employment procedures at RU. While Lazzaro initially sought to discuss the appointment details directly with Plaintiff, Freiwald intervened, characterizing Plaintiff's visa situation as "complicated." Consequently, Lazzaro proceeded with a J-1 Visa sponsorship, a less favorable option for Plaintiff's postdoctoral employment at RU.

29. Prior to Plaintiff's anticipated arrival at RU in September 2016, Freiwald, on or about April 20, 2016, emailed her regarding the CBMM collaboration. He reported having had a "fantastic" meeting with Tenenbaum and emphasized the "exciting prospects" this collaboration held for Plaintiff.

30. In July 2016, Freiwald, Tenenbaum, and Professor Nancy Kanwisher of MIT ("Kanwisher") reviewed Plaintiff's research proposal and agreed that her research should

focus on "electrophysiology to inform our understanding of Intuitive Physics." On or about August 1, 2016, Tenenbaum and Kanwisher provided positive feedback on Plaintiff's proposal, describing it as "cool" and "dynamite."

31. In or about February 2017, under the supervision of Freiwald, Kanwisher, and Tenenbaum, Plaintiff submitted her postdoctoral research proposal. Consequently, she was awarded the prestigious two-year Feodor-Lynen fellowship from the German Humboldt Foundation, which covered 50% of her salary from September 1, 2017, to August 30, 2019. Defendant RU agreed to cover the remaining salary to complete the project.

32. On or about September 1, 2016, upon commencing her employment, Plaintiff discovered that Freiwald had significantly misrepresented the state, maturity, and capabilities of the laboratory facilities. The promised fMRI protocol required development from scratch, and the large-scale electrophysiology method was in its nascent stages.

33. On or about September 15, 2016, Freiwald contacted Kanwisher and Tenenbaum to delegate Plaintiff to travel to MIT to establish collaboration, which lasted until Freiwald's retaliation.

34. In or about March 2017, Freiwald supervised Plaintiff's participation in a non-human primate medical procedure, where Plaintiff was expected to give instructions to surgeons and assistants. However, rather than fostering a professional and respectful environment, Freiwald encouraged Plaintiff in unprofessional and demeaning attitude to "be that slave driver once in your life."

35. Delegated by Freiwald, between August 28 and August 31, 2017 Plaintiff attended a CBMM Summer School in Woods Hole, MA, held at the Marine Biological Laboratory (MBL)'s campus, in the role of observing student, to get to know CBMM community and discuss her research with MIT collaborators, who were teaching there. Plaintiff requested and obtained permissions to attend from the School Directors, of Harvard and MIT, and was delegated by them to "talk about her accommodation" with Xavier Boix ("Boix"), a senior Teaching Assistant at the program[2].

---

2    Tuition for the course, as well as room and board on the MBL campus, is funded by NSF through a sub-award from MIT through Harvard to MBL.

36. Upon Plaintiff's arrival, Boix told Plaintiff she was assigned to share off-campus accommodation with him and Frederico Azevedo ("Azevedo"), both of whom she had not met previously. Both men were Teaching Assistants under supervision of Harvard and MIT. Plaintiff was not provided a separate key to the accommodation, her room did not have a door, and there was only one shared bathroom.

37. At her first night, Azevedo invited Plaintiff to a late-night gathering in his and Boix's rooms, which she declined. Plaintiff heard late during the night loud voices and laughs of Azevedo, Boix, and two women, whom Plaintiff met in the morning and recognized as Boix and Azevedo's students.

38. Upon information and belief, the women, who were under direct supervision of Boix and Azevedo, had been regularly invited to the house by Boix and Azevedo, where Azevedo attempted to pursue them for sexual encounters.

39. On August 30, 2017, Azevedo approached Plaintiff at the dining hall and offered Plaintiff a room in the main building, SWOPE, for rest. Because of a prolonged program and inability to travel back and forth to her initial accommodation, she agreed. Azevedo initially intended to stay in the room, but as Plaintiff categorically disagreed, he proceed to leave, and Plaintiff fell asleep.

40. Plaintiff was abruptly awakened by the sound of a door opening. She observed an individual entering the room briefly, appearing to retrieve an item, before quickly exiting. Shortly thereafter, Plaintiff noticed the presence of Azevedo, who approached her as she lay clothed and covered by a blanket. Without consent, Azevedo proceeded to remove the blanket and placed his hand beneath the Plaintiff's dress, initiating unwanted physical contact. The Plaintiff immediately expressed her lack of consent by physically resisting, pushing his hand away, and verbally stating, "No, I do not want this." Despite her clear objections, Azevedo continued to grope the Plaintiff, ignoring her repeated verbal protests of "No, no, no."

41. Azevedo then escalated his actions by pulling up Plaintiff's dress and attempting to remove her underwear. Plaintiff resisted forcefully, squeezing her legs together and reiterating, "No, I don't want it." Azevedo, undeterred by her resistance, proceeded to remove his pants and forcibly restrained Plaintiff by placing his hand over her mouth and

immobilizing her hands. He then forcibly spread her legs and penetrated her vagina with his penis, against her will and without her consent.

42. Following the assault, Azevedo laughed at her visible distress and callously mocked the Plaintiff, asking, "How does it feel to cheat on your boyfriend?"

43. Azevedo insisted on accompanying the Plaintiff to the Lobb Building, where the program activities were ongoing. Upon arrival, he instructed her to wait for him and Boix before returning to the accommodation.

44. Overwhelmed by feelings of helplessness, shame, and unaware of any immediate recourse, Plaintiff continued to participate in the program because next day, on August 31, 2017, at Tenenbaum's direction, Plaintiff was tasked with discussing the next steps in her project paradigm with two postdoctoral researchers from Tenenbaum's laboratory. Plaintiff felt compelled to proceed with her professional obligations, fearing potential retaliation or the loss of her job if she were to report the assault.

45. Following the scheduled meeting on August 31, 2017, Plaintiff returned to New York and promptly emailed Freiwald to schedule a meeting the following day, with intention to report Azevedo's sexual assault and seek help.

46. On September 1, 2017, the meeting between the Plaintiff and Freiwald, which was originally scheduled to take place in the office, was abruptly and unilaterally relocated to a location outside the university at the last minute. Freiwald arrived at the office with his backpack in hand, signaling his expectation that the Plaintiff would comply with this change without question or objection.

47. During a 40-minute walk, Freiwald repeatedly invaded her personal space by standing unnecessarily close to her, placed his hand on her lower back in a manner that was both intrusive and inappropriate for Plaintiff, and leered at her in a suggestive and lascivious manner, directing his gaze at her legs and buttocks. When he allowed Plaintiff to walk ahead of him, he positioned himself in a way that enabled him to continue staring at her.

48. This conduct caused the Plaintiff significant distress and subjected her to a degrading and humiliating experience. Additionally, Freiwald's actions exposed the Plaintiff to potential public scrutiny and derogatory social perception in the neighborhood

where she lived and worked, further compounding the emotional and psychological harm she endured.

49. During the course of the conversation, Plaintiff explicitly sought assistance from Freiwald by disclosing that in Woods Hole, MA, she had experienced a "bad encounter with somebody from another institution." Despite her attempt to convey the gravity of the situation, Freiwald dismissed her complaint, minimizing its significance and abruptly shifting the conversation to other matters, which Plaintiff understood as his suggestion she should downplay any incidents and accept it as an unavoidable or commonplace occurrence within the context of the CBMM Summer Course, discouraging her from pursuing any formal recourse, and exacerbating her sense of isolation and powerlessness.

50. In the following week, Plaintiff confronted Azevedo regarding a non-consensual sexual encounter, stating she recalled refusing any sexual activity. Azevedo dismissed her statement, asserting that her lack of consent was immaterial and recounted an incident from his graduate school, describing sexually assaulting an intoxicated junior individual who was unable to consent, and further stated that he disregarded her subsequent protests, which Plaintiff interpreted as a threat and act of intimidation.

51. On November 16, 2017, Azevedo forwarded to the Plaintiff an internal CBMM email exchange between the CBMM Managing Director, Kathleen Sullivan ("Sullivan") and himself regarding the planning of a trip for a select group of CBMM representatives to Palo Alto, California, to attend a collaborative meeting with Google/X. In the email, Sullivan discussed extending the hotel booking and provided instructions on securing funding for the trip through the National Science Foundation (NSF). The trip was not publicly announced or disclosed through any of CBMM's established email lists, maintaining an unusual level of confidentiality.

52. In his communication, Azevedo told her he is aware there is still a place left and offered to provide a referral on her behalf to Sullivan if she wanted to join a trip. While the trip presented a valuable opportunity for professional networking and collaboration, Plaintiff declined to pursue it based on her belief that Azevedo's suggestion was implicitly conditioned on her willingness to engage in sexual favors, given his prior inappropriate conduct and the power dynamics at play.

53. On or around December 6, 2017, Freiwald offered to facilitate Plaintiff's participation as a Teaching Assistant (TA) for the upcoming CBMM Summer School and initiated an internal email exchange with Gabriel Kreiman of Harvard ("Kreiman"), the Director of the CBMM Summer School, and Azevedo's Supervisor. Kreiman stated: "I would be happy to take your postdoc as a TA." Following this communication, Plaintiff sent her credentials to Kreiman and was subsequently offered the position.

54. In or around February 2018, Freiwald requested that Plaintiff and other junior female researchers from the laboratory accompany him to a social event the following evening hosted by another Head of Laboratory at Defendant RU, where Freiwald was an invited guest, but none of the women, including Plaintiff, were familiar with or involved in the research topic that was the focus of the event. Freiwald instructed the women to dress in evening attire and assigned them the role of accompanying him throughout the event. Their participation was limited to sitting with Freiwald during a PowerPoint presentation and walking with him during a laboratory tour.

55. This role placed Plaintiff in an uncomfortable and socially embarrassing position. During the event, external guests approached her with questions related to the research topic, assuming her presence indicated involvement or expertise in the subject matter. However, Plaintiff was unable to provide informed responses and had to clarify that her sole connection to the event was her affiliation with Freiwald's laboratory. It became evident that her presence was not based on her professional qualifications or contributions but rather to serve as a decorative accompaniment to Freiwald, reducing her to a role akin to "arm candy."

56. On February 15, 2018, Freiwald assigned Plaintiff the task of managing a webinar connection to facilitate the participation of Freiwald's laboratory members in the weekly CBMM research seminars held at MIT in Cambridge, Massachusetts. Azevedo was identified by Sullivan as one of the individuals involved in organizing the event, however to establish subsequent connections, Plaintiff communicated solely with Sullivan and the CBMM Director of Technology.

57. On or about March 15, 2018, Azevedo traveled to New York City to attend a neuroscience conference. During his stay, he pressured Plaintiff to provide him with

lodging. Despite her discomfort and reluctance, Plaintiff felt compelled to agree and allowed Azevedo to stay on the living room sofa of her shared two-bedroom apartment, which was part of Rockefeller University (RU) housing. Upon his arrival, Plaintiff directed Azevedo to the living room. However, Azevedo insisted on using Plaintiff's private bathroom, claiming that there was no available guest shower.

58. After using the bathroom, Azevedo attempted to enter and remain in the Plaintiff's bedroom without her consent. Recognizing that Azevedo was likely intending to initiate unwanted sexual advances, Plaintiff became visibly distressed and broke down in tears. She explicitly confronted him, stating that he could no longer assault women and revealing that, as a result of his prior sexual assault in Woods Hole, she had contracted human papillomavirus (HPV). Plaintiff expressed deep concern about the link between HPV and the increased risk of cervical cancer in women. In response, Azevedo callously laughed and made a dismissive remark, stating, "Welcome to the population of people with STDs".

59. Immediately following this exchange, Azevedo forcibly pushed Plaintiff onto her bed and proceeded to engage in non-consensual sexual intercourse without a condom. The Plaintiff repeatedly and unequivocally expressed her lack of consent through verbal protests, including saying "no" multiple times, and physically resisted his advances. Despite her clear and forceful objections, Azevedo overpowered her and carried out the assault.

60. In April 2018, Azevedo attempted to coerce Plaintiff to enable lodging for him in New York again. Plaintiff refused.

61. In May 2018, Plaintiff and two other members of Freiwald's laboratory traveled to MIT in Cambridge, Massachusetts, to attend a CBMM retreat conference. Prior to the event, Azevedo, in his role as an event organizer, attempted to involve Plaintiff in a social gathering associated with the CBMM retreat. He added her to a WhatsApp group, where he repeatedly used Neo-Nazi and White Supremacist rhetoric, including referring to himself as a "Fuhrer", making her extremely uncomfortable.

62. During the CBMM retreat conference at MIT, Azevedo approached Plaintiff in a corridor and initiated an unsolicited and inappropriate conversation. He urged her to end

her personal relationship and accompany him during the upcoming CBMM Summer School, where the Plaintiff had been recruited as a Teaching Assistant ("TA"). Azevedo explicitly stated that her presence would facilitate his attempts to engage in sexual interactions with female CBMM summer school students. When Plaintiff firmly refused, Azevedo retaliated by making derogatory and discriminatory remarks about her Polish heritage in front of other conference participants. He stated, "All Polish women I met in Germany were cleaning ladies," a comment that was both humiliating and offensive for Plaintiff.

63. In or around June 2018, Azevedo contacted Plaintiff uninvited by a message "I hope you are thinking about me and not about your stupid boyfriend". To prevent any additional unwanted contact, Plaintiff blocked Azevedo on WhatsApp and removed him from all her social media accounts.

64. In or around July-August 2018, during the CBMM Summer School in Woods Hole, Plaintiff, concerned about potential harassment from Azevedo, requested that her then-fiancé (now husband), accompany her while she worked as a TA for the three-week program. Upon their arrival, the Plaintiff and her fiancé were subjected to persistent scrutiny and gossip among male CBMM members associated with Azevedo. The program's environment was notably exclusionary and unwelcoming to women, with lectures often featuring sexist jokes and a pervasive culture that normalized private gatherings and alcohol consumption.

65. Plaintiff observed Azevedo informally bringing a visiting student from MIT to the Summer School and actively pursuing female students in a sexual manner. The overall atmosphere of the program resembled a "men's club" rather than a prestigious academic initiative affiliated with esteemed institutions.

66. On August 16, 2018, during a mandatory meeting for Teaching Assistants, Kreiman referenced an unspecified incident and explicitly instructed the TAs not to engage in "sex with students" until the conclusion of the Summer School. However, he then suggested that TAs could pursue such opportunities "somewhere else." While delivering these remarks, Kreiman scanned the room, making direct eye contact with Plaintiff, who was one of only three women present in a group of 22 individuals. Plaintiff

felt deeply unsettled by Kreiman's behavior, which further underscored the program's pervasive culture of sexism and inappropriate conduct.

67. On September 24, 2018, Freiwald invited Plaintiff to a lunch meeting at The Abby, an upscale campus restaurant known for its refined ambiance and frequent use for colleague gatherings, rather than holding the meeting in his office, which would have been more appropriate for professional discussions. Upon arrival, Freiwald waited for the Plaintiff in the sofa lounge near the restaurant entrance and selected a small table for two, despite the availability of larger tables that would have been more suitable for a productive work-related discussion.

68. During the meeting, Plaintiff attempted to present figures and data she had prepared for the discussion by holding her laptop. However, Freiwald abruptly instructed her to put the laptop away, effectively shifting the focus away from professional matters and transforming the meeting into a more social encounter. Throughout the interaction, Freiwald repeatedly diverted the conversation to Plaintiff's personal life, asking intrusive questions about her fiancé and inquiring whether she "preferred older men." Plaintiff felt deeply uncomfortable and embarrassed by Freiwald's conduct.

69. On or about March 12, 2019, Plaintiff was delegated to travel to MIT for a CBMM National Science Foundation ("NSF") evaluation, where she was to present a research poster. She arrived under significant stress and fear of potential further harassment from Azevedo. Although she did not encounter him there, she learned that she would be assigned to another NSF CBMM evaluation meeting in or about May 7, 2019. Fearing a potential encounter with Azevedo and concerned for other women in the environment, she explored the MIT website for available complaint options.

70. In or about March 2019, Plaintiff filed an incident report with MIT's Title IX & Bias Response Office against Azevedo and requested a no-contact order for the upcoming CBMM event at MIT.

71. On April 4, 2019, Plaintiff filed a police report with the Falmouth Police Department, MA about Azevedo's sexual assaults.

72. Despite her repeated requests both to MIT and Harvard Title IX coordinators, Plaintiff did not receive a no-contact order.

73. On May 7, 2019, at an MIT conference, Plaintiff encountered Azevedo at the poster session. Azevedo, though not listed as an organizer, positioned himself near the poster boards, creating the impression of authority. As Plaintiff began to hang her poster, Azevedo followed her, stopping at the adjacent board. He then engaged in a performance of assisting another attendee, while simultaneously his posture was aggressive, with his body angled towards Plaintiff, crowding her personal space. He maintained constant, intense eye gaze on Plaintiff, even while ostensibly addressing the other individual. Plaintiff, feeling acutely threatened and targeted, quickly left the area later that day filed an incident report with MIT police.

74. On or about May 14, 2019, Freiwald requested that the Plaintiff attend a lunch meeting with him and Tenenbaum at a restaurant in downtown Manhattan, New York. Concerned that declining the invitation might be perceived as a lack of commitment to the project, Plaintiff reluctantly agreed. However, Freiwald coordinated the meeting location exclusively through personal communication with Tenenbaum, only informing Plaintiff at the last minute that they should "get going." Alarmed by the prospect of commuting downtown with Freiwald and recalling his prior inappropriate behavior during off-campus meetings, Plaintiff left early and informed Freiwald that she was already on her way.

75. Following the lunch meeting, Freiwald insisted on accompanying Plaintiff back to the campus. While riding the subway alone with her, Freiwald repeatedly attempted to reduce the physical distance between them, visually scanning her body and inappropriately staring at her legs and buttocks. Despite Plaintiff's efforts to maintain a respectful distance, Freiwald persisted in his behavior, causing her significant discomfort. As they exited the train, Freiwald slapped her buttocks under the guise of letting her pass first. This physical contact was unwelcome and further exacerbated the Plaintiff's discomfort. Upon reaching their destination, the Plaintiff found a pretext to separate from Freiwald as quickly as possible.

76. On or about May 15, 2019, Plaintiff discussed Freiwald's recent misconduct with a female colleague, who subsequently shared an internal email exchange in which Freiwald had requested that only female members of his laboratory spend time with him during an

upcoming RU promotional event. Plaintiff also learned that Freiwald routinely requested lunch meetings exclusively with female students and postdocs. Following these revelations, Plaintiff took steps to plan future meetings with Freiwald exclusively in the office, where she felt safer and less vulnerable to inappropriate behavior.

77. On May 14, 2019, Plaintiff emailed the CBMM Director, Tomasso Poggio ("Poggio"), providing detailed allegations of Azevedo's sexual assaults against her and seeking assistance with the formal complaint process. Despite being aware of Plaintiff's complaint, as evidenced by prior knowledge from the NSF reviewer, Poggio did not respond to her email or offer any support.

78. Later that same day, the Plaintiff received an email from Rankin, who forwarded her complaint to Bridget Collier, the Title IX Coordinator at the University of Chicago, and Ann Egan, the Human Resources (HR) Director at the Marine Biological Laboratory (MBL). On May 20, 2019, Collier and Egan referred Plaintiff to RU's Title IX Coordinator and HR Director for further action.

79. On or about May 21 and 22, 2019, during meetings with RU's Title IX Coordinator and HR Director, Virginia Huffman ("Huffman"), Plaintiff detailed Azevedo's sexual assaults and her complaint effort but emphasized that no investigation into her allegations had been initiated at that time. Huffman did not provide Plaintiff with any options for filing complaints or addressing her concerns at RU, instead instructing her to agree to participate in the investigation through the University of Chicago.

80. During the investigation, Plaintiff provided a list of witnesses who could have corroborated her testimony. However, none of these witnesses were ever interviewed. Plaintiff was not afforded an opportunity to respond to Azevedo's statement before the investigation was finalized, while Azevedo was allowed to access Plaintiff's documents prior to submitting his statement.

81. On July 11, 2019, Plaintiff accessed Azevedo's statement, in which he included a threatening remark: "I advise her to stop [her complaint action]; I will not take her actions lightly." This statement caused Plaintiff to fear for her safety and well-being, further exacerbating the emotional and psychological distress she had already endured.

82. On July 22, 2019, Plaintiff confided in Freiwald about sexual assaults she had endured from Azevedo and the ongoing complaint process. She hoped that disclosing this information would deter Freiwald from continuing his own pattern of sexual harassment toward her. However, Freiwald did not provide Plaintiff with any support or accommodations regarding her situation. Instead, he appeared primarily concerned about the implications of the complaint and investigation.

83. Following the meeting, Freiwald, without informing Plaintiff of his intentions, rushed to meet with Huffman privately to discuss Plaintiff's complaint behind closed doors.

84. On or about August 11, 2019, the outcome of the investigation was announced, concluding that there was insufficient evidence to establish probable cause that Azevedo had violated MBL policies. Plaintiff was not provided with an opportunity to appeal this decision.

85. Later, in August 2019, Plaintiff met with Huffman and expressed her concerns about the lack of an appeal process following the investigation's outcome, but Huffman did not offer any complaint avenue. Plaintiff also requested Huffman's assistance in obtaining a new no-contact order to ensure her safety at future CBMM meetings, including the upcoming annual CBMM Retreat scheduled for August 30, 2019, in Woods Hole, Massachusetts, specifically asking Huffman to facilitate collaboration with other institutions to issue such an order. However, Huffman declined to provide any assistance and instead instructed Plaintiff to speak with Freiwald, stating, "he is nice."

86. Plaintiff visibly expressed discomfort at Huffman's remark about Freiwald, given her prior experiences with him. Despite her clear unease, Huffman abruptly ended the meeting without addressing her concerns or offering any further support.

87. On September 24, 2019, Plaintiff was assigned by Freiwald to remotely attend that day's CBMM weekly research seminar and prepare a summary report for him. Upon connecting to the seminar, Plaintiff unexpectedly encountered Azevedo on the screen, who appeared to be hosting the seminar. Azevedo directed the camera toward himself rather than the presentation and repeatedly asked whether "people from New York can see and hear him." This conduct violated the previous no-contact order that had been

issued by the University of Chicago to protect Plaintiff, causing her to feel intimidated and distressed.

88. In October 2019, Plaintiff was contacted by a female individual who had also experienced sexual harassment by Azevedo. This individual expressed her willingness to corroborate Plaintiff's institutional complaints and support the ongoing criminal investigation being conducted by the Falmouth Police Department.

89. On October 25, 2019, Plaintiff relayed this new information to Huffman and requested her assistance in reopening the institutional complaint in light of the additional corroborating evidence.

90. On or about November 15, 2019, Huffman informed Plaintiff that, after consulting with the General Counsel, RU was unable to provide any assistance regarding her complaint, leaving Plaintiff without institutional support to pursue her claims further.

91. On December 11, 2019, Plaintiff filed a complaint with the RU's Housing Administration regarding a recent incident in the housing building. She reported that a RU professor had inappropriately and persistently stared at her, consistent with similar behavior he had exhibited on prior occasions. Plaintiff's complaint was forwarded to Huffman.

92. On or about December 20, 2019, Plaintiff met with Huffman, accompanied by two other women—a PhD student and a postdoctoral researcher—who had also experienced discomfort due to the same professor's behavior. A postdoctoral researcher reported that the professor had stared at her "a shade too long" on multiple occasions in a laundry room. She also mentioned hearing similar accounts from other women and stated, "We definitely talked about making sure no young female student interviews him for Natural Selections [the RU's community newspaper]."

93. Despite the detailed accounts provided by the Plaintiff and the other women, Huffman did not file a formal complaint or create any official record of the incident.

94. On or about January 13, 2020, Plaintiff and the other women attended a follow-up meeting with Huffman, who informed them that the professor had a medical condition, suggesting that his staring behavior was unintentional. This explanation was provided despite multiple reports from women indicating that his behavior was specifically

directed toward females. Huffman abruptly concluded the discussion, citing medical confidentiality concerns, and did not address the women's concerns further[3].

95. In December 2019 and early January 2020, two female MIT professors affiliated with the CBMM program became aware of Plaintiff's allegations of sexual assault and harassment by Azevedo. Upon learning that additional individuals had come forward with corroborating accounts of Azevedo's misconduct, they sought to reopen the institutional investigation into Plaintiff's complaint, which had been filed with MIT and Harvard in March 2019 and discussed next steps with MIT's Title IX Coordinator.

96. On January 18, 2020, Plaintiff learned that MIT and Harvard would conduct a formal investigation into her complaint, led by Dr. Lizanne DeStefano ("DeStefano"), an evaluator for CBMM. DeStefano was tasked with interviewing all relevant parties and to present her findings and recommending corrective actions to the CBMM Summer School Directors.

97. In support of the investigation, Plaintiff provided detailed documentation of her allegations against Azevedo and of the procedural deficiencies of the earlier investigation conducted by the University of Chicago.

98. In addition, on or about January 19, 2020, Plaintiff facilitated contact between DeStefano and the additional individuals who had come forward with corroborating accounts of Azevedo's misconduct. Among these individuals was a CBMM student who reported receiving flirtatious messages and requests from Azevedo to spend time alone with alcohol during the CBMM Summer School.

99. Despite her efforts to support the investigation, Plaintiff never received any follow-up or communication from DeStefano or the MIT female professors regarding the outcome of the investigation or any subsequent actions taken.

100.    On January 20, 2020, Plaintiff sought Freiwald's approval to submit an internal fellowship application administered by RU based on the latest results of her work. Despite Freiwald approved the project's progress as satisfactory for advancing to the second phase, which involved electrophysiology, he prohibited her from spending time on the new application, instructing her instead to submit an outdated version. Feeling

---

3    The professor's behavior ceased entirely after Plaintiff's complaint directly contradicting Huffman's claim that his actions were unintentional due to a medical condition.

that failing to report her progress would compromise the quality of the application and her chances of securing the award, increasing her financial dependence on Freiwald, Plaintiff left the meeting in tears.

101.    On January 30, 2020, Plaintiff was contacted by Andrei Barbu of MIT ("Barbu"), who offered her a Teaching Assistant (TA) position for the upcoming CBMM Summer School. On February 2, 2020, Plaintiff expressed interest but noted that she could not participate if Azevedo, her harasser, was attending. Barbu confirmed that he had added her to the roster with this constraint and stated that the final selection would be made by the CBMM Summer School Directors.

102.    On January 31, 2020, in an internal email exchange between Kreiman and Barbu, Kreiman stated that while he was "sympathetic to having more women TAs," he instructed Barbu not to make any commitments yet. Kreiman emphasized that he and other Summer School Directors needed to review the list He also directed Barbu to note the constraints of the TA candidates in a shared spreadsheet.

103.    On February 3, 2020, Barbu sent Kreiman a list of all candidates who had expressed interest, along with their constraints. Within an hour, Kreiman returned the list with his proposed selection of 14 out of 18 candidates. Notably, Plaintiff was one of the four candidates removed from consideration, and she was the only woman excluded. On February 4, 2020, Barbu informed Plaintiff that she had been denied the TA position.

104.    Later that same day, in an internal communication, Barbu asked Kreiman to include a male TA candidate, but Kreiman responded that he was inclined to offer a position to a female candidate instead, stating, "to keep the number of women up," and stated "let us try not to drop any women TAs at this stage", alluding to the fact that Plaintiff, a woman, had already been removed from consideration the day before.

105.    On February 5, 2020, in an internal communication to Barbu, Kreiman unexpectedly selected a late application from a male postdoc with a similar scientific profile to the Plaintiff for the TA position, asserting that the postdoc's interest alone qualified him for the role. That same day, Plaintiff forwarded the TA recruitment decision and the Directors' refusal to select her to one of two female MIT professors with

whom she spoke earlier, signaling that the decision was causally related to her participation in DeStefano's investigation. She did not respond.

106.    On February 5, 2020, Plaintiff contacted Barbu, clarifying that her constraint regarding Azevedo was due to the no-contact order she had obtained. She attached the order and sought other opportunities to be involved in the summer school if Azevedo was not attending. In response on February 11, 2020, Kreiman contacted the Plaintiff directly. In his email, he claimed that the decision not to select her was based on her "scientific profile" and concluded by stating, "hoping to see you in other scientific events," which implied that she was no longer welcome at the CBMM Summer School.

107.    Plaintiff was deeply affected by the abrupt cessation of her Teaching Assistant opportunities at CBMM, which were integral to her identity as an educator and researcher. The loss of teaching opportunities, scientific publications, supervision of student projects, and the dissemination of potential research projects had a profound and far-reaching impact on her professional and personal life. The fear of further retaliation, particularly given that her salary was funded by the CBMM grant at RU, added a layer of anxiety and uncertainty to her situation.

108.     On February 13, 2020, Freiwald abruptly scheduled an in-person meeting with Plaintiff for the late afternoon of Valentine's Day, ostensibly to discuss the progression of her research project. During this meeting, on February 14, Freiwald initially praised Plaintiff's work, enthusiastically outlining the project's potential and the upcoming transition to electrophysiological and computational phases.

109.    However, the tenor of the meeting shifted dramatically when Freiwald, smirking, stated that the project's future depended on Plaintiff's desired course of action. Freiwald then reclined in his chair in a suggestive posture, and Plaintiff observed a visible erection through his clothing. Maintaining his smirk and silence, Freiwald appeared to await the Plaintiff's response. Plaintiff interpreted this behavior as a clear implication that the continuation and success of her project were contingent upon her willingness to engage in sexual relations with him. Feeling deeply humiliated and pressured, Plaintiff immediately terminated the meeting and left the room.

110.     As Plaintiff exited, Freiwald stood up from his chair and moved to open the door for her. While she was leaving, she felt Freiwald squeeze and slap her buttocks. Later, the Plaintiff expressed disbelief and reported the incident to her husband.

111.      On February 27, 2020, during a late afternoon office meeting with Plaintiff, Freiwald discussed a video featuring bananas that was to be used in upcoming experiments. When he mentioned the word "banana," his tone became overtly suggestive. Simultaneously, while maintaining direct eye contact with Plaintiff, he made a distinct, miming hand gesture of masturbation. Plaintiff immediately recognized the sexual nature of the gesture and felt deeply embarrassed and uncomfortable. She quickly attempted to redirect the conversation.

112.      In March and April 2020, the imposition of COVID-19 restrictions limiting in-person encounters, provided a welcome respite for the Plaintiff, who had been experiencing escalating discomfort due to Freiwald's overt sexual harassment and inappropriate propositions.

113.      On or about May 27, 2020, in an email exchange, Plaintiff raised concerns with Freiwald regarding her funding for a postdoctoral position from CBMM. Freiwald responded with ostensibly reassuring remarks about her financial stability and suggested continuing the conversation about her future career in person.

114.     This suggestion raised immediate red flags for Plaintiff, given Freiwald's prior inappropriate behavior during personal meetings. She became concerned about the potential for further harassment or unprofessional conduct.

115.     In a subsequent email to Freiwald on May 29, 2020, Plaintiff firmly and professionally asserted her need to establish clear boundaries. She explicitly requested that future professional meetings not take place in restaurants, directly referencing Freiwald's prior inappropriate behavior, which included persistently attempting to move their meetings to unprofessional settings.

116.     Approximately a week later, on June 4, 2020, Freiwald responded to her email by scheduling a Zoom meeting for the following day. During this meeting, Freiwald unexpectedly announced that he had decided it would be better for Plaintiff to "change the environment" and look for another place to work. He instructed her to "wrap up

things here," effectively forcing her resignation and suggesting the cancellation of the planned second phase of the Intuitive Physics project, which included critical electrophysiology research.

117.    Following the meeting, Plaintiff promptly reported Freiwald's sexual harassment and the apparent retaliation to Robert Cosgrove ("Cosgrove") of the NSF Office of Diversity and Inclusion ("ODI"). Cosgrove informed Plaintiff that, in light of her prior adverse experience when reporting misconduct to RU's HR office, she was not obligated to report the incident to Virginia Huffman. Instead, Cosgrove advised Plaintiff to file an external complaint directly with the Equal Employment Opportunity Commission ("EEOC") or the New York State Division of Human Rights.

118.    On June 9, 2020, Plaintiff sent a follow-up email to Freiwald in an effort to clarify what she believed to be a misunderstanding regarding his sudden decision to force her resignation. Freiwald's response was unequivocal and chilling: he stated, "there is no misunderstanding," and explicitly threatened to end her career if she chose to remain in her position any longer.

119.    When Plaintiff refused to resign, Freiwald sent her an email on July 30, 2020, formally notifying her that her upcoming appointment would be extended for only six months, a significant departure from the standard one-year term. He diminished her responsibilties and opportunities by instructing her to focus solely on completing a limited number of fMRI experiments to conclude her research, effectively halting any progress toward the second phase of the project, which involved electrophysiology, a critical component of the original agreement between the Plaintiff and the Defendants for her postdoctoral work at RU,

120.    Freiwald's email of July 30, 2020 severely undermined Plaintiff's job security, limited her opportunities for advancement, and increased her risk of unemployment. These consequences were especially dire given the heightened uncertainty and challenges posed by the ongoing Covid-19 pandemic. Plaintiff was left in a precarious position, facing not only the loss of her current position but also the long-term repercussions of Freiwald's retaliatory actions on her career and professional reputation.

121.     On August 5, 2020, Freiwald addressed the results of an anonymous "Lab Climate Survey" that had been administered among members of his laboratory. This initiative was jointly agreed upon by both laboratory members and Freiwald in response to growing internal concerns about Freiwald's misconduct and the pervasive hostile culture within the laboratory[4]. The survey, conducted by three representatives from the Freiwald laboratory, revealed that a majority of respondents reported experiencing or witnessing a hostile environment in Freiwald's laboratory. Additionally, most respondents indicated that they did not feel supported by Freiwald and were uncomfortable bringing issues or concerns to his attention.

122.     During the discussion of the survey results, Freiwald informed Plaintiff and other laboratory members that he had no intention of changing his leadership style or how he interacted with lab members, stating that his approach was rooted in his personal "philosophy." He harshly criticized those who expressed dissatisfaction, advising them to reconsider their scientific careers or leave the laboratory if they were unhappy, further reinforcing the hostile and unsupportive environment within the lab.

123.     In late 2020, Freiwald reneged on a prior agreement with Plaintiff to allow her to serve as a guest lecturer in a CBMM course at Hunter College. Instead, Freiwald assigned this opportunity, which had been agreed upon in July 2019, to a male postdoc, depriving Plaintiff of a valuable professional opportunity.

124.     Similarly, Freiwald retracted his earlier proposal for a collaboration between Plaintiff and a laboratory in Belgium, despite assurances given to her in October 2019. At that time, Freiwald had arranged for a student from the Belgian laboratory to work on the Intuitive Physics project, the collaboration planned to commence in 2020. However, when the student arrived in late 2020, the student was reassigned to a male postdoc in Freiwald's laboratory. This reassignment further undermined Plaintiff's ability to advance her research and fulfill her professional responsibilities.

125.     Beginning in late 2020, Freiwald diverted the electrophysiological resources originally promised to Plaintiff and reassigned them to a male postdoc. This reallocation

---

4     The survey, conducted through Google Forms, had been created in September 2019 by Leslie Vosshall, a Professor at RU, and was recommended as a tool "to identify issues in the lab that the lab head can work with members to address to improve lab culture."

of resources severely hindered the Plaintiff's ability to complete her research and achieve her career goals, further undermining her professional progress

126.    Moving forward, Freiwald also terminated Plaintiff's collaboration with CBMM. Plaintiff did not receive any communication from her MIT collaborators, leaving her feeling further excluded from CBMM and its associated professional opportunities.

127.    Despite the hostile environment and ongoing retaliation, Plaintiff persevered in her research and, in or about December 2020, successfully reported her findings. Freiwald acknowledged the significance of Plaintiff's new fMRI results, positively assessing their potential for scientific publication. However, this recognition did not revers his earlier decision to prevent her from completing the electrophysiological phase of her project.

128.    In February 2021, Freiwald assigned Plaintiff an additional task of writing a review paper on Intuitive Physics. Following this assignment, Freiwald and RU sponsored an H-1B visa petition for Plaintiff and her husband, valid for three years from September 1, 2021, to August 31, 2024. During this period, Plaintiff was to remained in her postdoctoral position, where she would continue to contribute her fMRI expertise and produce scientific papers. Freiwald and RU did not hire additional personnel to assist with the project, relying instead on Plaintiff's contributions. Plaintiff's role during this time was limited to writing tasks, and she was not permitted to complete the electrophysiological phase of her research, which had been part of the original agreement for her postdoctoral work.

129.    In early 2021, Plaintiff became aware of the troubling experience of a female PhD student in Freiwald's laboratory, who had raised concerns to him about the lack of support she received from Freiwald as a woman of color. Freiwald reported her to the HR Department, labeling her as "threatening" him.

130.    On or about May 18, 2021, Plaintiff filed a sexual harassment and retaliation complaint against Freiwald and RU with the New York State Division of Human Rights (NYSDHR), which was dual-filed with the Equal Employment Opportunity Commission (EEOC). The complaint detailed Freiwald's sexual harassment and his retaliatory actions in 2020 after the Plaintiff opposed his misconduct.

131.    In Spring 2021, on two separate occasions, Plaintiff and her husband were observed by Virginia Huffman playing tennis on the campus tennis court. Following these sightings, the security department contacted Plaintiff to inform her that her husband was not permitted on campus. This enforcement of campus policies appeared selective and targeted, as Plaintiff and her husband had been engaging in a harmless and socially distanced outdoor activity, consistent with COVID-19 safety protocols. Plaintiff responded by formally requesting an exception to allow her husband to accompany her on the outdoor tennis court. She provided multiple justifications, including her need for physical activity to maintain her well-being amid her demanding work schedule, her and her husband's COVID-19 vaccination status, and her adherence to RU's testing protocols, which included weekly self-testing using the university's equipment and consistently negative results. Despite her reasonable and well-documented request, the RU administration denied her appeal.

132.    On July 3, 2021, RU's Vice President and General Counsel sent Plaintiff a Legal Hold Notice Memorandum, formally notifying her of her obligation to preserve documents related to the administrative complaint she had filed with the NYSDHR.

133.    During the summer of 2021, despite repeated requests from Freiwald's laboratory members and the clear need for updated data, Freiwald refused to conduct a revised lab climate survey.

134.    On July 9, 2021, RU and Freiwald, represented by attorneys Elise Bloom and Noa M. Baddish from Proskauer Rose LLP, submitted their position statement to the NYSDHR, denying Plaintiff's allegations.

135.    On August 3, 2021, Freiwald, for the first time since February 2021, reached out to Plaintiff by email and inquired about the progress of Plaintiff's work, which she then summarized to him in her reply. She also explicitly mentioned her involvement in the complaint process, stating that she had been "dealing with legal requirements to prepare and submit the documentation" related to her NYSDHR complaint.

136.    In response, on August 12, 2021—just two weeks before her scheduled reappointment to a new Research Associate position— Freiwald sent Plaintiff an email

informing her that both he and RU had collectively decided to terminate her employment effective November 30, 2021.

137.    By prematurely terminating Plaintiff's employment at RU, Freiwald halted her ongoing work on analyzing experimental data and preparing it for publication. This action denied her the opportunity to publish the results of her postdoctoral work, effectively undermining her research and devastating her academic career[5].

138.    Plaintiff quietly resisted Freiwald's email notice.

139.    In 2021, RU promoted Freiwald by appointing him as Co-Director of the Price Family Center for the Social Brain at RU.

140.    On September 2, 2021, Plaintiff contacted RU's Vice-President, Alex Kogan, copying Sharisse Brown from the housing administration and Michael Glaster from the financial department, to request that RU complete the landlord portion of her New York State Emergency Rental Assistance Program (ERAP) application. On September 23, 2021, Ms. Brown acknowledged receipt of Plaintiff's message, however, RU failed to act on her request, leaving her without essential support during a critical period. It was not until after Plaintiff initiated this lawsuit that RU finally submitted the required documentation.

141.    On or about November 17, 2021, Plaintiff received an email from Michael Wiener of RU's HR Department, notifying her that her last day of employment would be November 30, 2021. The email included exit instructions, which stated that her RUNet account—providing access to her email and data server—would be deactivated five days after her departure. This abrupt termination and loss of access threatened her ability to preserve essential data.

142.    To comply with the Legal Hold Notice, which required her to preserve evidence for the pending NYSDHR investigation, Plaintiff requested an extension of her RUNet access. She contacted Freiwald's Lab Manager, who, on or about November 24, 2021, submitted an extension request to the IT department on her behalf and provided

---

5    Because RU reinforces the policy, according to which the Head of Laboratory at RU has ownership of experimental data and result, the Head of Laboratory makes decisions regarding publishable content and article submissions. Ultimately, Freiwald's decision determined whether a postdoctoral researcher could successfully complete a project and achieve a scientific publication.

Plaintiff with additional exit instructions, which Plaintiff complied with. On November 29, 2021, the RU IT department granted her a 90-day extension, allowing her to retain access to her account temporarily.

143.     However, on December 7, 2021, Freiwald emailed Plaintiff, stating that the extension was unnecessary, and by December 15, 2021, her RUNet access had been suspended.

144.     In early January 2022, Plaintiff submitted three applications for a postdoctoral position, However, due to the absence of a positive letter of recommendation from Freiwald, her applications were ultimately rejected.

145.     On January 17, 2022, Plaintiff received correspondence from RU's Human Resources department notifying her of the university's intent to withdraw her H-1B petition, offering her a one-way ticket to Poland

146.     On January 18, 2022, the New York State Division of Human Rights (NYSDHR) issued a probable cause determination in connection with Plaintiff's sexual harassment and retaliation complaint against Freiwald and RU, recommending the case for a public hearing.

147.     On January 24, 2022, Plaintiff emailed William Scott Carr and Robert Cosgrove, compliance officers at the National Science Foundation's Office of Diversity and Inclusion (NSF ODI), providing them with the NYSDHR Determination Letter. Despite NSF policies stipulating that perpetrators of sexual harassment and retaliation may face limitations on NSF funding, no such restrictions were imposed on Freiwald.

148.     On February 24, 2022, RU unilaterally filed a withdrawal of Plaintiff's H-1B petition with the United States Citizenship and Immigration Services (USCIS) without prior notice to Plaintiff or an opportunity for her to respond to the January 17, 2022 letter. This action left Plaintiff unaware of the impending termination of her visa status.

149.     It was not until March 29, 2022, after Plaintiff proactively inquired, that LaSalata of RU provided her with the visa withdrawal receipt. This communication abruptly informed Plaintiff of the imminent loss of her and her husband's legal immigration status. In the same email, LaSalata reiterated RU's offer to purchase a one-way ticket to Poland, further compounding Plaintiff's emotional distress.

28

150.    As a direct result of RU's actions, Plaintiff and her husband experienced significant emotional and psychological harm, including fear of deportation and uncertainty regarding their future.

151.    Plaintiff has suffered and will continue to suffer medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational and employment benefit, a denial of access to next step in academic career, a denial of access to publishing scientific articles, loss of educational and employment benefit including scholarship opportunities, grant opportunities, award opportunities, loss of income, loss of enjoyment of life, emotional and economic damages associated with inability to flee her abusers, and other economic or non-economic damages, for which she is entitled to just compensation.

152.    Economic damages: As a consequence of Defendants' conduct, Plaintiff has suffered and will suffer harm, including lost past and future income and employment benefits, damage to her career, and lost wages, overtime, unpaid expenses, and penalties, as well as interest on unpaid wages at the legal rate from and after each payday on which those wages should have been paid, in a sum to be proven at trial.

153.    Non-economic damages: As a consequence of Defendants' conduct, Plaintiff has suffered and will suffer psychological and emotional distress, humiliation, and mental and physical pain and anguish, in a sum to be proven at trial.

154.    Punitive damages: The conduct of Defendants was outrageous and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's protected civil rights, entitling Plaintiff to an award of punitive damages under federal law. In addition, Defendants' conduct constitutes malicious, willful, wanton and/or reckless indifference to Plaintiff protected rights, entitling Plaintiff to punitive damages against Defendants under State Law.

155.    Attorneys' fees: Plaintiff has incurred and continues to incur legal expenses and attorneys' fees.

## FIRST CAUSE OF ACTION

### QUID PRO QUO SEXUAL HARASSMENT
### Title VII, NYSHRL, NYCHRL,
### (against Freiwald and RU),

156.    The allegations set forth in the foregoing paragraphs are realleged and incorporated herein.

157.    Plaintiff was employed as a postdoctoral researcher at Defendant RU under the direct supervision of Defendant Freiwald, who held a position of authority as the head of the laboratory and assistant professor at RU. Freiwald had significant control over Plaintiff's employment, including her research opportunities, professional advancement, and the terms and conditions of her employment.

158.    Throughout her employment, Freiwald engaged in a pattern of unwelcome sexual advances and inappropriate behavior toward Plaintiff, including:

 - Relocating the job interview to an upscale restaurant and insisting on paying for the meal, creating an inappropriate personal dynamic.

 - Sending personal emails with flirtatious language and requests for personal contact, such as "for whatever reason, anytime, ok?"

 - Repeatedly emailing Plaintiff with personal inquiries, expressions of concern, and insistence on her confiding in him, particularly around Valentine's Day.

 - Insisting on being the one to pick her up from the guest house.

 - Inviting her to a social event in the office of another Head of Laboratory at RU, where her role was to be his "arm candy".

 - Making inappropriate comments about her personal life and making physical gestures during a lunch meeting at the Abby restaurant.

 - Inappropriate touching and leering at her during meetings, which Freiwald moved off-campus.

159.    This behavior escalated in 2020, culminating in explicit sexual harassment and retaliation after Plaintiff attempted to establish professional boundaries. Specifically:

- On February 14, 2020, Freiwald scheduled a meeting with Plaintiff on Valentine's Day, ostensibly to discuss her research project. During the meeting, Freiwald praised Plaintiff's work but then shifted the conversation to suggest that the future of her project depended on her willingness to engage in sexual relations with him. Freiwald reclined in his chair, displayed a visible erection, and smirked at Plaintiff, creating a coercive and sexually suggestive environment. Plaintiff felt deeply humiliated and pressured, and she immediately terminated the meeting. When she was leaving, Freiwald groped and squeezed her buttock.

- On February 27, 2020, during a professional meeting, Freiwald made overtly suggestive comments about a video featuring bananas, accompanied by a miming hand gesture of masturbation while maintaining direct eye contact with Plaintiff. This behavior was sexually explicit and made Plaintiff feel deeply uncomfortable and embarrassed.

- On May 29, 2020, Plaintiff sent an email to Freiwald explicitly requesting that future professional meetings not take place in restaurants, directly alluding to Freiwald's prior inappropriate behavior, including his persistent attempts to move their meetings to unprofessional settings where he had sexually harassed her.

160.    After Plaintiff refused Freiwald's sexual advances and attempted to establish professional boundaries, Freiwald retaliated against her by taking adverse employment actions starting on July 30, 2020, when Freiwald sent Plaintiff an email formally notifying her that her upcoming appointment would be extended for only six months, a significant departure from the standard one-year term. He diminished her responsibilities and opportunities by instructing her to focus solely on completing a limited number of fMRI experiments, effectively halting any progress toward the second phase of her project. This action severely undermined Plaintiff's job security, limited her opportunities for advancement, and increased her risk of unemployment. On August 12, 2021, after Plaintiff filed the NYSDHR complaint, Freiwald and RU collectively decided to terminate Plaintiff's employment effective November 30, 2021, abruptly ending her postdoctoral position and cutting off her access to research resources and professional opportunities.

161.    Freiwald's actions constitute quid pro quo sexual harassment under Title VII, NYSHRL, and NYCHRL. Freiwald's control over Plaintiff's research, collaborations, and access to resources created a power dynamic where her professional success was dependent on his approval. His control over her participation in CBMM events, and his ability to facilitate her participation, created a situation where he could condition her participation on her compliance. Freiwald implicitly and explicitly conditioned tangible employment benefits, including the continuation of Plaintiff's research project and her employment at RU, on her submission to his sexual advances. When Plaintiff refused, Freiwald retaliated by shortening of her appointment, demoting her, limiting her research opportunities, and ultimately terminating her employment.

162.    Plaintiff's quid pro quo sexual harassment claim under Title VII accrued, and therefore the statute of limitations began to run, at the time of Freiwald's adverse employment action on July 30, 2020, directly resulting from her refusal to submit to Freiwald's unwelcome sexual advances. Plaintiff filed the NYSDHR complaint within 300 days afterwards.

163.    Defendant RU is liable as an employer for Freiwald's quid pro quo sexual harassment under Title VII, NYSHRL, and NYCHRL because:
- Freiwald's unwelcome sexual conduct and advances were made within the scope of his employment as Plaintiff's supervisor.
- RU failed to take appropriate action to prevent or address Freiwald's harassment, despite Plaintiff's complaints and the clear pattern of inappropriate behavior.
- RU's failure to investigate Plaintiff's complaints and its lack of adequate policies and procedures to prevent sexual harassment contributed to the continuation of the hostile work environment and the adverse employment actions taken against Plaintiff.

164.    Plaintiff seeks compensatory damages, punitive damages, injunctive relief, and attorneys' fees for the harm caused by Freiwald's quid pro quo sexual harassment and RU's failure to address the harassment and retaliation. Plaintiff also seeks a declaration that Defendants' conduct violated her rights under Title VII, NYSHRL, and NYCHRL.

## SECOND CAUSE OF ACTION

### HOSTILE WORK ENVIRONMENT
### Title VII,NYSHRL, NYCHRL,
### (against Freiwald and RU)

165.    Freiwald engaged in a pattern of unwelcome sexual harassment, intertwined with tangible employment actions, Freiwald's actions created a hostile and intimidating work environment for her, subjected her to retaliation, and discriminatory treatment, all of which had a profound and detrimental impact on her professional and personal well-being.

166.    Freiwald's conduct was sufficiently severe and pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment.

167.    The repeated unwelcome advances, inappropriate comments, and physical conduct created a pattern of harassment that Plaintiff reasonably found offensive and intimidating.

168.    The incidents occurred over an extended period, demonstrating a persistent and ongoing pattern of harassment.

169.    The sexual assault of Plaintiff by Azevedo, and the knowledge of that assault by Freiwald, caused Plaintiff to have a heightened sense of fear and intimidation.

170.    Plaintiff subjectively perceived the harassment as abusive and offensive.

171.    A reasonable person in Plaintiff's position would have found the harassment to be severe and pervasive enough to create a hostile work environment.

172.    RU is liable for Freiwald's actions under the doctrine of respondeat superior, as his actions occurred within the scope of his employment.

173.    RU failed to provide a safe and respectful work environment for Plaintiff and did not properly investigate her complaints of harassment and assault, allowing the hostile environment to persist

174.    RU failed to implement adequate policies and procedures to prevent and address sexual harassment in the workplace. RU's failure to act on Plaintiff's complaints and its lack of adequate policies contributed to the continuation of the hostile work environment, further exacerbating Plaintiff's emotional distress and professional harm.

33

175.    Therefore, Plaintiff demands judgment against Freiwald and RU for creating a hostile work environment in violation of Title VII, including compensatory damages, punitive damages, injunctive relief, and attorney's fees.

### THIRD CAUSE OF ACTION
### RETALIATION
### Title VII,NYSHRL, NYCHRL,
### (against Freiwald and RU)

176.    Plaintiff engaged in protected activity by:

- Objecting to Freiwald's sexual harassment, including requesting professional meetings not occur in restaurants;

- Participating in the MIT and Harvard investigation into her complaint against Azevedo;

- Filing a sexual harassment and retaliation complaint with the New York State Division of Human Rights (NYSDHR) and the EEOC;

- Relating to Freiwald and RU that she was dealing with legal requirements to prepare and submit the documentation related to her NYSDHR complaint;

- Reporting sexual harassment and retaliation to the NSF ODI.

177.    Freiwald retaliated against Plaintiff by:

- Instructing her to "change the environment" and look for another job, effectively attempting forcing her resignation;

- Threatening to end her career if she did not resign;

- Extending her appointment for only six months instead of the standard one-year term;

- Diminishing her responsibilities and opportunities by preventing her from completing the electrophysiological phase of her project;

- Refusing to change his lab management style after the lab climate survey;

- Revoking her guest lecturer opportunity at Hunter College;

- Retracting the promised collaboration with a laboratory in Belgium;

- Diverting electrophysiological resources to a male postdoc;

- Cutting her collaboration with CBMM;

- Refusing to allow her experimental data to be published;

- Terminating her employment effective November 30, 2021 without providing a positive letter of recommendation.

178.    RU further retaliated against Plaintiff by:

- Denying her appeal to allow her husband on campus;

- Failing to complete the landlord portion of her ERAP application;

- Deactivating her RUNet account prematurely;

- Withdrawing her H-1B visa petition;

- Refusing to cover the open-access fee for her published paper.

179.    Freiwald's and RU's retaliatory actions occurred shortly after Plaintiff engaged in protected activity, demonstrating a causal connection.

180.    Freiwald's explicit threats and the timing of the adverse actions clearly indicate retaliatory intent.

181.    The fact that Freiwald knew that she was dealing with legal requirements related to her NYSDHR complaint, and then terminated her employment, shows a clear causal connection.

182.    The retaliatory actions were materially adverse, as they would dissuade a reasonable employee from engaging in protected activity.

183.    The actions significantly impacted Plaintiff's employment, career prospects, and emotional well-being, causing to her economic and non-economic damages. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation.

184.    RU is liable for Freiwald's retaliatory actions under the doctrine of respondeat superior, as his actions occurred within the scope of his employment.

185.    RU had actual or constructive knowledge of the retaliation and failed to take prompt and effective corrective action.

186.    RU itself engaged in retaliatory behavior.

187.    Therefore, Plaintiff demands judgment against Freiwald and RU for retaliation in violation of Title VII, including compensatory damages, punitive damages, injunctive relief, and attorney's fees.

## FOURTH CAUSE OF ACTION
## NEW YORK CITY GENDER MOTIVATED ACT
## N.Y.C. Admin. Code §§ 10-1101, et seq. ("VGMVPL")
## (against Freiwald and Azevedo)

188.     The allegations set forth in the foregoing paragraphs are re-alleged and incorporated herein by reference.

189.     Defendants Freiwald and Azevedo engaged in gender-motivated violence against Plaintiff, in violation of the New York City Gender-Motivated Violence Act ("VGMVPL"), New York City Administrative Code § 8-901 et seq. Specifically, Azevedo sexually assaulted Plaintiff in New York City in March 2018, and Freiwald forcibly touched Plaintiff on multiple occasions, including in May 2019 and February 2020, in New York City.

190.     Under the VGMVPL, the act of violence must have been motivated by the victim's gender, meaning the perpetrator targeted the victim specifically because of their sex. See N.Y.C. Admin. Code § 8-902(a). The acts of violence committed by Azevedo and Freiwald were motivated by Plaintiff's gender, as they targeted her specifically because she is a woman.

191.     The alleged acts of violence occurred within the five boroughs of New York City, as required by the VGMVPL. See N.Y.C. Admin. Code § 8-902(a). Specifically:

- Azevedo sexually assaulted Plaintiff in her apartment in New York City in March 2018, in violation of New York Penal Law § 130.52 (Forcible Touching) and § 130.25 (Rape in the Third Degree);

- Freiwald forcibly touched Plaintiff on multiple occasions, including in May 2019 and February 2020, in New York City, in violation of New York Penal Law § 130.52 (Forcible Touching).

192.     Plaintiff demonstrates through the allegations in her Third Amended Complaint the physical, emotional, economic, and reputational harm she suffered as a result of the gender-motivated violence perpetrated by Defendants. The acts of violence and harassment caused Plaintiff severe emotional distress, humiliation, and long-term psychological trauma, as well as significant harm to her professional and personal life.

193.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress, pain and suffering, humiliation, and damage to her reputation and career.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against the Defendants and respectfully requests that this Court:

a. Declare that Defendants violated Plaintiff's rights and Defendant RU fostered a hostile educational and work environment;

b. Award Plaintiff compensatory damages for the emotional distress, pain, suffering, humiliation, and economic harm she has endured as a result of Defendants' unlawful conduct;

c. Award Plaintiff punitive damages to deter Defendants and other institutions from engaging in similar conduct in the future;

d. Grant injunctive relief requiring Defendants to implement policies and procedures to prevent and address gender-based discrimination and sexual harassment within the CBMM program and other federally funded programs;

e. Award Plaintiff attorneys' fees and costs incurred in bringing this action;

f. Grant such other and further relief as the Court deems just and proper, and

g. Request damages for Defendants' wrongful conduct in an amount to be determined at trial. The amount requested is for compensatory damages for:

    i. The fear, pain, and suffering of Plaintiff after being subjected to Defendants wrongful conduct,

    ii. The loss of the value and enjoyment of her life;

    iii. The loss of the value and enjoyment of her scientific work;

    iv. The loss of her and his earnings and earning capacity.

    v. The loss of her academic career

vi. Medical expenses

vii. Aggravating circumstances surrounding the retaliation and her wrongful termination;

viii. Punitive damages in an amount to be determined at trial

ix. Costs and

x. Such other relief as this Court or a jury may find appropriate

Dated: February 28, 2025          Respectfully submitted,

KAROLINA MARCINIAK-DOMINGUES
GONCALVES AGRA
(Plaintiff *pro se*)

Karolina Marciniak-Domingues Goncalves Agra
500 E 63rd St., Apt 13F
New York, New York 10065
Tel. 646.770.2045
marciniak.kar@gmail.com