# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
                                    :

DR. KAROLINA MARCINIAK-DOMINGUES     :
GONCALVES AGRA and MR. PEDRO HENRIQUE  :
MARCINIAK-DOMINGUES GONCALVES AGRA,   :
                                      :

                Plaintiffs,             :

                                  :            23 Civ. 10305 (JPC)
         -v-                       :
                                  :           OPINION AND ORDER

MASSACHUSETTS INSTITUTE OF TECHNOLOGY,  :
*et al.*,                                 :
                                  :

                Defendants.       :
                                  :
----------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      On December 29, 2022, Karolina Marciniak-Domingues Goncalves Agra ("Marciniak")

and her husband Pedro Henrique Marciniak-Domingues Goncalves Agra ("Agra") filed suit in this

District against, among several others, Massachusetts Institute of Technology ("MIT") and

Rockefeller University ("RU"). *Marciniak v. Ctr. for Brains, Minds & Machs. at Mass. Inst. of

Tech. ("Marciniak I")*, No. 22 Civ. 10959 (ALC), (S.D.N.Y. Dec. 29, 2022), Dkt. 1. *Marciniak I*

is pending before the Honorable Andrew L. Carter, Jr. In a sprawling complaint in that case,

Marciniak and Agra bring thirteen causes of action, including under Title VII of the Civil Rights

Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the New York State Human Rights Law,

N.Y. Exec. Law §§ 290 *et seq.* (the "NYSHRL"), and the New York City Human Rights Law,

N.Y.C. Admin. Code §§ 8-101 *et seq.* (the "NYCHRL"). In that complaint, Plaintiffs allege a

troubling saga of Marciniak being the victim of sexual harassment and discrimination at the hands

of her former supervisor and RU employee, Dr. Winrich Freiwald, and the victim of sexual assault

and harassment committed by a teaching assistant at the Center for Brains, Minds, and Machines

("CBMM") named Frederico Azevedo, as well as the unsatisfactory investigation into these incidents conducted by RU and MIT.

On November 22, 2023, about two weeks after Judge Carter set a briefing schedule on the defendants' anticipated motions to dismiss in *Marciniak I*, Marciniak and Agra filed this suit ("*Marciniak II*"). At its core, *Marciniak II* is a repeat of *Marciniak I*: The Complaint here recounts the same basic factual allegations, sometimes word-for-word; raises many of the same causes of action, including under Title VII, the NYSHRL, and the NYCHRL; and names as Defendants both MIT and RU. Indeed, before both this Court and Judge Carter, Plaintiffs have described the two suits as "involv[ing] common questions of law, the same operative facts, [and] substantially the same parties and witnesses." Dkt. 33 at 1; *accord Marciniak I*, No. 22 Civ. 10959, Dkt. 88. The primarily differences are that the Complaint in this case names Freiwald and Azevedo as Defendants and mentions New York's Adult Survivors Act ("ASA"), N.Y. CPLR § 214-j.

Defendants argue that these differences are not enough, and that this suit should be dismissed as duplicative of *Marciniak I*. The Court agrees. For reasons that follow, Defendants' motions are granted, and the Complaint is dismissed without prejudice. Plaintiffs, however, are granted leave to file an amended complaint.

## I.  Background

### A.  Facts[1]

#### 1.  Underlying Conduct

During the latter part of 2014, Marciniak began her protracted journey to become a postdoctoral fellow at RU. Compl. ¶ 29. She interviewed with Freiwald—the head of the

---

[1] The following facts, which are assumed true for purposes of this Opinion and Order, are taken from the Complaint in this case, *Marciniak II*, Dkt. 1 ("Compl."). *See Trireme Energy Dev., LLC v. RWE Renewables Americas, LLC*, No. 22 Civ. 7439 (JLR), 2023 WL 5469021, at *11

Laboratory of Neural Circuits at RU—in November of that year while finishing her PhD in Germany. *Id.* ¶¶ 29, 35. During the interview, Freiwald promoted the state-of-the-art technological capabilities of his laboratory, expressed his intent to hire Marciniak as a postdoctoral researcher, and gave her until the end of the year to decide whether to accept his offer. *Id.* ¶ 32. Marciniak, anticipating a postdoctoral fellowship award with Freiwald in the future, accepted the position in December 2014. *Id.* ¶¶ 33-35. Marciniak spent the next nine months finishing her degree and drafting a research proposal for a postdoctoral fellowship. *Id.* ¶ 35. Unfortunately, Freiwald allocated the fellowship position to a different postdoctoral researcher already employed in his laboratory. *Id.* ¶ 35.

In September 2015, Marciniak visited RU to view the laboratory and discuss her proposal with Freiwald. *Id.* ¶ 36. Not only was Marciniak unable to see the facilities, as Freiwald had promised, but during that visit Freiwald informed her that her proposed research was already being pursued at the laboratory. *Id.* Uncertain about the research facilities at RU, and facing the ambiguous future of her research plan, Marciniak withdrew her acceptance of the researcher position under Freiwald around November 2015. *Id.* ¶ 37. Freiwald nonetheless continued to contact Marciniak, emailing her three times during February 2016. *Id.* ¶¶ 37-38. In his third email, he assigned Marciniak to a project with CBMM—a multi-institutional research and education center funded by the National Science Foundation ("NSF"). *Id.* ¶ 38; *see* Dkt. 52 ("Opp. to MIT")

---

(S.D.N.Y. Aug. 24, 2023) (noting that, when evaluating a motion to dismiss on claim-splitting grounds, "the Court must accept the well-pleaded allegations in the [] Complaint as true and draw all reasonable inferences in Plaintiffs' favor"). For the avoidance of doubt, the Court emphasizes that its recitation here of Plaintiffs' allegations does not reflect any factual findings made by the Court. These allegations are merely assumed true for purposes of resolving Defendants' motion.

at 4-5.[2]  In assigning Marciniak to this CBMM project, Freiwald "express[ed] excitement about the potential fit and the opportunity to work closely with a professor at Defendant MIT."  Compl. ¶ 38.  Marciniak felt she could not decline this offer.  *Id.* ¶ 39.

Marciniak planned another visit to RU—again intending to tour the laboratory's facilities and clarify her project proposal—for March 2016.  *Id.* ¶ 40.  At the last minute, however, her trip was frustrated by her lack of a valid visa.  *Id.*  She emailed Freiwald to explain her troubles, and Freiwald arranged for them to instead meet via Skype.  *Id.* ¶ 41.  On that call, Freiwald offered RU's help in securing a visa—an offer which Marciniak understood to be in relation to the visit to RU's laboratory that she wanted to make to evaluate the facilities before committing to the job. *Id.*  To her surprise, however, Freiwald immediately began the employment process and had RU's Director of Immigration and Academic Appointments sponsor a J-1 Visa for her.  *Id.*  Even though she had not wanted to commit to the job before seeing the laboratory, finalizing her research project, and applying for the fellowship, Marciniak accepted employment offer.  *Id.* ¶ 42.

Marciniak began working at the laboratory in September 2017, and immediately realized that Freiwald had misrepresented to her the maturity and capabilities of his laboratory's facilities. *Id.* ¶ 44.  Upon her arrival, Freiwald tasked her with establishing a working relationship with CBMM, which included traveling to MIT and later applying for CBMM's Summer School in Woods Hole, Massachusetts.  *Id.* ¶¶ 44, 46.  In the meantime, under Freiwald's supervision, Marciniak was awarded a prestigious two-year Feodor-Lynen postdoctoral research fellowship

---

[2] According to its website, CBMM "is a National Science Foundation funded Science and Technology Center focused on the interdisciplinary study of intelligence," and "is a multi-institutional collaboration headquartered at MIT, with managing partners at Harvard University." Center for Brains, Minds, and Machines, *About*, https://cbmm.mit.edu/about (last visited September 29, 2024).

that was to pay half of her salary—with RU paying the other half—from September 1, 2017, through August 30, 2019. *Id.* ¶ 45.

In August 2017, Marciniak attended a CBMM course in Woods Hole. *Id.* ¶ 47. It was there that she met Azevedo, then a teaching assistant at CBMM. *Id.* ¶¶ 16, 47. They were assigned to reside in the same off-campus cottage, where Azevedo created a "party atmosphere" and spread malicious and false rumors about Marciniak. *Id.* ¶ 47. On Marciniak's last day, Azevedo offered her a room to rest in during a particularly long program. *Id.* ¶ 48. Marciniak went to sleep but was awoken by Azevedo and another individual. *Id.* According to Plaintiffs, "Azevedo violated [Marciniak's] personal boundaries by sexually assaulting her despite her resistance and the lack of consent to the sex." *Id.* Afterwards, Azevedo dismissed his actions, mocked Marciniak's emotions, and coerced her silence, insisting on secrecy. *Id.*

Feeling helpless and ashamed, Marciniak confided in Freiwald on September 1, 2017, after returning from CBMM's summer program. *Id.* ¶¶ 48-50. She told Freiwald of a "bad encounter with somebody from another institution," but he dismissed the seriousness of her complaints and changed the topic. *Id.* ¶ 50. He suggested that she should accept the experience "as a daily-life reality" of her summer course at CBMM. *Id.* Also during that September 1 meeting—which entailed a forty-minute walk outside RU—Freiwald invaded Marciniak's personal space by inappropriately touching her lower back and looking at her legs and buttocks. *Id.* ¶ 49. This made Marciniak extremely uncomfortable. *Id.*

Marciniak repeatedly confronted Azevedo about his conduct in the weeks that followed. *Id.* ¶ 51. She told him of the injuries he had caused her, but he dismissed those out of hand. *Id.* And when she told him that she clearly remembered saying no to any sexual relations, he ridiculed her account and told her that consent did not matter. *Id.* ¶ 52. During this time, Azevedo also

harassed Marciniak through daily calls and text messages, asking her questions about with whom she had interacted or conversed. *Id.* ¶ 51. He intimidated Marciniak and ordered her to stay silent about the incident, telling her of "a disturbing event from his graduate school" to instill fear in her mind. *Id.* ¶ 52.

Marciniak's encounters with Azevedo only continued. Between November 2017 and January 2018, Azevedo coerced Marciniak "into participating in 'three[]some' sexual encounters with other women." *Id.* ¶ 53. In November 2017, for example, he insisted that Marciniak provide accommodations for him and his female friend during a visit to New York, during which "he misused [Marciniak]'s pictures to create a profile on Tinder which he used to seek further 'threesome' sexual encounters." *Id.* When Marciniak refused to participate in one such sexual encounter in January 2018, Azevedo immediately became aggressive towards her. *Id.* In February 2018, Azevedo pressured Marciniak to host him for a conference in New York the following month. *Id.* ¶ 55. Although she initially declined to host him and expressed her refusal to engage in any further sexual encounters, she succumbed to Azevedo's pressures once he threatened to jeopardize her CBMM opportunities if his wishes were not met. *Id.*

Azevedo sexually assaulted Marciniak again during that March 2018 visit to New York. *Id.* ¶ 56. Immediately prior to that assault, Marciniak disclosed to Azevedo "her contraction of an HSV infection because of Azevedo's assault on another woman in Woods Hole," expressed her fear of cervical cancer from that infection, and pleaded with Azevedo to stop harassing women. *Id.* Azevedo just laughed it off. *Id.* After remarking "welcome to the population of people with STDs," he forcefully pushed Marciniak onto her bed and engaged in non-consensual intercourse without a condom despite Marciniak's repeated protests and attempts to escape. *Id.* This caused

Marciniak to feel devastated, confused, helpless, and ashamed.  *Id.* ¶ 57.  She vehemently refused any further personal contact with Azevedo in New York, despite his subsequent requests.  *Id.*

During a May 2018 CBMM retreat conference at MIT, Azevedo approached Marciniak and initiated a private conversation.  *Id.* ¶ 58.  After Marciniak told Azevedo of her current boyfriend and her intention to marry him, Azevedo suggested that she instead end that relationship and join him at the upcoming CBMM Summer School, where she also had been recruited as a teaching assistant, to facilitate his interactions with female students.  *Id.*  Additionally, in his role as CBMM retreat organizer, Azevedo attempted to involve Marciniak in social events.  *Id.* ¶ 59. He added her to a WhatsApp group of event "organizers," in which he repeatedly used Neo-Nazi and white supremacist terms, such as referring to himself as Führer.  *Id.*  Azevedo also insulted Marciniak's Polish background in front of conference participants when she refused his advances. *Id.*  After the conference, Azevedo continued to harass Marciniak over text message, prompting her to block him on WhatsApp and other social media accounts.  *Id.* ¶ 60.

The next summer, Marciniak requested that her then fiancé (and now husband), Agra, accompany her to Woods Hole while she worked as a teaching assistant for three weeks.  *Id.* ¶ 61. The atmosphere there was unwelcome, to say the least.  *Id.*  Upon arrival, Marciniak and Agra faced scrutiny and gossip from the male CBMM members.  *Id.*  And Plaintiffs describe the school's atmosphere as "akin to a men's club"—with sexist jokes, private gatherings, and Azevedo sexually pursuing female students.  *Id.*

Even after the CBMM summer program ended, Marciniak continued to face an uncomfortable environment back at RU.  *Id.* ¶ 63.  On September 24, 2018, Freiwald invited Marciniak to a lunch meeting, purportedly to discuss "the planning of forthcoming medical procedures."  *Id.*  Instead of this meeting occurring in Freiwald's office, it took place at an upscale

campus restaurant and during the meeting, Freiwald inquired about Marciniak's personal life and asked if she preferred older men, all while making physical gestures.  *Id.*

### 2.    Marciniak's Complaints and Aftermath

Marciniak was required to travel back to MIT in March 2019 to present her research to CBMM members.  *Id.* ¶ 64.  While she did not encounter Azevedo on that trip, she learned that she would have to present again to other CBMM members in two months.  *Id.*  Fearing that she would run into Azevedo in the future, Marciniak filed an incident report with MIT's Title IX & Bias Response Office against Azevedo in relation to the 2017 sexual assault and subsequent harassment.  *Id.* ¶ 65.  The Director, Sarah Rankin, followed up with a phone call on March 28, during which Marciniak expressed her desire to proceed with a formal complaint and requested a no-contact order to protect herself from Azevedo during her future visits to MIT.  *Id.*  Unsure whether MIT was the appropriate entity to conduct the investigation, Rankin told Marciniak that she would discuss with the other CBMM institutions.  *Id.*  Rankin contacted Marciniak two weeks later, suggesting that Marciniak speak to Rankin's counterpart at Harvard.  *Id.* ¶ 66.  Describing the complaint process as "complicated," Rankin also advised Marciniak that there were no restrictions placed on Azevedo.  *Id.*  Around this time, Marciniak also filed a police report in Massachusetts alleging the same set of facts concerning Azevedo's 2017 sexual assault and subsequent harassment.  *Id.* ¶ 67.

When Marciniak spoke with Harvard's Title IX Coordinator, Jose Martinez, he too questioned which institution was primarily responsible for CBMM-related investigations and suggested that Marciniak also contact the Marine Biology Laboratory ("MBL").  *Id.* ¶ 68.  Despite the difficulty, Martinez promised Marciniak that he would find the answer for her.  *Id.*  After three weeks without an answer, Marciniak reached back out to Rankin on May 4, 2019, three days before the May CBMM conference at MIT.  *Id.* ¶ 69.  Rankin did not respond until May 9.  *Id.*  In the

meantime, however, Marciniak faced more harassment from Azevedo, who followed her around at the conference and attempted to intimidate her through gestures and looks. *Id.* ¶¶ 70-71. Frightened, Marciniak called MIT police for security during the event and filed an incident report. *Id.* ¶ 71. She also explained her struggles to an NSF reviewer at the conference, who directed her to NSF's Office of Diversity and Inclusion ("ODI"). *Id.*

Frustrated at the lack of progress, on May 13, Marciniak again emailed Rankin pleading that Rankin conduct a formal investigation. *Id.* ¶¶ 72-73. Rankin replied that she was still trying to determine which entity would conduct an investigation, should Marciniak choose to file a formal complaint, and Martinez also reached out to Marciniak that day, expressing the same sentiment. *Id.* ¶ 74. Meanwhile, Marciniak continued to face harassment. The following day, May 14, Freiwald scheduled a meeting with Marciniak and a colleague at a downtown restaurant, and in the subway on the way back, he intentionally touched her lower back and hand. *Id.* ¶ 75. Also that day, Marciniak emailed the CBMM Director for assistance, but she received no response. *Id.* ¶ 76.

One day after that, on May 15, Rankin informed Marciniak that MBL was the most appropriate entity to investigate the matter, and representatives from that entity subsequently reached out to schedule a call. *Id.* ¶ 78. The MBL representatives outlined the complaint process and referred Marciniak to RU's Title IX Coordinator and Human Resources Director, Virginia Huffman, who also scheduled a meeting with Marciniak. *Id.* ¶ 79. During meetings with Huffman, Marciniak described Azevedo's sexual harassment, as well as her frustration with the ongoing complaint process and lack of a formal investigation. *Id.* ¶ 80. Huffman provided Marciniak with contact details for attorneys and a no-contact order as to Azevedo was issued. *Id.* ¶¶ 81-84. But Plaintiffs still express frustration with this investigative process. Specifically, the investigators

only interviewed a single witness—who corroborated Azevedo's story but also had "participat[ed] in the 2017 sexual assault of [Marciniak] claiming a consensual sexual encounter"—and allowed Azevedo to see Marciniak's statement before he prepared his own.  *Id.* ¶ 85.  Ultimately, the investigation found a lack of probable cause that Azevedo violated any policies—a determination which Marciniak was not permitted to appeal.  *Id.* ¶ 86.  The outcome of the investigation was announced on August 11, 2019.  *Id.*  The following month, Marciniak unexpectedly saw Azevedo at a Zoom meeting.  *Id.* ¶ 87.

During all this, Marciniak continued to have problems with Freiwald.  In January 2020, Freiwald told her not to spend time on an internal fellowship application.  *Id.* ¶ 91.  And the next month—after CBMM denied Marciniak a teaching assistant position for the 2020 Summer School—Freiwald asked to speak with Marciniak about her project's future.  *Id.* ¶¶ 92-93.  At that meeting, Freiwald's behavior took a suggestive turn when he reclined in his chair and displayed a visible erection through his clothing.  *Id.* ¶ 93.  Similarly, at another meeting later that month, Freiwald made a sexually suggestive joke about a video featuring a monkey eating a banana.  *Id.* ¶ 94.

In an email, which apparently was sent on or about May 28, 2020,[3] Freiwald proposed an in-person meeting with Marciniak to discuss her future career.  *Id.* ¶ 95.  Citing the limitation on

---

[3] Paragraph 95 of the Complaint appears to have at least one typographical error with respect to when this email was sent:

> Due to the Pandemic, no further in-person meetings occurred until an email exchange on or about May 28, 2020, addressing concerns regarding [Marciniak]'s funding for a postdoctoral position and project support.  Freiwald, in an email on or about February 28, 2019, suggested continuing the conversation about [Marciniak]'s future career in person.

Compl. ¶ 95.  The next paragraph, which refers to "a subsequent email on or about 29, 2020" [*i.e.*, without a month], *id.* ¶ 96, does not help to clarify when these events took place.

in-person contact during the COVID-19 pandemic and her discomfort with offsite meetings due to Freiwald's past behavior, however, Marciniak declined the invitation to meet Freiwald in person. *Id.* Apparently the next day, *see supra* n.3, Marciniak emailed Freiwald again, alluding to his previous inappropriate actions as the reason for her discomfort with meeting in restaurants. *Id.* ¶ 96. Freiwald responded on June 4, 2020, asking for a Zoom meeting the following day, at which he effectively terminated her employment and asked her to wrap up her project. *Id.* ¶ 97. Marciniak convinced Freiwald to extend her project, but Freiwald nonetheless "demote[d] her work to limited research" and stood by his decision to have her finish up as quickly as possible. *Id.* ¶ 99.

Marciniak continued working at RU through the end of 2020 and the beginning of 2021. *Id.* ¶¶ 101-102. On May 18, 2021, she filed a sexual harassment and retaliation complaint against Freiwald and RU with the New York State Division of Human Rights. *Id.* ¶ 104. Three months later, and two weeks before she was due for a reappointment, Freiwald emailed Marciniak to inform her that he and RU decided to terminate her employment effective November 30, 2021. *Id.* ¶ 105. Early the next year, RU withdrew its ongoing H-1B Visa petition for Marciniak and offered her a one-way ticket to Poland. *Id.* ¶ 108.

## B.     Procedural History

### 1.   *Marciniak I*

On December 29, 2022, Marciniak and Agra filed their lawsuit in *Marciniak I* against MIT, Harvard, RU, Boston Children's Hospital, MBL, the University of Chicago, and NSF. *Marciniak I*, No. 22 Civ. 10959, Dkt. 1. Their original *pro se* complaint in that case spanned 105 pages, with 839 paragraphs and sixteen causes of action. *Id.* On April 10, 2023, still proceeding without an attorney, Marciniak filed an amended complaint. *Marciniak I*, No. 22 Civ. 10959, Dkt. 65. The amended complaint, while substantially trimmed down, still spanned over forty pages and

contained 220 paragraphs and thirteen causes of action.  *Id.*  In it, Marciniak detailed (among other allegations): (1) her recruitment to Freiwald's laboratory, her troubling professional experience there, and her ultimate termination, *id.* ¶¶ 15-40; (2) her experiences with sexist environments at Freiwald's laboratory and the CBMM Summer School, *id.* ¶¶ 41-55, 126-138; (3) Freiwald's sexual harassment, including the forty-minute walk, the lunch meeting at the campus restaurant, the touching on the subway, and his displaying of an erection, *id.* ¶¶ 56-66; (4) Azevedo's sexual assault in 2017 at the CBMM Summer School, his sexual assault in 2018, and his harassment, including the constant contact and threats, the WhatsApp group chat, and the intimidation on MIT's campus, *id.* ¶¶ 67-86; (5) the unsatisfactory investigation process by MIT, Harvard, NSF, MBL, and RU, *id.* ¶¶ 87-125, 185-201; and (6) the alleged retaliation by CBMM by not selecting her for a 2020 Summer School teaching assistant position, and by Freiwald by demoting and firing her, *id.* ¶¶ 161-184.  She asserted various causes of action under Title IX, Title VII, the NYSHRL, and the NYCHRL, as well as state and federal law claims of labor exploitation, sex trafficking, negligence, racketeering, intentional infliction of emotional distress, and loss of consortium.  *Id.* ¶¶ 15-218.

The *Marciniak I* defendants sought leave to move to dismiss the amended complaint, and on November 6, 2023, Judge Carter set a briefing schedule.  *Marciniak I*, No. 22 Civ. 10959, Dkt. 68.  Marciniak's counsel entered an appearance two days later on November 8.  *Marciniak I*, No. 22 Civ. 10959, Dkt. 69.  And on December 5, 2023, through their counsel, Marciniak and her husband voluntarily dismissed NSF, MBL, Boston Children's Hospital, and the University of Chicago from the action.  *Marciniak I*, No. 22 Civ. 10959, Dkt. 75.  Ten days later, Harvard, MIT, and RU all moved to dismiss the amended complaint.  *Marciniak I*, No. 22 Civ. 10959, Dkts. 78, 80, 84, 86.  Marciniak has not sought leave to file a second amended complaint in *Marciniak I*.

12

2.      *Marciniak II*

On November 22, 2023, just over two weeks after Judge Carter set the motion to dismiss briefing schedule in *Marciniak I*, Marciniak and Agra—through the same attorney representing them in that case—initiated this action, *Marciniak II*.  Dkt. 1.  The Complaint alleges the facts recounted above, *see supra* I.A, and names as Defendants MIT, RU, NSF, Azevedo, and Freiwald. *Id.*  It asserts nine causes of action, each against all Defendants: (1) sexual harassment under Title VII, *id.* ¶¶ 113-117; (2) gender discrimination and sexual harassment under the NYSHRL, *id.* ¶¶ 118-128; (3) those same claims plus hostile work environment under the NYCHRL, *id.* ¶¶ 129-135; (4) retaliation under Title VII, *id.* ¶¶ 136-141; (5) retaliation under the NYSHRL, *id.* ¶¶ 142-148; (6) retaliation under the NYCHRL, *id.* ¶¶ 149-155; (7) a claim titled "New York Adult Survivors Act," *id.* ¶¶ 156-161; (8) intentional infliction of emotional distress, *id.* ¶¶ 162-166; and (9) loss of consortium, *id.* ¶¶ 167-172.

On December 26, 2023, RU and Freiwald sought leave to move to dismiss the Complaint in the instant action on various grounds, including that it is improperly duplicative of *Marciniak I*. Dkt. 21.  In response to that pre-motion letter, on January 5, 2024, Marciniak asked this Court for leave to move to consolidate the instant action with *Marciniak I*, and to stay the briefing schedule on any motion to dismiss.  Dkt. 33.  On the same day, Marciniak submitted a similar letter to Judge Carter in *Marciniak I*, requesting permission to consolidate the two cases and to stay the briefing schedule.  *Marciniak I*, No. 22 Civ. 10959, Dkt. 88.  In both letters, Marciniak wrote that *Marciniak I* and *Marciniak II* "involve[] common questions of law, the same operative facts, [and] substantially the same parties and witnesses."  *Id.* at 1; Dkt. 33 at 1.

Judge Carter denied the request to consolidate in *Marciniak I* on January 11, 2024, determining that "Plaintiffs have not shown good cause for filing a new action (*Marciniak II*) involving common questions of law and fact and substantially the same parties and witnesses and

13

requesting to move to consolidate the cases, rather than moving to amend their First Amended Complaint in *Marciniak I*." *Marciniak I*, No. 22 Civ. 10959, Dkt. 93 at 1-2. Following that order, this Court set the briefing schedule for Defendants' motions to dismiss the Complaint. Dkts. 38, 41, 61. In the midst of the briefing, Plaintiffs voluntarily dismissed NSF from the instant action. Dkt. 56. Now pending before this Court are fully briefed motions to dismiss filed by MIT, RU and Freiwald (jointly), and Azevedo. *See* Dkt. 43 ("MIT MTD"); Dkt. 50 ("RU Defts. MTD"); Opp. to MIT; Dkt. 54 ("Opp. to RU Defts."); Dkt. 59 ("MIT Reply"); Dkt. 62 ("RU Defts. Reply"); Dkt. 64 ("Azevedo MTD"); Dkt. 67 ("Opp. to Azevedo"); Dkt. 69 ("Azevedo Reply").

## II. Discussion

All Defendants argue that the Complaint should be dismissed as impermissibly duplicative of the claims asserted in *Marciniak I*. *See* MIT MTD at 8-10; RU Defts. MTD at 10-13; Azevedo MTD at 4-7. Because the Complaint asserts claims that could have been raised in *Marciniak I* and concern the same subject matter as the claims in *Marciniak I*, and because the parties in the two suits are the same or their privies, the rule against claim splitting applies and the Complaint is dismissed without prejudice. The Court, however, *sua sponte* grants Plaintiffs leave to amend the Complaint.

### A. Claim Splitting

#### 1. Governing Law

Generally, a plaintiff has "no right to maintain two actions on the same subject in the same court, against the same defendant[s] at the same time." *Curtis v. Citibank, N.A.*, 226 F.3d 133, 139 (2d Cir. 2000). So, "[a]s part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit," so long as neither suit has reached a final judgment. *Id.* at 138; *accord New Phone Co., Inc. v. City of New York*, 498 F.3d 127, 129 (2d Cir. 2007) (per curiam). This general precept has long been recognized by federal

14

courts: over 150 years ago, the Supreme Court explained that the pendency of one federal suit can defeat another when "the case [is] the same." *Watson v. Jones*, 80 U.S. 679, 715 (1871). The principle's continued endurance, however, has not resulted in a doctrine with clear-cut definitions or precise delineations. *Cf. Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) ("As between federal district courts, however, though no precise rule has evolved, the general principle is to avoid duplicative litigation.").

From this general principle flow two different rules that apply in slightly (but importantly) different contexts.[4] One is called the "first to file rule," or the "first filed rule." *First City Nat'l Bank & Tr. Co. v. Simmons*, 878 F.2d 76, 79 (2d Cir. 1989) (former); *Emps. Ins. of Wausau v. Fox Ent. Grp., Inc.*, 522 F.3d 271, 274 (2d Cir. 2008) (latter). This "well-settled" doctrine applies when two competing lawsuits are filed in *different* federal judicial districts. *Emps. Ins. of Wausau*, 522 F.3d at 272-75 (internal quotation marks omitted). In that situation, the general rule is that the first suit to be filed has priority over the later-filed suit. *Id.* at 274-75. But the priority may flip "where the balance of convenience favors the second-filed action" or "where special circumstances warrant giving priority to the second suit." *Id.* at 275 (internal quotation marks omitted). By establishing a presumption that the later-filed suit cannot proceed simultaneously with the earlier-filed suit, the first-to-file rule conserves judicial resources and honors the plaintiff's choice of forum. *Id.*; *First City Nat'l Bank & Tr. Co.*, 878 F.2d at 79-80. Here, both *Marciniak I* and *Marciniak II* were filed in this District, so the first-to-file rule does not apply.

The second rule—and the one that applies here—travels under several names. Alternatively known as the "rule against duplicative litigation," the "rule against claim splitting,"

---

[4] There is also, of course, the closely related *Colorado River* abstention doctrine, which comes into play when a potentially duplicative action is pending in *state* court—not *federal* court like here. *See Colorado River Water Conservation Dist.*, 424 U.S. at 817.

or even the "prior pending action doctrine," this multi-monikered rule applies when two competing

lawsuits are filed within the *same* federal judicial district. *See Sacerdote v. Cammack Larhette*

*Advisors, LLC*, 939 F.3d 498, 501, 504 (2d Cir. 2019) (noting that "the rule against duplicative

litigation [is] sometimes termed the rule against claim-splitting"); *Ziemba v. Clark*, 167 F. App'x

831, 832 (2d Cir. 2006) (calling it the "'prior pending action' doctrine"); *Smith v. United Fed'n of*

*Tchrs.*, 162 F.3d 1148 (2d Cir. 1998) (same); *Kanciper v. Suffolk Cnty. Soc. for the Prevention of*

*Cruelty to Animals, Inc.*, 722 F.3d 88, 92 (2d Cir. 2013) (explaining that the rule against claim

splitting applies when both suits are filed "in the same federal district court" (alteration adopted

and internal quotation marks omitted)).  This rule "foster[s] judicial economy, protect[s] the parties

from vexatious and expensive litigation, and ensur[es] the comprehensive disposition of

litigation." *Sacerdote*, 939 F.3d at 504 (internal quotation marks omitted).  And just like with the

first-to-file rule, the rule against claim splitting allows a district court to exercise its discretion to

stay or dismiss a suit when it is "the same" as another suit. *Oliver v. Penny*, No. 21-111, 2022 WL

2165814, at *1 (2d Cir. June 16, 2022) (quoting *Sacerdote*, 939 F.3d at 504).

      For two suits to be the same, "there must be the same parties, or, at least, such as represent

the same interests; there must be the same rights asserted and the same relief prayed for; the relief

must be founded upon the same facts, and the title, or essential basis, of the relief sought must be

the same." *Sacerdote*, 939 F.3d at 504 (alteration adopted) (quoting *The Haytian Republic*, 154

U.S. 118, 124 (1894)).  More concretely, two suits are the same for the purposes of the rule against

claim splitting when: (1) the parties in the later-filed suit are the same as, or in privity with, the

parties in the earlier-filed suit; and (2) the claims asserted in the later-filed suit were, or could have

been, raised in the earlier-filed suit. *Sacerdote*, 939 F.3d at 504-06 & n.25 (explaining that the

principles of claim preclusion apply except for the requirement that the prior suit generally be

16

resolved on the merits); *see Oliver*, 2022 WL 2165814, at *1 ("We apply the general principles of res judicata to duplicative lawsuits. The main difference is that the rule against duplicative lawsuits can only be raised to bar one of two suits that are both still pending." (citation and internal quotation marks omitted)); *Sarikaputar v. Veratip Corp.*, No. 19 Civ. 11168 (ALC), 2021 WL 3914064, at *3 (S.D.N.Y. Aug. 31, 2021) ("To decide if a later-filed suit is duplicative, courts examine whether the two proceedings involve the same (1) parties or their privies and (2) transactions or series of transactions."); *see also TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 499 (2d Cir. 2014) (explaining the elements of claim preclusion).

As to the first requirement, generally, the parties to each suit must be the same. *Sacerdote*, 939 F.3d at 505. That is because "a plaintiff has as many causes of action as there are defendants to pursue." *Id.* (internal quotation marks omitted). There is an exception to the same-party requirement, however, for a party that is in privity with a party in the earlier action. *Id.* at 506. The Supreme Court has distilled six categories of "recognized exceptions" to the same-party requirement:

> (1) agreements by a nonparty to be bound by the determination of issues in an action between others; (2) certain pre-existing substantive legal relationships based in property law between the nonparty and the party, such as preceding and succeeding owners of property, bailee and bailor, and assignee and assignor; (3) representative suits where the nonparty's interest was adequately represented by a party with the same interests, such as class actions and suits brought by trustees, guardians, and other fiduciaries; (4) when a nonparty has assumed control over the litigation in which the judgment was rendered; (5) when a nonparty is acting as a proxy, agent, or designated representative of a party bound by a judgment; and (6) when a statutory scheme expressly forecloses successive litigation by nonlitigants, so long as the scheme comports with due process.

*Id.* at 506 (footnotes omitted) (citing *Taylor v. Sturgell*, 553 U.S. 880, 893-95 (2008)). But "[t]he doctrine of privity is a functional inquiry, not a formalistic one, and must be applied with flexibility." *Cho v. Blackberry Ltd.*, 991 F.3d 155, 169-70 (2d Cir. 2021) (citations and internal

quotation marks omitted). This inquiry, and those six categories, "apply in the context of the rule against duplicative litigation" just as they "do so in the context of claim preclusion." *Sacerdote*, 939 F.3d at 506.

With respect to the second requirement, whether a claim could have been raised in the previously filed suit "depends in part on whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first." *TechnoMarine SA*, 758 F.3d at 499 (internal quotation marks omitted). The rule against claim splitting "does not require that all aspects of the new and prior suits be identical." *Davis v. Norwalk Econ. Opportunity Now, Inc.*, 534 F. App'x 47, 48 (2d Cir. 2013). Rather, this element "focuses on whether the two claims arise from the same 'nucleus of operative fact,'" *id.* (quoting *Waldman v. Vill. of Kiryas Joel*, 207 F.3d 105, 108 (2d Cir. 2000)); that is, "whether [the] two actions spring from the same 'transaction' or 'claim,'" *Waldman*, 207 F.3d at 108. *See also Curtis*, 226 F.3d at 140 (explaining that the claim-splitting "rule applies only to . . . claims arising out of the same events as those alleged in [the earlier-filed suit]"). The Second Circuit has identified three factors as "crucial" to whether two claims arise from a common nucleus of operative fact: (a) "whether the underlying facts are related in time, space, origin, or motivation"; (b) whether the two claims "form a convenient trial unit"; and (c) "whether their treatment as a unit conforms to the parties' expectations." *Waldman*, 207 F.3d at 108 (internal quotation marks omitted).

### 2. Analysis

As the analysis of the similarity of facts is the same with respect to all Defendants, the Court starts with the second element of the rule against claim splitting. All relevant considerations show that the claims in *Marciniak I* and *Marciniak II* spring from a common nucleus of operative fact. In fact, Plaintiffs have acknowledged before this Court and before Judge Carter that the two

18

pending cases "involve[] common questions of law, the same operative facts, [and] substantially the same parties and witnesses."  Dkt. 33 at 1; *Marciniak I*, No. 22 Civ. 10959, Dkt. 88 at 1.  And they do.  The facts underlying the two pending actions are not just "related," *Waldman*, 207 F.3d at 108, they are indeed the same.  In *Marciniak I*, Plaintiffs bring causes of action that all stem from, generally, Marciniak's sexual assault and harassment at the hands of Azevedo, her unsatisfaction with the multi-institutional investigatory process once she filed a complaint, her sexual harassment by Freiwald, and her subsequent termination from RU.  *See supra* at I.B.1.  Plaintiffs' causes of action in the instant suit, *Marciniak II*, stem from exactly these same set of alleged facts, sometimes copied word-for-word from the *Marciniak I* complaint.  *Compare* Compl. ¶¶ 46-48, 51-53, 55-62, 70-71, 87 (Azevedo), *id.* ¶¶ 64-69, 72-74, 76-86, 89-90 (investigation), *and id.* ¶¶ 29-45, 49-50, 54, 63, 75, 88, 91-108 (Freiwald), *with Marciniak I*, No. 22 Civ. 10959, Dkt. 65 ¶¶ 51-55, 67-86, 126-133 (Azevedo), *id.* ¶¶ 87-125, 185-201 (investigation), *and id.* ¶¶ 15-49, 56-66, 134-138, 171-184 (Freiwald).

Not only are the underlying facts the same, but the two suits would form a convenient trial unit, and treating the two suits as such would conform to the parties' expectations.  *See Waldman*, 207 F.3d at 108.  In *Marciniak I*, Plaintiffs bring claims under Title VII, the NYSHRL, the NYCHRL, and state law.  *Marciniak I*, No. 22 Civ. 10959, Dkt. 65 ¶¶ 15-218.  And they allege, among other things, harassment, discrimination, hostile work environment, retaliation, emotional distress, and loss of consortium.  *Id.*  In the instant action, Plaintiffs also bring claims under Title VII, the NYSHRL, the NYCHRL, and state law.  Compl. ¶¶ 113-172.  And they also allege harassment, discrimination, hostile work environment, retaliation, emotional distress, and loss of consortium.  *Id.*  Thus, again as Plaintiffs themselves note, the two suits raise "common questions of law."  Dkt. 33 at 1; *accord Marciniak I*, No. 22 Civ. 10959, Dkt. 88 at 1.  This unity in causes

of action leaves no doubt that the two suits would form a convenient trial unit and that Defendants would have expected Plaintiffs to bring all claims in one suit. This is especially true in light of the identical factual background, and the need for the same evidence to support the causes of action in both suits. *See Davis*, 534 F. App'x at 48 (affirming application of the rule against claim splitting when "the facts alleged in the two complaints" were "nearly identical" and "both actions share[d] a common inquiry"). Plaintiffs, too, implicitly acknowledged that *Marciniak I* and *Marciniak II* would form a convenient trial unit when they moved before Judge Carter to consolidate the two actions.

The first element of the rule against claim splitting—that the same parties or their privies are in both suits—is similarly met here. In the instant action, Plaintiffs bring claims against MIT, RU, Azevedo, and Freiwald. Dkt. 1. In *Marciniak I*, they also sued MIT and RU. *Marciniak I*, No. 22 Civ. 10959, Dkt. 65. So, at least as to MIT and RU, the second requirement is easily met— they are named defendants in both suits. Plaintiffs do not, however, bring claims against Freiwald or Azevedo in *Marciniak I*—a fact they argue removes *Marciniak II* from the clutches of the rule against claim splitting. *See* Opp. to MIT at 8; Opp. to RU Defts. at 10; Opp. to Azevedo at 11. But as discussed, two suits with different defendants can be "nonetheless duplicative" if "the defendants in the second suit are in privity with the defendants in the first suit." *Barclay v. Lowe*, 131 F. App'x 778, 779 (2d Cir. 2005); *see also Wang v. Ren*, No. 20-4216, 2023 WL 1977233, at *1 (2d Cir. Feb. 14, 2023) ("Like claim preclusion, the rule against duplicative litigation applies not only where there is identity, but also where there is privity, between the parties in the first- and second-filed actions."). And "[c]ourts in the Second Circuit have previously held that employees are in privity with their employers." *Wang v. Ren*, No. 19 Civ. 5310 (JPO), 2020 WL 6825675, at *2 (S.D.N.Y. Nov. 20, 2020), *aff'd*, 2023 WL 1977233; *see also Araoz v. New Albany Co., LLC*,

20

No. 22 Civ. 125 (AMD), 2024 WL 866169, at *3 (E.D.N.Y. Feb. 29, 2024) ("An employer-employee or agent-principal relationship will provide the necessary privity for claim preclusion with respect to matters within the scope of the relationship, no matter which party is first sued." (alterations adopted and internal quotation marks omitted)).  So the instant suit may still be duplicative of *Marciniak I* as to Freiwald and Azevedo—even though they were not named in that earlier suit—to the extent that Freiwald and Azevedo's alleged actions arose out of their employment with Defendants named in *Marciniak I*.  *Araoz*, 2024 WL 866169, at *3; *see Wang*, 2023 WL 1977233, at *2 (explaining that "there can be no doubt that [an employee] has a 'sufficiently close relationship' with [his employers] to meet the privity requirement" for claim-splitting purposes (quoting *Cho*, 991 F.3d at 170)); *Barclay*, 131 F. App'x at 779 (finding privity in the claim-splitting context when "[a]ll [new] defendants are employees of" a defendant in the first suit and "their interests are adequately represented by those in the first suit who are 'vested with the authority of representation'" (quoting *Alpert's Newspaper Delivery, Inc. v. The N.Y. Times Co.*, 876 F.2d 266, 270 (2d Cir. 1989))); *DiGennaro v. Whitehair*, 467 F. App'x 42, 44 (2d Cir. 2012) (same); *cf. Oliver*, 2022 WL 2165814, at *2 (explaining that "[e]mployee defendants have a sufficiently close relationship with other employees when their challenged actions in both lawsuits consist of acts in their official capacities on behalf of their employer" and thus "share the 'same interests'" (quoting *Sacredote*, 939 F.3d at 504; citing *Cho*, 991 F.3d at 170)).

Freiwald was an employee of RU at the time of his actions alleged by Plaintiffs.  Compl. ¶ 18 ("At all times relevant, [Freiwald] was employed by Defendant RU.").  And those actions allegedly were taken in the course of his employment by RU.  *See id.* ¶¶ 29-45, 49-50, 54, 63, 75, 88, 91-108.  Indeed, his conduct forms the basis for Plaintiffs' Title VII, NYSHRL, and NYCHRL claims against RU.  *Id.* ¶¶ 113-135.  The same is true for Azevedo.  At least as alleged by Plaintiffs,

Azevedo was employed by MIT during all times relevant to the Complaint.[5]  *Id.* ¶ 15 ("At all times

relevant, [Azevedo] was employed by Defendant MIT."); *see also id.* ¶¶ 16-17 (describing

Azevedo as a "Teaching Assistant").  And all of Azevedo's actions, as alleged by Plaintiffs,

likewise were taken in the course of his employment—either while at CBMM's Summer School

or related to his conduct at that school, *id.* ¶¶ 46-48, 51-53, 61-62, or while attending and running

CBMM and other conferences, *id.* ¶¶ 55-60, 70-71, 87.  Just as with RU and Freiwald, many of

Plaintiffs' allegations against MIT arise from Azevedo's conduct.  Even in their emotional distress

cause of action against Freiwald and Azevedo, Plaintiffs allege that Freiwald and Azevedo were

"acting within the scope of their employment" by RU or MIT.  *Id.* ¶ 164.

---

[5] MIT argues that "Azevedo was not an employee of MIT until March 2021," and urges
the Court to take judicial notice of Azevedo's LinkedIn page.  MIT MTD at 5 & n.7.  Plaintiffs
argue the opposite, stressing "the existence of an employer-employee relationship between MIT
and Azevedo."  Opp. to MIT at 17.  Although a court may take judicial notice of matters outside
the pleadings at the motion to dismiss stage, *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d
406, 426 (2d Cir. 2008); *see Trireme Energy Dev.*, 2023 WL 5469662, at *11 (applying motion to
dismiss standards in the claim-splitting context), a LinkedIn page is not the sort of document for
which it is appropriate to take judicial notice.  For a court to take judicial notice of an adjudicative
fact, it must be "not subject to reasonable dispute because it . . . can be accurately and readily
determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid.
201(b)(2).  The accuracy of an unvetted, user-created LinkedIn profile can be questioned with
considerable ease.

        MIT also has attached to its reply brief a declaration from Lianne Shields, the Director of
Employee and Labor Relations at MIT, in which Ms. Shields declares that MIT never employed
Azevedo prior to March 2021.  Dkt. 59-1.  As MIT acknowledges, MIT Reply at 5 n.6, however,
the Court cannot consider that exhibit at the motion to dismiss stage because it is neither appended
to nor incorporated in the Complaint.  *See Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016)
(explaining that, when considering a motion to dismiss, a court may consider only "facts stated on
the face of the complaint, documents appended to the complaint or incorporated in the complaint
by reference, and matters of which judicial notice may be taken" (alterations adopted and internal
quotation marks omitted)); *Trireme Energy Dev.*, 2023 WL 5469662, at *11 (applying motion to
dismiss standards in the claim-splitting context); *see generally* Compl.  Accordingly, for the
purposes of Defendants' motions to dismiss, the Court treats Azevedo as Plaintiffs allege in their
Complaint: as an employee of MIT at all relevant times.  *See supra* I.A.

More to the point, Plaintiffs specifically allege that "[a]ll Defendants were responsible for the events" alleged because each Defendant either (a) "committed the acts alleged"; (b) was "the agent or employee . . . of one or more of the remaining Defendants and, in committing the acts alleged, acted within the course and scope of such agency and employment"; or (c) "there existed a unity of ownership and interest . . . such that any individuality and separateness between or among those defendants has ceased." *Id.* ¶ 22. In fact, as alleged in the Complaint, "Defendants exercised domination and control over one another to such an extent that any individuality or separateness of Defendants does not, and at all times herein mentioned did not, exist." *Id.* Therefore—at least as alleged by the Complaint—Freiwald and Azevedo were in privity with their respective employers, RU and MIT, at the relevant time for the purposes of the rule against claim splitting.[6] *See Araoz*, 2024 WL 866169, at *3-4; *Oliver v. Penny*, No. 19 Civ. 233 (BKS/DJS), 2020 WL 7316125, at *6-8 (N.D.N.Y. Dec. 11, 2020), *aff'd*, 2022 WL 2165814; *Reininger v. N.Y.C. Transit Auth.*, No. 11 Civ. 7245 (DAB), 2016 WL 10566629, at *4-5 (S.D.N.Y. Dec. 22, 2016); *see also Reininger*, 2016 WL 10566629, at *4 ("[C]ourts have long recognized that privity exists between employees and their employers for res judicata purposes." (collecting cases)). And because RU and MIT are defendants in *Marciniak I*, the rule's first requirement is met with respect to all Defendants in *Marciniak II*.

---

[6] The Court takes no position on whether Freiwald and Azevedo would have been in fact acting within the scope of their employments when allegedly sexually assaulting and harassing Marciniak. Indeed, the Court struggles to imagine how a sexual assault could be committed in furtherance of one's employment. *Cf. Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 757 (1998) ("The general rule is that sexual harassment by a supervisor is not conduct within the scope of employment."). Nevertheless, Plaintiffs allege in the Complaint that every action taken by Freiwald and Azevedo—even the assaults and harassment—was within the scope of their employments. *See, e.g.*, Compl. ¶¶ 22, 164. And Plaintiffs never once make an argument to the contrary in opposing dismissal. *See, e.g.*, Opp. to MIT at 14-17 (attributing Azevedo's sexual assault to MIT and asserting "the existence of an employer-employee relationship between MIT and Azevedo").

In reaching this conclusion, the Court notes this case's similarity to *Malcolm v. Rochester City School District*, the latter of two nearly identical suits alleging, among other things, discrimination under Title VII and the NYSHRL.  388 F. Supp. 3d 257, 261-62 (W.D.N.Y. 2019). In *Malcolm I*, the plaintiff sued her employer, the Rochester City School District ("RCSD"); and in *Malcolm II*, she also named certain employees of RCSD, including her supervisor, in addition to RCSD.  *Id.*  The Second Circuit concluded that *Malcolm II* was properly dismissed as duplicative even though the plaintiff had added new defendants: "the facts relied upon and the claims asserted in both actions were virtually identical," and the new defendants, "as RCSD employees, were in privity with RCSD, which was named as a defendant in *Malcolm I*."  *Malcolm v. Rochester City Sch. Dist.*, 828 F. App'x 810, 812 (2d Cir. 2020).  Here, Plaintiffs have brought extremely similar employment-based claims against her alleged employers in *Marciniak I*, and against her alleged employers plus two fellow employees in *Marciniak II*.  The facts relied upon in each suit are "virtually identical," and the parties are either the same or in privity with each other.  The rule against claim splitting thus applies in full force to all allegations against all Defendants here.

Plaintiffs also ask that, should the Court conclude that the rule against claim splitting applies, the Court to stay the instant suit instead of dismissing it.  *See* Opp. to MIT at 19-20; Opp. to RU Defts. at 11-12; Opp. to Azevedo at 12-13.  A district court may "administer its docket so as to avoid duplicative litigation in any manner it chooses," *Barclay*, 131 F. App'x at 779, and it should "consider the equities of the situation when exercising [that] discretion," *Curtis*, 226 F.3d at 138.  Here, the balance of the equities strongly favors a dismissal.  The only reason Plaintiffs proffer for filing this second action is that she wanted "to preserve certain claims," as the

*Marciniak I* motion to consolidate was denied and the ASA deadline was fast approaching.[7]  Opp. to MIT at 8; *see* Opp. to RU Defts. at 10-11; Opp. to Azevedo at 11-12.  But as Judge Carter noted in *Marciniak I*, "Plaintiffs have not shown good cause for filing a new action (*Marciniak II*) involving common questions of law and fact and substantially the same parties and witnesses and requesting to move to consolidate the cases, rather than moving to amend their First Amended Complaint in *Marciniak I*."  22 Civ. 10959, Dkt. 93 at 1-2.  Moreover, Plaintiffs' use of the ASA deadline as a justification is unpersuasive—*Marciniak I* was pending for eleven of the twelve months of the ASA revival window,[8] and Plaintiffs' counsel appeared in *Marciniak I* weeks before the expiration of that window, *see id.*, Dkt. 69 (Plaintiffs' counsel's appearance on November 8, 2023), yet chose to file *Marciniak II* instead of seeking leave to amend the complaint in *Marciniak I.*

Marciniak's "duplicative litigation is not the proper procedure for adding additional parties" to *Marciniak I*; rather, it is "an effort to circumvent the rules pertaining to the amendment of complaints."  *Wang*, 2020 WL 6825675, at *3 (alterations adopted and internal quotation marks omitted); *see McFarlane v. Iron Mountain Info. Mgmt. Servs., Inc.*, No. 17 Civ. 9739 (DLC), 2018 WL 941748, at *2 (S.D.N.Y. Feb. 16, 2018) ("Plaintiffs may not evade amendment deadlines by filing separate lawsuits that plead claims that were not timely raised in the initial suit." (citing

---

[7] The motion to consolidate in *Marciniak I* of course could not have been filed until *after* the Complaint in *Marciniak II* was filed.  So Marciniak's justification for filing a second suit is internally inconsistent.

[8] "[T]he ASA provides for a one-year 'look back' window for adult survivors of sexual assault whose claims otherwise fall outside of the statute of limitations.  Beginning on November 24, 2022, six months after the ASA's enactment, and continuing until November 24, 2023, anyone who was sexually assaulted as an adult in New York State and whose civil claim was previously outside the statute of limitations would have one year to file a civil lawsuit."  *Heath v. Galloway*, No. 23 Civ. 10886 (LTS), 2024 WL 2978475, at *3 (S.D.N.Y. June 10, 2024) (citing N.Y.C. P.L.R. § 214-j).

*Curtis*, 223 F.3d at 140)).  Because this suit "is a thinly-veiled attempt to expand [P]laintiff[s']
legal rights [and] evade the Federal Rules," dismissal is warranted.  *McFarlane*, 2018 WL 941748,
at *2; *see Branded Apparel Grp. LLC v. Muthart*, No. 17 Civ. 5956 (PAE), 2018 WL 4308545, at
*4-5 (S.D.N.Y. Sept. 10, 2018) (concluding that the equities "tip decidedly in favor of dismissal"
where the plaintiff, in an exercise of pure "gamesmanship," filed a new lawsuit to try to add parties
it otherwise would not be able to add); *see also Wang*, 2023 WL 1977233, at *2 (affirming
dismissal of a suit where "both suits involve[d] the same set of facts" and "assert[ed] substantially
identical claims," and where the parties were in privity with each other).

    Accordingly, the Complaint is dismissed in full without prejudice.

## B.    Leave to Amend

    Lastly, the Court considers whether to grant leave to amend.  Under Rule 15(a) of the
Federal Rules of Civil Procedure, a court "should freely give leave when justice so requires."  Fed.
R. Civ. P. 15(a)(2).  Plaintiffs have not asked the Court for leave to amend the Complaint.  "But
even when a party does not ask for leave to amend, the Court may grant leave to amend *sua
sponte*."  *In re Garrett Motion Inc. Sec. Litig.*, No. 20 Civ. 7992 (JPC), 2022 WL 976269, at *18
(S.D.N.Y. Mar. 31, 2022) (internal quotation marks omitted) (collecting cases).  When deciding
whether to grant *sua sponte* leave to amend, "courts will consider many factors, including undue
delay, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice to the
opposing party, and futility."  *Morales v. Kimberly-Clark Corp.*, No. 18 Civ. 7401 (NSR), 2020
WL 2766050, at *9 (S.D.N.Y. May 27, 2020).

    After considering these factors, the Court grants Plaintiffs leave to file an amended
complaint, in the event they believe they can plead facts and claims that are not duplicative of

those in *Marciniak I*. The Court emphasizes, however, that Plaintiffs should amend only to the extent that they are able to resolve the claim-splitting problems outlined in this Opinion and Order.[9]

### III. Conclusion

For the foregoing reasons, the Complaint is dismissed without prejudice. The Court grants Plaintiffs leave to amend the Complaint. Any amended complaint must be filed within thirty days of this Opinion and Order. If Plaintiffs fail to file an amended complaint within thirty days or fail to obtain an extension of time to do so by that date, the Court will direct the Clerk of Court to close this case. The Clerk of Court is respectfully directed to terminate the motions pending at Docket Numbers 42, 49, and 63.

SO ORDERED.

Dated: September 29, 2024
     New York, New York

                                        JOHN P. CRONAN
                           United States District Judge

---

[9] For example, as discussed, the Complaint—over the objections of MIT—alleges that Azevedo was an employee of MIT and that his actions were taken in the course of that employment. *See supra* II.A.2. And for that reason, Plaintiffs' claims against Azevedo in the Complaint are duplicative of those alleged in *Marciniak I*.