**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------X

KAROLINA MARCINIAK-DOMINGUES
GONCALVES AGRA,

                    Plaintiff,

    v.                                  Civil Action No: 1:22-cv-10959-ALC

THE ROCKEFELLER UNIVERSITY,
FREDERICO AZEVEDO, WINRICH
FREIWALD

                    Defendants.

---------------------------------------------------------X


# PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER EX PARTE EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE

Karolina Agra
500 E 63rd St, Apt 13F
New York, 10065 NY
marciniak.kar@gmail.com
(646) 770 2045
PLAINTIFF PRO SE

1

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ....................……………………........................................... 1

**INTRODUCTION AND FACTUAL BACKGROUND** …………………………………............…. 2

**LEGAL STANDARD FOR A TEMPORARY RESTRAINING ORDER** ...........…………......…..... 5
I. THE GOVERNING THREE-FACTOR STANDARD FOR INTERIM INJUNCTIVE RELIEF …... 5
II. THE SLIDING SCALE OF IRREPARABLE HARM AND LIKELIHOOD OFSUCCESS .....…..…5
III. THE EX PARTE STANDARD ...................................................…………….…..................... 6
IV. THE EQUITABLE POWER OF THE COURT AND THE SPECIFICITY REQUIREMENT ......... 6
V. LIBERAL CONSTRUCTION OF PRO SESUBMISSION ...................................…………….….... 7

**ARGUMENT** ...........................................................................…......... 8

I. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HER GMVA CLAIM AGAINST
AZEVEDO ………………………………………………………………………………. 8
    A. This Court Has Jurisdiction Over Plaintiff's Claims Against Defendant Azevedo and
        Authority to Issue a Restraining Order .........................................……....... 8
        1. This Court Properly Exercises Supplemental Jurisdiction Over the GMVA Claim
            Against Azevedo .............................……………………….…....... 8
        2. This Court Has Personal Jurisdiction Over DefendantAzevedo ..........…….................. 9
    B. Overwhelming Evidence of Serial Sexual Assault and Harassment by Defendant
        Azevedo ……………………………………………………………………………. 9
        1. The Sexual Assaults Themselves Constitute Felonious Acts and Inherently
            Demonstrate Gender Animus .....................................................……... 10
        2. Azevedo's Admissions and Prior Bad Acts Prove Intent, Plan, and Absence of Mistake
            ………………………………………………………….......………………... 10
        3. Corroborative Victim Testimony Confirms a Pattern of Gender-Motivated
            Predation ...............……………………………………………………….…... 11
        4. Direct Evidence of Discriminatory Animus Underscores the Gender-Based
            Motive .......……………………………………………………….…..……... 11
        5. Objective Corroboration Validates the Seriousness of the Allegations .........…….... 11
    C. Defendant's Pattern of Post-Rejection Retaliation Confirms a Clear and Present Danger .... 12
    D. Conclusion on GMVA Likelihood of Success .............................……………………..... 12

II. PLAINTIFF WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN    INJUNCTION
………………………………………………………………………………..... 13
    A. The Trigger: The Lifting of the MBL Order as a Catastrophic Event Creating Imminent
        Crisis ………………………………………………………………………….….. 13
    B. The Medical Proof: Objective Evidence of a Life-Threatening Decompensation ....….…... 14
    C. The Ongoing Harassment: Weaponization of Judicial Processes as Active, Current Harm .. 14
    D. The Pattern of Violence: A History That Makes Fear of Future Harm Objectively Reasonable

………………………………………………………………………………………..... 15

E. The Chilling Effect: harm that poisons the judicial process itself ...................……............ 15

F. The Retaliatory Eviction Notice Itself Constitutes a Separate and Severe Irreparable Harm. 16

G. Conclusion on Irreparable Harm .......................................................................……............... 17

III. THE BALANCE OF HARDSHIPS TIPS DECIDEDLY IN PLAINTIFF'S FAVOR, AND AN INJUNCTION SERVES THE PUBLIC INTEREST ..................................................……....... 17

A. The Balance of Equities Tips Decidedly and Overwhelmingly in Plaintiff's Favor ............. 17

B. A Preliminary Injunction Is Vitally in the Public Interest .....…….............................. 18

IV. ROCKEFELLER UNIVERSITY'S DELIBERATE INDIFFERENCE CREATES A STATE-CREATED DANGER AND A CONSTITUTIONALLY COGNIZABLE CHILLING EFFECT ......... 18

A. Plaintiff's Reporting Was Protected Activity as a Private Citizen Acting on a Matter of Public Concern ....................................................................................……………....... 18

B. RU's Pattern of Deliberate Indifference and Bad Faith Constitutes a "State- Created Danger" and an Ongoing Violation ......................................................……………...... 19

C. RU's Retaliatory Conduct Has Created a Profound and Irreparable Chilling Effect ...…. .... 21

D. RU's Retaliatory Eviction is an Affirmative Act of Bad Faith and a State- Created Danger  22

V. THE REQUESTED RELIEF IS SPECIFIC AND NECESSARY TO PREVENT IRREPARABLE HARM ...……………………………………………………………………..... 22

A. Relief Against Defendant Azevedo: A Tailored Prohibition ......................……………...... 23

B. Affirmative Relief Against Defendant Rockefeller University: Mandating Protection ......... 23

**CONCLUSION AND PRAYER FOR RELIEF ......................................……….................. 23**

I. Against Defendant Frederico Azevedo, the Court should order: ......................……. 23

II. Against Defendant Rockefeller University, the Court should order: ...................……........ 24

III. Grant such other and further relief as the Court deems just and proper ............................. 25

## <u>TABLE OF AUTHORITIES</u>

## CASES

|  | Page |
|---|---|
| *Breest v. Haggis*, 180 A.D.3d 83 (1st Dep't 2019) | 10, 12 |
| *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342 (2d Cir. 2003) | 13, 16, 21 |
| *Calder v. Jones*, 465 U.S. 783 (1984) | 9 |
| *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30 (2d Cir. 2010) | 5,6 |
| *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114 (2d Cir. 2011) | 7 |
| *Conn. State Police Union v. Rovella*, 36 F.4th 54 (2d Cir. 2022) | 5 |
| *Cronkhite v. Kemp*, 741 F. Supp. 822 (E.D. Wash. 1989) | 16 |
| *Dakota Access, LLC v. Archambault*, 2016 WL 4734334 (D.N.D. Aug. 16, 2016) | 15 |
| *Doe v. Rensselaer Polytechnic Inst.*, 2020 WL 6544607 (N.D.N.Y. Nov. 6, 2020) | 5 |
| *Dwares v. City of N.Y.*, 985 F.2d 94 (2d Cir. 1993) | 14 |
| *Eckhart v. Fox News Network, LLC*, 2021 WL 4124616 (S.D.N.Y. Sept. 9, 2021) | 11 |
| *Elrod v. Burns*, 427 U.S. 347 (1976) | 16, 21 |
| *Erickson v. Pardus*, 551 U.S. 89 (2007) | 7 |
| *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110 (2d Cir. 2009) | 13 |
| *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112 (2d Cir. 2005) | 17 |
| *Grand River Enters. Six Nations, Ltd. v. Pryor*, 481 F.3d 60 (2d Cir. 2007) | 13 |
| *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155 (2d Cir. 1992) | 13 |
| *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945) | 9 |
| *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75 (2d Cir. 1990) | 6 |
| *Jugmohan v. Zola*, 2000 WL 222186 (S.D.N.Y. Feb. 10, 2000) | 10 |
| *Kamine/Besicorp Allegany L.P. v. Rochester Gas & Elec. Corp.*, 908 F. Supp. 1180 (W.D.N.Y. 1995) | 6 |
| *Mastrio v. Sebelius*, 768 F.3d 116 (2d Cir. 2014) | 7, 18 |
| *Matthews v. City of New York*, 779 F.3d 167 (2d Cir. 2015) | 19 |
| *Mullins v. City of New York*, 626 F.3d 47 (2d Cir. 2010) | 8, 13 |
| *Mullins v. City of New York*, 634 F. Supp. 2d 373 (S.D.N.Y. 2009) | 16 |
| *Munaf v. Geren*, 553 U.S. 674 (2008) | 5 |
| *Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127 (S.D.N.Y. 2016) | 8 |
| *Patsy's Ital. Res., Inc. v. Banas*, 658 F.3d 254 (2d Cir. 2011) | 7 |
| *People v. Empire Prop. Solutions, LLC*, 2012 NY Slip Op. 30346 (Sup. Ct. Nassau County Jan. 27, 2012) | 18 |
| *Solow v. Wellner*, 86 N.Y.2d 582 (1995) | 19 |
| *Strouchler v. Shah*, 891 F. Supp. 2d 504 (S.D.N.Y. 2012) | 22 |
| *Sutton v. Tapscott*, No. 22-2327 (2d Cir. 2024) | 9 |
| *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27 (2d Cir. 1995) | 18 |

| | **Page** |
|---|---|
| *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471 (2d Cir. 2006) | 7 |
| *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) | 6 |
| *Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) | 5 |

**STATUTES & RULES**

| | |
|---|---|
| 28 U.S.C. § 1331 | 8 |
| 28 U.S.C. § 1343 | 8 |
| 28 U.S.C. § 1367(a) | 8 |
| Fed. R. Civ. P. 65 | 7, 15, 23, 6 |
| Fed. R. Civ. P. 65(b)(1) | 6 |
| Fed. R. Civ. P. 65(d) | 7, 15, 23 |
| Fed. R. Evid. 404(b) | 10 |
| N.Y. CPLR § 302 | 9 |
| N.Y. CPLR § 302(a)(2) | 9 |
| N.Y. CPLR § 302(a)(3) | 9 |
| N.Y. CPLR 6301 | 16 |
| N.Y.C. Admin. Code § 8-902 | 12 |

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Dr. Karolina Agra respectfully requests this Court's immediate intervention to halt an escalating campaign of terror and protect her from a known serial sexual predator, Defendant Frederico Azevedo. The evidence attached to Plaintiff's Declaration ("Pl. Decl")—including Azevedo's own boast of a prior rape, corroborated by the victim herself; the testimony of multiple other women who endured nearly identical patterns of predation and post-rejection retaliation; and an active, multi-year criminal investigation by the Falmouth Police Department—paints an incontrovertible picture of a dangerous and repeat offender who operates with a sense of institutional impunity.

The recent lifting of the last institutional barrier—the Marine Biological Laboratory's ("MBL") no-contact order, revoked at Azevedo's own request—has triggered a severe, objectively documented medical and psychological crisis for Plaintiff. This act has simultaneously empowered Azevedo to weaponize this Court's own procedures to stalk and harass her directly. He is now a pro se litigant who was recently physically present in New York and who deliberately copies Plaintiff on court filings, forcing his presence into her personal inbox—a jarring, digital form of showing up at her door. Plaintiff has exhausted all other avenues of protection. The very institutions meant to safeguard her have instead engaged in a coordinated campaign of evasion and obstruction, making this Court the last remaining authority capable of preventing the imminent harm all others have enabled.

This institutional betrayal has now escalated to its most destructive extreme: in a blatant act of retaliation, Rockefeller University has served Plaintiff with a 90-day notice to terminate her tenancy. This action seeks to strip her of her home—her last refuge—at the precise moment she seeks this Court's protection, thereby actively manufacturing the very homelessness and vulnerability she asks the Court to prevent.

A restraining order is not merely a legal remedy; it is a medical necessity for Dr. Agra's survival.

Critically, Defendant Azevedo is now in default for failing to answer or otherwise respond to the Third Amended Complaint (ECF 147), and the Clerk has entered a Certificate of Default (ECF 160). His

default is not a mere procedural failure; it is a continuation of a years-long pattern of evasion and contempt for authority. This Court should not countenance his use of silence as a weapon. The requested restraining order is a necessary and immediate measure to protect Plaintiff from irreparable harm* while the Court considers Plaintiff's opposition to vacating the default and while Plaintiff prepares to seek a default judgment on the merits.

## INTRODUCTION AND FACTUAL BACKGROUND

The Third Amended Complaint ("TAC") and Plaintiff's supporting Declaration detail a harrowing years-long campaign of sexual violence, harassment, and institutional betrayal. The relevant facts pertaining to this motion are stark.

Plaintiff's ordeal began with two sexual assaults by Defendant Frederico Azevedo. The first occurred in August 2017 in a teaching assistant cottage in Woods Hole, Massachusetts (TAC ¶¶ 39-44; Pl. Decl. ¶ 4). The second assault took place in March 2018 in Plaintiff's own New York City apartment, a residence owned by her employer, Defendant Rockefeller University ("RU") (TAC ¶¶ 57-59; Pl. Decl. ¶ 8). It was during these assaults that Azevedo transmitted a cancer-linked strain of HPV to Plaintiff, as objectively documented by medical evidence (Pl. Decl. ¶ 4; ECF No. 193-1). During the second attack, he mockingly referenced her new health status, telling her, "Welcome to the population of people with STDs," an act that compounded the trauma of the sexual violence and foreshadowed the severe, years-long health complications that would follow (TAC ¶ 58; Pl. Decl. ¶ 8, ECF No. 193-1). Azevedo's presence in Plaintiff's home was itself intimidating and disruptive. His behavior was witnessed by Plaintiff's roommate, Ezgi Hacisuleyman, who swore under oath that Azevedo was "rude," "overbearing," spoke in a "condescending way," and was "controlling." Ms. Hacisuleyman found his conduct so objectionable that she specifically recalled a morning where she had to text Plaintiff to ask him to be quiet and respectful because he was being "inconsiderate and very loud." (Affidavit of Ezgi Hacisuleyman, ECF No. 193-3)

This violence was not an isolated 'he said/she said' incident but part of a serial pattern of predation.

7

Azevedo's conduct is overwhelmingly corroborated by: (1) his own admission of a prior rape, directly confirmed by the victim, Jane Doe 2 (Pl. Decl. ¶ 7; Ex. C); (2) the testimony of Jane Doe 3, who endured nearly identical patterns of unwanted sexual pressure and post-rejection retaliation (Pl. Decl. ¶ 9; Ex. B, E; ECF No. 193-4); (3) the cooperation of Jane Doe 2, Jane Doe 3 and other victims with law enforcement; and (4) an active, multi-year criminal investigation by the Falmouth Police Department which found sufficient probable cause to pursue charges against him (Pl. Decl. ¶ 7; Ex. D). This evidence paints an incontrovertible picture of a dangerous serial predator.

Azevedo's actions were enabled by a toxic environment within the federally funded CBMM program, administered by the Defendants and their affiliates. The program was characterized by a pervasive lack of oversight, alcohol abuse, and vulnerable housing arrangements that he exploited (Pl. Decl. ¶ 22; TAC ¶¶ 36, 64-66; Ex. I, J, K to Pl. Decl.). The complicity extended to individuals; another senior TA, Xavier Boix, was present in the cottage immediately after Plaintiff's rape and acted to normalize the violation (TAC ¶ 43; Pl. Decl. ¶ 21), and Freiwald dismissed Plaintiff's early complaint (TAC ¶ 49).

Upon reporting these assaults, Plaintiff faced a coordinated institutional runaround designed to evade accountability. MIT and Harvard concealed Azevedo's primary employment with Boston Children's Hospital and offloaded the complaint to the Marine Biological Laboratory (MBL)—an entity with no Title IX procedures—which conducted a sham investigation (TAC ¶¶ 77-81, 84). The MBL gave Azevedo Plaintiff's entire evidence dossier, refused to interview key witnesses, denied Plaintiff a right to appeal, and actively obstructed the parallel criminal investigation by refusing to cooperate with the Falmouth Police unless compelled by a court order (Pl. Decl., Ex. D., Falmouth Polce Emails, p.4).

Defendant Rockefeller University, in its dual role as Plaintiff's employer and landlord, demonstrated deliberate indifference and active bad faith. Despite explicit promises from Security Director James Rogers in June 2019 to implement protocols to monitor for Azevedo on campus after receiving his picture and description, no measures were ever enacted or communicated to Plaintiff, leaving her in a state of perpetual vulnerability (ECF No. 1 [Original Complaint] ¶¶ 236-239; Pl. Decl. ¶ 26). In a stark example of

institutional weaponization, RU's HR VP, Virginia Huffman, orchestrated a meeting where Security Officer Michael Murphy subjected Plaintiff to a traumatic re-interrogation about her police report, forcing her to utter the word "rape" in an institutional setting (Pl. Decl. ¶ 28; Original Complaint ¶¶ 359-367). After gathering the lead detective's contact information with an explicit promise to assist, the University completely ceased all communication after sending one cursory email, effectively sabotaging the early integration of new witness testimony and demonstrating a calculated effort to protect the institution over the victim (Pl. Decl. ¶ 28; Ex. L). This pattern of dismissal was further evidenced when Huffman later ignored formal complaints from Plaintiff and other female residents about a predatory professor, choosing to dismiss their validated safety concerns rather than address them (TAC ¶¶ 91-95; Pl. Decl. ¶ 27).

The already precarious situation catastrophically escalated on or about May 22, 2025, when the last institutional barrier—the MBL's No-Contact Order—was revoked upon Azevedo's own request (Pl. Decl. ¶¶ 7, 16-17, ECF No. 155, 166). The removal of this final vestige of protection triggered a severe psychological and medical crisis for Plaintiff, resulting in a documented "severe episode" of major depression, significant weight loss, and a hypertensive emergency requiring hospital evaluation (Pl. Decl. ¶¶ 36-41; Ex. G).

Most egregiously, on September 10, 2025, in a blatant act of retaliation, Defendant Rockefeller University served Plaintiff with a 90-Day Notice of Termination, demanding she vacate her university-owned apartment—her last refuge—by January 6, 2026 (Pl. Decl. ¶ 31-36; Ex. M). This action, coming after years of accepted tenancy and in the direct context of this litigation, is a calculated escalation designed to maximize Plaintiff's vulnerability and punish her for seeking justice.

Simultaneously, Azevedo has brazenly weaponized this Court's procedures to continue his campaign of harassment. After voluntarily submitting to this Court's jurisdiction for pro se ECF training in New York City on or about June 27, 2025 (ECF No. 168), he has initiated a campaign of abusive litigation tactics (Pl. Decl. ¶¶ 13-19). He systematically files documents with the Court while carbon-copying Plaintiff's personal email address on every submission, a calculated maneuver to force his presence directly into her inbox—a

digital space he previously violated. This is not a litigation strategy but a sophisticated form of indirect contact and intimidation designed to inflict psychological terror and surveil her responses, demonstrating his utter contempt for boundaries and the judicial process.

Plaintiff now stands completely exposed. She faces an imminent threat from a mobile, serial predator who has twice crossed state lines to assault her, weaponized a disease, and is now empowered by the removal of all institutional scrutiny. His recent physical presence in New York and his abuse of judicial process confirm his intent to continue his campaign of harassment and intimidation. The defendant institutions have proven not merely incapable, but actively unwilling to provide protection. A court-ordered restraining order is the only remaining mechanism to ensure Plaintiff's physical safety and psychological survival.

## **LEGAL STANDARD FOR A TEMPORARY RESTRAINING ORDER**

### **I.    THE GOVERNING THREE-FACTOR STANDARD FOR INTERIM INJUNCTIVE RELIEF**

A temporary restraining order is an "extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008), granted only upon a clear showing of (1) irreparable harm; (2) either a likelihood of success on the merits or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in the movant's favor; and (3) that the injunction is in the public interest. *See Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *Conn. State Police Union v. Rovella*, 36 F.4th 54, 62 (2d Cir. 2022). The standards for a TRO and a preliminary injunction are identical. *Doe v. Rensselaer Polytechnic Inst.*, 2020 WL 6544607, at *5* (N.D.N.Y. Nov. 6, 2020).

### **II.    THE SLIDING SCALE OF IRREPARABLE HARM AND LIKELIHOOD OF SUCCESS**

While each factor must be satisfied, they are not applied rigidly. The Second Circuit employs a "sliding scale" approach: "the gravity of a showing of irreparable harm varies inversely with the required

showing of likelihood of success." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). Stated plainly, "when the injury that allegedly will result if the restraining order is denied is very grave, less of a showing [of likely success] by the applicant is required." *Kamine/Besicorp Allegany L.P. v. Rochester Gas & Elec. Corp.*, 908 F. Supp. 1180, 1187 (W.D.N.Y. 1995). Where, as here, the movant faces an imminent threat of physical violence and severe psychological trauma —the quintessence of irreparable harm—the requisite showing on the merits may be satisfied by "sufficiently serious questions going to the merits" that are a "fair ground for litigation." *Citigroup*, 598 F.3d at 35.

### III.    THE EX PARTE STANDARD

This motion is brought, in part, *ex parte*—without prior notice to Defendant Azevedo. This imposes a "stricter standard," satisfied "only if: (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990) (quoting Fed. R. Civ. P. 65(b)(1)). *Ex parte* relief is thus appropriate only where prompt judicial intervention is necessary because the adversary cannot be contacted, "or when advance contact with the adversary would itself be likely to trigger irreparable injury." *Id.* Plaintiff's accompanying declaration provides the specific facts and compelling justification for this extraordinary request, demonstrating that any advance notice to a serial predator known for retaliation would likely precipitate the very harm this Court is asked to prevent (Pl. Decl. ¶ 3).

### IV.    THE EQUITABLE POWER OF THE COURT AND THE SPECIFICITY REQUIREMENT

This Court possesses broad equitable authority to "mould each decree to the necessities of the particular case." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). The relief sought here—a

prohibition on contact, harassment, and approach against Defendant Azevedo, and an affirmative injunction compelling Defendant Rockefeller University to fulfill its long-denied duty of protection—is a classic exercise of this power to halt a continuing violation and prevent future injury. This authority is tempered by the mandate of Federal Rule of Civil Procedure 65(d), which requires that an injunction "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document— the act or acts restrained or required." It must be "more specific than a simple command that the defendant obey the law." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011). The proposed order is meticulously crafted to meet this exacting standard, providing Defendant with unambiguous notice of the conduct from which he must refrain.

The requested injunction against Defendant Azevedo is **prohibitory** in nature; it does not alter the status quo but seeks to restore it by compelling him to cease his campaign of harassment and to reinstate the protective barrier removed by the MBL's actions. See Mastrio, 768 F.3d at 120. It is narrowly tailored to fit the specific violations alleged. Patsy's Ital. Res., Inc. v. Banas, 658 F.3d 254, 272 (2d Cir. 2011).

The requested injunction against Defendant Rockefeller University is **both prohibitory and affirmative** in nature. It prohibits RU from maintaining its policy of deliberate indifference and affirmatively compels it to finally implement the specific, concrete security measures it promised years ago. This relief is necessary to remedy an ongoing violation—RU's failure to act, which has affirmatively created a "state-created danger" and left Plaintiff exposed. Such affirmative injunctions are appropriate where, as here, a defendant's wrongful conduct is not merely a past act but a continuing omission that can only be halted by a court order mandating specific corrective action. The proposed order provides RU with a detailed and reasonable roadmap for compliance, thus satisfying the specificity requirements of Rule 65(d).

## V.    LIBERAL CONSTRUCTION OF PRO SE SUBMISSION

Finally, this motion is brought *pro se*. This Court must hold such submissions **"to less stringent standards than formal pleadings drafted by lawyers"** and must read them **"to raise the strongest arguments that they suggest."** *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006).

In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence." *Park Irmat Drug Corp. v. Optumrx, Inc*., 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016); see also *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010).

As detailed in the accompanying Declaration and verified pleadings, Plaintiff meets this demanding four factors standard required for a preliminary injunction or TRO. The imminent threat of physical and psychological harm is the epitome of irreparable injury. The overwhelming, corroborated evidence of Defendant's predatory pattern presents not merely "serious questions" but a compelling likelihood of success on the merits. The balance of hardships tips decisively in Plaintiff's favor, as an injunction merely requires Defendant to refrain from unlawful conduct he has no right to engage in, while denying it leaves Plaintiff exposed to imminent danger. Finally, the public interest is unequivocally served by preventing sexual violence, protecting victims, and upholding the integrity of the judicial process.

## ARGUMENT

### I.     PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HER GMVA CLAIM AGAINST AZEVEDO

#### A.     This Court Has Jurisdiction Over Plaintiff's Claims Against Defendant Azevedo and Authority to Issue a Restraining Order

##### 1.     *This Court Properly Exercises Supplemental Jurisdiction Over the GMVA Claim Against Azevedo.*

This Court has original jurisdiction over the federal Title VII claims against Defendants Rockefeller University and Winrich Freiwald. 28 U.S.C. §§ 1331, 1343. Supplemental jurisdiction over the pendant GMVA claim against Azevedo is proper under 28 U.S.C. § 1367(a) as all claims form part

of the same case or controversy, arising from a "common nucleus of operative fact." Azevedo's alleged

sexual assaults are the foundational predicate acts that directly triggered the subsequent Title VII

violations: they were the events reported to Freiwald, whose dismissal and harassment are core to the

hostile work environment claim (TAC ¶¶ 49, 82-83, 109-111); the resulting injuries impacted Plaintiff's

ability to work in New York (ECF 193, pp. 2-3); and Plaintiff's opposition to Azevedo's conduct was a

protected activity that spurred retaliation by Freiwald and RU —separate from and in addition to

Freiwald's own pattern of sexual harassment, including the ultimate termination of her employment (TAC

¶¶ 104, 136-137).

### 2.      This Court Has Personal Jurisdiction Over Defendant Azevedo.

Personal jurisdiction is established under N.Y. CPLR § 302. Under § 302(a)(2), jurisdiction

exists over a tortfeasor who commits a tortious act within the state, which is satisfied by the alleged

March 2018 sexual assault in Plaintiff's New York City apartment. (TAC ¶¶ 57-59). Under § 302(a)(3),

jurisdiction is also proper for the out-of-state Massachusetts assault, as it caused foreseeable, enduring

injury within New York to a known resident, including a high-risk HPV infection treated for years by

New York physicians and ongoing psychological trauma. (ECF 193, pp. 2-3; ECF 193-1); *Sutton v.*

*Tapscott*, No. 22-2327 (2d Cir. 2024).

Exercising jurisdiction comports with due process. Azevedo's deliberate travel to New York and

commission of an alleged tort here establish sufficient minimum contacts, and he should reasonably

anticipate being haled into court in this forum. *Calder v. Jones*, 465 U.S. 783, 789–90 (1984); *Int'l Shoe*

*Co. v. Washington*, 326 U.S. 310, 316 (1945).

Furthermore, Azevedo has waived any jurisdictional challenge. In the related *Marciniak II*

action (1:23-cv-10305-JPC), represented by counsel, he filed a Motion to Dismiss on the merits of the

identical GMVA claims without challenging personal jurisdiction. (ECF 64 in 1:23-cv-10305). This

conduct, including his in-person appearance in this District, constitutes a purposeful submission to the Court's authority.

**B.    Overwhelming Evidence of Serial Sexual Assault and Harassment by Defendant Azevedo.**

The record reveals a disturbing pattern of violent, non-consensual sexual acts and corroborative evidence that leaves no doubt as to Azevedo's motive and intent.

*1.    The Sexual Assaults Themselves Constitute Felonious Acts and Inherently Demonstrate Gender Animus*

Plaintiff's sworn testimony details two separate sexual assaults where she was awakened, repeatedly said "no," and was physically overpowered. This account alone establishes the predicate felony acts and directly rebuts any defense of consent. (Pl. Decl. ¶ 1, 5, 9). Critically, as the court in *Breest v. Haggis* held, "animus inheres where consent is absent," and "[c]oerced sexual activity is dehumanizing and fear-inducing." 180 A.D.3d 83, 94 (1st Dep't 2019). The very nature of these assaults—executed through coercive tactics of isolation, intimidation, and physical overpowering—demonstrates the requisite gender animus as a matter of law. *See also Jugmohan v. Zola*, 2000 WL 222186, at *2–4* (S.D.N.Y. Feb. 10, 2000). This pattern of intimidating and controlling behavior is further corroborated by the sworn affidavit of Ezgi Hacisuleyman, Plaintiff's former roommate, who witnessed Defendant Azevedo's rude, condescending, and disruptive conduct in the very apartment where the second assault occurred. *(See Affidavit of Ezgi Hacisuleyman, ECF No. 193-3, ¶¶ 5-7).* This evidence provides critical context, demonstrating a pattern of behavior that is entirely consistent with a individual who would disregard personal boundaries and commit the alleged assaults.

*2.    Azevedo's Admissions and Prior Bad Acts Prove Intent, Plan, and Absence of Mistake*

Azevedo's own written account of the initial assault is a critical admission that proves his awareness of Plaintiff's non-consent from the very beginning. In his 2019 position statement to MBL, Azevedo admits

that Plaintiff "categorically refused" his physical advances and that her reaction was a "body movement that [he] interpreted as a rejection," which caused him to feel uncomfortable and leave the room. (Pl. Decl. ¶ 5; Ex. B, Azevedo's Position Statement). This admission is devastating: it proves he was consciously aware that his advances were unwelcome, yet he deliberately chose to proceed with his assault. This pattern of testing boundaries and ignoring a clear and unwelcome rejection is the hallmark of a predatory mindset. This calculated disregard for consent is further evidenced by his explicit boast to Plaintiff about raping an unconscious woman—a damning admission that proves his specific modus operandi of targeting incapacitated women and his conscious disregard for consent, which he stated "does not matter." (Pl. Decl. ¶ 7; Ex. C). This prior bad act is directly admissible under Fed. R. Evid. 404(b) to prove his intent, plan, and the absence of mistake or accident in his assault on Plaintiff. These admissions are powerfully corroborated by the testimony of Jane Doe 1 and Jane Doe 2. (Pl. Decl. ¶¶ 6-7; Ex. A, C).

### 3.    *Corroborative Victim Testimony Confirms a Pattern of Gender-Motivated Predation*

The testimony of Jane Doe 3 confirms Azevedo's pattern of pressuring, isolating, and making unwanted sexual advances during the same CBMM Summer School. (Ex. B to Pl. Decl. (Jane Doe 3 Transcript at [00:10:00-00:12:00])). Her experience of his retaliatory hostility upon rejection further reveals a mindset that views women as objects to be conquered, and their autonomy as an affront to be punished. This pattern of behavior toward multiple women is precisely the type of evidence that confirms discriminatory animus. *See Eckhart v. Fox News Network, LLC*, 2021 WL 4124616, at *25* (S.D.N.Y. Sept. 9, 2021) (noting that allegations an assailant "acted inappropriately with and used degrading language toward other women" will likely suffice to establish animus).

### 4.    *Direct Evidence of Discriminatory Animus Underscores the Gender-Based Motive*

Azevedo's actions provide direct evidence of a discriminatory mindset. He cruelly weaponized a severe, biologically-gendered injury he inflicted upon Plaintiff—a high-risk HPV infection—by mockingly stating, "Welcome to the population of people with STDs." (Pl. Decl. ¶ 5,9; ECF 193, Ex. 1; Medical Records). This demonstrates a profound disregard for Plaintiff's bodily autonomy and health specifically as a woman. Furthermore, his use of his official role to engage in bigoted rhetoric, referring to himself as "Führer," and his use of ethnic slurs against Plaintiff, provide additional evidence of a hierarchical, dominant mindset that aligns with the gender animus inherent in his violent acts. (Pl. Decl. ¶ 10; See ECF No. 193-4, Exhibit 4, Fuhrer Whatsapp Logs.).

### 5. *Objective Corroboration Validates the Seriousness of the Allegations*

The multi-year Falmouth Police investigation, which found sufficient probable cause to pursue criminal charges against Azevedo, provides powerful, independent validation of the credibility of Plaintiff's allegations and the serious, criminal nature of the predicate acts. (Pl. Decl. Ex. D).

### C.     Defendant's Pattern of Post-Rejection Retaliation Confirms a Clear and Present Danger

Azevedo's behavior is defined by a pathological refusal to accept rejection, which makes Plaintiff's fear of imminent retaliation objectively reasonable. His own 2019 statement admits Plaintiff initially rebuffed his physical advance in Woods Hole. His subsequent actions—escalating sexual pressure, and after the assaults, sending intrusive messages like the June 2019 text, "I hope you are thinking about me and not about your stupid boyfriend"—were not romantic overtures but acts of intimidation designed to reassert control after final rejection (blocking on all platforms) (TAC ¶ 63, Pl. Decl. ¶11). This pattern is conclusively proven by the experience of Jane Doe 3, who testified that upon her rejection of his advances, Azevedo immediately retaliated by becoming rude, dismissive, and ignoring her professionally (Pl. Decl. Ex. B, p.9,[00:30:11.32] ). If he retaliates against a woman for a simple 'no,' his retaliation against Plaintiff —who accused him of rape and pursued a federal lawsuit—will be far more severe. This established modus

operandi transforms Plaintiff's fear from a subjective worry into an objective, reasonable prediction of imminent harm.

### D.    Conclusion on GMVA Likelihood of Success

The evidence against Defendant Azevedo is not merely compelling—it is overwhelming and corroborated from multiple independent sources, satisfying every element of the GMVA claim. His actions were conclusively motivated by gender animus. As held in *Breest v. Haggis*, 'animus inheres where consent is absent,' and the coercive, violent nature of Azevedo's acts is inherently 'dehumanizing and fear-inducing.' 180 A.D.3d at 94. His specific boasts, his weaponization of a biologically-gendered injury, and his history of degrading behavior toward women remove any conceivable doubt that these assaults were perpetrated **'because of gender… due, at least in part, to an animus based on the victim's gender.'** N.Y.C. Admin. Code § 8-902. Plaintiff has suffered profound physical and psychological injuries, including the diagnosed high-risk HPV infection and significant emotional trauma, satisfying the final element of the GMVA claim. (Pl. Decl. ¶ 5,9; ECF 193, Ex. 1; Medical Records).

**Furthermore, Azevedo's default for failing to answer the TAC (ECF 147) is a concession of these well-pleaded allegations.** By failing to respond, he has admitted the factual basis for the Court's personal jurisdiction and the merits of the GMVA claim. *See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992). Therefore, Plaintiff's likelihood of success on the merits against Defendant Azevedo is not just high; it is virtually certain.

## II.    PLAINTIFF WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION

The requirement of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). Such harm must be "actual and imminent, not remote or speculative," and of a nature that "cannot be remedied by an award of monetary damages." *Grand River Enters. Six Nations, Ltd. v. Pryor*, 481 F.3d 60,

66 (2d Cir. 2007). Threats to physical safety, severe psychological trauma, and the chilling of protected rights are quintessential forms of irreparable harm. *See Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010); *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349 (2d Cir. 2003).

Here, the harm is not only imminent; it is ongoing, escalating, and by its very nature, irreparable. The threat posed by Defendant Azevedo—a serial sexual predator with a demonstrated history of violence, intimidation, and retaliation—creates a present and intolerable reality for Plaintiff that satisfies this critical prerequisite. The recent dissolution of institutional protections and Azevedo's weaponization of this Court's processes have catastrophically altered the status quo, leaving Plaintiff completely exposed and triggering a severe medical and psychological crisis (Pl. Decl. 37-42, Ex.G Medical Record).

### A.    The Trigger: The Lifting of the MBL Order as a Catastrophic Event Creating Imminent Crisis.

The precipitating event for this immediate emergency was the lifting of the last institutional barrier —the Marine Biological Laboratory's (MBL) no-contact order—at Defendant Azevedo's request on or about May 21, 2025. (Pl. Decl. ¶ 17). This was not a passive administrative act; it was a calculated maneuver by Azevedo that "fundamentally alter[ed] the status quo to [Plaintiff's] severe detriment." *Dwares v. City of N.Y.*, 985 F.2d 94, 99 (2d Cir. 1993). The elimination of this final vestige of protection signals to a manipulative individual that all oversight is gone, thereby "affirmatively enhancing [Plaintiff's] vulnerability." *Id.* For years, this order functioned as a critical "security blanket"; its removal sent a devastating message that Plaintiff has been officially abandoned to face a known predator alone and unprotected. (Pl. Decl. 37-42, Ex.G Medical Record).

### B.    The Medical Proof: Objective Evidence of a Life-Threatening Decompensation.

As detailed in Plaintiff's Declaration (¶¶ 36-42, Ex. G), the lifting of the MBL order triggered an immediate and severe medical crisis, objectively documented by her physicians. This includes a 'severe

episode' of major depression, rapid and dangerous weight loss (from 143 lbs. to 116.84 lbs.), a stress-related corneal abrasion requiring ER evaluation, and a hypertensive crisis (170/108). This proves the absence of a court order is itself a source of life-threatening harm, making the requested relief a **medical necessity**.

### C.     The Ongoing Harassment: Weaponization of Judicial Processes as Active, Current Harm.

Simultaneously, Defendant Azevedo has brazenly weaponized this Court's procedures to continue his campaign of harassment, demonstrating that the threat is not theoretical but active and ongoing. As detailed in the Declaration (Pl. Decl. ¶¶ 14-20, Ex. F), since being granted ECF access, he has initiated a campaign of abusive litigation tactics. He systematically files documents with the Court while carbon-copying Plaintiff's personal email address on every submission. This is not a good-faith litigation strategy; it is **a calculated form of indirect contact and intimidation**. Each email from his MIT account is a traumatic trigger, a jarring intrusion into a digital space he previously violated, serving as a constant reminder of his presence and his refusal to abide by boundaries. This conduct proves he is actively engaged in harassment and is willing to exploit any tool, including the Court itself, to cause distress. See generally Fed. R. Civ. P. 65(d).

### D.     The Pattern of Violence: A History That Makes Fear of Future Harm Objectively Reasonable.

Defendant's established modus operandi confirms the imminent threat of physical harm. He has a documented history of leveraging professional pretexts for predation, including crossing state lines to access and assault Plaintiff (MA in 2017, NY in 2018). His recent physical presence in New York for ECF training shatters the last geographical safety barrier (ECF No. 168). His pattern of behavior leaves no doubt as to his intent and makes Plaintiff's fear objectively reasonable: (i) direct threats: He explicitly threatened that he would "not take [Plaintiff's] actions lightly" if she continued her complaints (TAC ¶ 81; Pl. Decl. ¶

10, Ex. B); (ii) pattern of retaliation: The testimony of Jane Doe 3 corroborates his modus operandi of punishing women who reject him, making Plaintiff's fear—after accusing him of rape and filing a federal lawsuit—objectively reasonable (Pl. Decl. ¶ 10-13; Ex. B, E); (ii) escalating conduct: His actions have progressed from sexual violence to threats to the sophisticated weaponization of court procedures, demonstrating an escalating campaign of coercion. Being forced to live under this credible threat of violence is the definition of irreparable harm. Plaintiff is now forced to exist in a state of perpetual hypervigilance, under the constant threat that a man who has twice sexually assaulted her, threatened her, and now stalks her through legal filings, has unrestricted access to her city. This profound and ongoing injury cannot be remedied by a final monetary judgment. See, e.g., *Dakota Access, LLC v. Archambault*, 2016 WL 4734334, at *5 (D.N.D. Aug. 16, 2016).

### E.    The Chilling Effect: harm that poisons the judicial process itself.

The harm here is irreparable because it poisons the entire litigation. Azevedo's actions, coupled with the institutional defendants' deliberate indifference, have created a profound chilling effect that stifles justice: (I) **Witness Intimidation:** As in *Mullins v. City of New York*, 634 F. Supp. 2d 373, 387 (S.D.N.Y. 2009), witness intimidation constitutes irreparable harm that corrupts ongoing proceedings. Plaintiff's declaration confirms that witnesses who provided information in 2019-2020 now refuse to give formal affidavits or testify, "explicitly citing fear of retaliation from MIT, RU, and CBMM." This has "irreparably corrupted the fact-finding process of this litigation."; (ii) **Chilling of Protected Rights:** The Defendants' retaliatory conduct has created a "deep freeze on speech" within the academic community, teaching potential victims that reporting leads to professional suicide and weaponized healthcare. This chilling effect on First Amendment rights is, in itself, a quintessential irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Bronx Household,* 331 F.3d at 349; (iii) **The Violation of Plaintiff's Rights Would Render a Final Judgment Ineffectual.** Under New York law, a preliminary injunction is warranted where a defendant "threatens or is about to do … an act in violation of the plaintiff's rights" that would "render the judgment

ineffectual." CPLR 6301. Defendant Azevedo's continued freedom to harass, intimidate, and threaten Plaintiff does precisely that. Each act of intimidation further traumatizes Plaintiff and undermines her ability to participate fully and safely in this litigation.

### F.    The Retaliatory Eviction Notice Itself Constitutes a Separate and Severe Irreparable Harm.

The threat of losing one's home is a classic and profound irreparable injury. As the court held in *Cronkhite v. Kemp*, 741 F. Supp. 822, 825 (E.D. Wash. 1989), the loss of a home through a foreclosure proceeding—which extinguishes the owner's equity and right of possession—constitutes irreparable harm. Here, Defendant Rockefeller University's 90-Day Notice of Termination (Pl. Decl. ¶ 31; Ex. M), served on September 10, 2025, is the functional equivalent of a retaliatory foreclosure on Plaintiff's tenancy. It is an act designed to strip her of her last refuge and the security of her home. The severe depression, dangerous weight loss, and hypertensive crisis triggered by the mere *fear* of being exposed to Azevedo would be drastically and irrevocably compounded by the concrete reality of being forced from her home (Pl. Decl. ¶¶ 36-39; Ex. G) . RU's action thus actively manufactures the very homelessness and exposure to harm that this Court's intervention seeks to prevent, constituting an extreme and independent irreparable injury (See Pl. Decl. 32-36).

### G. Conclusion on Irreparable Harm

Plaintiff's harm is "actual and imminent." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005). The irreparable harm facing Plaintiff is not a future possibility; it is a present and escalating reality, meticulously documented and overwhelmingly proven. **First**, the objective medical evidence is dispositive: the lifting of the last protective barrier directly triggered a life-threatening physiological crisis, including a hypertensive emergency and dangerous weight loss, confirming that the absence of a court order is itself a source of imminent, bodily harm. **Second**, Defendant Rockefeller University's retaliatory eviction notice actively manufactures a state of catastrophic vulnerability, seeking to render Plaintiff homeless and

exponentially more accessible to her predator—a harm akin to foreclosure, which courts have long recognized as irreparable. **Third**, Defendant Azevedo's sophisticated weaponization of this Court's procedures—transforming its filing system into a direct vector for harassment—proves the threat is not merely physical but a relentless campaign of psychological terror designed to paralyze her and corrupt these very proceedings.

### III.      THE BALANCE OF HARDSHIPS TIPS DECIDEDLY IN PLAINTIFF'S FAVOR, AND AN INJUNCTION SERVES THE PUBLIC INTEREST

#### A.      The Balance of Equities Tips Decidedly and Overwhelmingly in Plaintiff's Favor

The balance of hardships is starkly asymmetrical. As established in the Irreparable Harm section *supra*, Plaintiff faces imminent and severe dangers: physical and psychological terror from her predator, a life-threatening medical crisis, and retaliatory homelessness. The hardship to Plaintiff without an injunction is the certain escalation of this campaign of terror. Conversely, the hardship to Defendants is negligible. **As to Defendant Azevedo,** an injunction merely orders him to refrain from illegal conduct like stalking and harassment. **"The hardship to a defendant of being enjoined from activities that are... illegal is not compelling."** *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 39 (2d Cir. 1995). **As to Defendant Rockefeller University,** an injunction compels it only to fulfill the basic legal duties it has long promised and then abandoned, and to cease its retaliatory eviction effort. Granting a TRO would restore the *status quo ante bellum*—defined as **"the last actual, peaceable uncontested status which preceded the pending controversy"**—which here was a state where Plaintiff, however precariously, had some institutional barriers against her assailant and was not under an active eviction notice designed to maximize her vulnerability. *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014).

#### B.      A Preliminary Injunction Is Vitally in the Public Interest

The public interest compellingly favors granting the injunction. This serves the public's interest in: (1) preventing sexual violence and protecting victims; (2) upholding the integrity of judicial proceedings by

ensuring they are not weaponized for harassment; (3) compelling powerful institutions to be held accountable for their duties of care; and (4) deterring retaliation against whistleblowers who report misconduct, ensuring others are not chilled from coming forward. Where, as here, the injury to be enjoined is from persistent illegal and predatory acts, **'the irreparable injury to be enjoined is an injury to the public.'** *People v. Empire Prop. Solutions, LLC*, 2012 NY Slip Op. 30346, at *4 (Sup. Ct. Nassau County Jan. 27, 2012).*

## IV. ROCKEFELLER UNIVERSITY'S DELIBERATE INDIFFERENCE CREATES A STATE-CREATED DANGER AND A CONSTITUTIONALLY COGNIZABLE CHILLING EFFECT

### A. Plaintiff's Reporting Was Protected Activity as a Private Citizen Acting on a Matter of Public Concern.

Plaintiff's reporting of Azevedo's serial predation and the institutional cover-up was not undertaken pursuant to her official duties as a scientist. Rather, she acted as a private citizen on a matter of profound public concern: the systemic enablement of sexual violence within federally funded academic programs (CBMM) and the protection of women in science. This fundamental distinction is critical and finds direct support in *Garcetti and Matthews v. City of New York,* 779 F.3d 167 (2d Cir. 2015). In *Matthews,* a police officer's speech about a precinct-wide quota policy was deemed citizen speech because it was "neither part of his job description nor part of the practical reality of his everyday work." 779 F.3d at 174. Similarly, Plaintiff's duty as a Teaching Assistant was to support research and education, not to act as a private investigator or institutional whistleblower against a powerful consortium of universities. Her decision to file internal complaints and later a police report was a choice any citizen could and should make when confronting criminal conduct and institutional corruption. She acted out of a moral and civic obligation to protect other women from a known predator, a matter of urgent public safety that transcends any professional responsibility. By leveraging her position within the program to uncover the truth, she utilized

24

a "citizen analogue," much like the plaintiffs in *Bloomberg* and *Matthews*, who reported through internal channels also theoretically available to the public.

**B.    RU's Pattern of Deliberate Indifference and Bad Faith Constitutes a "State-Created Danger" and an Ongoing Violation.**

Rockefeller University's duty to protect Plaintiff from a known danger originated in its role as her employer. This duty was not extinguished upon her wrongful termination; instead, it was assumed and heightened by its ongoing role as her landlord. Plaintiff's lease, like all residential leases under New York law, contained an implied warranty of habitability, which requires that "occupants will not be subjected to conditions that are dangerous, hazardous or detrimental to their life, health or safety." *Solow v. Wellner*, 86 N.Y.2d 582, 587–88 (1995). Despite the expiration of her formal lease, RU's acceptance of rent and acquiescence to her occupancy establishes a tenancy at sufferance, reinforcing its legal duties—including the warranty of habitability and the duty to protect a tenant from foreseeable dangers. *Burgos*, 92 N.Y.2d at 548. Thus, RU's dual role creates an inescapable obligation to ensure her safety within her own home.

RU's Security Director, James Rogers, and HR VP, Virginia Huffman, had specific, detailed knowledge of the credible threat Azevedo posed, receiving his photograph and description with explicit promises of protection, as detailed in the Original Complaint (ECF No. 1, ¶¶ 238-239). Instead of acting, RU engaged in a pattern of deliberate indifference and active obstruction. As set forth in Plaintiff's Declaration (¶ 26), Rogers never implemented the promised security protocols or even communicated their existence, leaving Plaintiff in a state of heightened vulnerability. Furthermore, Huffman orchestrated a bad-faith intervention, using RU Security Officer Michael Murphy to re-traumatize Plaintiff under the guise of "helping" her police investigation, only to gather information and then completely cease communication, effectively sabotaging the timely integration of new witness testimony, as further detailed in the Complaint (¶¶ 361-362) and Plaintiff's Declaration (¶¶ 28-29; Ex.

K). This pattern of institutional intimidation is further evidenced by RU's handling of a separate housing complaint, where Huffman dismissed multiple women's concerns about a predatory professor, demonstrating a standard operating procedure of deflection and intimidation rather than protection, as alleged in the TAC (¶¶ 91-94).

This conduct is not mere negligence; it is an ongoing violation that perpetuates a "state-created danger." By affirmatively promising protection and then withholding it, RU left Plaintiff more exposed and vulnerable than if it had done nothing at all. Every day she resides and works on campus without knowing if security measures are in place constitutes a new instance of this deliberate indifference, exacerbating her PTSD and directly causing the documented medical crisis—including severe depression, weight loss, hypertension, and a corneal abrasion emergency—that followed the lifting of the last external barrier, the MBL order, as objectively documented in Plaintiff's Declaration (¶¶ 30, 37-39; Ex. G).

### C.    RU's Retaliatory Conduct Has Created a Profound and Irreparable Chilling Effect.

The harm inflicted extends far beyond the Plaintiff, poisoning the very well of the institutional environment and creating a pervasive chilling effect that stifles protected activity. This Court has consistently recognized that such a systemic silencing is, in itself, a quintessential and irreparable harm. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349 (2d Cir. 2003). The striking parallels to *Bloomberg v. NYC Department of Education* are legally dispositive, as that court found the initiation of an investigatory process against a principal for anti-racist activism created a "deep freeze on speech" where teachers were "afraid to speak out," "self-censored" their lessons, and were "too afraid to submit affidavits" in her support—a chilling effect constituting irreparable harm as the damage "will be irreparable and will not be able to be remediated by an award of damages."

Here, RU's conduct has triggered an identical and devastating chilling effect, manifesting in two particularly grievous ways.

First, the University's retaliatory response to Plaintiff's reports—comprising broken promises, weaponized HR meetings, and her ultimate termination (TAC ¶¶ 77-80, 119, 136) —broadcasts a unequivocal message to every employee that reporting sexual assault is an act of professional suicide. This is not mere speculation; it is proven by the fact that witnesses who previously provided information now refuse to give formal affidavits or testify, explicitly citing a well-founded fear of retaliation from the perpetrators and the institutional defendants (TAC ¶ 88; Plaintiff's Declaration, ¶ 14) . This direct evidence demonstrates that RU's actions have already irreparably corrupted the fact-finding process of this litigation, rendering a fair trial impossible when witnesses are terrified to participate.

Second, and in a particularly egregious act of retaliation, the University, through Huffman, perverted the very notion of sanctuary by referring Plaintiff to a therapist who reported her confidential disclosures back to HR (TAC ¶ 79). This transformed a haven for healing into an instrument of surveillance, creating a separate and profound chilling effect that reinforces the hostile environment. Now, no employee can safely seek therapeutic care for workplace trauma, laboring under the fear that their most private vulnerabilities will be weaponized against them. This profound violation of trust inflicts an irreparable harm upon the entire institutional community. As the court held in *Strouchler v. Shah*, 891 F. Supp. 2d 504, 522 (S.D.N.Y. 2012), 'the mere threat of a loss of medical care . . . even if never realized, constitutes irreparable harm.' This chilling effect is the direct and intended consequence of the alleged retaliation. No amount of monetary damages can possibly rectify this systemic silencing or restore the sense of security essential for Plaintiff's health and for a fair judicial process.

**D.     RU's Retaliatory Eviction is an Affirmative Act of Bad Faith and a State-Created Danger.**

Defendant Rockefeller University's retaliatory 90-day eviction notice is not a routine landlord-tenant action but a deliberate act of institutional bad faith designed to maximize Plaintiff's vulnerability. As detailed in the Declaration (¶¶ 31–36), this move weaponizes Plaintiff's housing status to punish her for pursuing this litigation, knowing full well that rendering her homeless would drastically increase her exposure to a known sexual predator. This constitutes the ultimate act of deliberate indifference, affirmatively creating a state-created danger that compounds the irreparable harm previously established—leaving Plaintiff not only unprotected but actively thrust into a position of extreme peril.

## V.     THE REQUESTED RELIEF IS SPECIFIC AND NECESSARY TO PREVENT IRREPARABLE HARM.

An injunction must "state its terms specifically" and "describe in reasonable detail… the act or acts restrained or required." Fed. R. Civ. P. 65(d). The relief requested is meticulously tailored to this standard, providing Defendants with unambiguous notice. It constitutes the minimum necessary intervention to halt the ongoing violations and prevent the imminent, irreparable harm detailed *supra*.

### A.     Relief Against Defendant Azevedo: A Tailored Prohibition

The order against Defendant Azevedo must be specifically calibrated to his pattern of trans-jurisdictional predation and sophisticated harassment. The requested provisions—including a comprehensive no-contact order, geographic restrictions around Plaintiff's home and professional forums, and a prohibition on witness intimidation—are essential to neutralize his documented tactics of ambush, intimidation, and obstruction of justice.

### B.     Affirmative Relief Against Defendant Rockefeller University: Mandating Protection

The injunction against Rockefeller University ("RU") must be affirmative to remedy its ongoing violation of deliberate indifference. Arising from its dual role as employer and landlord, RU's duty

requires the Court to mandate specific, immediate actions. The requested orders to implement a security protocol, designate a single point of contact, and provide sworn confirmation are the only mechanisms to rectify RU's bad-faith inaction and dissolve the state-made danger it has created.

This tailored relief is both specific and necessary to provide Plaintiff the protection she has been denied and to prevent further irreparable harm.

## CONCLUSION AND PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff respectfully requests that this Court issue an Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction that:

**I.     Against Defendant Frederico Azevedo, the Court should order:**

1. That Defendant Azevedo is immediately restrained and enjoined from contacting, harassing, intimidating, surveilling, or interfering with Plaintiff Karolina Agra, directly or indirectly, through any means including but not limited to in-person contact, telephone, electronic mail, social media, or through third parties.

2. That Defendant Azevedo is immediately restrained from coming within **500 feet** of: (a) Plaintiff's residence at 500 E 63rd Street, Apt 13F, New York, NY; (b) Plaintiff's person; and (c) any vehicle owned or operated by Plaintiff.

3. That Defendant Azevedo is specifically prohibited from carbon-copying (Cc'ing) Plaintiff's personal email address (marciniak.kar@gmail.com ) on any communication or filing with this Court. All communications shall be made solely through the Court's official ECF system, which provides automatic, non-intrusive notice.

4. That for any mandatory in-person court proceeding, Defendant Azevedo shall be required to provide the Court and Plaintiff's notice email (**karolina.marciniak.agra@gmail.com** ) with **at least 72 hours' advance notice** of his intent to be physically present. The Court may then make appropriate security arrangements to ensure the parties have no contact and that Plaintiff's safety is maintained within the courthouse.

**II.     Against Defendant Rockefeller University, the Court should order:**

1. That Defendant RU is immediately compelled to **WITHDRAW its 90-day notice of termination** (Exhibit M to Pl. Decl.) and cease all efforts to evict Plaintiff from her home during the pendency of this action.

2. That Defendant RU must, within 48 hours of this Order, implement and provide Plaintiff with a **written safety plan** that includes:

   - Distributing Defendant Azevedo's photograph and description to all campus security personnel with a directive to deny him entry to any RU property and to detain him for trespassing if he attempts to enter.

   - Designating a single point of contact within RU Security for Plaintiff to report any security concerns related to this Order.

3. That the Court schedules a prompt hearing to show cause why a preliminary injunction, extending these protections for the duration of this litigation, should not be issued.

**III.**     Grant such other and further relief as the Court deems just and proper to prevent the imminent and irreparable harm detailed herein.

Dated: New York, New York
September 15, 2025

Respectfully submitted,

Karolina Marciniak-Domingues Goncalves Agra

_Karolina Agra_
_____
500 E 63rd St, Apt 13F
New York, 10065 NY
marciniak.kar@gmail.com
(646) 770 2045
PLAINTIFF _PRO SE_