Karolina Agra
500 E 63rd St, Apt 13F
New York, 10065 NY
marciniak.kar@gmail.com
(646) 770 2045
PLAINTIFF PRO SE

1

UNITED STATES DISTRICT COURT
  SOUTHERN DISTRICT OF NEW YORK
  ----------------------------------------------------------X
   KAROLINA MARCINIAK-DOMINGUES
   GONCALVES AGRA,
                                  Plaintiff,
        v.
   THE ROCKEFELLER UNIVERSITY,                Civil Action No: 1:22-cv-10959-ALC
   FREDERICO AZEVEDO, WINRICH
   FREIWALD
                                  Defendants.
  ----------------------------------------------------------X

### PLAINTIFF'S DECLARATION IN SUPPORT OF HER EX PARTE EMERGENCY MOTION FOR ORDER TO SHOW CAUSE FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AGAINST DEFENDANTS FREDERICO AZEVEDO AND ROCKEFELLER UNIVERSITY

I, Dr. Karolina Marciniak-Domingues Goncalves Agra, residing at 500 E 63rd Street, Apt. 13F, New York, NY 10065, Plaintiff *pro se* in the above-captioned action, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 and the laws of the State of New York as follows:

## I.     Introduction & The Imminent Crisis

1. I respectfully seek this Court's immediate intervention to issue a Temporary Restraining Order against Defendants Frederico Azevedo ("Azevedo") and Rockefeller University ("RU"). The recent lifting of the last institutional barrier—the Marine Biological Laboratory's (MBL) no-

contact order on or about May 21, 2025—has created an imminent and catastrophic crisis. I am now completely exposed to a known serial sexual predator who has assaulted me on two separate occasions, weaponized an STD against me, and engaged in a relentless campaign of intimidation and retaliation. Without this Court's order, I will suffer irreparable harm, including continued psychological decompensation and a substantial likelihood of further harassment and physical danger.

2. This motion is necessitated by the coordinated and escalating threat posed by both Defendants. Defendant Azevedo, a known serial predator, now weaponizes this Court's procedures to continue his campaign of harassment and intimidation, forcing direct contact through abusive litigation tactics. Simultaneously, Defendant Rockefeller University, my former employer (from which I was terminated in retaliation for reporting these assaults) and current landlord, has demonstrated a years-long pattern of deliberate indifference and active bad faith, culminating in a retaliatory eviction notice designed to strip me of my last refuge and maximize my vulnerability. **Together, their actions create an institution-created danger,** leaving me completely exposed and unprotected from imminent and irreparable harm.

3. I respectfully request that this Motion be considered ex parte, without prior notice to Defendant Azevedo. Providing him with advance notice of this application for a restraining order would likely trigger the very irreparable harm this Court is asked to prevent. As detailed herein, Defendant Azevedo has a documented and violent pattern of retaliating against rejection and escalation in response to attempts to hold him accountable. His explicit threat, 'I will not take her actions lightly,' made in response to my prior reports, and his current campaign of harassing me through this Court's filing system, provide a reasonable basis to fear that advance notice of this Motion would provoke an immediate and dangerous escalation of stalking, intimidation, or physical violence against me.

## II. Azevedo's Pattern of Predation and Retaliation

4. I am requesting a restraining order because I have a reasonable fear of Azevedo based on his aggressive and threatening behavior in response to me cutting off contact with him and reporting his assault. This fear is based on a pattern of behavior, including his own admissions.

5. Defendant Azevedo is a serial predator whose modus operandi is to target junior female scientists, assault them, and punish them for rejection. The assault in Woods Hole was the foundational act of a broader pattern of discriminatory and retaliatory animus, where Azevedo established his method of isolation and inflicted a severe biological injury upon me—an HPV infection directly linked to an increased risk of cancer. This is corroborated by objective medical evidence **(See ECF No. 193-1, Exhibit 1, Medical Records**).

6. Azevedo's predatory conduct began with calculated grooming tactics designed to create opportunities for assault and to neutralize suspicion. A key part of this strategy was the fabrication of a false, pre-existing relationship to explain his inappropriate access to me. **Azevedo systematically told other CBMM participants that I was his 'old friend from Tuebingen.' This claim was a complete and strategic lie;** we had no prior acquaintance whatsoever **(Complaint, ¶ 116; TAC ¶ 36)**. **This deceptive tactic is directly corroborated by Jane Doe 1**, who confirmed in her email statement that *'Azevedo was saying that you were his old friend from Tuebingen'* **(See Exhibit A: Jane Doe 1 Email)**. This evidence demonstrates that Azevedo's manipulations were deliberate and sophisticated, aimed at isolating me and making his subsequent assault appear consensual to outsiders.

7. In his written statement to MBL in 2019, Azevedo himself admits that I explicitly rejected his physical advances (TAC ¶ 39: 'Azevedo intended to stay, I cathegorically refused'). He describes attempting to hug me and states that my reaction was 'a body movement that [he]

3

interpreted as a rejection,' which caused him to feel uncomfortable and leave the room. **(See Exhibit B, Azevedo's Position Statement**). This admission is critical: it proves Azevedo was aware of my non-consent from the very beginning, yet he deliberately chose to proceed. His account exemplifies a predatory pattern of targeting a vulnerable individual, testing boundaries, and ignoring a clear and unwelcome rejection.

8. After I confronted him about the rape, he explicitly boasted to me about raping an unconscious woman, an admission directly corroborated by the victim herself, identified as **Jane Doe 2,** who confirmed, '*What you told me happened to me as well'* **(See Ex. C, Email from Jane Doe 2).** His behavior is so egregious that **Jane Doe 2**, and other victims of his sexual predatory conduct, including **Jane Doe 3** (see below), cooperated with the Falmouth Police Department with their testimonies, confirming he is the subject of an active, multi-year criminal investigation. **(See Ex. D, Falmouth Police Emails, The Falmouth Police Felony Incident #: 19-7622-OF Report, and NYPD Complaint #: 2022-019-008886 Report).**

9. During the March 2018 assault in my New York apartment, I rejected him. While crying, I confronted him about transmitting cancer-linked HPV to me during the 2017 rape. In response, he sexually assaulted me again and mocked my health status, stating, '*Welcome to the population of people with an STD'* (TAC ¶ 57-8). This confirmed my growing fear that his conduct was not isolated and that he posed a similar health threat to other women.

10. The threatening and controlling nature of Defendant Azevedo's presence in my home is directly corroborated by my former roommate, Ezgi Hacisuleyman. In her sworn affidavit, she confirms that Azevedo was "rude," "overbearing," "spoke in a condescending way," and was "controlling" during his visits to our shared Rockefeller University apartment. She specifically recalls a morning where she had to text me to ask him to be quiet and respectful because he was being "inconsiderate and very loud." Ms. Hacisuleyman's independent account validates my

experience of his intimidating and disrespectful behavior within the home that he violated through sexual assault. (See Affidavit of Ezgi Hacisuleyman, ECF No.193-3, ¶¶ 5-7).

11. When I refused any further physical contact, his response was to intensify his efforts to maintain control through his professional capacity as a CBMM coordinator (See ECF No. 193-2, Exhibit 2, S**ullivan CBMM Manager /Freiwald Email**.). In May 2018, he added me to a WhatsApp group for a retreat game where he immediately began using hateful Nazi rhetoric, referring to himself and others as 'Führer.' (TAC ¶ 61**;** See ECF No. 193-4, Exhibit 4, **Fuhrer Whatsapp Logs**) Later, at an MIT conference, he approached me uninvited in a corridor and demanded I break up with my boyfriend to enable his inappropriate conduct towards students during an official CBMM retreat (TAC ¶ 62). When I refused, he retaliated by publicly demeaning my Polish heritage. In June 2018, he sent the message: '*I hope you are thinking about me and not about your stupid boyfriend* '(TAC ¶ 63). This pattern of lashing out after rejection is confirmed by **Jane Doe 3,** whom Azevedo professionally retaliated against after she simply rejected his sexual advances (**Exh. E, Transcript of January 15, 2020 Phone Call Between Plaintiff and Jane Doe 3**). If he retaliates against a woman for a 'no,' his retaliation against me for accusing him of rape will be far more severe.

12. This pattern of bigoted and retaliatory behavior, intertwined with his sexual violence, constitutes a clear and dangerous gender-based animus. My fear is therefore not hypothetical. I did not merely reject his advances; I accused him of rape. The June 2018 message he sent, *'I hope you are thinking about me and not about your stupid boyfriend,'* (TAC ¶ 63) was not a joke. It was an unwelcome, intimidating intrusion from a man who had already violently violated my boundaries—a stark reminder of his sense of entitlement and his refusal to accept that I had ended all contact. This is the behavior I fear now more than ever, especially with all institutional barriers removed. His threat in his MBL statement—'*I will not take her actions*

5

*lightly*' —was a direct response to my pursuit of justice (TAC ¶ 81; **Exh. B**; **Excerpts from Azevedo's 2019 Position Statement**). I am certain he intends to make good on that threat now that the MBL order is lifted and he has direct access to me through this Court's proceedings.

13. I interpret these statements as direct threats intended to intimidate me into silence. Given that he has already admitted to ignoring my rejection of his advance, I fear that he is capable of escalating his retaliation to protect his career and reputation, as he stated. His threats cause me significant anxiety and fear for my safety.

14. Azevedo's assault and the transmission of a cancer-linked HPV virus have had severe and enduring consequences for my physical and mental health. The psychological trauma from these assaults and his subsequent campaign of intimidation has resulted in diagnosed Post-Traumatic Stress Disorder (PTSD) and Major Depressive Disorder (**Ex. G.**, **Medical Documentation, p. 2-4**). Most critically, the recent lifting of the last institutional barrier protecting me from him triggered an acute medical crisis, including severe weight loss and a life-threatening hypertensive crisis, as objectively documented by my medical providers (**Ex. G.**, **Medical Documentation, p. 6-12**). This direct causal link between Azevedo's actions and my physiological deterioration underscores the imminent danger he poses to my well-being.

15. The chilling effect of Defendant Azevedo's retaliatory campaign, backed by Rockefeller University's institutional indifference, extends beyond harassing me to actively intimidating material witnesses. As detailed in this Declaration, multiple witnesses, including Jane Does 1-4, have provided corroborating evidence of Azevedo's predatory pattern. However, due to the Defendants' powerful positions, history of retaliation, and the current climate of intimidation created by their actions, these witnesses now explicitly refuse to cooperate further due to a reasonable fear of professional and personal retaliation. This witness intimidation irreparably corrupts the fact-finding process of this litigation, depriving the Court of critical testimony and

demonstrating that the Defendants' misconduct is actively preventing a fair adjudication of the facts.

## III. Abuse of Judicial Process and Imminent Threat

16. Defendant Azevedo's campaign of harassment is not confined to the past; it is a present and active threat being executed through the manipulation of this Court's procedures. This abuse began the moment a procedural barrier was lifted. He did not even wait for the Marine Biological Laboratory (MBL) no-contact order to be formally terminated through its proper channels. Instead, on **May 19, 2025**, he proactively drafted and submitted a request to this Court (filed as ECF 150) where he unilaterally 'assume[d]' my *pro se* status. This assumption was not his to make—a party's representation status is formally communicated to the Court and opposing parties. His act of filing based on this assumption was a deliberate, premeditated attempt to force a direct line of communication and re-establish contact the moment he perceived it to be legally permissible, confirming that his engagement with this Court is a central tactic in his ongoing campaign of intimidation.

17. This strategy of harassment through legal filings is not hypothetical; it is documented in a series of emails he has sent to the Court and, calculatedly, directly to me. Following the lifting of the MBL order and after voluntarily submitting to this Court's jurisdiction for ECF training, which this Court granted on **July 1, 2025** (ECF 168), he initiated a flood of motions and letters. In each instance, he has deliberately carbon-copied (Cc'd) my personal email address (marciniak.kar@gmail.com), ensuring these legal documents are delivered directly to my personal inbox (See **Ex. F; Azevedo's Court Emails**).

18. This is not standard practice nor is it required by court procedure. For example, in an email submission dated **July 10, 2025** (related to ECF 178), he admits he knows the proper channel is

7

to submit filings to the Pro Se Intake Unit, yet he consciously chooses to bypass this formal system to directly include me. Each of these emails from fazevedo@mit.edu is a jarring intrusion, a traumatic reminder of his presence and his obsession with this case. They force me to relive the assaults and serve as a digital form of him showing up at my door.

19. This conduct must be viewed in the full context of Defendant Azevedo's resources, sophistication, history of institutional legal backing, and the stark contradiction between his claimed incapacitation and his demonstrated capacity for sophisticated, strategic action. He is not a helpless or indigent litigant unfamiliar with the legal system; he is a research scientist employed by the Massachusetts Institute of Technology (MIT). Critically, until very recently, he was represented by sophisticated counsel from the firm Bond, Schoeneck & King (Attorneys Campbell and DiLorenzo), who were retained by his insurer, Boston Children's Hospital, to defend him in the related action, *Marciniak II*. These same attorneys **accepted service of the Third Amended Complaint in this very action on his behalf, acknowledging the May 27, 2025 deadline to answer, and engaged in pre-lawsuit communication with me** (See Plaintiff's Letter to the Court Opposing Azevedo's request for Extension, May 23, 2025, **ECF 155-1, Exhibit 1**). His counsel's involvement ceased abruptly just days before his answer was due, but did not prevent to further instruct Azevedo on legal steps, i.e., filing notice of pro se appearance (**see ECF 174, p. 5, May 22, 2025 email: 'you need to fill this out and submit to pro se department'**), which Azevedo strategically delayed and executed only post-default, on June 27, 2025 (ECF 165). He now weaponizes his chosen *pro se* status while operating from his official @mit.edu email account for court communications (see, e.g., ECF No. 171, 172, 174, 178; see also **Ex. F:,Selected Email Submissions from Defendant Azevedo to the Court (CC'd to Plaintiff)**), enjoying the implicit backing and stability of these powerful institutions. His choice to shed legal representation and proceed *pro se* is thus a calculated and tactical

8

decision to exploit the court's accommodations for self-represented parties, all while using the Court's filing system as a direct vector for harassment[1]. The willful nature of this harassment is underscored by Defendant Azevedo's demonstrated disregard for truthfulness before this Court, as evidenced by the shifting and contradictory narratives he has provided to explain his litigation conduct. In his initial request for an extension (ECF No. 150), he claimed he had to travel to Brazil around May 11, 2025, to manage a family emergency. However, his story materially changed in a subsequent filing (**ECF** No. **178**), where he claimed a different sequence and purpose for the same alleged trip. **He provided no proof of this travel—no boarding passes, ticket receipts, or passport stamps.** When explicitly challenged on this critical deficiency in my May 23, 2025 opposition (ECF 155), and ordered by the Court to file supporting exhibits, his submissions conspicuously omitted any objective evidence placing him outside the United States. This pattern of providing authentic Brazilian family documents while failing to provide falsifiable travel records strongly suggests his narrative is a calculated fabrication. His use of this Court's processes, based on what appears to be a dishonest pretext, is further proof that he views these proceedings not as a search for truth, but as another arena for his campaign of intimidation and control.

20. This pattern of deception extends beyond his personal narrative to his characterization of court orders. **Azevedo falsely asserted to this Court that the no-contact order was issued by the New York Family Court** (See **ECF No. 150**). This was a material misrepresentation. As documented correspondence confirms **(ECF No. 155, Exhibit 2)**, the order was issued solely by

---

1 The timeline of his own actions proves his capability and intent: (I) o**n or before May 22, 2025,** he actively coordinated with the Marine Biological Laboratory (MBL) to have the no-contact order against him lifted, a strategic move to remove the last barrier to contacting me; (ii) **On May 19, 2025,** he drafted and filed a detailed, multi-page ex parte letter (ECF 150) with this Court, proactively requesting an extension; (iii) t**hroughout this period,** he orchestrated the international collection of official Brazilian documents (death certificate, medical reports) to support his narrative; but (iv) could not file a one-page Notice of Appearance form as instructed by his counsel (see ECF 174, p. 5, May 22, 2025 email: 'you need to fill this out and submit to pro se department'), and (v) a**fter being granted ECF access on July 1, 2025,** he immediately began flooding the Court with sophisticated motions and letters (e.g., ECF 171, 172, 174, 178), choosing nevertheless to send them through email ccing me on each submission (**Ex. F**).

9

the Marine Biological Laboratory (MBL) and was lifted on May 22, 2025, **upon his own request, a date strategically aligned with this Court's deadline for his filings**. This lie cannot be dismissed as a mere error; it was a deliberate attempt to inflate the order's perceived authority and obscure the fact that he himself was actively petitioning to have it removed. Together, these acts—providing uncorroborated personal stories and falsifying the nature of judicial protections—reveal a litigant who operates in bad faith, weaponizing dishonesty to manipulate these proceedings and continue his harassment.

21. His actions demonstrate a profound disrespect for the judicial process itself, treating it not as a forum for adjudication but as another tool for his intimidation campaign, just as he previously exploited the academic environment of the CBMM program. Therefore, his filings are not merely legal documents; they are instruments of harassment. Their primary function is to force me to see his name, to acknowledge his presence, and to be reminded of his control and proximity, causing severe anxiety, sleepless nights, and a re-triggering of my PTSD symptoms (**Ex. G**, **Medical Documentation**)**.** This is a malicious abuse of the right to self-representation and a blatant attempt to use the Court as a mechanism for his ongoing predatory behavior.

22. This pattern provides incontrovertible evidence that Defendant Azevedo cannot be trusted to abide by any rules or boundaries. Without a formal Court order explicitly prohibiting all contact —direct, indirect, and through the deliberate cc'ing of legal filings—he will continue to find ways to harass and intimidate me, causing severe and ongoing psychological harm. The Court must intervene to stop this abuse of its own processes and protect me from this newest form of attack.

## IV. Rockefeller University's Deliberate Indifference and Ongoing Failure To Protect

23. **My presence at the scene of the assault was a direct result of my employment at Rockefeller University.** I declare that my attendance at the August 2017 CBMM Summer Course in Woods Hole was a work-related delegation, not a personal trip. As detailed in the Third Amended Complaint (TAC ¶ 35), I was sent by my supervisor, Defendant Winrich Freiwald, to integrate with the CBMM community and discuss my research on intuitive physics with MIT collaborators. This work-related delegation is directly corroborated by a contemporaneous August 26, 2017, email chain among CBMM leadership, including my supervisor Defendant Freiwald, in which he explicitly directs me to travel to Woods Hole to represent his laboratory and discuss my research with MIT collaborators. **(See Ex. H, Email from Freiwald stating: 'Karolina has some eye movement data on physics. She will be over in Woods Hole shortly...')**[2].

24. This fact is critical: Rockefeller University, through my supervisor, placed me directly into the toxic and dangerous environment of the CBMM program, a program it helped fund and with which it was intimately connected, thereby assuming a duty of care for my safety.

25. **The CBMM environment was a known hunting ground for predators, enabled by its leadership.** The permissive culture that allowed Defendant Azevedo to operate is extensively documented. This is corroborated by the declaration of **John Doe**, a former CBMM participant, student and Teaching Assistant **(Ex. I)**, who describes an environment with little oversight, pervasive alcohol use, and vulnerable housing arrangements. Furthermore, **Jane Doe 4**, a former CBMM student and TA, confirmed in writing that the TA selection process was **"completely informal,"** with **"no screening,"** **"no formal training,"** and **"no assessment,"** allowing abusive individuals to return year after year. She explicitly described a **"culture of**

---

2 For the jurisdiction purposes over the incident in Woods Hole, MA, please note that in August 2018 I was a full-year New York resident.

11

**drinking"** and the failure to uphold **"standards of professional behavior" (See Ex. J, Email from Jane Doe 4)**. This culture was not an accident; it was actively cultivated by CBMM leadership, as proven by a February 2017 recruitment email from Senior TA **Xavier Boix (Ex. K: Recruitment Email from Xavier Boix Demonstrating the Informal, Non-Professional Culture of the CBMM Summer School TA Program)**, which emphasizes a "fairly relaxed" atmosphere of "tennis" and "swimming" with no mention of professional standards or safeguarding responsibilities.

26. **Azevedo's predation was an open secret within this environment, and my assault was not an isolated incident.** Most significantly, **Jane Doe 3** revealed that my rape was part of a known pattern. She stated that a close friend of hers, another young female scientist, had a **"very similar experience"** in the same program, specifically referencing my account, and was also compelled to file a formal Title IX report **(Ex. B at [00:02:30.00])**. This confirms that Azevedo's behavior was a persistent, unchecked feature of the CBMM environment that the institutions, including RU through its partnership, knew or should have known about.

27. **Critically, Rockefeller University's institutional partnership with Defendant Azevedo is explicitly documented.** In a February 15, 2018 email from CBMM Center Manager Kathleen Sullivan to Defendant Freiwald, Sullivan formally identifies **"Hector Penagos and Frederico Azevedo, copied here, [a]s the two postdocs helping to coordinate the CBMM caucus, research meetings, and seminar talks."** She instructs Freiwald to have anyone in his group interested in presenting research **"contact Hector and Frederico" (See Exhibit [Assign Exhibit No. to Azevedo_CBMM_activity.pdf, Page 10])**. This proves that, at least at the time of the assault at Rockefeller University housing in March 2018 and thereafter, Rockefeller University, through its principal investigator Freiwald, was in direct and formal collaboration with Defendant Azevedo in his official capacity as a CBMM coordinator.

28. **Despite detailed knowledge of the threat, Rockefeller University has demonstrated a pattern of deliberate indifference and active bad faith, leaving me unprotected in my own home.** As my former employer and current landlord, RU has been having a non-delegable duty to provide a safe environment. This duty is heightened by their specific, repeated knowledge of the credible and imminent threat Defendant Azevedo poses to me.

29. **RU's Security Director made explicit promises of protection that were never fulfilled.** On or about June 10, 2019, I met with Security Director James Rogers and HR VP Virginia Huffman, terrified for my safety. Mr. Rogers explicitly promised that campus security would monitor for Azevedo. At his request, I provided Azevedo's picture and a detailed physical description via email on June 12, 2019. **Despite this, Mr. Rogers never replied, never updated me on any security measures, and never informed me of any protocol put in place. To this day, I have no confidence that RU security would stop Azevedo if he appeared on campus (Complaint, ¶ 236-239).** This was not negligence; it was an active choice to abandon a promised duty of care, creating a false sense of security and then withdrawing it.

30. **This failure is part of a broader, documented pattern of RU dismissing women's safety concerns.** In December 2019, I and other female residents filed a formal complaint about a RU professor who was persistently and inappropriately staring at us in the laundry room and common areas. Significantly, this housing complaint was forwarded directly to Virginia Huffman in HR, not handled by security. In a meeting, Huffman heard detailed, corroborated accounts from multiple women and then dismissed our validated concerns by attributing the behavior to a purported medical condition, refusing to create any formal record or take action (TAC ¶ 91-95) **This incident establishes RU's standard operating procedure: to deflect, dismiss, and avoid creating a formal record rather than to investigate and protect.**

13

31. **Most egregiously, RU actively obstructed a criminal investigation to protect itself.** In October 2019, I informed Virginia Huffman that a new witness, Jane Doe X, had come forward for the Falmouth Police investigation. Rather than help, Huffman orchestrated a performative and traumatic intervention. She brought in Security Officer Michael Murphy, a former police officer, and forced me to re-live the assault by explaining my police report and uttering the word **"rape"** in a hostile, institutional setting. After I provided Detective Loewen's contact information, Murphy explicitly promised to call him to facilitate the new testimony **(See Complaint ¶ 359-367)**. **One week later, he sent a single cursory email (Ex. K: Murphy Email) claiming he had left messages and would follow up. He never did. Murphy never contacted me again, never provided an update, and never followed through, a tangible example of a promise made and not kept, designed to ceate a false paper trail of "assistance" rather than to genuinely help.**

32. This institutional betrayal is ongoing and constitutes a continuing violation. Every day I reside in RU housing without knowing if effective security measures are in place, I suffer profound emotional and psychological distress. The university's failure to act is a present and ongoing source of trauma, exacerbating my PTSD and depression by reinforcing that I am not safe even within my own home. RU has proven it is capable of monitoring campus access but chooses not to exercise this capability for my protection against a known sexual predator. This is a conscious and reckless disregard for my safety.

33. The recent lifting of the MBL no-contact order has catastrophically escalated this crisis, and RU's empty promises are now more dangerous than ever. The institutions have had years to act voluntarily and have chosen not to. The MBL's order is gone, and RU's promises have proven to be worthless. Therefore, a court order against Rockefeller University is not only justified but necessary to compel this institution to finally fulfill its legal and ethical duties. Only a court can

14

mandate that RU implement and formally communicate to me a concrete safety plan, thus ending the uncertainty that is itself a source of ongoing harm. Specifically, this must include: (a). Providing Azevedo's picture and description to all campus security personnel with a directive to deny him entry to any RU property and to immediately detain him for trespassing if he attempts to enter; (b). Establishing a clear protocol for monitoring and alerting me of any attempted contact or approach by Azevedo on university property; and (c). Formalizing these measures in a written security plan delivered to me, thus ending the uncertainty that itself is a source of ongoing harm.

## V. Rockefeller University's Retaliatory Eviction Notice: Escalating the State-Created Danger

34. **On September 10, 2025, in a blatant and retaliatory act designed to maximize my vulnerability and punish me for pursuing this litigation, Defendant Rockefeller University served me with a 90-Day Notice of Termination, demanding I vacate my apartment by January 6, 2026.** A true and correct copy of this notice is attached hereto as **Exhibit M**. This action is not a routine landlord-tenant matter; it is a calculated escalation of RU's years-long campaign of institutional intimidation and deliberate indifference.

35. This notice comes at the precise moment I am seeking this Court's protection from a known sexual predator. Its timing is unmistakably retaliatory. For years, RU has accepted my rent and acknowledged my tenancy-at-sufferance. To initiate eviction proceedings now, immediately after I filed my declaration detailing RU's bad faith and while this emergency motion is being prepared, proves that the University is not merely indifferent to my safety but is actively hostile to it. This is a transparent attempt to weaponize my housing status to intimidate me, destabilize my life, and punish me for seeking justice.

36. The loss of my home would be catastrophic. My apartment is not just a residence; it is my last refuge, the primary location where I must be guaranteed safety from Defendant Azevedo. RU's action to strip me of this shelter while I am under an active and documented threat of violence constitutes an extreme "institution-created danger." It actively manufactures the very homelessness and exposure to harm that this Court's intervention seeks to prevent. If I am forced to vacate, I will be rendered exponentially more vulnerable and accessible to Azevedo.

37. The retaliatory eviction notice serves to compound the harm exponentially, extending it to my husband. Forcing us from our home would not only render me more vulnerable but also devastate my husband, who has been my steadfast protector throughout this ordeal. The notice intentionally creates instability and profound anxiety for both of us, threatening our housing security and mental well-being as a couple. RU's action is therefore not just an attack on me, but an attack on the stability of my marriage and my last safe relationship, demonstrating a callous disregard for the totality of the harm they are inflicting[3].

38. This eviction notice shatters any remaining illusion that RU can be trusted to act in good faith or fulfill its basic duties as a landlord, let alone as an institution that once employed me. It is the ultimate act of institutional betrayal, confirming that RU's strategy is to eliminate the victim rather than address the threat. This Court's intervention is now more critical than ever, not only to restrain Azevedo but to compel RU to withdraw this retaliatory notice and cease its active efforts to make me unsafe in my own home of 9 years.

## VI. Severe Psychological and Medical Impact

---

3   The well-documented devastation wrought by homelessness cannot be overstated. Unhoused people suffer enormous physical, emotional, and social harm. People who experience homelessness due to an eviction face a decreased lifespan and increased rates of diabetes, hypertension, heart attack, and depression. NAT'L HEALTH CARE FOR THE HOMELESS COUNCIL, HOMELESSNESS & HEALTH: WHAT'S THE CONNECTION? FACT SHEET (2019), https://nhchc.org/wp-content /uploads/2019/08/homelessness-and-health.pdf. See also Anna Gorman & Harriet Blair Rowan, The Homeless are Dying in Record Numbers on the Streets of L.A., KAISER HEALTH NEWS, (Apr. 24, 2019), https://khn.org/news/the-homeless-are-dying-in-recordnumbers-on-the-streets-of-l-a ("In Los Angeles County, the average age of death for homeless people was 48 for women and 51 for men. The life expectancy for women in California in 2016 was 83 and 79 for men.")

16

39. The lifting of the Marine Biological Laboratory's (MBL) no-contact order on or about May 21, 2025, was not a mere administrative event; it was the catalyst for a severe psychological and physiological collapse. For years, that order functioned as a critical "security blanket," a tangible symbol that an institutional authority recognized the threat Azevedo posed and was actively holding him at bay. Its removal sent a devastating message: that I have been officially abandoned to face a known serial predator alone and unprotected. This withdrawal of protection shattered my hard-won sense of security and directly triggered a severe escalation of my trauma-related disabilities.

40. The psychological and physical injuries I suffer are a direct and proximate result of Defendant Azevedo's sexual assaults and his relentless campaign of intimidation. For years, I managed the chronic conditions of Post-Traumatic Stress Disorder (PTSD) and Major Depressive Disorder with consistent medication and therapy, maintaining a fragile but stable baseline. However, the recent actions of the Defendants—specifically, the lifting of the last institutional barrier protecting me and Azevedo's subsequent weaponization of this Court's procedures—have directly triggered a catastrophic and life-threatening decompensation. This is not a subjective claim but an objectively documented medical crisis, as proven by the clinical evidence compiled in **Exhibit G, and summarize below.**

| Date | Weight (lbs) | BMI | Clinical Diagnoses & Notes | BP | Link to Stressor |
|---|---|---|---|---|---|
| 11/18/2024 | 143 | 21.12 (Normal) | PTSD; Chronic Depression; Chronic Migraine | 124/80 | Baseline (Protected) |
| 06/04/2025 | 122.24 | **18.05 (Underweight)** | "Severe episode of recurrent major depressive disorder"; "Intractable chronic migraine"; "Anxiety" | 122/81 | **2 weeks post-order lift** |
| 06/28/2025 | 116.84 | **17.77 (Underweight)** | **ER visit for a corneal abrasion (a condition often linked to extreme stress). The clinical notes also document a Hypertensive Crisis** | 170/108 | **~5 weeks post-order lift** |

41. The objective medical data, detailed in **Exhibit G**, and summarized above, provides irrefutable proof of this acute decompensation:

    * **On November 18, 2024**, my medical records show a stable, albeit chronic, condition: a weight of 143 lbs. (BMI 21.12, Normal), with diagnoses of PTSD, Chronic Depression, and Chronic Migraine, and a normal blood pressure of 124/80.

    * **Just two weeks after the order was lifted, on June 4, 2025**, my condition had deteriorated drastically. I was diagnosed with a '*Severe episode of recurrent major depressive disorder'* and *Intractable chronic migraine'*. My weight had plummeted to 122.24 lbs. (BMI 18.05, **Underweight**), a clear indicator of the severe psychological distress I was under.

    * **By** June 28, 2025, approximately five weeks post-order lift, the terror induced by the loss of protection manifested in a severe physical crisis. I suffered a **stress-related corneal abrasion**, requiring emergency medical evaluation at NewYork-Presbyterian Hospital[4]. The clinical notes from this ER visit also objectively documented **a concurrent hypertensive crisis (170/108)**. My weight had fallen further to 116.84 lbs. (BMI 17.77, Underweight).

42. The severe psychological and physiological deterioration triggered by the Defendants' actions has had a devastating ripple effect, profoundly harming my husband, who is my primary caregiver and emotional support. Witnessing my rapid decline—the severe weight loss, hypertensive crises, and debilitating terror—has caused him significant emotional distress, anxiety, and helplessness. The constant state of fear in our own home, which should be a sanctuary, has destroyed our sense of safety and stability as a family unit. This collateral harm to my spouse underscores the pervasive and destructive nature of the threat posed by the Defendants and further demonstrates that the irreparable harm extends beyond me, eroding the

---

4  This specific injury is a recognized manifestation of extreme psychological distress and dissociative episodes, see eg., Toth, M.; Jokić-Begić, N.; Krašić, S. The Relationship Between Anxiety Sensitivity, Emotional States, and Dry Eye Disease Symptom Severity: A Cross-Sectional Study. Vision 2025, 9, 36. https://doi.org/10.3390/vision9020036

foundation of my family and my most critical support system.

43. This timeline of clinical facts—a documented **'severe episode' of depression, rapid and dangerous weight loss, and a hypertensive crisis**—all occurring within weeks of the lifted order, confirms the direct causal link. The absence of a court-enforced barrier is itself a source of life-threatening harm. My treating mental health professionals have documented a significant regression, including debilitating hypervigilance, profound insomnia, and an overwhelming sense of imminent danger that makes basic daily functioning nearly impossible.

44. This medical crisis has directly impaired my ability to concentrate and effectively litigate this case, as previously noted in my July 16, 2025 request for an extension (**ECF No. 179**). My mind, unable to reconcile the overwhelming terror of being exposed to Mr. Azevedo with the institutions' failure to act, struggles to maintain a grip on reality. The requested restraining order is therefore not a mere legal formality; it is a **medical necessity**. Only an order from this Court, with the full force of law behind it, can restore the minimum sense of security required to stabilize my mental health, halt my physical decline, and allow me to participate in these proceedings. The objective evidence in **Exhibit G** demonstrates the "irreparable harm" required for this Court's intervention and proves that a protective order is essential for my safety and stability.

## PRAYER FOR RELIEF

For these reasons, I respectfully and urgently pray that this Court:

- Issue an immediate Temporary Restraining Order against Defendant Azevedo to stop his harassment and protect my safety.

- Issue an Order to Show Cause why a Preliminary Injunction should not be granted against both Defendants.

- **Order Rockefeller University** to finally fulfill its promises and legal duties by creating and giving me a real, written safety plan to stop Azevedo from coming onto campus and to keep me safe in my home.

- Provide me with the protection that I have been denied for years, so that I may begin to heal and pursue justice in this case without living in constant fear.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

Executed on: September 15, 2025

In: New York, New York

Karolina Marciniak-Domingues Goncalves Agra

*Karolina Agra*

500 E 63rd St, Apt 13F
New York, 10065 NY
marciniak.kar@gmail.com
(646) 770 2045
PLAINTIFF *PRO SE*

20