*Submitted via email to ALCarterNYSDChambers@nysd.uscourts.gov & prose@nysd.uscourts.gov*

*Pro se defendant*
Frederico Augusto Casarsa de Azevedo
10 Emerson Place, apt. 21D
Boston, Massachusetts 02114
Tel. 857.999.1396
fazevedo@mit.edu

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KAROLINA MARIA MARCINIAK-DOMINGUES GONCALVES AGRA,<br><br>                              Plaintiff,<br><br>          -against-<br><br>ROCKEFELLER UNIVERSITY; FREDERICO AZEVEDO and WINRICH FREIWALD,<br><br>                              Defendants. | No. 22-cv-10959 (ALC)(SN) |

**DEFENDANT DR. FREDERICO AUGUSTO CASARSA DE AZEVEDO'S**
**RESPONSE TO ORDER TO SHOW CAUSE PURSUANT TO FED. R. CIV. P. 65**

i

# **TABLE OF CONTENTS**

**Page(s)**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENTS ......................................................................................................................... 1

I.     Plaintiff Cannot Demonstrate Irreparable Harm Attributable to Defendant Azevedo ....... 1

     A.     Plaintiff's Allegations Are Speculative and Unsupported. ........................................... 2

     B.     Defendant Has Had No Contact with Plaintiff for Over Seven Years......................... 2

     C.     Plaintiff's Own Contemporaneous Communications Contradict Her Claims. ............. 2

     D.     Defendant's Clean Record Undermines Plaintiff's Claim of Imminent Danger. ......... 3

     E.     No Non-Compensable Injury Exists in the Present Circumstances.............................. 3

     F.     Plaintiff Mischaracterizes Routine Court Procedures as Harassment.......................... 3

     G.     Conclusion on Irreparable Harm................................................................................. 4

II.     Plaintiff Is Not Likely to Succeed on the Merits ................................................................ 4

     A.     Defendant Unequivocally Denies the Allegations........................................................ 4

     B.     2019 Title IX Investigation Confirms No Misconduct ............................................... 5

     C.     Contemporaneous WhatsApp Messages Directly Contradict Plaintiff's Claims ......... 5

     D.     Report Police Records Reflect Intake Only—No Charges; 2018 Claim Absent from 2019............................................................................................................................... 8

     E.     Plaintiff's "Support" is Unreliable, Unauthenticated, and Non-Probative. ................. 9

     F.     Plaintiff Has Not Shown Sufficient Evidence to Prove Non-Consent....................... 11

     G.     Plaintiff's Shifting STI Claims, Medical Facts, and Alternative Exposure Undermine Causation.................................................................................................................... 12

     H.     Plaintiff Mischaracterizes a Joke Clearly Lacking Any Ideological or Extremist Intent ..................................................................................................................................... 13

     I.     Plaintiff is Unlikely to Succeed on Her GMVA Claim (TAC's Fourth Cause of Action). ..................................................................................................................... 14

     J.     Dr. Azevedo's Default Was Unintentional and Occurred Despite His Diligent Efforts to Comply with Court Deadlines. ............................................................................... 14

     K.     Conclusion on Likelihood of Success on the Merits ................................................. 15

III.     The Balance of Hardships Weighs Against an Injunction ................................................ 15

     A.     The Status Quo Is Safe and Contact-Free; There Is Nothing to Enjoin..................... 16

     B.     Plaintiff's Claimed Recent Psychological Decompensation Traces to Third Parties, Not to Dr. Azevedo. ................................................................................................. 16

     C.     A Narrow, Non-Injunctive Accommodation Eliminates the Only Complained-of Contact. ..................................................................................................................... 17

    D.    Comparative Hardship Favors Defendant.................................................................... 17

    E.    Conclusion on the Balance of Hardships ................................................................. 18

IV.    Public Interest Does Not Support Injunctive Relief ..................................................... 18

    A.    Injunctions are Reserved for Necessity, Not Convenience......................................... 19

    B.    Uniform, Even-Handed Procedures—Especially for a Pro Se Litigant...................... 19

    C.    A Less-Restrictive, Immediately Available Alternative Better Serves the Public
        Interest................................................................................................................... 19

    D.    Avoiding Stigma and Conserving Judicial Resources. .............................................. 20

    E.    Conclusion on Public Interest. ................................................................................. 20

V.    The Requested "No-Contact" Injunction Is Unnecessary.................................................. 20

CONCLUSION.......................................................................................................................... 21

EXHIBITS ................................................................................................................................... 22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Breest v. Haggis, 180 A.D.3d 83* ...............................................................................14

*City of Los Angeles v. Lyons*, 461 U.S. 95, 111–12 (1983) ...............................................1

*Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000)* ...............................................14

*Iqbal, 556 U.S. 662* ...............................................................................14

*Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) ...............................1, 2, 4

*Lyons, 461 U.S. at 111–12* ...............................................................................2, 4

*Salinger, 607 F.3d at 79–83* ...............................................................................1

*Twombly, 550 U.S. 544* ...............................................................................14

*Winter v. NRDC*, 555 U.S. 7, 24 (2008) ...............................................................1, 4

**Statutes & Rules**

Fed. R. Civ. P. 1 ...............................................................................19

Fed. R. Civ. P. 5(d)(3) ...............................................................................19

Fed. R. Civ. P. 65 ...............................................................................1

N.Y. Penal Law §§ 130.25 ...............................................................................7

N.Y. Penal Law §§ 130.52 ...............................................................................7

N.Y.C. Admin. Code § 10-1103 ...............................................................................14

**Other Authorities**

Individual Practices of Judge Andrew L. Carter, Jr. (Mar. 2025) ...............................2, 3, 11, 17, 21

National Cancer Institute, "Understanding Cervical Changes" (cancer.gov) ...............................12

S.D.N.Y. Electronic Case Filing Rules & Instructions ...............................................................19

U.S. Dept. of Health & Human Services, Office on Women's Health, "Human Papillomavirus"

(womenshealth.gov) ...............................................................................13

## PRELIMINARY STATEMENT

Defendant Frederico Azevedo, appearing pro se, respectfully submits this response to the Court's September 15, 2025 Order (ECF 197) directing him to show cause why a preliminary injunction should not issue under Rule 65 of the Federal Rules of Civil Procedure. To obtain such relief, a movant must demonstrate: (i) irreparable harm absent the injunction, (ii) a likelihood of success on the merits, (iii) that the balance of equities favors the movant, and (iv) that the public interest supports the injunction. As detailed in arguments I–IV below, Plaintiff fails to satisfy these stringent requirements. With respect to the sole relief sought against him—a prohibitory "no-contact" order—argument V shows that Plaintiff has not demonstrated any irreparable harm or ongoing misconduct to restrain. The equities and public interest likewise weigh against issuing an unnecessary order that would impose stigma and contempt risk on a pro se litigant without providing any meaningful protection.

This submission addresses only the relief sought against Dr. Azevedo (see ECF 195-2 § I). He takes no position on Plaintiff's requests directed to the other defendants, and nothing herein concedes any allegation or waives any defense.

## ARGUMENTS

### I. Plaintiff Cannot Demonstrate Irreparable Harm Attributable to Defendant Azevedo

The "single most important prerequisite" for preliminary injunctive relief is irreparable harm, and it must be actual and imminent, not remote or speculative. See *Winter v. NRDC*, 555 U.S. 7, 24 (2008); accord *Salinger, 607 F.3d at 79–83* (extraordinary remedy, never awarded as of right); *City of Los Angeles v. Lyons*, 461 U.S. 95, 111–12 (1983) (must show a "real and immediate" threat of future injury); *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (must be actual and imminent, not remote or speculative).

1

**A.  Plaintiff's Allegations Are Speculative and Unsupported.**

Plaintiff relies primarily on conclusory assertions of future danger, but she provides no admissible evidence that Defendant poses an actual, immediate threat. Absent proof of a real and immediate threat, injunctions are improper. *See Lyons, 461 U.S. at 111–12; Kamerling, 295 F.3d at 214.*

**B.  Defendant Has Had No Contact with Plaintiff for Over Seven Years.**

Defendant Dr. Azevedo has had no communication with Plaintiff since June 17, 2018. Their final WhatsApp exchanges (March 12–June 17, 2018), attached as exhibit C, confirm that (i) the last electronic exchange occurred more than seven years ago; (ii) there has been no further contact, direct or indirect, since then, aside from courtesy copies of ECF filings sent in accordance with Judge Carter's Individual Practices; and (iii) since March 20, 2018, Dr. Azevedo has not visited or approached Rockefeller University's campus or the Rockefeller University Apartments. This unbroken period of silence and physical distance is fundamentally inconsistent with a present risk of harm. *See Kamerling, 295 F.3d at 214.*

**C.  Plaintiff's Own Contemporaneous Communications Contradict Her Claims.**

Immediately after the alleged assaults in 2017 and 2018, Plaintiff continued to exchange cordial, voluntary, and affectionate messages with Defendant, as the WhatsApp records show (Exs. B and C). Her decision to engage in ongoing conversations—including invitations, expressions of happiness, and ordinary social exchanges—undercuts the claim that Defendant represented a continuing threat. These contemporaneous writings are discussed in more detail in § II.B below.

### D.  Defendant's Clean Record Undermines Plaintiff's Claim of Imminent Danger.

Defendant has never been accused, charged, or found responsible for any violent act—sexual or otherwise—outside of Plaintiff's contested allegations in this case. He has no criminal record, no history of restraining orders, and no record of disciplinary findings. For over seven years since his last communication with Plaintiff, Defendant has lived peacefully without incident. This unblemished record—together with the supporting declarations for Dr. Azevedo (Exs. H–J), attesting to his good character—stands in sharp contrast to Plaintiff's claim that he poses an imminent danger.

### E.  No Non-Compensable Injury Exists in the Present Circumstances

While physical safety concerns can constitute irreparable harm, Plaintiff identifies no ongoing risk of physical injury or imminent threat traceable to any current conduct by Dr. Azevedo. Injunctive relief is warranted only to prevent future injury that is both imminent and not redressable at law; alleged emotional distress arising from past events or from routine CM/ECF notice does not satisfy that standard. There has been no contact for more than seven years, and the only "contact" Plaintiff cites— the administrative receipt of courtesy-copy emails—can be eliminated by a narrow accommodation (see § III.C). To the extent she invokes "ongoing psychological trauma," the stressors she identifies stem from third-party administrative actions, not from any present conduct by Dr. Azevedo (see § III.B). Should Plaintiff ultimately prevail on claims regarding past events, damages provide an adequate remedy. Equitable relief is therefore unwarranted.

### F.  Plaintiff Mischaracterizes Routine Court Procedures as Harassment.

Plaintiff further contends that she suffers trauma from receiving Defendant's court filings by email and from Defendant's attendance at the SDNY Pro Se ECF training. These arguments mischaracterize routine, mandatory procedures as harassment. Judge Carter's Individual Practices

3

make clear that "letters should be filed electronically on ECF and courtesy copies should be emailed to Chambers … with all counsel copied". Because Plaintiff is pro se, she functions as her own counsel. Defendant has complied fully with these requirements and has never sent Plaintiff any private or unauthorized communications. Likewise, Defendant's attendance at the Court's mandatory CM/ECF training was an administrative prerequisite to obtain filing privileges, not conduct directed at Plaintiff. Compliance with court rules is not harassment. If Plaintiff wishes to change how she receives notice of filings, her recourse is through the Clerk's Office or the Court's administrative procedures—not an injunction against Defendant. Dr. Azevedo respectfully proposes a solution to this problem in § III.C.

### G.  Conclusion on Irreparable Harm.

In sum, Plaintiff has not shown irreparable harm attributable to Defendant. The parties have had no contact since June 17, 2018, Defendant has not attempted any in-person contact and has not visited or approached Rockefeller University or the Rockefeller University Apartments since March 20, 2018. He has no criminal or disciplinary history and has complied with all court procedures. On this record, Plaintiff's fear is speculative, not imminent. Should past harm be proven, it can be remedied by damages, so equitable relief is not warranted. *See Winter, 555 U.S. at 24; Lyons, 461 U.S. at 111–12; Kamerling, 295 F.3d at 214.*

## II.  Plaintiff Is Not Likely to Succeed on the Merits

A preliminary injunction requires a clear showing of likely success on the merits. And because the requested relief would alter the status quo by imposing special communication/service conditions on a pro se litigant, the required showing is especially strong. Plaintiff cannot meet this burden.

### A.  Defendant Unequivocally Denies the Allegations.

Defendant Dr. Azevedo unequivocally denies all allegations of violence, forcible touching

4

sexual assault, sexual harassment, rape, or any other unlawful conduct asserted in the Third Amended Complaint (TAC, case 1:22-cv-10959-ALC-SN) and in Plaintiff's TRO memorandum (ECF 195-1). He further denies that he poses any threat to Plaintiff and confirms he has had no contact with her since June 17, 2018. The factual disputes are set out below.

### B. 2019 Title IX Investigation Confirms No Misconduct

Although the alleged 2017 rape and purported ongoing harassment are not pleaded in the TAC's sole claim against Dr. Azevedo, Plaintiff includes them in TAC's Statement of Facts. Dr. Azevedo categorically denies these assertions. Their inclusion is improper and prejudicial—injecting non-actionable allegations to inflame the record—and they are rebutted below.

On March 21, 2019, Plaintiff filed a report with MIT's Title IX and Bias Response Office alleging that Dr. Azevedo had sexually assaulted her on August 30, 2017. MIT, Children's Hospital Boston, and the other member institutions of CBMM, including Harvard and MBL, convened to address the allegation and ultimately referred the matter to MBL (the site of the 2017 incident) for investigation. MBL conducted a thorough investigation, including interviews and written statements from both parties and witnesses, and on August 1, 2019, it issued an official investigative report finding that the 2017 encounter did not violate any policy or code of conduct (Ex. A). Notably, Plaintiff's 2019 Title IX complaint—which is intended to capture all forms of sex-based misconduct—made no mention whatsoever of the alleged March 2018 assault, though its inclusion would have strengthened the story she now advances.

### C. Contemporaneous WhatsApp Messages Directly Contradict Plaintiff's Claims

The most probative contemporaneous evidence for the alleged facts—conspicuously absent from Plaintiff's submissions—are the WhatsApp conversations around both alleged incidents between

5

Plaintiff and Dr. Azevedo. Dr. Azevedo cures this omission by submitting exhibits B and C—uncut, unmodified WhatsApp transcripts from August 30 to September 22, 2017 (immediately after the first alleged rape) and from March 12 to June 17, 2018 (immediately before and after the second alleged rape, through the last message ever sent). The authenticity of those exchanges is undisputed since WhatsApp stores identical copies of the chat on both parties" devices.

According to the TAC, on August 30, 2017, Dr. Azevedo woke Plaintiff while she was resting in a room and sexually assaulted her despite her resistance and lack of consent (TAC ¶¶ 40–42, see also Ex. D). Plaintiff alleges that afterward Dr. Azevedo dismissed her reaction, minimized the incident, and urged her to keep it secret. Importantly, she did not report this alleged assault to law enforcement, MIT's Title IX office, or anyone else at that time, and no formal complaint or action was taken in 2017. Plaintiff further alleges that in the weeks following the August 2017 encounter, after she returned to New York, Dr. Azevedo harassed her "through daily calls and text messages" (Marciniak II, case 1:23-cv-10305-JPC, ¶ 51), which she characterizes as an attempt to intimidate her into silence. Plaintiff's own words contradict these claims (Ex. B, discussed below).

Exhibit B (WhatsApp messages from August 30, 2017 to September 22, 2017): In the days immediately following August 30, 2017, Plaintiff communicated with Dr. Azevedo frequently and in an affectionate tone. On September 3, 2017—just four days after the alleged very violent assault (detailed in exhibit D[1], an excerpt from Plaintiff's Title IX complaint)—she joked that she "*still [had] a blue spot from the wolf bite on [her] thigh* 😊" (playfully referring to a love bruise from their encounter). When Dr. Azevedo asked how she felt emotionally, she replied, "*I feel very good*", adding that she was "*trying not to overintellectualize*" why it happened. Far from indicating distress, Plaintiff conveyed a positive and

---

[1] In exhibit D p. 1, Plaintiff, who alleges being deeply traumatized and physically injured by a violent rape, states that she consented to another sexual encounter with the alleged assailant only hours later because she "thought that at least [she] will try to get something pleasant of that this time" (exhibit D, p. 1). Plaintiff's description of events is inconsistent.

lighthearted attitude about the encounter. Their exchange over the next several weeks was consistently warm and romantic. For example, on September 4, 2017, Dr. Azevedo messaged Marciniak late at night, *"I miss you! 😘 "*, to which she replied the next morning, *"I miss you too 😊 "*. On September 20, 2017, Dr. Marciniak teased Dr. Azevedo about their sexual chemistry – she quipped that after his workout he might be *"more vulnerable to get raped"* by her, prompting Dr. Azevedo to laugh and recall how *"last time [he] barely finished and [she] started kissing [him] down again,"* playfully calling Dr. Marciniak a *"Rapist!"*. These bantering messages confirm that both parties perceived their relations as consensual and pleasurable. After that, between September 20th, 2017 and March 12th 2018 their relationship continued affectionately as usual. The pair vacationed in Las Vegas with two of Marciniak's friends, went to the Rockefeller University's Halloween Party as a couple, and spent New Year's Eve 2017/2018 in Warsaw, Poland – Plaintiff's home country – sharing an apartment with Dr. Azevedo's mother and brother, where Dr. Azevedo expressly welcomed Marciniak into his family circle.

Plaintiff further alleges that between March 15 and 20, 2018—during the "Canonical Computations in Brains and Machines" conference at NYU, which both attended, while Dr. Azevedo stayed at her apartment—he "forcefully pushed [her] onto the bed, engaging in non-consensual intercourse without a condom" (TAC ¶ 59). This encounter is the sole basis for her GMVA claim against Dr. Azevedo, characterizing the conduct as third-degree rape and forcible touching under N.Y. Penal Law §§ 130.25 and 130.52. She further asserts the assault was gender-motivated and caused extensive physical, emotional, economic, and reputational harm (TAC ¶¶ 188–192). Once more, Plaintiff's own words contradict any claim of violence, sexual harassment, sexual assault, forcible touching, rape, or any other unlawful conduct (Ex. C, discussed below).

Exhibit C (WhatsApp messages from March 12, 2018 to June 17, 2018): Before, during and after the alleged March 15-20 2018 incident, Plaintiff's exchanges with Dr. Azevedo were as

affectionate as they always have been. For example, on March 12, 2018 Plaintiff writes: "*I am always happy with my life! Apart from the dark time when I thought we wont see each other anymore ;)*". On March 17 while Dr. Azevedo waited alone in her New York apartment, he wrote, "*The key is on the lamp — come back quickly, I already miss you* 🙂" Plaintiff replied instantly, "*On the way!!!*" signaling eagerness to rejoin him. Their messages over that weekend and beyond continued in the same warm vein. When Dr. Azevedo departed New York on March 20 2018, Plaintiff texted playfully, "*You almost did not leave New York! You would have to stay :) I miss you...* 😘" and "*I am really happy with the last weekend with you* 😘 😘". The thread afterwards is filled with comparable terms of endearment, routine personal updates, and plans to meet again. Nowhere does Plaintiff convey fear, anger, or estrangement; rather, the exchange depicts an ongoing, amicable romantic relationship. Even after Plaintiff told him on May 2, 2018, that she was "*meeting somebody in New York*", Dr. Azevedo responded, "*If you are happy, I am happy :)*" (Ex. C, p. 68), and their communications remained cordial. For example, on May 24, 2018, Plaintiff wrote, *"Fred! Can you make two plates of food for hungry people from New York before the food disappears? :)*", to which Dr. Azevedo promptly asked Kathleen, one of the organizers, to prepare the plates (Ex. C, pp. 80–81).

Additional evidence contradicting Plaintiff's claims and corroborating Dr. Azevedo appears throughout the WhatsApp exchanges (Exs. B–C).

### D. Report Police Records Reflect Intake Only—No Charges; 2018 Claim Absent from 2019

The police materials Plaintiff attaches (ECF 196-4) consist of correspondence with the Falmouth Police Department and routine incident/record entries, plus an NYPD complaint report; they contain no charging instrument, docket number, arrest record, or prosecutorial determination. Plaintiff's contrary assertion—that the police "found sufficient probable cause to pursue charges"—

appears only in her memorandum (ECF 195-1), not in any police document. Notably, although Plaintiff alleges assaults in August 2017 and March 2018, her 2019 police report references only the alleged 2017 incident; the March 2018 allegation first appears in police records on October 15, 2022 (ECF 196-4 at 7). Inclusion of the March 2018 allegation in the 2019 police report would have materially strengthened the narrative she now advances; the multi-year omission undermines the later claim.

### E. Plaintiff's "Support" is Unreliable, Unauthenticated, and Non-Probative.

Plaintiff's 'support' consists largely of anonymous or heavily redacted emails and a roommate statement that lacks personal knowledge of any assault. These materials are unauthenticated, largely hearsay, and substantially more prejudicial than probative; they do not establish non-consent or any imminent risk, and several misstate third-party records (e.g., police materials reflect routine incident reporting, not charges or prosecutorial determinations). Nevertheless, Dr. Azevedo will address those that pertain to him individually.

ECF 193-C (Hacisuleyman "aff."): Dr. Azevedo visited Plaintiff's apartment about once or twice per month; her roommate, Dr. Hacisuleyman, was usually absent (he recalls seeing her only two or three times). Because they were not acquainted, he was polite and respectful. Plaintiff's bedroom was directly across a short hallway from the bathroom she used (Dr. Hacisuleyman had her own). The only times he was minimally clothed were the brief moments—towel at the waist—taking two steps from the bathroom to Plaintiff's room; when the roommate was home, he confirmed her door was closed before crossing, and she never saw him in that state. Any occasional elevation in his voice reflected animation, not hostility (Ex. H).

ECF 196-1, 196-3 & ECF 196-9 (Jane Doe 1, 2 & John Doe). Anonymous, heavily redacted emails about purported 2017 events; they are hearsay, unauthenticated, and lack specific, verifiable facts tied to Plaintiff's claims. Notably, they also omit any March 2018 allegation—an omission

9

Plaintiff did not remedy until years later, though, if true, it would have been central to her narrative.

ECF 196-2 (Nap and alleged threats): After a full day of summer-school activities and mutual affectionate gestures, Plaintiff and Dr. Azevedo were very tired, so he offered her his single bed to sleep in. When they lay down, he placed an arm around her to avoid slipping off the narrow bed. When she bumped her leg against him, whether by reflex or intentionally, he respectfully chose to let her rest alone and to look for another place for him to rest.

The "I won't take it lightly" line appears in a 2019 email to Title IX investigators, not to Plaintiff, and reflects an intent to pursue formal channels—not intimidation. In any case, it is not evidence of imminent harm.

ECF 196-4 (Police reports): discussed in § II.D.

ECF 196-5 (Jane Doe 3): Unauthenticated anonymous comments by a purported student about the 2018 CBMM summer program, where Dr. Azevedo was a TA. The alleged student characterizes her own conduct as "harmless flirtation," says she found Dr. Azevedo "an attractive person," and notes it was "hard to draw that line" (ECF 196-5 at 12). She also recounts a party anecdote where she perceived Dr. Azevedo was avoiding her (ECF p.10). These are opinions about tone and social interaction—not facts of physical contact, non-consent, or present risk. Dr. Azevedo states he maintains strict TA–student boundaries and, when friendliness is misread, narrows interactions to avoid misunderstanding, as the alleged student acknowledges. He denies any romantic or sexual contact with any student in any program. The file also contains bias indicators (e.g., "he should be in jail," at 13) and an invitation to shape the account ("however you want to phrase it," at 14–15), which further undercut reliability. As hearsay from an anonymous source, it has minimal probative value at this stage. To the extent the filing insinuates evidence spoliation (ECF 195 at 2; 195-2 at 4; 196-5 at 11), that claim is implausible on these facts: WhatsApp's "delete for everyone" function operates only for a

10

short window (roughly two days), and a sender cannot erase content from a recipient's device thereafter. Dr. Azevedo also has no access to others' emails, social-media accounts, or institutional records (CBMM or Rockefeller).

ECF 196-6 (Emails to all parties): These show compliance with Judge Carter's Individual Practices regarding courtesy copies and do not constitute harassment. Proposed solution in § III.C.

Taken together, Plaintiff's submissions are anonymous or heavily redacted, unauthenticated, and largely hearsay; they offer subjective character impressions rather than first-hand evidence of assault, misstate third-party records (e.g., police materials), and rely on speculative inferences about medical findings and TA–student interactions. They omit critical details (e.g., the alleged March 2018 incident from earlier reports) and contain several internal inconsistencies. Even if credited at face value, these materials do not establish non-consent, ongoing danger, or any likelihood of success on the merits. By contrast, Exs. H, I, and J contain detailed declarations from individuals with direct and long-term knowledge of Dr. Azevedo. Exhibit H describes over a decade of consistent, respectful behavior, and documents Plaintiff's contradictory statements during a personal outreach attempt. Exhibit I recounts a consensual, romantic encounter involving Plaintiff and directly contradicts her narrative of fear or discomfort. Exhibit J, from Dr. Azevedo's current partner, identifies multiple factual and behavioral inconsistencies in Plaintiff's claims based on close observation and review of the WhatsApp record. These declarations further undermine Plaintiff's credibility and refute any inference of ongoing threat.

**F. Plaintiff Has Not Shown Sufficient Evidence to Prove Non-Consent.**

To prevail on her sexual assault/harassment claims, Plaintiff must present credible, admissible proof of non-consent. The evidence cited above—the contemporaneous WhatsApp record reflecting willing, affectionate and reciprocal communication before and after each alleged incident and the declarations of support of Dr. Azevedo (Exs. H, I and J)—directly undermines the core element of her

claims.

### G. Plaintiff's Shifting STI Claims, Medical Facts, and Alternative Exposure Undermine Causation

Plaintiff's own filings are inconsistent as to the STI allegedly being used as a biological weapon by Dr. Azevedo (ECF 195-1 pp. 17, 18). In Marciniak I (1:22-cv-10959-ALC-SN) and Marciniak II (1:23-cv-10305-JPC), Plaintiff attributed an HSV infection to Dr. Azevedo; by contrast, the TAC (1:22-cv-10959-ALC) alleges a high-risk HPV infection (see Ex. E). As a trained scientist who routinely uses scientific acronyms, Plaintiff unquestionably knows that HSV, HPV, and HIV differ by only one letter yet denote entirely different diseases; it is therefore a serious matter, and attributing the discrepancy to a mere typo is not credible.

Nevertheless, Dr. Azevedo denies and rebuts both allegations. Exhibit E includes his negative HSV laboratory results, confirming he has never had that virus. The same exhibit contains an MIT Medical email chain explaining that there is no FDA-approved HPV test for males; clinically, HPV in men is often inferred by visible genital warts, which Dr. Azevedo has never had. Despite the absence of FDA-approved HPV testing for males, the arguments Plaintiff uses to accuse Dr. Azevedo of infecting her are conclusory. She claims that a test result reflecting a Low-Grade Squamous Intraepithelial Lesion (LGSIL/CIN1), obtained on September 5, 2017, is highly suggestive of a new, active HPV infection attributable to her sexual encounter with Dr. Azevedo around August 30, 2017 (ECF 193-A). However, LGSIL/CIN1 cannot result from HPV exposure only a few days earlier; according to the National Cancer Institute, cervical epithelial changes from HPV typically take months to years to develop (*cancer.gov, "Understanding Cervical Changes"*). Plaintiff also had other sexual partners between August 30, 2017, and March 1, 2018. She had unprotected sex on at least two occasions with another individual—a Brazilian woman—on December 2–3, 2017 (Ex. I), further

weakening any attempt to attribute an STI to Dr. Azevedo. Finally, HPV is the most common STI in the United States, about 80% of women will acquire it at some point, according to U.S. Department of Health & Human Services" Office on Women's Health (*womenshealth.gov, "Human Papillomavirus"*), so it is not surprising that Dr. Marciniak, who was actively dating other people in that period, contracted it from someone other than Dr. Azevedo. On this record, there is no competent medical or temporal basis to attribute an STI to Dr. Azevedo.

## H. Plaintiff Mischaracterizes a Joke Clearly Lacking Any Ideological or Extremist Intent

Dr. Azevedo used the plural word "Führern" (meaning "several conductors") in a closed WhatsApp group containing 5 close friends (Ex. F) as an ill-judged attempt at humor to refer to all of them as the leaders of a CBMM retreat game that they were organizing. It was clearly never intended as advocacy of any ideology, as reflected in Dr. Azevedo's own characterization of it as a bad joke each time the word was used. No one expressed discomfort, and another Polish citizen even joined in (Ex. F, p. 3). No ethnic slur was ever used against anyone (ECF 195-1, p. 17). The notion that Dr. Azevedo embraces Nazi ideology is absurd on its face: under Nazi racial doctrine, he and his parents would have been persecuted as a so-called "mix of inferior races"; his recently deceased brother, because of his intellectual disability, would likely have been killed under the "Aktion T4" program; and his other brother, a gay man married to a man, would likely have been sent to a concentration camp. To the Nazis, all of them would have been "Untermenschen" (subhumans) to be eradicated. Nonetheless, Dr. Azevedo publicly apologizes for any resulting offense. He categorically rejects and condemns Nazi ideology and all forms of extremism, bigotry, and discrimination, including but not limited to racism, antisemitism, white supremacy, xenophobia, and discrimination based on race, color, religion, national origin, sex (including sexual orientation and gender identity), or disability.

13

**I. Plaintiff is Unlikely to Succeed on Her GMVA Claim (TAC's Fourth Cause of Action).**

Defendant denies all allegations and addresses the GMVA only in the alternative. Even assuming arguendo that the Court were to credit Plaintiff's allegations solely for analysis (with no admission or waiver), the GMVA requires both a qualifying "crime of violence" and that the act be committed "because of gender […] and due, at least in part, to animus" toward the victim's gender. N.Y.C. Admin. Code § 10-1103.

First, the predicate "crime of violence" is not supported on this record: contemporaneous WhatsApp messages (Ex. C) reflect cordial, reciprocal communications during and after the New York City encounter, undermining any claim of non-consent. Second, the TAC pleads no facts showing gender-based animus. The Council modeled the GMVA on hate-crime law; animus is an element, not a presumption. Conclusory assertions that Defendant acted "because she is a woman" are insufficient under federal pleading standards. See *Twombly, 550 U.S. 544; Iqbal, 556 U.S. 662. Breest v. Haggis, 180 A.D.3d 83*, does not help Plaintiff; there, detailed facts—including degrading conduct and misogynistic statements—supported animus. The TAC offers none of that, and the anonymous submissions and roommate "affidavit" supply no competent evidence of gender-targeting. Accordingly, Plaintiff is not likely to establish the GMVA elements on the merits (and, after multiple pleadings, any further amendment would be futile, see *Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000)*).

**J. Dr. Azevedo's Default Was Unintentional and Occurred Despite His Diligent Efforts to Comply with Court Deadlines.**

As exposed in detail in ECF 174, after his insurer withdrew coverage due to a recharacterization of Plaintiff's claims, Dr. Azevedo faced the dual challenge of transitioning to pro se status and

managing a sudden family crisis. On May 11, 2025, his brother passed away unexpectedly, requiring him to travel immediately to Brazil. Shortly thereafter, his father was hospitalized and diagnosed with dementia. Amid these events, and acting pro se, Dr. Azevedo submitted a timely request for an extension to respond to the complaint (ECF 150), which, according to confirmation from former counsel, was granted by the Court. Unfamiliar with ECF procedures, he relied in good faith on that assurance. He returned from Brazil in mid-June, began CM/ECF training, and reached out to pro se legal resources, only to be rejected by the SDNY clinic due to conflict of interest. He ultimately received limited guidance from Hofstra's program on July 7, the same day he filed his Motion to Vacate Default (ECF 174).

### K.  Conclusion on Likelihood of Success on the Merits

Plaintiff has not made the requisite clear showing of likely success on the merits. The record—consisting of (i) MBL's independent investigation finding no responsibility as to the 2017 allegation (Ex. A), (ii) Plaintiff's silence in her 2019 Title IX filing and in her 2019 police report regarding any March 2018 assault, (iii) contemporaneous WhatsApp communications before and after the alleged incidents reflecting willing, reciprocal interaction (Exs. B–C), and (iv) character declarations supporting Defendant (Exs. H–J)—undermines the essential element of non-consent. Plaintiff's supporting materials are largely anonymous, unauthenticated, or otherwise non-probative and do not establish assault, ongoing threat, or gender-based motive. As to the GMVA claim tied to the New York City incident, Plaintiff identifies neither a qualifying crime of violence nor facts plausibly showing gender-motivated intent. Plaintiff has not demonstrated a likelihood of success, let alone grounds for extraordinary relief.

## III.  The Balance of Hardships Weighs Against an Injunction

A preliminary injunction is an "extraordinary" remedy and must be no broader than necessary

to avert imminent, non-compensable harm. Here, the status quo is already contact-free and safe; Plaintiff's asserted harms either stem from third-party administrative decisions or from routine court-mandated notice, neither of which warrants burdening a pro se litigant with Rule 65 restraints.

### A. The Status Quo Is Safe and Contact-Free; There Is Nothing to Enjoin

Dr. Azevedo has had no communication with Plaintiff since June 17, 2018, and has not visited or approached RU's campus or housing since March 20, 2018. The only "contact" Plaintiff identifies is receipt of courtesy-copy emails of ECF filings—transmissions required by Court practice for letters to Chambers. Enjoining conduct that is not occurring provides no additional protection; converting court-mandated service into "harassment" weaponizes procedure rather than advancing safety.

### B. Plaintiff's Claimed Recent Psychological Decompensation Traces to Third Parties, Not to Dr. Azevedo.

Plaintiff ties her recent decompensation to (i) MBL's May 2025 decision to lift its internal no-contact directive and (ii) RU's September 10, 2025, 90-day housing-termination notice—both institutional actions, not conduct by Dr. Azevedo. MBL lifted its directive years after its 2019 investigative outcome found no policy violation (no responsibility, Ex. A) and there was no continuing basis to maintain a no-contact measure; the change was administrative. These asserted stressors are institution-generated and would persist regardless of any restraint on Dr. Azevedo and cannot be cured by a personal injunction against him.

Plaintiff also characterizes courtesy-copy emails as "weaponized" indirect contact because they "force his presence directly into her inbox." But courtesy copies are an administrative routing of court filings—not personal communications—and, as explained in § III.C, can be eliminated by a narrow procedural accommodation (omitting Plaintiff from Chambers courtesy-copy emails while leaving

16

CM/ECF service unchanged, see § III.C below), obviating any need for a Rule 65 order.

### C. A Narrow, Non-Injunctive Accommodation Eliminates the Only Complained-of Contact.

Without admitting any wrongdoing, and contingent on the Court granting an exception to Judge Carter's Individual Practices, Dr. Azevedo will cease copying Plaintiff on any Chambers courtesy emails, while continuing (i) ordinary service via CM/ECF, (ii) courtesy copies to Chambers, and (iii) copying all other counsel/parties as required. This targeted administrative adjustment removes the sole trigger Plaintiff identifies ("digital inbox" exposure) without the stigma, complexity, and contempt risk that accompany a Rule 65 order. This accommodation preserves uniform CM/ECF practice while honoring Chambers' courtesy-copy without any bespoke injunction.

### D. Comparative Hardship Favors Defendant

Plaintiff's campaign has already imposed concrete professional and reputational harm on Dr. Azevedo (see Exs. G, H). After she circulated disparaging statements to senior academics—including Profs. Nancy Kanwisher, Joshua Tenenbaum, Tomaso Poggio (CBMM Director), Robert Desimone (McGovern Institute Director), and Gabriel Kreiman—asserting as fact that "Frederico Azevedo raped [her] in August 2017," invoking supposed corroboration by "four other women," and falsely referencing a "probable cause determination," the fallout was immediate: the CBMM Summer School declined his requests to continue serving as a teaching assistant; he lost his CBMM organizer role; and Professor Kreiman, then his supervisor, declined to renew his appointment at Children's Hospital Boston/Harvard Medical School. Against that backdrop, even a "limited" no-contact injunction would layer on nontrivial, ongoing burdens for a self-represented litigant—compliance complexity (bespoke service rules running alongside CM/ECF), heightened error and contempt risk for technical missteps (e.g., an inadvertent auto-cc), and stigmatic effect suggesting wrongdoing on a disputed record—

17

thereby compounding the hardship already borne by Dr. Azevedo without adding any real protection.

By contrast, Plaintiff faces no cognizable hardship from denial: the status quo has been contact-free for over seven years; the only complained-of "contact" is the administrative receipt of courtesy-copy emails of court papers, which is fully mooted by Dr. Azevedo's narrow, voluntary accommodation to omit Plaintiff from courtesy emails (§ III.C); and she retains all ordinary litigation tools. Because the only identified exposure is purely administrative and already addressed by a less-restrictive adjustment, while an injunction would add compliance burdens and stigma to a pro se party on a contested record, the balance of hardships favors denying injunctive relief.

### E. Conclusion on the Balance of Hardships

Plaintiff identifies no imminent, non-compensable harm attributable to Dr. Azevedo. The status quo has been contact-free for more than seven years; the only complained-of "contact" is the administrative receipt of courtesy-copy emails, which is solved by the narrow accommodation in § III.C. Her asserted recent psychological decompensation stems from third-party institutional actions and would not be alleviated by a personal injunction against him. By contrast, an injunction would impose nontrivial, ongoing burdens on a self-represented litigant—bespoke compliance duties running alongside CM/ECF, heightened error and contempt risk for technical missteps, and stigmatic effect—while adding no meaningful protection beyond the contact-free status quo. Given the documented professional and reputational fallout already borne by Dr. Azevedo, the equities weigh decisively against injunctive relief.

## IV. Public Interest Does Not Support Injunctive Relief

A preliminary injunction is an "extraordinary" remedy and must be no broader than necessary to avert imminent, non-compensable harm. Here, the status quo is already contact-free and safe;

Plaintiff's asserted harms either stem from third-party administrative decisions or from routine court-mandated notice (see § III.B), neither of which warrants burdening a pro se litigant with Rule 65 restraints.

### A. Injunctions are Reserved for Necessity, Not Convenience.

Rule 65 relief should be reserved for circumstances demanding immediate intervention. There is no ongoing outreach to restrain; as discussed repeatedly supra, the only "contact" Plaintiff identifies is the administrative receipt of courtesy-copy emails of filings. Transforming administrative notice into a Rule 65 issue conflates procedure with harm and is legally insufficient.

### B. Uniform, Even-Handed Procedures—Especially for a Pro Se Litigant

Courts have a strong institutional interest in preserving uniform CM/ECF and service practices so all parties—particularly a self-represented litigant—can participate on equal footing. The Federal Rules emphasize the "just, speedy, and inexpensive" resolution of cases (*Fed. R. Civ. P. 1*) and require electronic filing and service (*Fed. R. Civ. P. 5(d)(3)*), and the S.D.N.Y. Electronic Case Filing Rules & Instructions direct parties to comply with each judge's Individual Practices. Bespoke injunctions dictating how one party must route filings create parallel systems, risk error and satellite disputes, and erode the predictability that orderly adjudication requires. By contrast, the narrow administrative accommodation set out in § III.C fully resolves the only complained-of contact without any need for a Rule 65 order.

### C. A Less-Restrictive, Immediately Available Alternative Better Serves the Public Interest

As discussed in § III.C, a narrow administrative adjustment fully cures the asserted harm and better serves the public interest than broad equitable restraints.

### D.  Avoiding Stigma and Conserving Judicial Resources.

A no-contact injunction carries stigma and invites collateral motion practice (compliance policing, contempt threats for inadvertent auto-ccs, disputes over exceptions), diverting judicial resources without adding protection beyond the contact-free status quo. The public interest is better served by the ordinary adversarial process—any Court-authorized motion practice, discovery if warranted, and, if reached, trial—rather than by supervising routine litigation communications. That is especially true where Plaintiff herself has widely circulated disparaging statements, including emails and conversations; an injunction aimed at court-mandated notice would do nothing to address that independent source of distress yet would burden a pro se party with ongoing contempt risk.

### E.  Conclusion on Public Interest.

Because effective, narrow administrative measures resolve the only identified concern—and because no imminent harm has been shown—the public interest weighs against issuing an injunction. If the Court determines that some directive is warranted, Defendant respectfully requests that any order be limited to memorializing the proposed email-routing accommodation (§ III.C).

### V.      The Requested "No-Contact" Injunction Is Unnecessary

Plaintiff's proposed preliminary injunction seeks a no-contact order and related restraints, including bans on attending events where she is present, bespoke email/service routing, and campus-security directives (ECF 195-2 at 3–5). On this record, there is nothing to restrain: there has been no contact since June 17, 2018, and no visits or approaches since March 20, 2018 (see § I). The only complained-of "contact" is administrative receipt of courtesy-copy emails, which results from standard procedures and can be fully eliminated by a narrow accommodation (see § III.C). For the reasons already set out in §§ I–IV, Plaintiff has not shown irreparable harm, likelihood of success, or a favorable

balance of equities; the public interest likewise disfavors bespoke restraints on a pro se litigant.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant Dr. Azevedo respectfully requests that the Court deny Plaintiff's request for a preliminary injunction against him. In the alternative, and solely to eliminate Plaintiff's asserted email-trigger harm, Defendant respectfully proposes that the Court enter the following narrow administrative directive, pending further order: (1) Dr. Azevedo shall not include Plaintiff on any email transmitting a Chambers courtesy copy pursuant to the Court's Individual Practices; (2) CM/ECF service and docket notices shall continue unchanged, and all other counsel/parties shall remain copied as required; and (3) Dr. Azevedo shall not initiate any direct, non-CM/ECF communications with Plaintiff regarding this case. No further restraints are warranted.

## EXHIBITS

28 U.S.C. § 1746 Declaration:

I, Dr. Frederico Augusto Casarsa de Azevedo, declare under penalty of perjury that the facts stated herein and in the attached exhibits are true and correct to the best of my knowledge and belief. Only redactions of third-party names and personal identifiers were made to the exhibits.

- **Exhibit A**: Outcome of Title IX investigation about the alleged 2017 incident

- **Exhibit B**: WhatsApp chat from August 30, 2017, to September 22, 2017

- **Exhibit C**: WhatsApp chat from March 12, 2018 to June 17, 2018

- **Exhibit D**: Excerpt of Plaintiff's title IX complaint

- **Exhibit E**: HSV/HPV claims and medical records

- **Exhibit F**: WhatsApp Chat of the organizers of the CBMM retreat game

- **Exhibit G**: Reputational and Professional damage caused by Plaintiff's claims

- **Exhibit H**: Declaration of support for Dr. Azevedo #1

- **Exhibit I**: Declaration of support for Dr. Azevedo #2

- **Exhibit J**: Declaration of support for Dr. Azevedo #3

Respectfully submitted,

Executed on September 23, 2025,

Rio de Janeiro, RJ, Brazil.

/s/ *Frederico Augusto Casarsa de Azevedo*
Frederico Augusto Casarsa de Azevedo (*pro se*)
10 Emerson Place, apt. 21D
Boston, Massachusetts 02114
Tel. 857.999.1396
fazevedo@mit.edu

22