Karolina Agra
500 E 63rd St, Apt 13F
New York, 10065 NY
marciniak.kar@gmail.com
(646) 770 2045
PLAINTIFF PRO SE

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

KAROLINA MARCINIAK-DOMINGUES GONCALVES AGRA,

                    Plaintiff,

   v.

THE ROCKEFELLER UNIVERSITY, FREDERICO AZEVEDO, WINRICH FREIWALD

                    Defendants.

Civil Action No: 1:22-cv-10959-ALC

------------------------------------------------------------X

**DECLARATION OF KAROLINA MARIA MARCINIAK-DOMINGUES GONCALVES AGRA IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AGAINST AZEVEDO**

I, Dr. Karolina Marciniak-Domingues Goncalves Agra, residing at 500 E 63rd Street, Apt. 13F, New York, NY 10065, Plaintiff *pro se* in the above-captioned action, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

**INTRODUCTION AND CULTURAL CONTEXT OF SHAME**

1. I submit this declaration in reply to Defendant Dr. Frederico Azevedo's Opposition ("Azevedo Opp.") to my motion for a preliminary injunction. His submission is a masterclass in victim-blaming, selectively presenting evidence to create a false narrative of a consensual relationship while ignoring the context of sexual assault, profound power imbalances, and the documented

1

psychological phenomenon of trauma bonding. His arguments fail to meet the legal standard for denying injunctive relief and, in fact, underscore the ongoing irreparable harm I suffer and the necessity of this Court's protection.

2. I make this declaration in rebuttal to Defendant Azevedo's opposition to my motion for a protective order. His characterization of our WhatsApp messages as evidence of a consensual relationship is a profound misrepresentation that ignores the context of sexual assault, psychological coercion, and my personal history.

3. My background as a woman raised in a small, conservative Catholic village in Poland is critical to understanding my initial response to the assaults. This environment socialized women into a culture of silence and shame surrounding sexual violence, where a victim's behavior is scrutinized and disclosure is often seen as bringing scandal. As detailed in the academic article *"Gender on Trial: Changes in Legal and Discursive Practices Concerning Sexual Violence in Poland from the 1970s to the Present"* by Agnieszka Kościańska (2020) (EXHIBIT A), Poland has a long history of a "progressive law regarding rape" that is undermined by "widespread stereotypes concerning rape" and a cultural environment where the victim's behavior is put on trial. The article documents how, for decades, expert discourses in law and sexology blamed women for sexual violence, suggesting that "no" could mean "yes" and that female "provocation" or being sexually experienced negated the validity of their refusal. This created a powerful culture of shame, silence, and self-blame, conditioning victims to internalize trauma rather than report it, fearing they would be disbelieved, shamed, or deemed responsible. This cultural script was ingrained in me.

4. The profound shame and fear of scandal, compounded by the power imbalance with Mr. Azevedo, made immediate disclosure or reporting feel impossible. My subsequent attempts to

2

maintain a semblance of normalcy through communication, which the Defendant now weaponizes as evidence of consent, must be viewed through this lens: they were the actions of someone operating under a deeply internalized cultural mandate to avoid scandal and silence, a common trauma response documented in the very society that shaped my upbringing.

5. In my culture, particularly in that setting, sexual assault is a source of deep shame and is not spoken of openly. As my brother Tomasz Marciniak has attested, I experienced traumatic sexual incidents as a child and adolescent that were never reported to authorities or discussed within the family (EXHIBIT B). This background conditioned me to internalize trauma and to avoid disclosure, fearing scandal and disbelief.

**REBUTTAL TO DEFENDANT'S ARGUMENTS ON LIKELIHOOD OF SUCCESS**

6. Defendant Azevedo's narrative, which seeks to reframe a pattern of coercion and assault as a consensual relationship by selectively presenting WhatsApp messages, relies precisely on the kind of rape myths that perpetuate injustice against victims of sexual violence. As detailed in academic analysis of international human rights case-law, rape myths are 'prejudicial, stereotyped or false beliefs about rape, rape victims, and rapists.' (EXHIBIT C). These include the pernicious ideas that a woman's 'no' can mean 'yes'; that friendly or acquiescent behavior after an assault implies original consent; and that a victim's failure to report immediately or resist physically indicates a lack of genuine violation. Azevedo's attempt to weaponize my post-assault communications—a documented trauma response—against me mirrors the flawed reasoning of authorities in cases like *D.J. v. Croatia* and *I.P. v. Moldova*, where victims were disbelieved because their reactions did not conform to a stereotypical 'perfect victim' script.(Id.) By invoking these discredited myths to suggest consent, the Defendant's narrative is not only factually wrong but also aligns with a well-documented pattern of discriminatory reasoning that

3

international jurisprudence recognizes as undermining effective access to justice for victims. My actions must be understood through the reality of trauma and coercion, not through the lens of these harmful and legally untenable stereotypes.

7. Azevedo's entire defense hinges on a sanitized and decontextualized presentation of the WhatsApp messages. He portrays post-assault communication as proof of consensual romance, willfully ignoring the power dynamics and psychological coercion at play. But the WhatsApp messages evidence coercion, not consent. A proper analysis reveals a pattern of manipulative and controlling behavior. First, Azevedo used <u>pressure and boundary violations</u>: immediately after the August 2017 assault, Azevedo demanded sexually explicit photos. When I attempted to set a boundary by stating, "But this is not included in the weekend package ;)," he immediately dismissed it, replying, "Of course it is," and continued to pressure me. This is not flirtation; it is coercion. Second, he deployed psychological control: he inserted himself into the most vulnerable aspects of my life, such as my breakup with my then-boyfriend, positioning himself as a confidant to create dependency. On September 11-12, 2017, he peppered me with messages about the breakup, offering unsolicited advice and ultimately demanding, "So, don't come back to him until Monday!" so he could have a weekend with me. This is a textbook tactic of isolation and control. Finally, he used degrading language and threats: His messages are laced with demeaning language, calling me a "bitch" on multiple occasions (e.g., March 13, 2018: "Where?? Bitch. I hope you can't sleep tonight!"). After the March 2018 rape, when I tried to establish boundaries, he stated, "Don't start with this shit again," and "I wont tolerate that." These are not the words of a respectful partner.

8. My continued communication with Azevedo is not evidence of consent but is a documented psychological response to assault known as trauma bonding or Stockholm Syndrome. As expert

4

literature confirms, victims often maintain contact with their abusers as a coping mechanism, seeking to regain a sense of control and safety by aligning with the aggressor[1].

9. The literature on trauma bonding clarifies that my continued engagement with Azevedo was not a reflection of genuine affection but a psychological response to a coercive dynamic, which is starkly illustrated in Azevedo's exhibit. The foundational power imbalance was inherent in his role as a senior figure in my academic program, CBMM, a position he leveraged to exert coercive control. This control manifested in a documented cycle of intermittent rewards and punishments, such as when, immediately after the August 2017 assault, his message applying intense sexual pressure on September 8th ("I look at you and I want to tear your clothes apart and bite you") was interspersed with planning friendly outings like jet skiing, creating a power imbalance where me, as a victim of Azevedo's August 30, 2017 rape, accepted positive interaction to avoid conflict. Azevedo's own awareness of his manipulative patterns is confirmed by his mother's statement that he did not love his long-term girlfriend and was merely angry he lost. Finally, my communication under duress is apparent in March 2018, where his escalating demeaning language ("Where?? Bitch. I hope you can't sleep tonight!") and my subsequent engagement following a second assault on March 15, 2018, are consistent with a trauma bond, not consensual relationship.

10. The most critical rebuttal to Azevedo's "consent" narrative comes from outside the messages. When I confronted him about the assault, he did not deny it. Instead, he boasted about a previous assault on another woman (Jane Doe 2), stating that he had sexually penetrated a sleeping woman, and when she woke up and protested, he said, "but then I fucked her anyway," so "it does not matter if the girl says no."  Plaintiff's email to Jane Doe 2, Jan 15, 2020). This

---

[1] See, e.g., Dutton & Painter, Traumatic Bonding: The Development of Emotional Attachments in Battered Women, 6 VICTIMOLOGY: AN INT'L J. 139 (1981).

reveals a mindset that fundamentally dismisses consent. The subsequent WhatsApp messages must be viewed through this lens: they are the interactions of a predator who believes 'no' is immaterial, manipulating a victim into a state of compliance. Azevedo's admission of a prior assault and corroboration of the victim, Jane Doe 2 herself, is devastating to his credibility.

11. Azevedo's selection of messages and omission of the relevant ones from the day of sexual assaults, beginning with deleting his nagging attempts to be around on August 30, 2017, the day of sexual assault in Woods Hole, just confirms a pattern of sexual predator, who is aware of his own misconduct and knows how to avoid accountability by deleting the evidence. This is corroborated by Jane Doe 3, a former CBMM School student whom Azevedo, a Teaching Assistant and CBMM "organizer", harassed with sexual propositions for a time alone with heavy alcohol drinks, and retaliated in their professional community when she rejected him, while conspicuously deleting the incriminating messages. (Pl. Decl. In Supp to Motion ¶ 11, Exh. E, Transcript of January 15, 2020 Phone Call Between Plaintiff and Jane Doe 3).

12. Defendant Azevedo's reliance on the MBL investigation is a profound mischaracterization of a process that was structurally designed to fail. This was not a good-faith inquiry but a cynical "jurisdictional runaround," where powerful institutions like Harvard, MIT, and Rockefeller University deliberately offloaded my complaint to the entity with the weakest authority and most flawed procedures to ensure no meaningful accountability. The investigation's fatal flaws are legion: investigators broke their binding promise of witness confidentiality by providing Azevedo with my full evidentiary dossier; they lacked the authority to interview the five key witnesses I identified; and they reached a predetermined "insufficient evidence" outcome that I was denied any right to appeal. This process was so fundamentally unfair that an independent

6

federal agency (NSF) confirmed its use of inferior procedures and inability to compel testimony.

13. The prejudice inherent in the MBL Report is profound and personal. The investigators deemed Azevedo's account "credible," a finding that was fundamentally based on prejudicial rape stereotypes and a vicious character assassination. His defense strategy relied on portraying me as morally deficient and sexually available by nature, thereby rendering me, in his view, "un-rapable." Specifically, he submitted a defamatory statement claiming I had worked as a "prostitute," among other salacious and false roles. By crediting this statement, the MBL investigators effectively sanctioned a smear campaign designed to shift the focus from his predatory conduct to my fabricated character. This narrative, once legitimized by the imprimatur of an "investigation," irreparably tainted my professional reputation and provided a gender-based stereotype for others to latch onto, allowing them to dismiss my assault allegations. The report's outcome is thus not a reliable finding but the product of this very prejudice, rewarding a strategy that sought to try the victim's character rather than the defendant's actions.

14. This institutional whitewash was compounded by Rockefeller University's bad-faith deflection of my March 2018 assault report. RU, my employer, strategically misclassified me as a student to shunt me away from the robust Title VII protections I was owed and into the dead-end MBL process, which had no jurisdiction over an assault that occurred in New York City. The scope of my 2019 MBL statement must be viewed through this lens: it was not an omission but a direct reflection of the procedural runaround I faced, where RU abdicated its responsibility and MBL's mandate was artificially narrow.

15. This pattern of institutional betrayal began immediately after the initial assault. My prompt report to my supervisor, Dr. Freiwald, was met with dismissal, normalizing the violation and instilling in me a well-founded fear of professional reprisal that forced me into silence. The MBL investigation was not a search for truth; it was the culmination of a coordinated strategy to silence me, protect powerful individuals and institutions, and create a seemingly "official" record to weaponize against me in this very litigation. Its findings are irredeemably unreliable and prejudicial.

**REBUTTAL TO DEFENDANT'S ARGUMENTS ON IRREPARABLE HARM**

16. Azevedo argues that the seven-year lack of direct contact negates a finding of irreparable harm. This is a profound misreading of the law and the nature of the injury. The standard is whether there is a "real and immediate threat of future injury. The "threat" here is not merely a future physical assault, but the ongoing and exacerbating psychological trauma caused by Azevedo's continued presence in my professional and litigation sphere. His recent actions—including leveraging court procedures to force his communications into my inbox and his successful campaign to lift institutional no-contact orders—have directly triggered severe psychological decompensation, including a documented hypertensive crisis and debilitating anxiety that destroys my capacity to work as a scientist. This destruction of my cognitive and professional capacity is a quintessential irreparable injury; it cannot be remedied by a damages award at the end of litigation.

17. Azevedo touts the "contact-free" status quo, but this ignores that the recent lifting of the MBL no-contact directive—an action he instigated—has fundamentally altered that status quo to my direct and severe detriment. My sense of safety was institutionally anchored to those directives. Their removal, coupled with Azevedo's use of mandatory court filings as a vector for indirect

8

contact, has created a "real and immediate" threat to my psychological well-being. His proposed "accommodation" to stop courtesy copies is an admission that this contact is harmful, yet it does nothing to address the core threat of his potential presence at conferences, his influence within my professional field, or the trauma of being continually re-victimized through the litigation process he attempts to kidnap by character assassination.

**1. Professional Isolation and Loss of Goodwill:**

18. In or around January 4, 2020, I contacted a former professional colleague, Michael Ortiz-Rios, (EXHIBIT My purpose was to seek his assistance as a potential witness in this litigation, asking if he could corroborate statements Dr. Azevedo had made to him.

19. After receiving no response to my initial email, I re-sent the message from a different email account to ensure it was received. I learned from the Defendant's own filings that Michael did not respond to me but instead reported my confidential legal outreach directly to Dr. Azevedo.

20. This incident is not a mere misunderstanding; it is a stark example of the irreparable professional harm I suffer. My professional network has been compromised and weaponized against me. A confidential attempt to gather evidence was funneled directly to my adversary, demonstrating a profound breakdown of trust and resulting in the tangible severance of a professional relationship. This is part of a pattern of isolation that will only be exacerbated if the Court withdraws its protection.

**2. Destruction of Cognitive and Professional Capacity:**

21. The harm I face is not merely relational; it is a direct assault on my foundational capacity to work. The no-contact order previously in place was a critical "security blanket" that provided a fragile sense of safety, allowing me to function.

22. The lifting of that order, orchestrated by Dr. Azevedo, directly triggered a severe medical crisis, documented by my physicians, including a hypertensive crisis and debilitating anxiety. This has manifested in an inability to concentrate, severe migraines, and a crushing depression that robs me of the cognitive clarity required for scientific research.

23. My professional "goodwill" is not a corporate asset; it is the intangible but real value of my intellect, my expertise, and my capacity for productive scientific work. This capacity is being actively destroyed. I cannot think, research, write, or collaborate at the level my career demands. This erosion of my core professional asset is irreparable; no monetary award can restore years of lost innovation, publication opportunities, or cognitive function.

**3. Ongoing Threat to My Career and Livelihood:**

24. The fear of encountering Dr. Azevedo at conferences or scientific events is not hypothetical. Given our overlapping fields and his influence within them, the threat is real and immediate. This fear prevents me from engaging fully in the scientific community, damaging my entrepreneurship and standing, and threatens to cripple my entire scientific career, which spans decades into the future.

25. Without the protection of an injunction, I am left vulnerable to the ongoing irreparable harm of professional isolation, the destruction of my cognitive capacity to work, and the constant threat of being forced into a professional environment with my assailant.

**CONCLUSION**

26. Based on the foregoing, I respectfully submit that Defendant Azevedo's opposition fails to rebut the overwhelming evidence of coercion, trauma bonding, and institutional betrayal that defines this case. His narrative, constructed on decontextualized messages and discredited rape myths,

10

cannot obscure the reality of the assaults and their devastating, ongoing consequences. The irreparable harm to my psychological well-being and professional capacity is not a relic of the past but an active and escalating crisis, directly fueled by his litigation conduct and the dismantling of institutional protections. The urgent necessity for this Court's intervention is clear. I therefore implore the Court to grant the preliminary injunction and restore the crucial barrier that protects me from further irreparable harm.

I declare under penalty of perjury that the information contained in this declaration is true and correct.

Executed on: October 2, 2025

New York, New York

**PLAINTIFF PRO SE**

*Karolina Agra*

Karolina Agra
500 E 63rd St, Apt 13F
New York, 10065 NY
marciniak.kar@gmail.com
(646) 770 2045