Karolina Agra

500 E 63rd St, Apt 13F

New York, 10065 NY

marciniak.kar@gmail.com

(646) 770 2045

PLAINTIFF PRO SE

**1**

**UNITED STATES DISTRICT COURT**

  **SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------X

  KAROLINA MARCINIAK-DOMINGUES

  GONCALVES AGRA,

                            Plaintiff,

      v.

THE ROCKEFELLER UNIVERSITY,                    Civil Action No: 1:22-cv-10959-ALC

FREDERICO AZEVEDO, WINRICH

FREIWALD

                      Defendants.

-------------------------------------------------------------X

### PLAINTIFF'S REPLY DECLARATION IN FURTHER SUPPORT OF HER

### MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY

### INJUNCTION

### I.    Introduction

1. I submit this declaration in further support of my reply to Defendants' Opposition (Dkt. 199). Their submission mischaracterizes my tenancy, ignores the integrated nature of housing and employment at RU, and whitewashes the retaliatory timing of its 90-Day Termination Notice. This declaration sets forth facts demonstrating that injunctive relief is necessary and essential to prevent imminent and irreparable harm.

**A. Good faith as tenants**

2. From the start of our tenancy until March 2020, my husband and I paid our rent in full and on time, with payment withdrawn directly from my bi-monthly RU's salary.

3. In March 2020, the COVID-19 pandemic caused severe financial hardship. I proactively reached out to RU's Financial Department and President's Office to explain our situation and seek rent relief or a payment plan.

4. In May 2020, Mr. Alex Kogan of RU Housing proposed we transfer to a smaller, less expensive apartment. We agreed to this good-faith step.

5. When new arrears emerged, I was directed to RU Human Resources and instructed to apply for a housing scholarship. I complied, and the committee approved a $5,000 scholarship.

6. On or about March 3, 2021, Housing requested immediate payment of $24,650.28. We immediately transferred $4,000.

7. On March 18, 2021 RU denied a requested abatement for repairs in the previous unit.

8. I replied within a week, reaffirming our commitment to repay and seeking further assistance from HR, explaining that pre-pandemic conditions, including the financial impact of a sexual assault at RU, had drained our finances.

9. HR requested additional information, which I provided. On July 2, 2021, I was informed the committee had made a one-time exception and approved a $10,000 scholarship.

10. Our actions throughout this period were consistently forthright and in good faith.

**B. RU's HR Department Has Direct Responsibility for Campus and Housing Safety**

11. Defendants argue my request for a safety plan is a "landlord-tenant" matter. This is false. Significant safety issues within University housing are managed by the central HR department, specifically Vice President Virginia Huffman.

12. In May 2019, I reported Azevedo's misconduct to Ms. Huffman. She instructed me to participate in the U of Chicago/MBL investigation and referred me to support resources.

13. RU's Own Actions Acknowledge the Threat. On or about June 10, 2019, I met with RU Security Director James Rogers and Ms. Huffman. They acknowledged the threat and initiated a security response. At Mr. Rogers's request, I provided Azevedo's photograph and description on June 12, 2019, for campus security to deny him entry.

14. **Universal No-Contact Directive:** The subsequent No-Contact Directive (NCD) issued on June 6, 2019, was explicitly universal, covering "all locations."

15. Azevedo violated this universal NCD by initiating contact with me at a virtual research seminar in September 2019.

16. In October 2018, RU's HR department, through Ms. Huffman and Security Officer Michael Murphy, actively involved itself in the criminal investigation against Azevedo.

### C. A separate Incident of Housing-Based Harassment Handled by RU's HR

17. In December 2019, I and two other female residents reported a safety concern regarding a RU professor who was persistently staring at us in our residential building.

18. My complaint was immediately forwarded to Ms. Huffman. In a December 14, 2019, phone call, Alexander Kogan affirmed my concerns were valid, stated the behavior was "inappropriate," and informed me he had already referred the matter to Virginia Huffman.

19. This confirms HR is the appropriate authority to address misconduct making residents feel unsafe in their homes.

   **D. RU's History of Deliberate Indifference**During a meeting on or about December 20, 2019, we detailed our accounts to Ms. Huffman. She did not file a formal complaint and later dismissed our validated concerns.

20. This incident proves: (i) RU, through its HR/Title IX office, considers safety within university housing to be within its jurisdiction; (ii) Virginia Huffman failed to act on housing-related safety complaints; and (iii) the "landlord-tenant" distinction is a litigation strategy.

21. My current request for a safety plan is a direct continuation of my long-standing efforts to get RU to provide a safe environment. Their past failure is part of the same pattern of deliberate indifference.

**III. Good Faith Efforts to Maintain Tenancy and RU's Unexplained Delay**

22. My employment was terminated in November 2021, and my lease ended. Despite awareness of rental arrears, RU took no formal action to evict for nearly four years—until September 2025.

23. On December 16, 2021, I replied to RU's termination letter, stating I intended to remain due to ongoing litigation but offered to relocate if RU covered expenses.

24. I secured relief through the NYS Emergency Rental Assistance Program (ERAP). RU initially failed to submit the required landlord portion of my application.

25. On October 14, 2022, ERAP provisionally approved my application for $37,426.00, covering 14 months of arrears, and informed me RU had not submitted its portion.

26. It was only after I filed this lawsuit in December 2022 that RU complied. In January 2023, New York State paid RU $37,426.00 directly. By accepting these funds, RU contractually agreed not to evict for a year.

27. On March 20, 2023, RU Housing sent a letter falsely stating we were in arrears for over two years, demanding $79,155.63.

28. On April 12, 2023, I responded in writing, acknowledging the debt and stating our intention to pay the remaining arrears upon moving out. I also noted our intention to request an abatement

for unresolved maintenance issues and asked for a positive rental reference. RU never

responded.

29. In January 2024, to fulfill application requirements for NYC HRA assistance, I requested a

landlord letter from RU Housing. RU's counsel ultimately refused, stating "there is presently no

landlord-tenant relationship."

30. Due to RU's lack of collaboration, we lost Cash Assistance Benefits.

**IV. The Termination Notice is Retaliatory**

31. RU's claim that the 90-Day Termination Notice is routine is false. The timing and context reveal

it as retaliation for my vigorous prosecution of this lawsuit.

32. The Timing of the Notice Exposes Its Retaliatory Motive. The notice, served on September 10,

2025, was issued just days after I filed my extensive declaration (Dkt. 196) on September 5,

2025. After years of inaction, RU chose to initiate termination at the precise moment I am most

vigorously litigating my claims.

**V. My husband and I Face Imminent, Irreparable HarmA. Irreparable Harm from the**

**Imminent Threat Posed by Defendant Azevedo.**

33. My delay in filing the TRO was a strategic decision made in reliance on legal advice to

prioritize responding to three separate court-ordered motions due July 1 and August 18, 2025.

34. My fear of Azevedo is based on a documented history of his intentional intimidation and

violations of protective measures.

35. **May 2019 Intimidation:** Following my report, Azevedo engaged in intimidating behavior at an

MBL conference, purposefully positioning himself near me to "provoke me," forcing me to seek

police intervention.

36. The universal NCD was violated by Azevedo on RU's property in September 2019.

37. The recent lifting of the external no-contact order has removed the deterrent, triggering a severe medical and psychological crisis. The harm I seek to prevent is a recurrence of a documented pattern of behavior.

**B. Irreparable Harm from Eviction and Homelessness.**

38. The harm of being rendered homeless is profound and irreparable. Losing my home would be catastrophic to my health and stability and severely impair my ability to prosecute this complex federal action.

39. We have no family in the United States, no substantial savings, and my ability to earn has been damaged by Defendants' retaliation. If evicted, we have literally nowhere to go.

**VI. Conclusion**

40. The Kogan Declaration misleadingly claims I "paid no rent" since 2021, ignoring the $37,426 ERAP payment RU accepted in 2023. RU's claim of "routine procedure" is belied by its four-year delay and acceptance of rent long after the lease ended.

41. Defendants' Opposition fails to rebut the core issues: RU treats housing safety as an HR matter, the eviction is retaliatory, and the threat from Azevedo is documented and imminent.

42. The injunctive relief I seek is directly tied to the claims in my TAC. RU's actions are retaliatory, and the harms I face—homelessness and gender-motivated violence—are imminent and irreparable.

43. I respectfully request that the Court grant my Motion.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on: October 2, 2025

New York, New York

                                **PLAINTIFF PRO SE**

                                Karolina Agra

                                500 E 63rd St, Apt 13F

                                New York, 10065 NY

                                marciniak.kar@gmail.com

                                (646) 770 2045