# EXHIBIT A

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

KAROLINA MARIA MARCINIAK-
DOMINGUES GONCALVES AGRA,

<div align="center">Plaintiff,</div>

- against -

ROCKEFELLER UNIVERSITY,
FREDERICO AZEVEDO and
WINRICH FREIWALD,

<div align="center">Defendants.</div>

Civil Case No.: 1:22-cv-10959-ALC

**FOURTH~~THIRD~~ AMENDED
COMPLAINT AND DEMAND
FOR JURY TRIAL**

Plaintiff Dr. KAROLINA MARIA MARCINIAK-DOMINGUES GONCALVES
AGRA ("Plaintiff") complain of Defendants ROCKEFELLER UNIVERSITY ("RU"),
FREDERICO AZEVEDO ("Azevedo") and WINRICH FREIWALD ("Freiwald"), and in
support respectfully states and alleges, upon information and belief, the following:

### PRELIMINARY STATEMENT

This is an action for discrimination, sexual harassment, and retaliation under
federal, state, and city law. Plaintiff, Dr. Karolina Agra, was a postdoctoral researcher in
the laboratory of Defendant Dr. Winrich Freiwald at Defendant Rockefeller University
("RU"). Plaintiff alleges that Dr. Freiwald subjected her to unwelcome sexual advances
and a hostile work environment. After she explicitly rejected his advances and set
professional boundaries, Dr. Freiwald retaliated by demoting her, stripping her of
research responsibilities, and ultimately terminating her employment. Separately,
Plaintiff was sexually assaulted on two occasions by Defendant Frederico Azevedo, a
researcher affiliated with a collaborative program. RU was aware of these assaults but
failed to take adequate action to protect Plaintiff or address the hostile environment.
Following Plaintiff's complaints, RU and Dr. Freiwald engaged in a campaign of
retaliation that extended to interfering with her housing and immigration status.

~~Defendants RU, Azevedo and Freiwald intentionally discriminated against Plaintiff based on her gender, fostered a hostile work environment, sexually harassed her and subjected her to retaliation ultimately resulting in termination, abruptly ceasing her research, reputational damage and economic damages. Despite numerous complaints, Defendants allowed this discrimination, harassment and retaliation to persist, inflicting upon Plaintiff severe emotional distress. Furthermore, Defendants retaliated against Plaintiff after she lodged complaints opposing the discrimination, sexual harassment by both Defendants Freiwald and Azevedo, ad rape by Azevedo. The retaliation culminated in the unlawful termination of Plaintiff's employment on or about November 30, 2021 despite her stellar performance as a postdoctorate researcher working in Freiwald's laboratory researching Intuitive Physics. Additionally, Plaintiff asserts claims against Azevedo and Freiwald pursuant to the New York City Gender-Motivated Violence Act, based on allegations of sexual assault and sexual harassment she endured. These claims are brought within the applicable statutory look-back period permitted under the Act.~~

## NATURE OF THE ACTION

1. This action is brought pursuant to the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. § 2000e *et seq*. ("Title VII"), the New York State Executive Law ("NYSHRL") § 296, *et seq*., the New York City Admin. Code § 8-101, et seq. ("NYCHRL"), and the N.Y.C. Admin. Code §§ 10-1101, et seq.) ("VGMVPL")

2. Plaintiff brings this action against Defendants for economic, non-economic, compensatory and punitive damages, pre-judgment interest and costs and reasonable attorneys' fees, and any such remedies the Court deems just and proper.

3. Plaintiff's inclusion of Dr. Freiwald in the Third Amended Complaint (TAC, this Fourth Amended Complaint is not a back-door consolidation but a necessary and efficient joinder of a indispensable party. Joining Dr. Freiwald in this action is necessary for the complete and efficient resolution of this matter, as the claims against him and RU arise from the same core of operative facts, involve the same witnesses, and represent a continuous course of conduct.

4. The prior complaint, *Marciniak II*, naming Freiwald as Defendant (Marciniak-Domingues Goncalves Agra v. MIT et al., 23-cv-10305 (JPC)), was dismissed without

prejudice, "except to the extent that the dismissal in this case would not affect any current or future claims brought in Marciniak-Domingues Goncalves Agra v. Massachusetts Institute of Technology, No. 22 Civ. 10959 (ALC) (S.D.N.Y.) ("Marciniak I").Nothing in this Order should be construed as the undersigned taking a position as to whether Plaintiff should be permitted to add any claims or defendants in *Marciniak I*." ( Marciniak II, ECF No. 94), thereby preserving Plaintiff's right to seek amendment here. To require Plaintiff to pursue fragmented claims in separate actions would be inefficient and would contravene the federal rules' preference for the just, speedy, and inexpensive determination of every action.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, because Plaintiff's statutory claims present federal questions. Plaintiffs also assert supplemental state and city law claims pursuant to the New York State Constitution, New York Executive Law § 296, et seq., New York City Admin. Code § 8-101, et seq., and N.Y.C. Admin. Code §§ 10-1101, et seq.) ("VGMVPL") over which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

6. This Court has personal jurisdiction over Defendants RU and Freiwald, who are New York domiciliary. This Court also has personal jurisdiction over Defendant Azevedo pursuant to New York's long-arm statute, CPLR § 302(a)(2), because he committed tortious acts within the state. Furthermore, jurisdiction is proper under CPLR § 302(a)(3) because Defendant Azevedo committed a tortious act outside the state (the August 2017 sexual assault in Woods Hole, Massachusetts) causing a severe and enduring injury to a New York resident within the state of New York. Given that Plaintiff was a New York resident employed by a New York institution and received her medical care in New York, it was foreseeable that an injury stemming from a professional-academic conference would manifest and be treated in New York. A substantial part of the events giving rise to Plaintiff's claims occurred in New York, including the sexual harassment, hostile work environment, sexual assault from Azevedo in March 2018, and retaliation Plaintiff endured while working at RU.

3

7.  Venue is properly laid in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District, and application and enforcement of Defendants' equal employment opportunity ("EEO") policies, affecting the hiring, promotion, work assignments, discipline and termination of its employees, may be found in this District.

8.  All conditions precedent to jurisdiction have occurred or been complied with including, and in particular:

a. Within 300 days of Defendants Rockefeller and Freiwald's adverse employment action, which took place on July 30, 2020 in response to her opposition to Freiwald's sexual harassment, Plaintiff filed a complaint against Defendants RU and Freiwald with the New York State Division of Human Rights ("NYSDHR"), Case No. 10212022, Federal Charge No. 16GC101854, on or about May 18, 2021 alleging violations of federal law including, but not limited to, Title VII of the Civil Rights Act of 1964.  A probable cause determination upon investigation was issued on January 18, 2022 [EXHIBIT A]. Dismissal for administrative convenience because Plaintiff intended to pursue federal remedies in court, in which forum all the issues concerning the question of discrimination charged can be resolved, and Notice of Right to Sue was issued by the NYSDHR on April 7, 2023.

b. Within 300 days of Defendants Rockefeller and Freiwald's termination of Plaintiff's employment, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on or about June 7, 2022. A Dismissal and Notice of Right to Sue was issued by the EEOC on March 21, 2023.

## JURY DEMAND

9.  Pursuant to Fed. R. Civ. P. 38(b), Plaintiff respectfully demands a trial by jury on all issues and claims set forth in this Complaint.

## PARTIES

10. Plaintiff Dr. Karolina Marciniak-Domingues Goncalves Agra is, since August 30, 2016, a resident of the State of New York[1].

---

1  Plaintiff is a neuroscientist with background in Psychology (MA, 2008, Adam Mickiewicz University in Poznan, Poland) and PhD in Neuroscience (2015, International Max Planck Research School, Graduate School of Neural & Behavioral Science in Tuebingen, Germany). She has extensive training in neuroscience, particularly as applied to

11.  Plaintiff had been continuously employed by Defendant RU from in or about September 2016 until the date of her termination on or about November 30, 2021. Defendant RU is incorporated under the laws of the State of New York. Defendant RU employed Plaintiff as defined by federal law including, but not limited to, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. Furthermore, Defendant RU acted as Plaintiff's landlord, providing her with university-owned housing as a condition and benefit of her employment, thereby creating an integrated employment and residential relationship.

12. At all relevant times to this Complaint, Defendant RU shared a common business with Massachusetts Institute of Technology ("MIT") and President and Fellow of Harvard College ("Harvard") under federally funded program, the National Science Foundation's Center for Brain, Minds and Machines ("CBMM"), sharing resources and personnel, including Plaintiff.

13. Defendant Freiwald is a resident of the State of New York, a Professor at RU, and the Principal Investigator on the NSF-CBMM grant awarded to RU. During all times material to this matter, Freiwald served as the Plaintiff's supervisor and held the authority to make decisions regarding her hiring, termination, and employment conditions.

14. Upon information and belief, Defendant Dr. Winrich Freiwald, at all relevant times, acted as an agent of Defendant The Rockefeller University ("RU") as that term is defined in 42 U.S.C. § 2000e(b).

15. Freiwald was vested by RU with significant and ultimately unilateral authority over the tangible aspects of Plaintiff's employment, including but not limited to:

a. Hiring and Recruitment: Personally recruiting Plaintiff and determining the terms of her postdoctoral appointment.

b. Compensation and Funding: Controlling the source, amount, and continuation of Plaintiff's salary and research funding.

c. Research Direction: Possessing sole discretion to assign, modify, or terminate Plaintiff's research

---

magnetic functional imaging and single cell electrophysiology of social attention and motor adaptation in non-human primates. Plaintiff had authored or co-authored several original research articles, which have been published in leading scientific journals. https://orcid.org/0000-0003-2389-269X

projects and objectives.

d. Laboratory Resources: Exercising exclusive control over the allocation of laboratory resources, equipment, and collaborative opportunities for Plaintiff.

e. Termination: Wielding the ultimate authority to terminate Plaintiff's employment with RU, which he exercised in August 2021.

16. In exercising the powers described above, Dr. Freiwald was not merely a coworker or low-level supervisor but was the RU official who possessed and exercised the institution's core employer prerogatives. The tangible employment actions alleged in this Complaint, including Plaintiff's demotion and termination, were effected directly through Dr. Freiwald.

17.    Defendant Azevedo is a resident of the State of Massachusetts and ("MIT")'s employee associated with CBMM since 2014.

## STATEMENT OF FACTS

18.  Prior to his appointment at RU in 2009, Defendant Freiwald had a personal relationship with Doris Tsao, who was then in a position subordinate to him. His appointment at RU was facilitated, in part, by this prior association. This relationship ended poorly and Freiwald's conduct caused Tsao injury. In 2009, Defendant RU appointed Defendant Freiwald as Assistant Professor and Head of Laboratory of Neural Circuits at RU. Freiwald secured this appointment by leveraging his academic career through the exploitation of his prior relationship with Doris Tsao, who had been occupying a position of subordinate authority to him.

19. Upon information and belief, bBetween 2009 and 2016, Freiwald engaged in at least one personal relationship with an RU's employee, who provided services to his laboratory under his direction.

20. Beginning in 2014, Defendant Freiwald initiated a recruiting process with Plaintiff. In or about November 2014, he abruptly relocated her formal job interview from a conference venue in Washington D.C. to an upscale restaurant. At the conclusion, when Plaintiff attempted to pay, Freiwald insisted on covering the expense. Freiwald reviewed Plaintiff's application while recruiting for postdoctoral openings in his laboratory at RU

~~and invited Plaintiff for an interview scheduled to occur during a neuroscience conference in Washington D.C.~~

~~21.~~

22. ~~Upon meeting Plaintiff at the neuroscience conference, Freiwald abruptly relocated the scheduled job interview from the Convention Center to an upscale restaurant in the city.~~ He immediately offered her the postdoctoral position at his laboratory at RU, promising her autonomy to pursue her research proposal and assuring her that the laboratory possessed the necessary neuroscience technology and financial stability to cover her salary. ~~At the conclusion of the interview, when Plaintiff attempted to pay her bill, Freiwald insisted on covering the expense.~~

23. ~~During~~ her RU's campus visit i~~I~~n September 2015, Freiwald provided his personal cell phone number and stated, "for whatever reason, anytime, ok?" He also insisted on personally collecting her from her guest house.

24. ~~at Freiwald's invitation, Plaintiff traveled to New York to tour his laboratory facilities at RU and discuss her research proposal. Freiwald arranged for her accommodation at the campus guest house and paid for transportation.~~ On or about September 24, 2015, he initialized Plaintiff's hiring process by sending the necessary paperwork.

25. ~~Upon Plaintiff's arrival at RU on Sunday, September 27, 2015 but prior to the scheduled commencement of Plaintiff's visit, Freiwald sent her a personal email, where he provided his cell phone number and made a request for personal contact "for whatever reason, anytime, ok?". He also insisted on personally collecting her from the guest house. Plaintiff did not act upon Freiwald's request.~~

26. At the conclusion of Plaintiff visit to RU, Freiwald disclosed to her that the research Plaintiff proposed was already being pursued in the laboratory by another postdoc and requested that she prepare another proposal. Given this unexpected development and the uncertainty regarding the laboratory's research facilities, which Plaintiff could not tour, she withdrew from the hiring process.

27. Between November 2015 and February 2016, Defendant Freiwald sent Plaintiff a series of unsolicited personal emails. These included emails on or around Valentine's Day

in 2016, in which he urged Plaintiff to "confide" in him, assured her she had "nothing to be afraid of," and described himself as a "good listener and understanding."

28. In November 2015, Freiwald sent her an email insisting on "planning [her] next steps". Plaintiff did not reply.

29. In December 2015, Freiwald initiated a "Happy New Year" email exchange with Plaintiff, inquiring about her holiday plans. Plaintiff responded politely with New Year's greetings but did not engage in further personal conversation.

30. On February 6, 2016, Freiwald emailed Plaintiff again, expressing concern that she "might not be doing well" and urging her to confide in him. Plaintiff did not reply.

31. On February 14, 2016, Valentine's Day, Freiwald sent another email, assuring Plaintiff that she had "nothing to be afraid of" and insisting she open up to him, claiming to be a "good listener and understanding."

32. On February 17, 2016, Plaintiff replied stating she was "OK" but dealing with personal matters.

33. On February 19, 2016, Freiwald wrote he had "feared" she was experiencing personal difficulties, and informed Plaintiff that he had already contacted Professor Josh Tenenbaum of MIT ("Tenenbaum") about Freiwald and Plaintiff "working closely" together. Freiwald represented this purported collaboration with the Center for Brains, Minds, and Machines ("CBMM") as "invaluable" for Plaintiff's work and beneficial for her "closely integrated" scientific support.

34. In March 2016, without Plaintiff's prior knowledge or explicit consent, Freiwald unilaterally initiated the formal immigration and appointment process with RU's Human Resources. He characterized her visa situation as "complicated," which resulted in her receiving a J-1 visa sponsorship instead of a more favorable visa category. This action gave Freiwald direct control over Plaintiff's legal immigration status in the United States.

35. In or about March 2016, Plaintiff scheduled a follow-up visit to RU to clarify the project proposal and confirm laboratory resources before committing to the postdoctoral position. Regrettably, the visit was canceled due to an unanticipated visa procedural issue.

36. On or about March 21, 2016, following Plaintiff's communication with Freiwald regarding the visit cancellation, Freiwald called Plaintiff and offered RU's assistance in securing the necessary visa, which Plaintiff understood to be for the purpose of her prospective laboratory visit. She remained intent on evaluating the facilities prior to accepting the postdoctoral position.

37. Immediately following the call, Freiwald, without Plaintiff's prior knowledge or explicit consent, initiated the postdoctoral appointment process by sending a "New Postdoc" email to Maria Lazzaro ("Lazzaro"), Director of Immigration and Academic Appointments at RU's Human Resources. This email, which copied Freiwald's Lab Manager, Lihong Yin, formally began Plaintiff's employment procedures at RU. While Lazzaro initially sought to discuss the appointment details directly with Plaintiff, Freiwald intervened, characterizing Plaintiff's visa situation as "complicated." Consequently, Lazzaro proceeded with a J-1 Visa sponsorship, a less favorable option for Plaintiff's postdoctoral employment at RU.

38. Prior to Plaintiff's anticipated arrival at RU in September 2016, Freiwald, on or about April 20, 2016, emailed her regarding the CBMM collaboration. He reported having had a "fantastic" meeting with Tenenbaum and emphasized the "exciting prospects" this collaboration held for Plaintiff.

39. In July 2016, Freiwald, Tenenbaum, and Professor Nancy Kanwisher of MIT ("Kanwisher") reviewed Plaintiff's research proposal and agreed that her research should focus on "electrophysiology to inform our understanding of Intuitive Physics." On or about August 1, 2016, Tenenbaum and Kanwisher provided positive feedback on Plaintiff's proposal, describing it as "cool" and "dynamite."

40. In or about February 2017, under the supervision of Freiwald, Kanwisher, and Tenenbaum, Plaintiff submitted her postdoctoral research proposal. Consequently, she was awarded the prestigious two-year Feodor-Lynen fellowship from the German Humboldt Foundation, which covered 50% of her salary from September 1, 2017, to August 30, 2019. Defendant RU agreed to cover the remaining salary to complete the project.

9

41. On or about September 1, 2016, upon commencing her employment, Plaintiff discovered that Freiwald had significantly misrepresented the state, maturity, and capabilities of the laboratory facilities. The promised fMRI protocol required development from scratch, and the large-scale electrophysiology method was in its nascent stages.

42. On or about September 15, 2016, Freiwald contacted Kanwisher and Tenenbaum to delegate Plaintiff to travel to MIT to establish collaboration, which lasted until Freiwald's retaliation.

43. In or around December 2016, Freiwald required Plaintiff to participate in a laboratory "murder mystery" event. Freiwald cast Plaintiff in the role of "Karolina Delong," a character described in the script as "innocent" and "naive," whose storyline involved developing a state of devotion towards Freiwald's character and being groomed to murder a colleague to "save" Freiwald from blackmail.

44. In or about March 2017, ~~Freiwald supervised Plaintiff's participation in~~during a non-human primate medical procedure spervised by Freiwald, Freiwald instructed Plaintiff ~~where Plaintiff was expected to give instructions to surgeons and assistants. However, rather than fostering a professional and respectful environment, Freiwald encouraged Plaintiff in unprofessional and demeaning attitude~~ to "be that slave driver once in your life." when she was expected to give instructions to surgeons and assistants.

45. Delegated by Freiwald, between August 28 and August 31, 2017 Plaintiff attended a CBMM Summer School in Woods Hole, MA, held at the Marine Biological Laboratory (MBL)'s campus, in the role of observing student, to get to know CBMM community and discuss her research with MIT collaborators, who were teaching there. Plaintiff requested and obtained permissions to attend from the School Directors, of Harvard and MIT, and was delegated by them to "talk about her accommodation" with Xavier Boix ("Boix"), a senior Teaching Assistant at the program[2].

46. Upon Plaintiff's arrival, Boix informed her that~~told Plaintiff~~ she was assigned to share off-campus accommodation with him and Frederico Azevedo ("Azevedo"), both of whom she had not ~~met~~ previously met. Both men were Teaching Assistants ~~under~~ supervis~~ed~~ion ~~by~~of Harvard and MIT. Plaintiff was not provided a separate key to the

---

2  Tuition for the course, as well as room and board on the MBL campus, is funded by NSF through a sub-award from MIT through Harvard to MBL.

accommodation. Her sleeping area did not have a door, and there was only one shared bathroom.

47. On her first night, Azevedo invited Plaintiff to a late-night gathering in his and Boix's rooms. Plaintiff declined. Later that night, Plaintiff heard loud voices and laughs of Azevedo, Boix, and two women. The next morning, Plaintiff met these women and recognized them as students of Boix and Azevedo.

48. Upon information and belief, Boix and Azevedo regularly invited these women, who were under their direct supervision, to the house, where Azevedo attempted to pursue them for sexual encounters.

49. On August 30, 2017, Azevedo approached Plaintiff in the dining hall and offered her a room in the main building, SWOPE, for rest. Due to the prolonged program, her medical condition and the distance to her initial accommodation, Plaintiff agreed. Azevedo initially intended to stay in the room, but when Plaintiff objected, he left. Plaintiff then fell asleep.

50. Plaintiff was awakened by the sound of the door opening. She saw an individual enter briefly, retrieve an item, and exit. Shortly after, Plaintiff noticed Azevedo in the room, who approached her as she lay clothed and covered by a blanket. Without her consent, Azevedo removed the blanket and placed his hand under her dress, initiating unwanted physical contact. Plaintiff immediately resisted, pushing his hand away, and stating, "No, I do not want this." Despite her physical and verbal objections, Azevedo continued to grope her, ignoring her repeated protests of "No, no, no."

51. Azevedo then escalated his actions by pulling up Plaintiff's dress and attempting to remove her underwear. Plaintiff resisted forcefully, squeezing her legs together and reiterating, "No, I don't want it." Azevedo, undeterred by her resistance, proceeded to

remove his pants and forcibly restrained Plaintiff by placing his hand over her mouth and immobilizing her hands. He then forcibly spread her legs and penetrated her vagina with his penis, against her will and without her consent. As a direct result of this non-consensual contact, Plaintiff contracted a high-risk strain of Human Papillomavirus (HPV), a lasting physical injury that was later diagnosed and treated in New York.

52. Following the assault, Azevedo laughed at her visible distress and ~~callously~~ mocked the Plaintiff, asking, "How does it feel to cheat on your boyfriend?"

53. Azevedo insisted on accompanying the Plaintiff to the Lobb Building, where the program activities were ongoing. Upon arrival, he instructed her to wait for him and Boix before returning to the accommodation.

54. Overwhelmed by feelings of helplessness, shame, and unaware of any immediate recourse, Plaintiff continued to participate in the program because next day, on August 31, 2017, at Tenenbaum's direction, Plaintiff was tasked with discussing the next steps in her project paradigm with two postdoctoral researchers from Tenenbaum's laboratory. Plaintiff felt compelled to proceed with her professional obligations, fearing potential retaliation or the loss of her job if she were to report the assault.

55. Following the scheduled meeting on August 31, 2017, Plaintiff returned to New York and promptly emailed Freiwald to schedule a meeting the following day, with intention to report Azevedo's sexual assault and seek help.

56. On September 1, 2017, the meeting between the Plaintiff and Freiwald, which was originally scheduled to take place in the office, was abruptly and unilaterally relocated to a location outside the university at the last minute. Freiwald arrived at the office with his backpack in hand, signaling his expectation that the Plaintiff would comply with this change without question or objection.

57. During a 40-minute walk, Freiwald repeatedly invaded her personal space by standing unnecessarily close to her, placed his hand on her lower back in a manner that was both intrusive and inappropriate for Plaintiff, and leered at her in a suggestive and lascivious manner, directing his gaze at her legs and buttocks. When he allowed Plaintiff to walk ahead of him, he positioned himself in a way that enabled him to continue staring at her.

58. This conduct caused the Plaintiff significant distress and subjected her to a degrading and humiliating experience. Additionally, Freiwald's actions exposed the Plaintiff to potential public scrutiny and derogatory social perception in the neighborhood where she lived and worked, further compounding the emotional and psychological harm she endured.

59. During the course of the conversation, Plaintiff explicitly sought assistance from Freiwald by disclosing that in Woods Hole, MA, she had experienced a "bad encounter with somebody from another institution." Despite her attempt to convey the gravity of the situation, Freiwald ~~dismissed her complaint, minimizing its significance and abruptly shifting the conversation to other matters, which Plaintiff understood as his suggestion she should downplay any incidents and accept it as an unavoidable or commonplace occurrence within the context of the CBMM Summer Course, discouraging her from pursuing any formal recourse, and exacerbating her sense of isolation and powerlessness.~~ did not offer assistance, shifted the conversation to other matters, and did not initiate any investigation or support.

60. In the following week, Plaintiff confronted Azevedo ~~regarding a non-consensual sexual encounter,~~ stating she recalled refusing any sexual activity. Azevedo ~~dismissed~~replied ~~her statement, asserting~~ that her lack of consent was immaterial. He then ~~and~~ recounted an incident from his graduate school, describing sexually assaulting an intoxicated junior individual who was unable to consent, and further stated that he disregarded her subsequent protests, which Plaintiff interpreted as a threat and act of intimidation.

61. On November 16, 2017, Azevedo forwarded to the Plaintiff an internal CBMM email exchange between the CBMM Managing Director, Kathleen Sullivan ("Sullivan") and himself regarding the planning of a trip for a select group of CBMM representatives to Palo Alto, California, to attend a collaborative meeting with Google/X. In the email, Sullivan discussed extending the hotel booking and provided instructions on securing funding for the trip through the National Science Foundation (NSF). The trip was not publicly announced or disclosed through any of CBMM's established email lists, maintaining an unusual level of confidentiality.

13

62. In his communication, Azevedo told her he is aware there is still a place left and offered to provide a referral on her behalf to Sullivan if she wanted to join a trip. While the trip presented a valuable opportunity for professional networking and collaboration, ~~Plaintiff declined to pursue it based on her belief that Azevedo's suggestion was implicitly conditioned on her willingness to engage in sexual favors, given his prior inappropriate conduct and the power dynamics at play.~~ Given Azevedo's prior sexual assault and the power dynamics at play, Plaintiff understood Azevedo's suggestion as being implicitly conditioned on her willingness to engage in sexual favors and therefore declined to pursue the opportunity.

63. On or around December 6, 2017, Freiwald offered to facilitate Plaintiff's participation as a Teaching Assistant (TA) for the upcoming CBMM Summer School and initiated an internal email exchange with Gabriel Kreiman of Harvard ("Kreiman"), the Director of the CBMM Summer School, and Azevedo's Supervisor. Kreiman stated: "I would be happy to take your postdoc as a TA." Following this communication, Plaintiff sent her credentials to Kreiman and was subsequently offered the position.

64. In or around February 2018, Freiwald required~~requested that~~ Plaintiff and other junior female researchers to accompany him as his guests to a social event hosted by another RU Head of Laboratory. They were instructed to dress in evening attire. The event concerned a research topic with which Plaintiff had no professional involvement. When other guests inquired about her role, Plaintiff stated that she was not professionally connected to the research being presented.

~~65. from the laboratory accompany him to a social event the following evening hosted by another Head of Laboratory at Defendant RU, where Freiwald was an invited guest, but none of the women, including Plaintiff, were familiar with or involved in the research topic that was the focus of the event. Freiwald instructed the women to dress in evening attire and assigned them the role of accompanying him throughout the event. Their participation was limited to sitting with Freiwald during a PowerPoint presentation and walking with him during a laboratory tour.~~

66. ~~This role placed Plaintiff in an uncomfortable and socially embarrassing position. During the event, external guests approached her with questions related to the research~~

topic, assuming her presence indicated involvement or expertise in the subject matter. However, Plaintiff was unable to provide informed responses and had to clarify that her sole connection to the event was her affiliation with Freiwald's laboratory. It became evident that her presence was not based on her professional qualifications or contributions but rather to serve as a decorative accompaniment to Freiwald, reducing her to a role akin to "arm candy."

67. On February 15, 2018, Freiwald assigned Plaintiff the task of managing a webinar connection to facilitate the participation of Freiwald's laboratory members in the weekly CBMM research seminars held at MIT in Cambridge, Massachusetts. Azevedo was identified by Sullivan as one of the individuals involved in organizing the event, however to establish subsequent connections, Plaintiff communicated solely with Sullivan and the CBMM Director of Technology. On or about February 15, 2018, Defendant Freiwald delegated to Plaintiff the responsibility of establishing and managing a remote webinar connection for the weekly CBMM research seminars, a task that inherently required coordination with the event's MIT-based organizers. In internal CBMM communications, Defendant Azevedo was explicitly identified, alongside Hector Penagos, as one of the two postdoctoral fellows officially "helping to coordinate the CBMM caucus, research meetings, and seminar talks," and was designated as a point of contact for presenters. This was not a minor or passive role; Azevedo was an active and authorized organizer.

68. On February 16, 2018, Azevedo proactively provided Plaintiff with key information for an upcoming research meeting, but then withdrew his assistance.

69. When Plaintiff asked him to reinstate it, on February 20, Azevedo conditioned his help on her agreement to host him in New York City, emailing: "Only if you allow me to come to NYC".

70. In February 2018, Azevedo also requested Plaintiff to arrange a lab talk for his associate, Vishal Kapoor, and to provide an accommodation for him in New York.

71. The following month, oOn or about March 15, 2018, Azevedo traveled to New York City forto attend a neuroscience conference. HDuring his stay, he pressured Plaintiff to provide him with lodging. Despite her discomfort and reluctance, Plaintiff felt compelled to agree and allowed Azevedo to stay on the living room sofa inof her shared two-bedroom

~~apartment, which was part of~~ Rockefeller University (RU) housing apartment. Upon his arrival, she~~Plaintiff~~ directed Azevedo to the living room. However, Azevedo insisted on using Plaintiff's private bathroom, as~~claiming that~~ there was no guest shower. ~~available guest shower.~~

72. After using the bathroom, Azevedo attempted to enter and remain in ~~the~~ Plaintiff's bedroom. The Plaintiff stated she did not ~~without her~~ consent to his presence. ~~Recognizing that Azevedo was likely intending to initiate unwanted sexual advances,~~ The Plaintiff became visibly distressed and ~~broke down in tears~~began to cry. She told Azevedo~~explicitly confronted him, stating that~~ he could no longer assault women and ~~revealing that,~~ informed him that she had contracted human papillomavirus (HPV) from ~~as a result of his~~ a prior unconsensual sexual encounter with him ~~assault~~ in Woods Hole, ~~she had contracted human papillomavirus (HPV).~~ The Plaintiff expressed ~~deep~~ concern about the link between HPV and an~~the~~ increased risk of cervical cancer ~~in women~~. In response, Azevedo ~~callously~~ laughed and ~~made a dismissive remark,~~ stat~~ed~~ing, "Welcome to the population of people with STDs". Medical records confirm the Plaintiff was diagnosed with HPV and was undergoing monitoring for the infection in New York at that time.

73. Immediately following this exchange, Azevedo forcibly pushed Plaintiff onto her bed and proceeded to engage in non-consensual sexual intercourse without a condom. The Plaintiff repeatedly and unequivocally expressed her lack of consent through verbal protests, including saying "no" multiple times, and physically resisted his advances. Despite her clear and forceful objections, Azevedo overpowered her and carried out the assault.

74. In April 2018, Azevedo attempted to coerce Plaintiff to enable lodging for him in New York again. Plaintiff refused.

75. In May 2018, Plaintiff and two other members of Freiwald's laboratory traveled to MIT in Cambridge, Massachusetts, to attend a CBMM retreat conference. Prior to the event, Azevedo, in his role as an event organizer, attempted to involve Plaintiff in a social gathering associated with the CBMM retreat. He added her to a WhatsApp group, where

he repeatedly used Neo-Nazi and White Supremacist rhetoric, including referring to himself as a "Fuhrer", making her extremely uncomfortable.

76. During the CBMM retreat conference at MIT, Azevedo approached Plaintiff in a corridor and initiated an unsolicited and inappropriate conversation. He urged her to end her personal relationship and accompany him during the upcoming CBMM Summer School, where the Plaintiff had been recruited as a Teaching Assistant ("TA"). Azevedo explicitly stated that her presence would facilitate his attempts to engage in sexual interactions with female CBMM summer school students. When Plaintiff firmly refused, Azevedo retaliated by making derogatory and discriminatory remarks about her Polish heritage in front of other conference participants. He stated, "All Polish women I met in Germany were cleaning ladies," a comment that was both humiliating and offensive for Plaintiff.

77. In or around June 2018, Azevedo contacted Plaintiff uninvited by a message "I hope you are thinking about me and not about your stupid boyfriend". To prevent any additional unwanted contact, Plaintiff blocked Azevedo on WhatsApp and removed him from all her social media accounts.

78. In or around July-August 2018, during the CBMM Summer School in Woods Hole, Plaintiff, concerned about potential harassment from Azevedo, requested that her then-fiancé (now husband), accompany her while she worked as a TA for the three-week program. Upon their arrival, the Plaintiff and her fiancé were subjected to persistent scrutiny and gossip among male CBMM members associated with Azevedo. The program's environment was notably exclusionary and unwelcoming to women, with lectures often featuring sexist jokes and a pervasive culture that normalized private gatherings and alcohol consumption.

79. Plaintiff observed Azevedo informally bringing a visiting student from MIT to the Summer School and actively pursuing female students in a sexual manner. ~~The overall atmosphere of the program resembled a "men's club" rather than a prestigious academic initiative affiliated with esteemed institutions.~~ Lectures often featured sexist jokes, and there was a pervasive culture of private gatherings and alcohol consumption among the male TAs and organizers.

80. On August 16, 2018, during a mandatory meeting for Teaching Assistants, Kreiman referenced an unspecified incident and explicitly instructed the TAs not to engage in "sex with students" until the conclusion of the Summer School. However, he then suggested that TAs could pursue such opportunities "somewhere else." While delivering these remarks, Kreiman scanned the room, making direct eye contact with Plaintiff, who was one of only three women present in a group of 22 individuals. Plaintiff felt deeply unsettled by Kreiman's comments and his direct gaze.behavior, which further underscored the program's pervasive culture of sexism and inappropriate conduct.

81. On September 24, 2018, Freiwald invited Plaintiff to a lunch meeting at The Abby, an upscale campus restaurant known for its refined ambiance and frequent use for colleague gatherings, rather than holding the meeting in his office, which would have been more appropriate for professional discussions. Upon arrival, Freiwald waited for the Plaintiff in the sofa lounge near the restaurant entrance and selected a small table for two, despite the availability of larger tables that would have been more suitable for a productive work-related discussion.

82. During the meeting, Plaintiff attempted to present figures and data she had prepared for the discussion by holding her laptop. However, Freiwald abruptly instructed her to put the laptop away, effectively shifting the focus away from professional matters and transforming the meeting into a more social encounter. Throughout the interaction, Freiwald repeatedly diverted the conversation to Plaintiff's personal life, asking intrusive questions about her fiancé and inquiring whether she "preferred older men." Plaintiff felt deeply uncomfortable and embarrassed by Freiwald's conduct.

83. On or about March 12, 2019, Plaintiff was delegated to travel to MIT for a CBMM National Science Foundation ("NSF") evaluation, where she was to present a research poster. She arrived under significant stress and fear of potential further harassment from Azevedo. Although she did not encounter him there, she learned that she would be assigned to another NSF CBMM evaluation meeting in or about May 7, 2019. Fearing a potential encounter with Azevedo and concerned for other women in the environment, she explored the MIT website for available complaint options.

84. In or about March 2019, Plaintiff filed an incident report with MIT's Title IX & Bias Response Office against Azevedo and requested a no-contact order for the upcoming CBMM event at MIT.

85. On April 4, 2019, Plaintiff filed a police report with the Falmouth Police Department, MA about Azevedo's sexual assaults.

86. Despite her repeated requests both to MIT and Harvard Title IX coordinators, Plaintiff did not receive a no-contact order.

87. ~~On May 7, 2019, at an MIT conference, Plaintiff encountered Azevedo at the poster session. Azevedo, though not listed as an organizer, positioned himself near the poster boards, creating the impression of authority.~~ Despite her repeated requests to both MIT and Harvard Title IX coordinators, Plaintiff did not receive a no-contact order, culminating in a distressing encounter with Azevedo at an MIT conference on May 7, 2019. As Plaintiff began to hang her poster, Azevedo followed her, stopping at the adjacent board. He then engaged in a performance of assisting another attendee, while simultaneously his posture was aggressive, with his body angled towards Plaintiff, crowding her personal space. He maintained constant, intense eye gaze on Plaintiff, even while ostensibly addressing the other individual. His aggressive and intimidating posture forced her to leave the area and file a ~~Plaintiff, feeling acutely threatened and targeted, quickly left the area later that day filed an incident~~ report with MIT police.

88. On or about May 14, 2019, Freiwald requested that the Plaintiff attend a lunch meeting with him and Tenenbaum at a restaurant in downtown Manhattan, New York. Concerned that declining the invitation might be perceived as a lack of commitment to the project, Plaintiff reluctantly agreed. However, Freiwald coordinated the meeting location exclusively through personal communication with Tenenbaum, only informing Plaintiff at the last minute that they should "get going." Alarmed by the prospect of commuting downtown with Freiwald and recalling his prior inappropriate behavior during off-campus meetings, Plaintiff left early and informed Freiwald that she was already on her way.

89. Following the lunch meeting, Freiwald insisted on accompanying Plaintiff back to the campus. While riding the subway alone with her, Freiwald repeatedly attempted to

reduce the physical distance between them, visually scanning her body and inappropriately staring at her legs and buttocks. Despite Plaintiff's efforts to maintain a respectful distance, Freiwald persisted in his behavior, causing her significant discomfort. As they exited the train, Freiwald slapped her buttocks under the guise of letting her pass first. This physical contact was unwelcome and further exacerbated the Plaintiff's discomfort. Upon reaching their destination, the Plaintiff found a pretext to separate from Freiwald as quickly as possible.

90. On or about May 15, 2019, Plaintiff discussed Freiwald's recent misconduct with a female colleague, who subsequently shared an internal email exchange in which Freiwald had requested that only female members of his laboratory spend time with him during an upcoming RU promotional event. Plaintiff also learned that Freiwald routinely requested lunch meetings exclusively with female students and postdocs. Following these revelations, Plaintiff took steps to plan future meetings with Freiwald exclusively in the office, where she felt safer and less vulnerable to inappropriate behavior.

91. On May 14, 2019, Plaintiff emailed the CBMM Director, Tomasso Poggio ("Poggio"), providing detailed allegations of Azevedo's sexual assaults against her and seeking assistance with the formal complaint process. Despite being aware of Plaintiff's complaint, as evidenced by prior knowledge from the NSF reviewer, Poggio did not respond to her email or offer any support.

92. Later that same day, ~~the~~ Plaintiff received an email from Rankin, who forwarded her complaint to Bridget Collier, the Title IX Coordinator at the University of Chicago, and Ann Egan, the Human Resources (HR) Director at the Marine Biological Laboratory (MBL). In an intake call o~~O~~n May 20, 2019, Collier described the investigative procedure: they would first gather all information from Plaintiff, including a written statement and a list of witnesses, interview those witnesses, and only *then* notify Azevedo. Collier explicitly assured Plaintiff that "we don't disclose to him about witnesses that we are interviewing... that is not the information that we in general disclose." Collier ~~and~~ and Egan then referred Plaintiff to RU's Title IX Coordinator and HR Director for further action.

93. Folowing the directive from the MBL investigators, Plaintiff met with RU's Title IX Coordinator and HR Director, Virginia Huffman ("Huffman"), o~~O~~n ~~or about~~ May 21, 2019. During this and a subsequent meeting on May ~~and~~ 22, 2019, ~~during meetings with RU's Title IX Coordinator and HR Director, Virginia Huffman ("Huffman"),~~ the Plaintiff reported~~detailed~~ Azevedo's sexual assaults and ~~her complaint effort but emphasized that no investigation into her allegations had been initiated at that time.~~ the challenges she faced in reporting them across jurisdictions. Despite Plaintiff holding a salaried position as a Postdoctoral Associate, Huffman classified her as a student and referred her to the Campus Advocates Project, a student advocacy service. The Campus Advocates Project lacked the authority to compel institutional action or conduct a formal investigation.

94. In reliance on the procedural assurances from the MBL investigators and Huffman's directive, Plaintiff participated in the MBL investigation, submitting a 'Detailed Description' word file with a list of five corroborating witnesses. The investigators did not interview any of these witnesses.

95.~~Huffman did not provide Plaintiff with any options for filing complaints or addressing her concerns at RU, instead instructing her to agree to participate in the investigation through the University of Chicago.~~

96. ~~During the investigation, Plaintiff provided a list of witnesses who could have corroborated her testimony. However, none of these witnesses were ever interviewed. Plaintiff was not afforded an opportunity to respond to Azevedo's statement before the investigation was finalized, while Azevedo was allowed to access Plaintiff's documents prior to submitting his statement.~~On June 8, 2019 the investigators informed Plaintiff they had already notified Azevedo of the investigation and reduced the witness list from five to two. Then, on June 24, 2019, without Plaintiff's knowledge or consent, the investigators uploaded her full, unredacted statement—which included the names of all five witnesses—into a shared folder accessible to Azevedo.

97. During the MBL investigation, the attorneys RU referred Plaintiff to, Rebecca Zipkin and Jessica Morak, failed to secure crucial evidence (WhatsApp messages), advised Plaintiff to push for a premature conclusion of the MBL process, failed to review

her NSF complaint, and failed to advise her on how to submit new, corroborating witness testimony.

98. On July 11, 2019, Plaintiff accessed Azevedo's statement, in which he included a threatening remark: "I advise her to stop [her complaint action]; I will not take her actions lightly." This statement caused Plaintiff to fear for her safety and well-being, further exacerbating the emotional and psychological distress she had already endured. Critically, Azevedo's submission also contained defamatory and misogynistic character attacks, falsely labeling Plaintiff a "prostitute" and "sexually perverted" in an attempt to poison her reputation and credibility.

99. On July 22, 2019, Plaintiff confided in Freiwald about sexual assaults she had endured from Azevedo and the ongoing complaint process. She hoped that disclosing this information would deter Freiwald from continuing his own pattern of sexual harassment toward her. However, Freiwald did not provide Plaintiff with any support or accommodations regarding her situation. Instead, he appeared primarily concerned about the implications of the complaint and investigation.

100.    Following the meeting, Freiwald, without informing Plaintiff of his intentions, rushed to meet with Huffman privately to discuss Plaintiff's complaint behind closed doors.

101.    On or about August 11, 2019, the outcome of the investigation was announced, concluding that there was insufficient evidence to establish probable cause that Azevedo had violated MBL policies. Plaintiff was not provided with an opportunity to appeal this decision. This process was structurally incapable of being fair or thorough, a fact later confirmed by the NSF's finding that the University of Chicago had consciously chosen to apply the weaker, less formalized procedural framework of its affiliate, MBL, rather than its own more robust Title IX policy. The investigation's outcome relied on Azevedo's narrative, which Plaintiff alleges is false. Azevedo falsely claimed that he and Plaintiff were "old friends" from Germany, a fabrication designed to reframe his predatory conduct as a consensual relationship. The investigation relied heavily on the testimony of a single witness provided by Azevedo, Xavier Boix, who had a direct

incentive to corroborate Azevedo's fabricated story, as Boix had been complicit in arranging the shared accommodation, and facilitating Azevedo's assault.

102.    The fundamental flaws of the MBL process and RU's complicity were explicitly confirmed by Zipkin in a recorded call on August 19, 2019. Zipkin identified that "Title VII actually offers more protections than Title IX," elaborating that Title IX gives institutions "a lot of flexibility" and it is "very hard to get anybody to say they didn't do their job," whereas Title VII holds employers to a stronger standard. This admission underscores that RU, through Huffman, knowingly referred Plaintiff away from the more robust legal framework that applied to her as an employee.

103.    ~~Later, in August 2019, Plaintiff met with Huffman and~~When the MBL investigation concluded in August 2019 with a finding of "insufficient evidence," Plaintiff again sought Huffman's assistance. She expressed her concerns about the lack of an appeal process ~~following the investigation's outcome, but Huffman did not offer any complaint avenue. Plaintiff also~~ and requested ~~Huffman's~~ help ~~assistance~~ in obtaining a new no-contact order ~~to ensure~~for her safety at future CBMM events~~meetings~~, including the ~~upcoming annual CBMM Retreat scheduled for~~ one on August 30, 2019~~, in Woods Hole, Massachusetts, specifically asking Huffman to facilitate collaboration with other institutions to issue such an order. However,~~ Huffman declined to provide any assistance and, despite Plaintiff's visible discomfort, ~~instead~~ instructed her~~Plaintiff~~ to speak with her harasser, Freiwald, stating, "he is nice~~."~~, before abruptly ending the meeting.

104.    ~~Plaintiff visibly expressed discomfort at Huffman's remark about Freiwald, given her prior experiences with him. Despite her clear unease, Huffman abruptly ended the meeting without addressing her concerns or offering any further support.~~

105.    The therapeutic support provided by RU also involved sharing information with university officials. During a session on November 16, 2019, Plaintiff's therapist, Maria Solomon, asked multiple questions about Plaintiff's communications with her attorney and with Ms. Huffman regarding her legal case against the University. This communication was permitted by a "Release of Information" form signed by the Plaintiff, which authorized Ms. Solomon to speak with Ms. Huffman. The therapist's focus on legal

strategy during a therapeutic session created a conflict between her role as a therapist and the University's interest in the legal matter.

106.        On September 24, 2019, Plaintiff was assigned by Freiwald to remotely attend that day's CBMM weekly research seminar and prepare a summary report for him. Upon connecting to the seminar, Plaintiff unexpectedly encountered Azevedo on the screen, who appeared to be hosting the seminar. Azevedo directed the camera toward himself rather than the presentation and repeatedly asked whether "people from New York can see and hear him." This conduct violated the previous no-contact order that had been issued by the University of Chicago to protect Plaintiff, causing her to feel intimidated and distressed.

107.        On September 30, 2019, Plaintiff re-filed the Title IX complaint with the National Science Foundation, Office of Diversity and Inclusion, alleging that the CBMM program failed to properly investigate her report of being raped and groomed by Azevedo, exploiting his position of power, and asked a new investigation to remove the accused from the program.

108.        In October 2019, Plaintiff was contacted by a female individual who had also experienced sexual harassment by Azevedo. This individual expressed her willingness to corroborate Plaintiff's institutional complaints and support the ongoing criminal investigation being conducted by the Falmouth Police Department.

109.        On October 25, 2019, Plaintiff relayed this new information to Huffman and requested her assistance in reopening the institutional complaint in light of the additional corroborating evidence.

110.        On or about November 15, 2019, Huffman informed Plaintiff that, after consulting with the General Counsel, RU was unable to provide any assistance regarding her complaint, leaving Plaintiff without institutional support to pursue her claims further. when Plaintiff informed Huffman that a new witness had come forward to corroborate Azevedo's pattern of harassment, Huffman again failed to act. On or about November 15, 2019, after consulting with the General Counsel, Huffman informed Plaintiff that RU was unable to provide any assistance, thereby formally abdicating its responsibility and leaving Plaintiff without any institutional support.

111.        On December 11, 2019, Plaintiff filed a complaint directly with the RU's Housing Administration, a department under the direct control and purview of the University, regarding a recent incident of inappropriate and persistent staring by a RU professor, Marcelo Magnasco, within the residential building. The initial complaint was made to Alexander Kogan of Housing, who immediately acknowledged the complaint's validity and, critically, referred the matter directly to Virginia Huffman, the Vice President of Human Resources. This referral confirms that RU itself treated safety and misconduct within its university-owned housing not as a routine landlord-tenant issue, but as an institutional, HR-driven responsibility. Plaintiff's complaint was one of multiple reports about this professor's behavior, which was part of a pattern of misconduct that made female residents feel unsafe in their homes.

112.        in the housing building. She reported that a RU professor had inappropriately and persistently stared at her, consistent with similar behavior he had exhibited on prior occasions. Plaintiff's complaint was forwarded to Huffman.

113.        On or about December 20, 2019, Plaintiff met with Huffman, accompanied by two other women—a PhD student and a postdoctoral researcher—who provided corroborating accounts of had also experienced discomfort and intimidation from due to the same professor's behavior. TheA postdoctoral researcher reported that the professor had stared at her "a shade too long" on multiple occasions in a residential laundry room. She further stated also mentioned that she had hearding similar accounts from other women and revealed that they had collectively discussed protective measures, stating, "We definitely talked about making sure no young female student interviews him for Natural Selections [the RU's community newspaper]." This demonstrated a shared understanding among multiple female residents that his behavior was a known risk.

114.        Despite these detailed, corroborated accounts provided by the Plaintiff and the otherfrom multiple women describing a pattern of gender-based intimidation within university housing, Huffman, acting on behalf of RU's HR department, failed todid not file a formal complaint, initiate any meaningful investigation, or create any official record of the incident. This inaction perpetuated a hostile environment.

115.    On or about January 13, 2020, ~~at a follow-up meeting with~~ Plaintiff and the other women~~,~~ ~~attended a follow-up meeting with~~ Huffman attempted to dismiss their validated concerns by asserting, without providing evidence, ~~who informed them~~ that the professor had a medical condition~~, suggesting~~ that caused the~~his~~ staring ~~behavior was unintentional.~~ This explanation was directly contradicted by ~~provided despite multiple reports from~~the women~~'s~~ specific accounts of targeted, gender-based behavior ~~indicating that his behavior was specifically directed toward females~~and the fact that the professor's troubling conduct ceased entirely after the complaint was made. Huffman then abruptly ~~concluded~~terminated the discussion, citing medical confidentiality ~~concerns~~, and ~~did not address the women's concerns~~provided no further recourse, thereby leaving the female residents without a remedy for a serious safety concern that RU's own HR department had been tasked to address.[3]~~.~~

116.    ~~In December 2019 and early January 2020, two female MIT professors affiliated with the CBMM program became aware of Plaintiff's allegations of sexual assault and harassment by Azevedo. Upon learning that additional individuals had come forward with corroborating accounts of Azevedo's misconduct, they sought to reopen the institutional investigation into Plaintiff's complaint, which had been filed with MIT and Harvard in March 2019 and discussed next steps with MIT's Title IX Coordinator.~~In January 2020, senior MIT faculty initiated a separate inquiry into the climate for women in CBMM. Professor Nancy Kanwisher contacted Plaintiff, stating she had just learned of Plaintiff's experience and that she felt the "system, including me, failed you." Kanwisher stated, "it sounds like Title IX did not do their job," and confirmed the MBL had only interviewed "the two parties plus a witness." She said, "there is going to have to be some better effort to uncover the truth."

117.    ~~On January 18, 2020, Plaintiff learned that MIT and Harvard would conduct a formal investigation into her complaint, led by Dr. Lizanne DeStefano ("DeStefano"), an evaluator for CBMM. DeStefano was tasked with interviewing all relevant parties and to present her findings and recommending corrective actions to the CBMM Summer School Directors.~~ The faculty enlisted Lizanne DeStefano, the official

---

3    The professor's behavior ceased entirely after Plaintiff's complaint directly contradicting Huffman's claim that his actions were unintentional due to a medical condition.

CBMM program evaluator, to conduct this informal investigation. Plaintiff participated and, at their request, put DeStefano in contact with other victims of Azevedo, including a former CBMM student ("Jane Doe 3"),

118.    DeStefano interviewed Jane Doe 3, who provided corroboration of Azevedo's "overly flirtatious" and "uncomfortable" sexual advances towards her during the CBMM Summer School program.

119.    ~~In support of the investigation, Plaintiff provided detailed documentation of her allegations against Azevedo and of the procedural deficiencies of the earlier investigation conducted by the University of Chicago.~~

120.    ~~In addition, on or about January 19, 2020, Plaintiff facilitated contact between DeStefano and the additional individuals who had come forward with corroborating accounts of Azevedo's misconduct. Among these individuals was a CBMM student who reported receiving flirtatious messages and requests from Azevedo to spend time alone with alcohol during the CBMM Summer School.~~

121.    ~~Despite her efforts to support the investigation,~~ Plaintiff never received any follow-up or communication from DeStefano or the MIT female professors regarding the outcome of this inquiry. Subsequently, CBMM leadership implemented new policies for TA housing and conduct and excluded Azevedo from future TA roles.

122.    ~~of the investigation or any subsequent actions taken.~~ Following the inquiry, Plaintiff was removed from the Teaching Assistant list, a valuable professional opportunity, while other candidates, including all other women, were selected.

123.    On January 20, 2020, Plaintiff sought Freiwald's approval to submit an internal fellowship application administered by RU based on the latest results of her work. Despite Freiwald approved the project's progress as satisfactory for advancing to the second phase, which involved electrophysiology, he prohibited her from spending time on the new application, instructing her instead to submit an outdated version. Feeling that failing to report her progress would compromise the quality of the application and her chances of securing the award, increasing her financial dependence on Freiwald, Plaintiff left the meeting in tears.

124.      On January 30, 2020, Plaintiff was contacted by Andrei Barbu of MIT ("Barbu"), who offered her a Teaching Assistant (TA) position for the upcoming CBMM Summer School. On February 2, 2020, Plaintiff expressed interest but noted that she could not participate if Azevedo, her harasser, was attending. Barbu confirmed that he had added her to the roster with this constraint and stated that the final selection would be made by the CBMM Summer School Directors.

125.      On January 31, 2020, in an internal email exchange between Kreiman and Barbu, Kreiman stated that while he was "sympathetic to having more women TAs," he instructed Barbu not to make any commitments yet. Kreiman emphasized that he and other Summer School Directors needed to review the list He also directed Barbu to note the constraints of the TA candidates in a shared spreadsheet.

126.      On February 3, 2020, Barbu sent Kreiman a list of all candidates who had expressed interest, along with their constraints. Within an hour, Kreiman returned the list with his proposed selection of 14 out of 18 candidates. Notably, Plaintiff was one of the four candidates removed from consideration, and she was the only woman excluded. On February 4, 2020, Barbu informed Plaintiff that she had been denied the TA position.

127.      Later that same day, in an internal communication, Barbu asked Kreiman to include a male TA candidate, but Kreiman responded that he was inclined to offer a position to a female candidate instead, stating, "to keep the number of women up," and stated "let us try not to drop any women TAs at this stage", alluding to the fact that Plaintiff, a woman, had already been removed from consideration the day before.

128.      On February 5, 2020, in an internal communication to Barbu, Kreiman unexpectedly selected a late application from a male postdoc with a similar scientific profile to the Plaintiff for the TA position, asserting that the postdoc's interest alone qualified him for the role. That same day, Plaintiff forwarded the TA recruitment decision and the Directors' refusal to select her to one of two female MIT professors with whom she spoke earlier, signaling that the decision was causally related to her participation in DeStefano's investigation. She did not respond.

129.      On February 5, 2020, Plaintiff contacted Barbu, clarifying that her constraint regarding Azevedo was due to the no-contact order she had obtained. She

28

attached the order and sought other opportunities to be involved in the summer school if Azevedo was not attending. In response on February 11, 2020, Kreiman contacted the Plaintiff directly. In his email, he claimed that the decision not to select her was based on her "scientific profile" and concluded by stating, "hoping to see you in other scientific events," which implied that she was no longer welcome at the CBMM Summer School.

130.    Plaintiff was deeply affected by the abrupt cessation of her Teaching Assistant opportunities at CBMM, which were integral to her identity as an educator and researcher. The loss of teaching opportunities, scientific publications, supervision of student projects, and the dissemination of potential research projects had a profound and far-reaching impact on her professional and personal life. The fear of further retaliation, particularly given that her salary was funded by the CBMM grant at RU, added a layer of anxiety and uncertainty to her situation.

131.    On February 13, 2020, Freiwald abruptly scheduled an in-person meeting with Plaintiff for the late afternoon of February 14. Valentine's Day, ostensibly to discuss the progression of her research project. During this meeting, on February 14, Freiwald initially praised Plaintiff's work, enthusiasticallyand outlineded the project's potential and the upcoming transition to new electrophysiological and computational phases.

132.    However, the tenor of the meeting shifted dramatically when Freiwald then, smirking, stated that the project's future depended on Plaintiff's desired course of action. Freiwald thenHe reclined in his chair and remained silent. Plaintiff observed a visible erection through his clothing.

133.

134.    in a suggestive posture, and Plaintiff observed a visible erection through his clothing. Maintaining his smirk and silence, Freiwald appeared to await the Plaintiff's response. Plaintiff interpreted this behavior as a clear implication that the continuation and success of her project were contingent upon her willingness to engage in sexual relations with him. Feeling deeply humiliated and pressured, Plaintiff immediately terminated the meeting and left the room.

135.    WhileAs Plaintiff was leaving the room exited, Freiwald stood up. from his chair and moved to open the door for her, and. While she was leaving, she felt Freiwald

squeezed and slapped her buttocks. ~~Later, the~~ Plaintiff later ~~expressed disbelief and~~ reported the incident to her husband.

136.    On February 27, 2020, during a late afternoon office meeting with Plaintiff, Freiwald discussed a video featuring bananas that was to be used in upcoming experiments. When he said~~mentioned~~ the word "banana," he slowed his speech and emphasized the word.~~his tone became overtly suggestive. Simultaneously,~~ Wwhile maintaining direct eye contact with Plaintiff, he made a fist and moved it repeatedly up and down, a distinct, miming hand gesture of masturbation. Plaintiff ~~immediately recognized the sexual nature of the gesture and felt deeply embarrassed and uncomfortable. She quickly~~then attempted to redirect the conversation.

137.    In March and April 2020, the imposition of COVID-19 restrictions limiting in-person encounters, provided a welcome respite for the Plaintiff, who had been experiencing escalating discomfort due to Freiwald's overt sexual harassment and inappropriate propositions.

138.    On or about May 27, 2020, in an email exchange, Plaintiff raised concerns with Freiwald regarding her funding for a postdoctoral position from CBMM. Freiwald responded with ostensibly reassuring remarks about her financial stability and suggested continuing the conversation about her future career in person.

139.    This suggestion raised immediate red flags for Plaintiff, given Freiwald's prior inappropriate behavior during personal meetings. She became concerned about the potential for further harassment or unprofessional conduct.

140.    In a subsequent email to Freiwald on May 29, 2020, Plaintiff firmly and professionally asserted her need to establish clear boundaries. She explicitly requested that future professional meetings not take place in restaurants, directly referencing Freiwald's prior inappropriate behavior, which included persistently attempting to move their meetings to unprofessional settings (Exhibit B).

141.    ~~Approximately a week later, o~~On June 4, 2020, Defendant Freiwald convened~~responded to her email by scheduling~~ a Zoom meeting in direct response to Plaintiff's May 29, 2020 email, which constituted protected activity under opposition and participation clauses. Freiwald opened the meeting by explicitly referencing the

Plaintiff's disclosed struggles, stating he had been "thinking a lot about you and the worries that you have." He then advised that her initial instinct "was probably right, that it would be the best for you to move to a different place and different environment." Freiwald characterized continuing with the core Intuitive Physics project as a "huge gamble" on her part, one where the risks were "very big," and stated it would not be responsible for him to encourage her to continue. He presented this recommendation to abandon the project's next phase as being for her benefit, advising her that a change of environment would ensure her future work would not be affected by CBMM. ~~for the following day. During this meeting, Freiwald unexpectedly announced that he had decided it would be better for Plaintiff to "change the environment" and look for another place to work. He instructed her to "wrap up things here," effectively forcing her resignation and suggesting the cancellation of the planned second phase of the Intuitive Physics project, which included critical electrophysiology research.~~ (Exhibit B)

142.    Following the meeting, Plaintiff promptly reported Freiwald's sexual harassment and the apparent retaliation of constructive discharge to Robert Cosgrove ("Cosgrove") of the NSF Office of Diversity and Inclusion ("ODI"). Cosgrove informed Plaintiff that, in light of her prior adverse experience when reporting misconduct to RU's HR office, she was not obligated to report the incident to Virginia Huffman. Instead, Cosgrove advised Plaintiff to file an external complaint directly with the Equal Employment Opportunity Commission ("EEOC") or the New York State Division of Human Rights.

143.    On June 9, 2020, after Plaintiff sought to clarify what she hoped was a misunderstanding, Freiwald responded by explicitly rejecting that premise, stating, "there is no misunderstanding.", that "we are not in position to progress to phase ii directly", that "it actually makes the most sense for you-both personally and scientifically", that "it would not be responsible for [him] to suggest doing this to you" and instructed her to "wrap up phase I with a paper and search for that place for a second postdoc you mentioned." After Plaintiff further clarified she was committed to work on her project as it was planned, with phase II, on June 12 Freiwald then explicitly threatened the end of her scientific career, writing: "Given the current status of the

project and results, it is almost guaranteed that if you continue into phase II on this basis, it will be the end of your career." Exhibit B

~~On June 9, 2020, Plaintiff sent a follow-up email to Freiwald in an effort to clarify what she believed to be a misunderstanding regarding his sudden decision to force her resignation. Freiwald's response was unequivocal and chilling: he stated, "there is no misunderstanding," and explicitly threatened to end her career if she chose to remain in her position any longer.~~

144.

On or about July 30, 2020, Freiwald sent Plaintiff an email formally notifying her that her upcoming appointment would be extended for only six months, a significant and detrimental departure from the standard one-year term. He also formally limited her laboratory tasks to finalizing the ongoing fMRI experiments, cutting off phase II of the Intuitive Physics project. ~~When Plaintiff refused to resign, Freiwald sent her an email on July 30, 2020, formally notifying her that her upcoming appointment would be extended for only six months, a significant departure from the standard one-year term. He diminished her responsibilties and opportunities by instructing her to focus solely on completing a limited number of fMRI experiments to conclude her research, effectively halting any progress toward the second phase of the project, which involved electrophysiology, a critical component of the original agreement between the Plaintiff and the Defendants for her postdoctoral work at RU,~~

~~Freiwald's email of July 30, 2020 severely undermined Plaintiff's job security, limited her opportunities for advancement, and increased her risk of unemployment.~~ These consequences were especially dire given the heightened uncertainty and challenges posed by the ongoing Covid-19 pandemic. Plaintiff was left in a precarious position, facing not only the loss of her current position but also the long-term repercussions of Freiwald's retaliatory actions on her career and professional reputation. Exhibit B.

145.    On August 5, 2020, Defendant Freiwald was compelled to address~~ed~~ the findings~~results~~ of an anonymous "Lab Climate Survey" ~~that had been~~ administered to his~~among~~ laboratory members, an ~~of his laboratory. This~~ initiative undertaken ~~was jointly agreed upon by both laboratory members and Freiwald~~ in direct response to

growing internal concerns about Freiwald's misconduct and the pervasive and worsening hostile environment he had fostered culture within the laboratory[4]. The survey results, presented during a Zoom meeting, objectively confirmed the systemic nature of the hostility. conducted by three representatives from the Freiwald laboratory, revealed that a majority of respondents reported experiencing or witnessing a hostile environment in Freiwald's laboratory. Additionally, most respondents indicated that they did not feel supported by Freiwald and were uncomfortable bringing issues or concerns to his attention. Freiwald opened the meeting by acknowledging the survey as a "document of my complete failure" and admitting that "[t]he lab is in crisis." (Exhibit C, p. 1). He further conceded that the data showed lab members were "maximally unhappy or almost maximally unhappy," that "[c]urrently no one is really having fun," and, most critically, that the survey "portrays lack of trust in me as a person," with more than half the lab feeling they could not talk to him about personal concerns. (Exhibit C, p. 1).

146.    During the discussion of the survey results, In response, Freiwald stated, 'I will not change this principle, my philosophy of life. It is my philosophy for the lab,' and told staff that if they were unhappy, 'you will have to think about your situation.' informed Plaintiff and other laboratory members that he had no intention of changing his leadership style or how he interacted with lab members, stating that his approach was rooted in his personal "philosophy." He harshly criticized those who expressed dissatisfaction, advising them to reconsider their scientific careers or leave the laboratory if they were unhappy, further reinforcing the hostile and unsupportive environment within the lab.

147.    In late 2020, Freiwald reneged on a prior agreement with Plaintiff to allow her to serve as a guest lecturer in a CBMM course at Hunter College. Instead, Freiwald assigned this opportunity, which had been agreed upon in July 2019, to a male postdoc, depriving Plaintiff of a valuable professional opportunity.

148.    Similarly, Freiwald retracted his earlier proposal for a collaboration between Plaintiff and a laboratory in Belgium, despite assurances given to her in October 2019. At

---

4    The survey, conducted through Google Forms, had been created in September 2019 by Leslie Vosshall, a Professor at RU, and was recommended as a tool "to identify issues in the lab that the lab head can work with members to address to improve lab culture."

that time, Freiwald had arranged for a student from the Belgian laboratory to work on the Intuitive Physics project, the collaboration planned to commence in 2020. However, when the student arrived in late 2020, the student was reassigned to a male postdoc in Freiwald's laboratory. This reassignment further undermined Plaintiff's ability to advance her research and fulfill her professional responsibilities.

149.    Beginning in late 2020, Freiwald diverted the electrophysiological resources originally promised to Plaintiff and reassigned them to a male postdoc. This reallocation of resources severely hindered the Plaintiff's ability to complete her research and achieve her career goals, further undermining her professional progress

150.    Moving forward, Freiwald also terminated Plaintiff's collaboration with CBMM. Plaintiff did not receive any communication from her MIT collaborators, leaving her feeling further excluded from CBMM and its associated professional opportunities.

151.    Despite the hostile environment and ongoing retaliation, Plaintiff persevered in her research and, in or about December 2020, successfully reported her findings. Freiwald acknowledged the significance of Plaintiff's new fMRI results, positively assessing their potential for scientific publication. However, this recognition did not revers his earlier decision to prevent her from completing the electrophysiological phase of her project.

152.    In February 2021, Freiwald assigned Plaintiff an additional task of writing a review paper on Intuitive Physics. Following this assignment, Freiwald and RU sponsored an H-1B visa petition for Plaintiff and her husband, valid for three years from September 1, 2021, to August 31, 2024. During this period, Plaintiff was to remained in her postdoctoral position, where she would continue to contribute her fMRI expertise and produce scientific papers. Freiwald and RU did not hire additional personnel to assist with the project, relying instead on Plaintiff's contributions. Plaintiff's role during this time was limited to writing tasks, and she was not permitted to complete the electrophysiological phase of her research, which had been part of the original agreement for her postdoctoral work.

153.    In early 2021, Plaintiff became aware of the troubling experience of a female PhD student in Freiwald's laboratory, who had raised concerns to him about the lack of

34

support she received from Freiwald as a woman of color. Freiwald reported her to the HR Department, labeling her as "threatening" him.

154.    On or about May 18, 2021, Plaintiff filed a sexual harassment and retaliation complaint against Freiwald and RU with the New York State Division of Human Rights (NYSDHR), which was dual-filed with the Equal Employment Opportunity Commission (EEOC). The complaint detailed Freiwald's sexual harassment and his retaliatory actions in 2020 after the Plaintiff opposed his misconduct.

155.    In Spring 2021, on two separate occasions, Plaintiff and her husband were observed by Virginia Huffman playing tennis on the campus tennis court. Following these sightings, the security department contacted Plaintiff to inform her that her husband was not permitted on campus. This enforcement of campus policies appeared selective and targeted, as Plaintiff and her husband had been engaging in a harmless and socially distanced outdoor activity, consistent with COVID-19 safety protocols. Plaintiff responded by formally requesting an exception to allow her husband to accompany her on the outdoor tennis court. She provided multiple justifications, including her need for physical activity to maintain her well-being amid her demanding work schedule, her and her husband's COVID-19 vaccination status, and her adherence to RU's testing protocols, which included weekly self-testing using the university's equipment and consistently negative results. Despite her reasonable and well-documented request, the RU administration denied her appeal.

156.    On July 3, 2021, RU's Vice President and General Counsel sent Plaintiff a Legal Hold Notice Memorandum, formally notifying her of her obligation to preserve documents related to the administrative complaint she had filed with the NYSDHR.

157.    During the summer of 2021, despite repeated requests from Freiwald's laboratory members and the clear need for updated data, Freiwald refused to conduct a revised lab climate survey.

158.    On July 9, 2021, RU and Freiwald, represented by attorneys Elise Bloom and Noa M. Baddish from Proskauer Rose LLP, submitted their position statement to the NYSDHR, denying Plaintiff's allegations.

159.     On August 3, 2021, Freiwald, for the first time since February 2021, reached out to Plaintiff by email and inquired about the progress of Plaintiff's work, which she then summarized to him in her reply. She also explicitly mentioned her involvement in the complaint process, stating that she had been "dealing with legal requirements to prepare and submit the documentation" related to her NYSDHR complaint.

160.     In response, on August 12, 2021—just two weeks before her scheduled reappointment to a new Research Associate position— Freiwald sent Plaintiff an email informing her that as per his and RU's decision, ~~both he and RU had collectively decided to terminate her employment~~her employment was terminated, effective November 30, 2021.

161.     By prematurely terminating Plaintiff's employment at RU, Freiwald halted her ongoing work on analyzing experimental data and preparing it for publication. This action denied her the opportunity to publish the results of her postdoctoral work, effectively undermining her research and devastating her academic career[5].

162.     Plaintiff quietly resisted Freiwald's email notice.

163.     In 2021, RU promoted Freiwald by appointing him as Co-Director of the Price Family Center for the Social Brain at RU.

164.     On September 2, 2021, Plaintiff contacted RU's Vice-President, Alex Kogan, copying Sharisse Brown from the housing administration and Michael Glaster from the financial department, to request that RU complete the landlord portion of her New York State Emergency Rental Assistance Program (ERAP) application. On September 23, 2021, Ms. Brown acknowledged receipt of Plaintiff's message, however, RU failed to act on her request, leaving her without essential support during a critical period. It was not until after Plaintiff initiated this lawsuit that RU finally submitted the required documentation.

165.     On or about November 17, 2021, Plaintiff received an email from Michael Wiener of RU's HR Department, notifying her that her last day of employment would be

---

5   Because RU reinforces the policy, according to which the Head of Laboratory at RU has ownership of experimental data and result, the Head of Laboratory makes decisions regarding publishable content and article submissions. Ultimately, Freiwald's decision determined whether a postdoctoral researcher could successfully complete a project and achieve a scientific publication.

November 30, 2021. The email included exit instructions, which stated that her RUNet account—providing access to her email and data server—would be deactivated five days after her departure. This abrupt termination and loss of access threatened her ability to preserve essential data.

166.    To comply with the Legal Hold Notice, which required her to preserve evidence for the pending NYSDHR investigation, Plaintiff requested an extension of her RUNet access. She contacted Freiwald's Lab Manager, who, on or about November 24, 2021, submitted an extension request to the IT department on her behalf and provided Plaintiff with additional exit instructions, which Plaintiff complied with. On November 29, 2021, the RU IT department granted her a 90-day extension, allowing her to retain access to her account temporarily.

167.    However, on December 7, 2021, Freiwald emailed Plaintiff, stating that the extension was unnecessary, and by December 15, 2021, her RUNet access had been suspended.

168.    In early January 2022, Plaintiff submitted three applications for a postdoctoral position, However, due to the absence of a positive letter of recommendation from Freiwald, her applications were ultimately rejected.

169.    On January 17, 2022, Plaintiff received correspondence from RU's Human Resources department notifying her of the university's intent to withdraw her H-1B petition, offering her a one-way ticket to Poland

170.    On January 18, 2022, the New York State Division of Human Rights (NYSDHR) issued a probable cause determination in connection with Plaintiff's sexual harassment and retaliation complaint against Freiwald and RU, recommending the case for a public hearing.

171.    On January 24, 2022, Plaintiff emailed William Scott Carr and Robert Cosgrove, compliance officers at the National Science Foundation's Office of Diversity and Inclusion (NSF ODI), providing them with the NYSDHR Determination Letter. Despite NSF policies stipulating that perpetrators of sexual harassment and retaliation may face limitations on NSF funding, no such restrictions were imposed on Freiwald.

172.     On February 24, 2022, RU unilaterally filed a withdrawal of Plaintiff's H-1B petition with the United States Citizenship and Immigration Services (USCIS) without prior notice to Plaintiff or an opportunity for her to respond to the January 17, 2022 letter. This action left Plaintiff unaware of the impending termination of her visa status.

173.     It was not until March 29, 2022, after Plaintiff proactively inquired, that LaSalata of RU provided her with the visa withdrawal receipt. This communication abruptly informed Plaintiff of the imminent loss of her and her husband's legal immigration status. In the same email, LaSalata reiterated RU's offer to purchase a one-way ticket to Poland, further compounding Plaintiff's emotional distress.

174.     Following her termination, Plaintiff remained a tenant-at-sufferance in Rockefeller University housing. Despite being aware of significant rental arrears, RU took no formal action to evict Plaintiff for nearly four years.

175.     In or around late 2022, Plaintiff secured relief through the New York State Emergency Rental Assistance Program (ERAP). Her application was provisionally approved for $37,426.00 to cover 14 months of arrears. However, RU initially failed to submit the required landlord portion of the application, delaying the process.

176.     It was only after Plaintiff filed the instant lawsuit in December 2022 that RU complied with the ERAP requirements. In January 2023, New York State paid RU $37,426.00 directly. By accepting these funds, RU contractually agreed not to evict for the arrears covered for a period of one year.

177.     On or about March 20, 2023, despite the ERAP payment, RU Housing sent a letter falsely claiming Plaintiff was in arrears for over two years and demanding immediate payment of $79,155.63.

178.     In or about January 2024, to fulfill application requirements for NYC HRA assistance, Plaintiff requested a standard landlord letter from RU Housing to confirm her residence and arrears. Through her attorney, RU's counsel refused to provide this letter, stating "there is presently no landlord-tenant relationship," thereby obstructing Plaintiff's ability to secure financial assistance and causing the loss of potential benefits.

179.     On or about October 10, 2024, RU housing building managers verbally accosted Plaintiff's husband, repeatedly stating "you gotta pay the rent." In his presence,

they told a story about a woman who "didn't pay the rent and ended up on the streets." One manager also made statements about obtaining a punching bag and his status as a "brown belt." Plaintiff and her husband understood these comments to be directed at them and their pending litigation against RU.

180.    On or about September 10, 2025, Defendant Rockefeller University served Plaintiff with a 90-Day Notice of Termination, demanding she vacate her apartment of nine years by January 6, 2026.

181.    The termination notice was issued on or about September 10, 2025, just days after Plaintiff filed a comprehensive declaration (Dkt. 196) on September 5, 2025, detailing her claims. After years of inaction regarding her housing arrears, RU initiated termination proceedings at this precise moment in the litigation.

182.    The loss of her home would render Plaintiff and her husband homeless, as they have no supporting family in the United States, no substantial savings, and Plaintiff's ability to earn has been damaged by Defendants' retaliation. This would catastrophically impair her health, stability, and ability to continue this complex federal litigation.

183.    As a direct result of RU's actions, Plaintiff and her husband experienced significant emotional and psychological harm, including fear of deportation and uncertainty regarding their future.

184.    Plaintiff has suffered and will continue to suffer medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational and employment benefit, a denial of access to next step in academic career, a denial of access to publishing scientific articles, loss of educational and employment benefit including scholarship opportunities, grant opportunities, award opportunities, loss of income, loss of enjoyment of life, emotional and economic damages associated with inability to flee her abusers, and other economic or non-economic damages, including but not limited to the severe and lasting physical injury from contracting a high-risk HPV infection, resulting in pre-cancerous cervical conditions

39

(LGSIL/CIN1) that required years of invasive medical monitoring, biopsies, and caused significant stress and fear, for which she is entitled to just compensation.

185.    Economic damages: As a consequence of Defendants' conduct, Plaintiff has suffered and will suffer harm, including lost past and future income and employment benefits, damage to her career, and lost wages, overtime, unpaid expenses, and penalties, as well as interest on unpaid wages at the legal rate from and after each payday on which those wages should have been paid, in a sum to be proven at trial.

186.    Non-economic damages: As a consequence of Defendants' conduct, Plaintiff has suffered and will suffer psychological and emotional distress, humiliation, and mental and physical pain and anguish, in a sum to be proven at trial.

187.    Punitive damages: The conduct of Defendants was outrageous and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's protected civil rights, entitling Plaintiff to an award of punitive damages under federal law. In addition, Defendants' conduct constitutes malicious, willful, wanton and/or reckless indifference to Plaintiff protected rights, entitling Plaintiff to punitive damages against Defendants under State Law.

188.    Attorneys' fees: Plaintiff has incurred and continues to incur legal expenses and attorneys' fees.


### FIRST CAUSE OF ACTION

### QUID PRO QUO SEXUAL HARASSMENT
### Title VII, NYSHRL, NYCHRL,
### (against Freiwald and RU),

189.    The allegations set forth in the foregoing paragraphs are realleged and incorporated herein.

190.    Plaintiff was employed as a postdoctoral researcher at Defendant RU under the direct supervision of Defendant Freiwald, who held a position of authority as the head of the laboratory and assistant professor at RU. Freiwald had significant control

over Plaintiff's employment, including her research opportunities, professional advancement, and the terms and conditions of her employment.

191.    Plaintiff alleges that tThroughout her employment, Freiwald engaged in a pattern of unwelcome sexual advances and inappropriate behavior toward Plaintiff, including:

 - Relocating the job interview to an upscale restaurant and insisting on paying for the meal, creating an inappropriate personal dynamic.

 - Sending personal emails with flirtatious language and requests for personal contact, such as "for whatever reason, anytime, ok?"

 - Repeatedly emailing Plaintiff with personal inquiries, expressions of concern, and insistence on her confiding in him, particularly around Valentine's Day.

 - Insisting on being the one to pick her up from the guest house.

 - Inviting her to a social event in the office of another Head of Laboratory at RU, where her role was to be his "arm candy".

 - Making inappropriate comments about her personal life and making physical gestures during a lunch meeting at the Abby restaurant.

 - Inappropriate touching and leering at her during meetings, which Freiwald moved off-campus.

192.    Plaintiff alleges that tThis behavior escalated in 2020, culminating in explicit sexual harassment and retaliation after Plaintiff attempted to establish professional boundaries. Specifically:

- On February 14, 2020, Freiwald scheduled a meeting with Plaintiff on Valentine's Day, ostensibly to discuss her research project. During the meeting, Freiwald praised Plaintiff's work but then shifted the conversation to suggest that the future of her project depended on her willingness to engage in sexual relations with him. Freiwald reclined in his chair, displayed a visible erection, and smirked at Plaintiff, creating a coercive and sexually suggestive environment. Plaintiff felt deeply humiliated and pressured, and she immediately terminated the meeting. When she was leaving, Freiwald groped and squeezed her buttock.

- On February 27, 2020, during a professional meeting, Freiwald made overtly suggestive comments about a video featuring bananas, accompanied by a miming hand gesture of masturbation while maintaining direct eye contact with Plaintiff. This behavior was sexually explicit and made Plaintiff feel deeply uncomfortable and embarrassed.

- On May 29, 2020, Plaintiff sent an email to Freiwald explicitly requesting that future professional meetings not take place in restaurants, directly alluding to Freiwald's prior inappropriate behavior, including his persistent attempts to move their meetings to unprofessional settings where he had sexually harassed her.

193.    Plaintiff alleges that aAfter Plaintiff refused Freiwald's sexual advances and attempted to establish professional boundaries, Freiwald retaliated against her by taking adverse employment actions starting on July 30, 2020, when Freiwald sent Plaintiff an email formally notifying her that her upcoming appointment would be extended for only six months, a significant departure from the standard one-year term. He diminished her responsibilities and opportunities by instructing her to focus solely on completing a limited number of fMRI experiments, effectively halting any progress toward the second phase of her project. This action severely undermined Plaintiff's job security, limited her opportunities for advancement, and increased her risk of unemployment. On August 12, 2021, after Plaintiff filed the NYSDHR complaint, Freiwald and RU collectively decided to terminate Plaintiff's employment effective November 30, 2021, abruptly ending her postdoctoral position and cutting off her access to research resources and professional opportunities.

194.    Plaintiff alleges that Freiwald's actions constitute quid pro quo sexual harassment under Title VII, NYSHRL, and NYCHRL. Freiwald's control over Plaintiff's research, collaborations, and access to resources created a power dynamic where her professional success was dependent on his approval. His control over her participation in CBMM events, and his ability to facilitate her participation, created a situation where he could condition her participation on her compliance. Freiwald made unwelcome sexual advances toward Plaintiff. After she rejected these advances and set professional boundaries, Freiwald took a series of adverse employment actions against her, including shortening her appointment, stripping her of research responsibilities, and ultimately

terminating her employment. The temporal proximity between her rejection of his advances and these adverse actions demonstrates that the benefits of her employment were conditioned on her acquiescence to his sexual advances. ~~Freiwald implicitly and explicitly conditioned tangible employment benefits, including the continuation of Plaintiff's research project and her employment at RU, on her submission to his sexual advances. When Plaintiff refused, Freiwald retaliated by shortening of her appointment, demoting her, limiting her research opportunities, and ultimately terminating her employment.~~

195.   Plaintiff alleges that Plaintiff's quid pro quo sexual harassment claim under Title VII accrued, and therefore the statute of limitations began to run, at the time of Freiwald's adverse employment action on July 30, 2020, directly resulting from her refusal to submit to Freiwald's unwelcome sexual advances. Plaintiff filed the NYSDHR complaint within 300 days afterwards.

196.   Plaintiff alleges that Defendant RU is liable as an employer for Freiwald's quid pro quo sexual harassment under Title VII, NYSHRL, and NYCHRL because:

- Freiwald's unwelcome sexual conduct and advances were made within the scope of his employment as Plaintiff's supervisor.

- RU failed to take appropriate action to prevent or address Freiwald's harassment, despite Plaintiff's complaints and the clear pattern of inappropriate behavior.

- RU's failure to investigate Plaintiff's complaints and its lack of adequate policies and procedures to prevent sexual harassment contributed to the continuation of the hostile work environment and the adverse employment actions taken against Plaintiff.

197.   Plaintiff seeks compensatory damages, punitive damages, injunctive relief, and attorneys' fees for the harm caused by Freiwald's quid pro quo sexual harassment and RU's failure to address the harassment and retaliation. Plaintiff also seeks a declaration that Defendants' conduct violated her rights under Title VII, NYSHRL, and NYCHRL.

## SECOND CAUSE OF ACTION
## HOSTILE WORK ENVIRONMENT

## Title VII,NYSHRL, NYCHRL,
## (against Freiwald and RU)

198.    Plaintiff alleges Freiwald fostered a sexually objectifying and hostile work environment, as evidenced by, for example, the "murder mystery" event (Para. 43), the "slave driver" comment (Para. 44), requiring junior female researchers to act as his 'arm candy' at a social event (Para 64) while limiting their scientific responsibilities and opportunities (e.g., Paras 142-147).

199.    Plaintiff alleges Freiwald engaged in a pattern of unwelcome sexual harassment, intertwined with tangible employment actions, including the inappropriate lunches and walks (Paras. 56-58, 79-81, 86-87), the Valentine's Day incident (Paras. 128-132), and the banana/masturbation gesture (Para. 133).

200.    , Freiwald's actions created a hostile and intimidating work environment for her, subjected her to retaliation, and discriminatory treatment, all of which had a profound and detrimental impact on her professional and personal well-being.

201.    Freiwald's conduct was sufficiently severe and pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment.

202.    The repeated unwelcome advances, inappropriate comments, and physical conduct created a pattern of harassment that Plaintiff reasonably found offensive and intimidating.

203.    The incidents occurred over an extended period, demonstrating a persistent and ongoing pattern of harassment.

204.    The sexual assault of Plaintiff by Azevedo, in Woods Hole ( Paras. 46-54), and the knowledge of that assault by Freiwald, caused Plaintiff to have a heightened sense of fear and intimidation.

205.    Plaintiff subjectively perceived the subsequent Azevedo's NYC assault (Paras. 69-71) and the subsequent harassment ( Paras. 67-68, 73-75), harassment as abusive and offensive. RU's lack of action and flawed MBL/University of Chicago investigation (90-100, 104) excluded her from meaningful CBMM opportunities and support.

206.     A reasonable person in Plaintiff's position would have found the harassment to be severe and pervasive enough to create a hostile work environment.

207.     RU is liable for Freiwald's actions under the doctrine of respondeat superior, as his actions occurred within the scope of his employment.

208.     RU failed to provide a safe and respectful work environment for Plaintiff and did not properly investigate her complaints of harassment and assault, allowing the hostile environment to persist. RU's response to Plaintiff's complaints—including misclassifying her as a student, referring her to an advocacy service without investigatory power, and repeatedly declining to engage its investigative authority—failed to remedy the hostile environment and exacerbated the harm to Plaintiff.

209.     RU failed to implement adequate policies and procedures to prevent and address sexual harassment in the workplace. RU's failure to act on Plaintiff's complaints and its lack of adequate policies contributed to the continuation of the hostile work environment, further exacerbating Plaintiff's emotional distress and professional harm.

210.     Following Plaintiff's termination and the filing of this lawsuit, RU has engaged in a pattern of conduct related to her university housing that has exacerbated her distress. This includes: housing managers making intimidating statements to her husband about rent payments and the litigation; refusing to provide standard landlord documentation, thereby impeding her ability to secure public assistance; and serving a 90-Day Notice of Termination days after she filed a major declaration in this case.

211.     Therefore, Plaintiff demands judgment against Freiwald and RU for creating a hostile work environment in violation of Title VII, including compensatory damages, punitive damages, injunctive relief, and attorney's fees.

## THIRD CAUSE OF ACTION
## RETALIATION
## Title VII, NYSHRL, NYCHRL,
## (against Freiwald and RU)

212.     Plaintiff engaged in protected activity by: under federal, state, and city law, and Defendants Freiwald and RU subsequently took a series of materially adverse actions against her. The proximity in time between the protected activity and the adverse

45

actions, along with direct evidence of retaliatory intent, demonstrates a clear causal connection. Plaintiff's protected activities included:

213.    a.- Objecting to Freiwald's sexual harassment, including explicitly requesting on May 29, 2020, that professional meetings not occur in restaurants (Para. 137);

b.- Participating in the MIT and Harvard investigation into her complaint against Azevedo (Paras. 82-84, 90-94);

c. Participating in the NSF investigation (Para. 105, Exhibit A, email from May 29, 2020)

d.- Filing a sexual harassment and retaliation complaint against RU and Freiwald with the New York State Division of Human Rights (NYSDHR) and the EEOC (Para. 151);

e.- InformingRelating to Freiwald and RU that she was dealing with legal requirements to prepare and submit the documentation related to her NYSDHR complaint (Para. 156);

f.- Reporting Freiwald's sexual harassment and retaliation to the NSF ODI, on June 4, 2020 (Para. 139)

g. Filing and actively prosecuting the instant federal lawsuit. -

214.  In direct response to these protected activities, Defendants Freiwald and RU engaged in a continuous campaign of retaliation. The following sequence is illustrative:

a. Boundary-Setting Email -> Constructive Discharge and Career Threats: On May 29, 2020, Plaintiff sent an email to Freiwald explicitly opposing his sexual harassment by setting a firm professional boundary, requesting that future meetings not occur in restaurants. (Para. 137). In direct response, Freiwald convened a Zoom meeting on June 4, 2020 (within one week), where he instructed Plaintiff to abandon her primary research project and "move to a different place," effectively constructing her discharge. (Para. 138). When Plaintiff resisted, Freiwald explicitly threatened the "end of your career" in emails on June 9 and June 12, 2020. (Para. 140).

b. Boundary-Setting Email -> Formal Demotion: Following the same protected email of May 29, 2020, on July 30, 2020 (within two months), Freiwald formally executed the retaliatory demotion, notifying Plaintiff that her appointment was shortened to a non-standard six-month term and her research responsibilities were severely curtailed. (Para. 141).

c. NYSDHR/EEOC Complaint -> Termination and Professional Sabotage: On or about May 18, 2021, Plaintiff filed a formal complaint of sexual harassment and retaliation with the NYSDHR and EEOC against Freiwald and RU. (Para. 151). Defendants were immediately aware of this complaint, as RU's counsel submitted a position statement on July 9, 2021. (Para. 155). On August 3, 2021, Freiwald contacted Plaintiff for the first time in months. In her reply, she explicitly mentioned her involvement in the "legal requirements" of her NYSDHR complaint. (Para. 156). In direct response, on August 12, 2021 (within one week of this communication and just three months after the formal complaint), Freiwald and RU terminated Plaintiff's employment. (Para. 157). This termination was followed by RU's refusal to provide a positive recommendation, sabotaging her future job applications. (Para. 165).

d. NYSDHR/EEOC Complaint & This Lawsuit -> Retaliation in Housing and Immigration: Following the filing of the NYSDHR/EEOC complaint (May 2021) and the initiation of this federal lawsuit (December 2022), RU: (i) in January 2022 notified Plaintiff of its intent to withdraw her H-1B visa petition. (Para. 166). It formally did so in February 2022, after the NYSDHR issued a probable cause determination into her complaint, weaponizing her immigration status. (Para. 169); (ii) after years of inaction on housing arrears, RU served Plaintiff with a 90-Day Notice of Termination on September 10, 2025, just days after she filed a major declaration (Dkt. 196) in this litigation on September 5, 2025. (Paras. 177-178); (iii) permitted its housing managers to engage in direct intimidation of Plaintiff's husband regarding rent and the litigation. (Para. 176), and (iv) through its counsel, refused to provide a standard landlord letter, obstructing Plaintiff's ability to secure financial assistance. (Para. 175).

215.     The temporal proximity between each instance of protected activity and the ensuing adverse actions—ranging from one week to a few months—is itself sufficient to plead a causal connection.

216.     Furthermore, Freiwald's explicit threats to end Plaintiff's career (Para. 140) and the timing of the housing termination immediately following a key litigation filing (Para. 178) provide direct evidence of retaliatory intent.

217.     Plaintiff alleges that Freiwald retaliated against Plaintiff by:

- Instructing her to "change the environment" and look for another job, effectively attempting forcing her resignation (Para. 138);

- Threatening to end her career if she did not resign (Para. 140);

- Extending her appointment for only six months instead of the standard one-year term (Para. 141);

- Diminishing her responsibilities and opportunities by preventing her from completing the electrophysiological phase of her project (Paras. 141, 146);

- Refusing to change his lab management style after the lab climate survey (Para. 143);

- Revoking her guest lecturer opportunity at Hunter College (Para. 144);

- Retracting the promised collaboration with a laboratory in Belgium (Para. 145);

- Diverting electrophysiological resources to a male postdoc (Para. 146);

- Cutting her collaboration with CBMM (Para. 147);

- Refusing to allow her experimental data to be published (Para. 158); and

- Terminating her employment effective November 30, 2021 without providing a positive letter of recommendation (Paras. 157, 165).

218.    Furthermore, RU itself directly engaged in the retaliatory actions concerning Plaintiff's housing, immigration status, and professional reputation, including but not limited to:RU further retaliated against Plaintiff by:

- Denying her appeal to allow her husband on campus (Para. 152);

- Failing to complete the landlord portion of her ERAP application in a timely manner, thereby delaying critical rental assistance (Para. 172);;

- Deactivating her RUNet account prematurely (Para. 164);

- Withdrawing her H-1B visa petition (Paras. 166, 169);

- Refusing to cover the open-access fee for her published paper;

- Refusing to provide a necessary landlord letter to the New York City Human Resources Administration, thereby directly causing Plaintiff to lose Cash Assistance benefits for which she was eligible (Para. 175);

- Failing to address and permitting a hostile environment through its housing staff, who engaged in direct intimidation and harassment of Plaintiff's husband regarding the pending litigation and rent arrears, including threatening statements (Para. 176); and

- Issuing a 90-Day Notice of Termination on September 10, 2025, days after the filing of her major declaration (Dkt. 196) (Paras. 177-178).

219. Freiwald's and RU's retaliatory actions occurred shortly after Plaintiff engaged in protected activity, demonstrating a causal connection.

220. Freiwald's explicit threats and the timing of the adverse actions clearly indicate retaliatory intent. These retaliatory actions were materially adverse, as they would dissuade a reasonable employee from making or supporting a charge of discrimination. They have caused and continue to cause Plaintiff severe economic and non-economic harm, including the destruction of her academic career, severe emotional distress, financial ruin, and the imminent threat of homelessness.

221. The fact that Freiwald knew that she was dealing with legal requirements related to her NYSDHR complaint, and then terminated her employment, shows a clear causal connection.

222. The timing of RU's housing-based retaliation—particularly the 90-Day Termination Notice served days after a major litigation filing, after nearly four years of acquiescence—supports a strong inference of retaliatory intent.

The retaliatory actions were materially adverse, as they would dissuade a reasonable employee from engaging in protected activity.

223. The actions significantly impacted Plaintiff's employment, career prospects, housing stability, and emotional well-being, causing to her economic and non-economic damages. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation, and the imminent threat of homelessness.

224. Defendant RU is liable for Freiwald's retaliatory actions under the doctrine of respondeat superior, as his actions were taken occurred within the scope of his employment, and with RU's knowledge or ratification. RU is also directly liable for its own institutional acts of retaliation as detailed above.

225. RU had actual or constructive knowledge of the retaliation and failed to take prompt and effective corrective action.

226.    RU itself engaged in retaliatory behavior described herein.

227.    Therefore, Plaintiff demands judgment against Freiwald and RU for retaliation in violation of Title VII, including compensatory damages, punitive damages, injunctive relief, and attorney's fees.

<div align="center">

**FOURTH CAUSE OF ACTION**

**NEW YORK CITY GENDER MOTIVATED ACT**

**N.Y.C. Admin. Code §§ 10-1101, et seq. ("VGMVPL")**

**(against Freiwald and Azevedo)**

</div>

228.    The allegations set forth in the foregoing paragraphs are re-alleged and incorporated herein by reference.

229.    Defendants Freiwald and Azevedo engaged in gender-motivated violence against Plaintiff, in violation of the New York City Gender-Motivated Violence Act ("VGMVPL"), New York City Administrative Code § 8-901 et seq. Specifically, Azevedo sexually assaulted Plaintiff in Wood Hole, MA on August 30, and in New York City in March 2018, and Freiwald forcibly touched Plaintiff on multiple occasions, including in May 2019 and February 2020, in New York City.

230.    Under the VGMVPL, the act of violence must have been motivated by the victim's gender, meaning the perpetrator targeted the victim specifically because of their sex. See N.Y.C. Admin. Code § 8-902(a). The acts of violence committed by Azevedo and Freiwald were motivated by Plaintiff's gender, as they targeted her specifically because she is a woman.

231.    The alleged acts of violence occurred within the five boroughs of New York City, as required by the VGMVPL. See N.Y.C. Admin. Code § 8-902(a). Specifically:

- Azevedo sexually assaulted Plaintiff in her apartment in New York City in March 2018, in violation of New York Penal Law § 130.52 (Forcible Touching) and § 130.25 (Rape in the Third Degree);

- Freiwald forcibly touched Plaintiff on multiple occasions, including in May 2019 and February 2020, in New York City, in violation of New York Penal Law § 130.52 (Forcible Touching).

232.    Plaintiff demonstrates through the allegations in her Third Amended Complaint the physical, emotional, economic, and reputational harm she suffered as a result of the gender-motivated violence perpetrated by Defendants. The acts of violence and harassment caused Plaintiff severe emotional distress, humiliation, and long-term psychological trauma, as well as significant harm to her professional and personal life.

233.    The gender-motivated violence perpetrated by Defendant Azevedo caused a severe, tangible, and enduring physical injury that was suffered by Plaintiff in New York. The August 2017 assault in Woods Hole directly caused Plaintiff to contract a high-risk HPV infection, which was first diagnosed as a pre-cancerous condition (LGSIL/CIN1) in New York on September 5, 2017, and persisted, requiring continuous medical monitoring and intervention by New York healthcare providers for over three years. This documented medical harm, suffered in New York, provides an independent basis for this Court's personal jurisdiction over Azevedo for the out-of-state assault under CPLR § 302(a)(3), as he should reasonably have expected the act to have consequences in the state given Plaintiff was a New York resident. This ongoing physical injury is integral to the "course of conduct" alleged under the GMVA.

234.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress, pain and suffering, humiliation, and damage to her reputation and career.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against the Defendants and respectfully requests that this Court:

a. Declare that Defendants violated Plaintiff's rights and Defendant RU fostered a hostile educational and work environment;

b. Award Plaintiff compensatory damages for the emotional distress, pain, suffering, humiliation, and economic harm she has endured as a result of Defendants' unlawful conduct;

c. Award Plaintiff punitive damages to deter Defendants and other institutions from engaging in similar conduct in the future;

d. Grant injunctive relief requiring Defendants to implement policies and procedures to prevent and address gender-based discrimination and sexual harassment within the CBMM program and other federally funded programs;

e. Issue a preliminary and permanent injunction enjoining Defendant Rockefeller University from terminating Plaintiff's tenancy and evicting her from her current residence during the pendency of this action;

fe. Award Plaintiff attorneys' fees and costs incurred in bringing this action;

gf. Grant such other and further relief as the Court deems just and proper, and

hg. Request damages for Defendants' wrongful conduct in an amount to be determined at trial. The amount requested is for compensatory damages for:

   i. The fear, pain, and suffering of Plaintiff after being subjected to Defendants wrongful conduct,

   ii. The loss of the value and enjoyment of her life;

   iii. The loss of the value and enjoyment of her scientific work;

   iv. The loss of her and his earnings and earning capacity.

   v. The loss of her academic career

   vi. Medical expenses

   vii. The severe emotional distress and imminent harm caused by retaliatory housing actions and the threat of homelessness;

   viii. Aggravating circumstances surrounding the retaliation and her wrongful termination;

   ixviii. Punitive damages in an amount to be determined at trial

   ix. Costs and

   xi. Such other relief as this Court or a jury may find appropriate

Dated: ~~October~~ ~~February~~ ~~14~~28, 2025          Respectfully submitted,

KAROLINA MARCINIAK-DOMINGUES
GONCALVES AGRA
(Plaintiff *pro se*)

_____

Karolina Marciniak-Domingues Goncalves Agra
500 E 63rd St., Apt 13F
New York, New York 10065
Tel. 646.770.2045
marciniak.kar@gmail.com

# EXHIBIT A

# NEW YORK STATE

# DIVISION OF HUMAN RIGHTS

TO:    Files

FROM:  Joyce Yearwood-Drury
       Director O.S.H.I.

REGION: O.S.H.I.

DATE: December 31, 2021

SDHR CASE NO: 10212022-21-E-SO-E

Federal Charge No. 16GC101854

SUBJECT:   Karolina M. Marciniak v. The Rockefeller University, Winrich Freiwald

---

## FINAL INVESTIGATION REPORT AND BASIS OF DETERMINATION

### I.    CASE SUMMARY

This is a verified complaint, filed by complainant, Karolina M. Marciniak, on Tue 5/18/2021. The complainant, who is female, and who filed civil rights complaints, charges the respondents with unlawful discriminatory practices in relation to employment because of sex, opposed discrimination/retaliation.

### II.    SUMMARY OF INVESTIGATION

Complainant's Position:

Complainant, Dr. Karolina M. Marciniak, is a neuroscientist, and was a postdoctoral fellow with Respondent The Rockefeller University (the "University"). Dr. Winrich Freiwald was her supervisor. Complainant alleges that she was sexually assaulted in 2017, in Massachusetts by an MIT postdoctoral researcher at a Center for Brains, Minds and Machines ("CBMM") conference. CBMM is an academic partner of the University. Beginning in 2019, Complainant filed complaints for the sexual assault with various entities, including the University. Complainant believes that Dr. Freiwald terminated her project, Neuromechanisms of Intuitive Physics, because she wrote in an email that she was going to persist with her Title IX complaint about the sexual assault against CBMM, and also because she alluded to Dr. Freiwald's sexually harassing practice of inviting her to professional meetings in restaurants. Complainant alleges other sexually inappropriate behavior by him such as: shortening physical distance with Complainant; suggestively smiling; telling sexually suggestive jokes about a banana; and opening his legs and exposing his arousal at a one-on-one meeting. Complainant was terminated shortly after her May 2020 emails. Complainant alleges sexual harassment and retaliation.

Respondents' Position:

There is absolutely no evidence that anyone at the University, including Dr. Freiwald, discriminated or retaliated against Complainant. Complainant claims that Dr. Freiwald discriminated and retaliated against her because he was aware of the Title IX complaint that she filed with another institution when he decided to discontinue her research in his lab. Dr. Freiwald made this decision more than one year after he learned of the protected activity and in response to Complainant telling him that she wanted to pursue opportunities elsewhere. On September 1, 2016, Complainant joined the University as a Postdoctoral Associate in the Laboratory of Neural Systems, headed by Dr. Freiwald, currently, a tenured Professor. Dr. Freiwald's laboratory studies face recognition to understand how the brain works. Dr. Freiwald has eight postdoctoral researchers, including Complainant. Complainant's research is divided into two projects. Project one was anticipated to be completed in less than two years (i.e., before September 2018). Complainant has not completed project one and estimated that it would take her until about November 2021 to complete her analysis and have a first version of a manuscript for publication ready. In addition, Complainant's project one results would likely cause issues if she embarked on project two.

Dr. Freiwald and the University consistently supported Complainant. In 2017, Complainant attended a summer course sponsored by the Center for Brains, Minds and Machines ("CBMM") in Massachusetts, a non-profit institution and affiliate of the University of Chicago. CBMM is a multi-institutional Science and Technology Center. The CBMM partners with institutions, including Rockefeller, Harvard University, Massachusetts Institute of Technology ("MIT"), and various of their researchers, including Dr. Freiwald, are listed as CBMM faculty. On May 21, 2019, Complainant told Virginia Huffman, Vice President, Human Resources at the University, that she had been sexually assaulted by an MIT postdoctoral researcher while she was at the CBMM summer course over two years earlier in 2017, and that the University of Chicago had started its investigation. Ms. Huffman indicated that the University would pay for social worker services. In mid-July 2019, Complainant also told Dr. Freiwald, who offered his support.

Regarding Dr. Freiwald's behavior, Complainant identifies two specific instances in which he allegedly made her uncomfortable in connection with professional meetings held off-campus. First, she claims that Dr. Freiwald asked to hold a meeting with her while he walked to the post-office (instead of in his office) in 2017. Dr. Freiwald notes it is not unusual for him to ask a laboratory member to walk with him so they can have their scheduled meeting. She also claims that Dr. Freiwald embarrassed her when he came to look for her in the postdoctoral office before a lunch meeting with Josh Tenenbaum from CBMM on May 14, 2019. Complainant omits important facts. She was eager to meet with Dr. Tenenbaum for her research. Dr. Tenenbaum asked if they could meet at a restaurant downtown. Complainant and Dr. Freiwald traveled separately to the meeting at the restaurant. Complainant makes other vague allegations about Dr. Freiwald's conduct while she was meeting with him in his office. Dr. Freiwald emphatically denies any allegations of inappropriate conduct.

On May 25, 2020, Complainant informed Dr. Freiwald that because she was "anticipating the global effects of pandemic and likely economical shortages in scientific sectors," she was starting to look for a "second postdoctoral training" following her current training in Dr.

Freiwald's laboratory. On May 27, 2020, Complainant stated that she had concerns about whether there would be sufficient funds to cover her project until the end and reiterated that she wanted to secure backup options. Complainant also told Dr. Freiwald that she had two "main" concerns - that she could not rely on CBMM because her Title IX complaint was still pending. Dr. Freiwald responded that she should not worry "about the fellowship, CBMM financially. That will be fine even if push came to shove." By this, Dr. Freiwald meant that he would find another funding source to pay her salary. After further reflection, Dr. Freiwald realized that Complainant's discontinuation would be in her best professional interest, due to the slow progress on her project. On June 4, 2020, Dr. Freiwald explained his rationale over Zoom.

Investigator's Observations:

Complainant's Documents:

Complainant submitted thousands of pages of documents to the investigations. However, the core evidence to support her claim of a retaliatory termination by Dr. Freiwald is the email documentation submitted with the Complaint, to show a change of direction from the beginning of the email exchange to after Complainant purportedly referenced Dr. Freiwald's inappropriate boundaries, as well as insisted on pursuing a Title IX claim against CBMM, to which he is connected. It's noted that these are the same emails that Respondents focus on in support of the academic/professional justification for the termination of Complainant's project and position.

Witness Interviews:

_____ , Ph.D., was Complainant's same level colleague in Respondent's lab. She stated that Respondents claimed that they were terminating Complainant based on a lack of progression on her project, but that conclusion did not seem reflective of the science. Complainant had good and potentially publishable data sets. Dr. _____ also noted that Dr. Freiwald had told Complainant that her project did not have a problem with funding, and then all of a sudden she was terminated. Dr. _____ stated that the real reason was that Complainant had raised the sexual complaint issues in the email a week prior to her termination. Dr. _____ said that she was familiar with the emails and that there was a change in tone over their course (to the negative). Dr. _____ also stated that after Complainant's termination, Complainant confided in her about certain behaviors from Dr. Freiwald: instances in which he wanted to meet outside of the campus for lunch; inappropriate looks; sexually suggestive jokes about a banana. [Dr. _____ 's full interview is in CMS.]

Piedro Agra, Complainant's husband since 2018, reported that Complainant had contemporaneously told him about Dr. Freiwald's sexual harassment of her since around March/April 2019 when Complainant started making official complaints about the 2017 sexual assault at CBMM. This is when Complainant opened up about everything. Mr. Agra stated that Dr. Freiwald had been chasing Complainant, trying to go outside to restaurants to be alone with her. Mr. Agra wanted Complainant to quit, but she explained that she needed the job for her career advancement. Mr. Agra brought up specific incidents like Dr. Freiwald spreading his legs and revealing his arousal to Complainant during a one-on-one office meeting. Mr. Agra remembered it as occurring on Valentine's Day 2020 and felt that was deliberate. Later that

month, Complainant told Mr. Agra about the incident where Dr. Freiwald made a sexual joke about banana, right after it happened. [Piedro Agra's full interview is in CMS.]

Submitted by: _____

Michael Peel
Human Rights Specialist II


## III.    BASIS FOR DETERMINATION

Complainant, Dr. Karolina M. Marciniak, who is a neuroscientist and who was a postdoctoral fellow with Respondent The Rockefeller University (the "University"), and who was supervised by Dr. Winrich Freiwald, has alleged distinct and overlapping theories of sexual discrimination against Dr. Freiwald and the University. Complainant alleges that Dr. Freiwald terminated her project, Neuromechanisms of Intuitive Physics, and effectively fired her in June 2020 as retaliation against her stating that she was continuing to pursue her claim of sexual assault in 2017, in Massachusetts by an MIT postdoctoral researcher at a Center for Brains, Minds and Machines ("CBMM") conference. The Rockefeller University is in partnership with CBMM, as are other academic institutions, such as Harvard, and MIT. Respondent acknowledges that Dr. Freiwald is listed as CBMM faculty.

Further, Complainant alleged that the same email exchange which stated her intentions to continue her Title IX claims against her alleged assaulter, alluded to Dr. Freiwald's inappropriate sexual behavior toward Complainant. Consequently, Complainant alleges that Dr. Freiwald has been her long-term sexual harasser and retaliated against Complainant to protect himself, directly, and not just the relationship with CBMM and other entities.

Respondents submitted a response which argues that the University and Dr. Freiwald were supportive of Complainant's 2017 sexual assault allegation, and also that Dr. Freiwald did not engage in inappropriate sexual behavior toward Complainant, and that the termination of Complainant's project was done for scientific/academic reasons (Complainant's project was taking a long time), and not because Complainant had reported her 2017 sexual assault claim to human resources in May 2019, and to Dr. Freiwald in July 2019, which is about a year removed from Dr. Freiwald's termination decision.

Complainant's allegations are supported in the record by the late-May/early-June 2020 email exchange between Complainant and Dr. Freiwald. On May 27th, Complainant wrote, among other things, that she was afraid of a lack of funding to continue her project to the end given her Title IX complaint against CBMM, a funder. Early on May 28th, Dr. Freiwald told Complainant, among other things, "Do not worry about the fellowship, CBMM financially. That will be fine even if push came to shove." The next day, Complainant thanked Dr. Freiwald for his reassurance and continued to discuss the Title IX matter and her determination to see it through. She also discussed how her work situation necessitated boundaries, like no professional meetings in restaurants. That part of the email implicated Dr. Freiwald, as Complainant would explain in

her Division interviews, because it alluded to one of his behaviors. Shortly after Complainant's May 29, 2020 email, Dr. Freiwald invited her to a Zoom meeting where he fired her.

Complainant asked Dr. Freiwald, in a June 8th email for a reason. Dr. Freiwald stated that it took him a couple of days from the beginning of the email exchange to realize what made the most sense for Complainant - personally and scientifically. Dr. Freiwald said that they [the University] were not in a position to progress to phase II of the project; that the risk of doing so would be too high for Complainant's career. A few days later, Dr. Freiwald wrote, "Given the current status of the project and results, it is almost guaranteed that if you continue into phase II, it will be the end of your career."

Complainant's witness and former colleague, Pooja Viswanathan, Ph.D., stated in a Division interview that Respondents' reason for terminating Complainant did not seem reflective of the science. Complainant had good data sets that could have potentially been published. According to Dr. Viswanathan, Complainant had made a lot of progress, and her project was going better than it had in prior years. Additionally, Dr. Viswanathan stated that Complainant was the only one of her peers terminated. Dr. Viswanathan believes that Complainant was fired shortly after her email discussion about her Title IX claims, because of those emails.

Complainant husband, Piedro Agra, corroborated Complainant's allegation of sexual harassment from Dr. Freiwald, in that Complainant would contemporaneously report incidents to him. Mr. Agra stated that he asked Complainant to quit many times but that she explained that her academic world is small, and she needed to put in the time in this position before she could move forward. Mr. Agra stated that Dr. Freiwald would often maneuver to be alone with Complainant, trying to get her to go to professional meetings in restaurants. Mr. Agra also stated that in February 2020, Dr. Freiwald invited Complainant to his office and later spread his legs and revealed his arousal. Later that month, Dr. Freiwald told a joke, where he sexualized a monkey eating a banana. Dr. Viswanathan similarly reported that about a month after her termination, Complainant confided in her about some of the alleged incidents, including the phallic banana joke, and Dr. Freiwald's pressure to go to restaurants.

The Division's Investigation reveals that considering the emails submitted to the record, witness interviews, and the timeline, Complainant, at this juncture, has met her burden for a probable cause determination. Complainant's discrimination claims, and Respondents' denials of their substance, are issues of fact to be determined at an administrative hearing before a trier of fact. Any issues of credibility should be determined at an administrative hearing, and not at the regional level.

For workplace harassment alleged to have occurred on or after October 11, 2019, or alleged to have continued until or beyond that date, the legal standard for actionable harassment, including but not limited to sexual harassment, has been changed by an amendment to the Human Rights Law. To be an unlawful discriminatory practice, harassment is no longer required to be "severe or pervasive." The amendment added the following new paragraph:

    1. It shall be an unlawful discriminatory practice:
      (h) For an employer, licensing agency, employment agency or labor organization to subject any individual to harassment because of an individual's age, race, creed, color, national origin, sexual

orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, domestic violence victim status, or because the individual has opposed any practices forbidden under this article or because the individual has filed a complaint, testified or assisted in any proceeding under this article, regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims. Such harassment is an unlawful discriminatory practice when it subjects an individual to inferior terms, conditions or privileges of employment because of the individual's membership in one or more of these protected categories. The fact that such individual did not make a complaint about the harassment to such employer, licensing agency, employment agency or labor organization shall not be determinative of whether such employer, licensing agency, employment agency or labor organization shall be liable. Nothing in this section shall imply that an employee must demonstrate the existence of an individual to whom the employee's treatment must be compared. It shall be an affirmative defense to liability under this subdivision that the harassing conduct does not rise above the level of what a reasonable victim of discrimination with the same protected characteristic or characteristics would consider petty slights or trivial inconveniences.

Executive Law, art. 15 (Human Rights Law) § 296.1(h). These new standards have been applied in order to make a determination in this case as to whether there is probable cause to believe that unlawful discrimination has occurred, based on the evidence obtained from the investigation.

This matter should proceed to public hearing. Probable cause to believe that unlawful discrimination occurred exists when, after giving credence to the Complainant's version of the facts, some evidence of discrimination exists. A complaint may not be dismissed for lack of probable cause unless the facts revealed generate conviction in and persuade a fair and detached fact finder that there is no substance in the complaint. A determination of probable cause is not a final adjudication, but merely a determination that there should be a formal hearing on the matter.

A review of the record reveals that there are material issues of fact involved which are best resolved at a public hearing before an administrative law judge, where testimony is taken under oath, witnesses are subject to cross-examination and a full record is made.

Reviewed & Approved: _____

Joyce Yearwood-Drury
Director O.S.H.I.

## IV.    DETERMINATION

Based on the foregoing, I find  Probable Cause to support the allegations of the complaint.

_____

Joyce Yearwood-Drury
Director O.S.H.I.

- 6 -



**Division of
Human Rights**

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

| | |
|---|---|
| NEW YORK STATE DIVISION OF HUMAN RIGHTS on the Complaint of<br><br>KAROLINA M. MARCINIAK,<br>                Complainant,<br><br>v.<br><br>THE ROCKEFELLER UNIVERSITY, WINRICH FREIWALD,<br>                Respondents. | DETERMINATION AFTER INVESTIGATION<br><br>Case No.<br>10212022 |

Federal Charge No. 16GC101854

On 5/18/2021, Karolina M. Marciniak filed a verified complaint with the New York State Division of Human Rights ("Division"), charging the above-named Respondents with an unlawful discriminatory practice relating to employment because of sex, opposed discrimination/retaliation in violation of N.Y. Exec. Law, art. 15 ("Human Rights Law").

After investigation, the Division has determined that it has jurisdiction in this matter and that <u>PROBABLE CAUSE</u> exists to believe that the Respondents have engaged in or are engaging in the unlawful discriminatory practice complained of.

Pursuant to the Human Rights Law, this matter is recommended for public hearing. The parties will be advised of further proceedings.

Dated: 1/11/22
        Brooklyn, New York

STATE DIVISION OF HUMAN RIGHTS

By: _____
        Joyce Yearwood-Drury
        Director O.S.H.I.

# EXHIBIT B

## EXHIBIT B:

## NYSDHR MATERIALS SHOWING RETALIATORY TIMELINE

## (MAY 29, 2020 – AUGUST 12, 2021)

- **Page 1: Plaintiff's Protected Activity (May 29, 2020 Plaintiff's Boundary-Setting Email)**

**From:** Winrich Freiwald <wfreiwald@mail.rockefeller.edu>
**Sent:** Thursday, May 28, 2020 12:58 AM
**To:** Karolina Marciniak <kmarciniak@mail.rockefeller.edu>
**Subject:** Re: Lab Reopening, 1.01

Dear Karolina,

Thank you so much for sharing your thoughts. It is good we are having this conversation. Unfortunately I am too tired to have an appropriate response, just a few thoughts, and then maybe we continue in person.
- do not worry about the fellowship, CBMM financially. That will be fine even if push came to shove. (The rest cannot.)
- we should talk different scenarios openly, and it would then also be good for me to understand your husband's situation.
- have you talked with Ilaria about connectivity analyses? I forgot where we left things off, but I think they would add a lot to your story.

All the best,

Winrich

**From:** Karolina Marciniak <kmarciniak@rockefeller.edu>
**Sent:** Friday, May 29, 2020 11:20 AM
**To:** Winrich Freiwald <wfreiwald@mail.rockefeller.edu>
**Subject:** Re: Lab Reopening, 1.01

Hi Winrich,

It is good to hear your reassurance concerning financial situation.

My husband still has his job contract until September but is not get paid due to a lack of contracts in coronavirus time. We are currently organizing a visa for him independently from his work so that he can stay with my stay here. In the meantime, he could probably have his 3-year contract renewed but in the current world, we are dealing with a lot of uncertainties.

I am wholly excited about my project and working serves many times even as a huge distractor to unfavorable reality. I am also aware that for my future career it would make more sense to stay here until the end of the project. My husband supports my passion for science entirely and New York is also the first option for him to stay.

As of different scenario, I find it to be fair and nice to open to you my current struggles and give you heads-up about where the things might go. The difficulties of Title IX complaint have been pretty strenuous and financially, mentally and physically exhausting, making even my husband name the last year as the worst of his life. I am not a person that gives up easily. I always tend to look for ways to turn a negative experience into the positive one and I also learned a lot from trauma. That is also why I set up clear borders for my work environment, involving no restaurant professional meeting and not working with intrusive men like Michael. There is a huge hope to finally move forward with the Title IX issue but with the current financial crisis when we have been using our savings which are not unlimited, now looking to move to a smaller apartment and cutting on all possible expenses, we started to consider the possibility of moving somewhere where the living would be cheaper in case we would undoubtedly need a new beginning if we find the mission to fight for justice to be the lost battle and retaliation continuous.

I talked with Ilaria in the pre-lock down era and then you and I summarized the options. We agreed that some sort of connectivity analysis will be good together with fMRI results. What I can have from Ilaria's tractography's method right now would only mean projecting my functional ROIs onto her good-quality brains, which most likely will not result in anything new rather than seeing the broad tracks she has already identified as her PITd-LIP-FEF network. What became clear not only in conversation with Ilaria but also with Sarina, is the need for an improved sequence for DWI in-vivo studies. I am checking currently with Sarina if multishell approach can help to boost the quality but once we restart our CBIC activities, I think it would be a good idea to reconnect with Henning and Jon and look for their help with the sequence.

Best wishes,

Karolina

**From:** Winrich Freiwald <wfreiwald@mail.rockefeller.edu>
**Sent:** Wednesday, June 3, 2020 7:22 PM
**To:** Karolina Marciniak <kmarciniak@mail.rockefeller.edu>
**Subject:** RE: Lab Reopening, 1.01

Hi Karolina,

Do you have time to talk tomorrow, maybe 4pm or 5pm? Thank you!

Best,

Winrich

**<u>EXHIBIT B:</u>**

**<u>NYSDHR MATERIALS SHOWING RETALIATORY TIMELINE</u>**

**<u>(MAY 29, 2020 – AUGUST 12, 2021)</u>**

- **Page 2: Freiwald's Retaliatory Demand (June 4, 2020 Zoom Meeting Transcript)**


Winrich Freiwald (WF): Hi Karolina.

Karolina Marciniak (KM): Hi Winrich. Can you hear me?

WF: I can hear you, I can see you, under water

KM: Yep, that is my favorite background. Say again?

WF: Are you a diver?

KM: No, unfortunately no.

WF: I didn't figure the background yet. Also, with Zoom, I am still trying to figure stuff out, but, yes, this works. Uh mm… Uh mm, thanks so much for  (noise ) and then also the information about fMRI results that you have and your interpretation. So, I have been thinking a lot about you and the worries that you have and the project. So, my conclusion, and I can tell you a bit more why I think that, is that I think your initial instinct was probably right, that it would be the best for you to move to a different place and different environment. So let me …. ….  This is probably not what you expected, but I have been thinking about it quite a bit, and, …, so, the two levels. Here, one is the personal level. I don't want to dive too much what the legal situation is but, again, I don't think you have to fear any … retaliation or things like this but just a fact that you will have to worry about this or you know, what will this be on a personal level, it seems to me that it would probably be better for you hmm u mm to have a change of environment or at least a perspective to have a change of environment, so that whatever you gonna do, you know, it is not gonna be that CBMM affects that. That is sort of my sort of folk psychology echoing on your situation from my personal perspective

(…)

So, that is how I view the current situation, about next phase, second phase. I don't know whether we are in the position to … umm whether we are in the position with lots of knowledge to be launching that phase [not clear], and but if we do it, it would be like a huge gamble on your part. And umm it would also be a gamble for me but you know, I can take a gamble, I can lose now and then but this is not the case for you. And umm. Yeah.

So, this is where I am right now, thinking about this for the last week or so. And, so, I think it would not be responsible of me to encourage you just to continue and you know, when we see how things fall out because I think the risks are very big.

(...)

WF: Yes, I think it would be best way forward. You should think about that, I don't expect you to make a decision now, you should give it some thought and probably it is going to go back and forth a bit more, but this is sort of honestly, what I think right now is the best thing. I didn't talk about what would it mean for me, and the collaboration, and what not … ummm that is not really relevant, but what would it mean for you.

(...)

## EXHIBIT B:

### NYSDHR MATERIALS SHOWING RETALIATORY TIMELINE
### (MAY 29, 2020 – AUGUST 12, 2021)

- **Page 3: Freiwald's June 9, 2020 email (continued pressure to resign following protected activity)**

**From:** Karolina Marciniak <<u>kmarciniak@rockefeller.edu</u>>
**Sent:** Monday, June 8, 2020 4:03 PM
**To:** Winrich Freiwald <<u>wfreiwald@mail.rockefeller.edu</u>>
**Subject:** Re: Lab Reopening, 1.01

Hi Winrich,

Just a quick question related to what you said about discontinuation of my project last Thursday. You mentioned that your decision is not related to my work per see, so I was wondering if I will be able to count on your good reference letter for my next postdoc.

I should have asked right away, but I was too shocked.

Thanks,

Karolina


**From:** Winrich Freiwald <<u>wfreiwald@mail.rockefeller.edu</u>>
**Sent:** Tuesday, June 9, 2020 1:26 AM
**To:** Karolina Marciniak <<u>kmarciniak@mail.rockefeller.edu</u>>
**Subject:** RE: Lab Reopening, 1.01

Hi Karolina,

Of course!
I should also clarify. It took me a couple of days after your email from May 25th to see that it actually makes the most sense for you – both personally and scientifically. We are not in a position to progress to phase II of the project directly. The risk of doing so would be too high for your career, and it would not be responsible for me to suggest doing this to you. It is therefore much better for you to wrap up phase I with a paper and search for that place for a second postdoc you mentioned. I am very sorry that you were shocked by me coming around to your position, though I can see that you were surprised.
Of course I will write you as strong a letter as I have continuously in the past.

Best wishes,


**From:** Karolina Marciniak <<u>kmarciniak@rockefeller.edu</u>>
**Sent:** Tuesday, June 9, 2020 12:00 PM
**To:** Winrich Freiwald <<u>wfreiwald@mail.rockefeller.edu</u>>
**Subject:** Re: Lab Reopening, 1.01

Ohh, now I see that there was a huge misunderstanding in our conversation. I am more relieved now. I think you might have wrongly understood my point. When I broadly mentioned about looking for opportunities in the email from May 25th, I was concerned about project funding and got very happy when you assured me that there is no worry about that. I opened up my personal situation because it is simply better to have the support. Of course I want to stay and finish the project. It is the best for me and my career. I have been totally excited about the large scale recordings guided by fMRI and same as you were convinced seeing the activations in January, I totally believe that the pattern of activation we are getting forms a clear set of the areas to target with the arrays implantation. Still keeping up with our motivation from the beginning, I believe that the intuitive physics approach we are taking will illuminate the core function of the cortical areas previously associated only with motor planning, and it was good to hear your encouraging opinion in January that the ephys result will be surely interesting so our planning proceeded accordingly. After clarifying the misunderstanding, would you still like to discontinue the project?

Karolina

**EXHIBIT B:**

**NYSDHR MATERIALS SHOWING RETALIATORY TIMELINE**

**(MAY 29, 2020 – AUGUST 12, 2021)**

- **Page 4: Freiwald's June 12, 2020 email (explicit threat of career termination)**

**From:** Winrich Freiwald <wfreiwald@mail.rockefeller.edu>
**Sent:** Friday, June 12, 2020 12:06 AM
**To:** Karolina Marciniak <kmarciniak@mail.rockefeller.edu>
**Subject:** RE: Lab Reopening, 1.01

Hi Karolina,

Thank you for sharing your thoughts. I am not sure where the misunderstanding lies. Let me try to explain it another way.

Given the current status of the project and results, it is almost guaranteed that if you continue into phase II on this basis, it will be the end of your career. I explained the reasons in detail before and am happy, if necessary, to do this again in person. The point is that it would be irresponsible to continue. Wrapping things up here and doing a second postdoc in a different lab makes much more sense.

## EXHIBIT B:

## NYSDHR MATERIALS SHOWING RETALIATORY TIMELINE

## (MAY 29, 2020 – AUGUST 12, 2021)

- **Page 5: Freiwald's July 30, 2020 email (demotion execution)**

**From:** Winrich Freiwald <wfreiwald@rockefeller.edu>
**Sent:** Thursday, July 30, 2020 2:40 PM
**To:** Karolina Marciniak <kmarciniak@rockefeller.edu>
**Subject:** quick check-in

Hi Karolina,

Following up on our previous conversation, I don't think I have gotten the list of fMRI experiments from you yet that still need to be done. I am sorry if I missed it – could you (re)send? Since your re-appointment is coming up, in the interest of time, I will do this now for half a year, which I am sure will be needed, and we can figure out the rest independently.

Best,

Winrich

**From:** Karolina Marciniak <kmarciniak@rockefeller.edu>
**Sent:** Wednesday, August 5, 2020 7:23 AM
**To:** Winrich Freiwald <wfreiwald@rockefeller.edu>
**Subject:** Re: quick check-in

Hi Winrich,

Here comes the list:

1. Hobbes, Physical interactions (videos of toys from familiar context): 70 runs, 5-10 scanning days
2. Hobbes, Physical interactions from Julia's experiment, to identify physical interactions overlays: 70 runs, 5-10 scanning days
3. Hobbes, FOB: 15-20 runs, 3-4 scanning days
4. Hobbes, Motion localizer:15-20 runs, 3-4 scanning days
5. Hobbes, Saccade areas LIP & FEF localizer: 15-20 runs, 3-4 scanning days
6. Hobbes, Physical and agent-animated animations: 70 runs, 5-10 scanning days
7. Lefty, Physical and agent-animated animations: 70 runs, 5-10 scanning days

Best,

Karolina

## EXHIBIT B:

## NYSDHR MATERIALS SHOWING RETALIATORY TIMELINE
## (MAY 29, 2020 – AUGUST 12, 2021)

- **Page 6: Freiwald's and RU's August 12, 2020 email (Employment Termination)**

**From:** Winrich Freiwald <wfreiwald@rockefeller.edu>
**Sent:** Tuesday, August 3, 2021 11:01 AM
**To:** Karolina Marciniak <kmarciniak@rockefeller.edu>
**Subject:** Analyses and paper

Hi Karolina,

I thought I would check in and ask where things are standing with analyses of your fMRI data for your Intuitive Physics paper. Please let me know.

Thank you.

Best,

Winrich


**From:** Karolina Marciniak <kmarciniak@rockefeller.edu>
**Sent:** Thursday, August 5, 2021 2:03 PM
**To:** Winrich Freiwald <wfreiwald@rockefeller.edu>
**Subject:** Re: Analyses and paper

Hi Winrich,

My timeline for the preparation of my Intuitive Physics experimental paper has shifted forward since we emailed about it earlier this year. As you proposed in the meantime, I had been working on the Intuitive Physics review paper. I submitted it only a little bit more than one month ago.

I would also ask for your understanding about the number of months I may still need for the work that I have to do.
I am involved in the complaint process about the sexual assault, harassment and retaliation events that happened during my work at Rockefeller University. I have been dealing with legal requirements to prepare and submit the documentation. For example, now I am working against the submission deadline which is due in a couple of days.
Also, in the meantime, I have been helping Alejandra with the margin cleanings, and Sarina with the scanning. For example now for the next couple of days, as soon as the current issue with the scanning machine gets resolved, I am Sarina's second person during the scanning.

Thank you for your understanding,

Best,

Karolina


**From:** Winrich Freiwald <wfreiwald@rockefeller.edu>
**Sent:** Thursday, August 12, 2021 5:38 PM
**To:** Karolina Marciniak <kmarciniak@rockefeller.edu>
**Subject:** RE: Analyses and paper

Hi Karolina,
The University and I have considered your request to extend your appointment, which is set to expire on November 30, 2021. We are unable to grant your request for another extension. The existing extension through November 30, 2021 should provide you with sufficient time to complete your Intuitive Physics experimental paper.

Best,

Winrich

# EXHIBIT C

**EXHIBIT C:**

**MEETING TRANSCRIPT IN WHICH DEFENDANT FREIWALD ACKNOWLEDGES SYSTEMIC LAB HOSTILITY AND INSTITUTIONAL FAILURES**

**(AUGUST 5, 2020, via Zoom)**

XXX. I don't think we expect anybody else. So I think we can start.

**FREIWALD**: Ok, good. Lets' get started. So, can you all hear me? First of all I would like to thank XXX, XXX, XXX for doing the survey and everyone who participated in it and I also understand that there have been some lines of discussion. So, today I will address the content of the climate lab survey. This will not be easy for me because the survey is a document of my complete failure. I take full responsibility. I have been thinking about the lab during the last couple of months about the lab. The lab is in crisis. (silence)

Philosophy  XXX humanistic. I believe that science is about individual people making discoveries. This individualistic approach inevitably leads to rough patches, being in the cloud. The individual scheme that is a lot of freedom. With this freedom comes the responsibility. Some have other ideas to run the lab. I will not change this principle, my philosophy of life. It is my philosophy for the lab. The survey shows that it works against the lab. (...)

The first chart saying that you are maximally unhappy or almost maximally unhappy  in the lab. I want to apologize to those who feel unhappy. You should not feel unhappy or certainly maximally unhappy. I promise to improve. But if you feel unhappy, you will have to think about your situation.

The average picture is not better. The major think I have always though was that you have to have fun doing science. So, with NHP there is a lot of work, a lot of responsibilities, but you have to feel fun, you have to feel excitement. Currently no one is really having fun. This is very bad for your life and for the science that you are doing. This was my first conclusion.

The second general conclusion I would draw from the survey: Is similar to the first one, maybe not as obvious but I think it is pretty clear when you think about it.The survey portrays lack of trust in me as a person. More than half of the lab feels that they can not talk with me about their personal concerns. Some of them may be trivial, we can make some excuses for that, there may be some cultural reasons. That is ok but it is not good.

So, if nobody told me, if they tried but it did not stick with me, if it had to take anonymous survey for that to come out, then I really don't know what to say. I don't want to be that kind of person. I think I must have been much worse person than I think I am.

I do believe that there are things that once you lose them you can not get them back. I am sceptical if I can turn things better.

For me there is life before the survey and after the survey.

I will have to ask myself how difficult it will be for me to interact with you going forward. How to talk to people whom I have made profoundly unhappy. To be person of power who you don't trust. I thought about this a couple of days. I have come to the conclusion

So, if you are maximally unhappy, if you feel unsupported by me, if you think I don't have your interests in mind while talking to the vets, I would have to ask this question to myself if I would like to work with such person. You have to ask yourself this question. I want to be clear, I don't want you to leave the lab but I also don't want to be the person who makes you unhappy.

(…) [discussion about lab logistics]