# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

KAROLINA MARIA MARCINIAK-
DOMINGUES GONCALVES AGRA,

                              Plaintiff,

- against -


ROCKEFELLER UNIVERSITY,
FREDERICO AZEVEDO and
WINRICH FREIWALD,
                              Defendants.

Civil Case No.: 1:22-cv-10959-ALC


**FOURTH AMENDED
COMPLAINT AND
DEMAND FOR JURY
TRIAL**

Plaintiff Dr. KAROLINA MARIA MARCINIAK-DOMINGUES GONCALVES AGRA ("Plaintiff"), proceeding *pro se*, complains of Defendants ROCKEFELLER UNIVERSITY ("RU"), FREDERICO AZEVEDO ("Azevedo") and WINRICH FREIWALD ("Freiwald"), and in support respectfully states and alleges as follows:

## INTRODUCTION

1. This action arises from a continuous and escalating campaign of sexual predation, harassment, retaliation, and institutional betrayal that destroyed Plaintiff's scientific career and now threatens her home.

2. The Defendants' conduct, which began in 2016 and culminated in a retaliatory eviction notice in September 2025, constitutes a single, persistent pattern of gender-based discrimination and retaliation. While certain early acts provide critical context for the severity and intent behind this pattern, the timely adverse actions—including Plaintiff's demotion, retaliatory termination, the weaponization of her immigration status, and the current attempt to evict her from university housing—are indivisible components of this ongoing violation.

3. Plaintiff, Dr. Karolina Agra, was a postdoctoral neuroscientist in the laboratory of Defendant Dr. Winrich Freiwald at Rockefeller University ("RU"). Her career was

1

systematically dismantled after she rejected Freiwald's sexual advances and reported being raped twice by Defendant Frederico Azevedo, a researcher in a collaborative program RU helped administer. RU failed to protect her, then retaliated by firing her, weaponizing her immigration status, and, most recently, moving to evict her from university housing days after she filed a key declaration in this lawsuit.

4.  Plaintiff brings this action pursuant to: Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*; the New York State Human Rights Law ("NYSHRL"), Executive Law § 296 *et seq.*; the New York City Human Rights Law ("NYCHRL"), Admin. Code § 8-101 *et seq.*; and the New York City Victims of Gender-Motivated Violence Protection Law ("GMVA"), Admin. Code § 10-1101 *et seq.*

5.  Plaintiff seeks compensatory and punitive damages, injunctive relief (including an order enjoining her retaliatory eviction), attorneys' fees, and all other just relief.

## JURISDICTION AND VENUE

6.  This Court has federal question jurisdiction over Plaintiff's Title VII and FHA claims under 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction over her related state and city law claims under 28 U.S.C. § 1367(a).

7.  This Court has personal jurisdiction over Defendants RU and Freiwald, as they are domiciled and conduct substantial business in New York. Jurisdiction over Defendant Azevedo is proper under New York's long-arm statute, CPLR § 302.

•  Under § 302(a)(1), Azevedo transacted business in New York by deliberately leveraging his role in the CBMM program to pressure Plaintiff for lodging and professional access in New York City, culminating in the March 2018 sexual assault in her New York apartment.

•  Under § 302(a)(2), Azevedo committed the tortious act of sexual assault within New York in March 2018.

•  Alternatively, under § 302(a)(3), Azevedo's August 2017 sexual assault in Massachusetts caused a severe, continuing injury—a high-risk HPV infection—that

2

was diagnosed, monitored, and treated in New York, a foreseeable consequence to a known New York resident.

8.  Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims occurred here, including: Freiwald's harassment at RU; the March 2018 rape by Azevedo in Plaintiff's New York apartment; the retaliatory termination and demotion; and the discriminatory and retaliatory actions concerning Plaintiff's housing and immigration status.

9.  All conditions precedent to suit have occurred or been complied, including, in particular, Plaintiff's timely complaint with the New York State Division of Human Rights ("NYSDHR") and the Equal Employment Opportunity Commission ("EEOC") regarding Defendants RU and Freiwald's unlawful employment actions. The NYSDHR issued a Determination and Finding of Probable Cause on January 18, 2022 (Exhibit A), and a Notice of Right to Sue on April 7, 2023. The EEOC issued a Dismissal and Notice of Right to Sue on March 21, 2023.

## JURY DEMAND

10. Pursuant to Fed. R. Civ. P. 38(b), Plaintiff respectfully demands a trial by jury on all issues and claims set forth in this Complaint.

## PARTIES

11. Plaintiff Dr. Karolina Marciniak-Domingues Goncalves Agra is a neuroscientist residing in New York. She holds a Ph.D. in Neuroscience and was employed as a postdoctoral researcher at RU from September 2016 until her retaliatory termination in November 2021.

12.  Defendant Rockefeller University is a New York corporation that employed Plaintiff and, as a condition of her employment, acted as her landlord, providing on-campus housing.

13. Defendant Dr. Winrich Freiwald is a New York resident, a professor at RU, and was the Principal Investigator and direct supervisor of Plaintiff. He held ultimate authority over her employment. Upon information and belief, RU was aware of Freiwald's history of inappropriate relationships with subordinates prior to and during his tenure.

14.    Plaintiff names Dr. Winrich Freiwald as a defendant in this Fourth Amended Complaint because subsequent discovery and litigation events have further clarified the extent of his personal, individual liability under the Title VII, NYSHRL, NYCHRL, and GMVA. His addition is necessary to provide complete relief and does not prejudice Dr. Freiwald, who has been on notice of these claims since at least May 2021 when Plaintiff filed her NYSDHR complaint naming him, and who has been represented by the same counsel as Defendant Rockefeller University throughout these proceedings. This amendment relates back to the original pleadings under Fed. R. Civ. P. 15(c) as it arises from the same core of operative facts alleged from the outset.

15. Defendant Dr. Frederico Azevedo is a Massachusetts resident employed by the Massachusetts Institute of Technology ("MIT"). He was a coordinator for the National Science Foundation's Center for Brains, Minds and Machines ("CBMM"), a collaborative program involving RU, MIT, and Harvard. In this role, he held influence over program logistics and interactions with participants, including Plaintiff.

## STATEMENT OF FACTS

### I. Freiwald's Predatory Pattern and Inappropriate Recruitment (2014-2016)

16.  Freiwald has a history of engaging in personal relationships with subordinates, including a prior relationship with a then- Ph.D. student that facilitated his hire at RU.

17.  Between 2009 and 2016, Freiwald engaged in at least one other personal relationship with an RU employee who provided services to his laboratory under his direction.

18.  Freiwald recruited Plaintiff beginning in 2014. In November 2014, he abruptly moved her formal job interview from a conference venue to an upscale restaurant and insisted on paying.

19. During a September 2015 campus visit, Freiwald gave Plaintiff his personal cell number, said "for whatever reason, anytime, ok?" and insisted on picking her up from her guest house.

4

20. After Plaintiff initially withdrew her application, Freiwald bombarded her with intrusive, unsolicited emails in late 2015 and early 2016, urging her to "confide" in him and positioning himself as her sole professional gateway.

21. On February 6, 2016, Freiwald emailed Plaintiff again, expressing concern that she "might not be doing well" and urging her to confide in him. Plaintiff did not reply.

22. On Valentine's Day 2016, he again urged her to confide in him, assured her she had "nothing to be afraid of," and described himself as a "good listener and understanding."

23. On February 17, 2016, Plaintiff replied stating she was "OK" but dealing with personal matters.

24. On February 19, 2016, Freiwald wrote he had "feared" she was experiencing personal difficulties, and informed Plaintiff that he had already contacted Professor Josh Tenenbaum of MIT ("Tenenbaum") about Freiwald and Plaintiff "working closely" together. Freiwald represented this purported collaboration with the Center for Brains, Minds, and Machines ("CBMM") as "invaluable" for Plaintiff's work and beneficial for her "closely integrated" scientific support.

25. In March 2016, without Plaintiff's prior consent, Freiwald unilaterally initiated her immigration process with RU, securing a J-1 visa for her, which gave him significant control over her legal status.

26. Prior to Plaintiff's anticipated arrival at RU in September 2016, Freiwald, on or about April 20, 2016, emailed her regarding the CBMM collaboration. He reported having had a "fantastic" meeting with MIT Professor Josh Tenenbaum and emphasized the "exciting prospects" this collaboration held for Plaintiff.

27. In July 2016, Freiwald, Tenenbaum, and MIT Professor Nancy Kanwisher formally reviewed and endorsed Plaintiff's research plan, agreeing it should focus on "electrophysiology to inform our understanding of Intuitive Physics." On or about August 1, 2016, Tenenbaum and Kanwisher provided enthusiastic written feedback on Plaintiff's proposal, describing it as "cool" and "dynamite."

28.  In or about February 2017, Plaintiff formally submitted her postdoctoral research proposal, which was sponsored by Freiwald, Kanwisher, and Tenenbaum. Based on this proposal, she was awarded the prestigious two-year Feodor-Lynen fellowship from the Alexander von Humboldt Foundation. The fellowship covered 50% of her salary from September 1, 2017, to August 30, 2019. Rockefeller University committed to covering the remaining salary to fund the approved project.

## II. Commencement of Employment and Emerging Hostile Environment (2016-2017)

29.  On or about September 1, 2016, Plaintiff began her employment. Upon arrival, she discovered that the laboratory facilities differed from Freiwald's descriptions during recruitment, forcing her to build core methodologies from scratch.

30.  On or about September 15, 2016, Freiwald directed Plaintiff to travel to MIT to begin collaborative work with the CBMM. This collaboration proceeded productively until Freiwald ended it in 2020 after Plaintiff opposed his sexual harassment.

31.  In or around December 2016, Freiwald required Plaintiff to take part in a laboratory "murder mystery" event. He did not provide details of the roles or plot before demanding her participation. Freiwald assigned Plaintiff the role of "Karolina Delong," a character described in the script as "innocent" and "naive." The character's storyline involved developing devotion to Freiwald's character and being groomed to murder a colleague to "save" Freiwald from blackmail.

32.  A few days after the "murder mystery" dinner, Plaintiff suffered anaphylactic shock at Rockefeller University, requiring emergency care.

33. In March 2017, during a lab procedure led by Freiwald, he instructed the Plaintiff to assist and said, "be that slave driver once in your life."

34.  During spring 2017, while experiencing severe, ongoing stress from her work environment, Plaintiff developed debilitating kidney stones. The pain was so intense it disrupted her work and required surgery in June 2017, followed by recovery period.

## III. Sexual Assault by Defendant Azevedo in Woods Hole, MA (August 2017)

35.  In August 2017, Plaintiff attended a CBMM Summer School in Woods Hole, MA. Upon arrival, Xavier Boix, who was delegated to assign accommodations, informed her she would share an off-campus house with him and Defendant Azevedo. Plaintiff was not given a separate key; her sleeping area had no door, and there was only one shared bathroom.

36.  On August 30, 2017, while Plaintiff was medically vulnerable following recent surgery, Azevedo and Boix, subjected her to a grueling, two-hour "stress test" run to assess her physical limits.

37.  Later that day, Azevedo offered Plaintiff a room in the main building to rest. After she objected to him staying, he left and she fell asleep.

38.  Plaintiff was awakened by Azevedo removing her blanket and placing his hands under her clothes. She immediately resisted, stating, "No, I do not want this." Despite her verbal and physical objections, he continued.

39.  Azevedo then pulled up Plaintiff's dress and attempted to remove her underwear. Plaintiff resisted forcefully, squeezing her legs together and stating, "No, I don't want it."

40.  Defendant Azevedo, a trained martial arts practitioner, used his superior physical strength and skill to forcibly restrain Plaintiff by placing his hand over her mouth and neck, immobilizing her hands, and forcibly spreading her legs. He then penetrated her vagina with his penis against her will and without her consent.

41.  As a direct result of this assault, Plaintiff contracted a high-risk strain of Human Papillomavirus (HPV), a lasting physical injury diagnosed and treated in New York.

42.  After the assault, Azevedo mocked Plaintiff, asking, "How does it feel to cheat on your boyfriend?"

43.  In the housing, where Plaintiff had no private space or separate key, Boix and Azevedo regularly invited female students under their supervision, where Azevedo attempted to pursue them for sexual encounters.

44.  Azevedo falsely presented himself to others as Plaintiff's "old friend from Tuebingen" to fabricate a context of pre-existing rapport and isolate her.

45.  Azevedo later admitted to studying and using 'pickup artist' (PUA) techniques, which he described as strategies to manipulate women into sexual encounters, treating

7

women as "targets," and viewing refusal as an obstacle to overcome. Azevedo and Boix had arranged for Plaintiff to share housing where she had no private space or separate key.

## IV. Freiwald's Inappropriate Response and Escalating Harassment (Fall 2017-2019)

46.  On or about September 1, 2017, Plaintiff attempted to report the August 2017 sexual assault by Azevedo to Defendant Freiwald. Freiwald moved their scheduled meeting outdoors for a walk. During this walk, he stood unnecessarily close to Plaintiff, leered at her body, and placed his hand on her lower back. When Plaintiff referenced having had a "bad encounter," Freiwald ignored the subject and shifted the conversation, failing to provide support or initiate any reporting process.

47.  Between September and November 2017, Defendant Azevedo, having learned of Plaintiff's life-threatening peanut allergy which developed after the December 2016 laboratory event, stated, 'Now I know how to kill you.' Plaintiff perceived this as a threat to her safety.

48.  During this period, Azevedo invited himself to stay at Plaintiff's university housing in New York. Plaintiff felt professionally pressured and reluctantly agreed. She had to pay for his food and entertainment during the stay.

49. Azevedo admitted to using "pickup artist" (PUA) strategies to manipulate women. This included insulting Plaintiff ("negging"), falsely claiming they had a shared past to isolate her, and reversing blame when confronted—tactics aimed at psychological control.

50.  On or about November 16, 2017, Azevedo forwarded Plaintiff an internal CBMM email exchange concerning a selective, non-publicized trip to Palo Alto for a collaborative meeting with Google/X. He informed her a spot was available and offered to provide a referral to the CBMM Managing Director if she wished to join. Given Azevedo's prior sexual assault and his position of influence, Plaintiff believed that accepting the offer might imply consent to further unwanted advances. She therefore declined.

51.  In or around December 2017, Freiwald offered to facilitate Plaintiff's role as a Teaching Assistant (TA) for the upcoming CBMM Summer School, initiating an email

exchange with Gabriel Kreiman of Harvard, the Summer School's Director. Kreiman replied, "I would be happy to take *your postdoc* as a TA." Plaintiff subsequently submitted her credentials and was offered the position.

52. In February 2018, Freiwald required Plaintiff and two other junior female researchers from his laboratory to accompany him as his guests to a formal social event at RU, instructing them to dress in evening attire for a topic unrelated to their scientific work.

53. On or about February 15, 2018, Freiwald delegated to Plaintiff the responsibility of managing the remote webinar connection for the weekly CBMM research seminars—a task requiring coordination with the MIT-based organizers, including Defendant Azevedo, who was an authorized coordinator for the seminars.

54. In February and March 2018, Azevedo conditioned his professional assistance to Plaintiff regarding these seminar connections on her agreement to host him in New York City for an upcoming conference. He also requested that she arrange a laboratory talk for his associate, Vishal Kapoor, and provide accommodation for Kapoor in New York.

**V. <u>Sexual Assault by Defendant Azevedo in New York City (March 2018).</u>**

55. On or about March 15, 2018, Defendant Azevedo traveled to New York City for a neuroscience conference. He contacted Plaintiff and pressured her to provide him with lodging in her Rockefeller University apartment. Despite profound discomfort and fear stemming from his prior sexual assault, Plaintiff, feeling professionally intimidated and obligated, reluctantly agreed to let him stay on her living room sofa.

56. Upon arrival, Plaintiff directed Azevedo to the living room. He insisted on using the shower in her private bathroom. After showering, Azevedo entered Plaintiff's bedroom and refused to leave. Plaintiff became visibly distressed and began to cry. She confronted him, stating he could no longer assault women, and informed him that his August 2017 assault had caused her to contract a high-risk HPV infection, for which she was undergoing medical monitoring in New York. In response, Azevedo laughed and stated, "Welcome to the population of people with STDs."

57.  Immediately after this remark, Azevedo utilizing his training as a martial artist, used precise physical force to overpower Plaintiff's resistance. He forcibly pushed her onto her bed pinning her face down onto her stomach. With Plaintiff now immobilized in this prone position, she continued to resist both verbally and physically, repeatedly stating 'No' and attempting to push him away. Azevedo used his superior body weight, strength, and hands to restrain her in that position, and proceeded to engage in sexual intercourse without her consent and without a condom.

58.  This second rape by Azevedo compounded the severe physical injury he had already inflicted—the high-risk HPV infection—and intensified Plaintiff's psychological trauma, fear, and sense of powerlessness, directly contributing to the development of her severe Post-Traumatic Stress Disorder (PTSD).

59.  In April 2018, Azevedo again attempted to coerce Plaintiff into providing him lodging in New York. Plaintiff refused.

60. In May 2018, Plaintiff traveled with other lab members to a CBMM retreat conference at MIT. Prior to the event, Azevedo, in his role as an organizer, added her to a WhatsApp group where he repeatedly used Neo-Nazi and White Supremacist rhetoric, including referring to himself as a "Fuhrer," causing her extreme discomfort.

61.  During the CBMM retreat at MIT, Azevedo approached Plaintiff in a corridor. He urged her to end her personal relationship and accompany him to the upcoming CBMM Summer School where she was slated to be a Teaching Assistant, explicitly stating her presence would facilitate his attempts to pursue sexual interactions with female students. When Plaintiff firmly refused, Azevedo retaliated by making a derogatory and discriminatory remark about her Polish heritage in front of others, stating, "All Polish women I met in Germany were cleaning ladies."

62.  In or around June 2018, Azevedo sent Plaintiff an unwanted message stating, "I hope you are thinking about me and not about your stupid boyfriend." To prevent further unwanted contact, Plaintiff blocked Azevedo on WhatsApp and removed him from all her social media accounts.

## VI. The Hostile and Sexualized Work Environment Created by Defendant Freiwald.

63. In or around July-August 2018, during the CBMM Summer School in Woods Hole where Plaintiff served as a Teaching Assistant (TA), she observed that male TAs and organizers, including Azevedo and his associates, regularly held private gatherings that emphasized alcohol consumption. Female participants were often excluded or made to feel unwelcome. Plaintiff and her then-fiancé (now husband), who accompanied her, were subjected to persistent scrutiny and gossip by these male members.

64. During lectures, presentation slides were used that contained demeaning, misogynistic jokes objectifying women's bodies and sexual behavior, contributing to an unprofessional and degrading atmosphere for female attendees.

65. Plaintiff further observed Defendant Azevedo leveraging the environment to pursue inappropriate sexual dynamics. He informally brought a visiting student from MIT to the Summer School and was observed actively and inappropriately pursuing female students for sexual encounters. This conduct was facilitated by the normalized culture of private, alcohol-focused gatherings among the male TAs and organizers, which created opportunities for such predatory behavior.

66. On August 16, 2018, during a mandatory TA meeting, Gabriel Kreiman, the Summer School's Director, addressed the assembled TAs. He referenced an unspecified incident and instructed the TAs not to engage in "sex with students" for the remainder of the program, but then suggested they could pursue such opportunities "somewhere else." While delivering these remarks, Kreiman scanned the room and made direct, sustained eye contact with Plaintiff, who was one of only three women present in a group of approximately 22 individuals. Plaintiff felt targeted and intimidated by this gesture.

67. On September 24, 2018, Freiwald, the CBMM program faculty member, invited Plaintiff to a lunch meeting at The Abby, an upscale campus restaurant, instead of his office. Upon arrival, he waited for her in an intimate sofa lounge and selected a small table for two, despite the availability of larger, more professional seating arrangements.

68. During the meeting, when Plaintiff attempted to discuss her research by presenting data on her laptop, Freiwald abruptly instructed her to put the laptop away.

He then repeatedly steered the conversation away from work topics, asking intrusive questions about her personal life and her fiancé, and inquiring whether she "preferred older men." This interaction mirrored behaviors Plaintiff observed in the broader CBMM culture, where professional boundaries were frequently blurred through intrusive personal inquiries.

## VII. <u>Plaintiff's Reports and Institutional Failures (2019)</u>

69. In March 2019, Plaintiff traveled to MIT to present her research at a CBMM conference. She was under significant stress, fearing another encounter with Azevedo. She learned she was scheduled for another conference at MIT on May 7, 2019.

70. To prevent an encounter, Plaintiff filed a report with MIT's Title IX office against Azevedo in March 2019 and requested a no-contact order for the May event.

71. On April 4, 2019, Plaintiff filed a police report with the Falmouth Police Department in Massachusetts regarding Azevedo's assaults.

72. Despite Plaintiff's requests, neither MIT nor Harvard issued a no-contact order against Azevedo. On May 7, 2019, at the MIT conference, Azevedo positioned himself next to her poster area. He stood with an aggressive posture, angled his body toward her, and maintained a constant, intense stare at her while pretending to help someone else. This forced Plaintiff to leave the area and file a report with MIT police.

73. After reporting the assaults to RU HR Director Virginia Huffman, in May 2019, Plaintiff was referred to student advocacy services despite being a salaried postdoctoral employee. Huffman instructed Plaintiff to cooperate with an MBL investigation.

74. Subsequent to Plaintiff's report, Rockefeller University issued a modified version of its 'Personal Relationship Policy', explicitly prohibiting romantic or sexual relationships between a supervisor and his or her subordinate.

75. In June 2019, Huffman and RU's Security Director acknowledged Azevedo was a threat. They requested his photo and description to ban him from campus. RU never implemented this ban, followed up, or told Plaintiff of any safety measures.

76. Director Virginia Huffman referred Plaintiff to a psychologist, Maria Solomon, who was provided through RU-sponsored services. Huffman also, through Solomon, had

Plaintiff sign a "Release of Information" form, authorizing communication between the psychologist and RU's Human Resources department.

77. During a therapy session on November 16, 2019, the psychologist, Maria Solomon, questioned Plaintiff extensively about her communications with HR and her assigned attorneys, focusing on the status and strategy of her complaint. Following this session, Plaintiff felt increased distress and mistrust, and discontinued the meetings.

78. On June 24, 2019, the MBL investigators uploaded Plaintiff's full, unredacted statement—including the names of all five witnesses—into a shared folder that Azevedo could access. They did this without her knowledge or consent.

79. On July 11, 2019, Plaintiff read Azevedo's statement to the MBL. In it, he warned her to stop her complaint and falsely called her a "prostitute" and "sexually perverted."

80. In July 2019, Plaintiff told her supervisor, Dr. Freiwald, about the assaults by Azevedo and the ongoing complaint. Freiwald did not offer support or help. Following this conversation, he arranged a private meeting with RU's HR Director, Virginia Huffman.

81. Following the conclusion of the MBL process, in August 2019, Plaintiff met with Virginia Huffman and requested her assistance in obtaining a no-contact order against Azevedo for an upcoming CBMM event. Huffman stated she would not help. She told Plaintiff to discuss the matter with Dr. Freiwald instead, referring to him as "nice," and then concluded the meeting.

82. In August 2019, an attorney RU had provided to Plaintiff stated in a phone call that "Title VII actually offers more protections than Title IX" for employees.

83. On September 24, 2019, while attending a CBMM seminar remotely as assigned, Plaintiff saw Azevedo hosting the seminar on screen. He pointed the camera at himself and repeatedly asked if "people from New York" could see and hear him, intimidating Plaintiff.

84. In October 2019, another woman contacted Plaintiff to report that she too had been sexually harassed by Azevedo and was willing to corroborate Plaintiff's complaints. Plaintiff informed Huffman.

85. Huffman and a RU Security Officer, Michael Murphy, met with Plaintiff, questioning her in detail regarding Azevedo's assaults. Officer Murphy promised to

contact the detective on Plaintiff's criminal case to pass along the new witness information. He later sent one email saying he left messages, but never followed up, provided an update, or contacted Plaintiff again.

86. In November 2019, after consulting with RU's General Counsel, Huffman told Plaintiff that RU could not provide any further assistance regarding Azevedo.

87. In late 2019, Plaintiff and two other women reported to Huffman that a RU professor, Marcelo Magnasco, was engaging in persistent staring at female residents in university housing, including recent incident with Plaintiff. Other woman said he stared at her 'a shade too long' multiple times in the laundry room. Upon information and belief, the women at RU had discussed among themselves how to protect younger students from him.

88. At a follow-up meeting in January 2020, Huffman claimed the professor had a medical condition causing the staring, but provided no evidence. She then ended the discussion, citing medical confidentiality. The professor's staring behavior stopped after the complaint was made.

89.  In January 2020, MIT Professor Nancy Kanwisher contacted Plaintiff. She said she had just learned of Plaintiff's experience and felt the "system, including me, failed you." She confirmed the MBL had only interviewed "the two parties plus a witness" and said, "there is going to have to be some better effort to uncover the truth."

90.  MIT faculty enlisted the official CBMM program evaluator, Lizanne DeStefano, for an informal inquiry. Plaintiff participated and connected DeStefano with another of Azevedo's victims ("Jane Doe 3"). Jane Doe 3, the CBMM Summer School student, confirmed Azevedo had made "overly flirtatious" and "uncomfortable" sexual advances toward her.

91.  After this inquiry, Plaintiff was not selected for a Teaching Assistant position for which she had previously been considered.

92. Plaintiff never received any follow-up from DeStefano or the MIT professors about the outcome of this inquiry. Afterwards, CBMM implemented new policies for TA housing and conduct, and excluded Azevedo from future TA roles.

## VIII. <u>Freiwald's Explicit Sexual Harassment and Retaliatory Demotion (2020)</u>

93.  On May 14, 2019, Freiwald asked Plaintiff to attend a work lunch in downtown Manhattan with him and another professor. Concerned that declining would seem unprofessional, she agreed. Freiwald coordinated the location privately and told Plaintiff to leave at the last minute. Fearing being alone with him, Plaintiff left early and said she was already on her way.

94.  After the lunch, Freiwald insisted on accompanying Plaintiff back to campus on the subway. During the ride, he repeatedly tried to stand close to her and stared inappropriately at her legs and buttocks. As they exited the train, he slapped her buttocks. Plaintiff separated from him as soon as possible.

95. The next day, a female colleague showed Plaintiff an email where Freiwald requested that only female lab members spend time with him at a university event. The colleague said Freiwald routinely asked female students and postdocs to lunch. After this, Plaintiff insisted on only meeting Freiwald in his office.

96. On January 20, 2020, Plaintiff asked Freiwald to approve an internal fellowship application using her latest research results. Freiwald said her project was progressing well but told her to submit an old version of the application instead. He refused to let her update it with her new work, which would have improved her chances of getting independent funding. Plaintiff left the meeting in tears.

97. On February 14, 2020, Freiwald met with Plaintiff in his office. He discussed her work, then reclined in his chair and fell silent. Plaintiff saw he had a visible erection. He said the future of her project depended on her "desired course of action."

98. As Plaintiff was leaving the room, Freiwald stood up, opened the door for her, and squeezed and slapped her buttocks.

99. On February 27, 2020, during an office meeting, Freiwald discussed a video featuring bananas for an experiment. When he said the word "banana," he slowed his speech, made direct eye contact with Plaintiff, and made a fist, moving it up and down in a miming gesture of masturbation.

100.    In late May 2020, during an email exchange about her funding, Freiwald suggested discussing her career future in person.

101.    On May 29, 2020, Plaintiff sent an email to Freiwald in which she explicitly requested that future work meetings not be arranged in restaurants, directly referencing his prior inappropriate behavior (Exhibit B, page 1).

102.    On June 4, 2020, Freiwald held a Zoom meeting with Plaintiff. He referenced her email and said it would be best for her to "move to a different place and different environment." He told her to abandon the next phase of her core research project, calling it a "huge gamble" that could end her career (*Id*, page 2)

103.    Plaintiff reported this to an official at the National Science Foundation.

104.    On June 9, 2020, Freiwald emailed Plaintiff, stating there was no misunderstanding. He said they could not progress to the next project phase and she should wrap up her current work and look for another job (*Id*, page 3).

105.    On June 12, 2020, after Plaintiff said she wanted to continue her project, Freiwald emailed her: "Given the current status of the project and results, it is almost guaranteed that if you continue into phase II on this basis, it will be the end of your career" (*Id*, page 4).

106.    On July 30, 2020, Freiwald emailed Plaintiff. He said her upcoming appointment would only be extended for six months, instead of the standard one year. He also restricted her work to finishing only her current experiments, cutting off the next phase of her project (*Id*, page 5).

107.     On August 5, 2020, Freiwald held a Zoom meeting to address the results of an anonymous lab climate survey. During the meeting, he stated that the survey was a "document of my complete failure" and admitted, "The lab is in crisis." He acknowledged that the data showed lab members were "maximally unhappy or almost maximally unhappy" and that "currently no one is really having fun." Freiwald also conceded that the survey "portrays lack of trust in me as a person," noting that more than half the lab felt they could not talk to him about personal concerns. In response to these findings, he told lab members, "I will not change this principle, my philosophy of life. It is my

philosophy for the lab," and said that those who were unhappy would "have to think about your situation." (Exhibit C, p. 1).

108.    In late 2020, Freiwald gave a promised guest lecturer opportunity at Hunter College to a male postdoc instead of Plaintiff.

109.    He also canceled a planned collaboration for Plaintiff with a laboratory in Belgium. When the Belgian student arrived, Freiwald assigned them to a male postdoc instead.

110.    Freiwald diverted specialized research equipment and resources promised for Plaintiff's project to a male postdoc.

111.    He also ended Plaintiff's collaboration with the CBMM program. Her contacts at MIT stopped communicating with her about the work.

112.    In December 2020, Plaintiff reported successful new findings from her research. Freiwald acknowledged the results were good enough to publish but still refused to let her proceed to the next phase of the project.

113.    In February 2021, Freiwald assigned Plaintiff to write a review paper and RU sponsored a three-year H-1B work visa for Plaintiff and her husband. Plaintiff remained in her postdoctoral role but was limited to writing tasks. She was not allowed to do the electrophysiology research that was part of her original postdoctoral agreement.

## IX. Formal Complaint and Escalating Retaliation (2021)

114.    In early 2021, a female PhD student of color in Freiwald's lab raised concerns about lack of support. Freiwald reported her to HR as "threatening."

115.    On May 18, 2021, Plaintiff filed a sexual harassment and retaliation complaint against Freiwald and RU with the NYSDHR and EEOC.

116.    In Spring 2021, RU security selectively enforced campus policy to ban Plaintiff's husband from the outdoor tennis court after HR observed them playing, denying Plaintiff's request for an exception.

117.    On July 3, 2021, RU's General Counsel sent Plaintiff a Legal Hold Notice regarding her NYSDHR complaint.

118.    In Summer 2021, Freiwald refused requests to conduct a revised lab climate survey.

119.    On July 9, 2021, RU and Freiwald, through attorneys, submitted a position statement to the NYSDHR denying Plaintiff's allegations.

120.    On August 3, 2021, Freiwald contacted Plaintiff for the first time since February. In her reply, she mentioned involvement in the "legal requirements" of her NYSDHR complaint. (Exhibit B, page 6)

121.    On August 12, 2021, Freiwald and RU terminated Plaintiff's employment, effective November 30, 2021.

122.    The termination halted Plaintiff's data analysis and prevented publication of her postdoctoral work.

123.    On November 15, 2021, Rockefeller University announced the establishment of the Price Family Center for the Social Brain, created through a $25 million gift. The University named Dr. Winrich Freiwald as its Co-Director.

124.    In January 2022, Plaintiff applied for two postdoctoral research positions. These applications required a letter of recommendation from her doctoral supervisor. Dr. Freiwald, her former supervisor at Rockefeller University, did not provide a positive recommendation. Her applications were unsuccessful.

### X. <u>Retaliation Through Immigration and Housing (2021-2025)</u>

125.    In September 2021, RU failed to timely complete its portion of Plaintiff's Emergency Rental Assistance Program (ERAP) application until after she filed this lawsuit.

126.    On November 17, 2021, RU notified Plaintiff her employment would end November 30, and her university system access would be cut off five days later.

127.    To preserve evidence under the Legal Hold, Plaintiff requested and initially received a 90-day extension of her system access. Freiwald deemed it unnecessary, and her access was suspended by December 15, 2021.

128.    On December 8, 2021, RU demanded she immediately surrender her university apartment due to her termination.

129.    On December 16, 2021, Plaintiff informed RU she would remain in housing pending litigation and offered to relocate if RU covered expenses. RU did not respond or engage.

130.    On January 17, 2022, RU inform it would issue a one-way ticket to Poland for Plaintiff regards her RU's sponsoed H-1B visa. Plaintiff refused.

131.    On January 18, 2022, the NYSDHR issued a Probable Cause Determination against RU and Freiwald.

132.    On February 24, 2022, RU unilaterally withdrew Plaintiff's H-1B petition with USCIS without prior notice to her.

133.    RU delayed informing Plaintiff of the withdrawal until Plaintiff intervened, on March 29, 2022. RU reiterated they would issue a ticket to Poland for her.

134.    Plaintiff remained in RU housing as a tenant-at-sufferance. After she secured an ERAP payment to RU for 14 months of arrears in early 2023, RU, by the terms of the program, agreed not to evict for one year.

135.    In March 2023, RU falsely claimed she owed over $79,000 in arrears. Plaintiff reached out to clarify the discrepancy and proposed a payment plan. RU never replied.

136.    In January 2024, RU's counsel refused to provide a standard landlord letter for public assistance, stating no landlord-tenant relationship existed, causing Plaintiff to lose benefits.

137.    In October 2024, RU housing managers made statements to Plaintiff's husband about rent that referenced the ongoing litigation.

138.    On September 10, 2025, days after Plaintiff filed a major declaration (Dkt. 196) in this case, RU served her with a 90-Day Notice of Termination, demanding she vacate by January 6, 2026.

139.    In January 2026, Plaintiff, proceeding *pro se*, reiterated her request to Defendant Rockefeller University for a standard landlord letter of tenancy, which was necessary to complete a critical application for public assistance. Plaintiff attached the application that had been previously rejected specifically due to the absence of this required letter. Defendant RU did not reply.

19

## XI. Injuries

140.    As a result of Defendants' conduct, Plaintiff suffers from severe Post-Traumatic Stress Disorder (PTSD), a recognized disability.

141.    The threat of eviction and resurgent fear have triggered a debilitating PTSD episode, causing severe physical decline, hypervigilance, and panic attacks.

142.    Plaintiff has suffered severe economic damages (lost income, career destruction), non-economic damages (emotional distress, humiliation), and specific physical harm (a high-risk HPV infection requiring years of invasive monitoring).

143.    The recent eviction notice and other pressures have caused paralyzing symptoms and significant weight loss, substantially limiting major life activities.

144.    Plaintiff has incurred and will incur medical expenses, pain, suffering, loss of income, and other damages.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### QUID PRO QUO SEXUAL HARASSMENT
**Title VII, NYSHRL, NYCHRL,
(against Freiwald and RU),**

145.    Plaintiff incorporates by reference the allegations in all preceding paragraphs as if fully set forth here.

146.    Defendant Freiwald was Plaintiff's direct supervisor and principal investigator at Rockefeller University (RU), with ultimate authority over her employment, work assignments, compensation, professional advancement, and termination. As such, he had the power to make tangible decisions affecting the terms and conditions of her employment.

147.    Throughout her employment, Freiwald subjected Plaintiff to unwelcome sexual advances and conduct. This included, but was not limited to:

a. During recruitment, relocating her formal job interview to an upscale restaurant and insisting on paying, creating an inappropriately personal dynamic (¶15).

b. Sending a series of personal, unsolicited emails with intrusive inquiries and invitations

to confide in him, particularly around Valentine's Day (¶¶18-24).

c. At a work lunch on September 24, 2018, instructing her to put her research data away and repeatedly steering conversation to her personal life and romantic preferences (¶¶69-70).

d. On May 14, 2019, during a subway ride following a work lunch, staring inappropriately at her body and slapping her buttocks (¶¶93-94).

e. On February 14, 2020, during a meeting in his office, reclining in his chair with a visible erection, smirking at her, and stating that the future of her research project depended on her "desired course of action," thereby explicitly linking her career prospects to sexual acquiescence (¶¶97-98).

f. On February 27, 2020, making an overtly sexual gesture mimicking masturbation while maintaining direct eye contact with her during a professional discussion (¶99).

148.    On May 29, 2020, Plaintiff explicitly rejected Freiwald's sexual advances and set a firm professional boundary by email, requesting that future work meetings not be held in restaurants and alluding to his prior inappropriate conduct (¶101).

149.    After Plaintiff refused his advances, Freiwald took a series of adverse employment actions against her:

a. On June 4, 2020, he told her to abandon her core research project and "move to a different place," effectively threatening the end of her career (¶¶102, 105).

b. On July 30, 2020, he formally demoted her by shortening her appointment to a non-standard six-month term and restricting her work to only completing existing experiments, halting the next phase of her project (¶106).

c. He subsequently revoked promised professional opportunities, diverted her research resources to a male postdoc, and terminated her collaboration with the CBMM program (¶¶108-111).

d. On August 12, 2021, following Plaintiff's filing of formal complaints with the NYSDHR and EEOC, Freiwald and RU terminated her employment (¶121).

150.    Freiwald's conduct constitutes quid pro quo sexual harassment. He made unwelcome sexual advances and implicitly and explicitly conditioned the tangible benefits of Plaintiff's employment—including the continuation of her project, her

appointment term, and her job itself—on her submission to his sexual demands. Her rejection of those demands directly resulted in the adverse employment actions described above.

151.    Defendant RU is liable for Freiwald's unlawful harassment. Freiwald acted as Plaintiff's supervisor and agent within the scope of his employment. RU is further liable for its own failure to take prompt and effective corrective action to stop the harassment after it knew or should have known of Freiwald's conduct, and for ratifying the retaliatory termination.

152.    As a direct and proximate result of Defendants' quid pro quo sexual harassment, Plaintiff suffered severe economic damages, including loss of income and career destruction, and significant non-economic damages, including emotional distress, humiliation, and exacerbation of her physical and mental health conditions.

## SECOND CAUSE OF ACTION

## HOSTILE WORK ENVIRONMENT

### Title VII,NYSHRL, NYCHRL,
### (against Freiwald and RU)

153.    Plaintiff incorporates by reference the allegations in all preceding paragraphs as if fully set forth here.

154.    Defendant Freiwald, as Plaintiff's direct supervisor and principal investigator at Rockefeller University (RU), subjected her to severe and pervasive unwelcome verbal, physical, and visual conduct of a sexual and sexist nature, which created an intimidating, hostile, and offensive work environment.

155.    RU's liability is further established by its negligent hiring and retention. With knowledge—actual or constructive—of Freiwald's history of engaging in inappropriate relationships with subordinates, RU nonetheless hired and retained him as a principal investigator with supervisory power over female postdocs, including Plaintiff,

without adequate oversight. This failure to take reasonable preventive measures directly facilitated the creation and perpetuation of the hostile work environment.

156.     This hostile environment was created and sustained through a pattern of conduct by Freiwald, including but not limited to:

a. Requiring Plaintiff's participation in a laboratory "murder mystery" event, casting her as a naive, devoted character groomed to murder for his benefit (¶¶31-32).

b. Making demeaning and sexually charged comments, such as instructing her to "be that slave driver once in your life" during a medical procedure (¶33).

c. Demanding that Plaintiff and other junior female researchers accompany him as his guests to a formal social event as "arm candy," a role unrelated to their scientific work (¶54).

d. Persistently moving professional meetings to intimate, non-professional settings (e.g., restaurants, walks), where he made intrusive personal inquiries, leered at her body, and made inappropriate physical contact (¶¶49, 69-70, 93-94).

e. Explicit sexual harassment, including displaying a visible erection while stating her career depended on her "desired course of action," and slapping her buttocks (¶¶97-98).

f. Making overtly sexual gestures, such as mimicking masturbation while maintaining direct eye contact with her during a work meeting (¶99).

157.     This unwelcome conduct was objectively severe and pervasive. It was not isolated but formed a sustained pattern over years, including sexualized role-playing (¶31), demeaning commands (¶33), demands to serve as "arm candy" (¶52), physical sexual assaults (¶¶94, 98), and overt sexual gestures (¶99). This pattern fundamentally altered the conditions of Plaintiff's employment and created an abusive working environment.

158.     Plaintiff subjectively perceived this environment as hostile, intimidating, and abusive. Her perception was compounded by the known sexual assaults perpetrated against her by Defendant Azevedo, which Freiwald and RU failed to address, thereby exacerbating her fear and sense of danger within her workplace (¶¶49, 80-81, 159).

159.    A reasonable person in Plaintiff's position—a female postdoctoral researcher under the direct authority of Freiwald—would likewise have found this environment to be hostile or abusive.

160.    Defendant RU is liable for this hostile work environment. Freiwald acted as Plaintiff's supervisor within the scope of his employment. RU is further liable for its own direct failures, including:

a. Failing to take prompt and effective corrective action after Plaintiff reported Azevedo's assaults and Freiwald's harassment, instead misclassifying her, referring her to powerless services, and declining to engage its investigative authority (¶¶74, 81, 86).

b. Ratifying the hostile environment by promoting Freiwald during the pendency of these events (¶124).

c. Engaging in post-termination conduct that exploited Plaintiff's vulnerability, including using its control over her university housing to intimidate her and threaten her with eviction after she filed this lawsuit (¶¶136-138, 166). This housing-based intimidation was directly related to her sex and disability (PTSD) and served to perpetuate the hostile environment beyond her formal employment.

161.    As a direct and proximate result of the hostile work environment fostered by Freiwald and permitted by RU, Plaintiff suffered severe emotional distress, the exacerbation of physical and mental health conditions, the destruction of her professional career, and other significant damages.

## THIRD CAUSE OF ACTION

## RETALIATION

### Title VII,NYSHRL, NYCHRL,

### (against Freiwald and RU)

162.    Plaintiff incorporates by reference the allegations in all preceding paragraphs as if fully set forth herein.

163.    Plaintiff engaged in the following protected activities under federal, state, and city law:

a. In or around May 2020, Plaintiff explicitly rejected Defendant Freiwald's sexual advances and set a firm professional boundary via email.

b. From 2019 onward, Plaintiff reported Defendant Azevedo's sexual assaults to Rockefeller University ("RU") Human Resources, the MIT Title IX office, and law enforcement.

c. On or about May 18, 2021, Plaintiff filed a formal charge of discrimination and retaliation against Defendants Freiwald and RU with the New York State Division of Human Rights ("NYSDHR") and the U.S. Equal Employment Opportunity Commission ("EEOC").

d. Plaintiff participated in investigations related to her complaints, including with the National Science Foundation.

e. In August 2021, Plaintiff informed Freiwald she was engaged in the "legal requirements" related to her NYSDHR complaint.

f. In December 2022, Plaintiff initiated this federal lawsuit.

164.    Following Plaintiff's protected activities, Freiwald took the following materially adverse actions against her:

a. In June 2020, he instructed Plaintiff to abandon her core research project and look for another job, threatening the "end of your career."

b. On July 30, 2020, he formally demoted Plaintiff by shortening her appointment to a non-standard six-month term and restricting her research.

c. He revoked promised professional opportunities, diverted her research resources to a male postdoc, and terminated her key collaboration with the CBMM program.

d. On August 12, 2021, Freiwald and RU terminated Plaintiff's employment.

e. After her termination, Freiwald and RU refused to provide a positive recommendation, sabotaging her subsequent job applications.

165.    Following Plaintiff's protected activities, RU independently engaged in the following materially adverse actions:

a. In February 2022, RU unilaterally withdrew its sponsorship of Plaintiff's H-1B visa petition with USCIS, weaponizing her immigration status.

b. RU denied Plaintiff's request for a reasonable exception to campus access

policies for her husband.

c. RU delayed and interfered with her application for emergency rental assistance.

d. In January 2024, RU's counsel refused to provide a standard landlord letter, causing Plaintiff to lose public assistance benefits.

e. RU housing managers intimidated Plaintiff's husband with threatening statements alluding to the litigation.

f. On September 10, 2025, days after Plaintiff filed a major declaration (Dkt. 196) in this case, RU served her with a 90-Day Notice of Termination of her university housing, demanding she vacate by January 6, 2026.

166.    The pattern of retaliation exhibits a direct and escalating causal nexus that is evident from both temporal proximity and the shifting, pretextual justifications offered by Defendants. Each major step Plaintiff took to defend her rights was met with a swift and severe institutional response: her May 2020 rebuff of Freiwald's advances led to her demotion and project sabotage in June/July 2020; her May 2021 EEOC/NYSDHR filing led to her termination in August 2021; the January 2022 Probable Cause finding led to her visa withdrawal in February 2022; and her September 2025 litigation declaration led to the eviction notice days later. This sequence, combined with RU's failure to take these severe actions at any point prior to Plaintiff's protected activities, despite knowledge of the underlying issues, leaves no reasonable inference other than retaliatory animus.

167.    As a direct and proximate result of this retaliation, Plaintiff has suffered severe economic damages, including loss of income and career destruction, and significant non-economic damages, including emotional distress, humiliation, and the imminent threat of homelessness, which have exacerbated her disability (PTSD).

168.    Defendant RU is liable for Freiwald's retaliatory actions under the doctrine of *respondeat superior*, as his actions were taken within the scope of his employment and with RU's knowledge or ratification. RU is also directly liable for its own institutional acts of retaliation as detailed above.

**FOURTH CAUSE OF ACTION**

**NEW YORK CITY GENDER MOTIVATED ACT**

**N.Y.C. Admin. Code §§ 10-1101, et seq. ("VGMVPL")**

**(against Freiwald and Azevedo)**

169.     Plaintiff incorporates by reference the allegations in all preceding paragraphs of this Complaint as if fully set forth herein.

170.     This claim is brought pursuant to the New York City Victims of Gender-Motivated Violence Protection Law (the "GMVA"), N.Y.C. Admin. Code §§ 10-1101 et seq. The GMVA provides a civil cause of action to a victim of a "crime of violence motivated by gender," defined as an act or series of acts that would constitute a "crime of violence" under New York law, committed "because of gender or on the basis of gender, and due, at least in part, to animus based on gender." N.Y.C. Admin. Code § 10-1102.

I. Qualifying Acts of Violence Committed as Part of a Continuous Course of Conduct

171.     Defendant Azevedo committed acts constituting the crimes of Forcible Touching (N.Y. Penal Law § 130.52) and Rape in the Third Degree (N.Y. Penal Law § 130.25) against Plaintiff:

a. In Woods Hole, Massachusetts, on or about August 30, 2017: Azevedo forcibly restrained and raped Plaintiff in an off-campus house during the CBMM Summer School, after she explicitly objected and physically resisted. This assault resulted in Plaintiff contracting a high-risk strain of Human Papillomavirus (HPV), a lasting physical injury diagnosed and treated in New York[1].

b. In New York City, on or about March 15, 2018: Azevedo again used physical force to overpower Plaintiff's resistance and engaged in non-consensual sexual intercourse in her apartment at 500 E 63rd Street, mocking the HPV infection he had previously inflicted.

---

1     This Court has personal jurisdiction over Defendant Azevedo for the Woods Hole assault under New York's long-arm statute, CPLR § 302(a)(3). Azevedo committed a tortious act outside New York that caused continuing, foreseeable injury within the state to a New York resident. At the time of the assault, Azevedo knew Plaintiff was a New York resident employed by Rockefeller University. The injury he inflicted—a high-risk HPV infection—was diagnosed, monitored, and treated by healthcare providers in New York, constituting a "cognizable injury within the state" that was both severe and enduring. This foreseeable New York-based harm provides an independent basis for jurisdiction over the Woods Hole assault as part of the integrated GMVA claim.

172.    Defendant Freiwald committed acts constituting the crime of Forcible Touching (N.Y. Penal Law § 130.52) against Plaintiff in New York City on multiple occasions. These acts were not isolated but part of a documented pattern of sexualizing and physically intruding upon female subordinates, which included: slapping Plaintiff's buttocks on a New York City subway platform on May 14, 2019; and squeezing and slapping her buttocks in his office on February 14, 2020, immediately following a meeting where he displayed a visible erection and implied her career depended on her sexual acquiescence.

## II. Gender-Based Motivation and Animus

173.    The acts of violence described above were committed because Plaintiff is a woman and were motivated, at least in part, by animus based on her gender. This is demonstrated by the following facts, which are integral to the NYC incidents:

a. Exploitation of Biological Vulnerability: Azevedo's knowing transmission of HPV—a virus that poses a disproportionate cancer risk to women—and his subsequent mockery of Plaintiff's diagnosis ("Welcome to the population of people with STDs") demonstrate a callous animus directed at her female bodily integrity.

b. Gender-Derogatory Statements and Patterns: The assaults were part of a documented pattern of gender-based conduct by both Defendants:

i. During the Woods Hole assault, Azevedo taunted Plaintiff with, "How does it feel to cheat on your boyfriend?", weaponizing gendered relationship norms. During the New York assault, he combined mockery of her HPV status with ethnic slurs targeting Polish women, revealing a pattern of gender-based contempt.

ii. Freiwald's pattern of demanding Plaintiff's presence as "arm candy" at social events (¶ 53) and his intrusive inquiry about whether she "preferred older men" during a work meeting (¶ 69) reduced her to a gender-based stereotype, establishing a context of sexualization that culminated in physical violations.

iIi. Both Defendants operated from positions of authority over Plaintiff (Azevedo as a program coordinator, Freiwald as her supervisor), using violence as a means of asserting dominance and control in a gendered hierarchy. ¶¶ 13, 54, 146.

c. Pattern of Predatory Conduct Targeting Women: The assaults were not isolated incidents but part of a documented pattern of gender-based conduct.

i. Azevedo admitted to studying and employing "pickup artist" (PUA) techniques—a male supremacist strategy focused on manipulating women into sex—and treated women as "targets." He boasted to Plaintiff about raping another unconscious woman, stating "it does not matter if the girl says no." This misogynistic methodology, combined with his history of sexual misconduct toward other women in the CBMM community, establishes a broader pattern of gender-based animus.

ii. Freiwald's violence was the culmination of a years-long pattern of conduct motivated by gender-based animus and a desire to exert sexualized control, leveraging his supervisory power to create a dynamic where professional standing was conflated with sexual acquiescence. This pattern included: (i) recruiting Plaintiff through inappropriately personal dinners and communications; (ii) requiring her to serve as "arm candy" at social functions; (iii) persistently moving professional meetings to intimate settings to make unwanted personal inquiries and advances; and (iv) explicitly conditioning her scientific career on her response to his sexual arousal on February 14, 2020. The physical violations—the slapping and groping of Plaintiff's buttocks—were the tangible manifestations of this animus, representing a coercive assertion of power and dominance because Plaintiff is a woman. His conduct presented a serious risk of psychological injury and was part of a course of conduct that created a credible threat of further physical and professional harm,

d. Context of Power Imbalance: Both Defendants committed their acts of violence from positions of authority and power over Plaintiff—Azevedo as a senior coordinator in her collaborative academic program and Freiwald as her direct supervisor and principal investigator. The violence was a means of asserting dominance and control in a gendered hierarchy.

e. Predatory Use of Skill: Defendant Azevedo's status as a trained martial arts practitioner allowed him to employ precise, overpowering physical force to verpower

Plaintiff's resistance in both assaults, Exploiting his physical superiority in a manner that reflects predatory, gender-based domination, turning Plaintiff's private residence into a site of inescapable violence and animus that exploited his physical advantage over her.

### III. The Woods Hole Assault as Integral to the New York GMVA Claim

174.    The 2017 Woods Hole assault is not a separate claim but an integral component of a single, continuous GMVA cause of action. It established the pattern of predation, animus, and method that culminated in the New York assault. The HPV infection caused in Woods Hole created a continuing injury suffered in New York, directly linking the two incidents into a unified course of conduct. Severing the Woods Hole assault would artificially fracture a claim that is inextricably tied by Azevedo's intentional, gender-motivated violence.

175.    This claim is timely under the GMVA revival window (N.Y.C. Admin. Code § 10-1104) and relates back to the original pleadings, as it arises from the same conduct, transactions, and occurrences set forth from the outset of this litigation. The prior dismissal of *Marciniak v. MIT, et al.*, 23-cv-10305, does not bar this claim, as that dismissal expressly preserved Plaintiff's right to pursue all related claims in this action.

176.    As a direct and proximate result of the Defendants' gender-motivated violence, Plaintiff has suffered and continues to suffer severe physical injury (including the high-risk HPV infection), severe psychological trauma diagnosed as Post-Traumatic Stress Disorder (PTSD), profound emotional distress, humiliation, damage to her professional reputation and career, and economic losses.

**FIFTH CAUSE OF ACTION**
**DISCRIMINATION, FAILURE TO ACCOMMODATE, AND RETALIATION IN VIOLATION OF THE FAIR HOUSING ACT**
**42 U.S.C. § 3601, et seq.**

**(against Defendant Rockefeller University)**

177.         Plaintiff incorporates by reference the allegations in all preceding paragraphs of this Complaint as if fully set forth herein.

178.         Defendant Rockefeller University ("RU"), through its ownership, management, and rental of on-campus residential apartments, is a "person" engaged in the rental of a "dwelling" within the meaning of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3602(a), 3602(b).

179.         178. As a landlord, RU discriminated against Plaintiff on the basis of sex and disability (PTSD): RU failed to take reasonable steps to secure her housing from a known sexual assailant (Azevedo) connected to its program, subjecting her to differential, dangerous terms of tenancy (sex Discrimination), and RU denied Plaintiff's reasonable request for a safety accommodation (e.g., banning Azevedo from housing areas) necessary for her to use and enjoy her dwelling, knowing her PTSD was linked to assault (Disability Discrimination & Failure to Accommodate).

180.         RU retaliated against Plaintiff for opposing discriminatory housing practices by engaging in a campaign of coercive housing actions, culminating in the September 2025 eviction notice issued days after she pursued this litigation.

I. Discrimination on the Basis of Sex and Disability

181.         Plaintiff is a member of the protected class of sex under the FHA, 42 U.S.C. § 3604. Plaintiff also suffers from severe Post-Traumatic Stress Disorder ("PTSD"), a physical and mental impairment that substantially limits major life activities, including sleeping, working, and feeling secure in her home. This constitutes a "handicap" under the FHA, 42 U.S.C. § 3602(h).

182.         RU has been aware of the traumatic, sex-based origins of Plaintiff's disability since at least 2019, through her detailed reports of sexual assault by its collaborator, Frederico Azevedo, and her subsequent requests for safety measures and support. (¶¶ 71-81, 86-87). Plaintiff formally disclosed her PTSD diagnosis to the Court and RU in August 2025. (¶ 139, and Declaration in *this* action, ECF No. 196).

183.         RU discriminated against Plaintiff on the basis of sex in connection with her housing by subjecting her to differential terms, conditions, and privileges of rental.

Specifically:

a. After Plaintiff reported being sexually assaulted by Azevedo—a threat connected to her residency via the collaborative program—RU, as her landlord, had a duty to take reasonable steps to ensure the safety of its premises. Its total failure to ban Azevedo from campus or her housing vicinity, or to provide any security accommodation, subjected Plaintiff, as a female tenant, to a dangerous living environment that a male tenant reporting a violent crime would not have faced.

b. RU's subsequent campaign of housing-based intimidation and the retaliatory eviction notice were delivered because Plaintiff is a woman who opposed sex-based violence, making her continued tenancy unwelcome.

184.        RU discriminated against Plaintiff on the basis of her disability (PTSD) and failed to provide a reasonable accommodation in violation of 42 U.S.C. § 3604(f)(3)(B). Plaintiff's PTSD, caused by sexual assault, made her uniquely vulnerable to feeling unsafe in her home, especially with her assailant having access to campus. Her repeated requests for a safety accommodation (e.g., a formal ban of Azevedo from the residential area) were reasonable and necessary to afford her an equal opportunity to use and enjoy her dwelling.

185.        Plaintiff's PTSD, which manifests in hypervigilance and severe anxiety regarding personal safety, was exacerbated by RU's failure to secure her housing environment from a known perpetrator. Her request for a reasonable accommodation—a formal safety plan and exclusion of Azevedo from campus housing areas—was denied, thereby denying her the full enjoyment of her dwelling and subjecting her to discriminatory terms based on her disability and the sex-based violence that caused it

## II. Retaliation and Coercive Housing Actions

186.        Plaintiff's reports of sex-based violence, her requests for related safety accommodations, and her opposition to RU's discriminatory failure to act are activities protected by the FHA. 42 U.S.C. § 3617.

187.       Following these protected activities, and with escalating intensity after Plaintiff filed this lawsuit alleging discrimination, RU engaged in a series of adverse, coercive, and retaliatory housing actions, including:

a. In January 2024, RU's counsel refused to provide a standard landlord letter of tenancy, causing Plaintiff to lose critical public assistance benefits. ( ¶ 136).

b. RU housing managers subjected Plaintiff and her husband to intimidating, threatening statements alluding to the litigation. (¶ 137).

c. On September 10, 2025, days after Plaintiff filed a major declaration (Dkt. 196) in this case, RU served her with a 90-Day Notice of Termination of Tenancy, demanding she vacate her home of nine years by January 6, 2026. (¶ 138).

188.       RU's service of the 90-Day Eviction Notice constitutes an ultimate adverse housing action. It was taken with knowledge of her PTSD and the catastrophic, irreparable harm homelessness would inflict upon her health, as documented by her medical records. (¶¶ 140-142).

189.       The close temporal proximity between Plaintiff's vigorous prosecution of this lawsuit—a protected opposition to discriminatory housing practices based on sex and disability—and the sudden eviction notice, after years of inaction on alleged arrears, demonstrates a direct causal link evidencing retaliatory intent.

190.       RU's actions, as described above, constitute unlawful coercion, intimidation, threats, and retaliation against Plaintiff for exercising rights protected by the FHA, in violation of 42 U.S.C. § 3617.

## III. Resulting Damages

191.       As a direct and proximate result of RU's: (a) discrimination on the basis of sex and disability; (b) failure to provide a reasonable accommodation for her disability; and (c) retaliatory and coercive conduct; Plaintiff has suffered and continues to suffer severe damages, including the imminent irreparable harm of homelessness, extreme emotional distress, a dangerous exacerbation of her PTSD and physical health, financial losses, and other damages as detailed in the Prayer for Relief.

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, and grant the following relief:

1. Preliminary and Permanent Injunctive Relief enjoining Defendant Rockefeller University from terminating Plaintiff's tenancy and evicting her from her residence at 500/504 E 63rd Street during the pendency of this action and permanently;

2. Compensatory Damages for past and future economic losses (including lost wages, benefits, and earning capacity), emotional distress, pain and suffering, humiliation, and medical expenses;

3. Punitive Damages against all Defendants;

4. Equitable Relief, including front pay, reinstatement or placement in a comparable academic position,

5. Declaratory Relief that Defendants violated Plaintiff's rights under federal, state, and city law;

6. Attorneys' Fees and Costs pursuant to applicable statutes; and

7.  Such other and further relief as the Court deems just and proper.

Dated: January 30, 2026

Respectfully submitted,

KAROLINA MARCINIAK-DOMINGUES
GONCALVES AGRA
(Plaintiff *pro se*)

*Karolina Agra*

Karolina Marciniak-Domingues Goncalves Agra
500 E 63rd St., Apt 13F
New York, New York 10065
Tel. 646.770.2045
marciniak.kar@gmail.com

34