**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------X

KAROLINA MARCINIAK-DOMINGUES GONCALVES AGRA,

Plaintiff,

v. Civil Action No: 1:22-cv-10959-ALC

THE ROCKEFELLER UNIVERSITY, FREDERICO AZEVEDO, WINRICH FREIWALD

Defendants.

---------------------------------------------------------X

**PLAINTIFF'S SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF**

**RENEWED MOTION FOR PRELIMINARY INJUNCTION**

**AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Dr. Karolina Marciniak-Domingues Goncalves Agra
500 E 63rd St, Apt 13F
New York, 10065 NY
marciniak.kar@gmail.com
(646) 770 2045
PLAINTIFF *PRO SE*

## PRELIMINARY STATEMENT

This supplemental brief does not ask the Court to revisit its prior rulings. It asks the Court to consider facts that did not exist when the pending motions were briefed: Rockefeller University (“RU”)'s prior defective notice was discontinued by the state court based on my motion, yet RU served a replacement notice on the eve of trial, before the dismissal was even entered. This sequence demonstrates that RU's motive is not to enforce a legitimate property right, but to continue a retaliatory campaign. Under the Second Circuit's "motivating factor" standard, this evidence is sufficient to establish a likelihood of success on the merits of the FHA retaliation claim.

## ARGUMENT

### I. THE "MOTIVATING FACTOR" STANDARD APPLIES, AND RU'S POST-DISMISSAL CONDUCT SATISFIES IT

Under the FHA, a plaintiff must show protected activity, awareness, adverse action, and a causal connection. *Lynn v. Vill. of Pomona*, 373 F. Supp. 2d 418, 432 (S.D.N.Y. 2005). The Second Circuit has held that the FHA retaliation claim applies a "motivating factor" causation standard, not a "but-for" standard. *Gilead Cmty. Servs., Inc. v. Town of Cromwell*, 112 F.4th 93, 101 (2d Cir. 2024). I need only show that retaliatory motive "played a part" in RU's decision to serve the New Notice.

RU argues that this is a simple landlord-tenant dispute. The procedural history defeats that argument. RU's first holdover proceeding was discontinued on September 30, 2026, based on my motion identifying an improper notice. (Supp. Decl. ¶ 6, Ex. C). On the evening of September 29, 2026—before the dismissal was even entered—RU served the New Notice. (Supp. Decl. ¶ 7, Ex. D).

This is not the conduct of a landlord seeking a good-faith resolution. A landlord who genuinely believed its notice was valid would have waited for a ruling. RU instead raced to serve a replacement before the dismissal was entered.

**A. <u>RU Did Not Cure the Defects; It Repeated Them and Restarted the Clock</u>**

RU will likely argue that its prior proceeding was dismissed for procedural defects (e.g., defective service and an improper termination date), and that the New Notice "cures" those defects by terminating the tenancy on December 31, 2026. This argument fails.

The procedural defects are distinct from the substantive defects. The New Notice repeats the exact same substantive claims that the prior notice contained: that my apartment is a "dormitory" exempt from the Good Cause Eviction Law (Supp. Decl. ¶ 8, Ex. D, Pages 3, 6, and adds yet another false claim exception, i.e., that my employment was "lawfully terminated." (Supp. Decl. ¶ 15, Ex. D, Pages 3, 10). RU has been on notice since January 2022 that my termination was not lawful (4AC ¶ 9; Exhibit A to 4AC (NYSDHR Determination and Finding of Probable Cause, dated January 18, 2022), and since March 4, 2026 that dormitory claim is false. (ECF 243, 244-10, Supp. Decl. ¶ 22) A landlord genuinely seeking to correct a defective notice would correct the false claims. RU did not. It repeated them. The failure to cure the substantive defects, while racing to cure the procedural ones, proves that RU's motive was not to comply with the law, but to continue the eviction campaign.

**B. <u>RU's "Staff Housing" Justification Is Pretextual</u>**

RU may argue that it needs the apartment to house its scientific staff, citing the high demand for its housing. But RU's own conduct shows that recovering the unit was not its objective. In December 2021, I offered to transfer to a comparable apartment if RU covered moving expenses and rent. (Decl., ECF No. 244-7, Supp. Decl. ¶ 19). RU did not respond. RU's housing policies expressly provide for apartment transfers and maintain a transfer waitlist. A landlord genuinely seeking to recover a unit for its staff would have accepted a transfer that achieved that goal. RU's refusal to engage with my offer, and its later demand for a broad claims release as a condition of settlement (Supp. Decl. ¶¶ 48-54), demonstrate that its objective was not to recover the unit, but to remove me and to use the eviction as leverage against my federal lawsuit.

### C. <u>RU's Claim of Arrears is a Manufactured Pretext</u>

RU's New Notice demands $144,329.61 in arrears. (Supp. Decl. ¶ 23). This figure is not a legitimate basis for eviction. It is the direct result of RU's own obstruction.

In September 2021, I applied for the New York State Emergency Rental Assistance Program ("ERAP"). RU did not respond to my requests for the landlord documentation required to complete the application. (Reply Decl., ECF No. 244-2; Supp. Decl. ¶ 25). I filed this action on December 29, 2022. Eleven days later—on January 9, 2023—ERAP approved a payment of $37,426.00 to RU. (Reply Decl., ECF No. 244-5; Supp. Decl. ¶ 27). RU had not submitted the required documentation at any point before I sued.

RU then repeated this pattern with the New York City Human Resources Administration ("HRA"). In early 2024, I was unemployed and receiving Cash Assistance. (Supp. Decl. ¶ 29). HRA required a landlord letter to process my rent arrears application. I requested that letter from RU's litigation counsel on January 5, 2024, and again on January 16, 2024. (Supp. Decl. ¶ 30, Exhibit I). RU's counsel responded that RU "will not be providing the documents... as there is presently no landlord-tenant relationship between her and the University." (Supp. Decl. ¶ 30, Exhibit I, Page 4). Because RU refused to provide the letter, HRA denied my application. (ECF No. 233-1, pp. 6-7;Supp. Decl. ¶ 31). I requested the documentation again on January 20, 2026, and RU again refused. (Supp. Decl. ¶ 33).

RU cannot now rely on arrears that it deliberately engineered and inflated. A landlord who blocks a tenant's access to government rental assistance, and then uses the resulting arrears as a basis for eviction, is not acting for a legitimate, non-retaliatory reason. The "non-payment" justification is a pretext. Under *Gilead*, this evidence demonstrates that RU's motive in serving the New Notice was retaliation.

### D. <u>The Settlement Negotiations Confirm Retaliatory Intent</u>

RU's decision to seek settlement only after I filed my dispositive motion in Housing Court, and its insistence on a broad release, further confirms its retaliatory motive. On September 19, 2026, RU

proposed a stipulation requiring me to release "any and all claims... from the beginning of the world to the date of this Stipulation." (Supp. Decl. ¶ 51). My counsel negotiated to preserve my federal claims. On September 28, 2026—the same day RU served the New Notice—RU sent a final proposal reinstating the broad release and demanded I sign it within 24 hours. (Supp. Decl. ¶ 53). RU's objective was not to resolve a tenancy dispute; it was to use the Housing Court settlement as a vehicle to strip me of my federal rights.

## II. THE NEW MEDICAL EVIDENCE CONFIRMS ONGOING IRREPARABLE HARM

The harm is not speculative. On September 21, 2026—seven days before RU served the New Notice—I called a triage line reporting "Anxiety and Panic Attack" and was advised to be seen within two weeks. (Supp. Decl. ¶ 64, Ex. K, Pages 5-6). Because I am working two jobs to meet RU's use-and-occupancy demands, I could not attend a daytime appointment. (Supp. Decl. ¶ 61). On October 2, 2026, my treating physician issued an emergency prescription for Sertraline 50 mg daily without an in-person psychiatric evaluation, to stabilize my symptoms. (Supp. Decl. ¶ 65, Ex. K, Pages 7-8). RU's defective petition also forced me to incur $9,776.67 in attorney's fees, which I had to earn by working additional hours because I have no savings. (Supp. Decl. ¶¶ 56, 67-68). This further reduces the time available for the medical care her condition requires.

If RU is permitted to proceed with a new eviction proceeding based on the New Notice, this cycle will restart: emergency housing court appearances, the threat of displacement, and further deterioration of my condition. That harm cannot be remedied by monetary damages after the fact.

## III. THE BALANCE OF EQUITIES FAVORS A STAY

RU's hardship from a short stay is minimal. I have paid use and occupancy under protest throughout the housing proceeding, and I volunteer to continue paying that amount pending resolution of my federal claims. (Supp. Decl. ¶ 47, Ex. J). These payments are made under duress solely to prevent immediate

homelessness while this federal case proceeds; they are not an admission of RU's right to evict me. (Supp. Decl. ¶ 47). Because I am willing to continue paying, any delay in RU's recovery of possession does not impose a financial loss on RU. What remains at stake for me, by contrast, is my home and my psychiatric stability.

## IV. CONCLUSION

For the foregoing reasons, the Court should grant the renewed motion for a preliminary injunction (Dkt. 232), enjoin RU from initiating or prosecuting any eviction proceeding based on the September 28, 2026 Notice, or any future notices, and deny Defendants' Motion to Dismiss (Dkt. 248) in its entirety.

Dated: New York, New York
October 22, 2026

Respectfully submitted,

Dr. Karolina Marciniak-Domingues Goncalves Agra

500 E 63rd St, Apt 13F
New York, 10065 NY
marciniak.kar@gmail.com
(646) 770 2045
PLAINTIFF *PRO SE*